**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Nathan Rapport, and | ) | |
| Radian Industries Inc., | ) | CASE NO. |
| by and through Nathan Rapport, | ) | |
| Authorized Representative, | ) | JUDGE |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Michael Chapiro, | ) | |
| | ) | |
| *Defendant*. | ) | |

# <u>Table of Contents for Complaint</u>

COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Nature of the Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.1. Initial Contact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.2. Roles and Inventorship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.3. Evidence of Founder-Led Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

C. Business Formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.1. ARK Interim Partnership Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.2. Provision for Enhanced Stability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.3. Undisclosed Incorporations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.3.a. Secret Incorporation of Ophanim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.3.b. Backdated Incorporation of Radian Industries . . . . . . . . . . . . . . . . . . . . . 18

    C.4. The Loan and Licensing Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        C.4.a. The Loan Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        C.4.b. The Vacuustat License Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.5. Confidentiality Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.6. Corporate Governorship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.7. Defendant's Concealment of Background and Material Beliefs . . . . . . . . . . . . . . . 23

(i)

  C.7.a.  Admission of Concealment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  C.7.b.  Plaintiffs Were Misled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D. Breaches of Fiduciary Duty and Justification for Dissolution . . . . . . . . . . . . . . . . . . . . . . . . 26

 D.1. Black Lattice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

  D.1.a.  Unauthorized Request For Information Submissions . . . . . . . . . . . . . . . . . . . . . 27

  D.1.b.  Diverted Investment Opportunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

 D.2. Phoenix Dynamics and Black Lattice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  D.2.a.  Board Resolutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  D.2.b.  Phoenix Investment Memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

  D.2.c.  Final Letter of Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

 D.3. Operational Sabotage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

  D.3.a.  Failure to File Federal Grant Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  D.3.b.  Obstructing Technical Work With Excessive Communications . . . . . . . . . . . . . 35

  D.3.c.  Failure to Issue Tax Forms or File Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  D.3.d.  Unauthorized Disclosures of Confidential Information . . . . . . . . . . . . . . . . . . . 37

  D.3.e.  Operational Security Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

 D.4. Investor Sabotage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

  D.4.a.  General Reputational Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

  D.4.b.  Sabotaged Investor Engagement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

E. Post-Dissolution Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

 E.1. Dissolution Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

 E.2. Lockouts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

 E.3. Dissemination of Confidential Material in Violation of ITAR/EAR . . . . . . . . . . . . . . 46

 E.4. Defamation Per Se . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

 E.5. Extortion in Violation of Ohio Rev. Code § 2905.11 (Third-Degree Felony) . . . . . . . . 49

 E.6. Conversion and Fraudulent Conveyance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

 E.7. Trade Secret Misappropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

 E.8. Incorporation of Phoenix Dynamics LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

 E.9. Continuing Misappropriation and Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

F. List of Predicate Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

G. Injury to Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

 G.1. Total Economic Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

 G.2. Ongoing and Future Harm Justifying Declaratory and Injunctive Relief . . . . . . . . . . 67

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

COUNT I:  Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836 . . . . . . . . . . . . . . . . 69

COUNT II:  Violation of the Lanham Act – False Designation of Origin and False Advertising

  (15 U.S.C. § 1125(a)(1)(A)–(B)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

COUNT III:  Violation of the Lanham Act – Cyberpiracy (15 U.S.C. § 1125(d)) . . . . . . . . . . . . 73

COUNT IV:  Violation of 18 U.S.C. § 1962(a) – Investment of Racketeering Income . . . . . . . . 74

COUNT V:  Violation of 18 U.S.C. § 1962(b) – Acquisition or Maintenance of Control Through
Racketeering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

COUNT VI:  Violation of 18 U.S.C. § 1962(c) – Conduct of an Enterprise Through a Pattern of
Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

COUNT VII:  Violation of 18 U.S.C. § 1962(d) – RICO Conspiracy . . . . . . . . . . . . . . . . . . . . . . 80

COUNT VIII:  Violation of Ohio Corrupt Activities Act – O.R.C. § 2923.32(A) . . . . . . . . . . . . . 81

COUNT IX:  Computer Fraud and Abuse Act – 18 U.S.C. § 1030 . . . . . . . . . . . . . . . . . . . . . . . . 83

COUNT X:  Defamation Per Se . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

COUNT XI:  Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

COUNT XII:  Fraudulent Conveyance – O.R.C. §§ 1336.04(A) and 1336.05(A) . . . . . . . . . . . . 89

COUNT XIII:  Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

COUNT XIV:  Civil Theft – O.R.C. §§ 2307.61 and 2913.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

COUNT XV:  Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

COUNT XVI:  Fraudulent Inducement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

COUNT XVII:  Fraudulent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

COUNT XVIII:  Constructive Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

COUNT XIX:  Tortious Interference With Business Relationships . . . . . . . . . . . . . . . . . . . . . . . . 101

COUNT XX:  Misappropriation of Trade Secrets Under OUTSA – O.R.C. §§ 1333.61–
1333.69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

COUNT XXI:  Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

COUNT XXII:  Civil Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

COUNT XXIII:  Declaratory Judgment Under 28 U.S.C. § 2201 and O.R.C. § 2721.03 . . . . . . 108

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

(iii)

# <u>List of Exhibits</u>

**Exhibit A**  Corporate & Governance Documents
    **A1**: Corporate Records
    **A2**: Dissolution
    **A3**: Employment Records
**Exhibit B**  Intellectual Property
    **B1**: Vacuustat Patent
    **B2**: Artifact Patent Pending [SEALED]
    **B3**: Technical Papers [SEALED]
    **B4**: Technical Materials [SEALED]
**Exhibit C**  Communications
    **C1**: Initial Conversations
    **C2**: Screenshots
    **C3**: Corporate Communications
    **C4**: Social Media Posts
    **C5**: Investor Sabotage
    **C6**: Signal Export [SEALED]
**Exhibit D**  Financial Records
    **D1**: Transactions
    **D2**: Receipts
    **D3**: Economic Injury
**Exhibit E**  Enterprise and IP Misappropriation
    **E1**: Enterprise Structure
    **E2**: Post-Dissolution Misconduct
    **E3**: National Security Risk
    **E4**: RFIs [SEALED]

# COMPLAINT

1. Plaintiffs Nathan Rapport and Radian Industries Inc. ("Radian" or "the Company"), by and through its authorized representative Nathan Rapport, bring this action against Defendant Michael Chapiro for violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962), the Defend Trade Secrets Act (18 U.S.C. § 1836), the Computer Fraud and Abuse Act (18 U.S.C. § 1030), the Lanham Act's prohibition on false designation of origin and unfair competition (15 U.S.C. § 1125(a)), and the Lanham Act's cyberpiracy prevention clause (15 U.S.C. § 1125(d)), as well as related and pendent state law claims, and allege as follows:

# PARTIES

2. Plaintiff Radian Industries Inc. is a dissolved Wyoming corporation that had its principal place of business in Cleveland, Ohio. Although the Company has been formally dissolved (see Exhibit A2 — Dissolution), it continues to exist for the purpose of prosecuting and defending legal claims arising from its prior operations, pursuant to Wyo. Stat. § 17-16-1405 and related doctrines of post-dissolution corporate survival. During its active period, Radian engaged in research, development, and early commercialization of advanced inertial navigation and vacuum buoyancy technologies.

3. Plaintiff Radian's representative and authorized signatory in this action is Nathan Rapport, Radian's cofounder, former Chief Technology Officer, Chairman of the Board, and majority

shareholder, with control of two of the Company's three board seats. Plaintiff Rapport is a citizen of the state of Ohio, residing at 1893 W 54th Street, Cleveland, OH 44102.

4. Plaintiff Rapport is the sole inventor of the technologies underlying Radian's core business and retains full intellectual property ownership rights before, during, and after the Company's dissolution. Plaintiff Rapport brings this action in his individual capacity and as the rightful representative of Radian, the dissolved entity.

5. Defendant Michael Chapiro is a former officer of Radian Industries who served as Chief Executive Officer during a portion of the Company's operational period. He was terminated for cause prior to the filing of this Complaint, with written notice delivered to the Company's principal place of business,1893 W. 54th Street, Cleveland, OH 44102, accompanied by a performance review that documented his misconduct (see Exhibit A3 — Employment Records). Defendant was granted a minority interest in the Company although he never purchased any shares, did not contribute to the underlying inventions, and lacked authority to act unilaterally on behalf of the corporation.

6. This action is brought against Defendant Chapiro for acts and omissions undertaken before, during, and after his tenure as CEO of Radian Industries, including in his official role and in his individual capacity.

7. Upon information and belief, Defendant also controls a number of shell companies and coordinated entities through which he continues to misappropriate Plaintiff's corporate assets and intellectual property following the dissolution of Radian. While this complaint does not yet name

2

those individuals or entities as defendants, Plaintiff expressly reserves the right to amend this complaint to include additional parties under theories of conspiracy, civil RICO, and related claims as discovery progresses.

# JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962), the Computer Fraud and Abuse Act (18 U.S.C. § 1030), the Defend Trade Secrets Act (18 U.S.C. § 1836), and the Lanham Act's false designation of origin and unfair competition provisions (15 U.S.C. § 1125(a)). This Court also has jurisdiction under 28 U.S.C. § 1332(a) because, while Plaintiffs are domiciled in Ohio, on information and belief, Defendant is not domiciled in Ohio. In the process of preparing this legal action it has become apparent that Defendant, who has no known permanent residence and relocates approximately every sixty days, has deliberately adopted a nomadic lifestyle to hinder service and evade legal scrutiny, despite possessing the means to live stably. On information and belief, Defendant may reside and may accept mail at 300 Lenora St #787, Seattle WA 98121. The amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has supplemental and pendent jurisdiction pursuant to 28 U.S.C. § 1367 over all related state law claims, including pendent jurisdiction over Plaintiff's claims under the Ohio Corrupt Activities Act, Ohio Revised Code §§ 2923.31–2923.36, as all such claims arise from the

same nucleus of operative fact and form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district, and the Plaintiff's principal place of business and development activities were located in this district during the relevant period. Defendant also designated Plaintiff's Cleveland address as the business location in multiple places, including the federal System for Award Management (SAM.gov), and in the ARK Interim Partnership Agreement, which was the original governing document between the parties (see Exhibit A1 — Corporate Records).

11. As recently as the first half of 2025, Defendant has listed 1893 W. 54th Street, Cleveland, OH 44102—with his name as the point of contact—as the business address for Radian in the System for Award Management (SAM.gov) filings (see Exhibit A1 — Corporate Records). This action constitutes purposeful availment of the forum state, and Defendant should reasonably anticipate being haled into court in this district for conduct undertaken in his corporate capacity on behalf of an Ohio-based company.

## FACTS

12. This case arises from a systematic pattern of racketeering activity executed by Defendant Michael Chapiro, who operates an enterprise, within the meaning of 18 U.S.C. § 1961(4), under the Mach Capital brand for purposes that include intellectual property misappropriation, trade secret

theft, extortion, and unlawful enrichment. Defendant Chapiro's racketeering activity was carried out in coordination with co-conspirators Dylan Tyler Carrington (a/k/a Tyler Carrington) and Kole McGinn, as well as through a web of affiliated shell companies including Phoenix Dynamics LLC, BL Machines LLC (d/b/a Black Lattice), and Advanced Human Engineering LLC (d/b/a Chroma).

## A. <u>Nature of the Action</u>

13. Plaintiff Rapport—an independent inventor with a degree in physics and applied mathematics (see Exhibit A3 — Employment Records)—is the sole inventor of multiple technologies, including two that are directly relevant to this case: a patent-pending precision navigational sensor (see Exhibit B2 — Artifact Patent Pending [SEALED]) based on Doppler-shifting principles (the "Artifact"), and a patented vacuum-lift device (see Exhibit B1 — Vacuustat Patent) enabling persistent high-altitude flight without lifting gas (the "Vacuustat," US10625842B2). Both inventions were the product of over a decade of independent research and development.

14. Defendant Chapiro, on information and belief, is the operator of an apparently unregistered investment vehicle known as "Mach Capital." He approached Plaintiff Rapport and misappropriated his work under the guise of helping secure Phase I/II SBIR/STTR funding and providing strategic guidance.

15. On information and belief, Defendant is an unlicensed lender under Ohio laws (Ohio Revised Code § 1321.02: "No person shall engage in the business of lending money […] without

first having obtained a license from the division of financial institutions under sections 1321.01 to

1321.19 of the Revised Code.").

16. Defendant never made any contribution relevant to inventorship with respect to either

the Artifact or the Vacuustat. Defendant never visited Radian's development site or observed the

Artifact prototype; nevertheless, Defendant exploited Plaintiff's request for advice to initiate a

coordinated campaign of deceit and misappropriation.

17. Defendant's campaign—by himself and through his shell companies and affiliated entities

—included: unauthorized disclosure of Plaintiff's trade secrets to at least one unnamed third

party; false statements on incorporation documents; undisclosed shell entities; fraudulent finan-

cial transactions—including unauthorized self-dealing, embezzlement, conversion, and fraudulent

conveyance; breaches of fiduciary duty; unauthorized federal grant-related submissions that

misappropriated Plaintiff's patented technology and presented it as his own; the attempted unau-

thorized transfer of Plaintiff's intellectual property to entities he exclusively controlled; investor

presentations with investor materials that presented Plaintiff's inventions as Defendant's own;

defamatory communications with financial institutions; unauthorized solicitation of investments

using Plaintiff's work; and spoliation of internal company records, intended to obscure his

misconduct and obstruct Plaintiff's investigation.

18. Shortly after Plaintiff Rapport requested guidance on company formation, Defendant

covertly incorporated a shell company under the name "Radian Industries" using fictitious infor-

mation, a disposable email alias, and a phone number linked to a third party with no known

involvement (see Exhibit A1 — Corporate Records). This secret incorporation violated the terms of an active interim partnership agreement and positioned Defendant as sole incorporator of a company that would later be fraudulently presented as a continuation of the partnership.

19. Over the following months, Defendant systematically positioned himself as the sole authorized party over corporate governance, banking access, and investor relationships. He used a $60,000 loan—funneled through one of his shell companies, in breach of the partnership agreement —as a strategic instrument to gain leverage within the Company (see Exhibit A1 — Corporate Records). Defendant's loan violated Ohio usury laws and was later used as a pretext for unauthorized withdrawals and embezzlement from the Company account.

20. Defendant submitted materials derived directly from Plaintiff's issued Vacuustat patent in an attempt to secure government funding through a separate shell company, BL Machines LLC (d/b/a "Black Lattice"). These materials included technical descriptions corresponding to Plaintiff's patent, and were used to solicit federal funding for Plaintiff's Vacuustat, which Defendant had no legal right to commercialize outside of Radian (see Exhibit E4 — RFIs [SEALED]).

21. Defendant formed a separate entity, Phoenix Dynamics LLC ("Phoenix"), to solicit investments based on Plaintiff's Artifact technology (see Exhibit E1 — Enterprise Structure). Phoenix Dynamics was formed in coordination with Dylan Tyler Carrington (a/k/a Tyler Carrington) and Kole McGinn, who acted as co-conspirators in the misappropriation and commercialization of Plaintiff's work. These activities were carried out without attribution or consent and were designed to strip Plaintiffs of authorship, control, and economic benefit.

22. Upon discovering Defendant's extensive misconduct—including unauthorized incorporations, undisclosed shell entities, misappropriation of intellectual property, and breaches of fiduciary duty—Plaintiff Rapport formally dissolved Radian. Rather than accept the dissolution, Defendant escalated his misconduct: issuing coercive and retaliatory threats, making extortive demands, disputing the legitimacy of the dissolution, making defamatory claims to third parties, misappropriating and disseminating trade secrets, including trade secrets from a folder explicitly labeled "Private," (see Exhibit E2 — Post-Dissolution Misconduct) and ultimately relaunching stolen technology through Phoenix—a Wyoming shell entity (see Exhibit E1 — Enterprise Structure)—in direct defiance of Plaintiff's cease and desist notice.

23. Defendant's actions reflect a coordinated, multi-party racketeering activity under the Mach Capital umbrella, with the intent to extract high-leverage dual-use technologies from inventors—such as Plaintiff—lacking institutional protection. As set forth more fully below, Defendant's operation satisfies the structure, pattern, and enterprise requirements of both the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.) and the Ohio Corrupt Activities Act (Ohio Revised Code §§ 2923.31–2923.36). Plaintiffs assert claims under both statutes and seek both injunctive relief and treble damages accordingly.

## B. Factual Background

24. Plaintiff Rapport is the inventor of the Artifact—a breakthrough inertial rotation sensor (also referred to by the parties as a laser gyroscope) based on Doppler-shifting principles. The

invention builds on years of independent theoretical and experimental research (see Exhibit B3 — Technical Papers [SEALED]), including Plaintiff's peer-reviewed published work on Doppler shift and fringe displacement behavior in interferometric systems.

25. As the inventor of the Artifact technology, and based on the observed performance of the experimental prototype Plaintiff Rapport built and the data he collected (see Exhibit B3 — Technical Papers [SEALED]), Plaintiff Rapport affirms that it falls squarely under Category XII of the United States Munitions List (USML) and constitutes a "defense article" within the meaning of the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 120.6. The Artifact's performance also places it in the "strategic-grade" category of inertial navigation systems — a classification used in the defense and aerospace sectors for devices with accuracy sufficient to guide long-range ballistic missiles, including intercontinental ballistic missiles (ICBMs), as well as nuclear submarines, for extended periods without reliance on GPS or other external signals.

26. Plaintiff Rapport is also the sole inventor of the Vacuustat—a patented vacuum-lift technology with applications in high-altitude defense, telecommunications, persistent sensing, and cost-efficient wind energy (see Exhibit B1 — Vacuustat Patent). Plaintiff Rapport's Vacuustat patent was granted on April 21, 2020, reflecting years of independent work (see Exhibit B1 — Vacuustat Patent).

27. The Vacuustat and Artifact inventions were both wholly conceived, researched, and developed solely by Plaintiff Rapport, without institutional support.

## **B.1.** **Initial Contact**

28. By mid-2024, Plaintiff Rapport had developed the theoretical foundation, concept, and design architecture for the Artifact technology. With the objective of building and commercializing the device, he reached out to Defendant in an email on July 30, 2024, asking for business advice (see Exhibit C1 — Initial Conversations).

29. At the time, Defendant was known as one of the four original cofounders of Mantis Composites, a company specializing in carbon fiber additive manufacturing that had received a government Phase II award and grown to nearly 30 employees.

30. On information and belief, Defendant is also the sole owner of Chroma, a profitable LED light therapy company that generates approximately $3 million per year in revenue.

## **B.2.** **Roles and Inventorship**

31. During their initial discussions (see Exhibit C1 — Initial Conversations), Defendant asked whether Plaintiff Rapport was looking for a cofounder, writing in an email on August 1st, 2024: "Are you looking for a co-founder?"

32. Following correspondence demonstrates that Plaintiff Rapport was bringing Defendant into the project to assist with business development and fundraising rather than contribute to the underlying invention, which had already been conceived by Plaintiff Rapport alone. While Plaintiff Rapport had not originally been seeking a partner, Plaintiff Rapport ultimately proposed a 51/49 equity split in his own favor, with Defendant serving as CEO and Plaintiff as CTO. Under the

10

agreed structure, Plaintiff Rapport was to control two of the Company's three board seats and serve as chairman of the board (see Exhibit C1 — Initial Conversations).

33. Contemporaneous statements also make clear that it was understood by the parties that Plaintiff Rapport would construct the Artifact prototype himself and run validation tests at his own expense before any corporate entity was formed or investment accepted. Defendant declined to take on any financial risk until the concept was proven.

