# Exhibit A1: Corporate Records

# Contents

Exhibit A1: Corporate Records .................................................................. 1
1. Rapport Corporate Public Key Fingerprint ............................................... 1
2. Board Resolutions ......................................................................... 2
   2.a. Board Resolution on Strategic Authority .......................................... 2
   2.b. Board Resolution on Conflicts of Interest ........................................ 4
   2.c. Roles ............................................................................ 6
3. Initial Board Meeting Minutes ........................................................... 8
   3.a. Signed Initial Board Meeting Minutes ............................................. 8
4. Radian Industries Articles of Incorporation ............................................ 10
5. ARK Interim Partnership Agreement ....................................................... 11
6. ARK Name Change Document ................................................................ 12
7. Founding Agreements ..................................................................... 13
   7.a. Corporate Bylaws ................................................................. 13
   7.b. Founders Agreement ............................................................... 32
   7.c. Loan Agreement ................................................................... 48
   7.d. Vacuustat Licensing Agreement .................................................... 49
8. First Letter of Intent ................................................................. 52
9. Final Letter of Intent ................................................................. 55
10. System For Award Management Address ................................................... 56

# 1. Rapport Corporate Public Key Fingerprint

This public key corresponds to the private key that was used to sign corporate documents.

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512


pub   rsa3072 2025-04-06 [SC] [expires: 2030-04-05]
      7784 70AF 9FA6 C890 29CF  9964 A62F EB00 AFC9 62A3
uid           [ultimate] Nathan Rapport (Radian Industries signing
key) <nathan@radianindustries.com>
sub   rsa3072 2025-04-06 [E] [expires: 2030-04-05]

-----BEGIN PGP SIGNATURE-----
```

```
iQHQBAEBCgA6FiEEd4Rwr5+myJApz5lkpi/rAK/JYqMFAmid46wcHG5hdGhhbkBy
YWRpYW5pbmR1c3RyaWVzLmNvbQAKCRCmL+sAr8lio777DAClWWzHzKPglYaxso8I
ttEZpLqgQMmqSBX3KrwFDymFmMVlhGGLkfiIeRkFaDeIcL5wpTAmYMGHZd2nTWaQ
tna94EfnfbqMRcz4y+FJwBwGSbeMjF2hNz4BTPHxEnRy4BCGAhx86hbMS7ujN+9Y
/ckYJPooDLOuYNdq2AQs/5ZXZ+J+kVWHa90Xo43sP/HejyxxZRS0+hWa9fKsJzRT
2CyfyOUJceIdQpaBQoMWRO7GaAeXHXdZDvU6D8DHrxBbDCvCMKlrC0r5XsUEMBTa
I66Ti4mTVNxialxaAYM6YaHuTuvJv2lKSAWwt+0bnwxRtL4p6Vw/HIUYfy3WVGhB
UXXGCX0DsWQlbfVjVZSN9ir9KTLkDn9fVfx1RmAYd8NCq1ff4Ke+qWfDLTopfovg
MNkJW0cZTpfvx/N/bxYnW5cHgWSCe9Pcca372hcnx/i64C5prdhMKGfu9TMIq2ES
6Zsmq+jGZf5acp4T35akG5i5w1x4rcBbF52DKDf4o3ZZsuA=
=8cbm
```

```
-----END PGP SIGNATURE-----
```

## 2. Board Resolutions

### 2.a. Board Resolution on Strategic Authority

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

# Board Resolution: Restrictions on Strategic Authority and Related-Party Transactions

**Date:** 04/10/2025

**Company:** Radian Industries, Inc.

**Board of Directors Resolution**

Pursuant to the authority vested in the Board of Directors of Radian Industries, Inc., the undersigned, constituting a majority of the board, hereby adopts the following resolutions:

- ---

### 1. Exclusivity Agreements
No officer, director, employee, or agent of the Company shall negotiate, enter into, or represent the Company in any agreement that grants exclusive rights of any kind (including but not limited to licensing, sales, distribution, or access to intellectual property) without the prior written approval of the Board of Directors. This includes any agreement that limits the Company's ability to work with other partners, customers, vendors, or government entities.

### 2. Revenue Sharing Arrangements
No revenue-sharing agreements or obligations may be entered into by the Company with any third party, including related entities, without the prior written approval of the Board of Directors. This includes any arrangement whereby a third party is entitled to a percentage of gross revenue, regardless of whether the arrangement is equity-based.

### 3. Related-Party Transactions
Any proposed agreement, contract, or financial arrangement between the Company and any entity in which a Company director, officer, or shareholder holds a material interest must be fully disclosed to the Board and submitted for approval. The interested party must recuse themselves from any vote or decision related to the transaction.

### 4. Issuance of Equity or Convertible Instruments
No shares, stock options, warrants, SAFEs, convertible notes, or other equity instruments may be issued by the Company without the

prior written approval of the Board of Directors.

### 5. Licensing and Joint Ventures
No licensing of intellectual property, joint ventures, partnerships, or strategic alliances may be entered into without prior board review and approval.

### 6. Strategic Delegation and Representation
No officer or agent may delegate, assign, or transfer strategic decision-making authority to any outside party without prior written approval from the Board. No individual may represent the Company in discussions with investors, media, government, or other institutions in a manner that binds or commits the Company without prior authorization.

### 7. Confidentiality and Non-Disclosure
All officers and directors are reminded that Company information is confidential and may not be disclosed to outside parties without explicit authorization. This includes discussions related to unannounced products, inventions, funding strategies, partnerships, and internal deliberations.

- ---

**Enactment**
This resolution is effective immediately upon approval by a majority of the Board of Directors and shall remain in effect unless amended or repealed by a future board vote.

- ---

**Signed:**

Nathan Rapport
Chairman of the Board, Radian Industries, Inc.
-----BEGIN PGP SIGNATURE-----

iQGzBAEBCgAdFiEEd4Rwr5+myJApz5lkpi/rAK/JYqMFAmf4HSkACgkQpi/rAK/J
YqN7fAwAxLQm9CLElk5XTKeIYyMoJaxEkHl9xUdyhaztVgVc+AEmkRqunrcyt3Sj
sW66QF8vgCvBmqZexPbBKe8q/2kIylRzObBcn4vAbGxlQ8xdfTCPeSfVD3T0HMfw
eWurDDpjNL12W2wMI76IVnHaXmz+ow8zdY4lRV0nXLN4DnbHM9//oRxjbKiaqET1
rAg44lGLkNZGLKz7T80cNesQKgBQz5IWa7ShPxjukHACh3gjIR/WGgu41JJXJdAA
YX4txaodPLUYbZx6pmTtQzLVoViam7Hh5m84dWrtaSTwOVnz9uX3okpgKGi4vubQ
lC477Ecw3kD0IiY+HWoUk03mrFR+WTqRYR6+YmAvWr4FtQfELVDyIj3m//eNFlfP
dIV68rawtnsioAGrMxRwLZY5qJehcuQYDxDjgoRNuxPQz3k6ssREw04ZtZaMIpGh
FJUWR3SxIfoKCvEWJga1ya+78aM9D/M8Q5IXzw0Q8sDZn64scZ7hsh6R5TzUBbrl
ftPxviJw
=BO4x
-----END PGP SIGNATURE-----

## 2.b. Board Resolution on Conflicts of Interest

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512
```

# Radian Industries Conflict of Interest Policy

**Date:** 04/10/25
**Author:** Nathan Rapport, Founder & Chairman

- ---

## Policy on Conflicts of Interest

In order to preserve the integrity, independence, and long-term strategic alignment of Radian Industries, Inc., the following policy on conflicts of interest is hereby adopted:

### 1. Absolute Prohibition on Conflicts of Interest
No officer, director, or full-time contributor of the Company may maintain any disclosed or undisclosed conflict of interest with respect to the Company's mission, operations, intellectual property, strategy, or competitive landscape.

A conflict of interest is defined as:
- - Founding, cofounding, or maintaining a material stake in any outside entity that engages in business, research, development, or fundraising in an area related to or overlapping with the Company's core technologies, customers, or mission.
- - Using Company resources, knowledge, or confidential information to benefit another organization.
- - Creating external obligations or loyalties that may influence or appear to influence actions taken on behalf of the Company.

### 2. Applicability
This policy applies to all:
- - Directors and board members
- - Officers
- - Full-time contributors (employees)
- - Any individual with access to sensitive Company IP or strategy

### 3. Enforcement
The Company reserves the right to:
- - Require the resignation of any individual who is found to be in violation of this policy
- - Revoke access to Company information, systems, or operations
- - Terminate existing relationships with conflicting individuals or entities

### 4. Statement of Intent
Radian Industries is committed to building an enduring and independent organization, aligned in both vision and execution. The Company cannot and will not operate with divided loyalties at the leadership level.

This policy is enacted to protect the integrity of the Company's contributors, inventions, and long-term strategy.

- ---

**Signed:**

Nathan Rapport

Founder & Chairman, Radian Industries, Inc.
-----BEGIN PGP SIGNATURE-----

iQGzBAEBCgAdFiEEd4Rwr5+myJApz5lkpi/rAK/JYqMFAmf4KKkACgkQpi/rAK/J
YqMW1Av/SFuKGWa7QyDpNBxHAK+EHeosVyUtUw4/8hS4Zi9S4zChqiGNZDOjDr6E
5uXs0VzZZuNh0Zc0PiDTUe5m+3Ie9/cgr59/Jb56acVU57SVIZXXofABW2YvnO7f
p0+SolqER5n0K5O3aKXXeITsG/HS3KD80znqHwbigQsf74EbYOGBirbe8hteYDKD
+Z/sJmQp4UWzB3qhx3X/r9f3VTLZ3wdrv89yGtg2x15//xRuYjvVIBjv0u7mI3KC
FXCCYgf3/V69RaWOyrqz3iOiW6DyqLNeuTjG8D0HLISf5an5aU900yLXQx/ZkHrR
GNvUv13Rbvt9LrCKl8qcO8d8GoCta3nEQ62eZr4WIENPfXXYDI9iZx2q41h0Me0z
g88FkdzknUtWWTLt6Ns1fLylJ0IBEcWNjw6EcH5vhNLW+EeYOjLzxkoU0X50ERJ/
4Crcz+R/wtcYpYlF7mD9a1ZfRO1GoUQByZ6hUBBHguunAX/dPaNNAuzWRreZeDma
riEMWkID
=2IIA
-----END PGP SIGNATURE-----

