# Exhibit C5: Investor Sabotage

# Contents

Exhibit C5: Investor Sabotage .............................................................................. 1

OVERVIEW .............................................................................................................. 1

1.  Introduction ...................................................................................................... 1

2.  Sabotaged Investor Engagement With Vinod Khosla ................................... 2

3.  Sabotaged Outreach and Misrepresentation to Khosla .............................. 5

4.  Insults Directed Toward Vinod Khosla ........................................................ 9

5.  Insults Directed Toward Nic Carter .............................................................. 11

6.  Insults Directed Toward Paul Graham and Y-Combinator ........................ 13

7.  Insults Directed Toward Elon Musk and Others .......................................... 16

8.  Insults Directed Toward Mark Cuban and Chamath Palihapitiya ............. 20

9.  Conversation With Noah Knauf ...................................................................... 22

10.  General Insults Directed Toward Venture Capitalists ................................ 25

11.  Insults Directed Toward Anduril ................................................................... 29

# OVERVIEW

This exhibit documents a series of exchanges and communications in which Defendant's conduct directly undermined Plaintiff's credibility and professional reputation with prospective investors. These incidents include disparaging public statements and insults directed at prominent investors that sabotaged funding opportunities and caused lasting reputational harm. The evidence presented here supports Plaintiff's claims for damages tied to lost investment, impaired business relationships, and reputational injury.

# 1. Introduction

During the company's operation, Defendant engaged in a sustained pattern of reputational sabotage that formed part of a broader scheme to obtain control over the company through coercive and fraudulent means. His public hostility toward prominent investors, though superficially careless, served a calculated and deliberate purpose: by alienating respected institutions and undermining the company's public credibility, Defendant effectively foreclosed Plaintiff's access to external capital. This purposeful misconduct positioned Defendant as the sole viable source of financial support, enabling him to consolidate disproportionate control over the company and its direction.

In executing this scheme, Defendant repeatedly attacked prominent investors and start-up accelerators—individuals and institutions who might otherwise have been receptive to Plaintiff's venture—using profanity, slurs, and incoherent tirades broadcast under his public pseudonymous identity, which was linked to Plaintiff's real name in at least twelve instances. These actions not only embarrassed Plaintiff, but caused lasting reputational damage and made third-party fundraising materially more difficult, if not impossible. The result was predictable and, upon information and belief, intended: with investor goodwill eroded and institutional funding paths closed off, Defendant positioned himself as an indispensable gatekeeper to capital—setting the stage for later attempts to assert unilateral control and divert company resources for personal or affiliated use.

Defendant's conduct was shaped in part by his self-identification as a Bitcoin maximalist—a fringe, extremist techno-ideology that treats Bitcoin (a digital asset) as a comprehensive moral and economic worldview. Maximalists often reject mainstream technological progress, venture capital, and even other cryptocurrencies, labeling their proponents as "fiat scammers" or "anti-technologists." This fanatical worldview informed Defendant's pattern of hostility toward nearly every major investor and strategic partner in frontier technology.

Ironically, despite Defendant's absolutist rhetoric, Bitcoin suffers from profound structural flaws that render it ill-suited as both a store of value

1

and a medium of exchange. These flaws include: low transaction throughput, poor energy efficiency, and an overreliance on a single consensus algorithm vulnerable to cartelization. Bitcoin also lacks meaningful privacy guarantees: the on-ramps to Bitcoin are heavily surveilled, and every transaction is permanently recorded on a public ledger, making it trivial to trace activity with chain analysis tools. Additionally, its governance structure is informal and ossified, making protocol upgrades nearly impossible and leaving decision-making in the hands of a small, opaque developer-miner elite. Bitcoin's mining model also faces long-term sustainability problems: with block rewards halving every four years, miners are increasingly reliant on fees, introducing security risks, centralization pressure, and the potential for extractive behaviors such as transaction censorship. Defendant's ideological fixation on Bitcoin, despite these limitations, led him to denigrate nearly every major actor in the frontier technology ecosystem, undermining Plaintiff's efforts to secure investment, form strategic partnerships, and commercialize his groundbreaking inventions.

Additionally, Defendant does not have a formal background in any fields directly relevant to evaluating cryptocurrency architectures, while Plaintiff, by contrast, holds a degree in physics and applied mathematics, and has a decade of professional experience as a software engineer. This disparity in technical expertise provides important context for Defendant's absolutist and frequently erroneous claims regarding Bitcoin, and helps explain the reputational and commercial harm caused by his hostile posture toward the broader technology and investment ecosystem.

Although Defendant's pattern of behavior began prior to joining the company, Defendant strategically repurposed it in service of a broader scheme to consolidate control—deliberately attaching his public identity to Plaintiff's name and using reputational damage as a lever to isolate Plaintiff from external capital.

Defendant's conduct is consistent with a racketeering pattern: a deliberate, coordinated effort to sabotage outside investment opportunities in order to gain control, exploit Plaintiff's intellectual property, and extract financial benefit through deception, dependency, and manipulation.

## 2. Sabotaged Investor Engagement With Vinod Khosla

On August 21, 2024—several weeks after Plaintiff and Defendant formally agreed to cofound Radian Industries—Defendant sent a hostile and erratic email to Vinod Khosla, one of the most prominent venture investors in the defense and advanced hardware ecosystem. The email—which appears to have been opened at least ten times, indicating that it was received and read—contains multiple personal attacks against respected figures in the industry, including a disparaging reference to "Benny of Velo3D," whose company Defendant described as a "spectacular FAILURE", as well as Marc Andreeson,

whom Defendant alleges was "principally focused on crypto/shitcoin scams". Defendant further describes Mr. Khosla and his partner Rajesh in derogatory terms, writing:

> "You and Rajesh are clearly smart guys in many respects, so it's tough what to make of what I have found no better term to describe than functional retardation."

Rather than using this high-value opportunity to professionally represent the interests of the newly formed company, Defendant used the email to insult potential investors and propose an unrelated venture capital fund (presumably Mach Capital) for his own personal gain. Defendant concluded his message with the following solicitation:

> "If you want to be part of the true advancement of the physical world […] you could consider allocating $100–200m as a sole LP to a venture fund I can run to fill this major gap in the world."

Defendant's solicitation apparently did not result in funding. However, his conduct constitutes a clear example of usurpation of corporate opportunity and self-dealing. At a moment when Defendant had a fiduciary duty to prioritize the fundraising and strategic prospects of Radian Industries, he instead used his limited access to Khosla to advance a separate fund concept for his sole benefit. Defendant's actions undermined one of the company's most important potential investor relationships while simultaneously pitching a vehicle over which Plaintiff would have had no ownership, control, or benefit.

Plaintiff was not informed that this email had been sent at the time, and only later discovered its contents during a post-dissolution review of Defendant's social media. The tone, content, and undisclosed nature of the message support claims of breach of fiduciary duty, intentional interference with prospective economic advantage, and reputational harm. The fact that Defendant delivered this email during a period in which he was publicly representing the company compounds the damage, and highlights the deliberate and concealed nature of his misconduct.

Furthermore, Defendant did not merely send his email to Khosla privately. On August 30, 2024, he publicly referenced the exchange in a post on the social media platform X, writing:

> "Absolutely roasted Vinod in an email last week, maybe I should share publicly?
> I love calling VCs out for being retarded, which virtually all are.

> You are all fucking welcome for the altruistic backlash I take for my radical candor that y'all are too pussy or fiat to do. 😄 "

This post confirms that Defendant's actions were not accidental or misunderstood. Rather, he intentionally sought to damage key investor relationships, took pride in his conduct, and chose to make the episode public in a way that implicated the reputation of the new venture he was representing. His conduct was reckless, malicious, and fully aware of the damage it would cause—not only to the investor relationship in question, but to Plaintiff's overall professional credibility and fundraising capacity.

