# Exhibit D3: Economic Injury

# Contents

Exhibit D3: Economic Injury ............................................................................. 1

OVERVIEW ................................................................................................. 1

1. Vacuustat Valuation Estimate ................................................................. 1

2. Damage to Vacuustat Intellectual Property ............................................. 3

3. Royalty-Based Damages Estimate .......................................................... 4

4. Georgia-Pacific Reasonable Royalty Analysis ......................................... 5

5. Artifact Valuation Estimate .................................................................... 9

6. Damage to Artifact Intellectual Property ................................................ 12

7. Damages from Diverted Investment Opportunity with Khosla Ventures ......................... 15

8. Reputational Harm to Radian and Resulting Business Collapse ................... 16

9. Loss of Equity Valuation ........................................................................ 17

10. Strategic and Developmental Harm Justifying Equity Loss ........................ 18

11. Loss of Near-Term Investment Opportunity ............................................ 20

12. Lost Contract Opportunity ..................................................................... 21

13. Unauthorized Diversion of Capital .......................................................... 24

14. Out-of-Pocket Costs and Sunk Time ....................................................... 25

15. Total Economic Harm ............................................................................ 26

# OVERVIEW

This exhibit presents a structured valuation model detailing the various forms of economic injury suffered by Plaintiff as a result of Defendant's unlawful conduct. It quantifies losses across multiple categories, including misappropriated intellectual property, diverted business opportunities, reputational harm, and the unjust enrichment of Defendant. The model provides a basis for estimating damages and supports Plaintiff's claims for monetary relief, including compensatory and statutory damages, restitution, and injunctive remedies.

## 1. Vacuustat Valuation Estimate

The Vacuustat is a vacuum-lifted aerostat capable of permanent high-altitude flight without the use of helium, hydrogen, or combustion. Patent US10625842B2 protects Plaintiff's novel fractal tensegrity architecture that enables structural integrity under ambient atmospheric pressure using existing materials such as boron carbide, alumina, and carbon fiber. This core invention enables persistent airborne platforms that can support large-scale vertical axis wind turbines (VAWTs) far above ground level—where wind speeds are significantly higher and more consistent.

Wind power scales cubically with wind speed. According to the wind profile power law, a modest elevation gain to 600 meters can yield a 29% increase in wind speed and a 116% increase in power generation. Unlike current airborne wind concepts, the Vacuustat's structural support from above enables much larger and more efficient VAWT systems than are possible with traditional tower-mounted or hub-supported designs. In effect, it offers a path to the lowest-cost renewable energy platform ever created—one that is untethered from rare gases, scalable, and globally deployable.

Extensive feasibility analysis has been completed for the Vacuustat using conservative assumptions and well-established engineering principles. Test-ready CAD schematics have been produced for the internal struts. A physical demonstration in 2020 was delayed due to external constraints, including the COVID-19 pandemic and lack of funding, not due to any technical shortfall.

Had this invention received proper support or at least not been actively undermined, the Vacuustat could have proceeded to physical validation and early licensing opportunities, including in wind energy, telecommunications, off-grid infrastructure, and persistent ISR. Given the addressable market in those sectors and the global urgency of energy transition, even a modest share of that market would value the Vacuustat intellectual property at multiple billions of dollars. The commercial and environmental opportunity cost of delay—caused in part by Defendant's sabotage and exploitation—has been substantial.

1

In assessing the value of the Vacuustat intellectual property, it is important to consider the total addressable markets it directly enables or disrupts. These include:

(a) Wind energy: The global wind power market is projected to exceed $100 billion annually by 2030, with a growing segment focused on airborne wind energy. Companies like Makani (acquired by Google X) and Ampyx Power have pursued similar goals with substantially more fragile designs. A successful Vacuustat platform could access tens of billions in annual generation value by enabling large-scale wind harvesting at higher altitudes than traditional wind energy platforms with simpler, scalable infrastructure.

(b) Telecommunications (e.g. cell towers, 5G, rural broadband): The global telecom infrastructure market is valued at over $300 billion, with tens of billions spent annually on tower construction, satellite bandwidth, and rural coverage. A persistent high-altitude Vacuustat platform could replace or augment thousands of towers and low-orbit satellites, dramatically lowering cost per user in underserved regions.

(c) Persistent ISR (intelligence, surveillance, reconnaissance): The ISR market—used by military, defense, and border surveillance agencies—is expected to exceed $25 billion annually by 2028. Persistent high-altitude platforms with indefinite endurance and no need for fuel would directly compete with HALE UAVs and stratospheric balloons, offering governments an affordable alternative for wide-area monitoring.

(d) Off-grid infrastructure (farming, power, internet): As of 2025, over 750 million people globally lack access to reliable electricity, and 2.6 billion lack internet access. Off-grid systems represent a $50–100 billion annual market. Vacuustats could act as floating infrastructure nodes for clean power, water condensation, crop lighting, or connectivity in areas where permanent infrastructure is cost-prohibitive.

(e) Stratospheric platforms (HAPS, satellite replacement): High-altitude pseudo-satellites (HAPS) are expected to become a multi-billion-dollar market as alternatives to LEO satellite constellations. Unlike solar UAVs or helium-lifted platforms, vacuustats are structurally simpler and could remain aloft for years without maintenance, serving as stationary communications or sensing relays.

(f) Global energy market (ultimate addressable market): While the Vacuustat enables dramatic improvements in wind energy capture, its true disruptive potential lies in its capacity to become the cheapest form of energy generation ever created—not just compared to wind. Unlike fossil fuels, solar farms, or nuclear power plants, Vacuustat-supported vertical axis wind turbines can be deployed without mining, fuel, or land-intensive infrastructure, and can operate continuously at altitudes where wind is stronger and more consistent. The global energy market exceeds $9 trillion

2

annually[1], spanning electricity generation, industrial heating, transportation fuels, and grid infrastructure. Capturing even a fraction of 1% of this market would translate into tens of billions of dollars in potential value. No existing energy platform offers comparable scalability, modularity, and independence from finite resources.

The Vacuustat intellectual property represents a fundamental advance in energy infrastructure: a vacuum-lifted, persistently airborne platform capable of supporting large-scale vertical axis wind turbines at altitudes where wind speeds are higher and more consistent. The global energy market is estimated to exceed $9 trillion annually. Even assuming a highly conservative 0.1% total addressable market (TAM) capture—far below the 1–5% TAM penetration commonly modeled in early-stage venture capital forecasts—this corresponds to $9 billion in projected annual revenue from Vacuustat-enabled systems.

## 2. Damage to Vacuustat Intellectual Property

In cases where intellectual property has not yet generated revenue but demonstrates clear technical merit, commercial viability, and a credible trajectory toward monetization, courts have long recognized the reasonable royalty method as an appropriate measure of damages. *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). The Georgia-Pacific decision established a multifactor test for determining the royalty rate that would result from a hypothetical negotiation between a willing licensor and licensee at the time infringement began. This section focuses on royalty-based losses, but Plaintiff reserves the right to present additional damages models based on diminution in fair market value or unjust enrichment.

The Georgia-Pacific multifactor test is applicable here. Plaintiff's invention—a structurally validated vacuum-lift platform protected under U.S. Patent No. 10,625,842—had advanced well beyond the concept stage. Plaintiff had signed a license agreement, produced test-ready schematics, completed feasibility studies, written simulation software, and documented multiple deployment paths across multibillion-dollar sectors such as renewable energy, telecommunications, and persistent ISR. These developments placed the invention in a strong position to attract grant funding, additional licensing interest, or strategic partnerships.

Rather than support or participate in this process, Defendant knowingly disrupted it. Defendant's obstruction and misappropriation delayed commercialization, undermined Plaintiff's control over his own invention, and diverted its economic potential into unauthorized corporate vehicles. Because this interference occurred before first revenue, the appropriate

---

[1] https://iea.blob.core.windows.net/assets/d3a68a4e-7f55-4c6a-8f4f-ce2e55475701/StrategiesforAffordableandFairCleanEnergyTransitions.pdf

damages measure is a reasonable royalty: the amount that a willing licensee in Defendant's position would have paid Plaintiff at the time of infringement, had a license been properly negotiated.

