# Exhibit E2: Post-Dissolution Misconduct

# Contents

Exhibit E2: Post-Dissolution Misconduct .................................................................... 1
1. Post-Dissolution Emails ...................................................................................... 2
    1.a. First Post-Dissolution Email ........................................................................ 2
    1.b. Second Post-Dissolution Email ................................................................... 4
    1.c. Third Post-Dissolution Email ...................................................................... 5
    1.d. Cease and Desist Email ............................................................................... 6
    1.e. Black McCuskey Invoice Dispute ............................................................... 8
    1.f. Fourth Post-Dissolution Email .................................................................. 14
2. Corporate Gmail Lockout ................................................................................. 16
    2.a. Rapport Public Key Fingerprint ............................................................... 16
    2.b. Corporate Email Usage Proof ................................................................... 17
    2.c. Gmail Lockout Screenshot ........................................................................ 18
    2.d. Gmail Login Response Hash ..................................................................... 18
3. Corporate Google Drive Lockout ...................................................................... 19
4. Corporate Website Response Header ................................................................. 23

# 1. Post-Dissolution Emails

## 1.a. First Post-Dissolution Email

 Nathan Rapport <n.rapport@gmail.com>

---

Dissolution of Radian Industries and Funds Availability

---

Michael Chapiro <michael@radianindustries.com>                    Wed, Apr 30, 2025 at 10:46 AM
To: Nathan Rapport <n.rapport@gmail.com>

Hi Nathan,

The company is in debt to me $40k and this an unlawful dissolution, which is a clear and massive major breach of fiduciary duty that does not eliminate that debt or the massive damages to shareholders of an invalid dissolution. Fear of ramifications of a technology does not grant the right to unilaterally destroy property. You ceasing operations, effectively, deciding to resign yourself, does not allow you to declare things that are unlawful i.e. me taking back my $18.5k due to breach of obligations encumbers me in exactly zero ways, just like if I declare that the next time you brush your teeth you will owe me $500,000 is an absurd statement.

The company is the owner of the IP and physical, tangible property, fully assigned per the shareholder agreement. The company also has substantial value arising from the positioning and business relationships I have developed. This ownership extends to the concepts you said you wrote an analysis for and deleted, possibly including stealth concepts, which you stated were developed in relation to how they would be used with our core technologies.

Even if there were a valid dissolution, I would remain a joint owner in the IP. If you are abandoning it, then I would be well within my rights legally to continue working on it in a new entity -- so you are simply imposing further damages upon me by not simply allowing your shares in Radian to be repurchased (I just have to make a new corporation and go through all the DoD setup, which is a bit of a pain), and I could even keep going under the same trade name.

Given your erratic and unstable behavior, I do not think it is possible to have you continue in any sort of managerial or board role in any future venture. It would still be rather helpful if you remained involved as an engineer, at least until we complete the next milestone that is two months away, and have you provide a detailed report. If I have to continue without your support, it goes counter to your objectives of secrecy: in order to motivate DoD personnel to provide enough funding to compensate for losing a CTO, it means I will have to be more forthcoming about the significance (e.g. I am going to be briefing a couple people in industry on the technology and physics within the next several weeks to bolster options for moving forward). I don't physically have access to all of the latest design details, but you know I know enough of the details that with a $1m contract and a few good engineers, we will quickly catch up and get ahead. The analysis we have and the footage is enough for me to get a $1m contract. On the other hand, if we can go forward together, we can ensure the degree of secrecy we would both like. Perhaps something where Radian Industries assigns you the IP in exchange for your shares, and puts into place an exclusive licensing agreement with royalties.

I took your concerns very seriously and agreed that we would restrict the technology to applications where we would be certain it could never fall into enemy hands so your sudden increase in fear about this is surprising. The ███████████████████████████████████████████████████████████████████████ Of course, you would have considered the possibilities even before we started. I think it is simply that in our success in proving the concept, it probably felt like a more real and present danger. So there is certainly no case for force majeur as these hypothetical risks were anticipated. Even if work stopped, you know someone else would figure it out, even if it were not in your lifetime, so you do not actually make the world safer, only your own life -- but not really, because the world is safer with America having this technology, and America will have it, with or without you.

I value the work you have done and would much rather have you receive some benefit from the work you have done and could continue to do (along with not having outstanding personal liabilities that could be rather substantial), but Pandora's box has been opened and this will continue regardless.

Best,
Michael

Michael Chapiro
Co-Founder & CEO
Radian Industries Inc.

Sent with Mixmax

[Quoted text hidden]

## 1.b. Second Post-Dissolution Email

 **Nathan Rapport <n.rapport@gmail.com>**

**Dissolution of Radian Industries and Funds Availability**

**Michael Chapiro** <michael@radianindustries.com>                    Thu, May 1, 2025 at 12:05 PM
To: Nathan Rapport <n.rapport@gmail.com>

Additionally, your unlawful dissolution is a de facto resignation: consider all unvested shares repurchased, with the amount to repurchase hereby deducted by outstanding debts that would pierce the corporate veil. This hereby means you are a minority shareholder, if a shareholder at all.

All property of the company/myself must be returned including hardware, pending patents, and patentable information and technical information, regardless of whether destroyed. Withholding property may transcend the civil liabilities to the point of criminal theft, corporate espionage, or embezzlement.

Again, I would prefer to resolve this amicably, with you finishing the work you committed to carrying out, being able to one day see some financial upside from your work (including vacuum balloons if I make those work), rather than you simply abandoning all work in this area in such a negligent, purposefully destructive, but ultimately futile manner.

I hope to hear from you.

Michael Chapiro
Co-Founder & CEO
Radian Industries Inc.

Sent with Mixmax

[Quoted text hidden]

## 1.c. Third Post-Dissolution Email

 Gmail

Nathan Rapport <n.rapport@gmail.com>

---

### Dissolution of Radian Industries and Funds Availability

---

Michael Chapiro <michael@radianindustries.com>                      Fri, May 2, 2025 at 10:12 AM
To: Nathan Rapport <n.rapport@gmail.com>

1) If you think no one will ever discover this, you are arrogant.