### B.3. Evidence of Founder-Led Work

34. Contemporaneous documentation shows that from late August through December 2024, Plaintiff Rapport maintained an intensive, seven-day work schedule with frequent procurement activity occurring during the late-night and early-morning hours—often between 1:00 AM and 5:00 AM (see Exhibit D2 — Receipts). Plaintiff Rapport spent approximately $14,000 in personal funds to construct the Artifact prototype. During this same period, Plaintiff Rapport incurred a consistent but modest level of personal spending—less than approximately $1,000 per month (see Exhibit D2 — Receipts). Plaintiff's personal spending did not include luxury expenditures or lifestyle excesses; his spending habits were consistent with prioritizing startup survival over personal comfort. Plaintiff's late-night technical labor and seven-day procurement activity, alongside his personal frugality (see Exhibit D2 — Receipts), further distinguishes Plaintiff's behavior from that of a salaried worker or contractor.

35. By contrast, during the months when Plaintiff Rapport was working full-time on proto-typing and experimental development, on information and belief, Defendant was traveling across

Europe for recreational purposes, including extended stays in Spain and Italy for mountain climbing and dining.

36. Defendant's attempt to backdate the founding of Radian Industries to August 27, 2024 —coinciding with his undisclosed incorporation of the business (see Exhibit A1 — Corporate Records)—is a clear attempt to retroactively claim ownership over work he neither funded, directed, nor participated in.

## C. Business Formation

37. Contemporaneous statements make clear that (1) Plaintiff Rapport would conduct experiments independently, (2) Plaintiff Rapport would subsequently file a provisional patent for his Artifact invention, and (3) Plaintiff's invention would be validated solely by Plaintiff Rapport prior to the business formation (see Exhibit C1 — Initial Conversations).

38. Contemporaneous statements (see Exhibit C1 — Initial Conversations) also confirm the parties' mutual understanding that Plaintiff Rapport was the majority owner, technical founder, and board-controlling party.

39. Plaintiff Rapport personally undertook the financial burden and risk of proving the Artifact concept, quitting his job to pursue the project full time—further underscoring that he, not Defendant, assumed the financial burden and responsibility for advancing and de-risking the underlying technology (see Exhibit C1 — Initial Conversations).

## C.1. ARK Interim Partnership Agreement

40. On August 13, 2024, Defendant presented Plaintiff Rapport with an Interim Partnership Agreement under the name "ARK Industries", which both parties signed (see Exhibit A1 — Corporate Records). The agreement designated Plaintiff Rapport as CTO & Founder and Defendant as CEO & Co-Founder, and set forth a clear division of roles: Plaintiff Rapport would lead the technical development of novel technologies, while Defendant would support business and strategic functions. Ownership was allocated 51% to Plaintiff Rapport and 49% to Defendant, with Plaintiff Rapport explicitly granted board control and the title Chairman of the Board.

41. The agreement also included a non-compete clause prohibiting either partner from forming a separate entity in the same domain (see Exhibit A1 — Corporate Records), which stated: "Neither partner will form a separate entity for the purpose of competing in this domain of photonically enabled navigation/positioning systems."

42. Furthermore, the agreement made clear that financial contributions made by either party would be considered of minimal importance in comparison to the value of time and technical expertise contributed, reinforcing that the value of the partnership was to be created through labor rather than capital contributions: "Cash contributions for the purpose of building concept prototypes or various SaaS/web, provisional patent filing, or other expenses shall be seen as de-minimis in comparison to the 'sweat equity' and value of time provided by each partner."

43. The interim agreement also specified that the partnership would transition into a formal corporation within 90 days, along with "bylaws that are reasonable and do not excessively deviate from recognized norms."

## C.2. Provision for Enhanced Stability

44. Contrary to the express terms of the Interim Partnership Agreement, Defendant attempted to insert a provision into the bylaws he presented to Plaintiff Rapport to sign that would have made him virtually impossible to remove as CEO. Although the provision was ultimately removed after Plaintiff Rapport requested its removal, it represents an early, deliberate attempt by Defendant to entrench himself as CEO by stripping the board and majority shareholder of standard oversight rights.

45. This provision, labeled "Section 4.12: Provision for Enhanced Stability," read:

> Section 4.12: Provision for Enhanced Stability. Whereas it is recognized that a CEO is a position with a high rate of removal, which creates an existential risk, removal of the CEO will require both board approval and approval of a 60% majority of stockholders. This rule will supersede all other rules to the contrary and this rule itself will require a 60% majority of stockholder approval to be removed.

46. The "Enhanced Stability" clause would have been unnecessary, indeed, meaningless—if Defendant Chapiro possessed majority equity and board control.

47. Defendant's attempt to surreptitiously insert this provision into the Company bylaws was a bad-faith attempt to alter the fundamental governance of the Company solely for Defendant's

14

benefit. Additionally, the "Enhanced Stability" clause was plainly unreasonable and deviates excessively from recognized norms, and was never adopted in fact by the Company.

## C.3. Undisclosed Incorporations

48. On information and belief, Defendant utilizes the Mach Capital enterprise as a front for national and international intellectual property theft and laundering, financial engineering, governance fraud, and unlawful enrichment—in part by disguising usurious loans as strategic investments, and in part by using interconnected entities intended to misappropriate and monetize technology to which Defendant has no legitimate claim (see Exhibit E1 — Enterprise Structure).

49. Upon information and belief, Defendant never secured external limited partners for Mach Capital. However, he has continued to use the Mach Capital brand to execute so-called "angel investments" and technology acquisitions through a network of personally controlled and affiliated companies, most of which appear to be shell companies that lack independent operations (see Exhibit E1 — Enterprise Structure). These entities include, but are not limited to: Black Lattice, Inc., BL Machines LLC, Advanced Human Engineering LLC (d/b/a "Chroma"), Reflow Labs LLC, Reflow Labs Pte. Ltd. (based in Singapore), Phoenix Dynamics LLC, and Ophanim LLC (FL and WY).

50. Upon information and belief, Defendant's associates include Dylan Carrington and Kole McGinn, who are engineers with whom Defendant works to commercialize the misappropriated intellectual property. Upon information and belief, Dylan Carrington—who also operates under the

alias "Tyler Carrington"—is the beneficial owner of the Ophanim LLC's incorporated in Florida and Wyoming respectively (see Exhibit E1 — Enterprise Structure).

51. Black Lattice, Inc. (CAGE: 89BH2; UEI: SKFPSNPRDRL3) is the parent entity under which three additional entities are grouped.

52. Advanced Human Engineering LLC (CAGE: 8RHQ5; UEI: EWY1D8S12D63), the first entity, doing business as Chroma, lists its corporate website as `https://getchroma.co`.

53. BL Machines LLC (CAGE: 8RHH8; UEI: F9TGVG9MCVT9), the second entity, served as the submission vehicle for multiple federal Requests for Information (RFIs) using Plaintiff's proprietary designs—without attribution, authorization, or consent. These submissions explicitly described, and sought funding for, Plaintiff's patented Vacuustat invention.

54. Reflow Labs LLC (CAGE: 8RDU8; UEI: VH4LD4QLUZF8) is the third entity formally affiliated with Black Lattice, Inc. as an immediate-level offeror in the Defense Logistics Agency's CAGE database. Reflow Labs was incorporated in Delaware on August 20, 2020, just three days after the creation of its foreign counterpart, Reflow Labs Pte. Ltd., incorporated in Singapore on August 17, 2020.

55. Unlike Black Lattice, Reflow Labs was configured to avoid appearing in the SBA's Dynamic Small Business Search (DSBS) database while remaining SAM.gov eligible for defense work. This nonstandard registration pattern across the shell company network controlled by Defendant Chapiro supports a coordinated effort to obscure beneficial ownership, mislead government reviewers, and selectively disclose affiliations.

56. The use of a Singapore-based twin for a U.S. entity involved in defense-adjacent technology raises the specter of unlawful export pathways, ITAR/EAR violations, and potential violations of the Economic Espionage Act. Reflow Labs' inclusion in the Black Lattice web, its dual-national structuring, and its evasive registration profile provide further confirmation that the enterprise was deliberately designed to conceal control, reroute sensitive technology, and facilitate business activity across jurisdictional boundaries.

57. This formal linkage in a federal contracting database reflects an interconnected enterprise structure designed to misappropriate, commercialize, and launder federally sensitive intellectual property. The use of multiple registered entities to obscure beneficial ownership, submit duplicative or misattributed proposals, and reroute financial assets is consistent with the statutory definition of enterprise coordination under 18 U.S.C. § 1961(4).

### C.3.a. Secret Incorporation of Ophanim

58. An anonymous Wyoming entity named Ophanim LLC, which is connected by social media to Defendant's associate, Carrington, was formed on July 30, 2024—the same day Plaintiff Rapport initially contacted Defendant Chapiro regarding company formation advice (see Exhibit E1 — Enterprise Structure). This timing reflects that the Wyoming company was created in direct response to Plaintiff's inquiry and was intended to serve as a vehicle for covert commercial development.

59. Dylan Tyler Carrington (a/k/a Tyler Carrington) is a Florida-based mechanical engineer and software engineer, and operates under the alias "Tyler Carrington." Carrington is listed as the

17

Chief Technology Officer (CTO) of Phoenix Dynamics. Evidence from social media and contact aggregators links Dylan Carrington directly to at least two limited liability companies named Ophanim LLC, one registered in Florida and the other in Wyoming (see Exhibit E1 — Enterprise Structure).

60. The Florida entity, Ophanim LLC, was incorporated on January 26, 2021, and remains active. It is registered at 7901 4th St N, Suite 300, St. Petersburg, Florida 33702 (Document Number: L21000047850; EIN: 86-2180534). This address is in close geographical proximity to Carrington's listed residence in Temple Terrace, Florida, and is commonly used by incorporation services that offer mail forwarding (see Exhibit E1 — Enterprise Structure).

61. In sum, Carrington operates multiple shell companies under the Ophanim brand across jurisdictions, on information and belief, with the intent to obscure his identity and facilitate the misappropriation of Plaintiff's intellectual property.

### C.3.b. Backdated Incorporation of Radian Industries

62. On August 27, 2024, two weeks after signing the ARK Interim Partnership Agreement and in violation of its non-compete clause, Defendant incorporated a new entity, "Radian Industries Inc." in Wyoming. Defendant listed himself as the sole incorporator, used a one-time email alias (wycorp@radianindustries.com), and for his contact information listed a fictitious phone number corresponding to a landline in Colorado. Plaintiff Rapport was unaware of this newly incorporated entity at the time and was omitted entirely from the articles of incorporation (see Exhibit A1 — Corporate Records).

18

63. After Plaintiff Rapport had completed core development work, collected promising data, and demonstrated that his invention's core effects were observable, Defendant placed a document titled Name Change and Incorporation in the shared Company drive. This document claims that the venture had simply changed names—from "ARK Industries" to "Radian Industries"—due to domain name availability (see Exhibit A1 — Corporate Records). Defendant did not disclose that he had already incorporated Radian Industries unilaterally.

64. The Name Change document, dated September 9, 2024, states that Radian Industries had been incorporated in Wyoming "by unanimous agreement of 100% of the owners." However, Plaintiff Rapport never agreed to the incorporation of a new entity in Wyoming prior to the completion of his experimental validation.

65. Additionally, the Name Change document designates Plaintiff's Cleveland address as the principal place of business for hardware operations in corporate documentation related to Radian Industries, stating: "The principal place of business for hardware is: 1893 W 54TH ST, CLEVE-LAND, OH 44102."

66. In addition to attempting to legitimize the unilateral incorporation of Radian Industries, the Name Change document dated September 9, 2024 appears designed to ensnare Plaintiff's intellectual property under a new corporate entity created to predate the period in which Plaintiff Rapport reached a significant development milestone with respect to reducing his invention to practice. By positioning Radian as a continuation of the ARK partnership, Defendant sought to assert ownership over Plaintiff's work without executing a formal assignment or license.

19

## C.4.  The Loan and Licensing Agreements

67.  Around the time of Radian's business formation, Plaintiff Rapport wrote and signed an exclusive license agreement granting Radian the right to commercialize his patented Vacuustat technology, in exchange for Defendant executing a loan agreement to fund further development (see Exhibit A1 — Corporate Records).

### C.4.a.  The Loan Agreement

68. The loan agreement (see Exhibit A1 — Corporate Records) authored by Defendant Chapiro, named Defendant Chapiro personally as the lender and promised a loan of $60,000 to the Company with a fixed 10% interest rate, above the cap authorized under Ohio usury law: Ohio Revised Code § 1343.01, which limits interest rates on personal loans to 8% per annum.

69.  The loan agreement specified that the loan was non-callable, stating: "The loan shall not be callable." Furthermore, the loan was to be repayable only upon the Company generating $700,000 or more in cumulative revenue.

70.  However, the actual loan funds were deposited through a shell company—Advanced Human Engineering LLC—which, based on information from the Defense Logistics Agency (DLA) website and Chroma's website, corresponds to Defendant's LED light therapy company, Chroma. This entity was never disclosed in the loan agreement.

71.  Later, without notice or authorization, Defendant unilaterally withdrew approximately $18,500 of these funds in violation of the loan agreement's terms (see Exhibit D1 — Transac-

tions). Defendant labeled his withdrawal as a loan repayment: "via mercury.com; Returning loan payment." An additional $2,000 of these promised funds were never deposited by Defendant.

72. Additionally, one of the deposits from Defendant's shell company, in the amount of $18,000, was internally labeled to suggest it was payment for "services" that Plaintiff Rapport had neither performed nor authorized (see Exhibit D1 — Transactions).

### C.4.b. The Vacuustat License Agreement

73. The Vacuustat license agreement required Radian to make reasonable, good-faith efforts to commercialize the technology, such as constructing a functional prototype or obtaining a government grant to advance the technology (see Exhibit A1 — Corporate Records).

74. Radian Industries is now a dissolved entity (see Exhibit A2 — Dissolution), and as such, is incapable of fulfilling the commercialization requirement. Pursuant to the commercialization requirement, the contract is now null and void. All rights to commercialization are currently vested in Plaintiff Rapport.

75. No licensing agreement was ever established for the Artifact; Plaintiff Rapport filed the provisional patent for the Artifact solely in his own name and has never assigned it to any entity or person.

## C.5. Confidentiality Provisions

76. In addition to the confidentiality clause in the ARK Interim Partnership Agreement, the Founders Agreement executed by Plaintiff Rapport and Defendant on January 8, 2025 contains a confidentiality clause in Section 13(c), which prohibits either founder (defined in the agreement

as a "Purchaser") from disclosing or using Confidential Information except in the good faith

performance of Company duties (see Exhibit A1 — Corporate Records).

77. The Founders Agreement defines Confidential Information in section 9(b) as follows:

> "Confidential Information" means any information of a confidential or secret
> nature that may be disclosed to Purchaser by or on behalf of the Company
> or any of its Affiliates that (a) relates to the business of the Company, its
> Affiliates, its customers and suppliers, as well as other entities or individuals
> on whose behalf Purchaser or the Company has agreed or may, during the
> Continuous Service Status, agree to hold information in confidence or (b) is
> otherwise produced or acquired by or on behalf of the Company or any of its
> Affiliates ("Confidential Information"). Confidential Information includes, in
> addition to the information itself, all files, letters, memoranda, reports, records,
> data or other written, reproduced or other tangible manifestations of the
> Confidential Information (whether written, printed or otherwise reproduced
> or recorded), whether created by Purchaser or others, to which Purchaser has
> access during Continuous Service Status.

78. On April 10, 2025, the Radian Industries Board of Directors passed a formal resolution

reaffirming strict confidentiality obligations and limitations on authority (see Exhibit A1 —

Corporate Records). This resolution, signed by Plaintiff Rapport as Chairman, was binding on

Defendant and clearly prohibited unilateral disclosures of sensitive material to third parties. Section

7 of that resolution stated:

> All officers and directors are reminded that Company information is confiden-
> tial and may not be disclosed to outside parties without explicit authorization.
> This includes discussions related to unannounced products, inventions, fund-
> ing strategies, partnerships, and internal deliberations.

79. Subsequently, Defendant made unauthorized disclosures of the Company's technology to

U.S. defense personnel, despite Plaintiff's insistence that an NDA be signed (see Exhibit C6 —

22

Signal Export [SEALED]). These disclosures violated the April 10 board resolution as well as the confidentiality provisions of the Founders Agreement.

## C.6. Corporate Governorship

80. The ARK Interim Partnership Agreement, signed by both parties on or about August 13, 2024, confirms Plaintiff Rapport's controlling ownership and governance authority (see Exhibit A1 — Corporate Records), reflecting the formalization of the roles and ownership structure that had already been agreed upon via email, and establishing that Plaintiff Rapport retained controlling equity and board authority from inception.

81. The Name Change document affirms that Radian was a direct continuation of ARK—thereby preserving Plaintiff's 51% controlling ownership and board majority under the terms of the signed ARK Interim Partnership Agreement.

82. The Founders Agreement for Radian Industries Inc., included in the Company's official corporate records and signed by both parties, explicitly documents Plaintiff Rapport's majority equity position.

## C.7. Defendant's Concealment of Background and Material Beliefs

83. Defendant Chapiro presents himself as a world-class technologist and fundraiser. On LinkedIn (see Exhibit A3 — Employment Records) he writes, "My work underpins major subsystems across the West's hypersonic weapons, strategic re-entry vehicles, and missile interceptors," and he describes himself as the "Inventor/developer of the world's most bleeding edge materials

and manufacturing capabilities." He highlights patents at Mantis Composites and boasts that his company Black Lattice was the "fastest ever company founding to Air Force contract awarded at 3.5 weeks". In early conversations he represented to Plaintiff Rapport that he had left Cal Poly in good standing to pursue opportunities at Mantis. He also promised to take on business development, grant-writing, and government interfacing, to build an advisory board, to explore both commercial and defense markets, and to cover initial hardware costs until external funding was reached. His representation was that by partnering with him, Plaintiff Rapport would gain credibility, rapid funding, and access to defense opportunities.

84. In reality, Defendant Chapiro left Cal Poly on academic probation (see Exhibit C4 — Social Media Posts). His patents at Mantis list three other inventors, raising doubts about his personal contributions, and his role in Mantis's Phase II SBIR awards is unclear—these awards appear to have been granted only in the past two years, well after his unofficial departure from Mantis. While he bragged of lightning-fast Black Lattice funding, at Radian he delivered none of the same: eight months passed without external funding, he refused to write grants after Plaintiff Rapport produced compelling experimental results,[1] and he produced no market strategies beyond repeating "hyper-sonics."[2] He never formed an advisory board, he misused the Company's loan funds, he diverted his efforts and Plaintiff Rapport's IP into his own shell entities, and he nevertheless sought to entrench

---

[1] He responded to Plaintiff Rapport's request to write grants (see Exhibit C6 — Signal Export [SEALED]) by complaining that this was akin to Plaintiff Rapport behaving "like a soviet union bureaucrat bolting on blocks of iron to 'produce' more weight."

[2] After the Company's dissolution he wrote, "I am shifting my perspective towards subs being the place to go, which I recall you liked due to the low vibration environment" (see Exhibit E2 — Post-Dissolution Misconduct), demonstrating that even after eight months he had not produced any genuine market strategies, and was simply recycling scraps of information he recalled from his initial conversations with Plaintiff Rapport.

himself through a pattern of inducement (promising fair bylaws) and subversion (sneaking in an entrenchment clause)—revealing, in retrospect, that far from being an indispensable asset, he anticipated Plaintiff Rapport would later have good cause to want him removed.

85. Defendant has, through pseudonymous X account under the handle @DeltaClimbs, publicly and repeatedly denied the legitimacy of intellectual property, comparing it to violent theft and calling for its abolition. Defendant's statements—far from being academic or abstract philosophical positions—are explicitly hostile, vulgar, and framed in a context of refusal to recognize intellectual as real, enforceable, or morally valid. These statements, spanning from August 2023 to June 2025 in dozens of posts, provide clear evidence of animus toward the concept of intellectual property, including the rights Plaintiff Rapport holds over his patented technology (see Exhibit C4 — Social Media Posts).