## 2.c. Roles

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512
```

# Roles and Responsibilities Document

**Radian Industries, Inc.**

**Date:** 04/10/2025

This document defines the roles, responsibilities, and decision-making authority of the CEO and CTO of Radian Industries, Inc.

## 1. CEO Responsibilities
The CEO will be primarily responsible for the **external operations** of Radian Industries, including but not limited to:

- - **External Business Development**: Grant submissions, partnerships, and managing key external relationships.
- - **Fundraising**: Coordinating all funding activities, including government grants, strategic partnerships, and potential investments.
- - **Operations**: Ensuring efficient company operations, including managing non-technical staff, legal, and compliance requirements.
- - **Public Representation**: Acting as the public face of Radian when interacting with stakeholders, including the media, government, and strategic partners.

## 2. CTO Responsibilities
The CTO will be primarily responsible for the **internal technical aspects** of Radian Industries, including but not limited to:

- - **Product Development**: Directing the technical development of products, including technical decision-making for prototypes and innovations.
- - **Technical Hiring**: Managing the recruitment, onboarding, and training of technical contributors (engineers, researchers, etc.).
- - **IP Management**: Ensuring the protection of intellectual property and coordinating with legal counsel as necessary to maintain ownership and control of Radian's innovations.
- - **Technical Strategy**: Shaping the long-term vision for the technology and product roadmap of the company.

## 3. Joint Responsibilities
Both the CEO and CTO share the responsibility for the following areas:

- - **Strategic Decision-Making**: Major decisions, including

changes to company direction, equity agreements, or high-value
partnerships, must be jointly reviewed and approved by the board.
- - **Company Vision**: The CEO and CTO must align on Radian's core
mission and objectives, ensuring both technical and business
strategies complement each other.

## 4. Board Oversight and Final Authority
As per the board structure, **final authority on all major company
decisions** lies with the Board of Directors, which consists of:

- - **Michael Chapiro**, CEO and Cofounder
- - **Nathan Rapport**, CTO and Cofounder

Any **major decisions** outside the scope of day-to-day operations
(e.g., significant financial moves, strategic pivots, equity or
partnership agreements) must be presented to and approved by the
Board of Directors.

- ---

**Signed:**

Nathan Rapport

Radian Industries, Inc.
-----BEGIN PGP SIGNATURE-----

iQGzBAEBCgAdFiEEd4Rwr5+myJApz5lkpi/rAK/JYqMFAmf5HWIACgkQpi/rAK/J
YqPyUQv/W4Nr/d2QQrsTqPbXeYWZUus85d2+xvXNf/7yavT7XVcXvUilbR94wuAI
C6POnb897Q87AM85b6XppKqb+NFWp6t/uvK2fE0fCXKzNkjJEj1mc8azytK9xggB
BD/M34DMQYVYqmhaa5/x/mn38NJHxslCnCQ6VmVyhCwnU2A9u95E7npQcym8Fj3s
sqc+MHQjvrIwxnCMObdBgYA8JVPlK7N6zqNopj9uZ7P4r++G71K+8Y5kn3FANzlY
df07qRDyWJnW1vsimcHSW07TuPyTdaxXma2YPDa33DIr4X2icvKxcT1yeoHRWpnc
CIBicYeWlBPSOnO0kTpHZ3wabieJ8kzQlm6glVHsfHWoX1IX1oPNhBDN0m3fKudm
qaNRdBId7GtLjETClk3ny+AQVeFSyMGFFM+B70BUqQP9a771HmqECqqlUT3hKD0N
Lfpmb/FwZQ0zIUvPUq7y4rRv9iMn7GUOOUWUQ99u/NHq3Rudrvg1rRBgsJngajaT
yIroGG/r
=ZYbN
-----END PGP SIGNATURE-----

# 3. Initial Board Meeting Minutes



Figure 1: Meeting minutes metadata, showing the file was last modified on November 17, 2024.

## 3.a. Signed Initial Board Meeting Minutes

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

## Initial Meeting Minutes

1. Resolved that Nathan Rapport is appointed two board seats, and
Michael Chapiro is appointed one board seat.
2. Resolved that Nathan Rapport is appointed as CTO and Chairman of
the Board, and Michael Chapiro as CEO, Treasurer, Secretary, and
President.
    - a. Resolved that Michael Chapiro is authorized to open
financial accounts on behalf of the corporation (e.g. banking,
brokerage, etc.)
3. Resolved 1 million shares of stock have or are about to be issued
for purchase by the founders, Nathan Rapport and Michael Chapiro, as
per the founder's stock purchase agreement. Stock certificates shall
be issued, and a general stock ledger under Google Sheets may be
used for the interim as PDFs do not actually prove anything.
4. Resolved that corporate bylaws are hereby adopted.
5. Resolved that Michael Chapiro shall provide a loan to Radian
Industries Inc. of no less than \$30k and no more than \$60k, as per
the terms of the separate loan agreement.


By unanimous consent of the board and shareholders of Radian
Industries Inc.


By:_____
Name: Nathan Rapport, Chairman
```

Date:


By:_____
Name: Michael Chapiro, CEO
Date:
-----BEGIN PGP SIGNATURE-----

iQGzBAEBCgAdFiEEd4Rwr5+myJApz5lkpi/rAK/JYqMFAmfyBfgACgkQpi/rAK/J
YqMNXAwAlsGDF2koKOrN+XxH71wZIhH4DI3e6HblM526Z5il+b6T0yIOHn2LjYd/
/uTyE7NVmp063zs5z1vbMg3Vxj1Ywcw8lQyVEYWGkSXu/PYClmsZIR+V2i+f0Nj0
1nqfXNF3DZyA3bxcot85m3LWzG1zTCqaBOfqSJsjwEvk2x1GrkabEj4W0t8HjeE9
r4sL/tQOi1nbHwBfGzp1C1ZLEDd5XKBCA/Pg2o5L1BFd9tDSOJPQphuulcwegdJV
qGuXW8iVZdIBThMLUqruKTfgDOGpMus41KMT4FxMDOh165M166wXfYawLP+r6sGr
+MNbSLooUDMDDfuDYzzNgpx1UEE4rm5xRyvU1EuELgp3CjN3+1IXGir+Elwda4mm
9WMFq7npXxeNGRZzh1Tvlh3vDfaE15K7LHUjcq39oLRi9P/LyVfOXzew35ykHfaJ
WBzgbNTK/48W4+iOK/5auqytXijIaxvfCLrCUHsBBg+iYrOUMw21xOoSTGvOqDep
d1G5PS4e
=9qrV
-----END PGP SIGNATURE-----

# 4. Radian Industries Articles of Incorporation



Secretary of State

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

<u>For Office Use Only</u>
**WY Secretary of State**
**FILED: Aug 27 2024  3:29PM**
**Original ID: 2024-001512967**

---

**Profit Corporation**
**Articles of Incorporation**

I.    **The name of the profit corporation is:**
      Radian Industries Inc.

II.   **The name and physical address of the registered agent of the profit corporation is:**
      Registered Agents Inc
      30 N Gould St Ste R
      Sheridan, WY 82801

III.  **The mailing address of the profit corporation is:**
      300 LENORA ST
      SEATTLE, WA 98121

IV.   **The principal office address of the profit corporation is:**
      30 N Gould St Ste R
      Sheridan, WY 82801

V.    **The number, par value, and class of shares the profit corporation will have the authority to issue are:**
      Number of Common Shares:   10,000,000          Common Par Value:    $0.0001
      Number of Preferred Shares:  0                 Preferred Par Value:  $0.0000

VI.   **The name and address of each incorporator is as follows:**
      Michael Chapiro
      300 Lenora St, Seattle, WA, 98121

VII.  **Additional Article:**
      Authorized Shares
      Class A Common Shares: 10,000,000
      Class B Non-Voting Shares: 2,500,000
      Par Value: $0.0001

      (web form only had option for common/preferred)

---

Signature:  *Michael Chapiro*                          Date:  **08/27/2024**

Print Name:  **Michael Chapiro**

Title:  **CEO**

Email:  **wycorp@radianindustries.com**

Daytime Phone #:  **(650) 260-8044**

Page 1 of 4

# 5. ARK Interim Partnership Agreement

**ARK Interim Partnership Agreement**

Nathan Rapport and Michael Chapiro hereby enter into a partnership agreement on this 13th day of August, 2024.

**Purpose:** The partnership shall design, engineer, and develop technologies & products based on novel photonic effects, principally useful for the purpose of precision navigation across aviation, space, maritime, ground industries, and any other system requiring precise position or motion data. Nathan shall be CTO & Founder, while Michael shall be CEO & Co-Founder. The name of the partnership shall be ARK Industries.

**Capital Contributions and Ownership:** The partnership itself shall not manage capital. Each partner will contribute technical skills, know-how, engineering services, business development, strategy development. Cash contributions for the purpose of building concept prototypes or various SaaS/web, provisional patent filing, or other expenses shall be seen as de-minimis in comparison to the "sweat equity" and value of time provided by each partner. Nathan shall have a 51% controlling ownership, and Michael shall have 49%.

**IP, non-disclosure, and non-compete:** The company is largely based on IP related to sensing absolute orientation in space given light speed anisotropy and this IP shall be assigned to the partnership. These details, and various proprietary business strategies shall be held in confidence by the partners and reasonable measures will be taken to prevent 3rd party discovery of this data, without said 3rd parties having similar obligations to protect information in place (e.g. government grant proposals acceptable). Neither partner will form a separate entity for the purpose of competing in this domain of photonically enabled navigation/positioning systems.

**Scope and transition:** This is a temporary agreement that shall be superseded upon incorporation within the next 90 days. The corporation shall have a set of terms and bylaws that are reasonable and do not excessively deviate from recognized norms. The ownership when converted to shares in the corporation may have vesting restrictions associated with them. Nathan will be the Chairman of the Board and have board control with 2 seats, while Michael will have 1 seat.

Michael Chapiro                                      Nathan Rapport
michael@machcap.com                          n.rapport@gmail.com

_____              _____

Figure 3: The ARK Interim Partnership Agreement, signed by both parties. Note that the agreement uses future-tense "shall be assigned" language, which does not convey title, and there is no separate written/recorded assignment as required by 35 U.S.C. § 261. The clause on its face concerns "light speed anisotropy" IP (which the Artifact does not rely on[1]), and any broader reading is voidable as fraudulent inducement.

---

[1]Chapiro's assertion that "light-speed anisotropy" is implicated in the subject technology betrays a fundamental lack of comprehension of its underlying principles and serves to underscore his non-inventorship. The Artifact sensor operates in full conformity with the established framework of special relativity, a fact exhaustively set forth in the Radian Industries technical white paper provided to him. Chapiro's failure to grasp this core concept—despite explicit explanation—demonstrates that he lacked the expertise required to have conceived, reduced to practice, or contributed in any substantive manner to the invention.

# 6. ARK Name Change Document

**NAME CHANGE AND INCORPORATION**

By unanimous agreement of 100% of the owners, on this 9th day of September 2024 it is recognized that in continuation of the ARK Partnership agreement, due to domain name and other company name conflicts, the ARK Partnership is continued under the name Radian Industries, which has been incorporated in the State of Wyoming as Radian Industries Inc.

The principal place of business for hardware is: 1893 W 54TH ST, CLEVELAND, OH 44102

Michael Chapiro, CEO

Nathan Rapport, CTO

Figure 4: This reflects that key development, experimentation, and prototyping occurred in Ohio, and that Defendant acknowledged Ohio as the operational center of the company's technical work. As such, venue in this district is proper under applicable civil procedure rules.

# 7. Founding Agreements

## 7.a. Corporate Bylaws

**RADIAN INDUSTRIES INC**

a Wyoming Corporation

**BYLAWS**

As Adopted As Of Nov 30, 2024

i

**RADIAN INDUSTRIES INC.**

a Wyoming Corporation

**BYLAWS**

**ARTICLE I: STOCKHOLDERS**

**Section 1.1:** **Annual Meetings.** Unless members of the Board of Directors of the Cor

poration (the "***Board***") are elected by written consent in lieu of an annual meeting and these Bylaws, an  annual meeting of stockholders shall be held for the election of directors at such date and time as  the Board shall each year fix. The meeting may be held either at a place, within or without the  State of Wyoming, or by means of remote communication as the Board in its sole discretion may  determine. Any proper business may be transacted at the annual meeting.

**Section 1.2: <u>Special Meetings</u>.** Special meetings of stockholders for any purpose or purposes may be called at any time by the Chairperson of the Board, the Chief Executive Officer,  the President, the holders of shares of the Corporation that are entitled to cast not less than ten  percent (10%) of the total number of votes entitled to be cast by all stockholders at such meeting,  or by a majority of the "***Whole Board***," which shall mean the total number of authorized direc
tors, whether or not there exist any vacancies in previously authorized directorships. Special meetings may not be called by any other person or persons. If a special meeting of stockholders is called by any person or persons <u>other than </u>by a majority of the members of the Board, then such person or persons shall request such meeting by delivering a written request to call such meeting to each member of the Board, and the Board shall then determine the time and date of such special meeting, which shall be held not more than one hundred twenty (120) days nor less than thirty-five (35) days after the written request to call such special meeting was delivered to each member of the Board. The special meeting may be held either at a place, within or without the State of Wyoming, or by means of remote communication as the Board in its sole discretion may determine.

**Section 1.3: <u>Notice of Meetings</u>.** Notice of all meetings of stockholders shall be given in writing or by electronic transmission in the manner provided by law (including, without limi tation, as set forth in Section 7.1.1 of these Bylaws) stating the date, time and place, if any, of the   meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is   called. Unless otherwise required by applicable law or the Certificate of Incorporation of the   Corporation (the "***Certificate of Incorporation***"), such notice shall be given not less than ten   (10), nor more than sixty (60), days before the date of the meeting to each stockholder of record  entitled to vote at such meeting.

**Section 1.4: <u>Adjournments</u>.** The chairperson of the meeting shall have the power to adjourn the meeting to another time, date and place (if any). Any meeting of stockholders may adjourn from time to time, and notice need not be given of any such adjourned meeting if the time, date and place (if any) thereof and the means of remote communications (if any) by which stockholders and proxy holders may be deemed to be present in person and vote at such

1

adjourned meeting are announced at the meeting at which the adjournment is taken; *provided, however*, that if the adjournment is for more than thirty (30) days, or if a new record date is fixed  for the adjourned meeting, then a notice of the adjourned meeting shall be given to each stock holder of record entitled to vote at the meeting. At the adjourned meeting the Corporation may   transact any business that might have been transacted at the original meeting. To the

fullest   extent permitted by law, the Board may postpone or reschedule any previously scheduled special  or annual meeting of stockholders before it is to be held, in which case notice shall be provided  to the stockholders of the new date, time and place, if any, of the meeting as provided in Section  1.3 above.