On November 13, 2024—nearly three months after sending the original email—Defendant again referenced the exchange publicly, posting:

> "You should see the email I sent Vinod Khosla when that prick cancelled our call day of on the advice of a guy whose experience was working on a government backed cleantech bankruptcy and a Khosla backed company that SPAC crashed >99%. I am an expert at saying 'fuck you'"

This follow-up post underscores Defendant's ongoing hostility, lack of professionalism, and complete disregard for the strategic importance of investor relationships. It further confirms that Defendant viewed the sabotage of this engagement not as a regrettable misstep, but as a personal victory worthy of public boasting—compounding the reputational harm to Plaintiff and reinforcing his pattern of malicious, self-serving conduct.

Defendant's self-characterization as an "expert" in saying "fuck you" is also contradicted by the sheer heavy-handedness of his delivery. Rather than executing a pointed or strategic rebuke, he resorted to transparent, juvenile antagonism—a clumsy and overplayed approach that demonstrated no real skill and instead revealed profound immaturity. The result was not a calculated insult or a blow to anyone's ego, but a publicly documented act of self-sabotage that inflicted reputational damage on both Defendant and Plaintiff.

Ironically, Defendant had been brought on by Plaintiff for his alleged track record in securing funding from institutional sources—not for his self-proclaimed expertise in saying "fuck you" to investors via theatrical outbursts, which neither requires expertise nor secures capital. Had Plaintiff simply wanted to deliver emails saying "fuck you" to venture capitalists, he could have satisfied this desire himself without offering nearly half of his company for someone else to do it on his behalf.

4

## 3. Sabotaged Outreach and Misrepresentation to Khosla

On or around April 11, 2025, Defendant circulated a mass fundraising email to venture capital firms under the subject line "We'll Own Golden Dome Strategic Missile Defense & Outpace AT&T+Starlink in Telecom." This message was sent during a period in which Defendant was publicly representing Radian Industries and privately pitching Plaintiff's patent-protected technology to federal stakeholders.

Although the email was allegedly intended to solicit $50–100 million in funding for Radian Industries, Defendant made no mention of the company's name, its corporate structure, or the name of its technical founder and inventor (Plaintiff). As a result, investors receiving the email had no way to verify the legitimacy of the venture, conduct independent diligence, or communicate directly with Plaintiff, the co-founder responsible for the underlying technology. This omission was not accidental; it was calculated to ensure that Defendant remained the sole point of contact for all inbound interest.

Defendant's decision to withhold identifying information ensured that all investor communication would be funneled exclusively through him—cutting off Plaintiff from the investor community and consolidating fundraising control in Defendant's hands.

The message itself included valuation claims (e.g. "$1T public val in 15 years") and disclosed a sensitive engagement with the Missile Defense Agency ("we were recently selected by the Missile Defense Agency for Golden Dome Industry Day one-on-one meetings")—a real event that Defendant had no authorization to publicize. Defendant's decision to include such material in a mass investor solicitation email, surrounded by erratic and unprofessional rhetoric, created reputational and regulatory risk for all parties associated with the venture, and reflects a broader disregard for confidentiality, security, and institutional trust.

Defendant concluded the email by insulting its recipients, writing:

> "The BCC is deliberate […] if you have an incorrect ego, as many VCs do, you will not be able to operate effectively here […] we hope to filter those out and lower the response rate from the start to not waste your time or ours. This is bigger than you. This is bigger than me."

This final paragraph intentionally insulted and deliberately alienated the exact audience Defendant was soliciting for investment, undermining not only the credibility of the company, but the long-term trustworthiness of anyone affiliated with it. Defendant's conduct in this instance was reckless, exclusionary, and self-serving. It directly harmed Plaintiff by creating an opaque fundraising channel that prevented outside parties from engaging with

5

the company on objective terms, while simultaneously disqualifying credible investors through performative hostility.

Taken together, the April 11 fundraising email constitutes a willful breach of fiduciary duty, intentional interference with Plaintiff's ability to raise capital, and a deliberate act of reputational sabotage. It reinforces a pattern of self-dealing and concealment that ultimately contributed to the dissolution of the partnership and material loss to Plaintiff.

Following Defendant's April 11 fundraising email, which omitted both Plaintiff's name and the name of his company (Radian Industries)—despite alleging that Khosla suffered from "functional retardation" in his previous email, Defendant secured a follow-up meeting with Khosla Ventures. This meeting, scheduled for April 17, 2025, was an important opportunity to pitch Plaintiff's patented and patent-pending technologies, including Plaintiff's Vacuustat and his inertial navigation technology.

That Defendant was able to secure a follow-up meeting with Khosla Ventures —despite having sent a bizarre, hostile, and unprofessional email months earlier—is itself a striking testament to the strength and credibility of Plaintiff's underlying intellectual property. No reasonable investor would have entertained further engagement based on Defendant's behavior alone; the fact that Khosla remained engaged at all strongly suggests that the technical merit of Plaintiff's work was the primary driver of interest.

Khosla Ventures' website claims that their fund looks to back "'Black swan' ideas […] characterized by rarity, extreme impact and retrospective predictability. High-impact investments can change the dynamics of large markets." This principle is central to their public identity: Khosla Ventures presents itself not as a conventional investor chasing incremental improvements, but as a fund deliberately seeking radical innovation—unexpected breakthroughs with the potential to redefine entire industries. Their investment thesis revolves around identifying and supporting visionary ideas and individuals that others overlook precisely because of their unconventional nature.

Plaintiff's work and identity as an independent inventor fits squarely within this paradigm. Plaintiff's Vacuustat—U.S. Patent 10,625,842—is a novel physical device with massive potential applications spanning energy generation, communications, and defense. It does not build incrementally on established designs, but introduces original innovations with the capacity to disrupt existing paradigms. Like many genuine black swan inventions, its full impact may only be recognized in hindsight—but its rarity, technical rigor, and far-reaching utility should be evident to any serious evaluator.

Moreover, Plaintiff's personal trajectory aligns with the archetype Khosla Ventures claims to support: an independent, self-funded inventor working outside institutional systems, with a track record of original problem-solving and deep technical focus. Plaintiff is not a career entrepreneur or

pitch-deck specialist, but the actual originator of the core intellectual property that had piqued Khosla's interest—precisely the kind of individual Khosla Ventures allegedly claims to champion.

On April 16—one day before the scheduled pitch—Plaintiff sent a professional message to Khosla Ventures with a link to his patent in the very first sentence, writing: "Hello, I'm Nathan, the inventor and technical lead behind the vacuustat (U.S. Patent 10,625,842 – PDF) as well as other technologies […] that Michael may be presenting tomorrow."

In this message, Plaintiff clarified his role at Radian Industries as the inventor and technical lead, and outlined the licensing and corporate structure designed to ensure long-term continuity, stability, and commercial scalability. However, Plaintiff received no response from Khosla, even though Defendant had advertised Plaintiff's patented technology to secure the meeting. Khosla's silence was particularly troubling given that the meeting was premised on Plaintiff's patented and patent-pending technologies—yet no effort was made to verify Plaintiff's consent, no inquiry was made regarding the licensing status of his intellectual property, and no reply was sent in response to his outreach.

That Plaintiff personally reached out to the firm the day before their meeting with Defendant—sharing a direct link to the patent and clarifying his role—should have served as an immediate signal that this was a "black swan" opportunity in the most literal sense. However, Khosla Ventures ignored Plaintiff's outreach. Instead, they met exclusively with Defendant—who held the CEO title but had made no inventive contribution—despite Defendant's extensive public history of insulting Khosla personally and directly, as well as attacking other institutional investors.

In an April 15, 2025 post, Defendant revealed that he had secured a meeting with a Khosla Ventures partner by emailing Vinod Khosla directly—purportedly regarding the Vacuustat ("golden dome") telecommunications concept Plaintiff had been developing. However, the pitch deck ultimately presented was for Defendant's separate company, Black Lattice, focused on "supersonic glide vehicles and FPV missiles," indicating a bait-and-switch that diverted a major funding opportunity—potentially worth $50–100 million—away from Plaintiff's invention and toward Defendant's own unrelated, self-serving venture. Defendant publicly confirmed this funding opportunity was diverted from Plaintiff in a post on X:

> "Lmk if you want to check out the deck or would provide feedback
> Upcoming call with Khosla partner based on a few paragraphs I
> emailed Vinod with no deck
> I must say, I am extremely impressed with his humility and
> genuine technological curiosity given the prior email I sent
> him"

The image below showed a pitch slide with the following text:

> "Black Lattice
> Developing Supersonic Glide Vehicles and FPV Missiles for a
> new era of global security."