Plaintiff's analysis is grounded in conservative estimates, addressable market data, and the demonstrated technical feasibility of the invention. The following section applies the fifteen Georgia-Pacific factors to this dispute.

## 3. Royalty-Based Damages Estimate

As a direct result of Defendant's misconduct, Plaintiff was prevented from timely commercializing his vacuum-lift technology, which was otherwise positioned for early-stage licensing and deployment. Plaintiff held a formal licensing arrangement with Radian Industries, under which 5% of gross revenue attributable to the Vacuustat platform was contractually owed in the form of royalties. While the invention had not yet reached revenue, it had completed extensive design work, feasibility validation, and market analysis—placing it squarely within the scope of established Georgia-Pacific factors for calculating a reasonable royalty.

Courts have long recognized that a reasonable royalty may be awarded even absent direct sales or licensing revenue, so long as there is evidence supporting technical merit, commercial potential, and a plausible hypothetical negotiation. In *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552 (Fed. Cir. 1984), the Federal Circuit upheld a reasonable royalty award (as "merely the floor below which damages shall not fall") even though the patentee had made no sales of the patented product.

In *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1542–50 (Fed. Cir. 1995), the Federal Circuit upheld lost profits on sales of a device (ADL-100) that was not covered by the patent in the suit but was directly competed against by the infringing product—so long as causation, foreseeability, and capacity were established. This case affirms that a reasonable royalty or lost-profit model remains viable even when commercialization has not yet occurred, provided the product was technically viable, targeted a known market, and the infringer's conduct foreseeably caused the loss.

In addition, the Federal Circuit has held that damages based on a reasonable royalty analysis may even exceed the inventor's expected lost profits. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011) ("While either the infringer's or the patentee's profit expectation may be considered in the overall reasonable royalty analysis, […] neither is an absolute limit to the amount of the reasonable royalty that may be awarded upon a reasoned hypothetical negotiation analysis under the Georgia–Pacific factors.").

These precedents confirm that pre-revenue status does not invalidate a royalty-based damages model, provided the patentee demonstrates technical merit, commercial viability, and a credible trajectory toward monetization —as Plaintiff has done here.

Applying conservative and litigation-defensible assumptions, the total addressable market (TAM) for Vacuustat-enabled platforms is estimated at $9 trillion annually across energy, telecommunications, ISR, and off-grid infrastructure. Plaintiff does not claim this total market, but rather a highly constrained 0.1% market penetration, yielding $9 billion in annual revenue. Under the terms of the licensing agreement, this equates to $450 million per year in royalties once full commercialization is reached.

Assuming a linear ramp to full revenue over five years and stable performance for the remaining seven years of patent life, the total royalty stream would span twelve years. Delaying commercialization by two years —due to Defendant's interference, sabotage, and reputational harm—caused Plaintiff to lose the final two years of that royalty stream.

A 15% annual discount rate is used to reflect early-stage risk, time value of money, and industry norms for technology valuation under uncertainty. Discounted at 15% annually, the present value of the lost royalty income in years 11 and 12 is approximately $180.8 million. This figure reflects only the narrowly framed economic consequence of the delay, not the full value of the intellectual property or additional damages related to unjust enrichment, fair market diminution, reputational injury, or strategic misappropriation.

Plaintiff's valuation and damages model is supported by documentary evidence, a signed licensing agreement, and plausible, expert-defensible projections. The appropriate standard in this civil action is a preponderance of the evidence, not proof beyond a reasonable doubt. Accordingly, Plaintiff need only show that it is more likely than not that Defendant's misconduct caused material delay and economic harm—an evidentiary threshold that the record clearly satisfies.

Plaintiff therefore seeks damages of at least $180 million based on a reasonable royalty methodology, supported by explicit license terms, conservative economic modeling, and judicially recognized valuation standards.

## 4. Georgia-Pacific Reasonable Royalty Analysis

In assessing a reasonable royalty for the misappropriated use of the Vacuustat technology, Plaintiff relies on the framework established in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). The following factors support the use of a 5% royalty rate, as documented in Plaintiff's prior licensing agreement and substantiated by the broader commercial context and Defendant's conduct.

1. Royalties received by the patentee for the licensing of the patent in suit: Plaintiff executed a written licensing agreement with Radian Industries that granted the company exclusive commercial rights to the Vacuustat platform in exchange for a 5% royalty on revenue derived from products incorporating the patented technology. This agreement was executed voluntarily, at arm's length, and prior to the onset of litigation. As such, it reflects a contemporaneous and uninflated assessment of the patent's commercial value by the patentee. The 5% royalty rate represents the amount Plaintiff was actually willing to accept in exchange for exclusive commercialization rights and thus serves as a direct and credible benchmark under Factor 1.

2. Rates paid by the licensee for the use of other comparable patents: There is no evidence that Defendant or any affiliated entity ever paid for a license to comparable patented technologies. The absence of any comparable royalty history on Defendant's part underscores the need to anchor the analysis in Plaintiff's documented licensing framework. Accordingly, the Radian license remains the most reliable indicator of a reasonable rate.

3. Nature and scope of the license (exclusive or non-exclusive, territorial rights, etc.): The license granted by Plaintiff to Radian Industries was exclusive and worldwide, applying to all revenue-generating uses of the Vacuustat platform and related technologies. The license covered not only the core patent (U.S. Patent No. 10,625,842) but also associated technical assets such as notes, calculations, CAD files, and computer code. This broad scope—exclusive rights across all territories and commercial applications—supports the 5% royalty as a baseline rate for high-leverage commercialization.

4. Licensing policy of the patentee regarding maintaining patent monopoly or willingness to license: Plaintiff has consistently pursued a licensing-based commercialization strategy. Rather than building a vertically integrated manufacturer, Plaintiff's intent was to enable deployment through external partners by offering access to the core Vacuustat technology in exchange for royalties. This open licensing posture is evidenced by the executed Radian agreement and further corroborated by Plaintiff's repeated efforts to attract aligned commercialization partners.

5. Commercial relationship between the licensor and licensee (e.g., competitors or not): Plaintiff and Defendant were initially aligned through their mutual involvement in Radian Industries. However, Defendant subsequently formed shell companies—without Plaintiff's consent—designed to divert commercialization of the Vacuustat and related technologies. This placed Defendant in direct competition with Plaintiff and created a hostile commercial relationship. In a hypothetical negotiation, this adversarial posture would likely have increased Plaintiff's insistence

on clear terms, documentation, and compensation—further reinforcing that the 5% royalty previously granted to a trusted entity would represent a floor, not a ceiling, in any arms-length negotiation with Defendant or his affiliates.

6. Effect of selling the patented specialty in promoting sales of other products or in securing the patentee other business: At the time of misappropriation, the Vacuustat platform was not part of a bundled product suite or revenue stack with ancillary offerings. However, its successful commercialization would have generated substantial secondary business benefits for Plaintiff, including derivative licensing opportunities, consulting engagements, and strategic partnerships. Additionally, early deployments—particularly in defense, telecommunications, or energy—would likely have led to further monetization channels beyond core platform royalties, including systems integration, data services, or co-development contracts. While these ancillary revenues are not included in the damages model presented, their existence reinforces the Vacuustat's role as a commercial catalyst and supports a royalty floor of 5% as a conservative, standalone rate.

7. Duration of the patent and the term of the license: As of the date of Defendant's misconduct, the Vacuustat patent (U.S. Patent No. 10,625,842) had approximately 12 years of enforceable life remaining, expiring in 2037. The licensing agreement with Radian Industries was coextensive with the life of the patent, ensuring consistent royalties throughout the entire remaining term. A hypothetical license negotiated in 2025 would therefore cover the same duration, and the royalty rate must reflect this long-term commercial potential. The extended exclusivity window further justifies a robust royalty valuation.