2) If you think someone will simply discover it after you are dead, you are selfish.

███████████████████████████████████████████

I am shifting my perspective towards subs being the place to go, which I recall you liked due to the low vibration environment.

For anyone to take your warnings seriously about downstream risks, you need to be in the room where decisions get made, so abdicating your role in the advancement of this does nothing for you.

Are you going to change your tune if I come back with capital and a real salary offer? I would still prefer to work with you and think America will be stronger for it. I also want you to have royalties to this technology, but it is also trivial for you to have none if you dig your heels in -- moreover, you would have outstanding liabilities I could pursue at a future date. Don't you still want a way to fund your research lab? Filing patents invalidly/fraudulently assigned to yourself will do nothing: 1) the patent assignment would be invalid; 2) you will never know what is being used because of the clandestine nature of applications.

I blame myself here for putting so much trust in you when you have now demonstrated you have a bit too much of the schizo part of schizo genius. Can't have you as a shareholder.

Also, there is now a third person who knows what we know (under NDA of course), and he agrees the data is compelling. That also means if you kill me it will be highly suspicious and not be effective in burying the information. Not that I think you seem so inclined, but better to play it safe.

Of course, I also have a backup of the company Drive you fraudulently restricted access to. I am $250k, 1 physicist, and 1 engineer away from surpassing where we were in a few months.

Anyway, despite your erratic and rude behavior here, I do not wish you ill. Hopefully everything stays secret for the next century, but if it ever does get declassified, I will make sure the Nobel is rightfully assigned to you.

[Quoted text hidden]

## 1.d. Cease and Desist Email



**Nathan Rapport <n.rapport@gmail.com>**

---

### Unauthorized Possession and Misuse of Proprietary Technical Data

---

**Nathan Rapport** <n.rapport@gmail.com>                                      Fri, May 9, 2025 at 1:02 PM
To: michael@radianindustries.com, Michael Chapiro <mrchapiro@gmail.com>, Michael Chapiro
<michael@machcap.com>

Michael,

Please be advised that unauthorized disclosure or use of technical data derived from my intellectual property--such as the Artifact--may fall under U.S. export control laws, including the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulations (EAR). Violations of these laws can result in severe civil and criminal penalties.

**ITAR (International Traffic in Arms Regulations)**

Civil Penalties: Up to $1,272,251 per violation.

Criminal Penalties: Up to 20 years in federal prison and/or up to $1 million in fines per violation.

Additional consequences may include debarment from government contracts and permanent loss of export privileges.

**EAR (Export Administration Regulations)**

Civil Penalties: Up to $328,121 per violation.

Criminal Penalties: Up to 20 years in prison and/or up to $1 million in fines per violation.

A single unauthorized email, file transmission, or disclosure of controlled technical data may count as a separate violation per item or per recipient. **This is true even if the recipient is a U.S. person and no actual export occurs.** These laws apply to both physical items and intangible technical data, including CAD files, diagrams, research notes, photographs, video footage, source code, and experimental results.

Unauthorized possession or disclosure of this information--especially in the context of grant applications or outreach to third parties--**may already constitute multiple violations.**

Additionally, I've attached several grant materials that include proprietary information taken directly from my work. **These submissions were made without my permission and present serious issues of misrepresentation and potential grant fraud.**

I've also included an image documenting your prior acknowledgment of my patented "star" design, which further confirms your awareness of its origin and the lack of authorization to incorporate it into grant submissions.

Submitting false or misleading information in federal grant applications--especially those involving unauthorized use of another party's intellectual property--can trigger multiple serious federal offenses. These violations may apply regardless of whether funding is ultimately awarded.

1. Grant Fraud (18 U.S.C. § 1001)

* Knowingly making false statements to the U.S. government is a federal crime.
* Penalty: Up to 5 years in prison per offense (or more if connected to terrorism or national security).

2. Wire Fraud (18 U.S.C. § 1343)

* Involves any scheme to defraud using electronic communications (email, online portals, etc.).
* Used in nearly all modern grant application processes.
* Penalty: Up to 20 years in prison per count; up to 30 years if it affects a federal program.

3. Theft or Conversion of Trade Secrets (18 U.S.C. § 1832)

* Misappropriating proprietary research, designs, or technical data.
* Penalty: Up to 10 years in prison and significant fines.

4. Computer Fraud and Abuse Act (CFAA, 18 U.S.C. § 1030)

* Unauthorized access, retention, or use of computer systems or files.
* Includes downloading, emailing, or copying files without permission.
* Penalty: Up to 10 years in prison for first offense; 20 for repeat.

5. False Claims Act (31 U.S.C. §§ 3729–3733)

* Civil liability for anyone who knowingly submits false claims to the federal government.
* Includes treble (3×) damages and penalties up to $27,018 per false claim (as of 2024).

6. Mail Fraud (18 U.S.C. § 1341)

* If physical mail is involved in the scheme (even once), mail fraud charges can apply.
* Penalty: Up to 20 years per count.

Each of these can apply independently, and a single grant submission that includes false claims, unauthorized IP, or misrepresented authorship may trigger multiple simultaneous violations.

This is not an idle concern. These statutes are actively enforced, especially in the context of DoD grants, SBIR/STTR programs, and national security-related research.

**The scope of your misconduct is vast.** You have submitted government proposals under your name that incorporates core technical concepts, architectures, and language from my inventions--without permission, without attribution, and with full knowledge of their origin. Your attached proposals fraudulently claim authorship of proprietary IP, misrepresents inventorship to the U.S. government, and seeks funding in excess of half a billion dollars. These actions are not minor infractions. They are massive in scale, involve material misrepresentations in a national security context, and potentially trigger dozens of counts of federal criminal violations--including wire fraud, grant fraud, theft of trade secrets, and unauthorized use of controlled technical data.