86. Defendant's positions and statements, made under the pseudonymous handle @DeltaClimbs, were never disclosed by Defendant and were not discoverable through any reasonable due diligence.

### C.7.a. Admission of Concealment

87. In a March 3 post on his pseudonymous X account (see Exhibit C4 — Social Media Posts), Defendant admitted that "I wasn't pointing [my Twitter] out" to Plaintiff Rapport.

### C.7.b. Plaintiffs Were Misled

88. Plaintiffs reasonably relied on Defendant's representations about his background and his apparent alignment with Plaintiff's business goals during the initial formation period, assuming

shared respect for legal protections underpinning the commercialization of high-impact inventions. Had Defendant's views been disclosed, Plaintiff Rapport would not have agreed to form a company with Defendant, nor grant Defendant any equity, nor grant him any access to his proprietary, patent-protected technology or trade secrets.

## D. Breaches of Fiduciary Duty and Justification for Dissolution

89. Under Wyoming law, corporate officers, directors, and managing members owe fiduciary duties to the company and to one another, including the duty of care, the duty of loyalty, and the obligation to act in good faith. Defendant's breaches of these obligations—particularly those involving concealment, deception, or misuse of insider knowledge—are sufficient under Wyoming law to justify dissolution or other equitable remedies.

### D.1. Black Lattice

90. Defendant operated a parallel venture, "Black Lattice" (BL Machines LLC, CAGE: 8RHH8), to misappropriate Plaintiff's Vacuustat and navigation IP (see Exhibit E1 — Enterprise Structure). Without authorization, he filed at least three federal Request For Information (RFI) responses copying Plaintiff's patented "star/suspension-bridge" architecture and seeking over $500 million in funding for Black Lattice while concealing Plaintiff's inventorship (see Exhibit E4 — RFIs [SEALED]).

91. In April 2025, Defendant mass-solicited VCs without naming Radian or Plaintiff, improperly touted an MDA (Missile Defense Agency) engagement with Radian, and then diverted a

scheduled April 17 Khosla Ventures meeting—secured by pitching Plaintiff Rapport's technology —to solicit investment for Plaintiff Rapport's technology through his own venture, Black Lattice (see Exhibit C3 — Corporate Communications).

92. As set forth more fully below, these acts breached fiduciary duties and usurped corporate opportunities, and by deceiving the U.S. Government and investors implicate the False Claims Act (31 U.S.C. § 3729) and federal fraud statutes (18 U.S.C. §§ 1001, 1031, 1343), supporting claims under RICO, the DTSA, and unjust enrichment.

### D.1.a.  Unauthorized Request For Information Submissions

93. Without Plaintiff's knowledge or consent, Defendant Michael Chapiro submitted at least three federal Request for Information (RFI) responses in late 2024 and early 2025, including responses to the Missile Defense Agency's 2045 Threat RFI (see Exhibit E4 — RFIs [SEALED]).

94. These submissions explicitly describe technologies based on Plaintiff Rapport's patented Vacuustat invention—U.S. Patent No. 10,625,842—despite Defendant's full knowledge that Plaintiff Rapport is the sole inventor and rightful owner of the intellectual property (see Exhibit C1 — Initial Conversations).

95. In his February 27, 2025 submission to the Missile Defense Agency's 2045 Threat RFI, Defendant outlined a multi-phase development roadmap requesting in excess of $500 million in federal funding under the name of his newly formed entity, Black Lattice (BL Machines LLC). These monetary figures demonstrate not only the seriousness of the submission but also the extent

to which Defendant attempted to commercialize Plaintiff Rapport's invention on a massive scale —without attribution, authorization, or a licensing agreement.

96. Defendant nonetheless submitted RFI materials to the U.S. Government falsely presenting Plaintiff Rapport's "star" design as a novel architecture developed by BL Machines LLC.

97. At the time that Defendant presented Plaintiff Rapport's novel 'star' architecture as his own to the federal government, he was the CEO of Radian Industries and had access to Plaintiff Rapport's proprietary technical design materials related to the Vacuustat, including calculations and CAD files.

### D.1.b. Diverted Investment Opportunity

98. On or about April 11, 2025, Defendant circulated a mass fundraising email to venture capital firms under the subject line "We'll Own Golden Dome Strategic Missile Defense & Outpace AT&T+Starlink in Telecom." This message was sent during a period in which Defendant was publicly representing Radian Industries (see Exhibit C3 — Corporate Communications).

99. Although Defendant expressed to Plaintiff Rapport that the email was intended to solicit $50–100 million in funding for Radian Industries, Defendant made no mention of the Company's name, its corporate structure, or the name of its technical founder (Nathan Rapport). As a result, investors receiving the email had no way to verify the legitimacy of the venture, conduct independent diligence, or communicate directly with Plaintiff Rapport, the inventor responsible for the underlying technology. The email included valuation claims ("$100b private val in 10 years, $1t public val in 15 years") and disclosed a sensitive engagement with the Missile Defense Agency

("we were recently selected by the Missile Defense Agency for Golden Dome Industry Day one-on-one meetings")—a real event that Defendant had no authorization to publicize.

100. Defendant secured a follow-up meeting with Khosla Ventures after his April 11 fundraising outreach. The April 17, 2025 meeting was scheduled on the basis of Plaintiff Rapport's inventions and related innovations, which were the sole technologies pitched in Defendant's email.

101. On April 16—one day before the scheduled pitch—Plaintiff Rapport sent an email to Khosla Ventures with a link to his patent in the very first sentence (see Exhibit C3 — Corporate Communications). In this message, Plaintiff Rapport clarified his role at Radian Industries as the inventor and technical lead behind the technologies Defendant had pitched in his email, and outlined the licensing and corporate structure designed to ensure long-term continuity, stability, and commercial scalability. However, Plaintiff Rapport received no response from Khosla, which was particularly troubling given that the meeting was premised on Plaintiff Rapport's patented and patent-pending technologies.

102. On April 17—the day of the meeting—rather than pitch Radian Industries to Khosla, Defendant diverted the opportunity, instead pitching Plaintiff Rapport's technology through his own separate entity, Black Lattice, without Plaintiff Rapport's consent (see Exhibit C2 — Screenshots). This bait-and-switch diverted a major funding opportunity—potentially worth $50–100 million—away from Plaintiff Rapport's invention and toward Defendant's own self-serving venture.

103. In Defendant's investor presentation of Black Lattice, Defendant presented Plaintiff Rapport's inertial technology as his own, without attribution—even including a captioned picture

of Defendant's experimental prototype in his pitch deck (see Exhibit E1 — Enterprise Structure). Defendant's decision to proceed under a misleading narrative damaged Plaintiffs by causing reputational damage, and foreclosed a viable funding opportunity for Radian.

## D.2. Phoenix Dynamics and Black Lattice

104. Around early April 2025, Defendant Michael Chapiro began promoting a new venture under the name Phoenix Dynamics, which—based on contemporaneous statements—he had not yet incorporated. Defendant positioned himself as CEO of this new company and brought in a purported CTO, Tyler Carrington, to lead the technical side.

105. Defendant has admitted in contemporaneous statements that Phoenix Dynamics and Black Lattice were functionally interchangeable entities (see Exhibit C2 — Screenshots).

### D.2.a. Board Resolutions

106. On April 10, 2025, Plaintiff Rapport—acting in his capacity as Chairman of the Board and majority director of Radian Industries—formally enacted two binding governance resolutions designed to address mounting concerns over Defendant's Phoenix Dynamics activities: a Conflict of Interest Policy and a Board Resolution on Strategic Authority and Related-Party Transactions (see Exhibit A1 — Corporate Records). These policies were intended to safeguard the Company's independence, protect its intellectual property, and prevent divided loyalties at the leadership level.

107. The Conflicts of Interest Policy specifically barred any individual from "Founding, cofounding, or maintaining a material stake in any outside entity that engages in business, research, development, or fundraising in an area related to or overlapping with the Company's

core technologies, customers, or mission." Defendant violated this policy by cofounding Phoenix Dynamics.

108. The Conflicts of Interest Policy imposed an "Absolute Prohibition on Conflicts of Interest," stating: "No officer, director, or full-time contributor of the Company may maintain any disclosed or undisclosed conflict of interest with respect to the Company's mission, operations, intellectual property, strategy, or competitive landscape."

109. The Conflicts of Interest Policy also prohibited "Using Company resources, knowledge, or confidential information to benefit another organization."

110. Furthermore, the Conflicts of Interest Policy prohibited "Creating external obligations or loyalties that may influence or appear to influence actions taken on behalf of the Company." Regarding enforcement, the resolution reserved the right to "Revoke access to Company information, systems, or operations" to individuals acting in violation of the policy.[3]

111. Plaintiff Rapport's April 10, 2025, binding Board Resolution on Strategic Authority and Related-Party Transactions restricted Defendant's ability to make unilateral strategic commitments on behalf of the Company. The resolution on Strategic Authority also barred all revenue-sharing agreements, related-party transactions, and the issuance of equity or convertible instruments without board approval.

---

[3]In accordance with this policy, Plaintiff Rapport later removed Defendant's access to the Private folder in the shared Company drive containing Plaintiff Rapport's trade secrets, following Radian's dissolution.

112. Furthermore, the resolution's strategic delegation clause specified that "No individual may represent the Company in discussions with investors, media, government, or other institutions in a manner that binds or commits the Company without prior authorization."

113. As set forth more fully below, Defendant violated the Plaintiff Rapport's Conflict of Interest Policy by attempting to create an exclusive licensing and revenue-sharing arrangement between Radian and Phoenix. Defendant also violated this policy by stealing trade secrets from Radian with the intention of benefiting his own companies, including Phoenix. Defendant's investor outreach and licensing discussions on behalf of Phoenix, conducted in parallel with his role at Radian, also violated the foregoing strategic delegation clause (see Exhibit E1 — Enterprise Structure).

### D.2.b. Phoenix Investment Memo

114. Without Plaintiff Rapport's knowledge or consent, Defendant circulated an investment memo (see Exhibit E1 — Enterprise Structure), dated April 4, 2025, which presented the proprietary gyroscopic invention as Phoenix's own asset, despite the fact that no license, assignment, or authorization had ever been granted. The proprietary gyroscopic technology described in the Phoenix investment memo was the Artifact, which was invented solely by Plaintiff Rapport, had never been assigned to Phoenix Dynamics, and remained entirely under Plaintiff Rapport's ownership. At no point did Defendant seek permission to represent Plaintiff's invention as Phoenix's property, and in his investment memo he did not disclose that the technology originated outside Phoenix Dynamics and had not been legally licensed.

### **D.2.c.** **Final Letter of Intent**

115. On or about April 13, 2025, Plaintiff Rapport informally proposed a corporate restructuring whereby he would purchase Defendant's remaining shares in Radian Industries, thereby removing Defendant from the Company, in exchange for a licensing agreement between Radian Industries and Phoenix Dynamics. This restructuring was never agreed to or adopted by the parties but the resulting letters of intent (LOIs) drafted by Defendant demonstrate his desire to undermine the fundamental tenets of the Radian corporate organization.

116. The eighth clause of Defendant's proposed LOI violated multiple standing Company board resolutions and Radian's adopted Conflict of Interest Policy. This clause would have explicitly allowed Defendant to form outside companies that could act as customers of Radian Industries.

## **D.3.** **Operational Sabotage**

117. Defendant abandoned his core CEO duties at Radian and actively impeded operations. He refused to draft or file federal grant applications despite having the data, mocked requests to pursue SBIR/NSF funding and redirected effort toward a competing venture (see Exhibit C2 — Screenshots). Defendant flooded Plaintiff Rapport with round-the-clock, unstructured Signal messages—including late-night bursts—disrupting R&D (see Exhibit D2 — Receipts). Defendant neglected basic compliance by failing to file the corporate tax return (Form 1120) or issue required W-2/1099s, and later cut off access to the Company bank account, exposing Plaintiffs to avoidable tax risk (see Exhibit C2 — Screenshots). He breached confidentiality by leaking a "Private" folder post-dissolution and by sharing sensitive technical details with defense personnel without NDAs,

contrary to the Founders Agreement and Board restrictions (see Exhibit E2 — Post-Dissolution Misconduct). He further created OPSEC/export-control risk by transmitting dual-use technical information to the MDA from Mexico without utilizing secure channels (see Exhibit C4 — Social Media Posts).

### D.3.a. Failure to File Federal Grant Applications

118. One of the primary reasons Plaintiff Rapport brought Defendant into the venture was Defendant's prior experience securing federal grants, particularly through programs such as the NSF SBIR. As CEO of Radian Industries, Defendant's core responsibilities included assisting in the preparation and submission of grant materials, positioning the Company for non-dilutive funding, and presenting a credible founding team to government reviewers. These responsibilities were delineated in the Roles and Responsibilities document. Defendant explicitly acknowledged receiving this document and agreed to its terms.

119. By the end of February 2025, Plaintiff Rapport had successfully completed multiple rounds of experimental testing and data processing, yielding highly promising results (see Exhibit B3 — Technical Papers [SEALED]). At this point, the Company had the necessary technical foundation to pursue competitive grant funding. However, despite repeated requests, Defendant failed to provide any draft or response to indicate that any progress on preparing applications had been made. Despite having access to figures of processed data, underlying theory and calculations, and Plaintiff Rapport's write-up of his experimental apparatus and procedure, Defendant took no concrete steps to submit proposals on behalf of Radian Industries during this critical period.

120.  Gradually, it became apparent that Defendant's failure to submit grants was not a temporary delay, but a willful abdication of duty. Rather than fulfilling his obligation to advance Radian's funding prospects, Defendant diverted his time and attention toward launching Phoenix Dynamics instead. This shift in focus not only deprived Radian of critical funding opportunities, but also demonstrated Defendant's intention, in direct contravention of his fiduciary obligations, to commercialize Plaintiff Rapport's technology through an entity he controlled exclusively.

121. On April 7, 2025, Plaintiff Rapport explicitly raised this issue, suggesting that the Company submit additional Phase I grant applications to secure early-stage funding. Plaintiff Rapport reiterated this request again in a phone conversation on April 10, 2025, urging Defendant more firmly to begin preparing grant materials incorporating the newly processed data. Despite having previously emphasized the importance of federal grants and credible team presentation, Defendant refused to file the Phase I grant applications. Defendant's refusal to act, paired with Defendant's single-minded focus on launching a competing enterprise, demonstrated that Defendant had deprioritized Radian's success in favor of ventures under his exclusive control.

122. Later correspondence confirms that while Defendant refused to attempt to secure government funding on Radian's behalf, he intended to unjustly enrich himself (or other corporate entities exclusively controlled by him) with Plaintiff Rapport's work for his own benefit.

### D.3.b. Obstructing Technical Work With Excessive Communications

123. The pattern and volume of Signal messages initiated by Defendant throughout April 2025 constituted a sustained interference with the technical operations of the business (see Exhibit D2

— Receipts). Despite repeated requests to consolidate communications and respect working time boundaries, Defendant persisted in a high-frequency, unstructured messaging pattern that demonstrably impaired the ability of the Company's sole inventor to conduct uninterrupted research and development.

### D.3.c. Failure to Issue Tax Forms or File Taxes

124. Defendant, as CEO, was tasked with executive functions such as financial oversight, tax compliance, grant strategy, and corporate governance. Despite this formal division of roles, Defendant repeatedly failed to carry out even the most basic administrative responsibilities. This included failing to file the corporation's annual income tax return (Form 1120), as well as failing to issue IRS-mandated income reporting documents such as Form W-2 or Form 1099 for payments made to Plaintiff Rapport (see Exhibit C2 — Screenshots).

125. In one contemporaneous exchange, Plaintiff was forced to remind Defendant of the corporation's obligation to file Form 1120 with the IRS, and to explain the importance of recording deductible expenses for 2024 (see Exhibit C2 — Screenshots).

126. During this same period, the Company made salary payments to Plaintiff Rapport without issuing any required tax reporting documents, including Form W-2 or 1099. These omissions violated statutory IRS requirements for income reporting and left Plaintiff Rapport unable to accurately file personal tax returns. Defendant's failure to fulfill his core executive duties (or to even understand their basic requirements) defined under both state corporate law and federal law may have exposed Plaintiffs to avoidable tax compliance risk.

127. Moreover, following Plaintiff Rapport's lawful dissolution of the Company, Defendant unilaterally revoked Plaintiff Rapport's access to Radian's Mercury business account, despite Plaintiff Rapport's need for this information to complete final tax documentation and ensure regulatory compliance. This obstruction was particularly egregious given Defendant's prior failures to carry out these responsibilities himself.

### D.3.d. <u>Unauthorized Disclosures of Confidential Information</u>

128. Defendant's unauthorized disclosure of the folder labeled "Private" following the Company's dissolution (see Exhibit E2 — Post-Dissolution Misconduct) constitutes a clear breach of fiduciary duty and a violation of his ongoing contractual obligations under the Founders Agreement and Radian's board resolutions, which required confidentiality.

129. Section 13(c) of the Founders Agreement, signed by both parties on January 8, 2025, contains a broad confidentiality clause prohibiting either founder (defined as a "Purchaser") from disclosing or using any Confidential Information, "either during his Continuous Service Status with the Company and its Affiliates or thereafter," except in the good faith performance of Company duties. This obligation explicitly survives the end of service and, by extension, the Company's dissolution.

130. Defendant also made multiple unauthorized disclosures of sensitive technical information to U.S. defense personnel during his service to the Company, including individuals affiliated with the Naval Surface Warfare Center (NSWC) and the Submarine-Launched Cruise Missile–Nuclear (SLCM-N) program (see Exhibit C6 — Signal Export [SEALED]). These disclosures occurred

after Plaintiff Rapport explicitly warned Defendant not to share proprietary information without an NDA in place, and further demonstrated a reckless disregard for Plaintiff Rapport's proprietary rights and Radian's governance procedures.

131. Defendant's decision to leak Plaintiff Rapport's confidential trade secrets—after the Company had been lawfully dissolved and after Plaintiff Rapport's explicit instructions not to share proprietary information—violated both his fiduciary duty as an officer and director and his post-dissolution contractual obligations as a signatory to the Founders Agreement.

### D.3.e. Operational Security Risks

132. On or about February 9, Defendant transmitted Plaintiff Rapport's export-sensitive technical information relating to Plaintiff Rapport's dual-use defense technology to the Missile Defense Agency while physically located in Mexico, without the use of a secure VPN or encryption protocols (see Exhibit C4 — Social Media Posts).

133. Defendant's strategic outreach to jurisdictions known for weak IP enforcement and adversarial regulatory postures further compounded the risk to U.S. national security. These include direct attempts to contact the President of El Salvador (and most recently, the president of Argentina), offers to assist in missile defense and nuclear development abroad, and coordination with foreign entities such as Tether. Recently, Defendant met with the Argentine Ministry of Defense. Defendant's own posts also document his smuggling, fabrication, and attempted distribution of export-controlled materials—high-modulus carbon fiber from Japan in particular

—without appropriate licenses, oversight, or regard for legal consequences (see Exhibit E3 —
National Security Risk).

## D.4. Investor Sabotage

134. During the Company's operation, Defendant engaged in a sustained pattern of reputational
sabotage that formed part of a broader scheme to obtain control over the Company through coercive
and fraudulent means (see Exhibit C5 — Investor Sabotage). His public hostility toward prominent
investors served a calculated and deliberate purpose: by alienating respected institutions and
undermining the Company's public credibility, Defendant effectively foreclosed Plaintiffs' access
to external capital. This purposeful misconduct positioned Defendant as the sole viable source of
financial support, enabling him to consolidate disproportionate control over the Company and its
direction.