**Section 1.5: <u>Quorum.</u>** At each meeting of stockholders the holders of a majority of the voting power of the shares of stock entitled to vote at the meeting, present in person or repre sented by proxy, shall constitute a quorum for the transaction of business, unless otherwise required by applicable law. If a quorum shall fail to attend any meeting, the chairperson of the meeting or the holders of a majority of the shares entitled to vote who are present, in person or by  proxy, at the meeting may adjourn the meeting. Shares of the Corporation's stock belonging to  the Corporation (or to another corporation, if a majority of the shares entitled to vote in the elec tion of directors of such other corporation are held, directly or indirectly, by the Corporation),  shall neither be entitled to vote nor be counted for quorum purposes; *provided, however,* that the  foregoing shall not limit the right of the Corporation or any other corporation to vote any shares  of the Corporation's stock held by it in a fiduciary capacity and to count such shares for purposes  of determining a quorum.

**Section 1.6: <u>Organization.</u>** Meetings of stockholders shall be presided over by such person as the Board may designate, or, in the absence of such a person, the Chairperson of the Board, or, in the absence of such person, the President of the Corporation, or, in the absence of such person, such person as may be chosen by the holders of a majority of the voting power of the shares entitled to vote who are present, in person or by proxy, at the meeting. Such person shall be chairperson of the meeting and, subject to Section 1.11 hereof, shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seems to him or her to be in order. The Secretary of the Corpo ration shall act as secretary of the meeting, but in such person's absence the chairperson of the meeting may appoint any person to act as secretary of the meeting.

**Section 1.7: <u>Voting; Proxies.</u>** Each stockholder entitled to vote at a meeting of stock holders, or to take corporate action by written consent without a meeting, may authorize another person or persons to act for such stockholder by proxy. Such a proxy may be prepared, transmitted and delivered in any manner permitted by applicable law. Except as may be required in the Certificate of Incorporation, directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the elec tion of directors. Unless otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, every matter other than the election of directors shall be decided by the affirmative vote of the holders of a majority of the voting power of the shares of stock entitled to  vote on such matter that are present in person or represented by proxy at the meeting and are voted for or against the matter.

**Section 1.8: <u>Fixing Date for Determination of Stockholders of Record.</u>**

2

1.8.1 <u>Generally</u>. In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or to take corporate action by written con

sent without a meeting**,** or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board may fix, except as oth erwise required by law, in advance, a record date, which shall not precede the date upon which  the resolution fixing the record date is adopted by the Board and which shall not be more than  sixty (60), nor less than ten (10), days before the date of such meeting, nor, except as provided in  Section 1.8.2 below, more than sixty (60) days prior to any other action. If no record date is  fixed by the Board, then the record date shall be as provided by applicable law. To the fullest  extent provided by law, a determination of stockholders of record entitled to notice of or to vote  at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however,*  that the Board may fix a new record date for the adjourned meeting.

1.8.2 <u>Stockholder Request for Action by Written Consent</u>. Any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent without a meeting shall, by written notice to the Secretary of the Corporation, request the Board to fix a record date for such consent. Such request shall include a brief description of the action pro posed to be taken. Unless a record date has previously been fixed by the Board for the written consent pursuant to this Section 1.8, the Board shall, within ten (10) days after the date on which  such a request is received, adopt a resolution fixing the record date. Such record date shall not  precede the date upon which the resolution fixing the record date is adopted by the Board. If no  record date has been fixed by the Board within ten (10) days after the date on which such a  request is received, then the record date for determining stockholders entitled to consent to cor
porate action in writing without a meeting, when no prior action by the Board is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation as required by law. If no record date  has been fixed by the Board and prior action by the Board is required by applicable law, then the   record date for determining stockholders entitled to consent to corporate action in writing with
out a meeting shall be at the close of business on the date on which the Board adopts the resolu tion taking such prior action.

**Section 1.9:  List of Stockholders Entitled to Vote.** A complete list of stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder,  shall be open to the examination of any stockholder, for any purpose germane to the meeting,  during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either  on a reasonably accessible electronic network as permitted by law (provided that the information  required to gain access to the list is provided with the notice of the meeting) or during ordinary   business hours at the principal place of business of the Corporation. If the meeting is held at a  location where stockholders may attend in person, the list shall also be produced and kept at the  time and place of the meeting during the whole time thereof and may be inspected by any stock holder who is present at the meeting. If the meeting is held solely by means of remote communi
cation, then the list shall be open to the examination of any stockholder during the whole time of  the meeting on a reasonably accessible electronic network, and the information required to access  the list shall be provided with the notice of the meeting.

3

**Section 1.10: <u>Action by Written Consent of Stockholders</u>.**

1.10.1 <u>Procedure</u>. Unless otherwise provided by the Certificate of Incorporation, any action required or permitted to be taken at any annual or special meeting of the stockholders may  be taken without a meeting, without prior notice and without a vote, if a consent or consents in  writing, setting forth the action so taken, shall be signed in the manner permitted by law by the  holders of outstanding stock having not less than the number of votes that would be necessary to   authorize or take such action at a meeting at which all shares entitled to vote thereon were pre

sent and voted and shall be delivered to the Corporation by delivery to its registered office in the   State of Wyoming, to its principal place of business or to an officer or agent of the Corporation  having custody of the book in which proceedings of meetings of stockholders are recorded.   Delivery made to the agent of the Corporation's registered office in the State of Wyoming shall be  by hand or by certified or registered mail, return receipt requested. Written stockholder consents  shall bear the date of signature of each stockholder who signs the consent in the manner permit

ted by law and shall be delivered to the Corporation as provided in Section 1.10.2 below. No written consent shall be effective to take the action set forth therein unless, within sixty (60) days  of the earliest dated consent delivered to the Corporation in the manner required by law, written   consents signed by a sufficient number of stockholders to take the action set forth therein are  delivered to the Corporation in the manner required by law.

1.10.2 <u>Form of Consent</u> A telegram, cablegram or other electronic transmission consent ing to an action to be taken and transmitted by a stockholder or proxy holder, or a person or per sons authorized to act for a stockholder or proxy holder, shall be deemed to be written, signed and dated for the purposes of this section, *provided* that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (a) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxy holder or by a person or persons authorized to act for the stockholder  or proxy holder and (b) the date on which such stockholder or proxy holder or authorized person  or persons transmitted such telegram, cablegram or electronic transmission. The date on which  such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date  on which such consent was signed. No consent given by telegram, cablegram or other electronic  transmission shall be deemed to have been delivered until such consent is reproduced in paper  form and until such paper form shall be delivered to the Corporation by delivery to its registered  office in the State of Wyoming, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to a Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the foregoing limitations on delivery, consents given by telegram, cablegram or other electronic transmission may be otherwise delivered  to the principal place of business of the Corporation or to an officer or agent of the Corporation  having custody of the book in which proceedings of meetings of stockholders are recorded if, to  the extent and in the manner provided by resolution of the Board. Any copy, facsimile or other  reliable reproduction of a consent in writing may be substituted or used in lieu of the original  writing for any and all purposes for which the original writing could be used, provided that such  copy, facsimile or

other reproduction shall be a complete reproduction of the entire original  writing.

4

1.10.3 <u>Notice of Consent</u>. Prompt notice of the taking of corporate action by stockhold ers without a meeting by less than unanimous written consent of the stockholders shall be given to those stockholders who have not consented thereto in writing and, who, if the action had been taken at a meeting, would have been entitled to notice of the meeting, if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation as required by law. If the action which is consented to is such as would have required the filing of a certificate under the DGCL (the "***Certificate of Action***") if such action had been voted on by stockholders at a meeting thereof, then if the DGCL  so requires, the certificate so filed shall state, in lieu of any statement required by the DGCL con
cerning any vote of stockholders, that written stockholder consent has been given in accordance with Section 228 of the DGCL.

### Section 1.11: Inspectors of Elections.

1.11.1 <u>Applicability</u>. Unless otherwise required by the Certificate of Incorporation or by the DGCL, the following provisions of this Section 1.11 shall apply only if and when the Corpo ration has a class of voting stock that is: (a) listed on a national securities exchange; (b) author ized for quotation on an interdealer quotation system of a registered national securities associa tion; or (c) held of record by more than two thousand (2,000) stockholders. In all other cases, observance of the provisions of this Section 1.11 shall be optional, and at the discretion of the Board.

1.11.2 <u>Appointment</u>. The Corporation shall, in advance of any meeting of stockholders, appoint one or more inspectors of election to act at the meeting and make a written report thereof. The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stock holders, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting.

1.11.3 <u>Inspector's Oath</u>. Each inspector of election, before entering upon the discharge of  his duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of such inspector's ability.

1.11.4 <u>Duties of Inspectors</u>. At a meeting of  stockholders, the inspectors of election shall  (a) ascertain the number of shares outstanding and the voting power of each share, (b) determine  the shares represented at a meeting and the validity of proxies and ballots, (c) count all votes and  ballots, (d) determine and retain for a reasonable period of time a record of the disposition of any  challenges made to any determination by the inspectors, and (e) certify their determination of the  number of shares represented at the meeting, and their count of all votes and ballots. The   inspectors may appoint or retain other persons or entities to assist the

inspectors in the performance of the duties of the inspectors.

    1.11.5 <u>Opening and Closing of Polls</u>. The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced by the chairperson of the meeting at the meeting. No ballot, proxies or votes, nor any revocations thereof or changes thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery upon application by a stockholder shall determine otherwise.

5

    1.11.6 <u>Determinations</u>. In determining the validity and counting of proxies and ballots, the inspectors shall be limited to an examination of the proxies, any envelopes submitted with those proxies, any information provided in connection with proxies in accordance with any information provided pursuant to Section 211(a)(2)(B)(i) of the DGCL, or Sections 211(e) or 212(c)(2) of the DGCL, ballots and the regular books and records of the Corporation, except that the inspectors may consider other reliable information for the limited purpose of reconciling proxies and ballots submitted by or on behalf of banks, brokers, their nominees or similar persons which represent more votes than the holder of a proxy is authorized by the record owner to cast or more votes than the stockholder holds of record. If the inspectors consider other reliable information for the limited purpose permitted herein, the inspectors at the time they make their certification of their determinations pursuant to this Section 1.11 shall specify the precise information considered by them, including the person or persons from whom they obtained the information, when the information was obtained, the means by which the information was obtained and the basis for the inspectors' belief that such information is accurate and reliable.

**ARTICLE II: BOARD OF DIRECTORS**

    **Section 2.1: <u>Number; Qualifications.</u>** The Board shall consist of one or more members. The initial number of directors shall be One (1), and, thereafter, unless otherwise required by law or the Certificate of Incorporation, shall be fixed from time to time by resolution of the Whole Board, or the stockholders of the Corporation holding at least a majority of the voting power of the Corporation's outstanding stock then entitled to vote at an election of directors. No decrease in the authorized number of directors constituting the Board shall shorten the term of any incumbent director. Directors need not be stockholders of the Corporation.

    **Section 2.2: <u>Election; Resignation; Removal; Vacancies.</u>** The Board shall initially consist of the person or persons elected by the incorporator or named in the Corporation's initial Certificate of Incorporation. Each director shall hold office until the next annual meeting of stockholders and until such director's successor is elected and qualified, or until such director's earlier death, resignation or removal. Any director may resign at any time upon written notice to the Corporation. Subject to the rights of any holders of Preferred Stock then outstanding: (a) any director or the entire Board may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors and (b) any vacancy occurring in the Board for any reason, and any newly created directorship resulting from any

increase in the  authorized number of directors to be elected by all stockholders having the right to vote as a single class, may be filled by the stockholders, by a majority of the directors then in office, although  less than a quorum, or by a sole remaining director.

      **Section  2.3:  Regular Meetings.** Regular meetings of the Board may be held at such places, within or without the State of Wyoming, and at such times as the Board may from time to  time determine. Notice of regular meetings need not be given if the date, times and places thereof are fixed by resolution of the Board.

      **Section  2.4:  Special Meetings.** Special meetings of the Board may be called by the Chairperson of the Board, the President or a majority of the members of the Board then in office  and may be held at any time, date or place, within or without the State of Wyoming, as the person  or persons calling the meeting shall fix. Notice of the time, date and place of such meeting shall

6

be given, orally, in writing or by electronic transmission (including electronic mail), by the per son or persons calling the meeting to all directors at least four (4) days before the meeting if the notice is mailed, or at least twenty-four (24) hours before the meeting if such notice is given by telephone, hand delivery, telegram, telex, mailgram, facsimile, electronic mail or other means of electronic transmission. Unless otherwise indicated in the notice, any and all business may be transacted at a special meeting.