On April 17—the day of the meeting—rather than pitch Radian Industries to Khosla, Defendant diverted the opportunity, instead pitching his own separate entity, Black Lattice, without Plaintiff's consent. Defendant confirmed this in a Signal message sent the previous day, writing, "the call on Thursday is not about vacuustat, but about the supersonic drones and loitering munitions."

These drones and munitions, however, were direct applications of Plaintiff's proprietary navigational technology—technology that Defendant did not invent, did not own, and had no right to independently commercialize. Upon information and belief, Defendant failed to disclose Plaintiff's role or intellectual property rights to Khosla Ventures during the meeting, just as he failed to disclose them in his earlier Phoenix Dynamics investment memo. This omission further underscores Defendant's pattern of presenting Plaintiff's inventions as his own, while systematically concealing the true source of the underlying technology.

In Defendant's investor presentation of Black Lattice, Defendant presented Plaintiff's inertial technology as his own, without attribution—even including a picture of Plaintiff's experimental prototype in his pitch deck. Defendant's decision to proceed under a conflicting narrative caused reputational damage, sowed confusion with a key investor, and deliberately foreclosed a viable funding opportunity for the company.

This episode reflects a clear and deliberate pattern of investor sabotage, and supports claims of: breach of fiduciary duty, including usurpation of corporate opportunity, fraudulent misrepresentation, and intentional interference with prospective economic advantage.

Defendant not only undermined Plaintiff's ability to represent his own technology to investors, but misappropriated that technology to redirect institutional interest toward his own shell entity, which lacked ownership of the relevant intellectual property and had no legitimate claim to the underlying technical breakthroughs.

That Defendant was able to secure a follow-up meeting with Khosla Ventures despite having accused the firm's partners of "functional retardation" in an earlier email, while Plaintiff's polite and professional outreach —clarifying that Plaintiff was the inventor of the technology they were discussing—was ignored, ironically serves to support Defendant's initial criticism. Defendant and Plaintiff, in this narrow respect, find themselves in agreement.

However, the fact that Defendant's behavior was rewarded, while Plaintiff's professional communication was ignored, does not excuse or justify Defendant's conduct. With that said, it does illustrate how wildly erratic emails such as Defendant's—based on theatrical self-promotion, superficial charisma, and speculative promises—are routinely prioritized by venture capitalists, many of whom invest in ways that would not functionally withstand basic tests of rationality or discernment, while rigorously grounded, civilizationally transformative technologies such as Plaintiff's are ignored.

## 4. Insults Directed Toward Vinod Khosla

On September 16, 2023, Defendant posted the following directive on X:

> "You must ridicule Vinod Khosla and other backers of Arevo for being pathetic failures
> You must ridicule Riley Reese and backers of Arris
> You must ridicule DCVC
> You must ridicule Drapers
> You must ridicule a great many more
> LITERALLY EVIL not to!
> Few"

This post, which explicitly targets multiple prominent investors and founders, reveals a preexisting pattern of aggressive, ideologically motivated hostility toward the very institutions and individuals whose support would later become critical to Plaintiff's venture. The tone—imperative, absolutist, and conspiratorial—illustrates a broader worldview fundamentally incompatible with institutional collaboration. The post ends with the cryptic term "Few," a common online shorthand for "few understand this." This rhetorical device is frequently used to imply intellectual or moral superiority over a mainstream consensus.

On February 1, 2024, Defendant posted:

> ". @vkhosla, SUCK MY COCK— I am a vastly superior technologist to you, and you have no hope of ever catching up, despite the billion dollar edge you think you have. Shut the fuck up, retire, enjoy your beach, and accept that you are have nothing of value left for the world."

This level of hostility, profanity, and degradation is consistent with Defendant's broader pattern of antagonistic behavior. It reflects a deliberate use of public platforms to harass, defame, and intimidate others. This conduct is relevant to both Defendant's lack of credibility and to the reputational damage he caused.

On August 30, 2024—shortly after his earlier hostile messages—Defendant posted:

> "RIP Vinod Khosla's legacy. His failures today as a venture capitalist and wannabe technologist are certainly related to his failures that led Sun to underperform in the end."

This remark, which seeks to diminish Mr. Khosla's lifetime achievements and link his venture performance to alleged past failures at Sun Microsystems, reflects a continued pattern of disrespect and antagonism.

On October 19, 2024—two months after his initial hostile email and social media reference—Defendant escalated his public attacks on Mr. Khosla, writing:

> "Vinod is a harmful, arrogant retard
> Iykyk
> Of all the anecdotes VCs have given me over the years, the one I have from Vinod is by far the most poignant and damning. So I suppose I really must thank him."

This post, which combines slurs with vague insinuations and condescension, reflects Defendant's continued and deliberate antagonism toward one of the most prominent investors in the advanced technology ecosystem. The gratuitous language and tone—publicly broadcast without Plaintiff's knowledge or consent, while Defendant was still formally associated with Plaintiff's company—was reputationally damaging, professionally indefensible, and demonstrative of a sustained pattern of sabotage and malice.

On February 3, 2025—months after their previous interactions—Defendant again publicly insulted Mr. Khosla, posting on X:

> "Much of fiat world capital misallocation is fear of death. Of course people who deeply feel their mortality will be fiat incentivized to invest in delusional high time preference activities like Vinod Khosla, at 70 years old investing in commercial hypersonic aircraft. 😂💀🖕 "

This post, which mocks Mr. Khosla's age, decision-making, and investment strategy, further demonstrates Defendant's sustained hostility toward one of the venture industry's most respected figures.

On April 3, 2025, Defendant disparaged prominent venture capitalist Vinod Khosla by name, accusing him of laziness and intellectual fragility, while further criticizing the broader venture culture as intolerant of what Defendant called "radical candor":

10

> "Extracting heat at economical rates is the easy part.
> Reliance on people with fragile egos like Vinod who are too
> lazy to read a bit, and a culture where people are intolerant
> of radical candor is the hard part.
> One day you will tire of it enough to stop denying bitcoin."

In a post dated June 24, 2023, Defendant wrote:

> "What do you guys think, will commie 🤡 Vinod learn that
> Bitcoin is the only thing that you can really own […]?"

This post demonstrates that Defendant had a longstanding pattern of hostility and antagonism toward Mr. Khosla. Defendant's willingness to attack Khosla publicly underscores the recklessness of Defendant's contact with institutional stakeholders, and further supports Plaintiff's claims of reputational damage through foreseeable misconduct.

In another public post on the same day, June 24, Defendant directly replied to Mr. Khosla, writing:

> "You are a commie too, Vinod.
> Until you come out as a Bitcoiner and stop funding attacks
> on capitalism by holding dollars, you are enjoying life as a
> communist party member.
> You do not even own your mind for you have given it to the
> collective, succumbing to veganist propaganda."

Defendant's statement was not only antagonistic, conspiratorial, and unprofessional, but also false and potentially defamatory, as Mr. Khosla has never identified as a communist and is widely known as a champion of capitalist innovation. Furthermore, Defendant's accusation that Mr. Khosla had "succumbed to veganist propaganda" was not only ideologically charged and bizarre, but factually incorrect. Mr. Khosla has publicly stated that he is a non-vegetarian. Defendant's use of baseless slurs against respected institutional figures created reputational risk not only for himself, but also for Plaintiff and the venture with which he was publicly associated, Radian Industries.

## 5. Insults Directed Toward Nic Carter

On February 16, 2022, Defendant Michael Chapiro publicly antagonized Nic Carter, a general partner at Castle Island Ventures, a respected early-stage venture capital firm. Carter is widely known within the investment community and maintains influence across a broad network of institutional and individual investors.