8. Established profitability, commercial success, and popularity of the product: The Vacuustat platform had already demonstrated significant commercial potential and investor interest. The technology was featured in pitch decks, grant application materials, strategic plans, and internal documents designed to attract partners and capital. Defendant's own statements—for example, his email to Khosla Ventures—acknowledged the high perceived value of the invention. While pre-revenue, the Vacuustat had a clearly established pathway to commercial success. This weighs in favor of a substantial valuation in line with high-value IP.

9. Utility and advantages of the patented invention over prior art: The Vacuustat offers a major technological departure from both traditional aerostats and existing airborne wind systems. It replaces helium or hydrogen lift with structurally stabilized vacuum lift—enabling massive advances in wind energy, telecommunications, off-grid infrastructure, and persistent ISR. Plaintiff's design avoids dependence on rare gases, can be manufactured with known materials, and supports persistent station-keeping flight at altitudes beyond conventional limits. These

7

advantages were central to Plaintiff's licensing strategy and sharply differentiate his invention from prior art. The substantial utility and novelty of the design supports a high market valuation and premium royalty rate.

10. Nature of the infringer's use of the invention and the value of that use: Defendant's use of the Vacuustat technology was directed toward immediate commercialization through unauthorized entities. Evidence indicates that Defendant actively attempted to solicit funding, build prototypes, and present the technology as his own. Defendant's actions demonstrate full-scale commercial intent, as opposed to incidental or academic use. Defendant's misappropriation directly targeted the invention's core commercial value and thus warrants full compensatory damages.

11. Extent to which the infringer has made use of the invention: Defendant's efforts to seize and redirect Plaintiff's technology were extensive. Defendant took steps to: present the technology to investors, including the federal government; build related infrastructure; and assume control over commercialization channels. These efforts caused meaningful reputational and strategic harm by disrupting Plaintiff's licensing trajectory and creating uncertainty among potential partners. Even absent completed sales, this preemptive interference justifies a royalty-based award based on the invention's projected use.

12. Portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions: In sectors involving high-value, foundational innovations—such as energy infrastructure, aerospace platforms, and defense technology—customary royalty rates for enabling IP typically fall between 3% and 10% of gross revenue, depending on the maturity of the invention, exclusivity of the license, and breadth of application. The 5% royalty specified in Plaintiff's licensing agreement with Radian Industries is well within this range and reflects prevailing market norms for core platform technologies that enable new commercial capabilities. Moreover, comparable arrangements in renewable energy and aerospace often involve multi-percentage royalties on system-level revenue or licensing fees based on total deployment capacity. Given the Vacuustat's role as an enabling architecture across multiple sectors—and its ability to supplant entire classes of infrastructure—the 5% royalty is consistent with industry standards and represents a conservative figure relative to the transformative nature of the invention.

13. Portion of realizable profit attributable to the invention, as distinguished from non-patented elements: The Vacuustat patent protects the core architectural innovation that makes the platform viable—a class of structures for supporting vacuum lift in ambient atmospheric pressure. This is the enabling principle for the entire technology, so the foundational lift mechanism is solely attributable to the patented invention.

As such, virtually all projected profit from Vacuustat-based systems is fairly attributable to the patent itself, supporting a substantial royalty base.

14. Opinion testimony of qualified experts: Plaintiff is prepared to support the royalty model in this Complaint with expert testimony, including technical valuation experts and economists with experience in IP monetization. Preliminary assessments of market potential, technical viability, and commercialization readiness have already been conducted. Further expert analysis will be provided at trial, if necessary, to substantiate the valuation methodology and the reasonableness of the selected royalty rate.

15. Hypothetical negotiation between a willing licensor and licensee at the time infringement began: At the time Defendant began his misappropriation (2024), he was serving as CEO of Radian Industries—the company to which Plaintiff granted an exclusive, worldwide license to commercialize the Vacuustat platform in exchange for a 5% royalty on gross revenue. This existing agreement reflects the terms Plaintiff deemed fair for a trusted partner acting in good faith. However, Defendant covertly attempted to expropriate the technology by forming competing shell companies and asserting control over the IP outside of the licensing framework. In a hypothetical negotiation with a similarly positioned but untrustworthy party, Plaintiff would have demanded not only the 5% royalty, but also enhanced structural protections, clear governance rights, and a higher royalty on a non-exclusive basis to compensate for elevated risk. Accordingly, the 5% royalty serves as a conservative benchmark in light of Defendant's bad faith and the friction that would have characterized any true arms-length negotiation.

## 5. Artifact Valuation Estimate

The Artifact is a novel solid-state inertial navigation sensor designed to operate with exceptional long-term precision and no moving parts. The Artifact leverages a proprietary architecture—derived from Plaintiff's original Doppler-shifting techniques—that enables accurate navigation even in GPS-denied or contested environments. An experimental prototype of the system has been constructed and tested in laboratory conditions. Its unique design enables drift-resilient, orientation estimation, potentially challenging high-end fiber optic gyroscopes (FOGs) in many applications.

The Artifact's use cases span several high-value commercial and defense sectors, including unmanned aerial vehicles (UAVs), autonomous underwater vehicles (AUVs), long-range strike drones, commercial vehicles, and classified military platforms. The Artifact has reached prototype status, demonstrating basic functionality and system feasibility. Its design has been reduced to practice and documented in schematics, source code, hardware, and

experimental data. While further iteration is required for field deployment, the core architecture has been de-risked in testing.

The Artifact targets multiple multi-billion-dollar markets where precision navigation is critical:

(a) Defense and military ISR: The global military inertial navigation market is expected to exceed $15 billion by 2028, with strong growth driven by the need for GPS-denied operations, electronic warfare, and autonomous systems. The Artifact offers advantages in size, power, reliability, and GPS-denied capability—essential for contested environments.

(b) Commercial shipping and subsea navigation: With increasing demand for autonomous maritime navigation, pipeline inspection, and undersea mapping, the AUV market is projected to reach $7 billion by 2030. A drift-free, solid-state navigation device offers critical advantages in this domain.

(c) Drone and aerospace platforms: The UAV market is expected to reach $60 billion globally by 2030. Many platforms require secondary or redundant navigation layers for mission assurance—especially under GPS degradation or denial.

(d) Space and planetary navigation: The Artifact's architecture lends itself to use in planetary surface navigation and lunar operations, where GPS is unavailable. NASA and commercial space missions increasingly rely on novel INS solutions.

(e) Autonomous vehicles and robotics: Although LIDAR and vision-based systems dominate ground autonomy, high-reliability inertial backup systems remain a requirement. The Artifact could serve in specialty roles (e.g., underground, mine, tunnel, or fallback navigation).

Together, these sectors yield a conservative total addressable market (TAM) exceeding $10 billion annually. Another estimation of the market size is found in the ARK NSF SBIR Phase I Project Pitch document, where Defendant wrote: "The inertial navigation system market overall is over $15b per year." A product enabling even a small fraction of those applications—especially with defense prioritization—could rapidly scale with the right funding and contracts.

To estimate the fair value of the Artifact IP, we apply conservative, defensible assumptions:

TAM capture: A 0.1% capture of a $10 billion market ($10 million annual revenue) is assumed. This is well below the 1%–5% capture rates frequently used in venture capital and startup projections. Courts have upheld damages models that project future market share where those estimates are grounded in credible, case-specific data. In *Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1260–62 (Fed. Cir. 2013), the Federal Circuit affirmed a substantial damages award over SAP's objection that the projection was speculative, holding that the jury was properly instructed on the entire

market value rule and that sufficient evidence supported the expert's forecast of lost sales. Plaintiff here assumes a mere 0.1% penetration of a clearly defined $10 billion market—an estimate approximately 200x more conservative—based on technology readiness level, investor interest, government interest, and established use cases. This places Plaintiff's damages model well within the bounds of judicially accepted forecasting methods.