**If any further unauthorized disclosures occur, I will take whatever steps are necessary to mitigate the exposure of my intellectual property. This includes notifying the appropriate agencies.**

-Nathan

---

**4 attachments**



**grant_fraud.jpeg**
340K

**2045_RFI_Black_Lattice_ConOps_Description.pdf**
50K

**MDA_C2BMC_BAA_Vacuum_Ballon_White_Paper.pdf**
86K

**MDA_2045_RFI_Vacuum_Balloons-2.pdf**
86K

## 1.e. Black McCuskey Invoice Dispute



Nathan Rapport <n.rapport@gmail.com>

---

### Formal Dispute of Invoice and Improper Charges
2 messages

---

**Nathan Rapport** <n.rapport@gmail.com>                                              Wed, Jun 18, 2025 at 8:00 AM
To: hbaer@bmsa.com, hbonnot@bmsa.com, tbundy@bmsa.com, gcallas@bmsa.com, jdayton@bmsa.com,
jdeeds@bmsa.com, ddodez@bmsa.com, Taryn Douglas <tdouglas@bmsa.com>, zhawks@bmsa.com,
jkamerer@bmsa.com, "Ryan A. Kuchmaner" <rkuchmaner@bmsa.com>, rmeiers@bmsa.com, bmertes@bmsa.com,
rmoore@bmsa.com, James Schweikert <jschweikert@bmsa.com>, rsnow@bmsa.com, bsoares@bmsa.com,
jwherley@bmsa.com, wwillits@bmsa.com

Dear Ryan,

I appreciate your response. However, I prefer to handle this in writing so that there is a clear record of our
communications. For the record, we have not had any phone conversations regarding this matter. All of my
communications to date regarding this issue have been via email.

I've cc'd several more partners at the firm, as this matter may have broader implications for Black & McCuskey if this
dispute is not resolved amicably.

Following up on our previous correspondence, I am writing to formally dispute the invoice sent to me for $963, which I
have attached for reference.

I would also like to note that I sent the following message on May 5, in which I respectfully expressed my view that no
billable legal work had occurred, while also inviting your firm to respond if you felt otherwise. No response was
provided--only an invoice weeks later. That failure to engage in good faith at the time has now compounded this
dispute unnecessarily.

In my May 5th email, I wrote:

  "Hi Ryan and Taryn,

   Thanks for the follow-up. I want to clarify that I greatly appreciated your time in the initial conversation. However, I
don't believe the services provided rose to the level of billable legal representation.

   As Taryn wrote in a prior email, the firm had not yet reviewed my documents or reached a point where formal legal
advice could be given. That was my impression as well--there was no memo, no formal opinion, and no substantive
guidance issued beyond an intake conversation and acknowledgment that review had not yet occurred.

   I understand that some early time was spent and respect your desire to invoice modestly. That said, I made the
decision to pursue representation elsewhere because of the urgent and high-stakes nature of this case, and the need
for a team fully resourced and prepared to act quickly on a contingency basis. I'll consider the matter closed on my
end unless you feel strongly that a charge is warranted.

   Again, thank you both for your time and professionalism.

   Best regards,
   Nathan"

I was also surprised to hear that you contacted my father to discuss the invoice, rather than me, especially given that
Samantha Bryant at your firm requested my contact information and received my phone number in writing on March
24. As I have previously stated, I did not authorize my father to act on my behalf or to receive confidential information
regarding billing for legal work claimed to be conducted on my behalf.

Additionally, my father relayed to me your statement that the original bill was $1,800 and was "cut in half"; this directly
contradicts the invoice your firm sent to me, which specifies that the total cost of professional services before the
courtesy discount was only $1063. This is a significant discrepancy, which further underscores the need to resolve this

matter transparently and in writing.

Ryan's contact with my father appears to be a maneuver to collect payment from him despite my prior written statement that no one is authorized to pay any amount on my behalf without my express written permission. That instruction was clearly communicated in my previous email. Attempting to involve third parties after this revocation creates the appearance of an intentional effort to evade the limitations I clearly set, and raises ethical concerns.

Therefore, Ryan--I am requesting that you immediately cease any and all communication with my father regarding this billing dispute. I have previously stated that no one is authorized to pay any amount on my behalf without my express written permission. Any further attempts to involve him, directly or indirectly, will be construed as a violation of that instruction and a continuation of the already troubling pattern of boundary violations and coercive collection efforts.

Upon reviewing the engagement letter, I've noticed that I have no record of receiving the referenced "Standard Engagement Provisions" that were incorporated by reference into the letter.

Can you please confirm whether those provisions were ever sent--and if so, to whom and when? Also, since I do not have a copy, can you please send me a copy now so that I can review the terms?

I have reviewed our prior correspondence and would like to highlight the following exchange for the record:

On Friday, March 21, I wrote:

  "Hi Ryan and James,
  Thank you very much for meeting with me today.
  Attached are the corporate documents for Radian Industries. Please let me know if you have any questions or concerns.
  Best,
  Nathan"

The purpose of my March 21 follow-up email with the attached documents was to assist your firm in assessing the scope of work required for a potential engagement. My understanding is that it is standard practice to share background information during the exploratory phase of a client–firm relationship, and I believe it should have been clear that the documents were provided so your firm could evaluate whether to take on the matter and propose appropriate terms, not as an authorization to begin billable work. I believe the Office of Disciplinary Counsel would concur that billing based on this type of preliminary exchange is improper.

Within the hour, Ryan responded:

  "Thanks Nathan and good to meet with you today. We will review and get back in touch.
  Ryan"

Although this email does not contain any communication of scope, fees, or terms of engagement, and did not convey the impression of the initiation of billable work to me at the time, I acknowledge that I could be mistaken. Ryan, can you clarify whether this email was intended to signal the initiation of paid legal work?

Following Ryan's email, I received no review, no summary, and no further communication regarding these documents prior to the dissolution of Radian Industries. The only intervening communication exchange was on March 24, when your office requested updated contact information. No engagement letter had been executed, no retainer was discussed, and no deliverable or legal opinion was ever provided.

If any internal review did occur, it was done without my authorization and contrary to the normal expectation that legal billing begins only after formal engagement.

As noted, no retainer was ever paid, and per your own written communication, work was not to begin until both an executed engagement letter and a retainer were received.