135. In executing this scheme, Defendant repeatedly attacked prominent investors and start-
up accelerators—individuals and institutions who might otherwise have been receptive to Plaintiff
Rapport's venture—using profanity, slurs, and incoherent tirades broadcast under his pseudony-
mous identity.

136. Chapiro actively and repeatedly associated his pseudonymous account with Rapport's
real name by publicly retweeting Rapport's posts and referring to Rapport's handle (@nmrapport)
by name. This occurred in more than a dozen instances, effectively linking Rapport's real-world
reputation to the content and tone of Chapiro's pseudonymous account (see Exhibit C4 — Social
Media Posts).

137. Defendant's actions not only embarrassed Plaintiff Rapport, but caused lasting reputational damage, and made third-party fundraising materially more difficult, if not impossible. The result was predictable and intended: with investor goodwill eroded and institutional funding paths closed off, Defendant positioned himself as an indispensable gatekeeper to capital—setting the stage for later attempts to assert unilateral control and divert company resources for personal or affiliated use.

### D.4.a. General Reputational Harm

138. As a cofounder of Radian, Defendant owed Plaintiffs fiduciary duties of loyalty, good faith, and full disclosure of material risks.

139. The `@DeltaClimbs` account—containing over 50,000 posts and over 5,000 followers—is a high-visibility public profile reflecting an active and long-standing online presence characterized by controversial ideological content, erratic tone, and frequent attacks on institutions, political groups, and public figures. By omitting this information while inducing Plaintiffs into a business relationship, Defendant deprived Plaintiffs of the opportunity to assess reputational risk and to make an informed decision about public alignment.

140. The existence and nature of Defendant's profile constituted a material fact that a reasonable cofounder should have disclosed prior to Defendant's engagement. Defendant's failure to disclose the existence of his pseudonymous social media profile (`@DeltaClimbs`) prior to associating it with Plaintiff Rapport's real-world identity constitutes a breach of his fiduciary obligations to Radian.

141. Once Defendant began tagging Plaintiff Rapport's handle and publicly promoting Plaintiff Rapport's posts from the @DeltaClimbs account (see Exhibit C4 — Social Media Posts), he converted what had been a concealed reputational risk into a deliberate public association. In so doing, Defendant unilaterally exposed Plaintiff Rapport to reputational harm that he himself sought to avoid by operating under a pseudonym—thereby placing the burden of public consequences on Plaintiff Rapport without consent or reciprocal accountability. This conduct violated the trust inherent in the cofounding relationship and contributed to tangible reputational damage, particularly in professional and investor-facing contexts.

142. Defendant's posts under the @DeltaClimbs account included statements that were inflammatory, offensive, and politically extreme. These included homophobic remarks, disparaging comments about retirees, repeated calls to repeal the 1964 Civil Rights Act, a demand to abolish the Equal Employment Opportunity Commission (EEOC), and statements fantasizing about political violence and mass death to facilitate political change (see Exhibit C4 — Social Media Posts). These posts signaled to the public, potential investors, and institutional partners that the Company or its leadership supports or tolerates overtly offensive conduct. The perception created by such language is damaging and likely to alienate key stakeholders, trigger regulatory or contractual scrutiny, and jeopardize future business opportunities—particularly in sectors where professionalism, trust, and nondiscrimination are essential. Defendant's conduct exposed the Company to reputational and legal risk, including possible exclusion from government programs, partner termination, or investor divestment.

143. Plaintiff Rapport raised concerns about Defendant's inflammatory social media content on multiple occasions, both publicly and privately (see Exhibit C2 — Screenshots). Defendant nevertheless continued his conduct and did not resolve this issue.

### D.4.b. Sabotaged Investor Engagement

144. On August 21, 2024—several weeks after Plaintiff Rapport and Defendant formally agreed to co-found Radian Industries—Defendant sent a hostile and erratic email to Vinod Khosla, one of the most prominent venture investors in the defense and advanced hardware ecosystem (see Exhibit C3 — Corporate Communications). The email contains multiple personal attacks against respected figures in the industry.

145. Rather than using his interaction with Khosla Ventures as a high-value opportunity to professionally represent the interests of the newly formed company, Defendant insulted his potential investors and solicited investment in his venture capital fund (Mach Capital) for his own personal enrichment.

146. Defendant's conduct constitutes a clear example of usurpation of corporate opportunity and self-dealing. At a moment when Defendant had a fiduciary duty to prioritize the fundraising and strategic prospects of Radian Industries, he instead used his limited access to Khosla to advance a separate fund concept for his sole benefit. Defendant's actions undermined one of the Company's most important potential investor relationships while simultaneously pitching a vehicle over which Plaintiffs would have had no ownership, control, or benefit.

147. Plaintiff Rapport was not informed that this email had been sent at the time, and only later discovered its contents during a post-dissolution review of Defendant's social media.

148. Defendant's actions were not accidental or misunderstood. Rather, Defendant intentionally sought to damage key investor relationships, took pride in his conduct, and chose to make the episode public in a way that directly implicated the reputation of the venture he was representing. His conduct was reckless, malicious, and fully aware of the damage it would cause—not only to the investor relationship in question, but to Plaintiff Rapport's overall professional credibility and fundraising capacity.

## E. Post-Dissolution Misconduct

149. On April 29, 2025, recognizing the trajectory of Defendant's conduct and the growing legal risk, Plaintiff Rapport formally dissolved the Company. As part of this process, Plaintiff Rapport offered the remaining corporate funds (approximately $18,500) in the corporate Mercury bank account back to Defendant and provided an optional acknowledgment and release of liability form (see Exhibit A2 — Dissolution), intended to "help formally document that the financial obligations between you and Radian Industries have been fully satisfied."

150. Defendant never signed the acknowledgment, and did not withdraw the funds at that time. Instead, he responded by disputing the validity of the dissolution, declaring he would continue commercializing the technology regardless. He falsely accused Plaintiff Rapport of theft, claimed ownership of all Company assets—including intellectual property and equipment—and

unilaterally asserted that he had "repurchased" Plaintiff Rapport's founder shares, despite having no authority or legal basis to do so (see Exhibit E2 — Post-Dissolution Misconduct).

151. On information and belief, Defendant secretly maintained a falsified, parallel set of corporate documents purporting to show himself as 100% owner of Radian Industries. These materials may have included a separate checking account and unilaterally issued equity inconsistent with the actual governance records, providing a plausible reason for Defendant to reject Plaintiff Rapport's offer.

## E.1. Dissolution Process

152. On April 29, 2025, Plaintiff Rapport signed a formal board resolution and uploaded it to the board resolutions directory in the shared corporate Google drive, authorizing the dissolution of Radian Industries Inc (see Exhibit A2 — Dissolution).

153. Plaintiff Rapport also completed the "Articles of Dissolution by Shareholders" form provided by the Wyoming Secretary of State and mailed the filing, along with the required $60 check, to the Secretary of State's office. Bank records show that this check was deposited and posted on May 13, 2025, confirming official receipt (see Exhibit A2 — Dissolution).

154. That same day, Plaintiff Rapport notified Defendant via both Signal and email that the Company had been dissolved (see Exhibit A2 — Dissolution).

155. Plaintiff Rapport further informed Defendant by email that the Company's remaining funds—approximately $18,500 —were still in the Mercury corporate account, and that Defendant was authorized to withdraw the funds directly at that time. A voluntary acknowledgment form was

44

attached, offering Defendant the opportunity to formally confirm that financial obligations had been satisfied (see Exhibit A2 — Dissolution).

156.   This process reflects a lawful and properly executed voluntary dissolution under controlling shareholder authority. It was conducted transparently, with formal documentation, due process, and good faith notice.

## E.2. Lockouts

157. Following the dissolution, Defendant unilaterally revoked Plaintiff Rapport's access to the corporate Gmail account, locking Plaintiff Rapport out of essential project files, communications, and documents—including nearly all mutually signed agreements except the ARK Interim Partnership Agreement (see Exhibit E2 — Post-Dissolution Misconduct). This obstruction interfered with Plaintiff Rapport's ability to preserve or even review corporate records.

158.   Sometime between May 9th and May 16th, 2025, after receiving a cease-and-desist and subsequently emptying the corporate Mercury bank account, Defendant also locked Plaintiff Rapport out of the Mercury bank account.

159.   Defendant's lockouts not only interfered with Plaintiff Rapport's ability to preserve and review corporate records in anticipation of foreseeable legal action, but also constituted three independent predicate acts under 18 U.S.C. § 1512(c). By corruptly concealing and rendering unavailable the corporate Gmail account—including corporate agreements, correspondence, and other materials relevant to anticipated litigation—Defendant impaired the integrity and availability of evidence for use in a foreseeable proceeding. By locking Plaintiff Rapport out of the shared

Google Drive containing grant drafts, project files, and corporate documents, Defendant again acted with the intent to obstruct justice through concealment. By locking Plaintiff Rapport out of the corporate Mercury account, Defendant interfered with Plaintiff Rapport's ability to wind down Company affairs and access financial records necessary to review transactions and perform the tax compliance duties that Defendant had neglected.

### E.3. Dissemination of Confidential Material in Violation of ITAR/EAR

160. Following the dissolution of Radian Industries, Defendant also informed Plaintiff Rapport that Defendant had retained an unauthorized copy of a folder labeled "Private," after Plaintiff Rapport had revoked Defendant's access.

161. The "Private" folder, which Plaintiff Rapport had originally shared in confidence for internal use, contained highly sensitive and confidential intellectual property, including technical materials for both the Artifact[4] and the Vacuustat (see Exhibit B4 — Technical Materials [SEALED]). The materials in the "Private" folder derived independent economic value from not being generally known and were subject to reasonable measures for maintaining their secrecy, including labeling, encryption, limited access, and post-dissolution revocation of access.

162. The "Private" folder included technical materials—for example, software developed by Plaintiff Rapport—and technical data sufficient to fully replicate the Artifact and validate experimental results from raw video footage through to final figures (see Exhibit B4 — Technical Materials [SEALED]). Additionally, the folder contained encrypted files, for which Defendant

---

[4]Specifically, the next-generation fiber-optic version of the Artifact.

had previously received decryption credentials from Plaintiff Rapport. The folder also contained a National Science Foundation (NSF) SBIR Phase I Project Pitch, which demonstrates that the technology was intended for commercial development and deployment across state lines as part of a federally-supported innovation program, satisfying the interstate commerce requirement of the Defend Trade Secrets Act (DTSA).

163. Following the dissolution of Radian Industries, Defendant disclosed the contents of this "Private" folder without Plaintiff Rapport's permission to at least one third party—constituting a clear breach of confidentiality, intellectual property rights, and trust (see Exhibit E2 — Post-Dissolution Misconduct).

164. Defendant was properly informed and aware of the potential consequences of his actions under ITAR/EAR and FAR.

## E.4. **Defamation Per Se**

165.  On May 20, 2025, when Plaintiff Rapport attempted to close the Company's empty corporate account and retrieve the Company's transaction statements, Defendant obstructed this process by making defamatory statements about Plaintiff Rapport to Mercury Bank (see Exhibit C3 — Corporate Communications).

166. Defendant falsely accused Plaintiff Rapport of "felony theft of corporate physical assets in excess of $10k." No such theft occurred. Upon dissolution, Plaintiff Rapport offered to return all remaining corporate funds to Defendant, and did not retain any assets beyond those to which he was legally entitled.

47

167. Defendant further stated that Plaintiff Rapport was "mentally unwell / deranged." This is a baseless and defamatory claim. Defendant has no professional basis to make psychiatric judgments. Plaintiff Rapport has no history of psychiatric illness, and this statement was made solely to injure Plaintiff Rapport's reputation and credibility.

168. Defendant also claimed that Plaintiff Rapport had made "various threats," yet offered no specifics. Plaintiff Rapport made no unlawful threats of any kind and has no history of violent or threatening conduct. This vague allegation was a deliberate reputational attack with no factual support, designed to portray Plaintiff Rapport as unstable and dangerous.

169. Finally, Defendant framed Plaintiff Rapport's actions as "grand theft" and implied criminal intent by invoking a "criminal dissolution." These statements are similarly baseless. Plaintiff Rapport lawfully dissolved the Company under applicable state law, gave written notice, and made repeated efforts to return funds and resolve any disputed matters without conflict.

170. Plaintiff Rapport's prior role as a software engineer at a financial institution underscores the harm caused by Defendant's defamatory statements. In banking and financial technology, trustworthiness, professional judgment, and reliability are paramount. By sending false criminal accusations and unfounded claims of mental instability to a bank, Defendant deliberately targeted a channel where such statements could inflict maximum professional and reputational damage.

## E.5. Extortion in Violation of Ohio Rev. Code § 2905.11 (Third-Degree Felony)

171. Following Plaintiff Rapport's lawful dissolution of Radian Industries, Defendant Michael Chapiro initiated a sustained campaign of coercion, extortion, and threats designed to pressure Plaintiff Rapport into reversing course, relinquishing control of hardware and intellectual property, and continuing to work under Defendant's unilateral authority.

172. On May 1 and May 2, 2025, Defendant Michael Chapiro committed multiple acts of extortion in violation of 18 U.S.C. § 1951 (Hobbs Act) by attempting to obtain Plaintiff Rapport's property—including hardware, intellectual property, patent applications, technical documentation, and royalty rights—through coercive threats of legal retaliation, reputational harm, and criminal prosecution (see Exhibit E2 — Post-Dissolution Misconduct).

173. Defendant issued a written demand in a May 1st email (see Exhibit E2 — Post-Dissolution Misconduct), stating:

> "All property of the company/myself must be returned including hardware, pending patents, and patentable information and technical information, regardless of whether destroyed. Withholding property may transcend the civil liabilities to the point of criminal theft, corporate espionage, or embezzlement."

174. This message constitutes a clear attempt to induce Plaintiff Rapport's involuntary compliance through fear of criminal exposure. Defendant has no prosecutorial authority, nor any

legal entitlement to many of the items demanded, which include contested or jointly developed materials.

175. On May 9th, hardly an hour after being served with a cease-and-desist, Defendant responded with a "settlement" offer demanding $15,000—specifically because it was "the total amount that [Rapport] took in stipend/salary"—under threat of civil litigation and unspecified criminal charges (see Exhibit E2 — Post-Dissolution Misconduct).

176. In his May 9th email to Plaintiff Rapport (see Exhibit E2 — Post-Dissolution Misconduct), Defendant accuses Plaintiff Rapport of fraudulent conduct and threatens litigation for over $1 million in damages. These threats were not made in the context of good-faith dispute resolution, but rather as part of a coordinated effort to intimidate and pressure Plaintiff Rapport unless he capitulated to Defendant's demands.

177. Defendant also made knowingly false and malicious statements about Plaintiff Rapport to a third party with the intent to damage Plaintiff Rapport's personal and professional reputation and to gain leverage in an ongoing dispute over corporate control and assets (see Exhibit C3 — Corporate Communications). Defendant's communication contains multiple knowingly false assertions, including fabricated claims of felony theft, criminal dissolution, slander, and mental instability. These statements were not only baseless, but designed to inflict reputational harm and discredit Plaintiff Rapport in the eyes of a financial institution.

178. Defendant's email was sent with the purpose of influencing control over corporate accounts and continuing a broader pattern of pressure and reputational warfare aimed at coercing Plaintiff Rapport into surrendering property and legal rights (Ohio Rev. Code § 2905.11).

## E.6. Conversion and Fraudulent Conveyance

179. Soon after receiving Plaintiff Rapport's cease-and-desist on May 9th (see Exhibit E2 — Post-Dissolution Misconduct), Defendant unilaterally drained the remainder of the funds (see Exhibit D1 — Transactions) in the corporate account (approximately $18,500), labeling the withdrawal, "Returning loan payment."

## E.7. Trade Secret Misappropriation

180. In an April 30, 2025 email to Plaintiff Rapport (see Exhibit E2 — Post-Dissolution Misconduct), Defendant expressed his belief that taking the funds remaining in the corporate account would not encumber him from misappropriating Plaintiff's IP and using it for his own business.

181. Defendant had no independent analysis of Plaintiff Rapport's technology; all analyses were entirely Plaintiff Rapport's own work.

182. Defendant also declared that his stolen Company materials—including confidential experimental data and trade secrets developed solely by Plaintiff Rapport—are sufficient to reconstruct Plaintiff Rapport's inventions and secure major funding without Plaintiff Rapport's involvement, and Defendant expressed his intention to pursue this course using external capital and labor. In

written correspondence following the dissolution and cease-and-desist, Defendant also claimed he would be "well within my rights legally to continue working on it in a new entity," and asserted, "I could even keep going under the same trade name."

183. On July 15, 2025, Defendant admitted on X that he is also continuing to pursue commercialization of the Vacuustat technology as well as the Artifact (see Exhibit C4 — Social Media Posts) despite receiving legal notice, and despite having no legal rights to the issued patent.

## E.8. Incorporation of Phoenix Dynamics LLC

184. On May 12, 2025, Defendant formed a new anonymous Wyoming entity named "Phoenix Dynamics LLC"—demonstrating his determination to relaunch Plaintiffs' technology, which he has no legal rights to, without Plaintiff Rapport's involvement (see Exhibit E1 — Enterprise Structure).

## E.9. Continuing Misappropriation and Conversion

185. Plaintiff Rapport reasonably believes that Defendant is now pitching a new defense venture in which he intends to integrate or build upon proprietary technical materials developed solely by Plaintiff Rapport. These materials were never assigned, licensed, or authorized for independent use by Defendant, and include confidential designs and methods originally created during the Radian period. On July 10, 2025, Defendant confirmed on X that he has started a new company, which, on information and belief, Defendant terms *Sierra Turbines*. On information and belief, Defendant has met with officials from the Argentine Ministry of Defense to pitch them a defense venture built on proprietary technology misappropriated from Plaintiffs.

# F. List of Predicate Acts

186.  Pursuant to 18 U.S.C. § 1961(1), the following acts constitute predicate offenses in furtherance of the racketeering enterprise described herein:

1.  On August 27, 2024, Defendant Michael Chapiro submitted articles of incorporation for "Radian Industries Inc." to the Wyoming Secretary of State using a fictitious phone number, a disposable email alias, and omitting Plaintiff Rapport as an incorporator—all in direct violation of the parties' governing agreement (see Exhibit A1 — Corporate Records). This filing contained knowingly false and misleading information, and was transmitted electronically across state lines. Defendant's conduct constitutes wire fraud in violation of 18 U.S.C. § 1343 and is pled as a predicate act under 18 U.S.C. § 1961(1).

2.  On or about September 9, 2024, Defendant uploaded a document titled "Name Change and Incorporation" to the shared Company drive (see Exhibit A1 — Corporate Records), falsely stating that the incorporation of Radian had occurred "by unanimous agreement of 100% of the owners." However, Plaintiff Rapport never agreed to the incorporation of a new entity in Wyoming, and specifically had not consented to the incorporation of such an entity prior to the construction of his experimental prototype and collection of experimental data,[5] and was unaware that Defendant had secretly formed Radian Industries nearly three months earlier. The Name Change document was transmitted electronically across state lines and was intended to retroactively legitimize Defendant's unilateral formation of Radian Industries, while posi-

---

[5]Contemporaneous communications make clear that the parties had agreed that the business would not be formed until after Plaintiff Rapport had collected his experimental data.

tioning the new entity as a continuation of the ARK partnership in order to misappropriate Plaintiff Rapport's intellectual property. This document constitutes wire fraud under 18 U.S.C. § 1343 and is pled as a predicate act under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.