      **Section 2.5:  Remote Meetings Permitted.** Members of the Board, or any committee  of the Board, may participate in a meeting of the Board or such committee by means of confer ence telephone or other communications equipment by means of which all persons participating  in the meeting can hear each other, and participation in a meeting pursuant to conference tele phone or other communications equipment shall constitute presence in person at such meeting.

      **Section 2.6:  Quorum; Vote Required for Action.** At all meetings of the Board a majority of the Whole Board shall constitute a quorum for the transaction of business. If a quo rum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another place, date or time without further notice thereof. Except as otherwise provided herein or  in the Certificate of Incorporation, or required by law, the vote of the Whole Board at a meeting  shall be the act of the Board.

      **Section  2.7:  Organization.** Meetings of the Board shall be presided over by the Chair person of the Board, or in such person's absence by the President, or in such person's absence by  a chairperson chosen at the meeting. The Secretary shall act as secretary of the meeting, but in  such person's absence the chairperson of the meeting may appoint any person to act as secretary  of the meeting.

      **Section  2.8:  Written Action by Directors.** Any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or

transmissions are filed with the minutes of proceedings of the Board or committee, respectively, in the minute books of the Corporation. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

      **Section 2.9: <u>Powers</u>.** The Board may, except as otherwise required by law or the Cer tificate of Incorporation, exercise all such powers and manage and direct all such acts and things as may be exercised or done by the Corporation.

      **Section 2.10: <u>Compensation of Directors</u>.** Members of the Board, as such, may receive, pursuant to a resolution of the Board, fees and other compensation for their services as directors, including without limitation their services as members of committees of the Board.

## ARTICLE III: COMMITTEES

      **<u>Section 3.1</u>: <u>Committees</u>.** The Board may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board may desig nate one or more directors as alternate members of any committee, who may replace any absent

7

or disqualified member at any meeting of the committee. In the absence or disqualification of a member of the committee, the member or members thereof present at any meeting of such com mittee who are not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in place of any such absent or disqualified member.

      **Section 3.2: <u>Committee Rules</u>.** Unless the Board otherwise provides, each committee designated by the Board may make, alter and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board conducts its business pursuant to Article II of these Bylaws.

## ARTICLE IV: OFFICERS

      **Section 4.1: <u>Generally</u>.** The officers of the Corporation shall consist of a Chief Execu tive Officer (who may be the Chairperson of the Board or the President), a Secretary and a Treas urer and may consist of such other officers, including a Chief Financial Officer, Chief Technol ogy Officer and one or more Vice Presidents, as may from time to time be appointed by the Board. All officers shall be elected by the Board; *provided, however*, that the Board may empower the Chief Executive Officer of the Corporation to appoint any officer other than the Chairperson of the Board, the Chief Executive Officer, the President, the Chief Financial Officer or the Treasurer. Each officer shall hold office until such person's successor is appointed or until such person's earlier resignation, death or removal. Any number of offices may be held by the same person. Any officer may resign at any time upon written notice to the Corporation. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled by the Board.

**Section 4.2: <u>Chief Executive Officer</u>.** Subject to the control of the Board and such supervisory powers, if any, as may be given by the Board, the powers and duties of the Chief Executive Officer of the Corporation are:

(a) To act as the general manager and, subject to the control of the Board, to have general supervision, direction and control of the business and affairs of the Corporation;

(b) Subject to Article I, Section 1.6, to preside at all meetings of the stock holders;

(c) Subject to Article I, Section 1.2, to call special meetings of the stockhold ers to be held at such times and, subject to the limitations prescribed by law or by these Bylaws, at such places as he or she shall deem proper; and

(d) To affix the signature of the Corporation to all deeds, conveyances, mort gages, guarantees, leases, obligations, bonds, certificates and other papers and instru ments in writing which have been authorized by the Board or which, in the judgment of the Chief Executive Officer, should be executed on behalf of the Corporation; to sign certificates for shares of stock of the Corporation; and, subject to the direction of the Board, to have general charge of the property of the Corporation and to supervise and control all officers, agents and employees of the Corporation.

8

The President shall be the Chief Executive Officer of the Corporation unless the Board shall designate another officer to be the Chief Executive Officer. If there is no President, and the Board has not designated any other officer to be the Chief Executive Officer, then the Chairper son of the Board shall be the Chief Executive Officer.

**Section 4.3: <u>Chairperson of the Board</u>.** The Chairperson of the Board shall have the power to preside at all meetings of the Board and shall have such other powers and duties as pro vided in these Bylaws and as the Board may from time to time prescribe.

**Section 4.4: <u>President</u>.** The President shall be the Chief Executive Officer of the Cor poration unless the Board shall have designated another officer as the Chief Executive Officer of the Corporation. Subject to the provisions of these Bylaws and to the direction of the Board, and subject to the supervisory powers of the Chief Executive Officer (if the Chief Executive Officer is an officer other than the President), and subject to such supervisory powers and authority as may be given by the Board to the Chairperson of the Board, and/or to any other officer, the Presi dent shall have the responsibility for the general management and control of the business and affairs of the Corporation and the general supervision and direction of all of the officers, employ ees and agents of the Corporation (other than the Chief Executive Officer, if the Chief Executive Officer is an officer other than the President) and shall perform all duties and have all powers that are commonly incident to the office of President or that are delegated to the President by the Board.

**Section 4.5: <u>Vice President</u>.** Each Vice President shall have all such powers and duties as are commonly incident to the office of Vice President, or that are delegated to him or her by

the Board or the Chief Executive Officer. A Vice President may be designated by the  Board to perform the duties and exercise the powers of the Chief Executive Officer in the event  of the Chief Executive Officer's absence or disability.

**Section 4.6: Chief Financial Officer.** The Chief Financial Officer shall be the Treas urer of the Corporation unless the Board shall have designated another officer as the Treasurer of  the Corporation. Subject to the direction of the Board and the Chief Executive Officer, the Chief  Financial Officer shall perform all duties and have all powers that are commonly incident to the  office of Chief Financial Officer.

**Section 4.7: Treasurer.** The Treasurer shall have custody of all moneys and securities of  the Corporation. The Treasurer shall make such disbursements of the funds of the Corporation   as are authorized and shall render from time to time an account of all such transactions. The  Treasurer shall also perform such other duties and have such other powers as are commonly inci dent to the office of Treasurer, or as the Board or the Chief Executive Officer may from time to  time prescribe.

**Section 4.8: Chief Technology Officer.** The Chief Technology Officer shall have responsibility for the general research and development activities of the Corporation, for supervi sion of the Corporation's research and development personnel, for new product development and  product improvements, for overseeing the development and direction of the Corporation's intel lectual property development and such other responsibilities as may be given to the Chief Tech nology Officer by the Board, subject to: (a) the provisions of these Bylaws; (b) the direction of

9

the Board; (c) the supervisory powers of the Chief Executive Officer of the Corporation; and (d)  those supervisory powers that may be given by the Board to the Chairperson or Vice Chairperson  of the Board.

**Section 4.9: Secretary.** The Secretary shall issue or cause to be issued all authorized notices for, and shall keep, or cause to be kept, minutes of all meetings of the stockholders and the Board. The Secretary shall have charge of the corporate minute books and similar records and shall perform such other duties and have such other powers as are commonly incident to the office of Secretary, or as the Board or the Chief Executive Officer may from time to time prescribe.

**Section 4.10: Delegation of Authority.** The Board may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

**Section 4.11: Removal.** Any officer of the Corporation shall serve at the pleasure of the  Board and may be removed at any time, with or without cause, by the Board; provided that if the Board has empowered the Chief Executive Officer to appoint any Vice Presidents of the Corpo ration, then such Vice Presidents may be removed by the Chief Executive Officer. Such removal

shall be without prejudice to the contractual rights of such officer, if any, with the Corporation.

## ARTICLE V: STOCK

**Section 5.1: <u>Certificates</u>.** The shares of capital stock of the Corporation shall be repre sented by certificates; *provided*, *however*, that the Board may provide by resolution or resolutions  that some all of any or all classes or series of its stock may be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surren dered to the Corporation (or the transfer agent or registrar, as the case may be). Notwithstanding the adoption of such resolution by the Board, every holder of stock that is a certificated security shall be entitled to have a certificate signed by or in the name of the Corporation by the Chairper son or Vice-Chairperson of the Board, or the President or a Vice President, and by the Treasurer  or an Assistant Treasurer, or the Secretary or an Assistant Secretary, of the Corporation, certify ing the number of shares owned by such stockholder in the Corporation. Any or all of the sig natures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who  has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be  such officer, transfer agent or registrar before such certificate is issued, it may be issued by the  Corporation with the same effect as if such person were an officer, transfer agent or registrar at  the date of issue. If any holder of uncertificated shares elects to receive a certificate, the Corpo ration (or the transfer agent or registrar, as the case may be) shall, to the extent permitted under  applicable law and rules, regulations and listing requirements of any stock exchange or stock

market on which the Corporation's shares are listed or traded, cease to provide annual statements  indicating such holder's holdings of shares in the Corporation.

**Section 5.2: <u>Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certifi cates</u>.** The Corporation may issue a new certificate of stock, or uncertificated shares, in the place  of any certificate previously issued by it, alleged to have been lost, stolen or destroyed, ,  upon the  making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen  or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certifi cate, or such owner's legal representative, to agree to indemnify the Corporation and/or to give  the Corporation a bond sufficient to indemnify it, against any claim that may be made against it  on account of the alleged loss, theft or destruction of any such certificate or the issuance of such  new certificate.

**Section 5.3: <u>Other Regulations</u>.** The issue, transfer, conversion and registration of stock certificates and uncertificated securities shall be governed by such other regulations as the Board may establish.

## ARTICLE VI: INDEMNIFICATION

**Section 6.1: <u>Indemnification of Officers and Directors</u>.** Each person who was or is made a party to, or is threatened to be made a party to, or is involved in any action, suit or pro

ceeding, whether civil, criminal, administrative or investigative (a "***Proceeding***"), by reason of the fact that such person (or a person of whom such person is the legal representative), is or was a member of the Board or officer of the Corporation or a Reincorporated Predecessor (as defined below) or is or was serving at the request of the Corporation or a Reincorporated Predecessor as a member of the board of directors, officer or trustee of another corporation, or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans (for purposes of this Article VI, an "***Indemnitee***"), shall be indemnified and held harmless by the Corporation to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expenses, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such Indemnitee in connection therewith, provided such Indemnitee acted in good faith and in a manner that the Indemnitee rea sonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful. Such indemnification shall continue as to an Indemnitee who has ceased to be a director or officer and shall inure to the benefit of such Indemnitees' heirs, executors and administrators. Notwithstanding the foregoing, the Corporation shall indemnify any such Indem nitee seeking indemnity in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board or such indem
nification is authorized by an agreement approved by the Board. As used herein, the term the "***Reincorporated Predecessor***" means a corporation that is merged with and into the Corporation in a statutory merger where (a) the Corporation is the surviving corporation of such merger; (b) the primary purpose of such merger is to change the corporate domicile of the Reincorporated Predecessor to Wyoming.

11

**Section 6.2: <u>Advance of Expenses.</u>** The Corporation shall pay all expenses (including attorneys' fees) incurred by such an Indemnitee in defending any such Proceeding as they are incurred in advance of its final disposition; *provided, however*, that (a) if the DGCL then so requires, the payment of such expenses incurred by such an Indemnitee in advance of the final disposition of such Proceeding shall be made only upon delivery to the Corporation of an under taking, by or on behalf of such Indemnitee, to repay all amounts so advanced if it should be determined ultimately by final judicial decision from which there is no appeal that such Indem nitee is not entitled to be indemnified under this Article VI or otherwise; and (b) the Corporation shall not be required to advance any expenses to a person against whom the Corporation directly brings a claim, in a Proceeding, alleging that such person has breached such person's duty of loy alty to the Corporation, committed an act or omission not in good faith or that involves inten tional misconduct or a knowing violation of law, or derived an improper personal benefit from a transaction.

**Section 6.3: <u>Non-Exclusivity of Rights.</u>** The rights conferred on any person in this Article VI shall not be exclusive of any other right that such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, Bylaw, agreement, vote

or con sent of stockholders or disinterested directors, or otherwise. Additionally, nothing in this Article  VI shall limit the ability of the Corporation, in its discretion, to indemnify or advance expenses to  persons whom the Corporation is not obligated to indemnify or advance expenses pursuant to this  Article VI.

**Section 6.4: Indemnification Contracts.** The Board is authorized to cause the Corpo ration to enter into indemnification contracts with any director, officer, employee or agent of the Corporation, or any person serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including employee benefit plans, providing indemnification or advancement rights to such person. Such rights may be greater than those provided in this Article VI.