11

Defendant posted the following message on X, directly targeting Carter:

> "Is not replying to founders pitching Bitcoin companies part
> of your strategy?
> I don't know what made you think you're such hot shots, but
> high-level Sequoia partners until recently had public emails
> and sent me multiple rejection replies, as did every other
> Bitcoin VC I emailed."

Carter responded the same day:

> "comments like this are precisely why I would never put anything
> in writing in an email to you. also, regardless of the merit
> of your ideas, I don't recommend pitching people you publicly
> harangued in a clubhouse/space the week before."

This exchange demonstrates that Defendant had already publicly harangued
Carter in a separate live audio forum and that Carter considered him too
volatile and hostile to engage with, even for promising ventures. The
reputational consequences of such behavior extend beyond a single investor
relationship. By alienating a well-known and respected investor in a public
venue, Defendant signaled to the broader investor community that he was a
liability, creating reputational and professional risk for anyone affiliated
with him.

In a separate incident on June 16, Defendant Chapiro once again antagonized
Nic Carter on X, continuing his pattern of publicly insulting and alienating
professional investors. Responding to a post by Carter, Defendant wrote:

> "I remember when I was working on a bitcoin startup trying to
> raise capital
> And these 'guys' didn't have a clue what it meant that I had
> done some crazy shit in missile defense in my prior startup
> Fucking retard consumer shitcoiner. NPC. Enjoy the show"

Carter replied bluntly: "If we passed it's because you're an insane
person. Hope this helps."

Defendant then doubled down:

> "Appreciate it, yes
> I actually like this reason since it's actually not wrong"

Defendant continued:

> "You need to be insane person maxing
> VCs should be saying things like this to you"

This exchange is revealing: A respected investor plainly stated that Defendant was passed on because he is "an insane person." Rather than dispute this characterization or clarify his behavior, Defendant affirmed it—publicly stating that such behavior should be the goal ("insane person maxing") and explicitly agreeing with the rationale for rejection ("it's actually not wrong").

Defendant's statements here not only alienated a respected investor but signaled to the broader venture community that he should not be trusted with capital, governance, or professional collaboration. By making himself radioactive to investors, and then celebrating that fact, Defendant made it extraordinarily difficult for any venture associated with him—including Plaintiff's company—to raise capital.

## 6. Insults Directed Toward Paul Graham and Y-Combinator

Defendant's pattern of antagonizing high-profile investors extended to Paul Graham, the co-founder of Y Combinator—widely regarded as one of the most influential startup investors in the world. On December 16, 2024, Defendant publicly mocked Graham in an X post that was both personally insulting and professionally reckless, not just to himself, but to any venture associated with him. Quoting a post by Graham, Defendant wrote:

> "Well isn't that incredibly cute, this arrogant Trump+bitcoin deranged Brit joins Vinod in pathetic delusion of thinking he has fund aviation money. Paul just admitted how poor he actually is btw."

This post references both Paul Graham and Vinod Khosla—two of the most well-known and respected figures in venture capital—and disparages them with unprovoked personal attacks. By accusing Graham of "pathetic delusion," financial incompetence, and labeling him as "deranged,"[1] Defendant further alienated not just these specific individuals, but also the broader venture community. Defendant's post projected unwarranted hostility toward major funders, signaling that Defendant was willing to publicly denigrate prominent investors who might otherwise be potential allies—or at least neutral observers—in future fundraising efforts.

This type of conduct further damaged the company's ability to raise capital, as any affiliation with Defendant became a liability. The tech and investor ecosystem is reputation-driven; investors are highly sensitive

---

[1] Defendant has also publicly labeled Plaintiff "deranged," recycling the same insult he used against Graham. His reliance on this limited stock of insults underscores both their lack of originality as well as their lack of credibility.

to financial and reputational risk, and Defendant's continued belligerence toward respected figures in that ecosystem amounted to reputational sabotage that undermined Plaintiff's business prospects.

On February 2, 2024, Defendant Chapiro shared an image showing that Paul Graham had blocked him from viewing or interacting with his X profile.

On June 26, 2025, Defendant Chapiro responded to a public post from Y Combinator (YC)—one of the most influential startup accelerators in the world. YC's post stated:

> "America needs better physical technology, and startups are the best way to build and scale it. We are looking for founders interested in applying modern software capabilities to the entire stack of industrial production - energy production, materials, CAD, manufacturing, and biotech. Reindustrialization is a matter of national survival. This is your invitation to build the future."

This was an ordinary call for start-ups focused on hard tech, and was directly relevant to Plaintiff's Radian Industries venture. At minimum, a responsible cofounder could have used the opportunity to highlight the relevance of Plaintiff's venture and its founding team. Plaintiff is a seasoned software engineer with a decade of industry experience in addition to his formal education in physics and applied mathematics, and Radian Industries was precisely the kind of hard-tech startup YC claimed to be seeking. Therefore, Defendant could have used YC's post as an appropriate moment to showcase the company's alignment with YC's thesis—even if he himself lacked their desired background. A thoughtful response might have emphasized the team's complementary strengths, or simply deferred to his cofounder's domain expertise while inviting conversation.

However, in reply to YC's post, Defendant instead chose to publish:

> "'America needs better physical technology-
> We are looking for… applying modern software'
> 😭😭😭😭😭😭😭😭😭😭😭😭
> 😭😭😭😭😭😭😭😭😭😭💀💀💀
> Fuck you, you LARPing pieces of shit 👆👆👆👆👆👆👆👆👆👆"

This attack was unprofessional and openly hostile toward one of the most prominent investor institutions in the startup ecosystem. Defendant's tweet would have been visible to YC partners, affiliated funds, founders, and a broader investor audience. The message conveyed was clear: Defendant held investors in open contempt and was willing to express that contempt in obscene, public terms.

14

Defendant's June 26 post also contradicted his earlier claim from November 13, 2024—"I am an expert at saying 'fuck you'". Genuine expertise requires factors such as judgment, timing, emotional control, situational awareness, an understanding of audience, and the ability to critique with clarity and purpose. Expertise in critique may take the form of satire, principled defiance, whistleblowing, or strategic disruption—any of which can provoke without destroying credibility, and challenge without undermining one's cause.

However, no rhetorical skill or expertise was apparently present in Defendant's June 26, 2025 response to YC; Defendant's response did not contain any arguments, observations, or coherent objections. Rather, it consisted of alternating clown and vomiting emojis followed by "Fuck you, you LARPing pieces of shit 🤡🤡🤡🤡🤡🤡🤡🤡🤡" with eleven middle-finger emojis. This response failed to offer any substantive critique or insightful observations; it did not identify any problems with YC's position, nor did it attempt to persuade, reframe, or satirize YC in any meaningful sense.

In short, Defendant's claim to "expertise" in saying "fuck you" is contradicted by the evidence; rather than mastery, his behavior reflects an inability to distinguish between strategic dissent and performative belligerence. Far from advancing any cause or viewpoint, his public outbursts alienated the people and institutions that any serious founder must engage in order to build and sustain a company. By aligning Plaintiff's venture with this behavior, Defendant inflicted reputational harm that was damaging and entirely avoidable.

Defendant's hostility toward Y Combinator was not limited to a single incident. On June 27, 2025—just one day after his previous tirade—Defendant again lashed out publicly at the organization, this time in response to a snippet from a YC promotional post about materials science. The post included the line: "for instance, titanium, a corrosion-proof metal with a strength-to-weight ratio…"

Rather than engage constructively or offer any technical correction, Defendant replied:

> "Hire an engineer to proofread your propaganda next time, you fucking retards. 🖕"

Defendant's reply involved a public insult, slur, and middle-finger emoji—visible to anyone reviewing his online presence. Defendant's outburst was not isolated, nor was it provoked. It was deliberate, disproportionate, and damaging.

If Defendant intended to object to YC's phrasing, one charitable interpretation is that he was splitting hairs over the distinction between "corrosion-resistant" and "corrosion-proof." While no material is entirely

15

impervious to corrosion in all environments, the phrase "corrosion-proof" is widely used in public-facing materials as shorthand for high resistance to corrosion—especially in the context of materials like titanium, which is known for its exceptional strength and durability compared to steel in corrosive conditions.