Valuation multiple: Applying a 4× multiple to projected annual revenue yields a $40 million IP valuation. This multiple reflects the status of the Artifact as (1) a prototype-stage, partially de-risked physical invention, (2) defensible through technical documentation and source code, and (3) strategically positioned for high-value defense and industrial applications. A revenue multiple of approximately 4× is consistent with valuations commonly observed in the technology sector.

IP quality factors: The valuation is further supported by the Artifact's unique characteristics: its utility in GPS-denied scenarios, modular design for miniaturization, absence of moving parts (reducing MTBF), and alignment with defense and aerospace procurement trends.

This $40 million valuation reflects the fair market value of the Artifact's intellectual property at the point where prototype validation was complete, assuming proper support, commercialization effort, and non-interference. It does not account for downstream revenue, contract acquisition, or synergistic value to defense integrators—factors which may substantially increase future worth.

While the $40 million valuation represents a fair and grounded estimate based on a 4× multiple of expected annual revenue from modest initial contracts, Plaintiff seeks a valuation of $100 million, based on precedent for de-risked technologies, market comparables, and admissions made by Defendant himself. This figure is consistent with acquisition benchmarks in the defense technology sector, particularly for dual-use inertial systems positioned to displace or augment GPS—a core national security vulnerability recognized by the Department of Defense.

In a public post dated April 28, 2025, Defendant Chapiro boasted about a "$100m buy out" of the company's core technology, naming Anduril, Raytheon, Lockheed, and Boeing as potential acquirers. The statement, made without Plaintiff's knowledge or consent, was a specific internal indication of Defendant's valuation expectations at that time, linked to identified acquirers and a live technology offering. Under Federal Rule of Evidence 801(d)(2)(A), such a statement is a party-opponent admission, and is admissible for its substantive truth. Courts have routinely treated such admissions—even those touching on valuation or negotiation posture—as probative evidence when offered by the non-declarant party. The statement is therefore admissible and highly relevant to valuation-based damages.

This $100 million figure is further supported by comparative transactions involving novel navigation and sensing technologies acquired by defense contractors and venture-backed firms. For example, AEye, a LiDAR and AI sensing company focused on autonomous and defense-grade situational aware-ness, reached a pre-IPO valuation exceeding $1 billion. Similarly, Navtech Radar, a UK-based navigation company with proprietary IP and government contracts, was acquired by Hexagon AB for over $30 million, primarily for its radar software and future strategic utility. Given that the Artifact combines hardware, software, and advanced signal processing for GPS-denied inertial navigation—one of the most sought-after capabilities in modern asymmetric warfare and autonomous ISR platforms—the $100 million valuation aligns with market precedent.

Crucially, the $100 million figure is not speculative when viewed as a strategic acquisition price, rather than a revenue-based IP valuation. Defense primes regularly acquire pre-revenue or early-stage companies at high premiums when the technology (i) provides a first-mover advantage, (ii) closes a critical capability gap, or (iii) enables new categories of deployable systems. The Artifact qualifies on all three counts. With wide applicability across aerial, underwater, and ground autonomous systems—and the potential to enable contested-environment operations without reliance on GPS—the technology is plausibly valued at $100 million in a strategic sale, especially with minimal internal resistance and technical de-risking already achieved.

Defendant's own post is therefore both evidentiary and illustrative: while it harmed Plaintiff by misrepresenting corporate authority and eroding trust with potential acquirers, it simultaneously confirms Defendant's belief in the extraordinary value of the technology. That belief—made public, specific, and attached to named buyers—is among the strongest possible indicators of fair market strategic value at the time of misappropriation.

## 6. Damage to Artifact Intellectual Property

The Artifact—unlike the Vacuustat—is not yet protected by an issued patent. Its intellectual property remains in a vulnerable patent-pending state, relying on trade secret protections, confidential documentation, and patent-pending rights for its legal integrity and commercial value. Defendant's actions have directly and materially damaged this IP in ways that go far beyond mere delay or disruption. Therefore, the injury to this intellectual property is existential.

First, Defendant unlawfully retained and accessed Plaintiff's "Private" folder, which was explicitly marked as confidential. This folder contained schematics, source code, experimental notes, design analysis, and internal technical materials that collectively documented the working prototype and underlying intellectual architecture of the Artifact. At the time of

retention, the folder was stored in a corporate Google Drive under an express expectation of confidentiality and cofounder trust. Defendant retained and accessed this material without authorization, following the dissolution of the company and explicit revocation of consent. He has since used these materials to aid a competing venture, Phoenix Dynamics, in violation of Plaintiff's ownership and development rights.

Second, Defendant has disclosed portions of the Artifact's core design to third parties without authorization. These disclosures—made during out-reach to advisors, collaborators, and investors—occurred in contexts where Plaintiff was not present, did not consent, and was not credited. Such disclosures materially undermine trade secret protections. Once disclosed, a trade secret can no longer be protected under law. The value of the Artifact IP depends on exclusivity; Defendant's disclosures and misappropriation have fundamentally compromised that exclusivity.

Third, Defendant has established Phoenix Dynamics, a direct competitor built on stolen intellectual property, and has solicited resources to further develop and commercialize this venture without Plaintiff's involvement.[2] This action constitutes not only a breach of fiduciary duty and contract but also a clear case of willful trade secret misappropriation, actionable under both federal and state law. (See 18 U.S.C. § 1836 (Defend Trade Secrets Act); Ohio Uniform Trade Secrets Act, R.C. 1333.61–69.)

The commercial harm from these actions is substantial. Plaintiff's Artifact IP—based on prototype validation and detailed technical analysis—has a conservative, justifiable fair market value of $100 million (see prior section). However, unlike the Vacuustat IP, which remains protected by an issued patent, the Artifact is now: legally compromised, due to lost trade secret status and weakened ability to patent; commercially undermined, due to competitive interference and stolen first-mover advantage; strate-gically disadvantaged, due to diversion of investors, advisors, and internal resources to Phoenix Dynamics.

Courts have awarded significant damages where misappropriation results in lost exclusivity or head start advantage. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09cv58, 2011 WL 4625760, at *14 (E.D. Va. Oct. 5, 2011) (entering $919 million judgment on jury verdict for trade secret misappropriation), and *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117 (7th Cir. 2020) (affirming $140 million award for misappropriation of confidential information).

Given the destruction of exclusivity, the breach of confidentiality, and the launch of a directly competing company based on misappropriated IP, damages should be calculated not merely as a lost licensing opportunity, but as a forced forfeiture of enterprise value. At minimum, Plaintiff has lost the opportunity to raise funding, license the technology, or secure

---

[2] https://x.com/DeltaClimbs/status/1958566628779860112

early defense contracts—any of which could have initiated monetization and further IP development.

Courts have long recognized that intellectual property valuation may extend beyond actual sales or royalties, particularly when the IP in question has clear technical differentiation and identifiable commercial paths. In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978), the Sixth Circuit held that a patentee may recover lost profits upon showing demand for the patented product, lack of acceptable noninfringing substitutes, capacity to meet the demand, and the profits it would have made. That standard applies directly here: Plaintiff had already developed a working prototype of the Artifact, a technology serving a high-demand market, and demonstrated its novelty and functionality in laboratory conditions. While production was not yet scaled for full commercial deployment, Plaintiff retained the capability to manufacture units at limited scale and had documented the design sufficiently to enable broader production with modest additional funding. These facts satisfy the Panduit factors of demand, capability, and product differentiation, making damages for lost opportunity and impaired value both appropriate and legally supported.