This is confirmed in Attorney Douglas's email from May 1st at 3:34 PM, which asserted: "We will need the engagement letter executed and the retainer paid as soon as possible so we can undertake the review you've requested." This establishes that no substantive work--for example, a requested review--was to be undertaken until both conditions were met, rendering any charges for review or analysis improper.

However, the invoice contains a line item dated April 30, attributed to Attorney Douglas, stating "review client

documents." If such a review took place, this review was unauthorized, premature, and contrary to the firm's policy that both a signed engagement and retainer payment were required prior to commencing any such work.

Moreover, the invoice sent to me includes charges for communications and meetings in March 2025, well before any engagement was signed. At that time, I was a prospective client. No representation had been offered or accepted, and no fee agreement was in place. Therefore, this may constitute legal misrepresentation via retroactive billing and suggestion of engagement before it occurred, in violation of Rule 8.4(c) of the Ohio Rules of Professional Conduct.

The invoice also fails to include any detailed time tracking, hourly rates, or per-entry subtotals. Without durations or rates, there is no way to verify the basis of the charges, and the vague nature of the descriptions raises concerns about fee inflation or double-billing. This lack of transparency renders the invoice fundamentally unreviewable and calls into question its reasonableness under Rule 1.5(a). Is this invoice representative of your firm's billing practices?

Additionally, I have no record of any meeting or communication with Attorneys Bonnot or Wherley. If these entries reflect internal firm discussions, they appear to have been billed without my knowledge or consent. If they do not, their inclusion raises more serious concerns about the accuracy and legitimacy of the invoice.

Furthermore, I canceled the engagement in writing less than 36 hours after signing, at 12:31 AM on Saturday, May 3, 2025, before any meaningful work could have taken place, and this is confirmed in your own correspondence. Specifically, on Friday, May 2 at 12:00 PM, Attorney Taryn Douglas wrote:

  "I will need time to review your corporate documents." and "Unfortunately, because our office did not draft any of the corporate documents, it will require time to review what is written so we can properly advise you moving forward."

This shows that as of mid-day Friday on May 2, no document review had occurred, and by your own internal policies, review was contingent upon payment of a retainer--which was never paid. Furthermore, only 5 more business hours elapsed between Attorney Douglas's May 2 email and my cancellation of the engagement.

Nevertheless, your invoice includes a line item dated April 30--two days earlier--attributed to Attorney Douglas, stating "review client documents." If the review had already taken place on April 30, then why did she write, two days later, that she still needed time to perform that review?

One generous possible interpretation is that a partial or preliminary review took place on April 30, but that would itself raise concerns: (1) such review would have occurred before any retainer was paid and without my consent, and (2) the May 2 email made no reference to any partial review having been completed, which would be expected if meaningful time had already been spent on the matter. The contradiction and lack of clarity only reinforce the appearance that the invoice is inaccurate or improperly constructed.

Additionally, your invoice includes a line item dated March 31 for "review corporate records and outline summary." However, I have no record or recollection of receiving any summary, outline, memorandum, or other deliverable reflecting this review. Given that you have included this work on your invoice, can you please re-send me the original outline summary with the intact metadata indicating the date of its creation and last modification, so that I can verify it corresponds to the March 31 line item, and can you confirm whether this deliverable was sent on March 31?

As before, this line item also appears to conflict with Attorney Douglas's May 2 email, which made clear that no review of documents would begin until both an executed engagement letter and retainer had been received--however, I requested disengagement in writing on May 3rd, and to date, I have not paid any retainer.

Finally, I would appreciate clarification on the timing of this invoice. If the firm indeed performed billable legal services on March 21, why was no invoice issued until May 30--more than two months later and several weeks after I had already canceled the engagement? Was there a reason these charges were not disclosed or billed contemporaneously? The delayed issuance, following my disengagement, raises the question of whether this invoice was generated in retaliation. Is that the case? I trust you can clarify the firm's rationale for the unusual delay.

Taken together, these charges you have presented to myself and to my elderly parents are unjustified and appear to directly conflict with the Ohio Rules of Professional Conduct:

  Rule 1.5(a) requires that a lawyer's fee be reasonable under the circumstances. Billing retrospectively after over two months for vague, under-documented entries--some of which contradict your own written communications--raises serious questions about the reasonableness of the fees charged.

  Rule 1.5(b) requires that the basis of fees and the scope of representation be communicated to the client before or

within a reasonable time after commencing representation. Upon knowledge and belief, there was no such communication in March, nor was there any agreement in place.

Rule 1.8(f) bars a lawyer from accepting third-party compensation absent informed consent from the client. I have expressly revoked any such authorization, and have made clear that no third-party (including my parents) is permitted to pay this invoice.

Rule 8.4(c) prohibits conduct involving dishonesty or misrepresentation. Retroactively billing for time not covered by any agreement, and suggesting third-party liability where none exists, raises serious ethical concerns.

In addition, in her May 2 email Attorney Douglas also wrote:

"I would suggest emailing Michael advising that you have engaged counsel and that he will be receiving a response in the near future."

This suggestion was improper and professionally irresponsible. At the time she made it, no retainer had been paid and no substantive review had taken place. Advising a client to tell a third party--particularly a legal adversary--that counsel has been engaged even though no legal representation has formally begun can constitute a material misrepresentation. The Rules of Professional Conduct require that attorneys communicate accurately and not suggest misleading representations regarding the status of counsel.

In fact, I did reach out to the opposing party based on Attorney Douglas's advice. That decision--made in reliance on guidance from your office--was taken before any formal engagement, retainer, or document review had occurred, and placed me in an unnecessarily vulnerable position given the legal sensitivity of the dispute.

I am mentioning these issues as a courtesy. If this is your firm's standard billing practice--attempting to charge prospective clients for communications that occurred before any engagement was formalized, or advising them to act as if counsel has been engaged without a retainer or substantive review--then you expose yourselves to significant reputational and ethical risk. Another prospective client in my position might well feel compelled to file a complaint with the Office of Disciplinary Counsel. I hope this feedback is received constructively, and that you take it into account in your future handling of prospective clients.