3. On or about April 29, 2025, following the lawful dissolution of Radian Industries, Defendant Chapiro unilaterally revoked Plaintiff Rapport's access to the corporate Gmail account, thereby concealing emails, signed agreements, and critical correspondence relevant to anticipated and foreseeable litigation (see Exhibit E2 — Post-Dissolution Misconduct). This conduct was undertaken knowingly and with the intent to impair the availability of evidence for use in an official proceeding, and constitutes obstruction of justice under 18 U.S.C. § 1512(c). This act is pled as a predicate offense under 18 U.S.C. § 1961(1).

4. On or about April 29, 2025, Defendant revoked Plaintiff Rapport's access to the shared Google Drive containing confidential grant materials, technical documents, corporate agreements, and internal documents, again with the intent to impair access to evidence relevant to foreseeable litigation (see Exhibit E2 — Post-Dissolution Misconduct). This act of concealment further constitutes obstruction of justice under 18 U.S.C. § 1512(c) and is pled as a separate predicate offense under 18 U.S.C. § 1961(1).

5. Following the dissolution of Radian Industries, Defendant Chapiro disclosed the contents of a folder labeled "Private" to at least one third party without authorization (see Exhibit E2 — Post-Dissolution Misconduct). This folder contained confidential technical data, trade

secrets, and proprietary materials developed solely by Plaintiff Rapport. Defendant's theft and unauthorized dissemination of these materials constitutes theft of trade secrets in violation of 18 U.S.C. § 1832 (Economic Espionage Act), and is pled as a predicate act under 18 U.S.C. § 1961(1).

6.  The disclosure of Plaintiff Rapport's "Private" folder was carried out electronically, across state lines, using digital communication channels. By transmitting misappropriated intellectual property through such means for the purpose of commercial gain and deception, Defendant engaged in wire fraud in violation of 18 U.S.C. § 1343. This act is pled as a predicate offense under 18 U.S.C. § 1961(1).

7.  On May 20, 2025, Defendant Chapiro sent an email to Mercury Bank containing knowingly false and malicious statements accusing Plaintiff Rapport of felony theft, mental instability, and criminal dissolution (see Exhibit C3 — Corporate Communications). These defamatory claims were made with the intent to damage Plaintiff Rapport's personal and professional reputation and to gain leverage in an ongoing dispute over control of corporate assets. This conduct constitutes extortion in violation of Ohio Rev. Code § 2905.11(B)(4) and (B)(5) and is pled as a predicate act under 18 U.S.C. § 1961(1)(A).

8.  At the time of Company formation and during discussions regarding equity allocation and access to Plaintiff Rapport's patented technology, Defendant knowingly concealed multiple pseudonymous X profiles—including @DeltaClimbs, @GhostDelta, and @DeltaEpoch— which contained inflammatory anti-intellectual-property rhetoric and statements hostile to the

legal protections underpinning Plaintiff Rapport's inventions (see Exhibit C4 — Social Media Posts). Defendant's concealment of this material information, combined with his electronic inducements and additional misrepresentations[6] to gain Plaintiff's confidence, constitutes wire fraud in violation of 18 U.S.C. § 1343 and is pled as a predicate act under 18 U.S.C. § 1961(1).

9.  On May 9, 2025, Defendant Michael Chapiro unilaterally withdrew $18,535.52 from Radian Industries' corporate Mercury account (see Exhibit D1 — Transactions), falsely labeling the transaction "Returning loan payment." This withdrawal was made without authorization, in violation of corporate governance procedures, and despite the fact that the alleged "loan" was not callable. The transfer was executed via interstate electronic communication and constitutes wire fraud in violation of 18 U.S.C. § 1343. This act is pled as a predicate offense under 18 U.S.C. § 1961(1).

10. Following his unauthorized withdrawal of Company funds, Defendant Michael Chapiro revoked Plaintiff Rapport's access to the corporate Mercury bank account (see Exhibit C3 — Corporate Communications), obstructing Plaintiff Rapport's ability to retrieve Company financials, communications, and intellectual property materials. This act was taken in anticipation of foreseeable litigation and with the intent to impair access to evidence relevant to corporate dissolution and financial misconduct. Defendant's conduct constitutes obstruction of justice in violation of 18 U.S.C. § 1512(c) and is pled as a predicate act under 18 U.S.C. § 1961(1).

---

[6]For example, his academic standing at Poly Cal.

11. Following the lawful dissolution of Radian Industries, Defendant Michael Chapiro continues to operate a public-facing website using the Company's name and branding—falsely implying that the business remains active and legitimate. This misrepresentation is knowingly made via interstate electronic communication and intended to mislead the public, potential investors, and commercial partners (see Exhibit E2 — Post-Dissolution Misconduct). The continued operation of the site constitutes wire fraud in violation of 18 U.S.C. § 1343 and is pled as a predicate act under 18 U.S.C. § 1961(1).

12. On April 30, 2025, Defendant Michael Chapiro sent a written message asserting that Plaintiff Rapport's lawful dissolution of Radian Industries constituted a "massive major breach of fiduciary duty," and demanded that Plaintiff Rapport allow his shares to be "repurchased" under threat of escalating financial liability. Defendant claimed that Plaintiff Rapport was causing "further damages" by refusing this demand, framing the situation as imposing legal and financial harm (see Exhibit E2 — Post-Dissolution Misconduct). The purpose of this coercive communication was to force Plaintiff Rapport to relinquish property—including his equity stake and intellectual property rights—through threats of legal retaliation and reputational harm. Defendant's conduct constitutes extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 and extortion chargeable under O.R.C. § 2905.11, and is pled as a predicate act of racketeering under 18 U.S.C. § 1961(1)(B).

13. On May 1, 2025, Defendant Michael Chapiro sent a written demand threatening Plaintiff Rapport with potential criminal prosecution—including allegations of "theft," "corporate

espionage," and "embezzlement"—if Plaintiff Rapport did not surrender hardware, patent filings, and technical materials. Defendant lacked legal authority to bring or threaten criminal charges, and many of the items demanded were subject to dispute (see Exhibit E2 — Post-Dissolution Misconduct). The communication was made for the purpose of coercing Plaintiff Rapport into relinquishing valuable property through fear of criminal liability, and constitutes extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and extortion chargeable under O.R.C. § 2905.11. This act is pled as a predicate offense under 18 U.S.C. § 1961(1)(B).

14. On May 9, 2025, Defendant Michael Chapiro sent a written message accusing Plaintiff Rapport of having made "false representations to garner financial investment/loans," and threatening litigation for over $1 million in damages—specifically citing damages to "shareholder equity" and unspecified "emotional damages." Defendant invoked a four-year statute of limitations under Wyoming corporate law to reinforce the implied threat of prolonged legal action. These statements were not made in good faith, but as part of a sustained campaign to intimidate and economically coerce Plaintiff Rapport into surrendering control over disputed corporate assets and intellectual property (see Exhibit E2 — Post-Dissolution Misconduct). The use of exaggerated legal threats to extract property or force compliance constitutes extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and extortion chargeable under O.R.C. § 2905.11, and is pled as a predicate act under 18 U.S.C. § 1961(1)(B).

15. On May 9, 2025, Defendant Michael Chapiro issued a written ultimatum demanding that Plaintiff Rapport personally repay $15,000 within one week under threat of civil and criminal

legal action (see Exhibit E2 — Post-Dissolution Misconduct). Defendant stated that this payment would serve as an "option" to "settle and cure all damages, civil and/or criminal"— a coercive and legally invalid framing designed to extract money under duress. This demand was not issued through proper legal channels, but via extrajudicial email correspondence, bypassing any formal legal process. Defendant's attempt to convert a baseless claim into a personal liability—while threatening prosecution and reputational damage—constitutes extortion under the Hobbs Act, 18 U.S.C. § 1951, and extortion chargeable under O.R.C. § 2905.11, and is pled as a predicate act under 18 U.S.C. § 1961(1)(B).

16. In the same May 9, 2025 email, Defendant used interstate electronic communication to transmit knowingly false and misleading claims of criminal liability and exaggerated civil damages for the purpose of obtaining money and intellectual property rights from Plaintiff Rapport. By misrepresenting the nature of the legal dispute and proposing that a private $15,000 payment would absolve "civil and/or criminal" exposure, Defendant engaged in a deliberate scheme to defraud Plaintiff Rapport out of money and property rights. This satisfies the elements of wire fraud under 18 U.S.C. § 1343 and is pled as a predicate act of racketeering under 18 U.S.C. § 1961(1)(B).

17. On or around November 8, 2024, Defendant submitted a response to a federal Request for Information (RFI) titled "Low-cost, Indefinite Endurance, Rapidly Deployable & Repositionable Vacuum Balloons for C2BMC Augmentation," under the entity "BL Machines LLC," falsely claiming exclusive ownership over a technical architecture invented by Plaintiff

Rapport (see Exhibit E4 — RFIs [SEALED]). This submission misrepresented the origin of the design and omitted Plaintiff Rapport's inventorship, constituting a deliberate attempt to defraud the United States government and secure funding under false pretenses. This act is pled as a predicate act under 18 U.S.C. § 1961(1)(B) based on a violation of 18 U.S.C. § 1343.

18. In a second RFI submission (see Exhibit E4 — RFIs [SEALED]) on February 27, 2025 titled "OV-1 Concept of Operations Description: Low-cost, Indefinite Endurance, Rapidly Deployable & Re-positionable Vacuum Balloons for C2BMC Augmentation" under the entity "BL Machines LLC," in an interstate electronic communication, Defendant again presented Plaintiff Rapport's invention as proprietary to his own entity, omitting any reference to Plaintiff Rapport's intellectual property or inventorship. This constituted a separate and independently actionable instance of wire fraud, made with intent to deceive federal authorities and divert potential funding. This act is pled as a predicate act under 18 U.S.C. § 1961(1)(B) based on a violation of 18 U.S.C. § 1343.

19. In a third RFI submission (see Exhibit E4 — RFIs [SEALED]) on February 27, 2025 titled, "Low-cost, Indefinite Endurance, Rapidly Deployable & Re-positionable Vacuum Balloons for C2BMC Augmentation," in an interstate electronic communication, Defendant again presented Plaintiff Rapport's invention as proprietary to his own entity, omitting any reference to Plaintiff Rapport's intellectual property or inventorship. This constituted a third independent act of wire fraud under 18 U.S.C. § 1343, as the submission was made electronically and with

intent to defraud the government. This act is pled as a predicate act under 18 U.S.C. § 1961(1)

(B) based on a violation of 18 U.S.C. § 1343.

20. On information and belief, Defendant met with officials from the Argentine Ministry of Defense to pitch a defense venture built on proprietary technology misappropriated from Plaintiff Rapport. The technical materials at issue were developed solely by Plaintiff Rapport during the Radian period, were never assigned or licensed to Defendant, and include confidential methods and designs related to advanced defense applications. By presenting these trade secrets to foreign government officials without authorization, Defendant violated 18 U.S.C. § 1831 (the Economic Espionage Act), which prohibits the theft or transfer of trade secrets intended to benefit a foreign government.

## G. Injury to Plaintiffs

187.  As a direct, proximate, and foreseeable result of Defendant's misconduct, Plaintiffs suffered severe and irreparable economic and strategic harm. These injuries are specific, thoroughly documented, and grounded in years of painstaking work. The intellectual property at issue was the result of more than a decade of focused technical development. Plaintiff Rapport began working on the Vacuustat in 2012, filed for patent protection in 2015, and was granted U.S. Patent No. 10,625,842 in 2020. The Artifact platform has been under active development since 2021, as reflected by extensive internal documentation and a published paper in August 2022 (see Exhibit B3 — Technical Papers [SEALED]). Both technologies reflect years of personal sacrifice, thousands

of hours of self-directed solitary labor, and tens of thousands of dollars in unreimbursed outlays—well before Defendant ever appeared (see Exhibit B4 — Technical Materials [SEALED]).

188. Defendant did not contribute to the development of either technology, yet attempted to erase Plaintiff Rapport's authorship, seize control of his inventions, and redirect their commercial value through competing shell companies. In attempting to overwrite a decade of Plaintiff Rapport's original work, falsely presenting it as his own while asserting ownership and control over the fruits of Plaintiff Rapport's long-term technical investment, Defendant inflicted direct and measurable damage to Plaintiffs' economic position, business trajectory, and ability to control his own intellectual legacy (see Exhibit D3 — Economic Injury).

## G.1. Total Economic Harm

189. The cumulative economic harm caused by Defendant's misconduct is extensive, spanning destroyed enterprise value, lost commercialization opportunities, and diverted or foreclosed contracts. These damages are grounded in Defendant's own statements, supported by expert-admissible valuation methodology, and reflect actual impairment to monetizable assets and corporate trajectory. Courts have long recognized that where misconduct causes uncertainty in calculating damages, that uncertainty should be borne by the wrongdoer—not the victim. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer, instead of upon the injured party."). Accordingly, Plaintiffs seek compensation for the following

economic injuries, all of which stem directly from Defendant's intentional misconduct and RICO violations:

190. First, the misappropriation and delay of the Vacuustat IP alone constitutes damages based on estimated lost royalties conservatively valued at $180 million, reflecting the 1–2 year delay caused by Defendant's sabotage and internal obstruction. As a direct and proximate result of Defendant's misconduct, Plaintiffs were prevented from the timely commercialization of Plaintiff Rapport's Vacuustat technology, which was otherwise positioned for licensing and deployment. Plaintiff Rapport held a formal licensing arrangement with Radian Industries, under which 5% of gross revenue attributable to the Vacuustat platform was contractually owed in the form of royalties (see Exhibit A1 — Corporate Records).

191. Second, the destruction of exclusivity, confidentiality, and first-mover advantage for the Artifact platform—coupled with Defendant's founding of a directly competing venture—supports a damages estimate of $25 million, reflecting the impairment to the $100 million fair market value of the IP if properly commercialized. This valuation is substantiated by the existence of a validated prototype, defense and industrial applicability, and Defendant's own public statement regarding a $100 million acquisition (see Exhibit C4 — Social Media Posts).

192. Third, Plaintiffs suffered direct economic loss from the diversion of a credible $5 million institutional investment opportunity with Khosla Ventures. Defendant's solicitation—conducted using Plaintiff Rapport's intellectual property while deliberately omitting Plaintiff Rapport's iden-tity—constituted a knowing usurpation of corporate opportunity. The funding in question reflected

63

a standard seed check size for Khosla Ventures, aligned precisely with their deep-tech and dual-use investment thesis. Defendant's actions destroyed a critical inflection point in Plaintiffs' commercialization trajectory and precluded access to downstream capital, partnerships, and early defense adoption pathways that would have followed. The lost Khosla funding—conservatively valued at $5 million—therefore represents an immediate and quantifiable impairment to the Company's enterprise value and growth trajectory.

193. Fourth, Defendant's conduct resulted in the total collapse of Radian Industries' valuation of $2.5 million, based on a reasonable expectation of early-stage fundraising that had been under discussion. The Company's shutdown and reputational impairment rendered future capital raises impossible, depriving Plaintiffs of equity, governance continuity, and forward momentum.

194. Fifth, Plaintiffs suffered a $1 million loss in contract opportunity, based on Defendant's own statement that the technology and documentation were sufficient to secure such a contract. Courts have upheld contract-loss damages where causation is clear and the lost opportunity is tangible. For example, see *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 441–42 (7th Cir. 2020) (recognizing plausible damages based on lost contracts and customers where defendant's anticompetitive actions foreclosed plaintiff's business opportunities) and *Glass v. Glass*, 321 S.E.2d 69, 77 (Va. 1984) (affirming recovery for a lost contract opportunity where the defendant's intentional misconduct diverted a concrete business deal from the plaintiff).

195. Sixth, Plaintiffs lost $500,000 in near-term investment that could have been raised based on existing deliverables, filings, and internal technical documentation, had the Defendant not irreparably damaged Company operations and trust with potential funders.

196. Seventh, Defendant's unauthorized diversion of capital resulted in at least $28,835 in direct financial harm to the Company. Of the original loan amount, only $49,665 was delivered in a form that conferred tangible benefit to Radian Industries. The remainder was either misappropriated to support Defendant's unrelated shell companies (including Phoenix Dynamics and Black Lattice) or unilaterally clawed back in breach of the loan's terms. These expenditures—$10,335 in unauthorized travel and withheld funds, and $18,500 in wrongful clawback—deprived Radian of critical operational runway and financial stability, accelerating the Company's collapse. These damages are distinct from broader valuation claims, and represent a quantifiable misuse of funds entrusted to the Company for commercial development.

197. Eighth, Plaintiff Rapport also suffered a $78,759.42 loss in the form of unreimbursed out-of-pocket expenses and uncompensated labor. During the core invention period from August to December 2024, Plaintiff Rapport worked 56-hour weeks on a continuous seven-day schedule, contributing 896 hours of skilled technical labor without compensation—valued at $64,512 based on Plaintiff Rapport's prior salary as a software engineer. In addition, Plaintiff Rapport spent $14,247.42 of personal funds on prototyping components and laboratory equipment to develop the Artifact technology. This investment of time and capital was foundational to the Company's formation and technical basis. Defendant's subsequent attempt to seize and repackage this work,

without contributing any technical effort or reimbursing expenses, constitutes unjust enrichment and appropriation of value created entirely by Plaintiff Rapport. These losses are fully documented and quantifiable, and independently support compensatory recovery.

198. Ninth, Plaintiff Rapport suffered an additional $38,000 in economic loss due to uncompensated labor between January and April 2025, a period in which he received only $12,000 in salary despite continuing to perform full-time duties as CTO. Based on Plaintiff Rapport's prior salary of $150,000 per year (or $12,500 per month), the fair market value of his services during this four-month period was $50,000, resulting in a shortfall of $38,000. Plaintiff Rapport continued advancing the Company's core technology and business objectives throughout this period, based on Defendant's representations that compensation and funding were forthcoming. This reliance was exploited by Defendant, who diverted Company funds and assets, including trade secrets, while benefiting from Plaintiff Rapport's ongoing labor. These losses are directly traceable, documented, and independently support compensatory damages.

199. Taken together, these categories of loss—supported by technical milestones, commercial readiness, and credible third-party validation—yield a total economic loss estimate of over $214 million, representing a conservative and well-supported assessment of the harm incurred. This figure encompasses both the destruction of enterprise value and the diversion of specific economic opportunities, and includes unreimbursed founder investment, fiduciary misconduct, and direct impairment to monetizable assets.

## G.2. Ongoing and Future Harm Justifying Declaratory and Injunctive Relief

200. In addition to the substantial economic and developmental harm already inflicted, Defendant's ongoing conduct presents a clear risk of future injury that cannot be remedied through monetary damages alone. Absent judicial intervention, Plaintiff Rapport faces the continued erosion of his legal rights, loss of control over his inventions, and further reputational harm. Injunctive and declaratory relief are therefore necessary and appropriate under the circumstances.

201. Defendant has declared in writing his intent to continue commercializing Plaintiff Rapport's proprietary technologies "with or without" Plaintiff Rapport's involvement (see Exhibit E2 — Post-Dissolution Misconduct)—confirming an ongoing and deliberate campaign of unauthorized use. In so doing, Defendant has demonstrated a willful disregard for Plaintiff Rapport's intellectual property rights and created a persistent threat to further misappropriate, rebrand, or divert the inventions at issue.

202. Given Defendant's repeated use of shell entities and deceptive presentation of Plaintiff Rapport's work as his own, there is a substantial likelihood of future deception, investor confusion, and dilution of Plaintiff's exclusive rights. This risk is grounded in Defendant's prior behavior and explicit statements of intent.

203. The commercial viability of Plaintiff Rapport's inventions—particularly in sectors such as aerospace, defense, and advanced manufacturing—depends on securing and maintaining a first-mover advantage. Defendant's premature disclosures, unauthorized solicitations, and misrepresentation to government agencies and investors have already impaired that advantage, creating

confusion in the market and potentially disqualifying Plaintiff Rapport from certain institutional channels.