**Section 6.5: Right of Indemnitee to Bring Suit.** The following shall apply to the extent not in conflict with any indemnification contract provided for in Section 6.4 above.

6.5.1 <u>Right to Bring Suit</u>. If a claim under Section 6.1 or 6.2 of this Article VI is not paid in full by the Corporation within sixty (60) days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the  applicable period shall be twenty (20) days, the Indemnitee may at any time thereafter bring suit  against the Corporation to recover the unpaid amount of the claim. If successful in whole or in  part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall be entitled to be paid also   the expense of prosecuting or defending such suit. In (a) any suit brought by the Indemnitee to  enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to  enforce a right to an advancement of expenses) it shall be a defense that, and (b) in any suit  brought by the Corporation to recover an advancement of expenses pursuant to the terms of an  undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication  that, the Indemnitee has not met any applicable standard for indemnification set forth in applica ble law.

12

6.5.2 <u>Effect of Determination</u>. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such suit  that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee  has met the applicable standard of conduct set forth in applicable law, nor an actual determina
tion by the Corporation (including its directors who are not parties to such action, a committee of  such directors, independent legal counsel or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit.

6.5.3 <u>Burden of Proof</u>. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to

recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article VI, or otherwise, shall be on the Corporation.

**Section 6.6:** **Nature of Rights.** The rights conferred upon Indemnitees in this Arti cle VI shall be contract rights and such rights shall continue as to an Indemnitee who has ceased  to be a director, officer or trustee and shall inure to the benefit of the Indemnitee's heirs, execu tors and administrators. Any amendment, repeal or modification of any provision of this Article  VI that adversely affects any right of an Indemnitee or an Indemnitee's successors shall be pro spective only, and shall not adversely affect any right or protection conferred on a person pursu ant to this Article VI and existing at the time of such amendment, repeal or modification.

### ARTICLE VII: NOTICES

**Section 7.1:** **Notice.**

7.1.1 <u>Form and Delivery</u>. Except as otherwise specifically required in these Bylaws (including, without limitation, Section 7.1.2 below) or by law, all notices required to be given pursuant to these Bylaws shall be in writing and may, (a) in every instance in connection with any delivery to a member of the Board, be effectively given by hand delivery (including use of a  delivery service), by depositing such notice in the mail, postage prepaid, or by sending such notice by prepaid telegram, cablegram, overnight express courier, facsimile, electronic mail or other form of electronic transmission and (b) be effectively be delivered to a stockholder when given by hand delivery, by depositing such notice in the mail, postage prepaid or, if specifically consented to by the stockholder as described in Section 7.1.2 of this Article VII by sending such notice by telegram, cablegram, facsimile, electronic mail or other form of electronic transmis sion. Any such notice shall be addressed to the person to whom notice is to be given at such per son's address as it appears on the records of the Corporation. The notice shall be deemed given (a) in the case of hand delivery, when received by the person to whom notice is to be given or by  any person accepting such notice on behalf of such person, (b) in the case of delivery by mail,  upon deposit in the mail, (c) in the case of delivery by overnight express courier, when dis patched, and (d) in the case of delivery via telegram, cablegram, facsimile, electronic mail or other form of electronic transmission, when dispatched.

13

7.1.2 <u>Electronic Transmission</u>. Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation, or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given in accordance with Section 232 of the DGCL. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed revoked if (a) the Corporation is unable to deliver by electronic transmission two con secutive notices given by the Corporation in accordance with such consent and (b) such inability  becomes known to the Secretary or an Assistant Secretary of the Corporation or to the

transfer agent, or other person responsible for the giving of notice; *provided, however,* the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. Notice given pursuant to this Section 7.1.2 shall be deemed given: (i) if by facsimile telecommu

nication, when directed to a number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of such posting and the giving of such separate notice; and (iv) if by any other form of electronic transmission, when directed to the stockholder.

7.1.3 <u>Affidavit of Giving Notice</u>. An affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the Corporation that the notice has been given in writing or by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

**Section 7.2: <u>Waiver of Notice.</u>** Whenever notice is required to be given under any provision of the DGCL, the Certificate of Incorporation or these Bylaws, a written waiver of notice, signed by the person entitled to notice, or waiver by electronic transmission by such person, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or con vened. Neither the business to be transacted at, nor the purpose of, any regular or special meet ing of the stockholders, directors or members of a committee of directors need be specified in any waiver of notice.

**ARTICLE VIII: INTERESTED DIRECTORS**

**Section 8.1: <u>Interested Directors.</u>** No contract or transaction between the Corporation and one or more of its members of the Board or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are members of the board of directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board or committee thereof that authorizes the contract or transaction, or solely because his, her or their votes are counted for such purpose, if: (a) the mate rial facts as to his, her or their relationship or interest and as to the contract or transaction are dis

closed or are known to the Board or the committee, and the Board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested

14

directors, even though the disinterested directors be less than a quorum; (b) the material facts as to his, her or their relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (c) the contract or

transaction is fair as to  the Corporation as of the time it is authorized, approved or ratified by the Board, a committee  thereof, or the stockholders.

**Section 8.2: Quorum.** Interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

### ARTICLE IX: MISCELLANEOUS

**Section 9.1: Fiscal Year.** The fiscal year of the Corporation shall be determined by resolution of the Board.

**Section 9.2: Seal.** The Board may provide for a corporate seal, which may have the name of the Corporation inscribed thereon and shall otherwise be in such form as may be approved from time to time by the Board.

**Section 9.3: Form of Records.** Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be kept on or by means of, or be in the form of, diskettes, CDs, or any other information storage device or method, provided that the records so kept can be converted into clearly legible paper form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to any provision of the DGCL.

**Section 9.4: Reliance upon Books and Records.** A member of the Board, or a mem ber of any committee designated by the Board shall, in the performance of such person's duties, be fully protected in relying in good faith upon records of the Corporation and upon such infor mation, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board, or by any other person as to matters the mem ber reasonably believes are within such other person's professional or expert competence and  who has been selected with reasonable care by or on behalf of the Corporation.

**Section 9.5: Certificate of Incorporation Governs.** In the event of any conflict between the provisions of the Certificate of Incorporation and Bylaws, the provisions of the Cer tificate of Incorporation shall govern.

**Section 9.6: Severability.** If any provision of these Bylaws shall be held to be invalid, illegal, unenforceable or in conflict with the provisions of the Certificate of Incorporation, then such provision shall nonetheless be enforced to the maximum extent possible consistent with such holding and the remaining provisions of these Bylaws (including without limitation, all portions of any section of these Bylaws containing any such provision held to be invalid, illegal, unenforceable or in conflict with the Certificate of Incorporation, that are not themselves invalid,  illegal, unenforceable or in conflict with the Certificate of Incorporation) shall remain in full  force and effect.

15

**ARTICLE X: AMENDMENT**

Unless otherwise required by the Certificate of Incorporation, stockholders of the Corporation holding at least a majority of the voting power of the Corporation's outstanding voting stock then entitled to vote at an election of directors shall have the power to adopt, amend or repeal Bylaws. To the extent provided in the Certificate of Incorporation, the Board shall also have the power to adopt, amend or repeal Bylaws of the Corporation.

16

## 7.b. Founders Agreement

**RADIAN INDUSTRIES INC.**
**FOUNDERS AGREEMENT AND STOCK PURCHASE AGREEMENT**

This Founders Agreement and Stock Purchase Agreement (the "Agreement") is made as of
January 8
_____, 2024 by and between Radian Industries Inc., a Wyoming corporation (the
"Company"), and Nathan Rapport, and Michael Chapiro or who may in the future execute, an
Adoption Agreement in the form of Exhibit "D" attached hereto  (collectively "Purchasers" and
in the singular "Purchaser").

     1. **Sale of Stock.** Subject to the terms and conditions of this Agreement, on the Purchase
Date (as defined below) as set forth in Schedule 1 attached hereto, the Company will  issue and
sell to Purchasers, and Purchasers agree to purchase from the Company, shares of the
Company's Common Stock (the "Shares") at a purchase price of $0.001 per Share. The term
"Shares" refers to: (i)the purchased Shares by a single Purchaser and by Purchasers, (ii) all
securities received in replacement of or in connection with the Shares pursuant to stock
dividends or splits, all securities received in replacement of the Shares in a recapitalization,
merger, reorganization, exchange or the like, (iii) all new, substituted or additional securities or
other properties to which Purchaser is entitled by reason of Purchaser's ownership of the Shares,
and (iv) all securities of the Company hereafter issued by the Company to a Purchaser or
acquired by the Purchaser, whether beneficially or of record. All references herein to the Shares
owned by a Purchaser include the community interest or similar marital property interest, if any,
of the spouse of such Purchaser in such Shares. In connection with the acquisition of Shares,
Purchasers shall execute an Assignment of IP and Assets Agreement, in the form of Exhibit C
attached hereto, in favor of the Company.

     2. **Purchase.** The purchase and sale of the Shares under this Agreement shall occur at the
principal office of the Company simultaneously with the execution and delivery of this
Agreement by the parties or on such other date as the Company and Purchaser shall agree (the
"Purchase Date"). On the Purchase Date, the Company will deliver to Purchaser a certificate
representing the Shares to be purchased by Purchaser (which shall be issued in Purchaser's
name) against payment of the purchase price therefor by Purchaser by (a) check made payable to
the Company, (b) cancellation of indebtedness of the Company to Purchaser, (c) an assignment
of certain assets, or (d) by a combination of the foregoing.

     3. **Limitations on Transfer.** In addition to any other limitation on transfer created by
applicable securities laws, Purchaser shall not assign, encumber or dispose of any interest in the
Shares while the Shares are subject to the Company's Repurchase Option (as defined below).
After any Shares have been released from the Repurchase Option, Purchaser shall not assign,
encumber or dispose of any interest in such Shares except in compliance with the provisions
below and applicable securities laws. In addition, Purchaser may not assign, encumber or
dispose of any interest in such Shares without obtaining the prior approval of a Purchaser
Majority as defined herein.

     (a) **Repurchase Option; Vesting.**
         (i) In the event of the voluntary or involuntary termination of
Purchaser's Continuous Service Status for any reason (including death or Disability), with or

without cause, the Company shall upon the date of such termination (the "Termination Date") have an irrevocable, exclusive option (the "Repurchase Option") for a period of 6 months from such date to repurchase all or any portion of the Shares held by Purchaser as of the Termination Date which have not yet been released from the Company's Repurchase Option at the original purchase price per Share specified in Section 1 (adjusted for any stock splits, stock dividends and the like).

(ii) The Repurchase Option shall be exercised by the Company by written notice at any time within 6 months following the Termination Date to Purchaser or Purchaser's executor and, at the Company's option, (A) by delivery to Purchaser or Purchaser's executor with such notice of a check in the amount of the purchase price for the Shares being purchased, or (B) by cancellation by the Company of indebtedness equal to the purchase price for the Shares being repurchased, or (C) by a combination of (A) and (B) so that the combined payment and cancellation of indebtedness equals such purchase price. Upon delivery of such notice and payment of the purchase price in any of the ways described above, the Company shall become the legal and beneficial owner of the Shares being repurchased and all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Shares being repurchased by the Company, without further action by Purchaser.

(iii) **Vesting** 70% of the Shares shall initially be subject to the Repurchase Option. 17.5% of the total number of Shares shall be released from the Repurchase Option on June 1, 2025, and an additional 8.75% of the total number of Shares shall be released from the Repurchase Option on the 1st day of each calendar quarter thereafter, until all Shares are released from the Repurchase Option; provided, however, that such scheduled releases from the Repurchase Option shall immediately cease as of the Termination Date. Fractional shares shall be rounded to the nearest whole share.

(b) **Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or  otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 3(b) (the "Right of First Refusal").

(i) **Notice of Proposed Transfer.** The Holder of the Shares shall deliver  to the Company a written notice (the "Notice") stating: (A) the Holder's bona fide intention to  sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other  transferee ("Proposed Transferee"); (C) the number of Shares to be transferred to each Proposed Transferee; and (D) the terms and conditions of each proposed sale or transfer. The Holder shall offer the Shares at the same price (the "Offered Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

(ii) **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance

with subsection (iii) below.

(iii) **Purchase Price.** The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section 3(b) shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(iv) **Payment.** Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(v) **Holder's Right to Transfer.** If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 3(b), then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 60 days after the date of the

3

Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws and the Proposed Transferee agrees in writing that the provisions of this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company  and/or its assignees shall again be offered the Right of First Refusal before any Shares held by  the Holder may be sold or otherwise transferred.