If the distinction between "corrosion-proof" and "corrosion-resistant" was in fact Defendant's intended objection, it was a minor semantic issue and did not warrant public slurs or profanity. And if it wasn't the basis for Defendant's outburst, then it is unclear what the objection actually was—underscoring how incoherent and gratuitous the attack truly was. Given the language of the post, it is doubtful that Y Combinator or its audience understood Defendant's point, if any existed. What they would have understood, however, is that Defendant publicly insulted and demeaned them without provocation—further cementing his reputation as a liability to any venture associated with him.

Defendant's behavior severely and predictably limits any associated venture's access to capital. Any investor conducting routine diligence on Plaintiff's company would have discovered this post—as Plaintiff did—and linked it to Defendant Chapiro. The reputational damage caused by Defendant's post and similar episodes constitutes a direct and material impairment of Plaintiff's ability to raise funds, pursue partnerships, and build credibility in the technology and investment community.

Y Combinator is among the most influential gatekeepers in early-stage venture funding. Alienating them is not a minor failure—it forecloses access to an entire class of institutional opportunities. Plaintiff reasonably believes that, if not for Defendant's conduct, Radian Industries would have been a strong candidate for consideration by YC and similarly positioned firms, given its direct alignment with YC's stated thesis and track record of funding comparable ventures.

## 7. Insults Directed Toward Elon Musk and Others

The individuals targeted by Defendant's posts on X in this section are among the most influential stakeholders in the frontier technology and defense investment landscape.

Elon Musk is the founder of SpaceX and Starlink, both direct potential partners or acquirers for Plaintiff's inventions. Marc Andreessen co-founded a16z, one of the most prominent venture capital firms backing deep tech, AI, and infrastructure plays. Palmer Luckey is the founder of Anduril, a major defense contractor and one of the most important new entrants in autonomous warfare systems. Josh Wolfe, managing partner at Lux Capital, is a leading investor in dual-use technology and breakthrough science ventures. Chamath Palihapitiya, through Social Capital, has backed frontier technology with a focus on transformative, large-scale systems. David Sacks, a prominent

investor and co-host of the All-In podcast, is tightly networked with many of the others and plays a significant gatekeeping role in early-stage defense and infrastructure deals.

Each of these individuals represents a potential funder, acquirer, or strategic partner for the Vacuustat, Artifact, and related technologies—and Defendant's repeated public hostility toward them severely undermined Plaintiff's ability to engage with this critical ecosystem.

On Oct 24, 2024, Defendant tagged Elon Musk in a post, in which he was apparently upset at one of his social media accounts being locked:

> ".@elonmusk, what the fuck is wrong with you,
> you ANTI FREE SPEECH
> CENSORING FUCK
> Your algo is fucking illiterate, you fucking retarded. […]
> Account locked.
> Fuck you, you fucking anti-American anti-freedom lying scammer"

On Sept 30, 2023, Defendant wrote:

> "Meanwhile, Elon proclaims that "speech is violence" when
> people point out the need to bring back the G-"

On March 6, 2024, Defendant posted on X, again disparaging Elon Musk:

> "Will you change your name to Elon Cuck?
> Fucking shitcoiner
> The people who gave you billions for your grift in stolen (tax)
> money are the same people pumping immigration. Immigrants are
> for Biden what Dogecoin is for you, so who are you to complain,
> little bitch."

On December 28, 2024, Defendant posted on X, calling "most of the American right wing" communists:

> "I have been saying that most of the American right wing is
> actually normie commie. I have been calling Peter Thiel, Marc
> Andreessen, Elon Musk, etc etc commies for a while."

This statement, made while Defendant was actively representing Plaintiff's intellectual property to external stakeholders, again demonstrates a pattern of public hostility toward high-value potential investors and strategic partners. Referring to Thiel, Andreessen, and Musk—three of the most prominent figures in American frontier technology—as "commies" is not only ideologically incoherent but reputationally toxic. These individuals and

17

their firms fund, acquire, or deploy exactly the kinds of dual-use and defense-aligned technologies Plaintiff had developed. Defendant's attacks on these actors created a chilling effect that harmed Plaintiff's ability to raise capital, secure licensing deals, or build commercial relationships. This post further supports Plaintiff's claim that Defendant deliberately sabotaged access to the strategic investor ecosystem.

On January 1, 2025, Defendant again insulted Elon Musk, writing:

> "I like companies that actually make money, not pump and dump scams that slow down the world
> Your worthless engineered clickbait will be done by AI bot in a year
> Cringe garbage I only had displeasure of coming across due to that fuck-face Elon
> Fuck your mother if you want fuck"

On January 20, 2025, Defendant responded to a misogynistic post on X that mocked public figures who "want to be famous", which read:

> "Wanting to be famous is gay
> Think about it
> Women are attention seekers…"

Defendant responded by listing: "Elon Musk, Marc Andreessen, Palmer Luckey, Josh Wolfe, Chamath, Sacks."

Defendant's response constituted a public insinuation that these figures are attention-seeking, unserious, or otherwise unworthy of respect. Coupled with the misogynistic tone of the original message, Defendant's endorsement of the sentiment demonstrates an ongoing pattern of reputational sabotage that actively undermined Plaintiff's ability to attract investment, forge strategic partnerships, or engage with serious actors in the tech ecosystem. This post further supports Plaintiff's claim that Defendant's behavior foreclosed commercial opportunities and rendered the venture unbackable.

On February 3, 2025, Defendant posted on X:

> "Elon Musk is a TECHNOCOMMUNIST fäg. The world deserves much better. Will you let shitcoiners like him, Thiel, Lonsdale, Andreessen, etc., or globalists like Gates, Khosla, or Brin, etc., own the narratives around technological advancement? Don't tolerate the consolation prizes!"

This post is emblematic of Defendant's reckless and hostile public behavior toward nearly every major funder, acquirer, and strategic partner in the frontier technology space. In a single message, Defendant insults Elon

Musk, Peter Thiel, Joe Lonsdale, Marc Andreessen, Bill Gates, Vinod Khosla, and Sergey Brin—individuals and institutions with deep financial ties to aerospace, defense, AI, and telecommunications. These are precisely the types of actors who fund and acquire technologies like the Vacuustat and Artifact. Defendant's conduct was not merely unprofessional—it was reputationally toxic and commercially destructive. This post forms part of a documented pattern of public investor hostility that damaged Plaintiff's ability to raise capital, secure partnerships, and commercialize his invention.

On April 27, 2025, Defendant again attacked Elon Musk on X, writing: "The world needs less retarded idols than Elon Musk. […]"

This statement reflects a continuing pattern of hostile and reputationally destructive public behavior. By calling Musk a "retarded idol" and framing him as a psychological symptom of cultural decay, Defendant positioned himself as fundamentally incompatible with the institutions and actors that drive frontier technology investment. Given Musk's deep involvement in space, defense, and telecommunications infrastructure—all of which are direct application domains for Plaintiff's inventions—this post further damaged Plaintiff's ability to raise capital, build strategic relationships, and license his technology.

On May 31, 2025, Defendant posted on X: "Elon Musk is a fahgett piece of shit and everyone knows it."

This crude and defamatory post, containing a homophobic slur, directed at one of the most influential figures in global technology and aerospace, is reputationally toxic, socially unacceptable, and professionally disqual-ifying in any context, let alone in the realm of high-level technology partnerships. It further demonstrates Defendant's reckless disregard for the reputational and commercial harm inflicted on Plaintiff and forms part of a sustained pattern of investor sabotage that damaged Plaintiff's ability to secure funding or strategic partnerships.

On July 1, 2025, Defendant replied to Elon Musk on X, stating: "America is not your personal piggy bank 👆," ending with a middle-finger emoji, in response to a comment by Musk about U.S. infrastructure investment and space exploration.