In this case, Plaintiff developed a working prototype of the Artifact navigation technology, and documented its feasibility and performance through internal testing. The technology targeted multiple high-value markets—precision drone navigation, underwater and subterranean robotics, submarine and commercial shipping navigation, and inertial guidance in GPS-denied environments. Comparable IP in these fields has fetched valuations and awards in the tens to hundreds of millions of dollars. For example, in *Epic Systems Corp. v. Tata Consultancy Services*, the Seventh Circuit court upheld a $140 million compensatory damages award based on the theft and dissemination of proprietary documentation, despite the absence of actual product loss. In that case, the value destruction lay in the lost exclusivity and head start conferred upon a competitor—a situation that parallels the facts here.

Additionally, in *BladeRoom Group Ltd. v. Emerson Electric Co.*, No. 5:15-cv-01370, the Northern District of California found that unauthorized disclosure of trade secrets to a third party—enabling that party to accelerate market entry—justified damages of $30 million. Like BladeRoom, Plaintiff has suffered both an unauthorized disclosure of trade secrets to a third party, and permanent loss of competitive positioning, compounded by the inability to assert clear ownership in future licensing or defense negotiations. In the current case, the damage is magnified by the fact that the IP is patent-pending and not yet granted, meaning the Defendant's misappropriation contaminated the commercial prospects at their most vulnerable stage.

Given the totality of circumstances, Plaintiff applies a conservative 25% impairment of fair market value. This discount is modest in light of industry norms and judicial precedent, where contamination of IP ownership and unauthorized use often render the technology commercially unusable by the

rightful owner. Based on a reasonable $100 million estimated value for the Artifact IP—supported by the prototype, strategic applications, established commercial interest, and Defendant's own admission—a $25 million valuation loss is well within the range of fair and legally justifiable damages.

## 7. Damages from Diverted Investment Opportunity with Khosla Ventures

The actions of Defendant Chapiro constitute a textbook case of usurpation of corporate opportunity, breach of fiduciary duty, and intentional interference with prospective economic advantage—entitling Plaintiff to damages representing the full value of the diverted investment. Based on Khosla Ventures' public track record, industry benchmarks, and the seriousness of the engagement, a conservative valuation of this diverted opportunity is $5 million.

Khosla Ventures regularly makes early-stage investments in advanced technology companies, including defense and deep-tech hardware startups, with initial investments commonly in the $2–10 million range. The firm's public investment thesis emphasizes "black swan" opportunities—rare, transformative technologies with the potential to disrupt established markets —making Plaintiff's patented Vacuustat and his inertial navigation system direct matches for Khosla's strategy. In fact, despite Defendant's history of openly insulting Vinod Khosla and his firm, Khosla Ventures nonetheless accepted a follow-up meeting with Defendant—an outcome that underscores the perceived value and technical promise of the underlying intellectual property, not Defendant's conduct or credibility.

Courts have held that when a fiduciary secretly diverts an active investment opportunity and uses the company's intellectual property to solicit funding for a separate, unauthorized entity, the injured party is entitled to recover the full value of the opportunity. *See Guth v. Loft Inc.*, 5 A.2d 503 (Del. 1939) (establishing the corporate opportunity doctrine) and *BladeRoom Group Ltd. v. Emerson Electric Co.*, No. 5:15-cv-01370 (N.D. Cal. 2018) (awarding $30 million for the diversion of a business opportunity enabled by unauthorized disclosure of trade secrets to a competitor).

Here, Defendant not only withheld Plaintiff's name and the company's identity from the investor outreach, but also falsely presented Plaintiff's proprietary technologies as part of his own venture—Black Lattice—without attribution or consent. Plaintiff attempted to correct the record by directly emailing Khosla Ventures the day before the scheduled meeting, identifying himself as the inventor and linking to his issued patent. He received no reply. Defendant proceeded with the meeting alone and pitched his own entity, not Radian Industries. Upon information and belief, he failed to disclose the true source and ownership of the IP. This act was calculated and deceptive.

15

Plaintiff's exclusion from this critical engagement destroyed a credible pathway to institutional funding and strategic growth. A $5 million seed investment from Khosla Ventures is directly in line with the firm's typical check size, consistent with industry benchmarks for dual-IP ventures, and supported by the fact that Khosla entertained the meeting despite Defendant's unprofessional conduct. Plaintiff is therefore entitled to compensatory damages in the amount of $5 million, representing the full value of the diverted investment opportunity, together with additional relief for reputational harm, delay, and the loss of downstream financing or defense-related commercialization that would have reasonably followed from such funding.

## 8. Reputational Harm to Radian and Resulting Business Collapse

Defendant's conduct in sabotaging multiple investor engagements—partic-ularly with Khosla Ventures—constitutes not only a loss of specific opportunities but a sustained reputational assault on the company he was purporting to represent. When Defendant sent hostile, erratic, and vulgar communications to high-profile venture capitalists while representing Radian Industries, he signaled to the broader ecosystem that Radian was untrust-worthy, unstable, and professionally radioactive. This reputational damage effectively foreclosed future investor interest and collapsed pathways for institutional engagement.

In this case, Defendant's communications were not isolated lapses but a deliberate pattern. The August 2024 Khosla email, followed by a public boast about "roasting Vinod," combined with the April 2025 mass solicitation email insulting its recipients and omitting critical facts (including Plaintiff's name and his company's identity), created the perception that Radian Industries was not a serious or stable company. These impressions were not confined to private correspondence—they were publicly broadcast on social media and permanently associated with the company's identity during its critical formative months.

The result was terminal reputational damage. Rather than being perceived as a venture-backed dual-use technology company with breakthrough IP and credible founders, Radian was effectively branded—by its own representative —as erratic, unprofessional, and ideologically hostile to the very investor class it depended upon. This collapse of credibility destroyed not only immediate investment prospects, but any realistic chance of future capital-ization, scaling, or market entry. Plaintiff, despite being the sole inventor and technical mind behind the company's core offerings, was left with no pathway to recovery or reengagement, as the reputational fallout extended beyond any single deal.

This reputational collapse must be understood as a quantifiable economic injury that directly contributed to the company's dissolution. It represents a permanent loss of goodwill, investor trust, and future earnings capacity— all of which were directly traceable to Defendant's actions while purporting to act on Radian's behalf. Accordingly, reputational harm supports and amplifies the broader economic loss calculations already detailed in this Complaint, and serves as an independent ground for compensatory and exemplary damages.

## 9. Loss of Equity Valuation

Defendant's own written admissions support a $2.5 million pre-dissolution valuation of the company, stating that Radian Industries "could have very conservatively raised $500k at a $2.5m valuation." This estimate as a valuation floor is also consistent with contemporaneous internal communications. In a message dated April 12, 2025—prior to the company's dissolution —Plaintiff wrote: "We can't take an early $2.5M VC round for Radian, that just doesn't make sense given the value of the IP that Radian currently has." This statement reflects Plaintiff's assessment of the company's value at the time, further underscoring the reasonableness of the $2.5 million equity loss figure now presented. Courts have recognized that such statements may be admitted as substantive evidence when offered against a party-opponent. *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) (admitting prior factual statements made by defense counsel as party admissions under Rule 801(d)(2)).

In addition, courts have routinely accepted internal communications and public statements as competent evidence of contemporaneous valuation, especially when they come from managing shareholders or officers. For example, in *In re Appraisal of Dell Inc.*, C.A. No. 9322-VCL (Del. Ch. May 31, 2016), the court relied on the company's internal financial models and executive commentary in assessing value. There, Dell's CFO presented board-level projections showing valuations substantially above the stock price, and the court noted that management had "used the July Case to estimate the Company's value as a stand-alone entity." The court also considered contemporaneous earnings calls in which management told the market that short-term weakness was consistent with a "long-term strategy [that] will take time." Taken together, these internal and public communications were treated as credible indicators of how Dell's leadership valued the business at the time.