Furthermore, as you are aware, this matter regarding the April 29 emails that I forwarded to Attorney Douglas involves active legal disputes involving allegations of intellectual property theft and corporate misconduct. Any documentation from our limited interaction could be drawn into related proceedings, as exhibits for example, and I would strongly prefer to avoid unnecessarily entangling your firm in what is already a highly complex and sensitive matter. I trust that a reasonable and amicable resolution is in everyone's best interest.

It has also become clear that the matter related to the April 29 emails involved complex intellectual property and federal litigation issues far outside the scope of your firm's evident expertise. Requesting an immediate $2,500 retainer without disclosing that limitation, while offering no specialized insight, action plan, or protective measures, is deeply troubling. Rule 1.1 of the Ohio Rules of Professional Conduct (notably, the very first rule) requires basic competence before accepting representation. Fortunately, I declined to proceed. However, your attempt to bill me despite the absence of meaningful legal work, and despite the lack of any formal engagement or deliverables, resembles fee abuse and raises serious concerns under Rules 1.1, 1.4, and 1.5.

Please note that while I am not pursuing any further action at this time, I expressly reserve the right to identify your firm and its personnel--for example, as fact witnesses--in any future legal proceedings where your communications or billing practices may become relevant.

I don't believe it's in anyone's interest to continue to escalate a billing dispute over a sum under $1,000, particularly given the significant ethical and procedural concerns this situation has raised. To resolve this matter, I propose a simple and limited resolution: if Ryan or someone from the firm replies with the following statement--"We agree to waive Invoice No. 350353 in full and will not pursue any collection efforts regarding it."--I will consider this matter amicably resolved, and no further response will be necessary.

Please consider this a formal dispute of the invoice in full. I request that your firm update its records to reflect this and confirm that no further attempts to collect will be made--directly or indirectly.

I hope this resolves the matter professionally and amicably.

Best,

Nathan

---

📄 **bm_invoice_5-30-2025.pdf**
443K

---

**Ryan A. Kuchmaner** <rkuchmaner@bmsa.com>                    Wed, Jun 18, 2025 at 9:18 AM
To: Nathan Rapport <n.rapport@gmail.com>

Nathan – I have received your email below and have discussed it with our Managing Partner.  Myself and Black McCuskey dispute each and every allegation you have made and certainly any allegations that any member of our firm has acted unethically.

Per your email below - We [Black McCuskey] agree to waive Invoice No. 350353 in full and will not pursue any collection efforts regarding it. Based on your email below, in which you state "I will consider this matter amicably resolved, and no further response will be necessary," Black McCuskey also considers this matter amicably resolved and closed. Further, Black McCuskey is under no obligation to provide any legal services to you whatsoever and is not responsible for any responsive deadlines, etc. regarding this matter or any other matter.  Any Agreement between you and Black McCuskey to provide legal representation is terminated effective immediately.

Please cease any further communications with our firm.

Thank you,

*Ryan A. Kuchmaner*

*Attorney*

BLACK McCUSKEY SOUERS & ARBAUGH, LPA

4505 Stephen Circle NW, Suite 200

Canton, OH 44718

p. 330.456.8341  f. 330.456.5756



CONFIDENTIALITY, PRIVILEGE, and WORK PRODUCT NOTICE:
This e-mail, including any attachments, is covered by the Electronic Communications Privacy Act, and is legally protected. Unauthorized review, use, disclosure or distribution of this communication is strictly prohibited. The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged, confidential, and work product. If you are not the intended recipient, please contact the sender by reply e-mail or by phone, and destroy all copies of the original message. Unintentional disclosure will not and does not in any manner whatsoever waive the attorney-client privilege or work product designation.

---

**From:** Nathan Rapport <n.rapport@gmail.com>
**Sent:** Wednesday, June 18, 2025 8:00 AM
**To:** Holly Baer <hbaer@bmsa.com>; Haley Bonnot-Orr <hbonnot@bmsa.com>; Todd Bundy <TBundy@bmsa.com>; Gust Callas <gcallas@bmsa.com>; Joel K. Dayton <jdayton@bmsa.com>; C. Jason Deeds <jdeeds@bmsa.com>; Dick D. Dodez <ddodez@bmsa.com>; Taryn Douglas <tdouglas@bmsa.com>; Zachary Hawks <zhawks@bmsa.com>; Jim Kamerer <jkamerer@bmsa.com>; Ryan A. Kuchmaner <rkuchmaner@bmsa.com>; Ray Meiers <rmeiers@bmsa.com>; Brian Mertes <BMertes@bmsa.com>; Rod A. Moore <RMoore@bmsa.com>; James Schweikert <jschweikert@bmsa.com>; Randy L. Snow <rsnow@bmsa.com>; Bruce M. Soares <bsoares@bmsa.com>; Jim Wherley <JWherley@bmsa.com>; Whitney Willits <WWillits@bmsa.com>
**Subject:** Formal Dispute of Invoice and Improper Charges

Some people who received this message don't often get email from n.rapport@gmail.com. Learn why this is important

[Quoted text hidden]

## 1.f. Fourth Post-Dissolution Email

 **Gmail**

**Nathan Rapport <n.rapport@gmail.com>**

---

### Offer to allow debts to be settled

---

**Michael Chapiro** <michael@machcap.com>                                          Fri, May 9, 2025 at 2:05 PM
To: Nathan Rapport <n.rapport@gmail.com>

Hi Nathan,

I am well aware of ITAR/EAR, and FAR, far better than you in fact.

Given you are deranged and have an overly vivid imagination, I would like to steer well clear of you. You are attempting to use intimidation to deprive me of real property in response to imagined damages. You would do well to pick up a law book instead of a physics book. You have a poor understanding of what your patent does and does not cover. You are welcome to send whatever you'd like to SBIR/STTR Fraud, Waste, & Abuse, OIG, DOJ, and whoever else you would like.