204. Continued delay, deception, and misappropriation would irreversibly harm Plaintiff Rapport's ability to assert rightful ownership, secure licenses, or attract aligned partners. The erosion of first-mover status cannot be repaired retroactively, making equitable relief essential to prevent further strategic damage.

205. Plaintiff Rapport seeks a declaratory judgment confirming his exclusive ownership of the relevant intellectual property, including but not limited to U.S. Patent 10,625,842 and associated trade secrets, designs, and prototypes. Plaintiff Rapport also seeks injunctive relief barring Defendant from: (1) representing or marketing Plaintiff Rapport's inventions without authorization; (2) misrepresenting his own inventorship or rights in Plaintiff Rapport's technologies; (3) diverting or soliciting commercial, investor, or governmental interest in connection with those technologies; and (4) retaining, using, or disseminating any confidential technical materials belonging to Plaintiff Rapport.

206. Monetary compensation alone is inadequate to redress these harms. Without injunctive and declaratory relief, Plaintiff Rapport's legal rights, professional reputation, and strategic opportunities will remain vulnerable to continued interference. The Court's intervention is therefore required to preserve Plaintiff Rapport's ownership, prevent ongoing misconduct, and protect the integrity of the intellectual property at the heart of this dispute.

# CLAIMS FOR RELIEF

207.  The Plaintiffs assert the following causes of action:

# COUNT I: Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836

208.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

209.  Plaintiffs own trade secrets in confidential technical data, software, design files, and commercialization strategies for the Vacuustat and the Artifact (see Exhibit B4 — Technical Materials [SEALED]). Plaintiffs protected these materials through encryption, credentialed access, and post-dissolution revocation (including a labeled "Private" folder). The information in these materials derives independent economic value and relates to products and services used in interstate and international commerce.

210.  After dissolution, Defendant knowingly stole these trade secrets, with a declared intention of converting them for his own benefit, and disclosed them without authorization. He admitted to retaining and accessing the "Private" folder, and disclosed protected content to at least one unnamed third party (see Exhibit E2 — Post-Dissolution Misconduct).

211.  Defendant also disclosed protected content to federal personnel (see Exhibit C6 — Signal Export [SEALED]) without NDAs (including NSWC/SLCM-N staff), submitted Plaintiff's intellectual property as his own to the federal government (see Exhibit E4 — RFIs [SEALED]), and

pursued commercialization through Phoenix Dynamics and Black Lattice—entities with no license or assignment—while concealing Plaintiff's inventorship (see Exhibit E1 — Enterprise Structure).

212. These actions reflect a pattern of intentional deception and misappropriation, strategic concealment, and commercial exploitation, in violation of 18 U.S.C. § 1836. The trade secrets at issue relate to products and services used in interstate and international commerce, and their misappropriation has caused significant economic harm and irreparable damage to Plaintiffs' commercial position.

213. Defendant's conduct was willful and malicious, warranting exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C)–(D).

214. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant for all damages available under the DTSA, including actual losses, unjust enrichment, exemplary damages, injunctive relief to prevent further use or disclosure of Plaintiff Rapport's trade secrets, attorneys' fees, and such other and further relief as the Court deems just and proper.

## COUNT II: Violation of the Lanham Act – False Designation of Origin and False Advertising (15 U.S.C. § 1125(a)(1)(A)–(B))

215. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

216. Defendant Michael Chapiro has violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)–(B), by engaging in acts of false designation of origin and false or misleading commercial representations in connection with goods and services distributed in interstate commerce.

217. Without authorization or license, Defendant misappropriated Plaintiff Rapport's proprietary Artifact and Vacuustat technologies—developed solely by Plaintiff Rapport—using them as the centerpiece of investor communications, commercial representations, and promotional materials for Phoenix Dynamics and Black Lattice, shell entities that he controlled (see Exhibit E1 — Enterprise Structure). These acts misrepresented the source, ownership, and inventorship of the technologies, falsely conveying to investors and federal contractors that Black Lattice, Phoenix Dynamics, or Defendant himself was the rightful originator, or alternatively, falsely implying an affiliation or sponsorship by the true inventor, Plaintiff Rapport.

218. Further, Defendant made these representations in a commercial context, with the intent to secure investment and support from third parties, including venture capital firms and federal agencies (see Exhibit C3 — Corporate Communications). These actions constitute false advertising under 15 U.S.C. § 1125(a)(1)(B) because they misrepresented the nature, characteristics, and source of the technology, and were likely to deceive prospective investors and customers.

219. In submitting multiple federal Requests for Information (RFIs) falsely presenting Plaintiff Rapport's patented invention as proprietary to BL Machines LLC (see Exhibit E4 — RFIs [SEALED]), Defendant violated both prongs of 15 U.S.C. § 1125(a).

71

220. First, under § 1125(a)(1)(A), Defendant misrepresented the origin of the technology by passing off Plaintiff Rapport's patented invention as a novel architecture developed by BL Machines, thereby causing confusion and deception as to the true source and ownership of the invention. This false designation of origin was likely to mislead government evaluators and potential partners into believing the technology was internally developed by BL Machines rather than by Plaintiff Rapport.

221. Second, under § 1125(a)(1)(B), Defendant made false and misleading statements in a commercial context about the invention's characteristics, status, and ownership—claiming it was proprietary to BL Machines and omitting its patented nature and Plaintiff Rapport's inventorship —in an effort to secure federal contracts and funding. These material misrepresentations, made in connection with proposed dual-use aerospace products and government contract offerings, were intended to influence the Government's procurement decisions and conveyed a false commercial impression of the product's origin, development history, and legal rights. Accordingly, Defendant's actions constitute violations of both § 1125(a)(1)(A) and § 1125(a)(1)(B), giving rise to Lanham Act liability.

222. Defendant also retained and operated the Radian Industries website following the Company's dissolution, thereby continuing to falsely suggest that the Company is active or that he maintains an ongoing affiliation with the Company and proprietary rights over its technologies, misleading the public as to the source, sponsorship, and ownership of the associated goods and

services (see Exhibit E2 — Post-Dissolution Misconduct). This constitutes an ongoing false designation of origin under § 1125(a)(1)(A).

223. Taken together, these actions misled investors, diverted business opportunities, and harmed the commercial integrity and reputation of Plaintiff Rapport and his work. The representations were made in interstate commerce, directly impacted commercial decision-making and public perception, and harmed the Plaintiffs.

224. WHEREFORE, Plaintiffs seek injunctive relief, actual and statutory damages, corrective advertising, disgorgement of profits, and any further relief the Court deems just and proper under 15 U.S.C. § 1117.

# COUNT III: Violation of the Lanham Act – Cyberpiracy (15 U.S.C. § 1125(d))

225. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

226. Defendant Michael Chapiro has violated the Anti-Cybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d), by registering and subsequently maintaining and using the domain name associated with Radian Industries Inc. after the Company's dissolution, without Plaintiffs' authorization or consent. The Radian name has acquired distinctiveness and goodwill in connection with Plaintiff Rapport's patented inventions and commercial activities. Defendant's retention and operation of the Radian Industries website falsely suggests an ongoing affiliation

with the Company and its technologies, and constitutes bad-faith use of a domain name that is identical or confusingly similar to a distinctive mark in which Plaintiffs have established rights through prior use in commerce.

227. Defendant's use of the Radian name and website is not for any legitimate or noncommercial purpose, and is intended to profit from confusion and misappropriated goodwill. Such conduct satisfies multiple statutory indicators of bad faith under § 1125(d)(1)(B), including Defendant's prior knowledge of Plaintiffs' rights, Defendant's lack of any trademark or intellectual property interest in the Radian name, and Defendant's use of the domain to mislead others regarding the source and sponsorship of proprietary technology.

228. WHEREFORE, Plaintiffs seek all appropriate relief, including statutory damages, transfer or cancellation of the domain, injunctive relief, disgorgement of profits, attorneys' fees, and any further relief the Court deems just and proper under 15 U.S.C. § 1117.

# **COUNT IV: Violation of 18 U.S.C. § 1962(a) – Investment of Racketeering Income**

229. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

230. Defendant Michael Chapiro has engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(1), including but not limited to wire fraud (18 U.S.C. § 1343), trade secret

misappropriation (18 U.S.C. § 1836), computer fraud (18 U.S.C. § 1030), obstruction of justice (18 U.S.C. § 1512), and extortion (Ohio Rev. Code § 2905.11, incorporated under § 1961(1)(A)).

231. Defendant used funds derived from these racketeering acts and related unlawful conduct to invest in and operate one or more enterprises engaged in interstate commerce, in violation of 18 U.S.C. § 1962(a).

232. Specifically, Defendant used Advanced Human Engineering LLC (doing business as Chroma) as both a conduit and laundering mechanism to transfer funds into Radian Industries under the false pretense of a personal loan (see Exhibit D1 — Transactions). Although the executed loan agreement named Chapiro personally as the lender (see Exhibit A1 — Corporate Records), the funds were instead transferred from Chroma—an undisclosed third-party entity controlled by Defendant—and were falsely labeled as payment for services never rendered.

233. These mischaracterized funds were used to finance the technical development of Plaintiff Rapport's inventions, including but not limited to Plaintiff Rapport's vacuum-lift platform and inertial navigation technologies. The resulting intellectual property constituted valuable corporate assets derived directly from the use of fraudulently transferred and misrepresented capital.

234. Rather than allowing Radian Industries to benefit from these assets, Defendant diverted and reinvested the intellectual property into downstream shell entities under his exclusive control, including Phoenix Dynamics LLC and Black Lattice (registered as BL Machines LLC), which he used to pursue federal grant funding and private investment without Plaintiff Rapport's knowledge or consent.

235. Following the lawful dissolution of Radian Industries, Defendant further reinvested the proceeds of the Company's remaining cash reserves—approximately $18,500—into his own ventures, by orchestrating a fraudulent conveyance of the funds back to Chroma and mislabeling the transfer as a "loan repayment," despite the loan being explicitly non-callable and not yet due.

236. Defendant's conduct constitutes the direct or indirect use and reinvestment of income derived from a pattern of racketeering activity and unlawful debts into one or more enterprises engaged in interstate commerce, in violation of 18 U.S.C. § 1962(a).

237. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered economic harm, including the loss of corporate funds, diverted commercialization opportunities, misappropriation of intellectual property, and irreparable damage to business reputation and enterprise value.

238. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant for treble damages under 18 U.S.C. § 1964(c), equitable and injunctive relief as appropriate, attorney's fees, costs of suit, and such other and further relief as the Court deems just and proper.

# COUNT V: Violation of 18 U.S.C. § 1962(b) – Acquisition or Maintenance of Control Through Racketeering

239. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

76

240. Defendant Michael Chapiro engaged in a pattern of racketeering activity, including but not limited to wire fraud (18 U.S.C. § 1343), theft and conversion of trade secrets (18 U.S.C. § 1832), obstruction of justice (18 U.S.C. § 1512), extortion (Ohio Rev. Code § 2905.11), and fraudulent conveyance and conversion of corporate assets.

241. In violation of 18 U.S.C. § 1962(b), Defendant used this pattern of racketeering activity and in the alternative, the collection of an unlawful debt, to acquire and maintain control of Radian Industries—an enterprise engaged in interstate commerce.

242. Through these actions, Defendant gained and maintained financial and managerial control over Radian Industries, in direct contravention of Plaintiff Rapport's 51% ownership and board authority. Defendant used this influence to reroute corporate assets, obstruct the Company's lawful dissolution, and divert Plaintiff Rapport's intellectual property to outside entities controlled solely by Defendant.

243. Defendant's conduct constitutes acquisition and maintenance of control over an enterprise engaged in interstate commerce—including the preparation and submission of federal grant applications across state lines—through a pattern of racketeering activity and, in the alternative, unlawful debt, in violation of 18 U.S.C. § 1962(b).

244. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered economic harm, loss of corporate control, destruction of enterprise value, and misappropriation of proprietary intellectual property.

245. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant for treble damages pursuant to 18 U.S.C. § 1964(c), injunctive and equitable relief as appropriate, attorneys' fees, costs of suit, and any further relief the Court deems just and proper.

## COUNT VI: Violation of 18 U.S.C. § 1962(c) – Conduct of an Enterprise Through a Pattern of Racketeering Activity

246. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

247. Defendant Michael Chapiro conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise engaged in interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

248. The enterprise consisted of a network of individuals and entities controlled by Defendant—including Advanced Human Engineering LLC (d/b/a Chroma), Black Lattice (registered as BL Machines LLC), Phoenix Dynamics LLC, and other undisclosed or anonymously formed entities. This enterprise functioned as a continuing unit under Defendant's Mach Capital organization with a common purpose: utilizing usurious debts as leverage to acquire, exploit, and monetize intellectual property without attribution, authorization, or compensation.

249. Defendant used his position as CEO of Radian Industries to gain insider access to Plaintiffs' trade secrets, patent filings, and confidential business materials. He then misappropriated

those materials to solicit federal grants and private investments under false pretenses, using entities he controlled and deliberately excluding Plaintiff Rapport from ownership or authorship.

250. The predicate acts forming the pattern of racketeering activity include, but are not limited to: wire fraud under 18 U.S.C. § 1343 (including false statements to investors and government agencies); trade secret theft under 18 U.S.C. § 1832; exceeding authorized access and obstruction under 18 U.S.C. §§ 1030 and 1512; extortion under Ohio Rev. Code § 2905.11; and fraudulent conveyance of corporate assets.

251. These acts were part of a coordinated, continuous scheme executed across state lines, including submission of federal grant materials, investor communications, interstate wire transfers, and use of national systems such as SAM.gov.

252. Defendant's racketeering activities directly injured Plaintiffs by destroying corporate governance, misappropriating core technologies, foreclosing legitimate commercialization paths, and undermining Plaintiffs' ability to recover or enforce their rights.

253. Accordingly, Defendant is liable under 18 U.S.C. § 1962(c) for conducting the affairs of an enterprise through a pattern of racketeering activity, and Plaintiffs are entitled to treble damages, injunctive relief, and all other remedies available under 18 U.S.C. § 1964(c).

254. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant for treble damages pursuant to 18 U.S.C. § 1964(c), injunctive and equitable relief as appropriate, attorneys' fees, costs of suit, and any further relief the Court deems just and proper.

# COUNT VII: Violation of 18 U.S.C. § 1962(d) – RICO Conspiracy

255.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

256. Defendant Michael Chapiro conspired with others, including Dylan Tyler Carrington (a/k/a Tyler Carrington), Kole McGinn, and affiliated shell entities such as Phoenix Dynamics and Black Lattice, to violate 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c), in violation of 18 U.S.C. § 1962(d).

257.  The conspirators entered into an agreement to acquire and maintain control over the enterprise through a pattern of racketeering activity that included misappropriation of trade secrets, wire fraud, submission of fraudulent federal filings, obstruction of justice, and extortion. This agreement was demonstrated through their coordinated actions: the use of anonymous shell companies, submission of federal RFIs containing Plaintiff Rapport's proprietary material without authorization, and the drafting and circulation of investor materials that falsely attributed Plaintiff Rapport's inventions to entities under Defendant's exclusive control (see Exhibit E1 — Enterprise Structure).

258.  The conspirators further acted in concert to exclude Plaintiff Rapport—the sole inventor—from the commercialization of his own technologies, obstruct his oversight of the enterprise, and launder the resulting intellectual property across multiple jurisdictions. Each co-conspirator knowingly participated in the broader scheme and took steps in furtherance of it, reflecting a unified purpose to defraud Plaintiffs and derive financial benefit from the stolen IP.

259. Defendant Chapiro and his co-conspirators agreed to the overall objectives of the enterprise and knowingly participated in its unlawful conduct. They shared a common purpose and worked in concert to accomplish the enterprise's goals through racketeering activity.

260. Accordingly, Defendant is liable under 18 U.S.C. § 1962(d) for conspiring to violate subsections (a), (b), and (c), and Plaintiffs are entitled to treble damages, injunctive relief, and all other remedies available under 18 U.S.C. § 1964(c).

261. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant for all damages arising from the conspiracy, including treble damages under 18 U.S.C. § 1964(c), equitable relief, attorneys' fees, costs of suit, and such other and further relief as the Court deems just and proper.

# COUNT VIII: Violation of Ohio Corrupt Activities Act – O.R.C. § 2923.32(A)

262.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

263. Defendant Michael Chapiro has engaged in a pattern of corrupt activity and the collection of a purported debt instrument—a loan nominally set at an interest rate of 10%—in violation of Ohio Revised Code § 2923.32(A)(1), (2), and (3). As detailed throughout this Complaint, Defendant participated in, acquired control over, and derived proceeds from an enterprise through

racketeering conduct and a purported debt instrument used to acquire/maintain control through corrupt activity, thereby violating the Ohio Corrupt Activities Act.

264. Under § 2923.32(A)(1), Defendant conducted and participated in the affairs of an enterprise—namely, Radian Industries and its successor shell entities—through a pattern of corrupt activity. This pattern includes acts of theft, fraud, wire fraud, obstruction of justice, access device fraud, misappropriation of trade secrets, and other predicate acts as defined under Ohio law. Defendant also retained and used property derived from these unlawful acts to further the enterprise's activities and maintain control.

265. Under § 2923.32(A)(2), Defendant used a purported debt instrument—a loan to Radian Industries with a 10% fixed interest rate, exceeding Ohio's statutory usury cap—to acquire and maintain control of the Company. He further leveraged this debt by unilaterally asserting financial control, obstructing the lawful dissolution of the business, and directing the transfer and commercialization of Plaintiff Rapport's intellectual property through unaffiliated shell entities. These acts reflect a deliberate effort to acquire and maintain control over an enterprise through unlawful means.

266. Under § 2923.32(A)(3), Defendant knowingly received and reinvested proceeds derived from corrupt activity. These proceeds included Company funds, usurped corporate opportunities, and access to trade secrets and protected intellectual property, which he used to launch and operate new corporate entities including Phoenix Dynamics, BL Machines, and affiliated shell companies. Defendant used these proceeds to present stolen inventions as proprietary to his new ventures,

solicit funding, and establish further control over assets developed outside of his ownership or contribution.

267. These acts constitute a continuous and interrelated pattern of corrupt activity affecting interstate and intrastate commerce, with damages accruing to Plaintiffs and others as a direct result of Defendant's conduct. Plaintiffs reserve the right to seek criminal forfeiture, treble damages, and all other remedies available under O.R.C. §§ 2923.32 and 2923.34.

268. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant under the Ohio Corrupt Activities Act, including compensatory and treble damages, forfeiture of proceeds and control interests, restitution, attorney's fees, and any additional relief the Court deems just and proper.

## COUNT IX: Computer Fraud and Abuse Act – 18 U.S.C. § 1030

269. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

270. The computers and accounts Defendant accessed—including Radian's Google Drive and Gmail, the "Private" repository, and other cloud-hosted systems used to store, transmit, and process Company data—are "protected computers" under 18 U.S.C. § 1030(e)(2)(B) because they were used in and affected interstate and foreign commerce and communication, including by routing data across state lines and through servers located in multiple states and/or abroad.

271. Defendant Michael Chapiro knowingly and intentionally accessed protected computers and cloud-based infrastructure without authorization and in excess of authorization, in violation of 18 U.S.C. § 1030(a)(2), (a)(4), and (a)(5). After Plaintiff Rapport lawfully dissolved Radian Industries and revoked Defendant's access to shared Company resources, Defendant retained and accessed sensitive corporate materials, including technical data, trade secrets, and corporate records stored in the Company's Google Drive and Gmail accounts.

272. Defendant used previously shared decryption credentials—provided to him solely for authorized internal use—to access and extract files from a confidential folder labeled "Private," after his access had been revoked. These files contained highly sensitive intellectual property, trade secret materials, and federal grant submissions (see Exhibit B4 — Technical Materials [SEALED]). This unauthorized use of decryption credentials constitutes use of an access device in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 1029(a)(2) and (a)(5).