(vi) **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 3(b) notwithstanding, the transfer of any or all of the Shares during Purchaser's lifetime or on Purchaser's death by will or intestacy to Purchaser's Immediate Family or a trust for the benefit of Purchaser or Purchaser's Immediate Family shall be exempt from the provisions of this Section 3(b). "Immediate Family" as used herein shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, uncle, aunt, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in law or sister-in-law, including adoptive relationships, or any person sharing the Purchaser's household (other than a tenant or an employee). In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3.

(c) **Company's Right to Purchase upon Involuntary Transfer.** In the event, at any time after the date of this Agreement, of any transfer by operation of law or other involuntary transfer (including divorce or death, but excluding in the event of death a transfer to Immediate Family as set forth in Section 3(b)(vi) above of all or a portion of the Shares by the

record holder thereof, the Company shall have the right to purchase all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the fair market value of the Shares on the date of transfer (as determined by the Board of Directors of the Company). Upon such a transfer, the person acquiring the Shares shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of thirty (30) days following receipt by the Company of written notice by the person acquiring the Shares.

(d) **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(e) **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement, including, insofar as applicable, the Repurchase Option. In the event of any purchase by the Company hereunder where the Shares or interest are held by a transferee, the transferee  shall be obligated, if requested by the Company, to transfer the Shares or interest to the Purchaser for consideration equal to the amount to be paid by the Company hereunder. In the event the  Repurchase Option is deemed exercised by the Company pursuant to Section 3(a)(ii) hereof, the  Company may deem any transferee to have transferred the Shares or interest to

4

Purchaser prior to their purchase by the Company, and payment of the purchase price by the Company to such transferee shall be deemed to satisfy Purchaser's obligation to pay such transferee for such Shares or interest and also to satisfy the Company's obligation to pay Purchaser for such Shares or interest. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(f) **Termination of Rights.** The Right of First Refusal and the Company's right to repurchase the Shares in the event of an involuntary transfer pursuant to Section 3(c) above shall terminate upon the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act").

(g) **Lock-up Agreement.** In connection with the initial public offering of the Company's securities and upon request of the Company or the underwriters managing such offering of the Company's securities, Purchaser hereby agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed 180 days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the Company's initial public offering. In addition, upon request of the Company or the underwriters managing a public offering of the Company's securities (other than the initial public offering), Purchaser hereby agrees to be bound by similar restrictions, and to sign a similar agreement, in connection with no more than one additional registration

statement filed within 12 months after the closing date of the initial public offering, provided that the duration of the lock-up period with respect to such additional registration shall not exceed 90 days from the effective date of such additional registration statement. Notwithstanding the foregoing, the Company shall use its best efforts to cause any such agreement to contain a phased release from the lock-up period contained in the agreement based on the Company's achievement of certain performance milestones. Any waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply to all securityholders subject to such agreements pro rata based on the number of shares subject to such agreements.

4. **Escrow of Unvested Shares.** For purposes of facilitating the enforcement of the  provisions of Section 3 above, Purchaser agrees, immediately upon receipt of the certificate(s)  for the Shares subject to the Repurchase Option, to deliver such certificate(s), together with an Assignment Separate from Certificate in the form attached to this Agreement as Exhibit A executed by Purchaser and by Purchaser's spouse (if required for transfer), in blank, to the Secretary of the Company, or the Secretary's designee, to hold such certificate(s) and Assignment Separate from Certificate in escrow and to take all such actions and to effectuate all such transfers and/or releases as are in accordance with the terms of this Agreement. Purchaser hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable. Purchaser agrees that said escrow holder shall not be liable to any party hereof (or to

5

any other party). The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time. Purchaser agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board of Directors of the Company shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

5. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b) Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon,  among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c) Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission ("Commission") and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Purchaser acknowledges that the Company has no obligation to register or qualify the Shares for resale. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the
Shares, and requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

(d) Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

6. **Restrictive Legends and Stop-Transfer Orders.**

(a) **Legends.** The certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by applicable state and federal corporate and securities laws):

(i) "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR

6

DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii) "THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY."

(iii) Any legend required to be placed thereon by the Wyoming Commissioner of Corporations.

(b) **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c) **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d) **Removal of Legend.** When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend referred to in Section 6(a)(ii) above: (i) the termination of the Right of First Refusal; and (ii) the expiration or termination of the market standoff provisions of Section 3(g) (and of any agreement entered pursuant to Section 3(g)); and (iii) the expiration or exercise in full of the Repurchase Option. After such time, and upon Purchaser's request, a new certificate or certificates representing the Shares not repurchased shall be issued without the legend referred to in Section 6(a)(ii) above, and delivered to Purchaser.

7. **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a Parent or Subsidiary of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

8. **Section 83(b) Election.** Purchaser understands that Section 83(a) of the Internal Revenue Code of 1986, as amended (the "Code"), taxes as ordinary income the difference  between the amount paid for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse. In this context, "restriction" means the right of the Company to  buy back the Shares pursuant to the Repurchase Option set forth in Section 3(a) of this Agreement. Purchaser understands that Purchaser may elect to be taxed at the time the Shares are purchased, rather than when and as the Repurchase Option expires, by filing an election under  Section 83(b) (an "83(b) Election") of the Code with the Internal Revenue Service within

7

30 days from the date of purchase. Even if the fair market value of the Shares at the time of the execution of this Agreement equals the amount paid for the Shares, the election must be made to avoid income under Section 83(a) in the future. Purchaser understands that failure to file such an election in a timely manner may result in adverse tax consequences for Purchaser. Purchaser further understands that an additional copy of such election form should be filed with Purchaser's federal income tax return for the calendar year in which the date of this Agreement falls. Purchaser acknowledges that the foregoing is only a summary of the effect of United States federal income taxation with respect to purchase of the Shares hereunder, does not purport to be complete, and is not intended or written to be used, and cannot be used, for the purposes of avoiding taxpayer penalties. Purchaser further acknowledges that the Company has directed Purchaser to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which Purchaser may reside, and the tax consequences of Purchaser's death. Purchaser agrees that he will execute and deliver to the Company with this executed Agreement a copy of the Acknowledgment and Statement of

Decision Regarding Section 83(b) Election (the "Acknowledgment"), attached hereto as Exhibit B.

9. **Certain Defined Terms.**

(a) **"Affiliate"** means an entity other than a Subsidiary which, together with  the Company, is under common control of a third person or entity.

(b) **"Confidential Information"** means any information of a confidential or secret nature that may be disclosed to Purchaser by or on behalf of the Company or any of its Affiliates that (a) relates to the business of the Company, its Affiliates, its customers and suppliers, as well as other entities or individuals on whose behalf Purchaser or the Company has agreed or may, during the Continuous Service Status, agree to hold information in confidence or (b) is otherwise produced or acquired by or on behalf of the Company or any of its Affiliates ("Confidential Information"). Confidential Information includes, in addition to the information itself, all files, letters, memoranda, reports, records, data or other written, reproduced or other tangible manifestations of the Confidential Information (whether written, printed or otherwise reproduced or recorded), whether created by Purchaser or others, to which Purchaser has access during Continuous Service Status.

(c) **"Consultant"** means any person, including an advisor but not an Employee, who is engaged by the Company, or any Parent, Subsidiary or Affiliate, to render services (other than capital-raising services) and is compensated for such services, and any Director whether compensated for such services or not.

(d) **"Continuous Service Status"** means the absence of any interruption or  termination of service as an Employee or Consultant. Continuous Service Status as an Employee  or Consultant shall not be considered interrupted or terminated in the case of: (i) Company  approved sick leave; (ii) military leave; (iii) any other bona fide leave of absence approved by  the Company, provided that such leave is for a period of not more than ninety (90) days, unless  reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless  provided otherwise pursuant to a written Company policy. Also, Continuous Service Status as an

8

Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between the Company, its Parents, Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(e) **"Director"** means a member of the Board of Directors of the Company.

(f) **"Disability"** means "disability" within the meaning of Section 22(e)(3) of the Code.

(g) **"Employee"** means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are

deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(h) **"Parent"** means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(i) **"Subsidiary"** means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(j) **"Work Product"** means a document, list, software, spreadsheet, memorandum, article, diagram, picture, sketch or anything else tangible developed by a person in Continuous Service Status with the Company relating to the Company's business.

10. **Change of Control Acceleration.** Notwithstanding the foregoing, if Purchaser is Involuntarily Terminated (as defined below) by the Successor Corporation (as defined below) in connection with or within 12 month(s) following the consummation of a Triggering Event (as defined below), then the vesting of any Shares subject to the Repurchase Option that was assumed by the successor corporation resulting from such Triggering Event or a parent or subsidiary of such successor corporation (the "Successor Corporation") that are held by the Purchaser at the time of termination shall accelerate such that any repurchase right of the Company to which the Successor Corporation has succeeded as a result of the Triggering Event shall lapse as to the number of Shares as to which such repurchase right would otherwise have lapsed as of the date 6 month(s) from the date of termination of all services by Purchaser to the Successor Corporation in any capacity, including without limitation as an employee, consultant or member of the Board of Directors (the "Services"). The acceleration of vesting and lapse of repurchase rights provided for in the previous sentence shall occur immediately prior to the effective date of termination of the Services. For purposes of this Agreement, Purchaser shall be deemed to have been "Involuntarily Terminated" if (1) the Company (or a successor, if

9

appropriate) terminates his service as an employee or a consultant without Cause other than for death or Disability, or (2) if Purchaser is not an employee or consultant of the Company (or a successor, if appropriate) at the time of consummation of the Triggering Event, Purchaser is removed from, or is not reelected to, the Board of Directors of the Company (or a successor, as appropriate) without Cause other than for death or Disability, or (3) Purchaser resigns within sixty (60) days of any of the following events: (A) a material reduction in Purchaser's job position (which shall include a material reduction, without Purchaser's consent, in the title and position of the person to whom Purchaser reports), responsibilities or duties, provided that neither a mere change in title alone nor reassignment following a Triggering Event to a position that is substantially similar to the position held prior to the transaction shall constitute a material

reduction in job responsibilities; (B) without Purchaser's prior written consent, the Company (or a successor, if appropriate) requires him to relocate to a facility or location more than fifty (50) miles away from the location at which he was working immediately prior to the required relocation; or (C) a reduction of more than ten percent (10%) in his then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers).

As used herein, "Cause" for the Company (or a successor, if appropriate) to terminate Purchaser's employment shall exist under the following conditions:

(i) Purchaser's willful failure to perform his or her duties and responsibilities to the Company (or a successor, if appropriate);

(ii) Purchaser's commission of any act of fraud, embezzlement, dishonesty or any other willful misconduct that has caused or is reasonably expected to result in material injury to the Company (or a successor, if appropriate);

(iii) Purchaser's material unauthorized use or disclosure of any proprietary information or trade secrets of the Company (or a successor, if appropriate) or any other party to  whom Purchaser owes an obligation of nondisclosure as a result of Purchaser's relationship with  the Company (or a successor, if appropriate); or

(iv) Purchaser's material breach of any of Purchaser's obligations under any written agreement or covenant with the Company (or a successor, if

appropriate).] As used herein, "Triggering Event" means:

(i) a sale, transfer or disposition of all or substantially all of the Company's assets other than to (A) a corporation or other entity of which at least a majority of its combined voting power is owned directly or indirectly by the Company, (B) a corporation or other entity owned directly or indirectly by the holders of capital stock of the Company in substantially the same proportions as their ownership of Common Stock, or (C) an Excluded Entity (as defined in subsection (ii) below); or

(ii) any merger, consolidation or other business combination transaction of the Company with or into another corporation, entity or person, other than a transaction with or

10

into another corporation, entity or person in which the holders of at least a majority of the shares of voting capital stock of the Company outstanding immediately prior to such transaction continue to hold (either by such shares remaining outstanding in the continuing entity or by their being converted into shares of voting capital stock of the surviving entity) a majority of the total voting power represented by the shares of voting capital stock of the Company (or the surviving entity) outstanding immediately after such transaction (an "Excluded Entity").

Notwithstanding anything stated herein, a transaction shall not constitute a "Triggering Event" if its sole purpose is to change the state of the Company's incorporation, or to create a holding company that will be owned in substantially the same proportions by the persons who hold the Company's securities immediately before such transaction. For clarity, the term "Triggering Event" as defined herein shall not include stock sale transactions whether by the Company or by the holders of capital stock.

11. **Voting Agreement**.