This post—hostile, vulgar, and directed at one of the most prominent figures in global technology—demonstrates Defendant's continuing pattern of reputational sabotage. Elon Musk, through SpaceX and other ventures, represents not only a potential investor, but a highly plausible strategic partner, acquirer, or customer for technologies like the Vacuustat or Artifact, which have direct relevance to persistent satellite infrastruc-ture, autonomous navigation, and space-based defense systems. Rather than maintain professionalism or discretion, Defendant deliberately antagonized a key ecosystem figure in a public forum, further undermining Plaintiff's ability to engage with high-value stakeholders. This episode reinforces

Plaintiff's claim that Defendant's conduct materially foreclosed access to potential partners, investors, and strategic customers through reckless public behavior.

## 8. Insults Directed Toward Mark Cuban and Chamath Pal-ihapitiya

On December 1, 2024, Defendant posted on X:

> "The dotcom bubble made Mark Cuban a billionaire, something that would never have happened in a free market where acqui-sitions will have real costs & risks for buyers. His capital misallocation and arrogance has been destroying wealth ever since. This is the fiat standard."

In this post, Defendant disparages Mark Cuban—a prominent technology investor, media figure, and startup backer—by suggesting his success was undeserved and that his investment decisions have been economically destruc-tive. The post not only undermines the credibility of one of the most public-facing advocates for entrepreneurial ventures, but also signals to potential investors that Defendant is hostile toward figures with mainstream success under the "fiat standard". This contributes to a sustained pattern of reputational sabotage that damaged Plaintiff's ability to engage with the broader investment ecosystem.

On December 15, 2024, in response to a post by Adam Back (one of the suspected creators of Bitcoin), Defendant wrote:

> "Adam is of course correct, but the crazy thing is that we would have to make the correction at all
> Only under fiat could a 2 bit grifter like Chamath rise to any level of prominence"

This unprovoked attack on Chamath Palihapitiya, inserted into a thread unrelated to Plaintiff or Defendant's work, exemplifies Defendant's tendency to denigrate high-profile investors even in professional or technical contexts. The reference to Chamath as a "2 bit grifter" who succeeded "only under fiat" further signals to industry observers that Defendant harbors disdain for major players in the venture ecosystem—particularly those who fund or acquire complex, system-level innovations like those developed by Plaintiff. Posts like this made Plaintiff's venture unapproachable to key stakeholders and caused reputational harm that obstructed potential capital funding and commercialization opportunities.

On December 21, 2024, Defendant posted on X, calling Chamath a scammer:

> "An anti-particle is exactly the same as its pair particle,
> except for an opposite charge. I propose introducing the term
> ANTI-TECHNOLOGIST to describe scammers like Chamath who slow
> down the world (the 'deeptech' stuff Chamath does is also part
> of the anti-technologist trend)."

This post combines condescension, personal insult, and public dispar-
agement of a leading investor in frontier technology. By labeling Chamath
Palihapitiya—whose firm Social Capital actively backs deep technology
ventures—as an "anti-technologist" and a "scammer," Defendant not only
undermines a potential investor, but also delegitimizes entire categories
of technological investment. Such rhetoric was reputationally damaging and
interfered with Plaintiff's ability to engage with the deep tech investment
community, further reinforcing the pattern of investor sabotage described
throughout this complaint.

On January 17, 2025, in a direct response to a message by Chamath
Palihapitiya, Defendant wrote:

> "Scammers like you are slowing down technologists like me who
> solve problems
> Very simple
> You are a scamming piece of shit (which you know) and the
> result is literally malignant — I know you know you are small
> time, but all the people like you add up to impose a real
> cost 🖕"

This direct and vulgar attack on Chamath Palihapitiya, ending with a
middle-finger emoji—constitutes reputational sabotage with clear commercial
consequences. By publicly insulting a high-profile venture capitalist who
could have served as a funder, strategic partner, or acquirer, Defendant
further alienated key members of the investment ecosystem and undermined
Plaintiff's ability to build external relationships necessary for commer-
cialization.

On February 19, 2025, Defendant reposted a message by Chamath Palihapi-
tiya, adding:

> "Might fuck around and become the next Howard Hughes. The
> world deserves a better class of billionaire than these LARPer
> scammers. Cargo culting men who were actually grand."

In this post, Defendant positions himself as a superior alternative to
contemporary technology billionaires—explicitly referring to them as "LARPer
scammers"—and implies that modern capitalists, including Chamath, are merely
imitating past greatness without substance. This public hostility toward

high-profile investors not only reflects a deep disdain for the individuals who shape frontier capital allocation, but also signals reputational risk to any firm or founder associated with Defendant. Such rhetoric further alienated Plaintiff from potential funders, partners, or acquirers, and contributes to a well-documented pattern of investor sabotage that undermined Plaintiff's ability to commercialize his inventions.

On June 30, 2025, Defendant posted on X:

> "Damn, sounds like @chamath is this generation's Mark Cuban, no wonder he is such a bitter loser scammer who can't do anything of substance and will be remembered briefly with derision, and soon after that not at all. Little paper handed bitch."

This post levels a vulgar and defamatory personal attack against Chamath Palihapitiya—a high-profile investor in frontier technology and defense—as well as Mark Cuban, one of the most visible public backers of early-stage innovation. Defendant's use of phrases like "bitter loser scammer" and "paper handed bitch" signals a deep contempt for leading capital allocators and communicates to potential investors that anyone aligned with Plaintiff's venture could be subject to public insult or reputational risk. The post forms part of a broader pattern of investor hostility that disrupted Plaintiff's ability to build credibility with the strategic capital ecosystem necessary to commercialize his inventions.

Additionally, Defendant has posted images on X indicating that he has been blocked by several prominent figures in the technology and defense communities, including Paul Graham (co-founder of Y Combinator), Matt Grimm (COO of Anduril Industries), and Abe Murray (former head of AI at Google X and managing director at the Allen Institute for AI). These individuals are known for their leadership in startups, national security, and AI innovation, and are not prone to engaging in online drama lightly. Their decision to block Defendant suggests prior exposure to his conduct or ideology and indicates that his behavior has alienated these well-established figures.

## 9. Conversation With Noah Knauf

In June 2024, Defendant initiated contact with Noah Knauf, a general partner at BOND Capital, only to aggressively respond after Knauf declined to invest. Instead of maintaining professionalism, Defendant ridiculed BOND's prior investments, taunted Knauf for being trapped in an illiquid position, and concluded with an unsolicited pitch. These messages are snippets of an apparent conversation with Noah Knauf that Defendant shared on X, and are representative of a broader pattern of reputational sabotage that directly undermined Plaintiff's ability to raise external capital.

Although Defendant blurred out Noah Knauf's last name when posting screenshots of their conversation, the identity of his interlocutor was unmistakable. The context of the messages—including references to BOND Capital, Relativity Space, and the inclusion of Noah's initials—made it trivial for anyone to deduce that he was speaking with Knauf. This undermines any claim of discretion or privacy and underscores Defendant's willingness to publicly attack prominent investors while hiding behind a veneer of plausible deniability.

On June 24, 2024, Noah wrote to Michael:

> Michael,
> Thanks for the note. Congrats on the progress. We invest after commercialization, so this round would not be the right timing for BOND.
> Best of luck with the process.
> — NK

On June 24, 2024, Michael wrote to Noah:

> Hi Noah,
> How many launches has Relativity delivered? How long ago did you invest in them?
> You change your strategy after your experience with them? Haha
> Beat,
> Michael

On June 24, 2024, Noah wrote to Michael:

> Relativity had a signed backlog of >$200M across six customers when we invested. That backlog is now >$2B.
> — NK

On June 24, 2024, Michael wrote to Noah:

> I remember a woman who did her undergrad at MIT who told me a similar thing about a small launch startup she invested in that is now bankrupt. Can you guess which one? Just so many of them!
>
> Let's be honest here—you didn't dump on retail fast enough and you can't get out now. You know what those "backorders" mean. How Planet hands out MOUs like candy. That outstanding MOUs for smallsat launch have always been about two orders of magnitude larger than the actual market size… you do know the game you're playing, right?

> Anyway, hit me up if you're ever interested in getting
> involved with a real company and people who actually built
> stuff of substance in aerospace & defense.

On July 1, 2024, Michael again wrote to Noah:

> Oof, that looks like it hit you pretty fast! I'm sure you knew
> a bit before the headlines started coming out that Relativity
> is circling the gutter (though I knew years before you).