In startup and early-stage venture contexts, valuation is often expressed as a function of anticipated funding rounds, projected intellectual property value, and team capacity. Here, Radian had secured early IP, developed significant technical assets (including the Artifact prototype and Vacuustat engineering files), and had at least one cofounder actively engaged in raising funds. The $2.5 million pre-money valuation was conservative, con-

sistent with typical seed-stage valuations in deep tech ventures with working prototypes. *See BladeRoom Group Ltd. v. Emerson Electric Co.*, No. 5:15-cv-01370, 2018 WL 514923 (N.D. Cal. Jan. 23, 2018) (upholding damages based on diverted commercialization opportunity and diminished enterprise value in a trade secret misappropriation case involving early-stage technology).

Courts have awarded damages based on consequential damages such as lost business value, particularly in cases involving sabotage. For example, in *TriMed, Inc. v. Sherwood Med. Co., 977 F.2d 885 (4th Cir. 1992)*, the Fourth Circuit affirmed damages based in part on "loss in value of the business as a going concern due to loss of customer goodwill", where Sherwood effectively sabotaged TriMed's business relationships and caused harm to its ongoing value. Also, *see Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 980 F.3d 1117, 1129–30 (7th Cir. 2020) (affirming damages based in part on unjust enrichment and harm to enterprise value where misappropriated trade secrets undermined the plaintiff's competitive position).

In Plaintiff's case, the equity collapse to zero resulted from direct sabotage, fraud, embezzlement, reputational harm, and IP misappropriation by Defendant, who then sought to independently commercialize Plaintiff's IP through Phoenix Dynamics. Accordingly, Plaintiff seeks damages of $2.5 million, corresponding to the destruction of shareholder equity and enterprise value based on Defendant's own valuation statements, comparable funding benchmarks, and the direct causal nexus between Defendant's actions and the company's collapse.

## 10. Strategic and Developmental Harm Justifying Equity Loss

Defendant's coordinated campaign of obstruction, misappropriation, and sabotage directly destroyed Radian Industries' ability to commercialize its intellectual property and maintain operational continuity. As a result, the company's enterprise value collapsed during a critical early growth phase. Plaintiff conservatively estimates the resulting loss at $2.5 million in destroyed equity—based on industry-standard valuation benchmarks for deep tech startups at a similar stage of development.

Plaintiff's $2.5 million estimate is supported by the following categories of harm:

(a) Theft and laundering of intellectual property: Defendant deliberately misappropriated Plaintiff's patented and patent-pending technologies—most notably the Vacuustat and Artifact—and presented them under unauthorized entities including Phoenix Dynamics and BL Machines. These actions constituted corporate theft and usurpation of corporate opportunity, and they undermined Radian's ability to establish exclusivity, raise capital, or license its inventions. In addition, Defendant disseminated confidential

technical materials from Plaintiff's "Private" folder post-dissolution, including experimental data, source code, and internal documentation—eroding the company's trade secret protections and further weakening its proprietary position.

(b) Obstruction of development and technical progress: Throughout the company's final months, Defendant engaged in relentless and destabilizing communication—involving over 1,200 Signal messages in a single month. This behavior created an adversarial and chaotic work environment that materially interfered with Plaintiff's ability to concentrate on hardware development. Defendant's conduct prevented the team from meeting critical technical milestones and delayed progress during a key window of opportunity.

(c) Destruction of institutional continuity and strategic position: Following the breakdown of the partnership, Defendant took unilateral steps to disable essential company infrastructure. He revoked access to Radian's corporate Google Drive, revoked access to the corporate email, and revoked access to its banking—impeding the company's ability to wind down operations, preserve continuity, or transition to a successor entity. Simultaneously, Defendant created parallel shell companies and diverted resources toward these entities, confusing external stakeholders and severing existing momentum. His actions fractured the company's external identity, undermined credibility, and eliminated any realistic path to continued development under the Radian name.

Taken together, these acts represent a comprehensive destruction of enterprise value: Defendant's misconduct extinguished the venture's ability to function as a coherent commercial entity. Radian Industries had intellectual property, a working prototype, early federal engagement, engagement with venture capitalists, and commercial licensing potential—all indicators that justify a $2.5 million valuation at minimum based on very conservative comparisons to similar deep tech startups at the pre-seed or seed stage.

This valuation is further substantiated by direct evidence of traction at the highest levels of the federal innovation ecosystem. In a message dated April 7, 2025, Defendant acknowledged that Plaintiff's invention had secured a meeting with DARPA, writing: "We just got a meeting at DARPA 😎," and specifically naming a senior agency program lead, Paul Jaffe. This demonstrates that Plaintiff's invention had achieved serious traction within advanced government research channels—further undermining any claim that it lacked viability or market potential. It also supports Plaintiff's claims of material disruption, as this trajectory was derailed by Defendant's misconduct.

Additional external validation came from the scheduled investor meeting with Khosla Ventures, one of the most prominent deep tech venture capital firms in Silicon Valley. The meeting was arranged in early 2025 with the potential to explore a $50–100 million funding path. Khosla Ventures is

known for backing ambitious, high-risk, high-impact technologies at the earliest stages. The fact that Radian secured such a meeting demonstrates that elite, sophisticated institutional investors recognized the disruptive potential of Plaintiff's technology. Defendant's misconduct diverted this opportunity, further contributing to the company's collapse and supporting Plaintiff's valuation estimate.

Further validation is found in the evaluation history of a December 2024 Phase I SBIR proposal submitted by Radian Industries Inc. The proposal received uniform "Good" ratings from the Department of the Air Force across all three evaluation categories: Technical Merit, Defense Need, and Commercialization Potential. Although not selected for funding, the proposal reflects independent recognition that the company's core technology—developed primarily by Plaintiff—was considered viable and relevant to defense priorities. These positive ratings provide additional confirmation that the misappropriated IP had concrete strategic and commercial value at the time of the theft.

Additional confirmation comes from Defendant's own contemporaneous assessment of the technology's viability. In a message dated April 12, 2025, after Plaintiff established boundaries regarding Defendant's proposed arrangement with Phoenix Dynamics, Defendant remarked: "It makes me have to re-adjust my priors on the probability that Radian tech works from 95% to 50–70%, and that I somehow overlooked something." This statement constitutes an admission that, in Defendant's own judgment, the core technology had a 95% probability of working. Such high confidence—expressed in probabilistic terms by a technically trained cofounder—further supports Plaintiff's contention that the company's underlying intellectual property had substantial commercial value, and that the company's destruction caused significant economic harm.

Any attempt by Defendant to now claim that the technology was worthless or commercially non-viable is contradicted by overwhelming evidence, including his own 95% confidence assessment, the DARPA meeting, two meetings with the Missile Defense Agency, and the scheduled investor meeting with Khosla Ventures—widely regarded as one of the top venture capital firms in the US. These facts collectively establish that Radian's intellectual property had substantial intrinsic and market-recognized value. Defendant's conduct directly destroyed a venture that leading federal agencies and elite investors had already identified as having extraordinary potential.

## 11. Loss of Near-Term Investment Opportunity

Defendant's own statements establish that Radian Industries was on the cusp of securing a $500,000 early-stage investment prior to its collapse. In his May 9, 2025 email, Defendant stated: "Given we could have very conservatively raised $500k at a $2.5m valuation […]."

This admission demonstrates Defendant's own belief that the company was capable of closing a seed-stage raise, and that sufficient investor interest or momentum existed to justify a $500,000 capital injection. At no point did Defendant disclaim this estimate or suggest that the figure was aspirational; rather, he used it to bolster his own damages theory—ironically underscoring Plaintiff's claim that Defendant's conduct caused quantifiable harm to the company's financing prospects.

Courts have long held that loss of a specific investment opportunity may be compensable when the opportunity was sufficiently definite, foreseeable, and thwarted by the defendant's misconduct. Similarly, in *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 607 F. Supp. 2d 470, 475 (S.D.N.Y. 2009), damages were awarded where the plaintiff lost sales and profits that it would have realized but for the defendant's infringement.