Your confusion between a *proposal* and a response to an *RFI* makes it obvious that this amateurish bullying is a theatrical attempt to intimidate. It is a crime to make false criminal reports. Your threats bear little difference from a video game player threatening to SWAT someone. In fact, I am disappointed you did not go further and mention that the Artifact should be considered Born Secret under the Atomic Energy Act and that you would notify the CIA so they can promptly assassinate me.

You declined to respond to my prior email with regards to the *real* damages you have made, and the grand theft of physical property, which belonged to the illegally dissolved company. **Given you have achieved your objective of further convincing me you are deranged, unstable, and desperate for me to not work on the Artifact, I would like to amicably step away from this.** Although I did mention interest in pursuing it independently, I have come to the realization that there is not a good path forward to commercializing it given the security requirements (which I treat as a superset of ITAR/EAR). Fringes are not compelling enough to program managers, and the few people that might put scientific funding to it, might do low 6 figure contracts -- with a CTO it was enough, but otherwise, it is not viable, especially if requiring employees with a security clearance. Moreover, reading more about nuclear deterrence, the market of applications that are not destabilizing is further reduced.

I am pursuing other projects that are going well in terms of fundraising, which have larger market sizes given the limited market opportunities for the Artifact. **Therefore, I am willing to entertain allowing the dissolution of Radian Industries, making it legitimate, and allowing you to lawfully take ownership of all hardware.**

Fundamentally, you made false representations to garner financial investment/loans (again, actual, not imagined -- the courts respond to actual ingress, not what *might* happen). **There are outstanding financial debts of ~$41,500.** That does not mean the damages incurred are that amount, they are vastly larger than this given the damages to shareholder equity. Under Wyoming corporate law, I have 4 years to pursue these damages. Given we could have very conservatively raised $500k at a $2.5m valuation, at a very minimum the damages could be over $1m, and "protecting all of human civilization by hiding the Artifact" is not a valid force majeure argument. And that's not taking into account the emotional damages.

**I am not interested in prolonged discussions or negotiation so I will very generously and graciously offer you the option now to settle and cure all damages, civil and/or criminal, with a payment of $15,000, the total amount that you took in stipend/salary that is not obviously unjust enrichment. I am willing to *mutually* sign an agreement similar to the one you sent 10 days ago stipulating this and releasing further claims.**

>  *"I have no further financial claims against Radian Industries, Inc., its officers, directors, or assets.*
>  *2. I release Radian Industries, Inc. and its officers and directors from any and all claims, liabilities,*
>  *or obligations as of the date below."*

I will make this offer available for exactly 1 week. Please let me know at your earliest convenience if you would like to resolve this matter.

Best,

Michael

--
Michael Chapiro
machcap.com
(650) 766-8030

Sent with Mixmax



**Screenshot From 2025-05-09 11-40-37.png**
145K

## 2. Corporate Gmail Lockout

### 2.a. Rapport Public Key Fingerprint

This public key corresponds to the private key that was used to sign the documents in this exhibit.

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

pub   rsa3072 2025-05-22 [SC] [expires: 2027-05-22]
      1483 5ED9 3782 861F 0F90  1933 0B9C E4AD 79DE FB9E
uid               [ultimate] Nathan Rapport (2025 master key)
<n.rapport@gmail.com>
sub   rsa3072 2025-05-22 [E] [expires: 2027-05-22]

-----BEGIN PGP SIGNATURE-----

iQGzBAEBCgAdFiEEFINe2TeChh8PkBkzC5zkrXne+54FAmg7NFkACgkQC5zkrXne
+54YRwv/ZVzLizrdCAdyA3oUnrwUpZArZlPCE/vkR+iPp4WojdDBYJYUJ88fNVmV
kWtGUPjwNfNOolfC/Uxpge3bem5SF9g2eXdkyjWav8Q0cZE98EpAUkGKxjkzjxGw
YLs9IJnrD8mTdxkgFqemWI9BCgoXikGfWLcyzlqiQ66T5/ZmV02WfvY65nh79tFa
Nm5i6R6N7u2SW4YIXk9V6ALgKrgwnIcwQB6C9xafCOtdN5VuEtwjdgHGuqk/26Kq
hmni39RfUg+sCgPuw6D6C0Xmmoafb/pdC5F3gRA6WxouJVkzjXtujj6JlOWB+0Gq
TAI9lQILKG8OQGeZbX5+QfPR2K5S5FWaFEZq4lT3b6Ni1z5hBcXQ6ADi939fjQoO
KGwpNbjSAgInuP1x7sR1JQeChiisC8pfu1qBoqlJLbDtq5AwADv2RESVDH8XgeSI
4VIVyyiMo5zemYIPxEteTPFhh/EjX+hA1HLqt0EqE/jdGBuOyj+3I4dzsHWAY/8S
vRsX8hY9
=koKx
-----END PGP SIGNATURE-----
```

## 2.b. Corporate Email Usage Proof

 **Gmail**                                                  **Nathan Rapport <n.rapport@gmail.com>**

---

**Fwd: DFB**
2 messages

---

**Nathan Rapport** <nathan@radianindustries.com>                          Wed, Mar 5, 2025 at 8:21 PM
To: "N.Rapport@gmail.com" <N.Rapport@gmail.com>

---------- Forwarded message ---------
From: **Nathan Rapport** <nathan@radianindustries.com>
Date: Wed, Mar 5, 2025 at 8:21 PM
Subject: DFB
To: <nathan@radianindustries.com>

https://www.laserdiodesource.com/shop/200mW-1030nm-dfb-laser-diode-CMDFB1030A-II-VI

---

**Nathan Rapport** <n.rapport@gmail.com>                                   Wed, Mar 5, 2025 at 9:28 PM
To: Nathan Rapport <nathan@radianindustries.com>, Nathan Rapport <n.rapport@gmail.com>

https://www.laserdiodesource.com/shop/1064nm-dfb-laser-diode-200khz-narrow-linewidth
[Quoted text hidden]

Figure 15: This demonstrates that `nathan@radianindustries.com` was a valid email address that
Nathan Rapport had previously used.

## 2.c. Gmail Lockout Screenshot



Figure 16: Screenshot showing that the email address `nathan@radianindustries.com` can no longer be used to access the associated Google account. The error message "Couldn't find your Google Account" confirms that the account was disabled or deleted, resulting in loss of access to key communications and company documents.

## 2.d. Gmail Login Response Hash

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

a7f3f72bd50564fa10980ec364fbf682596bf5c713ac40dd868997ddcb02ee69
google_login_response_2025-07-30T02-07-27-102Z.html
-----BEGIN PGP SIGNATURE-----

iQGzBAEBCgAdFiEEFINe2TeChh8PkBkzC5zkrXne+54FAmiJgHMACgkQC5zkrXne
+55JKQv/TBVBn/lWi6T+76izwOMiEVjU4ME44Y5aRw3+DL/K/4qoFOk3eZ7Ckw3l
UC6nu0LLNKyV9Qo2Ab1VyEPF9fNR6oxrFHUzKu5UCOj4aGGsEqPVaLgU+TZYHSKo
F0ZdgxUJVSb1i7eqnyAFi3qv9MNjKYbcrov6dMQamQePTCd88cNJYSR74jXQIRc5
kEECcC64fzYExplZmKXodAAxtJA6Sy5yUbyzUOLj2qyVyvex9mcqi/eECpmkNeF4
Ozr5fGuAh9To0pzU6ASOka9nB24j9LcMgyLbRVJMedH0qKguNFpN01P1g9C11qvM
ZWJ0iiwHONVn6N3xqyqF6MFWTE8ixU5wFBg1PCHZyg+wJvzIdW2C8atlyM8WL25m
IS98IHNga6Rt+CRMAwlpUDvAtxeNjB9DtehsP19GqshScDMUaaN/dy8k8oCdSU8Q
H8F5+Q+vndnaCqem/XYyS2k3FmNJPA/3bys8ho6ymmvFJIL2mb+VtJ8iG254+6P9
2JcKWOzk
=xxrL
-----END PGP SIGNATURE-----
```