273. Defendant further obstructed Plaintiff Rapport's access to the Company's Gmail and Google Drive accounts, locking Plaintiff Rapport out of essential corporate records, agreements, and project materials in anticipation of foreseeable legal action (see Exhibit E2 — Post-Dissolution Misconduct). This conduct impaired the availability and integrity of evidence for use in an official proceeding, in violation of 18 U.S.C. § 1512(c), and was undertaken in part to retaliate against Plaintiff Rapport for asserting legal rights, in violation of § 1513(e).

274. Defendant's conduct was carried out via interstate communications using email and online platforms, and constitutes wire fraud under 18 U.S.C. § 1343. These acts form part of a broader

scheme to misappropriate Plaintiff Rapport's intellectual property, deny him access to evidence, and assert unlawful control over Company assets.

275.  The foregoing conduct constitutes multiple predicate acts under 18 U.S.C. § 1961(1), including but not limited to wire fraud (§ 1343), access device fraud (§ 1029), and obstruction of justice (§§ 1512, 1513). As such, it also supports liability under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

276.  WHEREFORE, Plaintiffs respectfully request actual damages, attorneys' fees, injunctive relief as provided under § 1030(g), and any further relief the Court deems just and proper.

## COUNT X: Defamation Per Se

277.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

278.  On May 20, 2025, Defendant Michael Chapiro emailed Mercury Bank (see Exhibit C3 — Corporate Communications) regarding Plaintiff Rapport and stated, among other things, that Plaintiff Rapport was committing "felony theft of corporate physical assets in excess of $10k," was "mentally unwell / deranged," had made "various threats," and that Wyoming would "execute the criminal dissolution," characterizing Plaintiff Rapport's conduct as "grand theft."

279.  These statements were false, were of and concerning Plaintiff Rapport, and were published to a third party (Mercury Bank) without privilege or consent. They were not made in the course

of any litigation, pre-litigation demand, or other qualified context, and even if any privilege were claimed, Defendant acted with actual malice, defeating it.

280. Under defamation law, statements that (1) falsely impute criminal behavior, (2) falsely assert a mental illness that would undermine one's fitness to work, or (3) are made to interfere with another's profession or business, are considered actionable per se. Defendant's email to Mercury meets all three criteria. It falsely accused Plaintiff Rapport of multiple felonies, asserted a fictitious and derogatory mental condition, and sent those accusations to a financial institution—deliberately targeting Plaintiff Rapport's standing in his profession, where trustworthiness, integrity, and sound judgment are essential. Defendant's statements were not privileged, were not made in the course of litigation or legal process, and were offered without evidence, inquiry, or justification. Therefore, his statements were malicious.

281. Defendant knew, or recklessly disregarded, that his statements were false: Plaintiff Rapport lawfully dissolved the Company, offered to return remaining corporate funds, did not steal any corporate assets, did not make unlawful threats, and has no history of mental illness. Defendant is not qualified to render psychiatric diagnoses and had no basis to do so.

282. Defendant's statements constitute defamation per se because they: (a) falsely impute the commission of serious crimes (felony/grand theft; "criminal dissolution"); (b) falsely assert mental illness(es) that would undermine Plaintiff Rapport's fitness to work; and (c) injure Plaintiff Rapport in his profession by directing these assertions to a financial institution. Plaintiff Rapport

is a software engineer who has worked in financial institutions, including in his most recent role as a software engineer at a bank.

283. As defamation per se, damages are presumed. In addition, Defendant's publication fore-seeably interfered with banking relationships and professional reputation, causing further harm.

284. WHEREFORE, Plaintiffs respectfully request judgment for presumed, general, and spe-cial damages; punitive/exemplary damages for Defendant's willful and malicious conduct; costs; pre- and post-judgment interest; and such other and further relief, including appropriate injunctive relief against republication, as the Court deems just and proper.

## **COUNT XI: Breach of Fiduciary Duty**

285. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

286. At all relevant times, Defendant Michael Chapiro owed fiduciary duties to Radian Indus-tries as a cofounder, officer, and de facto manager of the Company. These duties included the duty of loyalty, the duty of care, the duty of candor, and the duty to act in good faith and in the best interests of the Company and its shareholders.

287. Defendant repeatedly and willfully breached these fiduciary duties through a course of self-serving, deceptive, and harmful conduct. Defendant withheld material information, concealed hostile ideological positions, diverted corporate opportunities, misrepresented material facts during capital and grant processes, and falsely presented the Company's intellectual property to

third parties without proper authority. These breaches were systemic, coordinated, and designed to assert control over the Company and its assets at Plaintiffs' expense.

288. Defendant unilaterally contacted and solicited grantmakers, potential investors, and third parties under the false pretense of representing the Company while concealing his status and intentions. He willfully disrupted business relationships, undermined potential contracts and funding opportunities, and misappropriated Company trade secrets and confidential technical materials for personal and competitive use.

289. Defendant's actions were in direct conflict with the interests of the Company and Plaintiff Rapport, and were undertaken without transparency, consent, or proper authorization. Defendant acted in furtherance of personal enrichment and ideological sabotage, rather than in service of the Company's mission, contributors, or long-term viability.

290. These actions constitute knowing and intentional breaches of fiduciary duty. As a result, Plaintiffs suffered substantial harm, including loss of funds, reputational damage, loss of business opportunity, misappropriation of trade secrets, impairment of intellectual property, investor confusion, and impairment of the Company's ability to operate effectively.

291. WHEREFORE, Plaintiffs seek compensatory damages, disgorgement of all benefits wrongfully obtained by Defendant, injunctive relief as appropriate, punitive damages for malicious and intentional misconduct, and any further relief the Court deems just and proper.

# COUNT XII: Fraudulent Conveyance – O.R.C. §§ 1336.04(A) and 1336.05(A)

292. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

293. Defendant Michael Chapiro made a fraudulent transfer of Company funds in the amount of approximately $18,500 (see Exhibit D1 — Transactions), which he labeled as a "loan repayment," despite the fact that the loan agreement explicitly stated the loan was non-callable and not repayable until the Company had generated at least $700,000 in cumulative revenue (see Exhibit A1 — Corporate Records). No such revenue milestone had been reached. Defendant withdrew these funds without authorization, notice, or legal justification.

294. The funds were deposited and later withdrawn through Advanced Human Engineering LLC, a shell company under Defendant's control, which was not named or disclosed in the original loan agreement. Defendant's use of a concealed, affiliated entity to move Company funds created a misleading and opaque financial trail inconsistent with the terms of the agreement and the reasonable expectations of the parties.

295. At the time of the initial deposit of $18,000 and the subsequent withdrawal of approximately $18,500, Radian Industries was insolvent. The Company had no outside revenue, no positive cash flow, and no ability to satisfy its liabilities. Defendant's withdrawal further depleted

the Company's assets, leaving it unable to meet obligations and frustrating Plaintiffs' ability to recover or continue operations.

296. The transfer was made without the Company receiving reasonably equivalent value in exchange. No loan repayment was due under the governing agreement, and no services were performed by Defendant or his affiliated entity to justify the withdrawal. The label used for one of the deposits falsely described the transaction as payment for engineering services, which Plaintiffs neither authorized nor performed, and which did not in fact occur.

297. Defendant's conduct satisfies the statutory elements of fraudulent conveyance under Ohio Revised Code §§ 1336.04(A)(1), 1336.04(A)(2), and 1336.05. The transfer was made with actual intent to hinder, delay, or defraud Plaintiffs; or, in the alternative, was made without receiving reasonably equivalent value while the Company was insolvent before and after the transfer.

298. WHEREFORE, pursuant to applicable law—including but not limited to the Uniform Voidable Transactions Act (or its predecessor statute) and/or 11 U.S.C. § 548—Plaintiffs seek avoidance of the fraudulent transfer; disgorgement of the improperly withdrawn funds; imposition of a constructive trust over all wrongfully retained proceeds; compensatory and punitive damages; attorneys' fees as permitted by law; and any additional relief the Court deems just and proper.

# COUNT XIII: Breach of Contract

299. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

300. Defendant Michael Chapiro entered into multiple binding agreements with Plaintiffs governing the formation, funding, operation, and confidentiality obligations of Radian Industries and its related technologies. These agreements include, but are not limited to: (1) the Loan Agreement executed on or around July 2024; (2) the ARK Interim Partnership Agreement signed by both parties; and (3) the Founders Agreement executed in connection with the incorporation of Radian Industries (see Exhibit A1 — Corporate Records).

301. Defendant materially breached the Loan Agreement by unilaterally withdrawing approximately $18,500 from Company funds under the pretense of repayment, despite no revenue threshold being met and no authorization or notice provided. The withdrawal directly violated the non-callable clause and repayment conditions, undermining the Company's financial position and contractual expectations.

302. Defendant breached the ARK Interim Partnership Agreement, which governed the parties' initial collaboration regarding the Artifact technology. That agreement contains a clear confidentiality clause, requiring both parties to protect proprietary information and limit third-party disclosures. Defendant breached this agreement by disclosing trade secrets, designs, and proprietary business plans to third parties without consent, including in connection with his formation of a competing entity and his attempts to solicit outside funding based on stolen IP.

303. Additionally, Defendant breached the Founders Agreement, which likewise imposes direct confidentiality obligations. Defendant repeatedly violated this agreement by misusing confidential information, bypassing Plaintiffs' consent, and publicly or privately exploiting proprietary materi-

als belonging to the Company, including materials originally developed by its founder and licensed to the Company under express agreements.

304. Each of these agreements was a binding contract, supported by valid consideration and executed in furtherance of shared business goals. Defendant's breaches were willful, material, and directly harmful to the Company and to Plaintiffs' ability to commercialize and protect his intellectual property.

305. WHEREFORE, Plaintiffs seek compensatory damages, restitution, disgorgement of improperly retained funds and benefits, interest, attorneys' fees where permitted by law, and all other relief the Court deems just and proper. To the extent Defendant's breaches were accompanied by independent tortious conduct—including fraud, malice, and knowing violations of fiduciary and statutory duties—Plaintiffs also seek punitive and exemplary damages under applicable tort claims.

## COUNT XIV: Civil Theft – O.R.C. §§ 2307.61 and 2913.02

306. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

307. Defendant Michael Chapiro knowingly and unlawfully exerted control over property belonging to Radian Industries without consent and with purpose to deprive the Company of its rightful use and benefit, in violation of Ohio Revised Code § 2913.02. Pursuant to Ohio Revised

Code § 2307.61, Plaintiffs bring this civil theft claim for damages resulting from this unlawful conduct.

308. Specifically, Defendant withdrew approximately $18,500 from Radian's corporate account under the false pretense of a loan repayment (see Exhibit D1 — Transactions), despite the express terms of the loan agreement prohibiting early repayment and limiting repayment to circumstances in which the Company had earned at least $700,000 in cumulative revenue (see Exhibit A1 — Corporate Records). At the time of the withdrawal, Radian Industries had generated no such revenue and was insolvent. The withdrawal was unauthorized, made without consent, and executed for Defendant's personal gain.

309. Additionally, Defendant wrongfully retained and disseminated a confidential internal folder labeled "Private," which contained trade secrets and sensitive internal materials belonging to Radian Industries. Defendant copied and distributed these files after his relationship with the Company terminated, and without authorization or consent. This conduct further constitutes knowing and unauthorized control over Company property with the purpose of depriving Radian of its rightful exclusivity.

310. Defendant's actions were willful, malicious, and committed in bad faith.

311. WHEREFORE, Plaintiffs seek judgment against Defendant pursuant to O.R.C. § 2307.61 for three times the value of the property wrongfully taken or retained; for compensatory damages; for punitive and exemplary damages where appropriate; for statutory attorneys' fees and costs; and for all other relief the Court deems just and proper.

# COUNT XV: <u>Conversion</u>

312.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

313. Defendant Michael Chapiro knowingly and intentionally exercised wrongful control over property belonging to Radian Industries without consent and in direct violation of contractual obligations and fiduciary duties.

314. Specifically, Defendant unilaterally withdrew approximately $18,500 in Company funds from Radian's business account (see Exhibit D1 — Transactions), labeling the transaction as a "loan repayment," despite the fact that the loan agreement explicitly stated that the loan was non-callable and not repayable unless and until the Company had generated at least $700,000 in cumulative revenue (see Exhibit A1 — Corporate Records). At the time of withdrawal, Radian had not generated such revenue and remained insolvent. The withdrawal was unauthorized, made without notice or approval, and constituted a deliberate misappropriation of Company assets for personal benefit.

315. In addition to this financial misappropriation, Defendant also exercised wrongful dominion and control over proprietary digital materials belonging to Radian Industries. Specifically, Defendant retained and disseminated a confidential internal folder labeled "Private," which contained Company trade secrets and other sensitive internal documents. These materials were provided to Defendant in his capacity as a co-founder and officer of the Company and were protected under multiple contractual and fiduciary obligations. Defendant had no right to retain

or distribute these materials after the dissolution of the Company or the termination of his role. His continued possession and use of these confidential files—particularly in connection with the formation of a competing entity—constitute unlawful conversion of Company property.

316. WHEREFORE, Plaintiffs seek judgment against Defendant for all property wrongfully converted, including the return of converted funds and all unauthorized copies of digital materials; for compensatory damages in an amount to be proven at trial; for consequential and incidental damages; for punitive and exemplary damages due to the willful and malicious nature of the misconduct; for interest, attorneys' fees where permitted by law; and for all other relief the Court deems just and proper.

# COUNT XVI: Fraudulent Inducement

317. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

318. At all relevant times, Plaintiff Rapport was the sole inventor and owner of the patented Vacuustat and other patent-pending technologies (the "Inventions"), which formed the core assets of the business venture later organized as Radian Industries.

319. Prior to and during the formation of Radian Industries, Defendant Michael Chapiro engaged in a deliberate scheme to obtain equity, managerial control, and access to Plaintiff Rapport's intellectual property through false pretenses and material omissions.

320. The parties had originally agreed that the Company—initially to be called "ARK Indus-tries"—would not be formed until after validation of the experimental data. In an August 5, 2024 email, Defendant confirmed this in writing. Nevertheless, on August 27, 2024, Defendant secretly incorporated a separate entity under the name Radian Industries, Inc., without informing Plaintiff Rapport. Later, Defendant presented Plaintiff Rapport with a Name Change document, falsely implying that Radian was to be a simple rebranding of a jointly formed company. Defendant's maneuver was a calculated attempt to entrap Plaintiff Rapport's intellectual property by capturing the work conducted by Plaintiff Rapport during the period between August and November and retroactively assigning it to Radian—an entity secretly formed by Defendant alone.

321. Additionally, at the time of equity negotiations, corporate formation, and assignment discussions, Defendant held deeply entrenched and publicly expressed beliefs that intellectual property is not legitimate, not enforceable, and not morally valid. These beliefs included repeated public statements—spanning from at least August 2023 through June 2025—calling for the aboli-tion of intellectual property rights, equating IP to "violent theft," and ridiculing the legal system that protects patents (see Exhibit C4 — Social Media Posts).

322. Defendant knew these beliefs were fundamentally incompatible with the stated business model of Radian Industries, which depended on the enforceability of Plaintiff Rapport's patents and trade secrets. Nevertheless, Defendant intentionally concealed these beliefs from Plaintiff Rapport and did not disclose his public statements, social media profiles, or ideological opposition to IP during the formation period.

323. Defendant's concealment was calculated to induce Plaintiff Rapport to enter into a cofounder relationship, grant him equity, and provide him access to confidential technical materials and trade secrets. By withholding his anti-IP ideology, Defendant presented an incomplete and misleading façade of alignment with Plaintiff Rapport's goals and respect for the venture's intellectual property rights.

324. In reliance on this false and misleading presentation, Plaintiff Rapport agreed to cofound Radian Industries with Defendant, granted him equity, and granted him access to proprietary technical designs, calculations, CAD files, and other trade secrets necessary for commercialization.

325. Defendant's concealed beliefs were material: had Plaintiff Rapport known of Defendant's sustained and public hostility toward intellectual property, Plaintiff Rapport would not have entered into any cofounder, equity, or IP-licensing arrangement with him.

326. Defendant acted with knowledge of the falsity of his presentation and with the intent to deceive Plaintiffs and obtain benefits to which he was not entitled. This conduct constitutes fraudulent inducement under applicable law.

327. Plaintiffs reasonably relied on the false impression created by Defendant's concealment, particularly in light of Defendant's role as prospective cofounder, officer, and manager of the Company, and the fiduciary duties that such positions entail.

328. As a direct and proximate result of Defendant's fraudulent misrepresentation, Plaintiffs suffered damages, including but not limited to: loss of equity, diversion of grant and funding oppor-

tunities, misappropriation of trade secrets, unauthorized disclosures of confidential information, reputational harm, and loss of control over the commercialization of his inventions.

329. WHEREFORE, Plaintiffs seek rescission of all agreements or portions of agreements granting Defendant equity, ownership rights, or IP interests in the Inventions; disgorgement of all benefits wrongfully obtained; compensatory and punitive damages; costs and attorneys' fees as permitted by law; and such other and further relief as the Court deems just and proper.

## **COUNT XVII: Fraudulent Misrepresentation**

330. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

331. Defendant Michael Chapiro knowingly and intentionally made multiple false representations of material fact to Plaintiff with the purpose of inducing reliance and securing control over Plaintiff's intellectual property and corporate governance rights.

332. Among these were false claims that the incorporation of "Radian Industries Inc." had been undertaken by unanimous agreement of all owners, when in fact Defendant secretly and unilaterally incorporated the entity using fictitious contact information, without Plaintiff's knowledge or consent. Defendant falsely represented that Plaintiff had agreed to this new corporate structure, and later presented internal documents falsely characterizing the entity as a continuation of the ARK partnership formed on identical terms (see Exhibit A1 — Corporate Records).

333. Defendant also misrepresented the nature of wire transfers made to the Company, including transfers routed through Advanced Human Engineering LLC. Defendant initially presented these as fixed-interest, non-callable loans governed by a signed agreement (see Exhibit A1 — Corporate Records). He later unilaterally withdrew Company funds and falsely labeled the withdrawal as a "loan repayment," despite the revenue threshold not having been met. At least one incoming wire was also internally labeled as compensation for services Plaintiff did not authorize, perform, or receive notice of—creating a misleading paper trail inconsistent with the governing agreements (see Exhibit D1 — Transactions).

334. Defendant made each of these representations with knowledge of their falsity, or with reckless disregard for the truth, and with the intent to induce Plaintiff's reliance. Plaintiff reasonably relied on these misrepresentations, including by contributing proprietary intellectual property, performing uncompensated technical work, and deferring enforcement of his rights.

335. As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff suffered damages including but not limited to: diversion of intellectual property, reputational harm, and disruption of commercialization efforts.

336. WHEREFORE, Plaintiffs seek judgment in his favor and against Defendant for compensatory damages in an amount to be determined at trial, punitive damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

# COUNT XVIII: <u>Constructive Fraud</u>

337.  Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

338.  At all relevant times, Defendant Michael Chapiro stood in a position of trust and confidence with respect to Plaintiff Rapport and the Company. Defendant served as Chief Executive Officer of Radian Industries, a role that carried fiduciary obligations including the duties of loyalty, care, candor, and fair dealing. Defendant also acted as Plaintiff Rapport's business partner pursuant to a signed Interim Partnership Agreement, which granted Plaintiff Rapport majority ownership, board control, and the right to govern the venture's strategic direction. As an officer and fiduciary, Defendant owed a heightened duty to act with honesty, transparency, and good faith in all matters affecting the corporation and its stakeholders.