(a) **Significant Transactions**. If a vote of holder of Shares is required under any applicable law or stock exchange regulations in connection with a Triggering Event transaction or is deemed otherwise desirable by a majority of the Purchasers (a "Purchaser Majority") each Purchaser agrees to cast all votes to which such holder is entitled in respect of the Shares, whether at any annual or special meeting, by written consent or otherwise, in such manner as the Purchaser Majority may instruct by written notice to approve any Triggering Event transaction in connection with, or in furtherance of, the exercise by the Purchaser Majority of their rights under Section 12. Each Purchaser hereby grants to each member of such Purchaser Majority an irrevocable proxy coupled with an interest to vote, including in any action by written consent, such holder's Shares in accordance with such holder's agreements contained in this Section, which proxy shall be valid and remain in effect until the provisions of this Section expire pursuant to the Agreement.

(b) **Consent to Charter Amendment**. Each Purchaser agrees to cast all votes to which such holder is entitled in respect of the Shares, whether at any annual or special meeting, by written consent or otherwise, in such manner as the Purchaser Majority may instruct by written notice to amend the Company's certification of incorporation to the extent necessary to permit the Company to comply with the requirements of a Triggering Event transaction. Each Purchaser hereby grants to each member of the Purchaser Majority an irrevocable proxy coupled with an interest to vote, including in any action by written consent, such holder's Shares in accordance with such holder's agreements contained in this Section, which proxy shall be valid and remain in effect until the provisions of this Section expire pursuant to this Agreement.

(c) **Period**. Each of the foregoing provisions of this Section shall expire on the earlier of (a) a Triggering Event, (b) an Initial Public Offering and (c) with respect to any particular provision, the last date permitted by applicable law (including the rules of the Commission and any exchange upon which equity securities of the Company might be listed); provided, that this Section shall expire no later than the expiration of the Drag Along Rights contained herein.

11

12. **Drag Along Rights**.

(a) **Drag Along**. Each Purchaser hereby agrees, if requested by 2/3 of the Purchasers (the "Purchaser Super Majority") at any time prior to an Initial Public Offering, to

sell the same percentage (the "Drag Along Sale Percentage") of each class of such Shares that is proposed to be sold by any Purchaser forming part of the acting Purchaser Super Majority that has elected to exercise the drag along right provided by this Section (the "Prospective Selling Purchasers") to a prospective buyer in a Triggering Event transaction, in the manner and on the terms set forth in this Section; provided, however, that this Section shall not apply to a Triggering Event transaction if such Triggering Event transaction has not been approved by vote or written consent of the Purchaser Majority. All Shares to be sold pursuant to this Section shall be included in determining whether or not a proposed transaction constitutes a Triggering Event transaction.

(b) **Exercise**. The Prospective Selling Purchasers shall furnish a written notice (the "Drag Along Notice") to each other holder of Shares at least ten business days prior to the consummation of the Triggering Event transaction. The Drag Along Notice shall set forth the principal terms and conditions of the proposed sale, including (i) the number and class of Shares to be acquired from the Prospective Selling Purchasers, (ii) the Drag Along Sale Percentage for each class, (iii) the per share consideration to be received in the proposed sale for each class, (iv) the name and address of the prospective buyer and (v) if known, the proposed transfer date. If the Prospective Selling Purchasers consummate the proposed sale to which reference is made in the Drag Along Notice, each other holder of Shares (each, a "Participating Seller," and, together with the Prospective Selling Purchasers, collectively, the "Drag Along Sellers") shall: (i) be bound and obligated to Sell the Drag Along Sale Percentage of such Purchaser's Shares of each class in the proposed sale on the same terms and conditions, with respect to each Share Sold as the Prospective Selling Purchasers shall sell each Share in the sale; and (ii) shall receive the same form and amount of consideration per Share to be received by the Prospective Selling Purchasers for the corresponding class of Shares (on an as converted basis, if applicable). If any owners of Shares of any class are given an option as to the form and amount of consideration to be received (other than with respect to any roll-over option given to any or all Purchasers who remain as executive officers of the Company), all owners of Shares of such class will be given the same option. Unless otherwise agreed by each Drag Along Seller, any non-cash consideration shall be allocated among the Drag Along Sellers pro rata based upon the aggregate amount of consideration to be received by such Drag Along Sellers. If at the end of the 180th day after the date of delivery of the Drag Along Notice the Prospective Selling Purchasers have not completed the proposed sale, the Drag Along Notice shall be null and void, each Participating Seller shall be released from such holder's obligation under the Drag Along Notice, and it shall be necessary for a separate Drag Along Notice to be furnished and the terms and provisions of this Section 12(b) separately complied with, in order to consummate such proposed sale pursuant to this Section. The right of an owner of Shares that have not vested to receive consideration for such unvested Shares pursuant to this Section shall be subject to vesting generally and acceleration, if the proposed sale that is subject of the Drag Along Notice, would result in a Triggering Event transaction.

12

13. **Non-Competition; Confidentiality and Assignment of Rights**. Sections 13(a), and 13(b) below will be in effect with respect to a Purchaser so long as that Purchaser is the

beneficial owner of at least 10% of the outstanding equity of the Company.

(a) **Non-Solicitation**. During the period commencing on the date hereof and ending on the fourth anniversary of the date of termination of Continuous Service Status with the Company for any reason, the Purchaser shall not directly or indirectly through another any individual, partnership or legal entity (collectively "Person"): (i) induce or attempt to induce any Employee of the Company or any Affiliate of the Company to leave the employ of the Company or such Affiliate, or in any way interfere with the relationship between the Company or any such Affiliate, on the one hand, and any Employee thereof, on the other hand, (ii) hire any person who was an Employee of the Company or any Affiliate of the Company or (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or any Affiliate of the Company to cease doing business with the Company or such Affiliate, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation, on the one hand, and the Company or any such Affiliate, on the other hand.

(b) **Non-Competition**. Each Purchaser acknowledges that, in the course of his relationship and involvement with the Company and/or its Affiliates and their predecessors, he has become familiar, or will become familiar, with the Company's and its Affiliates' and their respective predecessors' Confidential Information and that such Purchaser's services have been and will be of special, unique and extraordinary value to the Company and its Affiliates. Therefore, each Purchaser agrees that, during the period commencing on the date hereof and ending on the fourth anniversary of the Purchaser's termination of Continuous Service Status with the Company and its Affiliates for any reason (the "Non-Compete Period"), such Purchaser shall not, directly or indirectly, engage in any business that involves or relates to interferometry, inertial motion systems, compasses, pointing systems or apparatuses, navigation systems, whether in hardware or in software, (whether as of the date hereof or during the Non-Compete Period), anywhere in the world in which the Company or its subsidiaries is doing business. For purposes of this Section, the phrase "directly or indirectly engage in" shall include any direct or indirect ownership or profit participation interest in such enterprise, whether as an owner, stockholder, partner, joint venturer or otherwise, and shall include any direct or indirect participation in such enterprise as an employee, consultant, licensor of technology or otherwise; provided, however, that nothing in this Section shall prohibit any Purchaser from being a passive owner of not more than 5% of the outstanding stock of any class of a corporation which is publicly traded, so long as such Purchaser has no active participation in the business of such corporation.

(c) **Non-Disclosure; Non-Use of Confidential Information**. Purchaser shall not disclose or use at any time, either during his Continuous Service Status with the Company and its Affiliates or thereafter, any Confidential Information (as hereinafter defined) of which Purchaser is or becomes aware, whether or not such information is developed by him, except to the extent that such disclosure or use is directly related to and required by Purchaser's performance in good faith of duties assigned to Purchaser by the Company. Purchaser will take all appropriate steps to safeguard Confidential Information in his possession and to protect it against disclosure, misuse, espionage, loss and theft. Purchaser shall deliver to the Company at

13

the termination of his Continuous Service Status with the Company and its Affiliates, or at any time the Company may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or the Work Product (as hereinafter defined) of the business of the Company or any of its Affiliates that Purchaser may then possess or have under his control.

(d) **Proprietary Rights**. Purchaser recognizes that the Company and its Affiliates possess a proprietary interest all Confidential Information and Work Product and have the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts described therein to the exclusion of Purchaser, except as otherwise agreed between the Company and Purchaser in writing. Purchaser expressly agrees that any Work Product made or developed by Purchaser during the course of Continuous Service Status, including any Work Product which is based on or arises out of Work Product, shall be the property of and inure to the exclusive benefit of the Company and its Affiliates. Purchaser further agrees that all Work Product developed by Purchaser (whether or not able to be protected by copyright, patent or trademark) during the course of Purchaser's Continuous Service Status, or involving the use of the time, materials or other resources of the Company or any of its Affiliates, shall be promptly disclosed to the Company and shall become the exclusive property of the Company, and Purchaser shall execute and deliver any and all documents necessary or appropriate to implement the foregoing.

(e) **Assignment of Inventions**. Purchaser, on his own behalf and on behalf of Purchaser's spouse, heirs and assigns, irrevocably assigns all of Purchaser's rights, title and  interest, including, but not limited to, all patent, copyright and trade secret rights, in and to all  inventions, ideas, disclosures and improvements (whether patented or unpatented) or any other  works of authorship which are or may be developed, made or conceived by Purchaser, either  alone or jointly with others, in whole or in part, and which are not generally known to the public  or recognized as standard practice, and which (a) relate to methods, services, apparatus, designs, products, processes or devices manufactured, produced, designed, purchased, marketed, distributed, sold, provided or under construction or development by the Company, its predecessors or any Subsidiary or Affiliate of the Company, or (b) arise (wholly or partly) from Purchaser's efforts in providing services to the Company (an "Invention"). Purchaser will communicate promptly and disclose to the Company, in such form as the Company from time to time requests, all information, details and data pertaining to any such Inventions, and execute and deliver to the Company such forms of transfer and assignment and such other papers and documents as the Company may reasonably request to permit the Company or any person or entity designated by the Company to file and prosecute the patent applications. The Company will pay all costs incidental to the execution and delivery of such transfers, assignments and other documents. Purchaser further acknowledges and agrees that any invention made by Purchaser within one year following the end of Continuous Service Status is presumed to be the property of the Company subject to this Section, unless Purchaser can prove by clear and convincing evidence that such invention made no use of Confidential Information.

**(e)1** -- the terms of license for the vacuustat and vacuum balloon are defined in a separate agreement. In any area where there is a conflict between this agreement and the other agreement, the other one will take precedence in lieu of terms here.

(f) **Works Made for Hire; Assignment of Copyrights**. Purchaser acknowledges and agrees that copyrightable work(s) prepared by Purchaser, either alone or jointly with others, within the scope of his Continuous Service Status are "works made for hire"

14

under the United States Copyright Act (17 U.S.C. §§ 101-810) and that the Company will be considered the author and owner of such copyrightable work(s). In the event that such copyrightable work(s) are not deemed to be "works made for hire," on behalf of Purchaser and Purchaser's heirs and assigns, Purchaser hereby irrevocably assigns all of Purchaser's right, title and interest in and to such copyrightable work(s) to the Company.

14. **Miscellaneous.**

(a) **Governing Law.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Wyoming, without giving effect to principles of conflicts of law.

(b) **Entire Agreement; Enforcement of Rights.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d) **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(e) **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon delivery, when delivered personally or by overnight courier or sent by email or fax (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address or fax number as set forth on the signature page or as subsequently modified by written notice.

(f) **Counterparts.** This Agreement may be executed in two or more counterparts,

each of which shall be deemed an original and all of which together shall constitute one instrument.

        (g) **Successors and Assigns.** The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights and obligations of Purchaser under this Agreement may only be assigned with the prior written consent of the Company.

The parties have executed this Agreement as of the date first set forth above.

**THE COMPANY:**

RADIAN INDUSTRIES, INC.

By:_____
Name: Michael Chapiro
Title: Incorporator
email: michael@radianindustries.com

**PURCHASER:**

By:_____
Name: Nathan Rapport
Address:
Email: nathan@radianindustries.com

**PURCHASER:**

By:_____
Name: Michael Chapiro
Address: 300 Lenora St # 787, Seattle WA 98121

Email: michael@radianindustries.com

**SCHEDULE 1**
**PURCHASE OF SHARES**

| Name | Amount | Consideration |
|---|---|---|
| Nathan Rapport | 510,000 | $510 |
| Michael Chapiro | 490,000 | $490 |

## 7.c. Loan Agreement

**Loan Agreement**

Michael Chapiro hereby agrees to loan Radian Industries Inc. $30,000 upon execution of this agreement.

If the technical milestone of an indoor pointing apparatus is met as has been separately defined, Michael Chapiro will loan an additional $30,000 no later than March 31st, 2025.

The loan shall not be callable.

The loan shall be repaid immediately with a fixed 10% interest rate upon the corporation winning and receiving funds under government contracts or any other form of revenue or income that total in excess of $700,000 in terms of cumulative lifetime income/grants.