In his private messages with Noah Knauf of BOND Capital, Defendant
displayed a striking level of hostility and condescension toward a respected
investor. After Noah politely disengaged, Defendant continued sending unso-
licited follow-ups, criticizing BOND's judgment and valuation decisions,
and accusing them of being "stuck" in Relativity Space due to failure to exit
before retail investors were allegedly misled. His comment about "dumping on
retail" is particularly notable, as it not only implies unethical behavior by
default, but cynically frames investor exit strategy in terms of exploita-
tion of less sophisticated participants. Defendant's refusal to disengage,
combined with his sarcastic tone and unsolicited accusations, reinforces
a pattern of antagonism toward potential funders, and further illustrates
his inability or unwillingness to maintain professional relationships with
institutional investors.

While Defendant's tone in these messages is combative and unprofessional,
his core frustration is not entirely without merit. Venture capital firms—
often led by individuals with no technical background—have a long history of
funneling capital into overhyped or fundamentally flawed technologies, while
overlooking or failing to understand more promising innovations. In this
exchange, Defendant appears to be venting this frustration at Noah Knauf
of BOND Capital, a non-technical investor whose fund backed Relativity, a
3D-printed rocket startup now undergoing a 72-to-1 reverse stock split.
Defendant's behavior in this interaction remains inappropriate, but the
broader critique he expresses reflects a shared concern among many founders
and engineers.

Although Defendant's aggressive antagonism toward venture capitalists is
inappropriate, counter-productive, and ultimately futile—since no amount of
hostility, condescension, or argument can impart technical judgment where
it is lacking—Plaintiff shares his underlying concern. Having independently
developed multiple strategically significant technologies, years ahead of
their time and without institutional support, Plaintiff has observed a
consistent pattern of capital misallocation within the venture industry.

Despite frequent claims of supporting bold innovation, many investors
demonstrate a categorical aversion to pre-commercial technologies, regard-
less of their merit. In his exchange with Defendant, for example, BOND

24

Capital's Noah Knauf states that he would not invest in any technology before commercialization, implying that he would not invest before commercialization even if the underlying invention is extraordinary. This mental rigidity, common among venture firms, reflects a structural failure of capital markets to recognize or support high-leverage R&D until after commercialization—at which point it is no longer R&D.

Knauf's position regarding so-called "commercialization" is particularly difficult to defend in light of the fact that Relativity has raised over $1 billion in venture capital despite existing for over a decade without delivering even a single gram of payload to orbit. Relativity's core "innovation" involved 3D-printing large cylindrical structures[2]—components that would be far more efficiently fabricated from welded sheet metal using standard aerospace methods. While Relativity's approach satisfies investor appetite for hyped technology, it did not require $1 billion to determine it would fail.

Although Plaintiff has refrained from engaging in public antagonism, he notes that Defendant's contempt for the investment establishment arises from a recognizable reality: Investors routinely exhibit herd-like mentality, funding technically unsound ventures based on superficial signals while overlooking foundational breakthroughs that demand patience, technical discernment, and a willingness to pursue long-term public good at the occasional expense of short-term profit—qualities that are typically absent among venture capitalists, whose expertise rarely extends beyond finance and business strategy. That venture capitalists view their dismal investment success rates as a badge of honor, rather than as an indictment of their judgment, reflects a deep and pervasive lack of self-awareness within the industry. This systemic misallocation of resources—driven by a class of individuals who produce nothing themselves yet serve as gatekeepers to capital (usually not their own)—carries profound consequences, not only for individual inventors, but for national innovation and long-term security.

## 10. **General Insults Directed Toward Venture Capitalists**

Throughout the relevant period, Defendant repeatedly and publicly disparaged venture capitalists as a class, using inflammatory and derogatory language to express contempt for the individuals and institutions that fund innovation and early-stage companies. These statements were not isolated instances of sarcasm or humor, but consistent expressions of animus that reflect Defendant's broader disdain for the entrepreneurial ecosystem in which Plaintiff operated. The following examples illustrate a pattern of antagonism toward venture capitalists that is relevant both to Defendant's credibility and to the hostile context in which his other conduct occurred.

---

[2]Although apparently, they have since walked back from this approach.

On March 29, 2025, Defendant mocked the competence of venture capital general partners, suggesting that basic literacy would be a distinguishing feature in the industry:

> "A venture capital firm where GP's know how to read
> Instant top decile firm"

On April 6, 2025, Defendant recounted what ought to have been a routine scheduling exchange with a venture capitalist, but framed it in a way that conveyed deliberate condescension. Rather than treating the request professionally, he used the opportunity to elevate his own perceived importance —citing his attendance at a "Loitering Munitions conference in DC" as a reason for declining the call, while failing to propose a new time to reschedule. The post reflects a broader pattern of posturing and disdain toward the venture community, portraying engagement with VCs as beneath him:

> "Venture capitalist: Can we get on a call Tuesday to learn more?
> Me: Sorry, I'm gonna be at the Loitering Munitions conference
> in DC that day"

On April 8, 2025, Defendant launched an especially profane and hostile tirade, celebrating his perceived success in gaining credibility within the defense sector while openly insulting venture capitalists as "commie VC sons of bitches" and "normie retards"—language that reflects both deep contempt and a deliberate effort to alienate the venture community:

> "God damn does it feel good to speed run shit on establishing
> credibility.
> When I'm talking to serious people in defense rather than most
> of you normie retards, I casually state what I did in my prior
> company and the reaction is palpable.
> Fuck all you commie VC sons of bitches."

Also on April 8, 2025, Defendant asserted that venture capitalists avoid investing in him not due to any deficiency in merit, but because he appears "too powerful"—accusing the industry of preferring "cheap, weak, young labor" and attributing this preference to a broader societal decline marked by "low T men" and a "bureaucratic communist state." The post combines personal aggrandizement with sweeping ideological contempt, further straining any plausible relationship with the venture community:

> "I suspect one reason many VCs have not invested in me is that
> I simply come off far too powerful – most VCs are not looking
> for entrepreneurs, but cheap, weak, young labor. This is what

happens when a society tolerates low T men and the rise of bureaucratic communist state."

On April 10, 2025, Defendant publicly lectured venture capitalists on how to do their jobs, asserting that good investors should feel intellectually outmatched by the founders they back—and labeling those who cannot tolerate this as "shit investors" and "cowards" with "fragile egos." Notably, this post appears to be an implicit admission that he viewed Plaintiff as intellectually superior to himself. This acknowledgment contradicts any subsequent effort to discredit Plaintiff's capabilities and diminish his role in the venture. It also highlights the calculated nature of Defendant's misconduct: despite recognizing Plaintiff's superior intellect and the value of his inventions, Defendant chose to misappropriate them for personal gain. In doing so, he acted not out of ignorance or confusion, but with full awareness of the caliber of the individual and the significance of the technology he was misappropriating. Defendant's post read:

> "As an investor making venture bets
> Everyone you ever invest in
> Should give you the sense they are much smarter than you
> **And if that hurts your fragile ego**
> **You know you're a shit investor and a coward**
> Though you still need enough raw IQ yourself to tease out intelligence"

Later that same day, Defendant escalated his rhetoric further, characterizing certain venture capital firms as an "axis of evil" and accusing them of operating unchecked—while calling for a new ideological coalition to oppose them, grounded in what he described as "superior, actually Western values":

> "It cannot be under-emphasized the degree to which these VC firms in particular are a sort of axis of evil and they are operating entirely unopposed with bitcoiners often twiddling their fingers… but a new coalition with superior, actually Western values, shall emerge."