Here, Plaintiff had completed a working prototype of the Artifact, created internal technical documentation, CAD files, source code, developed trade secret documents for the Vacuustat and Artifact, and had engaged in substantive discussions with third parties prior to the company's dissolution. Defendant's erratic conduct, public disparagement, and unauthorized sharing of confidential material directly undermined investor confidence and shut down the company's ability to raise capital. Given that $500,000 was, by Defendant's own account, a "conservative" estimate of what the company could have raised, and that this figure aligns with typical seed-stage valuations for deep tech ventures with validated hardware, the loss is not speculative—it is the predictable outcome of Defendant's self-serving and destructive interference.

This foreclosed investment would have enabled essential follow-on activities, including physical validation of the Vacuustat strut architecture and pre-contract positioning for the Artifact. Its loss accelerated the collapse of the company and magnified the economic harm to Plaintiff.

## 12. Lost Contract Opportunity

Defendant's own statements explicitly reference a $1 million contract opportunity that he believed was realistically within reach. As he wrote: "The analysis we have and the footage is enough for me to get a $1m contract," and "with a $1m contract and a few good engineers, we will quickly catch up and get ahead." It is clear that this statement is referring to Plaintiff's Artifact invention, because it mentions video footage, which was obtained during the operation of Plaintiff's experimental prototype. Defedant referenced this $1 million figure again in his May 9 email, asserting "at a very minimum the damages could be over $1m". These admissions, made in writing and in the context of planning a competing venture, demonstrate Defendant's belief in the viability of a substantial early-stage contract

and his intent to personally capitalize on it after sabotaging the original company.

Courts have credited internal statements by corporate officers—such as admissions of overstatement or lack of product viability—as evidence of intent and misconduct. For example, in *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010), the Ninth Circuit credited internal admissions by a corporate officer that directly contradicted public claims, finding them relevant to scienter and evidentiary weight.

Courts have held that when a plaintiff is deprived of a reasonably probable business opportunity due to defendant misconduct, damages are recoverable even if the opportunity had not yet fully materialized. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer, instead of upon the injured party."), and *Taylor v. Bradley*, 39 N.Y. 129 (1868) ("[Plaintiff's] damages are what he lost by being deprived of his chance of profit.").

Here, Defendant's statements provide contemporaneous evidence of a reasonably probable lost business opportunity. He evaluated the opportunity as $1 million "at a very minimum" and also implied its imminence, citing the sufficiency of existing materials ("analysis" and "footage") to secure the deal. Defendant's wording, "at a very minimum," demonstrates reasonable certainty that the value of the lost contract opportunity was conservatively $1 million. The fact that Defendant subsequently launched a competing venture to pursue the same opportunity underscores both its reality and the causal nexus between his misconduct and Radian's inability to capture the contract.

Moreover, Defendant has direct experience successfully securing substantial government funding: Defendant is listed as the Principal Investigator (PI) for an SBIR Phase I grant, "5-Axis Continuous Carbon Fiber 3D Printing," awarded on December 1, 2016; Defendant is listed as Co-PI for $230,000 SBIR Phase I grant, "Continuous Fiber Ceramic Matrix Composite 3D Printing," awarded on June 1, 2018; and Defendant is listed as the Principal Investigator for a $50,000 Department of Defense grant, "Near-Isotropic, High-Strength, High-Stiffness Thermoset Composite 3D Printing for Drop-In Replacement of Machined Metals," awarded on March 9, 2020.

Furthermore, Defendant is a cofounder of Mantis Composites, which obtained a $1.2 million Phase II grant in 2023 (contract number FA8650-23-C-5012) and an additional $3 million Phase II grant (definitive contract HQ086024C7117) from the Missile Defense Agency (MDA) in 2024.

Defendant's statement—"The analysis we have and the footage is enough for me to get a $1m contract"—therefore reflects a credible and informed assessment of the funding potential of Plaintiff's Artifact invention, based upon his direct prior experience in obtaining federal grants.

Defendant's admissions placed a clear, concrete value on Plaintiff's intellectual property—confirming that the materials in his possession, derived entirely from Plaintiff's work, were sufficient to secure a seven-figure defense contract. This type of contract was a foreseeable and intended target of the venture's commercialization efforts and squarely within the contemplated use of the Artifact technology.

Courts allow recovery for the loss of government or commercial contracts where misconduct disrupts competitive standing. The facts presented in this Complaint satisfy all four elements required to establish tortious interference with a business expectancy under *Glass v. Glass*, 228 Va. 39, 51–52, 321 S.E.2d 69, 76–77 (Va. 1984):

1. A valid business expectancy with a reasonable probability of future economic benefit: Plaintiff's company, Radian Industries, had already developed the Artifact prototype, generated demonstrable technical output ("footage" and "analysis"), and was positioned to seek early commercialization through government or defense contracts—a common pathway in dual-use and SBIR-aligned technologies. Defendant's own statements confirm that "at a very minimum" a $1 million contract was "very conservatively" within reach, indicating not mere hope but a reasonably probable commercial opportunity.

2. Defendant's knowledge of the expectancy: Defendant explicitly references this $1 million contract opportunity in multiple written communications, expressing both familiarity with the opportunity and confidence in its viability. His statements reveal not only awareness of the business trajectory but an internal valuation of Plaintiff's proprietary materials as sufficient to win the contract. This establishes knowledge of the business expectancy as it existed prior to dissolution.

3. Intentional interference with the expectancy: Defendant deliberately positioned himself to pursue the same opportunity post-dissolution, having sabotaged internal operations, diverted and obstructed investment opportunities, and later launched a competing venture using misappropriated intellectual property and trade secrets. His written intent to "quickly catch up and get ahead" with "a few good engineers" following a $1 million contract demonstrates premeditated interference designed to divert the benefit away from the original entity.

4. Resulting damage to the plaintiff: Plaintiff's company was deprived of the opportunity to pursue this early-stage contract, and the proprietary work product (technical materials for both the Artifact and the Vacuustat) was used as the foundation for Defendant's separate commercialization effort. The opportunity was clearly acknowledged by Defendant as real, immediate, and worth $1 million. Given Defendant's prior successful acquisition of federal funding across multiple SBIR and DoD programs, his assessment of the opportunity's credibility carries particular evidentiary weight.

23

Accordingly, Plaintiff seeks compensatory damages of $1 million for the lost opportunity to secure an early-stage contract—an opportunity contemporaneously valued by Defendant himself and firmly supported by his experience, conduct, and admissions. This claim is consistent with prevailing case law recognizing recovery for foreseeable economic loss where intentional misconduct deprives a party of a reasonably probable commercial opportunity.

## 13. Unauthorized Diversion of Capital

Defendant's loan arrangement and subsequent handling of company funds constituted a direct economic injury to Plaintiff, reducing the actual capital available to Radian Industries and diverting resources toward self-interested activities under false pretenses. Although Defendant nominally extended a $60,000 loan to the company, only $49,665 was ever delivered in a form that conferred tangible benefit. The remaining $10,335 was either (i) spent on travel, lodging, and conferences that served Defendant's unrelated shell companies (Phoenix Dynamics and Black Lattice), or (ii) unilaterally withheld in breach of the loan's terms.

These expenditures were not authorized by Plaintiff, provided no deliverables or investments for Radian, and advanced Defendant's competing ventures at Radian's expense. As such, they constitute misappropriated corporate funds and satisfy the criteria for capital diversion damages. The $8,335 in travel-related expenditures—tied to government RFIs and defense outreach conducted in the name of Black Lattice—represents a form of covert reallocation of company money to support parallel commercialization efforts based on Plaintiff's proprietary designs. Defendant's additional embezzlement of $2,000 from the final loan installment, under the pretense of covering unspecified "expenses," was similarly conducted without disclosure, accountability, or board approval.

Moreover, Defendant clawed back $18,500 from the corporate account in violation of a non-callable repayment clause, even though the triggering revenue threshold of $700,000 was never met. The act of seizing these funds—combined with his partial and piecemeal disbursement of the original loan amount—demonstrates both a breach of contract and a misuse of corporate authority. These actions deprived the company of operational runway, destabilized financial planning, and hastened the company's dissolution.