## 3. Corporate Google Drive Lockout

This exhibit demonstrates that Chapiro locked Rapport out of the corporate Google drive after Rapport dissolved the company.

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

2025/07/29 21:43:06 DEBUG : rclone: Version "v1.60.1-DEV" starting with
parameters ["rclone" "lsd" "gdrive:Radian Industries" "--log-level"
"DEBUG" "--log-file" "rclone_radian_debug.log"]
2025/07/29 21:43:06 DEBUG : Creating backend with remote "gdrive:Radian
Industries"
2025/07/29 21:43:06 DEBUG : Using config file from "/home/thinker/.con-
fig/rclone/rclone.conf"
2025/07/29 21:43:06 NOTICE: Time may be set wrong - time from
"www.googleapis.com" is 6m46.930868532s different from this computer
2025/07/29 21:43:06 DEBUG : pacer: low level retry 1/10 (error
googleapi: Error 403: Quota exceeded for quota metric 'Queries' and
limit 'Queries per minute' of service 'drive.googleapis.com' for con-
sumer 'project_number:202264815644'.
Details:
[
  {
    "@type": "type.googleapis.com/google.rpc.ErrorInfo",
    "domain": "googleapis.com",
    "metadata": {
      "consumer": "projects/202264815644",
      "quota_limit": "defaultPerMinutePerProject",
      "quota_limit_value": "420000",
      "quota_location": "global",
      "quota_metric": "drive.googleapis.com/default",
      "quota_unit": "1/min/{project}",
      "service": "drive.googleapis.com"
    },
    "reason": "RATE_LIMIT_EXCEEDED"
  },
  {
    "@type": "type.googleapis.com/google.rpc.Help",
    "links": [
      {
        "description": "Request a higher quota limit.",
          "url": "https://cloud.google.com/docs/quotas/help/request_
increase"
      }
    ]
  }
]
, rateLimitExceeded)
2025/07/29 21:43:06 DEBUG : pacer: Rate limited, increasing sleep
to 1.741623058s
2025/07/29 21:43:06 DEBUG : pacer: low level retry 2/10 (error
googleapi: Error 403: Quota exceeded for quota metric 'Queries' and
limit 'Queries per minute' of service 'drive.googleapis.com' for con-
sumer 'project_number:202264815644'.
Details:
```

```
[
  {
    "@type": "type.googleapis.com/google.rpc.ErrorInfo",
    "domain": "googleapis.com",
    "metadata": {
      "consumer": "projects/202264815644",
      "quota_limit": "defaultPerMinutePerProject",
      "quota_limit_value": "420000",
      "quota_location": "global",
      "quota_metric": "drive.googleapis.com/default",
      "quota_unit": "1/min/{project}",
      "service": "drive.googleapis.com"
    },
    "reason": "RATE_LIMIT_EXCEEDED"
  },
  {
    "@type": "type.googleapis.com/google.rpc.Help",
    "links": [
      {
        "description": "Request a higher quota limit.",
          "url": "https://cloud.google.com/docs/quotas/help/request_
increase"
      }
    ]
  }
]
, rateLimitExceeded)
2025/07/29 21:43:06 DEBUG : pacer: Rate limited, increasing sleep
to 2.486686295s
2025/07/29 21:43:08 DEBUG : pacer: low level retry 3/10 (error
googleapi: Error 403: Quota exceeded for quota metric 'Queries' and
limit 'Queries per minute' of service 'drive.googleapis.com' for con-
sumer 'project_number:202264815644'.
Details:
[
  {
    "@type": "type.googleapis.com/google.rpc.ErrorInfo",
    "domain": "googleapis.com",
    "metadata": {
      "consumer": "projects/202264815644",
      "quota_limit": "defaultPerMinutePerProject",
      "quota_limit_value": "420000",
      "quota_location": "global",
      "quota_metric": "drive.googleapis.com/default",
      "quota_unit": "1/min/{project}",
      "service": "drive.googleapis.com"
    },
    "reason": "RATE_LIMIT_EXCEEDED"
  },
  {
    "@type": "type.googleapis.com/google.rpc.Help",
    "links": [
      {
        "description": "Request a higher quota limit.",
          "url": "https://cloud.google.com/docs/quotas/help/request_
```