339.  Defendant breached these fiduciary duties through a sustained course of deceptive conduct, including: secretly incorporating Radian Industries without Plaintiff Rapport's knowledge; submitting false internal documents purporting to reflect unanimous consent; misrepresenting the nature of loan terms and ownership structures; concealing the existence of outside entities and bank accounts under his exclusive control; and misappropriating Plaintiff Rapport's intellectual property through undisclosed grant submissions and investment materials.

340.  Constructive fraud does not require proof of intent to deceive; rather, it arises from a breach of legal or equitable duty that, regardless of motive, gains an advantage for the defendant by misleading or violating the confidence reposed in him. Here, Defendant gained substantial strategic

100

and financial advantage by concealing material facts, withholding information to which Plaintiff Rapport was entitled, and manipulating the corporate structure in ways that undermined Plaintiff Rapport's rights and control.

341. Defendant's conduct was undertaken in violation of his fiduciary obligations, and resulted in unfair benefit to Defendant at the expense of Plaintiff Rapport and the Company. Even absent specific intent to defraud, this breach of duty constitutes constructive fraud under applicable principles of equity and corporate law.

342. As a direct and proximate result of Defendant's conduct, Plaintiff Rapport suffered substantial harm, including but not limited to: misappropriation of proprietary information, reputational damage, and disruption of commercialization efforts.

343. WHEREFORE, Plaintiffs seek judgment in his favor and against Defendant for equitable relief, compensatory damages, disgorgement of unjust gains, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT XIX: Tortious Interference With Business Relationships

344. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

345. Plaintiffs had a reasonable expectation of entering into advantageous business relationships, including but not limited to: federal research and development grants, private investment

opportunities, and commercial partnerships related to the technologies Plaintiff Rapport developed and disclosed to Defendant under the auspices of Radian Industries.

346. Defendant Michael Chapiro was aware of these prospective business relationships. In his capacity as Chief Executive Officer of Radian Industries, Defendant had direct access to grant proposals, investor materials, experimental data, and other documents reflecting Plaintiff Rapport's commercial strategy and planned avenues for external engagement.

347. Rather than support or protect these opportunities, Defendant deliberately interfered with them. After gaining access to Plaintiff Rapport's proprietary work, Defendant incorporated a new entity—Phoenix Dynamics LLC—for the express purpose of excluding Plaintiff Rapport from the commercialization of his own technology. Defendant presented Plaintiff Rapport's inventions as his own in investment memos and outreach efforts, while naming new collaborators and falsely characterizing the technology's origins and ownership.

348. Defendant's interference extended to his refusal to cease use of trade identifiers associated with Plaintiff Rapport's work. In written correspondence following the dissolution and cease and desist (see Exhibit E2 — Post-Dissolution Misconduct), Defendant stated: "I could even keep going under the same trade name," and claimed he would be "well within my rights legally to continue working on it." Defendant also complained that Plaintiff Rapport was "imposing further damages upon me by not simply allowing your shares in Radian to be repurchased." Despite notice that he holds no rights in Plaintiff Rapport's intellectual property, Defendant has to date refused to

take down the Radian Industries website and has continued to exploit its branding, contributing to market confusion and reputational harm.

349. These actions were taken without justification and in direct violation of governing agreements, fiduciary obligations, and a cease and desist notice. Defendant's conduct was not only designed to appropriate Plaintiff Rapport's inventions, but also to damage Plaintiff Rapport's credibility and foreclose his ability to secure independent investment or grant funding.

350. As a direct and proximate result of Defendant's intentional interference, Plaintiff Rapport suffered harm, including lost funding opportunities, reputational injury, misappropriation of intellectual property, and the disruption of commercialization efforts.

351. WHEREFORE, Plaintiffs seek judgment in his favor and against Defendant for compensatory damages in an amount to be determined at trial, punitive damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

# COUNT XX: Misappropriation of Trade Secrets Under OUTSA – O.R.C. §§ 1333.61–1333.69

352. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

353. At all relevant times, Plaintiffs possessed confidential and proprietary technical materials that qualify as trade secrets under the Ohio Uniform Trade Secrets Act (OUTSA), including but not limited to: experimental data and validation methods for the Artifact; source code and data

processing pipelines; CAD models and design specifications for the Vacuustat; encrypted internal analyses; and grant-facing technical narratives and performance metrics intended for commercial deployment (see Exhibit B4 — Technical Materials [SEALED]).

354. These trade secrets derived independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use. Plaintiffs took reasonable measures to maintain their secrecy, including but not limited to: access restrictions, encrypted file storage, labeled "Private" designations, and post-dissolution revocation of shared drive access.

355. Following the dissolution of Radian Industries, Defendant Michael Chapiro informed Plaintiff Rapport that he had retained and accessed an unauthorized copy of the "Private" folder—despite no longer holding any legal or contractual right to access those materials. That folder contained the core technical assets underlying Plaintiff Rapport's next-generation designs, including materials that had not been publicly disclosed or assigned to the Company. Defendant subsequently disseminated those materials to at least one third party and used them to further his own commercial objectives through Phoenix Dynamics and other shell entities he controlled (see Exhibit E2 — Post-Dissolution Misconduct).

356. Defendant's theft and disclosure of Plaintiff Rapport's confidential materials was done without consent, and with actual or constructive knowledge that the information had been acquired through improper means and in violation of duties arising from Defendant's role as CEO, business partner, and fiduciary.

357. Defendant's conduct constitutes misappropriation of trade secrets under Ohio Rev. Code § 1333.61(B), and entitles Plaintiffs to recover damages under § 1333.63. Defendant's actions were willful and malicious, further entitling Plaintiffs to exemplary damages and attorneys' fees pursuant to § 1333.63(B) and (C).

358. As a direct and proximate result of Defendant's misappropriation, Plaintiffs have suffered and continues to suffer significant harm, including but not limited to: loss of control over proprietary technology, unjust enrichment by Defendant, competitive disadvantage, and ongoing disruption of commercialization efforts.

359. WHEREFORE, Plaintiffs seek judgment in his favor and against Defendant for compensatory damages, exemplary damages, disgorgement of unjust gains, injunctive relief, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT XXI: Unjust Enrichment

360. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

361. Plaintiff Rapport conferred substantial benefits upon Defendant Michael Chapiro, including but not limited to: access to proprietary inventions and trade secrets; experimental validation and technical data; software and analytical tooling; investor materials; grant-facing documentation; and corporate infrastructure, branding, and goodwill associated with Radian Industries. Plaintiff Rapport also contributed significant unpaid and underpaid labor and technical development,

undertaken in reasonable reliance on Defendant's representations of shared ownership, fiduciary obligation, and intended commercialization through the jointly governed Company.

362. Defendant knowingly accepted and retained these benefits. He subsequently used them to advance his own personal ventures—including Phoenix Dynamics and BL Machines—while excluding Plaintiff Rapport from any ownership, attribution, or financial participation. Defendant further seized assets and funds following dissolution, including misappropriated corporate funds from the Mercury bank account and proprietary technical documents.

363. Under the circumstances, it would be inequitable for Defendant to retain the value derived from Plaintiff Rapport's inventions, labor, and contributions without compensation or restitution. Defendant's retention of these benefits was not conferred gratuitously, nor supported by any valid contractual right.

364. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff Rapport has suffered damages including the loss of economic value derived from his inventions, the denial of rightful equity or profit participation, reputational harm, and impairment of future commercialization prospects.

365. WHEREFORE, Plaintiffs seek judgment in his favor and against Defendant for restitution, disgorgement of unjust gains, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

# COUNT XXII: Civil Conspiracy

366.  Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

367. Defendant Michael Chapiro knowingly combined and conspired with others as set forth above—including Dylan Tyler Carrington (a/k/a Tyler Carrington) and Kole McGinn—for the unlawful purpose of appropriating Plaintiff Rapport's intellectual property, diverting commercial opportunities, and excluding Plaintiff Rapport from the rightful economic benefit of his inventions. This combination culminated in the formation of Phoenix Dynamics LLC, the drafting and circulation of an investor memorandum misrepresenting the origin of Plaintiff Rapport's technology, and the public presentation of Plaintiff Rapport's work as a proprietary asset of a new entity in which Plaintiff Rapport held no stake.

368. The Phoenix investment memo identified Carrington as Chief Technology Officer and described him as "a Tony Stark like engineer," while omitting any mention of Plaintiff Rapport—despite the fact that the core technology had been developed solely by Plaintiff Rapport and had not been licensed or assigned to any Phoenix-related entity (see Exhibit E1 — Enterprise Structure). The memo falsely described the gyro technology as belonging to Phoenix and sought to attract investors and strategic partners on that basis.

369. Carrington's association with Phoenix Dynamics is further corroborated by overlapping social media profiles, identical branding, and domain names linked to both his alias and shell company "Ophanim LLC," which was registered anonymously in Wyoming on the very day

107

Plaintiff Rapport first contacted Defendant Chapiro regarding company formation. McGinn was similarly promoted as a member of the Phoenix team in related investor-facing materials.

370.  These actions were undertaken in concert and for the purpose of injuring Plaintiff Rapport's economic interests, misappropriating his intellectual property, and misleading third parties regarding the origin, authorship, and ownership of the technologies at issue. The conspiracy was malicious: it was undertaken willfully and knowingly, with the intent to commit unlawful acts —including misappropriation of trade secrets, breach of fiduciary duty, fraudulent inducement, and violations of federal and state racketeering statutes.

371.  As a direct and proximate result of this conspiracy, Plaintiff Rapport suffered substantial harm, including loss of control over proprietary assets, reputational injury, disruption of commercialization efforts, and unjust enrichment by the conspirators.

372.  WHEREFORE, Plaintiffs respectfully request judgment in his favor and against Defendant for compensatory damages, punitive damages, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT XXIII: Declaratory Judgment Under 28 U.S.C. § 2201 and O.R.C. § 2721.03

373.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

374. An actual and justiciable controversy exists between the parties regarding the ownership of intellectual property, inventorship of proprietary technologies, corporate control, and post-dissolution rights. Defendant Michael Chapiro has asserted, both explicitly and implicitly, that he retains authority to act on behalf of Radian Industries, that he possesses partial or sole ownership of the Company's intellectual property, and that he is entitled to continue commercializing those technologies through separate ventures of his own.

375. These assertions conflict with Plaintiff Rapport's legal rights as the sole inventor and owner of the technologies at issue, the lawful majority owner and board controller of Radian Industries prior to its dissolution, and the individual who dissolved the corporation in accordance with applicable law.

376. Therefore, Plaintiffs seek a declaration of the following:

1. **Inventorship & Ownership:** Plaintiff Rapport is the sole inventor and owner of the Artifact (a precision inertial sensor technology) and the Vacuustat (a vacuum-lift aerial platform), including all associated intellectual property, patents, trade secrets, copyrights (including code/CAD), and derivative technologies; no joint inventorship exists, and any purported claim of co-inventorship, ownership, or licensing interest by Defendant or his entities is false and void; no assignment, novation, continuation, "work-for-hire" arrangement, implied license, equitable ownership, or shop right ever transferred or conferred any such rights to Defendant or his entities.

2. **Use & Commercialization:** Defendant has no right to use, license, commercialize, or disseminate Plaintiff Rapport's inventions, confidential materials, trade secrets, or branding in connection with any third-party entity—including but not limited to Phoenix Dynamics LLC, BL Machines LLC, or any successor entity—and no right to retain, use, or disseminate any copies (digital or physical) of Plaintiff Rapport's trade secrets or confidential information.

3. **Corporate Dissolution & Authority:** Plaintiff Rapport lawfully dissolved Radian Industries Inc. in April 2025, and this dissolution remains valid and effective; any post-dissolution acts by Defendant purporting to bind Radian are ultra vires and without effect; Defendant holds no ongoing authority to act on behalf of Radian, bind it contractually, or represent its interests.

4. **Governing Agreement:** The ARK Interim Partnership Agreement remains the only valid agreement governing the relationship between the parties prior to dissolution, and it did not assign any intellectual property ownership to Defendant.

5. **Unauthorized Submissions:** Defendant's RFI, grant, and investor submissions referencing Plaintiff Rapport's inventions were unauthorized and conferred no ownership, license, waiver, or estoppel as between the parties.

6. **Corporate Records Access:** Plaintiff Rapport, as the remaining officer/authorized liquidator, is entitled to full access to corporate records, bank and tax statements, and credentials necessary to wind up; Defendant has no right to obstruct access.

7. **Non-Infringement:** Plaintiff Rapport's continued practice and commercialization of his own inventions does not infringe any intellectual property purportedly owned by Defendant or his entities.

377. Declaratory relief is necessary and appropriate to resolve this active dispute, clarify the parties' respective legal rights and obligations, and prevent further harm, confusion, and interference arising from Defendant's continuing misconduct.

378. WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment declaring the legal rights and interests of the parties as set forth above, and granting such further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

379. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendant Chapiro, individually and in his former capacity as Chief Executive Officer of Radian Industries, on all counts, and further requests that the Court award the following relief:

1. Compensatory damages, in an amount to be determined by the Court or at trial, including but not limited to: (a) Damages resulting from Defendant's misappropriation of trade secrets, intellectual property, and confidential information; (b) damages resulting from Defendant's breach of fiduciary duties, conversion, fraud, and tortious interference; (c) all direct and con-

sequential damages stemming from Defendant's wrongful conduct, including acts undertaken for Defendant's own personal benefit while acting under color of corporate authority;

2. Statutory damages and exemplary damages, where permitted by law, including under the Ohio Uniform Trade Secrets Act, the Defend Trade Secrets Act, the Lanham Act, and RICO statutes;

3. Treble damages, punitive damages, and forfeiture of any ill-gotten gains obtained by Defendant for his own personal benefit through Defendant's fraudulent, malicious, and intentional misconduct;

4. Disgorgement of profits, equity, or consideration obtained by Defendant for his own personal benefit through unjust enrichment, conversion, or improper self-dealing;

5. Permanent injunctive relief, enjoining Defendant from: (a) Using, licensing, marketing, commercializing, or disseminating any invention, trade secret, or derivative work originally created by Plaintiff Rapport, including but not limited to the Artifact and Vacuustat technologies; (b) using or claiming any affiliation with Radian Industries Inc., or using its name, branding, or reputation in any capacity; (c) acting on behalf of, or purporting to act on behalf of, Radian Industries Inc. or any entity holding itself out as its successor; (d) continuing any business activities involving Plaintiff Rapport's intellectual property through Phoenix Dynamics LLC, BL Machines LLC, or any other affiliated entity;

6. An order requiring the return of all confidential and proprietary materials in Defendant's possession, including technical documentation, CAD files, footage, encryption keys, grant proposals, and communications relating to Plaintiff Rapport's inventions;

7. An order requiring Defendant to identify the names and contact information of all third parties to whom such confidential or proprietary materials were disclosed, transferred, or made accessible;

8. An order requiring Defendant and any third parties acting in concert with him—including Phoenix Dynamics LLC, BL Machines LLC, and any affiliated agents or recipients of Plaintiff Rapport's proprietary materials—to permanently delete or destroy all copies, backups, or derivative uses of such materials, including those stored in cloud services or remote servers, and to certify such destruction under penalty of perjury;

9. A Declaratory Judgment as specified in Count XXIII, establishing: (a) Plaintiff Rapport's sole ownership and inventorship of the Artifact and Vacuustat; (b) Defendant's lack of inventorship, ownership, or licensing rights; (c) the lawful dissolution of Radian Industries Inc. in April 2025; (d) Defendant's lack of authority to act on behalf of Radian or to use its assets or branding; (e) the continued validity of the Interim Partnership Agreement as the sole binding agreement prior to dissolution;

10. A judicial finding that Defendant's actions—specifically including his misappropriation of trade secrets, conversion of corporate property, breaches of fiduciary duty, fraudulent self-dealing, and intentional interference with Plaintiff Rapport's business relationships—were: (a) willful and malicious within the meaning of 11 U.S.C. § 523(a)(6); (b) committed by fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning

113

of § 523(a)(4); and (c) involved false pretenses, false representations, or actual fraud within the meaning of § 523(a)(2)(A);

11. A judicial finding that Defendant acted as the alter ego of Phoenix Dynamics LLC, BL Machines LLC, Advanced Human Engineering LLC, and other affiliated entities, and used such entities to perpetuate fraud, misappropriate corporate assets, evade contractual obligations, and avoid personal liability; and that said entities are likewise jointly and severally liable with Defendant for all damages and equitable relief awarded herein;

12. A judicial finding that Plaintiff Rapport's proprietary technologies, business plans, technical documents, and confidential materials held substantial commercial value, and that Defendant's misconduct caused direct loss of economic opportunity, market position, and valuation potential through misappropriation, sabotage, and self-dealing;

13. Imposition of a constructive trust over any proceeds, assets, equity interests, or consideration obtained by Defendant or his affiliated entities—including Phoenix Dynamics LLC, BL Machines LLC, and Advanced Human Engineering LLC—to the extent such assets are directly or indirectly traceable to Plaintiff Rapport's misappropriated inventions, confidential materials, or business plans; and authorization for Plaintiff Rapport to take possession of such assets in partial or full satisfaction of any judgment awarded herein. Such trust shall apply to any funds or equity received from third-party investors, grantors, or business partners in connection with the misappropriated intellectual property, and may be enforced by turnover order, lien, or equitable garnishment as the Court deems appropriate;

14. Disgorgement of all investment proceeds, equity appreciation, capital infusions, or other financial benefits received by Defendant or any affiliated entity, to the extent such benefits were derived from, obtained through, or facilitated by the misappropriation, use, or commercialization of Plaintiff Rapport's intellectual property, trade secrets, or business opportunities;

15. An order compelling Defendant to identify and disclose under oath: (a) all current equity holdings, membership interests, stock options, or beneficial ownership in any entity commercializing Plaintiff Rapport's inventions, including Phoenix Dynamics LLC; (b) all investment funding, capital contributions, or financing obtained by such entities since January 1, 2024; (c) all bank accounts, brokerage accounts, cryptocurrency wallets, or other financial instruments under Defendant's control; and (d) all transfers of assets, funds, or equity with a value exceeding $1,000 made by Defendant or his affiliates since the formation of Radian Industries Inc.;

16. An order that the Court retain jurisdiction over this matter to enforce the judgment, monitor compliance with injunctive relief, supervise any required transfers, certifications, or deletions of proprietary materials, and resolve any disputes arising from Defendant's failure to comply with the relief granted herein;

17. An order certifying, pursuant to Federal Rule of Civil Procedure 54(b), that there is no just reason for delay and that judgment against Defendant Chapiro is final as to all claims currently asserted against him;

18. Attorney's fees and costs, where authorized by applicable statute, including under the Ohio Uniform Trade Secrets Act, the Defend Trade Secrets Act, and 18 U.S.C. § 1964(c), against Defendant personally where permitted by law;

19. Prejudgment and post-judgment interest as permitted by law;

20. Such other and further relief as the Court may deem just, proper, and equitable under the circumstances.

380. Plaintiffs expressly reserve the right to pursue claims for fraudulent transfer, unjust enrichment, successor liability, and any other post-judgment relief or causes of action necessary to enforce the judgment, trace diverted assets, or unwind any transfer, conveyance, or encumbrance undertaken by Defendant to evade execution.

Dated: 9/30/2025

Respectfully Submitted,

/s/Michael W. Vary
Michael W. Vary, Ohio Reg. 33,789
Counsel for Plaintiffs
17710 Westview Drive
Bainbridge, Ohio 44023
vary.michael@gmail.com
216-496-3429

# <u>DEMAND FOR JURY</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: 9/30/2025

Respectfully Submitted,

/s/Michael W. Vary

Michael W. Vary, Ohio Reg. 33,789

Counsel for Plaintiffs

17710 Westview Drive

Bainbridge, Ohio 44023

vary.michael@gmail.com

216-496-3429