By:_____
Name: Nathan Rapport, Chairman, Radian Industries Inc.
Date:

By:_____
Name: Michael Chapiro
Date:

## 7.d. Vacuustat Licensing Agreement

**Vacuum Balloon Licensing Agreement**

Nathan Rapport hereby provides Radian Industries Inc. an exclusive, worldwide license to US Patent US10625842B2, **Lighter-than-air fractal tensegrity structures,** along with any and all associated technologies or IP associated with vacuum balloons, which shall include, but not be limited to: All of Nathan Rapport's notes, calculations, computer code, and computer-aided design (CAD) files related to the design, construction, and operation of vacuum balloons as described in US Patent US10625842B2, Lighter-than-air fractal tensegrity structures.

This assignment shall be bound by the same terms of the founder's stock purchase agreement, including non-compete, non-disclosure of confidential information, and assignment of derivative IP.

**Governing Law and Jurisdiction:** This Agreement shall be governed by and construed in accordance with the laws of the State of Wyoming, without regard to its conflict of laws principles. Any dispute arising out of or relating to this Agreement shall be subject to the exclusive jurisdiction of the state or federal courts located in Wyoming.

**Royalty:** Radian Industries Inc. shall pay a royalty of 5% of revenues from the sale of vacuum balloons, systems incorporating vacuum balloons, or services enabled primarily by the use of vacuum balloons. Royalties will not be paid on Government prime or sub contract revenue that is primarily focused on R&D, or such contracts where fewer than 3 balloons are being acquired.

**Royalty Term:** Royalties shall be paid until expiration of the patent.

**Royalty Payments:** Royalty payments shall be made quarterly, within 30 days of the end of each fiscal quarter, as defined by Radian Industries Inc.'s fiscal year. Royalties shall be calculated and paid on the actual payments received from customers during each quarter. This means if a customer makes payments in installments, the 5% royalty will apply to each payment received, not the total sale price.

**Late Payment Penalty:** In the event of a late royalty payment, Radian Industries Inc. shall pay a late payment penalty to Nathan Rapport equal to the greater of:

(a) Two percent (2%) of the overdue amount per month, or
(b) The percentage change in the Consumer Price Index (CPI) for the preceding month, applied to the overdue amount.

The late payment penalty shall accrue daily from the due date until the date the overdue payment is received in full.

**Audit Rights:** Nathan Rapport shall have the right, upon reasonable notice and during regular business hours, to audit the books and records of Radian Industries Inc. relating to the calculation and payment of royalties under this Agreement. Such audit may be conducted by Nathan Rapport or his authorized representative, at Nathan Rapport's expense. Radian Industries Inc. shall cooperate fully with such audit and provide all reasonable assistance and

access to relevant documents and information.

**Corporate Commercialization Requirement:** Radian Industries Inc. must take adequate steps to ensure the advancement of this technology in one of two ways: 1) a single Government contract must be awarded with a focus on the vacuum balloon technology, or 2) a vacuum balloon must be constructed that is able to maintain its structural integrity while maintaining positive buoyancy at sea level for a minimum of 60 seconds. If neither of these events occurs prior to December 31st, 2027, this contract shall become null and void, and Radian Industries Inc. loses all licensee rights.

**License Transfer:** In the event of Radian Industries Inc.'s bankruptcy, the license granted under this Agreement shall automatically revert back to Nathan Rapport. In the event of Radian Industries Inc.'s acquisition, the license may be transferred to the acquiring company with Nathan Rapport's written consent. If Nathan Rapport does not consent to the transfer of the license, the license shall revert back to Nathan Rapport.

**(a) Transfer to Heirs:** In the event of Nathan Rapport's death, all rights and obligations under this Agreement, including the license granted to Radian Industries Inc., shall automatically transfer to his designated heir(s) as per his last will and testament. If no will exists, the transfer will be determined according to the applicable laws of intestate succession.

**(b) Buyout Option:** Upon the death of Nathan Rapport, Radian Industries Inc. shall have the option to purchase the license and all associated rights from Nathan Rapport's estate. This buyout option must be exercised within 60 days of Radian Industries Inc. receiving written notification of Nathan Rapport's death and the designated heir(s).

**(c) Buyout Price:** The purchase price for the license and associated rights will be determined as follows: An independent valuation of the license and associated rights will be conducted by a mutually agreed upon third-party valuation expert. The cost of this valuation will be shared equally between Radian Industries Inc. and Nathan Rapport's estate. The valuation expert's determination of the fair market value will be binding on both parties.

The buyout price shall be 70% of the fair market value determined by the independent valuation expert. This discount represents a mutually agreed-upon adjustment to incentivize the buyout option while providing a fair value to Nathan Rapport's estate.

**(d) Payment Terms:** If Radian Industries Inc. exercises its buyout option, the full purchase price shall be paid to Nathan Rapport's estate within 30 days of the final determination of the buyout price.

The payment terms for the buyout price shall be determined through mutual agreement between Radian Industries Inc. and Nathan Rapport's estate.

**(d.1) Default option:** As a default, the full buyout price shall be paid by Radian Industries Inc. to Nathan Rapport's estate within 30 days of the execution of the buyout agreement.

**(d.2) Installment Option:** Radian Industries Inc. and Nathan Rapport's estate have the option to negotiate and agree upon an installment payment plan. Such a plan, if agreed upon, shall

outline the following: The number of Installments, the amount of each installment, the payment schedule and due dates, and the interest rate (if applicable).

Any agreement for installment payments must be documented in writing and signed by both parties.

**(e) Failure to Exercise Buyout Option:** If Radian Industries Inc. does not exercise its buyout option within the stipulated timeframe, the license and all associated rights will remain with Nathan Rapport's heir(s) as outlined in section (a) of this clause.

By:_____
Name: Nathan Rapport
Date:

By:_____
Name: Michael Chapiro, CEO, Radian Industries Inc.
Date:

# 8. First Letter of Intent

Non-Binding Letter of Intent

Whereas Nathan Rapport ("Nathan") and Michael Chapiro ("Michael") have differing views on how to best structure and manage different companies from a perspective of management control and financial investment;

Whereas Nathan and Michael are presently co-founders of the company Radian Industries Inc ("radian"), with a 51:49 split on shares in Nathan's favor;

Whereas the company owns and is developing technologies related to gyros (with accelerometers planned) for high performance IMU, ARU, and/or pointing applications;

Whereas these technologies will be patented, possibly with portions of the technology and underlying physics remaining trade secret;

Whereas Radian holds the license to Nathan's patent on vaccustat and had been intent on improving, validating in the physical world, and actualizing the technical concept;

Whereas there is a fundamental divide between the scientific R&D Radian is principally engaged in and the technology and engineering associated with developing commercial offerings predicated on R&D results;

Whereas Nathan is more focused on R&D and Michael is more focused on application development and commercialization;

Nathan and Michael hereby declare their intent to restructure the company and their future ongoing operations to optimize the long term outcomes and the stability of the organizations advancing these technologies with the following terms / end result anticipated:

1) Michael shall form a new company, Celestial Precision. Michael shall furnish all his shares in Radian Industries and X% of shares in Celestial Precision to Radian Industries in exchange for the assignment of all Radian IP to Celestial, as well as any derivative IP in the areas of gyros, accelerometers, or vacuustats.

2) Radian Industries shall operate as an R&D lab and receive a flat 5% revenue share from Celestial Precision for 25 years for gyro & accelerometry tech and 15 years for vacuustat tech. Radian shall assign its voting rights in Celestial to Michael. This revenue share shall only apply to revenues in excess of $1m per year.

3) Radian shall provide detailed information as to its R&D activities and results to Celestial Precision.

4) Technologies unrelated to gyros, accelerometers, vacuustats, or applications thereof, shall not be subject to this agreement unless they are explicitly appended.

5) Michael shall be able to spin-out companies from Celestial Precision to split operations as may be necessary for financial investment. In such an event, any and all spin-outs shall inherit the ownership structure of Celestial Precision. The principal need for such a spin-out is expected to be around commercializing vacuustats.

6) Celestial Precision will intend to ensure Radian has sufficient operating resources by providing loans to support initial operations.

7) Celestial Precision will focus on commercialization, with the objective of selling gyros, ARUs, and IMUs across aerospace, defense, and any other relevant industry. Celestial Precision, possibly through a spinout, shall also focus on commercialization of vacuustats across a wide range of applications, which may include telecom, ISR, power transfer, power generation, weapons launch, directed energy,

8) Michael will not be restricted from starting companies that may be customers of Celestial Precision. However, for all such companies, only purchases of standard products at standard pricing is permissible. To prevent conflicts of interest, any other transaction or arrangement between Celestial Precision and a company in which Michael has a major stake shall require approval from Radian Industries.

9) Whereas Michael intends to raise money for a loitering munitions startup under the name Black Lattice, Radian Industries shall authorize a 10 year exclusivity deal for gyrocomp-enhanced directed RF coms links (only for loitering munitions, defined as munitions where a human in the loop is able to maintain continuous video feed and decide whether a target is found, or whether to recall the munition) in exchange for $500k. This shall be further limited to systems with a maximum takeoff weight of 500 lbs. This deal shall include Celestial Precision providing this capability at no more than 3x COGS when purchased in quantities of at least 100.

10) Radian shall authorize an option for a 10-year exclusivity deal that is limited to supersonic cruise missiles with a maximum weight of no more than 1000 lbs, and a top speed of no more than Mach 2.5 (stay out of ramjet territory), which may be purchased for $1m if exercised by December 31st 2026, or $2m if exercised by December 31st 2027. This deal shall include Celestial Precision providing this capability at no more than 3x COGS when purchased in quantities of at least 10.

11) Celestial Precision must make a continuous and good faith effort to advance and commercialize all technologies from Radian.

# 9. Final Letter of Intent

michael_proposed_LOI.md                                                    2025-05-02

**Non-Binding Radian Restructuring LOI/MOU**

**Corporate Structure**

1. Nathan to incorporate and owns 100% of Seldon Initiative (profit or non-profit)
2. Nathan releases shares in Radian Industries back to the company and will transfer remaining shares to Seldon Initiative. The new share split shall be 30:70 Seldon : Michael Chapiro. Michael to contribute additional $60k to support operations for the rest of the year as part of this.
3. Michael to have board control of Radian
4. Radian can be split apart into multiple companies as needed (e.g. gyro vs vacuustat)
5. Radian to commercialize research carried out by Seldon Initiative
6. Government contracting to be structured with Radian as prime and Seldo as subcontractor
7. Nathan can retain Radian CTO title to simplify PR at early stages
8. Michael will not be restricted from starting companies that may be customers of Radian Industries. However, for all such companies, only purchases of standard products at standard pricing is permissible. To prevent conflicts of interest, any other transaction or arrangement between Radian Industries and a company in which Michael has a major stake shall require approval from Seldon Initiative.
9. There will be bilateral information sharing across all technical data, financial data, business strategy, and so forth, and all information shared shall be kept confidential and secure.
10. Sales and activities of non-standard technologies by Radian shall require Seldon approval.

**Revenue Sharing and Sales Agreements**

1. Seldon Initiative shall operate as an R&D lab and receive a flat 5% revenue share from Radian Industries for 7 years. Seldon Initiative shall assign its voting rights in Radian Industries to Michael. This revenue share shall only apply to revenues in excess of $1m per year.
2. A revenue share of 5% will be paid to Nathan for 25 years for gyro & accelerometry tech and 15 years for vacuustat tech. This revenue share shall only apply to revenues in excess of $1m per year.
3. Radian will proactively contribute capital to Seldon Initiative as needed and as it is capable of doing, and in exchange, Radian will hold the right of first refusal to license and commercialize technologies.
4. Whereas Michael intends to raise money for a loitering munitions startup under the name Black Lattice, Seldon shall authorize a 10 year exclusivity option for gyrocomp-enhanced directed RF coms links (only for loitering munitions, defined as munitions where a human in the loop is able to maintain continuous video feed and decide whether a target is found, or whether to recall the munition) **in exchange for $500k, expiring December 31st 2025.** This shall be further limited to systems with a maximum takeoff weight of 500 lbs. This deal shall include Radian Industries providing this capability at no more than 2x COGS when purchased in quantities of at least 100.
5. Seldon shall authorize an option for discount pricing on standard-class gyros to Black Lattice **for a purchase price of $500k. This shall entitle Black Lattice to 10 years of purchasing standard-class gyros for any application at no more than 3x COGS in quantities above 10, and no more than 1.5x COGS in quantities above 500.** This option shall expire December 31st, 2025.

/

## 10. System For Award Management Address