On April 14, 2025, Defendant recounted an interaction with a venture capitalist in which he abandoned civility in favor of open insult, mocking the very idea of professional courtesy and likening it to feminine behavior—concluding that the appropriate approach is to "just call the guy a fucking retard" and see if "he's cool." The post reflects a conscious rejection of respectful engagement and a preference for confrontational provocation:

> "Me: try being nice to a VC
> Couple cordial calls, interactions
> I break the charade and tell it like it is
> VC: "I knew you didn't respect me"
> Lesson: don't pretend to be nice, that's how women interact,
> just call the guy a fucking retard, if he's cool, he'll
> understand"

On April 21, 2025, Defendant mocked the entire venture-backed defense sector, boasting that he was "about to make every venture backed defense play irrelevant", punctuating the claim with a laughing emoji—underscoring his contempt for VC-funded competitors and his belief in his own superiority:

> "That feeling when you're about to make every venture backed
> defense play irrelevant 😄"

Also on April 21, 2025, Defendant launched a vulgar and sweeping attack on angel investor Mario Nawfal, ridiculing his claim of having invested in over 600 startups and equating such activity with financial fraud. The post was accompanied by a screenshot of Nawfal's social media profile, which prominently states he is the founder of IBC Group and an investor in "600+ startups." Defendant used this as a springboard to portray Nawfal—and by extension, the broader angel investing community—as morally bankrupt "financial fraudsters," mocking their perceived hypocrisy in criticizing political systems while funding what he characterized as scams:

> "Is there anything gayer than angel investing in 600 'star-
> tups'?
> Bankroller of 600 financial fraudsters and has the gall to
> complain about leftist tyranny as if he has any semblance of
> moral high ground?
> h/t @stacyherbert for highlighting it with RT of his main scammer
> account."

On May 1, 2025, Defendant expressed broad disdain for both venture capitalists and Bitcoin advocates, referring to them as "NPCs" (non-player characters—a video gaming reference) who "do nothing"—a dismissive term implying herd-like behavior and lack of agency. The post portrays Defendant as a lone voice of action surrounded by ineffectual actors on all sides of the innovation landscape:

> "I have also been pointing this out for years
> Alas, the fiat VC NPCs do nothing
> And the bitcoiner tawker NPCs also do nothing
> Everyone simply does nothing these days"

To the VC community's credit, Defendant's sustained hostility may serve as a backhanded endorsement of its filtering role. His anger appears to stem from repeated rejection and humiliation, often as a direct consequence of his abrasive conduct or failure to present a coherent, compelling business case. Rather than adapting or engaging constructively, Defendant lashes out—likely as a coping mechanism to avoid confronting his own inadequacy—portraying the industry as cowardly, fraudulent, or ideologically compromised. However, in doing so, he inadvertently validates the very gatekeeping he derides. While the venture capital ecosystem is not without flaws, its resistance to individuals who exhibit open disdain for the investment process suggests that it plays at least some role in safeguarding innovation from opportunists.

## **11.** **Insults Directed Toward Anduril**

In addition to his hostility toward venture capitalists more broadly, Defendant repeatedly targeted the defense company Anduril (one of the most prominent defense innovators in the industry) and its leadership with a mix of sarcasm, dismissive commentary, and personal attacks. These statements reflect not only professional jealousy and strategic posturing, but also an intent to position himself publicly as a more serious or capable alternative.

For example, on November 12, 2024, Defendant posted the following inflammatory message about Anduril's leadership, accusing the cofounder of Anduril and the well-known investor Peter Thiel of being pro-CCP (Chinese Communist Party):

> "So disgusting
> Didn't realize just how pro-CCP the co-founder of Anduril is
> For those who don't know, shitcoiners are pro-CCP sociopath retards
> What do you think the CCP offered Thiel to perform a coup against America under the guise of stopping the commies?"

On April 12, 2025, Defendant shared a screenshot showing that Anduril cofounder Matt Grimm had blocked him on X—an apparent badge of honor within the context of his antagonistic campaign.

Anduril's relevance to Radian Industries is direct and significant. As a prominent defense technology firm with active interest in autonomous systems, advanced sensors, and dual-use military platforms, Anduril could have served as a customer, partner, or even a strategic acquirer of Plaintiff's technology. Geographically, the connection is even stronger: Anduril operates in Ohio, placing it in Radian's immediate vicinity and making engagement logistically and commercially feasible. Defendant's decision to target Anduril with public ridicule, sarcastic posts, and hostile generalizations reflected poor judgment and undermined a highly plausible opportunity for

collaboration or monetization, causing reputational and strategic harm to Plaintiff's venture in a domain where credibility and network access are critical.

One notable example of Defendant's disparagement occurred on March 17, 2025, when he posted a direct comparison between Anduril's Roadrunner drone and a BlueHalo missile system, implying that the latter offered far superior value. The post read:

> "What you want outside your house
> 1 Anduril Roadrunner
> Or 10 of these"

The post was accompanied by an image of the BlueHalo FE-1 surface-to-air missile. Framed as a rhetorical question, the post mocked the cost-effectiveness and capability of Anduril's flagship platform in contrast to a competitor's offering, while ignoring differences in mission profile or use case. This kind of public antagonism toward a peer defense firm not only reflected poor judgment, but also signaled to industry observers that Defendant—and by extension, the company he represented—was more interested in cultivating notoriety than building serious partnerships.

On April 28, 2025, Defendant made a post speculating openly about a potential $100 million acquisition of the company's technology, naming Anduril, Raytheon, Lockheed, Boeing, and other major defense contractors as possible buyers. While superficially framed as strategic musing, the post carried a tone of flippant self-aggrandizement and again referenced Anduril in a dismissive light, stating, "I don't know if I'll even care if we make Anduril make it." This comment exemplifies Defendant's pattern of erratic public messaging—oscillating between self-promotion and antagonism—while undermining any serious effort to position the company for acquisition by the very entities he publicly derided. Rather than building credibility with potential partners, Defendant's remarks signaled volatility and a lack of discretion, thereby harming Plaintiff's ability to engage constructively with the defense community. The post read:

> "Who will pay more for an acquisition of a deeply enabling
> technology across various platforms?
> Anduril, Raytheon, Lockheed, Boeing, others?
>
> Might end up going for a quick $100m buy out if we can find
> the right partner, I don't know if I'll even care if we make
> Anduril make it."

Notably, this post was made without Plaintiff's knowledge or consent, and at no point was Defendant authorized to pursue or publicly speculate about

acquisition opportunities on behalf of the company. Defendant's unilateral statement—naming specific acquirers and attaching a $100 million price tag —reflected not only a misrepresentation of corporate authority, but also a profound breach of fiduciary duty at a critical juncture. The post occurred just one day prior to Plaintiff's formal dissolution of the company, further illustrating Defendant's ongoing effort to posture as the driving force behind the venture in defiance of legal and organizational reality. Moreover, the $100 million valuation casually invoked by Defendant serves as a compelling admission: an acknowledgment, in his own words, of the extra-ordinary strategic value he attributed to the technology at the center of this dispute.[3] Defendant's actions both undermined the company's credibility and established a concrete benchmark for the very IP he misappropriated.

On January 19, 2025, Defendant posted a critique of Anduril's business model, claiming, "I highly doubt Anduril can build a factory that offers competitive ROI," and characterizing the company as "a financial roll-up firm with a big marketing arm, and a few UI/UX designers." He further alleged that a significant portion of Anduril's workforce resulted from "acquihires" of Group 1–2 UAS strike system startups. This post reflects Defendant's consis-tent effort to delegitimize Anduril's technical credibility and operational capacity, portraying the company as a hollow branding exercise rather than a serious defense contractor. The statement not only undercuts Anduril's reputation without evidence, but also signals to industry observers that Defendant lacked the professionalism and discretion expected of executives operating in national security and defense—especially while still publicly affiliated with Plaintiff's venture.

On May 3, 2025, Defendant continued his pattern of sarcastic commentary by posting a cryptic reference to "The Anduril, software first approach to defense hardware," a remark that appears to mock Anduril's public positioning as a tech-forward defense firm. The dismissive tone, devoid of context or explanation, reinforces Defendant's ongoing effort to undermine Anduril's credibility through ridicule rather than substantive critique. Taken together with his earlier posts, this remark contributes to a broader pattern of unprofessional public conduct that risked alienating potential strategic partners and further damaging Plaintiff's reputation in the defense sector.

---

[3] In Plaintiff's view, the technology is worth significantly more than $100 million and it would be foolish to sell it for so little—but Defendant's statement is an admission nonetheless.