Damages for unauthorized capital diversion are well recognized in corporate tort cases, especially where a fiduciary improperly uses company resources for personal gain or to benefit a competitor. *See Guttman v. Huang*, 823 A.2d 492, 505–06 (Del. Ch. 2003) (recognizing breach of loyalty and actionable damages when insiders place personal interests ahead of the corporation's) and *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (finding that intentional disregard for corporate duty may support fiduciary liability). Defendant's misappropriation of these funds,

24

under color of a development loan, meets the standard for compensatory damages based on capital loss, contract breach, and fiduciary misconduct. Plaintiff seeks recovery of at least $28,835 in direct financial harm: $10,335 in unauthorized expenditures and clawbacks, and $18,500 in wrongful repayment. These amounts reflect hard-dollar loss distinct from broader valuation or opportunity-based claims.

## 14. <u>Out-of-Pocket Costs and Sunk Time</u>

Plaintiff incurred substantial personal costs and uncompensated labor in developing the technologies that later became the foundation of Radian Industries—well before Defendant's involvement or any formal funding arrangement. From late August through December 2024, Plaintiff maintained a rigorous seven-day work schedule, with frequent procurement and technical activity during late-night hours (1:00 AM to 5:00 AM) to enable high-precision optical testing. Over 160 timestamped Amazon and credit card purchases reflect a continuous pattern of late-night and weekend activity, evidencing fast-cycle hardware iteration and founder-led engineering work.

Contemporaneous records show that Plaintiff directly invested $14,589.69 in out-of-pocket hardware, optics, electrical components, motion systems, and lab supplies—paid entirely from personal funds and never reimbursed. This total includes $9,947.93 in non-Amazon credit card purchases and $3,708.53 in Amazon orders, tracked in a document last modified December 10, 2024.

In addition to direct costs, Plaintiff contributed hundreds of hours of skilled technical labor. Using his prior base salary of $150,000/year as a senior software engineer at a financial institution, Plaintiff's effective hourly rate was approximately $72/hour (based on a 2,080-hour work year). During the core development window from late August to mid-December 2024—a span of approximately 16 weeks—Plaintiff worked an average of 56 hours per week, totaling 896 hours. This amounts to $64,512 in skilled labor contributed without compensation.

Combined with hard-dollar expenditures, Plaintiff's out-of-pocket investment in the early development of the Vacuustat and Artifact technologies totals approximately $78,169. This figure represents only the quantifiable economic inputs during the documented prototyping phase and does not include the significant opportunity cost of being diverted from revenue-generating employment, nor the lost value of forward development time foreclosed by Defendant's misconduct.

The evidence is unambiguous: Plaintiff operated as the sole founder-engineer, advancing the technology through personal sacrifice and full-time effort. Defendant's subsequent attempt to seize and rebrand these inventions —without having contributed capital, labor, or technical input—constitutes unjust enrichment and a clear diversion of Plaintiff's invested value.

## 15. __Total Economic Harm__

The cumulative economic harm caused by Defendant's misconduct is exten-sive, spanning destroyed enterprise value, lost commercialization opportu-nities, and diverted or foreclosed contracts. These damages are grounded in Defendant's own statements, supported by expert-admissible valuation methodology, and reflect actual impairment to monetizable assets and corpo-rate trajectory. Courts have long recognized that where misconduct causes uncertainty in calculating damages, that uncertainty should be borne by the wrongdoer—not the victim. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("The risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party."). Accordingly, Plaintiff seeks compensation for the following economic injuries:

First, the misappropriation and delay of the Vacuustat IP alone consti-tutes loss conservatively valued at $180 million, reflecting the 1–2 year delay caused by Defendant's sabotage and internal obstruction.

Second, the destruction of exclusivity, confidentiality, and first-mover advantage for the Artifact platform—coupled with Defendant's founding of a directly competing venture—supports a damages estimate of $25 million, reflecting the impairment to the $100 million fair market value of the IP if properly commercialized. This valuation is substantiated by the existence of a validated prototype, defense and industrial applicability, and Defendant's own public statement regarding a $100 million acquisition.

Third, Plaintiff suffered direct economic loss from the diversion of a credible $5 million institutional investment opportunity with Khosla Ventures. Defendant's solicitation—conducted using Plaintiff's intellec-tual property while deliberately omitting Plaintiff's identity—constituted a knowing usurpation of corporate opportunity. The funding in question reflected a standard seed check size for Khosla Ventures, aligned precisely with their deep-tech and dual-use investment thesis. Defendant's actions destroyed a critical inflection point in Plaintiff's commercialization trajectory and precluded access to downstream capital, partnerships, and early defense adoption pathways that would have followed. The lost Khosla funding—conservatively valued at $5 million—therefore represents an imme-diate and quantifiable impairment to Plaintiff's enterprise value and growth trajectory.

Fourth, Defendant's conduct resulted in the total collapse of Radian Industries' valuation of $2.5 million, based on a reasonable expectation of early-stage fundraising that had been under discussion. The company's shutdown and the damage caused by Defendant's reputational harm impaired the possibility of future capital raises, depriving Plaintiff of equity, governance continuity, and forward momentum.

Fifth, Plaintiff suffered a $1 million loss in contract opportunity, based on Defendant's own statement that the technology and documentation

were sufficient to secure such a contract. Courts have upheld contract-loss damages where causation is clear and the lost opportunity is tangible. For example, *see Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 441–42 (7th Cir. 2020) (recognizing plausible damages based on lost contracts and customers where defendant's anticompetitive actions foreclosed plaintiff's business opportunities) and *Glass v. Glass*, 321 S.E.2d 69, 77 (Va. 1984) (affirming recovery for a lost contract opportunity where the defendant's intentional misconduct diverted a concrete business deal from the plaintiff).

Sixth, Plaintiff lost $500,000 in near-term investment that could have been raised based on existing deliverables, filings, and internal technical documentation, had the Defendant not irreparably damaged company operations and reputation with potential funders.

Seventh, Defendant's unauthorized diversion of capital—under the guise of a $60,000 development loan—resulted in at least $28,835 in direct financial harm to the company. Of the original loan amount, only $49,665 was delivered in a form that conferred tangible benefit to Radian Industries. The remainder was either misappropriated to support Defendant's unrelated shell companies (including Phoenix Dynamics and Black Lattice) or unilaterally clawed back in breach of the loan's terms. These expenditures—$10,335 in unauthorized travel and withheld funds, and $18,500 in wrongful clawback—deprived Radian of critical operational runway and financial stability, accelerating the company's collapse. These damages are distinct from broader valuation claims, and represent quantifiable misuse of funds entrusted to the company for development—not for private enrichment.

Eighth, Plaintiff also suffered a $79,101.69 loss in the form of unre-imbursed out-of-pocket expenses and uncompensated labor. During the core invention period from August to December 2024, Plaintiff worked 56-hour weeks on a continuous seven-day schedule, contributing 896 hours of skilled technical labor without compensation—valued at $64,512 based on Plaintiff's prior salary as a software engineer. In addition, Plaintiff spent $14,589.69 of personal funds on prototyping components and laboratory equipment to develop the Vacuustat and Artifact platforms. This investment of time and capital was foundational to the company's formation and technical basis. Defendant's subsequent attempt to seize and repackage this work, without contributing any technical effort or reimbursing expenses, constitutes unjust enrichment and appropriation of value developed entirely by Plaintiff. These losses are fully documented and quantifiable, and independently support compensatory recovery.

Taken together, these categories of loss—supported by technical mile-stones, commercial readiness, and credible third-party validation—yield a total economic loss estimate of $214,107,937, representing a conservative and well-supported assessment of the harm incurred. This figure encompasses both the destruction of enterprise value and the diversion of specific

economic opportunities, and includes unreimbursed founder investment, fiduciary misconduct, and direct impairment to monetizable assets.