```
increase"
        }
      ]
    }
  }
]
, rateLimitExceeded)
2025/07/29 21:43:08 DEBUG : pacer: Rate limited, increasing sleep
to 4.461448187s
2025/07/29 21:43:11 DEBUG : pacer: low level retry 4/10 (error
googleapi: Error 403: Quota exceeded for quota metric 'Queries' and
limit 'Queries per minute' of service 'drive.googleapis.com' for con-
sumer 'project_number:202264815644'.
Details:
[
  {
    "@type": "type.googleapis.com/google.rpc.ErrorInfo",
    "domain": "googleapis.com",
    "metadata": {
      "consumer": "projects/202264815644",
      "quota_limit": "defaultPerMinutePerProject",
      "quota_limit_value": "420000",
      "quota_location": "global",
      "quota_metric": "drive.googleapis.com/default",
      "quota_unit": "1/min/{project}",
      "service": "drive.googleapis.com"
    },
    "reason": "RATE_LIMIT_EXCEEDED"
  },
  {
    "@type": "type.googleapis.com/google.rpc.Help",
    "links": [
      {
        "description": "Request a higher quota limit.",
          "url": "https://cloud.google.com/docs/quotas/help/request_
increase"
      }
    ]
  }
]
, rateLimitExceeded)
2025/07/29 21:43:11 DEBUG : pacer: Rate limited, increasing sleep
to 8.669552125s
2025/07/29 21:43:15 DEBUG : pacer: Reducing sleep to 0s
2025/07/29 21:43:15 DEBUG : Google drive root 'Radian Industries':
'root_folder_id = 0ADLPm5X-hmQ4Uk9PVA' - save this in the config to
speed up startup
2025/07/29 21:43:25 NOTICE: Dangling shortcut "Radian Industries"
detected
2025/07/29 21:43:25 DEBUG : 4 go routines active
-----BEGIN PGP SIGNATURE-----
```

iQGzBAEBCgAdFiEEFINe2TeChh8PkBkzC5zkrXne+54FAmiJeXEACgkQC5zkrXne
+55IkAv/ftO976sTrw7SSslEu6aBqoQRN6h1Ho1dESCOaHpuTsZzGQ6o0NKwlzkW
VfjBZrNj9CLdzcBg1aob4mug4pJRXnQ7oxe7/+Ifrh9NjIEnn/mMPrPMpl2LCymF
c4Vwsusc555ta5We/617GNafi4wWvY48nqhQQuX59Kv2tk74J2QWThJtMD/C5SPY

```
3vsnJS7jbE0A7M5lAoUuUIToxd6HrwcJeKPCJ2zMUEPb0I4IAHPhuRHg6dQhghv3
vXmBXO2uaByB5M6Z58fxR8AQ3pJhq3RYQrvhkxijfCFF7Pz5NxvWaynHdqldLoA4
61y2nfI9EWv0rXTsGZ36B4ykzfC0DLsT0aPV2R+mKN7Uqw+lAfkLZlULQ4w54IxP
EvZDOm2kBDvMFsnw+Ff8HD6voOVNlelcmFxOY5J+s04WSXp8awfTltTFg22UtkJo
WxeGABjyURkdDjRknDEyFYYtBYfieUg/Qjqq+CHIejMxcxVJ+V62UIIi76pHEWKW
HgDb2Lbe
=jBWq
-----END PGP SIGNATURE-----
```

## 4. Corporate Website Response Header

This exhibit confirms that `https://radianindustries.com/` was online and serving valid HTTPS traffic as of August 4, 2025, verified via curl with TLS certificate validation, remote IP capture, and full response header. The response header was cryptographically signed by Nathan Rapport and the website was archived independently on the Wayback Machine.[1]

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

HTTP/2 200
date: Mon, 04 Aug 2025 01:50:44 GMT
content-type: text/html
last-modified: Mon, 24 Feb 2025 19:30:36 GMT
cache-control: max-age=0
expires: Mon, 04 Aug 2025 01:50:44 GMT
vary: Accept-Encoding
cf-cache-status: DYNAMIC
server: cloudflare
cf-ray: 969a67da2e17610f-CMH


URL: https://radianindustries.com/
HTTP Status: 200
Connect Time: 0.068514s
Total Time: 0.211631s
Remote IP: 172.66.0.70
SSL Verify Result: 0
-----BEGIN PGP SIGNATURE-----

iQGzBAEBCgAdFiEEFINe2TeChh8PkBkzC5zkrXne+54FAmiQE7gACgkQC5zkrXne
+57LxQv/Qkxq65YNuIA/hch0ZbOMxz/CGIq6075VdMT1b1HEHWrabaC2ePPJdlGi
DtJdKtdAZNzsR/2rkKSFrR0McwNnUk+KinEIsopnTx+Ng/owNYodhuL3nGSllKuw
57pfka6CHJSNI9fDOKQ5XE7kcRfnU3ICkZmfAViC7DIZgPfOdtUjZmCWhM4RWn5g
SWoeXifcgKroPn/TPuridxbaKZAJuJ40xMCwcbZnPqsWoHLPzzoiXMo30kphnXMF
Ue2XgNo6r7Ni3ZTSz1e6thIAxfpIhZ2F46dGoS8w3BES0eeBqKt0OISV9LJEbicj
f+r/HZPXBCWHtBgGzR21mXmmvBmEhRmLaPPXCqvaEErl6F5DASeFLXBLUHeg+ZIw
E+7C39Am8aL0ACHpL48gcTAUGQav1q+kQo7fjXICa0f++ozzMHkjibEeXqrVoth6
3seG3W1QMOJcH79be9rrRWA22p51DoK7arLcpHM9d9LrTrXcPGCoTM/2Inlu+NxU
bXX//Bfu
=HXAe
-----END PGP SIGNATURE-----
```

<hr>

[1] `http://web.archive.org/web/20250531163510/https://radianindustries.com/`