# Exhibit E3: National Security Risk

# Contents

Exhibit E3: National Security Risk ............................................................................. 1

OVERVIEW ............................................................................................................. 1

I.  Evidence of Strategic Relevance and National Security Risk ..................................... 1

    A.  Plaintiff's Warnings and Technical Framing of Strategic Risk .............................. 2

    B.  Defendant's Stated Intent to Militarize and Weaponize IP ................................. 6

    C.  Unauthorized Disclosures to U.S. Strategic Weapons Personnel .......................... 10

    D.  Unauthorized Commercialization and Strategic Outreach ................................. 13

    E.  Improper Motives for Classification and Clearance Access ................................. 16

    F.  Exfiltration Risk ........................................................................................ 16

        1.  Representative Statements ..................................................................... 17

        2.  Meetings with Ministry of Defense in Argentina ........................................ 22

        3.  Lobbying for Transfer of Missile Defense and Nuclear Technology to El Salvador ........ 24

        4.  Opposition to Export Control Laws .......................................................... 27

        5.  Export-Control Evasion and Smuggling .................................................... 28

    G.  Contents of Private Folder .......................................................................... 33

    H.  Summary ................................................................................................. 35

II. Defendant's Opposition to Intellectual Property Rights ........................................... 36

    A.  Representative Statements .......................................................................... 36

    B.  Defendant's Rejection of Intellectual Property Rights In Practice ........................... 42

# <u>OVERVIEW</u>

This draft report outlines the national security risks posed by Defendant Chapiro's misappropriation of Plaintiff Rapport's intellectual property and is intended for referral to relevant federal agencies.

# <u>I.</u> <u>Evidence of Strategic Relevance and National Security Risk</u>

Many statements quoted in this section were made prior to Plaintiff's formal dissolution of the company.[1] Their inclusion is not to imply post-dissolution misconduct alone, but to establish Defendant's strategic intentions, mindset, and risk profile during the period in which he still had privileged access to Plaintiff's confidential technology. These statements are highly probative of motive, foreseeability, and the necessity of Plaintiff's eventual withdrawal. They reveal that Defendant was not acting as a normal business partner, but was actively positioning the technology for militarization and strategic weapons deployment regardless of the commercial sense in this.

This context is critical to understanding the Plaintiff's decision to terminate the relationship, and it supports claims of anticipatory breach, willful misappropriation, and ongoing national security risk stemming from Defendant's continued possession and use of the technology.

As the inventor of the Artifact technology, and based on the observed performance of the experimental prototype Plaintiff Rapport built and the data he collected, Plaintiff Rapport affirms that it falls squarely under Category XII of the United States Munitions List (USML) and constitutes a "defense article" within the meaning of the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 120.6. Specifically, the Artifact's bias repeatability (better than 0.0015 degrees per hour) and drift stability (better than 0.5 degrees per hour in a 1 g environment) exceed the performance thresholds specified in USML Category XII(e)(12)(ii), placing it under ITAR control. Defendant's repeated disclosures of Plaintiff's technology therefore implicates violations of ITAR (22 C.F.R. Parts 120–130) and the Export Administration Regulations (EAR), 15 C.F.R. Parts 730–774.

The Artifact's performance places it in the "strategic-grade" category of inertial navigation systems — a classification used in the defense and aerospace sectors for devices with accuracy sufficient to guide long-range ballistic missiles, including intercontinental ballistic missiles (ICBMs), as well as nuclear submarines, for extended periods without reliance on GPS

---

[1] Unless otherwise stated, all statements in this document are found in the social media posts exhibit (see Exhibit C4 — Social Media Posts) or the Signal posts exhibit (see Exhibit C6 — Signal Export [SEALED]).

or other external signals. Strategic-grade inertial sensors are controlled under Category XII of the USML because their extreme precision allows a missile, submarine, or other weapons platform to navigate across continents or oceans with only minimal accumulated error, even after hours or days of travel. This level of capability has direct and obvious military applications, including in the delivery of nuclear payloads, and is therefore subject to strict export controls under ITAR.

## A. Plaintiff's Warnings and Technical Framing of Strategic Risk

At the outset of development, Plaintiff understood that the Artifact had the potential to outperform traditional gyroscopes in certain respects, but did not yet grasp the full extent of its strategic value. That realization came only after Plaintiff completed multiple rounds of experimental data collection and began analyzing the Artifact's performance in comparison to existing inertial navigation systems (INS). Initially, the significance was not obvious, as the Artifact provides only heading information, whereas a complete INS requires both angular and linear measurements—i.e., gyroscopes and accelerometers. However, after reviewing and analyzing the error characteristics and drift rates of conventional systems, Plaintiff recognized the Artifact's significance in defense applications—in particular that it enables long-duration, GPS-independent navigation with a level of precision previously unattainable.

In a private Signal message on April 23, 2025, Plaintiff articulated the full extent of the gyroscope's capabilities and the risk posed by its unauthorized proliferation:

> "You can reduce the heading error to the point where the dominant component of INS error is the accelerometer noise. The error accumulation becomes a random walk in this case with $O(\sqrt{t})$ growth. With a high-end accelerometer you can reliably hit a fixed target after 10 hours of flight without any external correction. For all intents and purposes you can treat the INS as if there's no heading error at all. My design is also cheap to produce and mass manufacturable so you could create a massive swarm of autonomous precision drones with it. […] But again, if the gyro is captured or recovered, not only does your adversary gain that new capability, they also potentially gain a technological advantage on all new [navigational] technology they produce going forward."

This quote highlights both the extraordinary performance of the technology—enabling GPS-independent precision strikes over 10-hour timeframes—and the devastating strategic risk of its compromise. By reducing heading drift to the point of negligibility, the system permits unguided, unjammed, fully

2

autonomous long-range targeting with exceptional accuracy and precision. Moreover, the technology's low cost and mass-manufacturability makes swarm deployment not only feasible, but economically viable.

In this statement, Plaintiff also warns that the gyroscope enables more than just inertial guidance. If recovered by an adversary, it would provide not only a new strategic weapon, but also a platform-enabling technology that could accelerate the adversary's entire technological trajectory in the domain of navigation. Plaintiff's warning reflects the seriousness with which he treated its stewardship—viewing it as something that, if mishandled, could alter the balance of global power permanently.

Plaintiff's warning stands in stark contrast to Defendant's posture. While Plaintiff sought to safeguard the technology, limit its exposure, and control its ethical deployment, Defendant sought to push it into military channels, circulate it among third parties, and assert control over it without inventorship, understanding, or restraint. Defendant's failure to heed Plaintiff's warnings further supports claims of bad faith and ongoing national security risk.

In a private Signal conversation on April 20, Plaintiff described to Defendant a new class of vehicle made possible by his gyroscopic technology— one with the potential to fundamentally alter the balance of global military power. He wrote:

> "It enables a new category of vehicles I've been calling 'Strike Ghosts'. Basically: stealthy, low-observable strike vehicles that fly low, don't require active guidance, can't be jammed/ spoofed/dazzled, don't show up on radar until it's too late, and can effectively strike targets anywhere in the world. The exact design and flight characteristics of the vehicle can vary, but the general concept is that you can win a war more or less instantly with a swarm of these, completely defeating an enemy with an unstoppable barrage of precision strikes, without using nuclear weapons."

This statement reveals the strategic capabilities unlocked by Plaintiff's invention, and underscores the existential responsibility that comes with its control. Far from being a conventional commercial product, the Artifact enables a new doctrine of non-nuclear precision supremacy—a swarm-based, radar-evading strike capability with global reach and minimal warning time. These "Strike Ghosts" represent a military paradigm shift: a tool capable of circumventing traditional deterrence and rendering large portions of the nuclear arsenal obsolete through first-strike disablement.

The significance of Plaintiff's quote is twofold: first, it confirms both parties' awareness of the transformative and militarily sensitive nature of the technology; and second, it highlights that Plaintiff, the sole inventor,

understood its potential and articulated it in order to underscore the risks of mishandling, misuse, or premature disclosure. Defendant's actions—including attempts to unilaterally commercialize or disclose the technology despite Plaintiff's objections—must therefore be understood in light of these stakes.

In the same conversation, Plaintiff warned, "It also potentially circumvents MAD because you could destroy most of your enemy's nuclear arsenal without enough warning for a retaliation strike, and do it without a nuclear bombardment." He then added, "I actually deleted my entire analysis completely after our conversation. I'm familiar enough with the math + physics at this point that I can reconstruct it but I didn't want to leave a written record lying around."

The "analysis" referenced in Defendant's April 30 email—specifically, the "concepts you said you wrote an analysis for and deleted, possibly including stealth concepts"—refers to Plaintiff's privately developed strategic modeling of potential military applications of the gyroscopic technology, including the "Strike Ghost" concept. This analysis was authored solely by Plaintiff, was never shared with the company, and was deliberately deleted due to its sensitivity. It was developed in Plaintiff's personal capacity, outside any funding, assignment, or contractual obligation. Defendant had no involvement in its creation, no access to its contents, and no rights over it.

The significance of Defendant's attempted claim to this analysis is twofold:

First, Defendant clearly wanted the analysis, despite having no legal entitlement to it. This confirms that he recognized its strategic value and was actively seeking to obtain and control material he did not create.

Second, Defendant lacks the technical knowledge—both in advanced physics and defense systems modeling—to reconstruct the analysis himself. His reliance on Plaintiff's insight, paired with his inability to generate such work independently, underscores the asymmetry in contribution and expertise between the parties. Defendant's attempt to retroactively assert ownership over a deleted, unshared, and independently developed analysis reveals a pattern of overreach, intellectual appropriation, and bad-faith maneuvering.

This incident exemplifies the core dynamic of this case: Plaintiff conceived, developed, and refined strategic technologies, while Defendant—lacking the relevant technical foundation—sought to insert himself as the beneficiary and controller of those technologies through assertions of ownership that were unsupported by fact, contract, or inventorship law.

In a private Signal conversation on April 23, Defendant wrote: "[T]his technology defines who would win a nuclear war."

In a follow-up message on April 21, Plaintiff further elaborated on the strategic risk posed by the technology, stating:

> "Another consideration regarding MAD is plausible deniability. With stealth SG vehicles, you could actually launch a devastating preemptive attack without your enemy even knowing where the attack came from."

This comment highlights yet another destabilizing consequence of the invention: the erosion of attribution clarity in nuclear and conventional conflict scenarios. By enabling anonymous, untraceable strikes, the technology does not merely enable preemptive attack—it also allows adversaries to be struck without knowing whom to retaliate against. This erosion of attribution radically undermines traditional deterrence models and introduces a dangerous asymmetry in global strategic stability.

In a private Signal communication on April 28, 2025 Plaintiff also warned, "One of the differences between this and the Manhattan Project is that nuclear bombs cost a lot more than $10,000 to manufacture…"

This remark indicates that the technology in question may lower the barrier to entry for strategic weapon systems in a way that was unthinkable during the nuclear era. Unlike the Manhattan Project—where cost and infrastructure requirements were immense—this invention risks enabling precision strike capabilities at dramatically reduced cost, outside of formal control structures. This underscores the asymmetry of the risk: it is not simply that the technology is powerful, but that it is potentially low-cost, reproducible, and scalable. This combination creates an urgent imperative to ensure that such capabilities remain under responsible stewardship and do not fall into the wrong hands through misappropriation, reckless commercialization, or unauthorized dissemination.

In a private Signal communication on April 21, Plaintiff wrote: "I'm not opposed to continuing to develop this technology. I just want to be sure that it's handled very carefully going forward."

This quote confirms that Plaintiff's intent was not to suppress the invention, but to ensure it would be developed safely, ethically, and under appropriate control structures. Plaintiff recognized the invention's potential, but also its dangers—and sought to impose a standard of care that Defendant was unwilling to meet. This distinction is critical: Plaintiff dissolved the partnership not out of disinterest or abandonment, but—among other reasons—out of concern that continued development with Defendant posed unacceptable strategic and ethical risks.

In a private Signal communication on April 28, 2025 Plaintiff explicitly warned Defendant of the extraordinary danger posed by mishandling the core gyroscopic technology, writing:

> "The critical [Artifact] design gives me serious pause because
> the risk/reward ratio is not there. The commercial market is
> not nearly as large, for starters, and it would be extremely
> dangerous if the critical gyro technology were mishandled."

This message demonstrates Plaintiff's repeated, documented efforts to
warn Defendant of the geopolitical and existential risks inherent in the
technology's misuse. Plaintiff's insistence on restraint, risk awareness,
and non-disclosure of downstream systems reinforces the propriety and neces-
sity of restricting access. Defendant's ongoing attempts to commercialize
and share the invention—despite these explicit warnings—support claims of
recklessness, willful misappropriation, and grave national security risk.
Plaintiff's statement reflects a sober and serious risk assessment based
on the technology's unique capability to destabilize strategic deterrence
frameworks and enable precision first-strike doctrines.

## B. Defendant's Stated Intent to Militarize and Weaponize IP

In an X post on May 11, 2025, Defendant openly articulated his ideological
motivations in favor of a nuclear exchange, writing:

> "I don't know why so many right wing folks say we can't
> fuck with Russia because they have nukes—a nuclear exchange
> would overwhelmingly wipe out liberals that are concentrated
> in cities and see America go right wing for decades/forever".

This post not only revealed Defendant's willingness to entertain cata-
strophic nuclear conflict, but his underlying motivation for doing so: the
mass death of political opponents via global thermonuclear war. Therefore,
Defendant's motivation was not deterrence, security, or stability, but
rather the deliberate mass death of political opponents to induce permanent
political realignment. In expressing this view while simultaneously seeking
to weaponize Plaintiff's gyroscopic invention for nuclear delivery systems,
Defendant revealed a reckless and ideologically driven intent that elevates
both the strategic sensitivity of the misappropriated technology and the
legal urgency of injunctive relief.

From the outset, Defendant Chapiro viewed Plaintiff's invention as a
strategic asset to be exploited through military and weapons applications.
Before any company was formed, he began outlining commercialization strate-
gies that centered on deploying the gyroscope in offensive weapons systems.

In a message dated August 3, 2024, prior to the formation of any legal
entity or execution of partnership agreements, Defendant wrote:

> "[W]e can vertically integrate in attack drones and cruise
> missiles, while selling externally to higher end applications
> (e.g. hypersonic missiles, large ISR UAVs, satellites, etc.)."

Defendant's proposed plan—to integrate the technology into attack drones,
cruise missiles, and hypersonic weapons—demonstrates a deliberate strategy
to weaponize Plaintiff's intellectual property. Defendant's message also
proposes commercial exploitation through third-party sales in strategic
sectors including ISR (Intelligence, Surveillance, and Reconnaissance) UAVs
and satellite systems.

By contrast, when Plaintiff first introduced his invention to Defendant,
he emphasized peaceful, commercial or scientific applications. In his initial
message July 30, 2024 email describing the potential of his invention,
Plaintiff wrote:

> "I think that this [invention] could be very useful for
> satellite and deep space navigation. My understanding is
> that currently, most space navigation control is conducted by
> ground-based communication, and this is expensive and poten-
> tially error-prone. Interferometry, on the other hand, would
> allow satellites to determine their speed and direction in
> deep space autonomously."

This framing underscores Plaintiff's original intent: to advance space
autonomy, particularly in deep space environments. The focus was on improving
navigational reliability and reducing dependency on costly Earth-based
infrastructure. Defendant's immediate pivot to weapons applications—specif-
ically attack drones, cruise missiles, and hypersonic delivery systems
—represented a fundamental divergence in intent.

This further supports Plaintiff's assertion that Defendant was not a
co-creator or scientific collaborator, but rather a would-be commercial
opportunist seeking to exploit defense-related markets using technology he
neither invented nor understood.

In a Signal conversation on April 20, Defendant wrote: "[B]reaking MAD
should be a primary objective with this," and "[T]his works best with
tactical nuclear strikes."

In a Signal conversation on April 20, Defendant wrote: "ICBMs are already
designed to work without GPS using mechanical gyros. It seems hypersonic
missiles might be one of the best applications where the capability and
cost really shifts, as well as smaller yield tactical nuclear weapons such
as SLCM-N. And then the missile swarm concept I want to build. We could
potentially have the supersonic missile be the strategic ones with Radian
tech, and then subsonic ones don't have it and can be used more broadly".

7

In a Signal exchange dated April 24, 2025, Defendant engaged Plaintiff in a conversation concerning the survivability of the gyroscopic sensor under nuclear conditions.

Defendant wrote: "Radiation shouldn't impact the gyro functionality, right? Or are you unsure on that?"

Plaintiff replied: "Depends how much radiation we're talking, and the type of radiation… there are multiple types. It could potentially damage some of the electronics and photodetectors."

Defendant responded: "Radiation is from nuclear blast of first missile if you are firing multiple missiles," and continued, "Any ideas on how well our gyro will work under nuclear blast radiation?"

This exchange makes clear that Defendant was actively envisioning a scenario in which Plaintiff's invention would be used to guide additional nuclear missiles onto targets already struck by prior warheads—specifically, through fallout clouds created by preceding detonations.

The scenario described—precision-guided follow-up nuclear strikes through radioactive fallout clouds—highlights the extreme strategic sensitivity of the technology. Plaintiff replied with a technical assessment, noting that an ICBM would traverse such a cloud in less than two seconds, that light transmission through the fiber would likely remain unaffected, and that radiation hardening could mitigate damage to electronics and photodetectors.

This exchange reinforces Plaintiff's concerns about the national security implications of Defendant's continued possession of the invention and substantiates claims of anticipatory misappropriation. Defendant's posture —openly strategizing around nuclear use cases without authorization or entitlement—illustrates a deliberate attempt to develop military applica- tions of the technology outside the scope of its intended and lawful use. Such conduct presents a direct national security risk and further justifies the need for injunctive and protective relief.

On April 26, 2025, Defendant reported that he had conducted a 30–40 minute meeting with three personnel from the Naval Surface Warfare Center (NSWC), including a senior official involved in the Joint Hypersonics Transition Office (JHTO)—a core program in the development of next-generation U.S. strike weapons. He stated that he "explained to them the gravity of the situation" based on private conversations with Plaintiff.

This message confirms that Defendant was actively engaging with the Department of Defense to promote the technology for military application —specifically in strategic systems and hypersonics—without authorization, inventorship rights, or ownership. The meeting reveals that Defendant was not merely speculating about weaponization, but had already begun disclosing designs with military officials to operationalize the technology in offensive systems.

In a Signal message on April 22, Defendant wrote: "[…] from a strategic perspective, I think the most straightforward thing would be pushing for acquisition of greater numbers of SLCM-N and ALCM-N, both of which use the W80 warhead." The W80 warhead is a two-stage thermonuclear warhead designed for deployment on cruise missiles.

In another message on April 27, Defendant discusses the strategic premise of using Plaintiff's gyroscopic technology to enable "much better retaliatory counterforce strikes that take out ICBMs and there are only so much SLBMs," referencing second-strike capabilities against Russia or China and the limited number of SLBMs (submarine-launched ballistic missiles) in such scenarios. This quote reveals that Defendant not only envisions the technology's application to nuclear command and control infrastructure but is actively modeling its use in destabilizing nuclear deterrence frameworks. Such statements go far beyond abstract enthusiasm; they reflect concrete strategic planning for military applications of a proprietary invention to which Defendant has no legal rights. Defendant's reckless engagement with doctrines of nuclear warfare reinforces the national security implications of Defendant's continued possession and disclosure of Plaintiff's invention.

In response to Plaintiff's efforts to steer development toward safe, commercially viable applications of the gyro technology, Defendant made clear that he was not interested in responsible commercialization. In a Signal message dated April 28, 2025, Defendant wrote: "I will also mention that while it is a great business to just have better gyros… what I signed up for was to work on breakthrough capabilities, not just a fantastic, billion dollar product."

This statement shows that Defendant's goals were not aligned with lawful, commercially relevant, or rational development of the technology. Despite acknowledging that "better gyros" constituted a great business opportunity, Defendant explicitly rejected this path—preferring instead to pursue applications of the invention related to nuclear strategic doctrine. His rejection of a "fantastic, billion dollar product" underscores that he was not acting in the company's interest, but instead, pursuing personal ambitions related to nuclear warfare.

This supports Plaintiff's concerns that Defendant was not only misappropriating his proprietary intellectual property, but actively attempting to leverage it for destabilizing or strategically sensitive purposes. Defendant's statement further supports Plaintiff's decision to dissolve the company and reinforces the need to prevent Defendant from gaining control over technology he neither invented nor sought to steward responsibly. The quote bolsters claims of anticipatory misappropriation, strategic misconduct, and reckless pursuit of high-risk military or intelligence applications without consent or oversight.

Additionally, Defendant's explicit characterization of the gyro as "a fantastic, billion dollar product," affirms its extraordinary commercial potential. This admission not only validates Plaintiff's position regarding the significance and viability of the invention, but also supports a concrete basis for damages. Defendant's own valuation underscores that the technology is not merely theoretical or marginal—it is a commercially transformative asset with market potential in the hundreds of millions to billions of dollars. By interfering with its development, misappropriating technical data, and attempting to commercialize it without authorization, Defendant has significantly disrupted Plaintiff's ability to bring the invention to market, secure investors and partnerships, and control the timing and terms of deployment. This quote thus provides direct evidence of both willful misconduct and the scale of harm caused.

## C. Unauthorized Disclosures to U.S. Strategic Weapons Personnel

The Founders Agreement executed by both parties on January 8, 2025 contains a confidentiality clause in Section 13(c), which prohibits either founder (defined in the agreement as a "Purchaser") from disclosing or using Confidential Information except in the good faith performance of company duties. The agreement reads, in part:

> Purchaser shall not disclose or use at any time, either during his Continuous Service Status with the Company and its Affiliates or thereafter, any Confidential Information (as hereinafter defined) of which Purchaser is or becomes aware, whether or not such information is developed by him, except to the extent that such disclosure or use is directly related to and required by Purchaser's performance in good faith of duties assigned to Purchaser by the Company. Purchaser will take all appropriate steps to safeguard Confidential Information in his possession and to protect it against disclosure, misuse, espionage, loss and theft.

Both parties are listed as Purchasers and signed the agreement in that capacity.

The Founders Agreement defines Confidential Information in section 9(b) as follows:

> Confidential Information" means any information of a confidential or secret nature that may be disclosed to Purchaser by or on behalf of the Company or any of its Affiliates that (a) relates to the business of the Company, its Affiliates, its customers and suppliers, as well as other entities or individuals on whose behalf Purchaser or the Company has agreed

10

> or may, during the Continuous Service Status, agree to hold
> information in confidence or (b) is otherwise produced or
> acquired by or on behalf of the Company or any of its Affil-
> iates ("Confidential Information"). Confidential Information
> includes, in addition to the information itself, all files,
> letters, memoranda, reports, records, data or other written,
> reproduced or other tangible manifestations of the Confidential
> Information (whether written, printed or otherwise reproduced
> or recorded), whether created by Purchaser or others, to which
> Purchaser has access during Continuous Service Status.

On April 10, 2025, the Radian Industries Board of Directors passed a formal resolution reaffirming strict confidentiality obligations and limitations on authority. Section 7 of that resolution stated:

> All officers and directors are reminded that Company infor-
> mation is confidential and may not be disclosed to outside
> parties without explicit authorization. This includes discus-
> sions related to unannounced products, inventions, funding
> strategies, partnerships, and internal deliberations.

This resolution, signed by Plaintiff as Chairman, was binding on Defendant and clearly prohibited unilateral disclosures of sensitive material to third parties. Defendant's subsequent actions—including unauthorized meetings with U.S. defense personnel, disclosure of technical details, and reliance on government NDAs in lieu of proper company oversight—violated this directive as well as the Founders Agreement and constitutes a serious breach of fiduciary duty and company policy.

In a Signal communication on April 23, Defendant made a request for a report from Plaintiff for a conference he was attending in Indiana, writing: "Hey, I need your summary report today because tomorrow I am flying to Indiana."

Plaintiff responded: "Hey, I don't have time to put together a detailed report at the moment, I have to travel for an emergency and I'll be back Thursday. I'm not sure you should be talking to anyone about this except under strict NDA though."

With this response, Plaintiff explicitly warned Defendant not to discuss the technology with third parties.

Defendant countered, "Government employees are under very strict NDAs".

Defendant proceeded to attend the conference in Indiana, and in a private Signal communication on April 26, Defendant wrote:

11

"Had a 30-40 minute meeting with three NSWC people: 2 on strategic systems hardware, and another one who does hypersonics, and she actually was running part of the JHTO (joint hypersonics transition office).

Explained to them the gravity of the situation based on our conversation. They mentioned the need to get buy-in, and I went back to the flight test in a Faraday cage – we really need that when we can get it, so getting funding to enable that is still a key focus. They seem to be in support of what I emphasized, which is that we want to keep it classified, out of tactical systems, and were thinking of ways they can help us getting security clearances faster e.g. the CRADA for radiation testing.

The NSWC white paper will be the first one to submit and that will go to them."

Defendant continued:

"Oh, I also spoke with Captain Harley, the technical director of SLCM-N. He seemed enthused about the idea of being able to retain accuracy in the absence of space assets. 'I **need** to be accurate in the absence of space assets' were his words. So I think we are on the right track. I also discussed with the NSWC folks the concepts of tamper-resistance with destruction to prevent reverse engineering and emphasized we must have zero probability of it falling into enemy hands."

Defendant's statement constitutes direct evidence that Defendant disclosed sensitive technical information—derived from Plaintiff's proprietary invention—in at least three instances to U.S. defense personnel without authorization. These admitted disclosures, made after Plaintiff explicitly warned Defendant not to communicate the information without a strict NDA in place, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

Additionally, Defendant's statement that "Government employees are under very strict NDAs" was legally irrelevant to Plaintiff's concern—government NDAs protect government information, which does not necessarily extend to third-party proprietary material—and reflects a reckless disregard for Plaintiff's proprietary rights. Government NDAs do not substitute for proper nondisclosure agreements between inventors and third parties. Defendant's assertion served as a self-justifying pretext to improperly disclose protected information to defense personnel without Plaintiff's consent or oversight, thereby further establishing Defendant's bad faith and scienter

12

under the Defend Trade Secrets Act and supporting claims of misappropriation and unauthorized disclosure.

Defendant names Captain Harley, the technical director of the SLCM-N (Submarine-Launched Cruise Missile–Nuclear), as one recipient of this information, and further claims to have discussed tamper-resistance and self-destruct mechanisms with personnel from the Naval Surface Warfare Center (NSWC).

Defendant's discussion of anti-reverse engineering measures underscores his belief that the invention is militarily sensitive and must be protected from foreign acquisition—while continuing to disclose it without Plaintiff's consent. It also raises potential concerns under export control laws, including ITAR, and illustrates the recklessness of Defendant's actions.

In another private Signal communication, Defendant prefaced a technical statement with the label "(CUI)," referencing Controlled Unclassified Information—a federal designation used for sensitive material subject to handling restrictions under export control and defense procurement frameworks such as ITAR (International Traffic in Arms Regulations), EAR (Export Administration Regulations), and DFARS (Defense Federal Acquisition Regulation Supplement). While the full contents of this message are submitted under seal due to the sensitive nature of the technical discussion, the message itself relayed defense-relevant analysis concerning inertial navigation systems and strategic-grade gyroscopic performance. Defendant's use of the (CUI) label—despite lacking classification authority—reflected his own belief that the underlying technology falls within sensitive national defense domains. In the message, he further acknowledged that Plaintiff's invention fills a critical capability gap not addressed by existing systems such as ring laser gyroscopes (RLGs) or fiber optic gyroscopes (FOGs), underscoring its potential military significance and export-restricted character.

### D. Unauthorized Commercialization and Strategic Outreach

Sometime before April 11, 2025, Defendant Chapiro circulated an email soliciting venture capital funding, titled "We'll Own Golden Dome Strategic Missile Defense & Outpace AT&T+Starlink in Telecom."

In the body of the email, he claimed:

> "My physicist co-founder and I have something […] that will transform exquisite capabilities, with an unprecedented missile defense system of systems that will end MAD doctrine, with a platform that will also offer a unique telecom capability that will make us easily 10x larger than SpaceX. We will be the 'next Raytheon AND AT&T.'"

13

The technology referenced throughout Defendant's fundraising email—including both the missile defense and telecom claims—was rooted in Vacuustat-based infrastructure, a concept and invention that originated entirely with Plaintiff. In fact, the specific strategic applications highlighted in Defendant's pitch had already been shared with him years earlier by Plaintiff.

In an email to Defendant dated March 3, 2022, Plaintiff wrote:

> "[…] the major missing ingredient to establishing an effective ICBM nuclear missile shield is having a long-endurance, high-altitude platform to mount an airborne laser. In fact, I don't think the laser even needs to be elevated, most of it can sit underground in a bunker and you can just run an optical cable up to the vacuustat."

Plaintiff continued:

> "Do you have any suggestions on how I can bring my invention to the attention of someone in the government? Given the current geopolitical situation unfolding, I think there's an urgent need to protect cities from ICBMs and given the government's resources, a vacuustat could be built pretty quickly and relatively cheaply."

For context, the "geopolitical situation" Plaintiff was referring to was the Russian invasion of Ukraine in February 2022. In response to Plaintiff's email, Defendant acknowledged: "I hadn't considered the possibility of a fiber optic cable, that's really interesting…" Defendant also confirmed that the telecom application originated with Plaintiff, writing: "Previously, you mentioned the idea of 12 stationkeeping vacuustats for telecom coverage of the entire US."

This correspondence demonstrates that both core concepts behind the claims in Defendant's investor email—laser-based ICBM defense and persistent national-scale telecom—originated with Plaintiff. It was Plaintiff who first conceived and articulated these strategic applications, as well as the patented Vacuustat architecture that enabled them. Notably, the station-keeping Vacuustat concept for telecom is discussed in Plaintiff's 2020 patent, which was filed in 2015. Defendant, despite acknowledging these ideas in private correspondence, repackaged and presented them publicly without attribution—failing to name Plaintiff and falsely implying the ideas were his own.

This makes Defendant's venture capital fundraising email all the more egregious. Not only did it solicit investment using concepts and technologies that originated solely with Plaintiff—whose name was conspicuously

14

omitted—but it did so despite Defendant's documented awareness of both their origin and their national security sensitivity. Defendant's private acknowledgments of Plaintiff's invention, followed by a public erasure of his authorship, reflect a calculated pattern of misrepresentation. By repackaging Plaintiff's patented Vacuustat platform and strategic applications as his own, Defendant committed an act of intellectual appropriation, supporting Plaintiff's claims of willful misappropriation, fraudulent misrepresentation, fraudulent concealment, and breach of fiduciary duty.

Defendant's email was sent to multiple investors, including Khosla Ventures, and pitched a vision of strategic and commercial domination—promising both a total reinvention of nuclear deterrence and a global-scale communications infrastructure, stating:

"We were recently one of the few companies selected by the Missile Defense Agency for Golden Dome Industry Day one-on-one meetings," Defendant wrote. "We are uniquely sort of opening up an entirely new domain that will lead to us eventually owning most of missile defense, and we want to be the prime contractor, so we are interested in connecting with investors who can support and participate in a $50–100m seed round."

Defendant concluded with dramatic financial projections: "I only recently have something I can say can be a $1t+ outcome with a straight face." He continued: "I think we can hit $100b private val in 10 years, $1t public val in 15 years, if venture backed early on."

Notably, this pitch never named Plaintiff. Although the technology described was based on Plaintiff's patented Vacuustat invention—developed independently over many years of research— Defendant anonymized him as a "physicist co-founder," erasing both Plaintiff's identity and authorship. This deliberate omission mirrors the broader pattern of strategic displacement documented throughout, in which Defendant repeatedly attempted to expropriate Plaintiff's intellectual property while removing attribution.

Even more striking is Defendant's own admission of national security risk: "We will certainly not be sharing a deck with technology or architecture details given the highly sensitive nature of this area, and we are already adding risk to America by engaging with VCs at all!" In this sentence, Defendant acknowledges both the sensitive and potentially export-controlled nature of the material being solicited—and simultaneously reveals his willingness to proceed regardless, without the inventor's consent, oversight, or proper clearances.

Although the email was nominally written on behalf of Radian Industries—where Plaintiff was majority shareholder and CTO— Defendant later revealed that he used the resulting meeting with Khosla Ventures to pitch Phoenix Dynamics instead, re-branded under Black Lattice—a shell company he controlled exclusively. Defendant's rebranding of Phoenix Dynamics to Black Lattice was explicitly acknowledged in an April 20, 2025 Signal message.

During the Khosla meeting, Defendant presented a full pitch deck for Black Lattice without naming or crediting Plaintiff, and without disclosing that Plaintiff's intellectual property did not belong to him.

As CEO of Radian Industries, Defendant had a fiduciary duty to act in the company's best interests, disclose material conflicts, and protect its core assets—including licensed technologies. His substitution of Black Lattice for Radian Industries in investor outreach—and his omission of the company's majority owner and sole inventor from both the meeting and the materials—constituted a direct violation of those obligations. Defendant's actions demonstrate the deliberate and premeditated nature of Defendant's misappropriation and support claims for breach of fiduciary duty, unjust enrichment, fraudulent concealment, and willful misappropriation of proprietary technology.

### E. Improper Motives for Classification and Clearance Access

In a Signal message dated April 28, 2025, Defendant wrote:

> "I really like the idea of being able to impact things meaningfully at the strategic level! It's also a lot harder to get security clearances if we are not pursuing Critical gyro, which makes it harder to know what's really going on in a lot of areas. I don't think Safe gyros gets classified."

This statement reveals that Defendant's motivations are not grounded in responsible development or commercial viability, but in gaining access to classified programs, intelligence, and strategic systems. His enthusiasm for "impacting things meaningfully at the strategic level" underscores his intent to push the technology into national security domains—not out of necessity, but to gain proximity to power.

Defendant's admission that the "Critical gyro" increases the likelihood of security clearance, while "Safe gyros" likely remain unclassified, reflects an opportunistic and self-serving mindset. Rather than treating classification as a protective responsibility, he treats it as a pathway to privileged access.

### F. Exfiltration Risk

Defendant's public statements, travel history, and ongoing efforts to reposition himself internationally reveal a strategic attempt to circumvent U.S. intellectual property protections by aligning with jurisdictions hostile or indifferent to IP enforcement. In particular, Defendant has repeatedly advocated for the withdrawal of Latin American nations from the Patent Cooperation Treaty (PCT), openly calling for the abolition of

intellectual property laws and praising countries like El Salvador and Argentina as potential havens for unregulated commercial activity.

In this context, Defendant has not only expressed ideological opposition to IP, but also outlined specific legal and geopolitical mechanisms—such as the use of international patent exhaustion, offshoring corporate entities, and seeking relationships with foreign leaders and defense ministries—to avoid U.S. jurisdiction and export control regimes. These actions create a credible and imminent risk of intellectual property exfiltration, especially given Defendant's frequent international travel to countries including Spain, El Salvador, and Argentina, his outreach to foreign government contacts, and his efforts to establish international headquarters and licensing structures beyond U.S. oversight.

Defendant's systematic efforts to undermine global intellectual property protections—including his public calls for Latin American nations to exit the Patent Cooperation Treaty and his advocacy of foreign IP laundering schemes—represent a deliberate legal strategy to shield misappropriated intellectual property from enforcement and to facilitate unlawful commercialization in jurisdictions beyond U.S. oversight. These efforts directly impact Plaintiff, whose proprietary technology was misappropriated by Defendant and now faces imminent risk of unauthorized foreign use. Defendant's conduct, both in theory and practice, constitutes a concerted scheme to erase Plaintiff's rights through extrajurisdictional structuring and regulatory evasion, underscoring the need for immediate injunctive relief and further substantiating the RICO enterprise.

## 1. Representative Statements

The following statements underscore Defendant's intent to operationalize his anti-IP ideology in foreign jurisdictions, materially increasing the risk of intellectual property exfiltration and unlawful commercialization abroad.

A December 29, 2023 post offers an unusually explicit articulation of Defendant's strategic interest in undermining global intellectual property enforcement. Framing the Patent Cooperation Treaty (PCT) as a vehicle of coercion, Defendant calls for El Salvador to withdraw from it entirely—an action that would eliminate treaty-based recognition of foreign patent rights. He further urges a broader Latin American exodus from the agreement and casts IP protections as an unjustifiable infringement on liberty and property rights, positioning himself as ideologically and tactically aligned with jurisdictions that reject the IP framework altogether.

Notably, Defendant invokes international patent exhaustion—a legal doctrine limiting post-sale enforcement of patent rights—to suggest that production and commercialization could shift to countries like El Salvador in order to evade U.S. enforcement. Defendant concludes with an attempt to entice like-minded actors to engage with him, tagging a constellation

of populist and libertarian influencers, foreign officials, and crypto personalities.

Defendant's post underscores the seriousness and forethought behind his campaign against intellectual property, reflecting not only detailed legal research—such as his invocation of Article 66 of the PCT and international patent exhaustion—but also active outreach to global political figures, including the President of El Salvador, in an effort to influence policy on the international scale:

> El Salvador needs to get itself off the PCT (patent cooper-ation treaty) and encourage others to as well. Already there is a strong Latin American absence.
>
> Argentina Bolivia Paraguay Suriname Uruguay
>
> THERE IS NO SUCH THING AS "Intellectual Property."
>
> Ironically, the term is used to justify violent deprivation of private property and its trade. The US has the world's strongest rule of law, and the value of rule of law is fundamentally rooted in its recognition of and protection of property, which the US is failing to do by continuing to pretend IP is real. […]
>
> By endorsing theft and violence at gun point in such a fundamental way that interferes with business prosperity, there is a huge opportunity for someone to offer a greater degree of liberty, more American values than America!
>
> Now you might be thinking: "what good will respecting private property do for me if other countries prevent me from selling there?" Ah, well that's where things get a bit interesting. The US Supreme Court recently ruled on a case that confirms international patent exhaustion, which means after a product is sold once, anywhere, it loses its patent protection. This may drive production to countries that recognize liberty. […]
>
> So how can El Salvador get out and level up their freedom and international appeal to businesses? Article 66 of the PCT specifies that denunciation of the contract takes effect in 6 months. El Salvador could be out by summer 2024. […]
>
> All that being said I would be interested to know if anyone has any book recommendations laying out the arguments and explanations for why intellectual property has hindered technological advancement and productive capacity, as well as why its existence is legally flawed and incompatible with liberty.

18

@JuicefBukele  @nayibbukele  @Arceris_btc  @twocitizenships  @DrJackKruse
@rob1ham  @RobertKennedyJr  @Beautyon_  @maxkeiser  @stacyherbert  @Jmilei
@VivekGRamaswamy @JoeCarlasare @RegulatoryJason"

In a February 1, 2024 post, Michael outlines a tax evasion strategy based on shifting profit recognition offshore. Specifically, he suggests using an El Salvadoran entity to accrue profits—even while remaining a U.S. citizen living in the U.S. and selling primarily to the U.S. market. The key idea is that profits booked under the foreign entity would not be subject to U.S. taxation until they are repatriated (i.e., brought back into the U.S.).

He then raises the possibility of using IP licensing to justify this shift—by assigning intellectual property rights to the El Salvadoran entity and then having the U.S. business pay royalties for its use, essentially reclassifying the majority of business earnings as royalties paid to an entity in El Salvador. This would effectively move the "profit nexus" offshore, allowing the majority of earnings to be taxed (or not taxed) under more favorable foreign laws rather than under the U.S. corporate tax regime. As Defendant wrote:

> "If as a US citizen living in the US, and having sales primarily in the US, have profits accrue within El Salvadorean entity not be subject to US taxation **until repatriation**, I would do it. Problem may be if I can use something like IP licensing to move the profit nexus to ES."

The post was subsequently flagged by X as spam, rendering it unsearchable and hidden from Defendant's timeline on X.

The existence of Reflow Labs Pte. Ltd. in Singapore—an offshore entity believed to be controlled by Defendant—demonstrates that Defendant has taken concrete steps to implement his tax avoidance and IP-shifting scheme. The creation of such an entity to facilitate profit diversion, conceal asset ownership, or reclassify U.S.-generated income supports the existence of a racketeering enterprise and provides independent evidence of predicate acts such as wire fraud and attempted tax evasion under RICO.

In a post on May 18, 2024, Defendant declares that El Salvador will serve as the global headquarters for his company LoLa Oil, materially heightening the risk of intellectual property exfiltration in this case. By anchoring a new venture in a foreign jurisdiction that lacks strong IP enforcement and has been actively promoted by Defendant as a haven from U.S. law, he creates a direct pathway for the unauthorized transfer, commercialization, or replication of proprietary technology originally developed under U.S. protections.

This not only complicates potential enforcement of Plaintiff's IP rights, but also raises the likelihood that Defendant will use a foreign entity

to launder ownership, obscure the origin of inventions, and profit from stolen materials while insulating himself from U.S. legal consequences. In the context of this suit, it underscores the urgency of injunctive relief and supports the broader claim that Defendant's actions form part of a deliberate scheme to evade accountability through offshore structuring. As Defendant wrote:

> "El Salvador will be the home of the global headquarters for @LoLaOil_."

In a December 16, 2024 post, Defendant wrote:

> "There are thousands of widgets you can fabricate with your property that if handed to a non-US person, even within the US, could be a criminal ITAR violation. This is of course itself an illegal violation of American property rights, but good luck fighting that (I sure won't).
>
> You have a few options: 1) become a defense contractor and actually do something with your idea; 2) publish your idea without first filing a patent that can be captured – guess what, fuck-face, if you believe "intellectual property" is real, you can't get mad when you become a victim of the tyrannical system you attempted to use in an attempt to tyrannize others!!; 3) buy bitcoin and wait a century to see if the world is a bit different.
>
> On a related note, has anyone successfully had something intentionally get classified under the Invention Secret Act? Can that be a good tactic?"

This post is significant because it reveals Defendant's awareness of export control laws—specifically ITAR—and his open willingness to disregard them, framing such violations as illegitimate impositions on personal liberty rather than serious federal crimes. By mocking the legal regime surrounding defense-related technologies and encouraging others to bypass patents or intentionally provoke classification under the Invention Secrecy Act, Defendant signals both ideological hostility to lawful channels of protection and a reckless posture toward national security constraints. This mindset materially increases the risk that proprietary or sensitive technical information will be unlawfully disclosed or exported, particularly in light of Defendant's foreign ties and offshore ventures.

A post by Defendant on February 1, 2025, confirms that Defendant was physically present in El Salvador recently—further substantiating the risk of offshore IP exfiltration and foreign commercialization, especially given that just weeks earlier he publicly urged El Salvador to withdraw from the PCT

and reorient its legal system to reject intellectual property enforcement. Defendant's direct mention of President Nayib Bukele, along with the personal tone ("your glasses are en route, sir"), strongly suggests that he is attempting to establish contact with the Salvadoran head of state, if he has not already done so. This aligns with Defendant's broader efforts to position himself within jurisdictions hostile to U.S. intellectual property enforcement and reinforces the fact that he is seeking high-level political relationships, in an apparent effort to support or shield his offshore ventures:

> "Guys, listen, I'm in El Salvador now (@PlanBElsalvador), and let me tell you — I feel amazing, the power of real sunlight at 13.7 degrees North cannot be beat! A reminder that there is so much more for us to improve.
>
> President @nayibbukele, your glasses are en route, sir. 🙂 "

A June 19, 2025 post by Defendant further underscores the escalating exfiltration risk posed by his actions, as he openly announces ongoing engagement with the Argentine Ministry of Defense and invites other defense founders to join him in presenting sensitive technologies to a foreign government:

> "Do I know any other early stage defense founders who want to get their stuff in front of the Argentine Ministry of Defense? 🤔 DM me. 2nd meeting is happening in a few days…
>
> We're gonna make all of the Americas great again. 🚀 "

The reference to a "2nd meeting" indicates an active and developing relationship, not a speculative or one-time contact. In the context of Defendant's offshore positioning, anti-IP ideology, and relocation to jurisdictions with weak IP enforcement, this post strongly suggests an intent to commercialize or disclose advanced technologies in foreign countries, including potentially export-controlled materials.

With this post, Defendant signals a post-national orientation that deliberately distances his ambitions from the interests of the United States specifically. In the context of engaging with foreign defense ministries and promoting offshore jurisdictions hostile to U.S. law, this framing underscores that his loyalties and strategic goals are not aligned with preserving U.S. technological advantage or legal protections. Instead, he appears to view Latin America as a geopolitical alternative to the U.S., and potentially as a base for circumventing U.S. export controls, IP law, and regulatory scrutiny. This further amplifies the risk that stolen or sensitive technology will be diverted abroad for use or sale in jurisdictions beyond U.S. enforcement reach.

## 2. Meetings with Ministry of Defense in Argentina

Defendant's public statements and conduct make clear that his intent is to take Plaintiff's proprietary technology outside U.S. jurisdiction, evade both intellectual property protections and export control laws, and commercialize it for weapons development abroad. His repeated praise of jurisdictions with weak IP enforcement, open calls to dismantle global patent treaties, and ongoing engagement with foreign defense ministries—including Argentina—demonstrate a deliberate plan to strip Plaintiff of control over his invention. Defendant's explicit goal is to establish offshore development of the technology precisely because it is less likely to be subject to U.S. classification, regulation, or enforcement, and to weaponize it through foreign partnerships while denying the inventor both attribution and legal recourse. This conduct poses a direct threat to national security and irreparably harms Plaintiff's rights as inventor and lawful owner of the technology Defendant has misappropriated.

On July 10, 2025, Defendant publicly boasted about rapidly launching a new defense company following the dissolution of Radian, claiming high-level meetings with both U.S. and Argentine defense officials, and emphasizing the speed of his actions:

> "Be me
> Start new defense company a month or two ago
> Call with someone in Pentagon tomorrow
> And someone on my team meeting people very high up in Argentine
> Ministry of Defense also tomorrow
> You haven't seen how fast I move because my prior stuff is not
> really publicly known…"

In a July 22, 2025 post, Defendant wrote that he had "abandoned the El Salvador meme. In favor of Argentina," implying a shift in strategic focus from one jurisdiction to another. He framed this change as a matter of global relevance, stating that Argentina "can actually be relevant to the world." This post—along with Defendant's history of embracing and discarding locations, causes, and collaborators based on perceived short-term advantage—underscores the superficiality of his loyalties and the opportunistic nature of his affiliations. His conduct demonstrates a pattern of self-serving volatility that poses clear risks when coupled with proprietary technology, confidential information, or influence over high-impact projects.

On July 21, 2025, Defendant made a post implying that he was planning to help Argentina become a competitor to America:

> "America needs more competitors to thrive
> I think we may be able to find one in Argentina"

On July 22, 2025, Defendant posted: "Make Argentina Great Again".

In an August 1, 2025 post, Defendant wrote: "Time to flee to Argentina".

In an August 12, 2025 post, Defendant confirmed that he is meeting with the Ministry of Defense in Argentina, writing:

> ">Be me
> >Meeting with MoD & industry in Argentina
> >Seeing if they might want to be LPs rather than just buyers"

On August 19, 2025, Defendant wrote: "Should I help build a hypersonics startup in Argentina […]?" This clearly signals his intent to replicate the same commercialization and weapons-development plan he pursued with Phoenix Dynamics—built around Plaintiff's navigational technology—now transplanted to Argentina. By proposing to develop hypersonic missile systems—a category of technology widely recognized as among the most strategically sensitive in the world—Defendant has confirmed his intent to proceed with military applications of misappropriated IP in a foreign jurisdiction. Argentina, while not an adversary, is not a close strategic ally of the United States, and development of advanced weapons systems there using export-controlled U.S. technology raises serious national security and foreign policy concerns.

On August 22, 2025 Defendant wrote: "We're gonna build here like it's 1950s SoCal," and continued in a reply, "We are going to restore Argentina to its former glory and inspire the United States to return to its founding principles of private property and liberty," tagging the president of Argentina (Javier Milei) in hist post. This statement openly frames Argentina as the launchpad for a new defense-industrial initiative modeled on Cold War-era U.S. weapons development, and confirms Defendant's geopolitical ambition to shift the center of strategic innovation abroad using misappropriated technology belonging to Plaintiff.

In another revealing post on August 22, 2025, Defendant contrasted the regulatory environment in the U.S. with that of Argentina, writing:

> "3 months ago in DC I asked the test director of the White
> Sands 'how long does it take to get time on range?'
> '6 months' (and there's a fee).
> I asked a guy in Argentina: 'if you want to fire off a missile
> out here, how long does it take?'
> '1 week' (and there's asado)."

This comment underscores Defendant's explicit motivation to shift weapons testing and development to Argentina in order to bypass U.S. oversight, regulation, and delay: in his view, Argentina offers a permissive environment for weapons experimentation, including missile launches, making it an

ideal jurisdiction for deploying misappropriated technology with minimal constraints.

### 3. Lobbying for Transfer of Missile Defense and Nuclear Technology to El Salvador

Defendant's public statements also reveal a troubling pattern of engagement in discussions in an effort to position El Salvador as a recipient of sensitive U.S.-origin technology, including nuclear energy infrastructure and strategic missile defense. On multiple occasions, he has directly addressed President Nayib Bukele and others, offering assistance with nuclear development and suggesting the extension of a protective missile defense "umbrella" over the country. While this reference may appear vague, it takes on a more concrete—and concerning—meaning when considered in light of Defendant's unauthorized misappropriation of Plaintiff's Vacuustat technology.

In earlier communications to Defendant dating back to 2022, Plaintiff had proposed using the Vacuustat for high-altitude, optically-fed tethered laser platforms to defend against ICBMs. Defendant's later reference to bringing El Salvador "under the umbrella" appears to invoke this same defense capability—offering it as a geopolitical bargaining chip to a foreign government, outside U.S. jurisdiction and in direct contravention of ITAR and export control restrictions. This further underscores the severity of the exfiltration risk posed by Defendant's conduct and supports the broader pattern of racketeering, misappropriation, and national security endangerment alleged in this case.

In a February 16, 2024 post, Defendant broaches the subject of bringing nuclear energy to El Salvador—a country with no existing nuclear infrastructure and limited regulatory oversight—writing:

> "When nuclear energy in El Salvador?"

In a March 22, 2024 post directly tagging President Nayib Bukele, Defendant takes this one step further: offering to assist El Salvador with the development of low-capex nuclear energy infrastructure and explicitly referencing ITAR compliance. This message suggests not only active engagement with nuclear technology but also an awareness of the export control constraints governing such transfers, further reinforcing the seriousness of Defendant's efforts to insert himself into sensitive foreign energy and defense initiatives:

> "Nayib, I may be able to help El Salvador on the path to (lower capex) nuclear energy in a way that is ITAR compliant. Was just talking about it."

In a document authored by Defendant and titled Mach Prime, Defendant articulates a deliberate strategy for circumventing U.S. export control laws and evading domestic classification regimes. Specifically, he outlines how sensitive technologies can be moved beyond the reach of U.S. oversight by establishing parallel development efforts overseas:

> "The only way to get things out of going into a classified black hole is by getting them into non-classified programs early, or in the case of ITAR, developing them outside the United States as there is then nothing that is being exported. In the years of my purgatory, […] I was able to refine certain generating principles […]. And principles cannot be subject to ITAR. If we were to have parallel programs therefore, in the US and also El Salvador […], it could lock-in energy sector access to certain technologies."

Defendant's assertion that "principles cannot be subject to ITAR" likely reflects a willful misstatement of U.S. export control law. Under 22 CFR § 120.10, technical principles applied toward defense technologies are clearly subject to regulation when they constitute technical data, even absent physical prototypes.

In a March 12, 2025 post, Defendant replies to Paolo Ardoino, the CEO of Tether and Chris Pavlovski, the CEO of Rumble—both of whom are foreign nationals—and explicitly references the potential inclusion of El Salvador under a strategic defense "umbrella," a phrase that, in context, clearly alludes to ICBM defense capabilities. This message demonstrates that Defendant is actively attempting to enlist support for deploying or extending ICBM defense infrastructure to foreign jurisdictions, particularly El Salvador. This post ties back to Plaintiff's Vacuustat-based missile defense concept and underscores the seriousness of the exfiltration threat:

> "You could also help physically secure the West if you reply to my email
>
> …maybe we can even get El Salvador under the umbrella – assuming no one will fire ICBMs at El Salvador is akin to 'security by obscurity'"

El Salvador has no credible strategic rationale for developing nuclear energy or advanced missile defense infrastructure. The country lacks any existing nuclear reactors, has minimal industrial demand for baseload energy that cannot be met through conventional means, and is situated in a seismically active region—making nuclear deployment particularly imprudent. As of 2025, El Salvador's total energy consumption is among the lowest in Latin America, and over 70% of its electricity already comes from renewable

sources such as hydro, geothermal, and solar—undermining any urgent need for nuclear capacity.

To underscore the disproportionate nature of Defendant's proposals, a single nuclear reactor in the United States typically produces 10-20 terawatt-hours (TWh) of electricity per year—more than El Salvador's entire national electricity generation, which totals just 6–7 TWh annually. This comparison makes clear that El Salvador has no plausible need for nuclear infrastructure on the scale Defendant has suggested. Its modest energy demands are already met primarily through renewable sources, and its total electricity consumption is lower than that of many mid-sized U.S. cities.

Similarly, El Salvador faces no plausible threat from intercontinental ballistic missiles; it is not a geopolitical rival of any nuclear power and does not host U.S. military assets that would warrant targeting. Defendant's persistent efforts to court El Salvador as a recipient of such technologies therefore cannot be justified on strategic or humanitarian grounds. Rather, they appear designed to leverage the country's comparatively weak regulatory regime and close ties with crypto-aligned actors as a jurisdictional safe harbor, enabling Defendant to pursue sensitive defense-adjacent projects while evading U.S. export controls, classification restrictions, and intellectual property enforcement.

In his Mach Prime treatise, Defendant also advocates for the offshore development of advanced weapons-adjacent technologies in order to evade classification and oversight by the U.S. Department of Defense. In the "Executive Summary Thread" section, he asserts that U.S. authorities can prevent broader commercial deployment, and he explicitly frames domestic classification as an obstacle to be avoided:

> "Moreover, as such advancements typically represent novel technology paradigms, the fiat world can be slow even once it has been established and is placed on the roadmap across the world's most advanced weapons systems in an integral capacity – in fact, as the Department of Defense is the first institution to 'take notice,' further expansion beyond advanced weapons can be curtailed by decades if one falls into the classified black hole too quickly."

Here, Defendant is making a strategic argument for jurisdictional evasion. Rather than pursue lawful channels for high-impact defense technology, Defendant encourages parallel development outside the United States to preempt classification. This posture further substantiates Plaintiff's claim that Defendant poses a serious exfiltration and national security risk in connection with the misappropriated Vacuustat and Artifact technology.

#### 4. <u>Opposition to Export Control Laws</u>

Defendant has repeatedly and unequivocally denounced U.S. export control laws—including the International Traffic in Arms Regulations (ITAR) and the "born secret" doctrine governing nuclear-related information—as unconstitutional and illegitimate. These statements reflect a consistent ideological position that views national security regulations as violations of personal liberty and property rights. This ideological stance is particularly concerning given Defendant's simultaneous efforts to commercialize defense-related technologies abroad and build strategic relationships with foreign governments.

By framing export controls as criminal acts and advocating for their circumvention—for example, through offshore efforts in jurisdictions like El Salvador—Defendant reveals a mindset incompatible with the legal obligations imposed on anyone handling sensitive or dual-use technologies. These posts provide direct evidence of intent to sidestep or nullify U.S. regulatory oversight, materially increasing the risk of unauthorized transfer or misuse of controlled technology.

In an August 12, 2023 post, Defendant articulates a sweeping rejection of U.S. export control laws, declaring them not merely misguided but fundamentally illegitimate and unconstitutional—characterizing them as violations of basic human rights, including liberty, property, and the freedom to exchange goods and knowledge:

> "Export controls are unconstitutional violations of the human rights to liberty, property, and free exchange."

In a May 19, 2024 post, Defendant asserts that it is a "criminal act" to interfere with a private individual's decision to shape their property into any form—including, by implication, a nuclear weapon. While he claims not to be "fighting for anyone's right to nuclear weapons," his framing unmistakably defends the right of private citizens to produce their own nuclear weapons, arguing that any restriction on such activity constitutes unlawful aggression. He goes on to denounce both ITAR and the "born secret" doctrine as unconstitutional, emphasizing his view that even national security regulations related to nuclear weapons are illegitimate:

> "I am not fighting for anyone's right to nuclear weapons, but I recognize it is naturally a criminal act to aggress upon anyone for the act of forming some private property into a particular configuration. ITAR is unconstitutional, as is "born secret," though I abide by US law."

In a January 16, 2025 post, Defendant proposes a concrete plan to bypass U.S. and allied export restrictions by recruiting disaffected UK engineers

to develop advanced technologies in El Salvador—specifically to avoid the commercialization limits imposed by what he calls "unconstitutional ITAR restrictions." This statement reveals not only his intent to evade legal constraints, but also his active consideration of how to build high-tech capabilities abroad using foreign talent and permissive jurisdictions:

> "I think an interesting concept would be to recruit UK engineers that are sick of the tyranny there to build advanced capabilities in El Salvador without the restrictions to commercialization that arise from unconstitutional ITAR restrictions. Lots of interesting possibilities."

### 5. Export-Control Evasion and Smuggling

Defendant has repeatedly boasted about his acquisition of export-controlled materials in violation of both Japanese export law and, by implication, the International Traffic in Arms Regulations (ITAR). His posts leave little doubt that Defendant has sourced restricted high-performance materials from Japan, fabricated at least one physical object using them (a ring), and expressed clear intent to use these materials again for additional fabrications in the future.

According to his own statements, Defendant smuggled ultra-high modulus pitch carbon fiber—a material restricted under Japanese export controls and potentially covered by the U.S. Munitions List—into the United States to fabricate an engagement ring for a future fiancée. Notably, he is not currently engaged, and there is no public evidence that he is in any relationship. Instead, the ring appears to be a vanity project fabricated to showcase his access to controlled materials. He has since offered this ring to the general public on social media. His posts indicate that the ring was in fact completed and that he shared images of it with Paolo Ardoino, the CEO of Tether, a foreign national with whom he has sought to cultivate ties.

These actions, combined with Defendant's own admission that he has "thought about how to get around certain challenges" related to the U.S. Munitions List, point to a sustained and deliberate effort to circumvent export laws for personal, symbolic, and possibly commercial purposes. The pattern of behavior reflected in these posts—public glorification of smuggling, unlawful possession, and apparent intent to distribute or reuse restricted materials—presents a serious legal concern and further reinforces the risk that Defendant's activities extend beyond IP theft into the realm of international export violations and national security breaches.

In an October 6, 2024 post, Defendant openly jokes about violating Japanese export control regulations—specifically with respect to restricted graphitic materials—while simultaneously signaling that he has, in fact, done so. By framing the admission in mock-denial ("I'm not gonna say I have…"), he

invites plausible deniability while leaving little doubt that he transferred export-controlled Japanese materials to third-party subcontractors without proper authorization, in knowing violation of international law:

> "The Japanese do not fuck around when it comes to graphitic materials. Now, I'm not gonna say I have violated Japanese export control regulations passing some Japanese materials to subcontractors for some process, but if I had, it really wouldn't have been all that much…"

In a May 8, 2024 post, Defendant further reinforces his casual disregard for international export laws by flippantly admitting that he "might bend the Japanese export laws a bit now and then just out of convenience." With this, Defendant acknowledges a recurring pattern of noncompliance with foreign export regulations, treating legal restrictions on high-performance materials as obstacles to be ignored when inconvenient:

> "Same. I might bend the Japanese export laws a bit now and then just out of convenience. 👀"

In an October 26, 2024 post made under his pseudonym GhostDirac, Defendant explicitly admits to possessing export-controlled materials sourced from Japan. Unlike earlier posts that used humor or implication, this statement is direct and unambiguous—confirming not only prior acquisition but also current possession of restricted materials, and emphasizing their strategic value by noting that "no other country" produces them:

> "I have some export-controlled materials from Japan… they make certain things that no other country has."

As part of Defendant's broader effort to position himself with offshore entities or extrajurisdictional organizations, he has repeatedly attempted to establish contact with Tether, a company with a history of regulatory evasion and opaque international operations. This section provides context for why Defendant viewed Tether as a strategically desirable institutional partner, and why this poses significant export control risks given the nature of Plaintiff's intellectual property.

On December 27, 2024, Defendant reached out to Paolo Ardoino, CEO of Tether and a foreign national, offering him a look at the material he claims to have smuggled out of Japan in violation of export controls:

> "Hi Paolo, are you interested in taking a look at the object in this photo when you are in El Salvador at the Plan B conference? If Adam wants to meet me, I can go to Malta, and if Stacy

29

> wants to chat, week after is easier for me so you are the only
> reason I'd be there Jan 30-31"

If this meeting occurred, it may have constituted a serious violation of U.S. export law, given the nature of the materials and the foreign national involved.

Defendant has previously expressed deep admiration for Tether. On March 4, 2025, he remarked:

> "Tether is also in a league of its own if you consider the sort of bleeding edge, sovereign, decentralized, balance of power shifting energy technologies they may be considering investing in. 😉 "

Similarly, in a June 2, 2025 post, he wrote:

> "Tether could become the most important company in the world. That outcome becomes more likely if they hire me."

These statements reflect Defendant's aspirational alignment with a company known for regulatory evasion, false public claims, and centralized control masquerading as decentralization. Defendant's evident admiration for Tether is particularly revealing given his self-professed identity as a Bitcoin maximalist and advocate of "sound money," which he equates with Bitcoin. For example, on July 21, 2021, Defendant posted: "Bitcoin (sound money) is the only way the world shall direct its efforts toward proper optimization."

Tether is a privately issued stablecoin minted at the discretion of an offshore entity with a long history of deception, regulatory evasion, and opaque reserves. Its operations contradict nearly every core principle of sound monetary theory, and are clearly antithetical to Bitcoin's foundational principles. Defendant's endorsement of Tether exposes the hollowness of his professed ideology: presented with a token that benefits him despite allowing central actors to mint digital coins from thin air while evading scrutiny and accountability, he supports this enthusiastically.

Unlike Bitcoin, Tether has no computationally secured supply constraint, no trustless architecture, and no meaningful audit trail. Tether is not a technical innovation; it is a centralized token ledger administered by a private company with discretionary control over issuance and redemption. Furthermore, a 2021 investigation by the New York Attorney General's Office concluded that "starting no later than mid-2017, Tether had no access to banking, anywhere in the world, and so for periods of time held no reserves to back tethers in circulation at the rate of one dollar for every tether, contrary to its representations." Defendant's public support for Tether

despite its well-documented record of fraud and opacity is evidence that his advocacy of "sound money" is merely performative.

In a January 4, 2025 post, Defendant confirms that he has already fabricated at least one ring—presumably from restricted high-performance materials—and is actively planning to produce more. He references having reviewed the U.S. Munitions List (USML), indicating awareness of applicable export restrictions, and acknowledges that some of the raw materials he intends to use are still in storage in Colorado. He admits these materials "violate export laws a bit," but attempts to dismiss the seriousness by noting they violate laws of other countries, "just not America"—a statement that underscores his willingness to flout foreign export controls while exploiting jurisdictional blind spots:

> "I have a single ring now. Checked USML and could actually get 2nd, problem being it would cost 100x more than gold for just 1 :/
> Anyway, I have 3 other rings I must make. Some raw materials in storage in Colorado for 1 of those. Violates export laws a bit, just not America's 😉"

In a May 4, 2024 post, Defendant openly encourages others to smuggle export-controlled materials—specifically ultra high modulus pitch carbon fibers—by joking about sneaking them through airport security "just for funsies." While couched in humor, the underlying message trivializes the illegal transport of restricted materials. His suggestion to "screenshot this tweet in case you get caught so they know it was just a prank" further underscores his awareness of the illegality and his intent to frame deliberate export violations as harmless jokes:

> "Grab yourself a spool of export controlled ultra high modulus pitch carbon fibers and see if you can sneak them out in your carry on just for funsies. Screenshot this tweet in case you get caught so they know it was just a prank."

In a June 5, 2024 post, Defendant boasts about his preference for using materials that violate ITAR in the fabrication of a wedding ring—mocking the idea of using conventional metals with lower melting points and implying that his ring design intentionally incorporates restricted, defense-grade substances. Defendant appears to regard the use of ITAR-controlled materials as a mark of technical prowess, further trivializing serious export control violations:

> "Imagine giving a girl a wedding ring made of a material with a melting point barely over 1000 C instead of low-key something

that violates International Traffic in Arms Regulations laws.
Could never be me."

In an August 6, 2024 post, Defendant explicitly links his sense of status
or "clout" to the ability to fabricate a ring for a future girlfriend using
classified materials—and to do so without facing legal consequences. This
statement openly acknowledges the illegality of his intended actions while
framing them as a kind of elite threshold or rite of passage, further
reinforcing his disregard for federal export and classification laws:

> "If I don't have the clout to fabricate a gf a ring out of
> classified materials that cost more than diamonds and not go
> to federal prison for it, I'm not ready to get married. 💍"

In a January 1, 2025 post, Defendant openly admits that he has been
actively planning how to circumvent the U.S. Munitions List to avoid ITAR
violations when fabricating a ring for a future marriage proposal. This
reflects premeditated intent to evade federal export controls for the purpose
of constructing an object using defense-grade materials. His mention of the
"buy-to-fly ratio" and thermal resistance further confirms the technical
nature of the material and its likely classification under controlled
categories:

> "I've thought about how to get around certain challenges around
> the US Munitions List to avoid ITAR violations on the ring
> I will have fabricated when I need to propose. It will cost
> quite a bit more than solid gold given the buy-to-fly ratio…
> and will handle much hotter temps"

In a July 1, 2025 post, Defendant announces his intention to dispose of
approximately $15,000 worth of equipment and custom-engineered components
stored in his possession—materials that, based on earlier admissions, likely
include export-controlled or otherwise restricted items. His reference to
"bootstrapping another bleeding edge capability" suggests that the parts
were intended for high-performance or dual-use applications, and his casual
tone implies a lack of concern for proper handling or disposal protocols.
This post raises serious questions about whether controlled materials are
being discarded improperly or transferred without oversight:

> "Gonna be clearing out my storage unit
> Think I'm gonna end up trashing $15k of equipment + custom
> engineered parts
> I'm too old to 'bootstrap' another bleeding edge capability
> Just goes to show how steep the exchange rate is between money

and youth/time
I will not yearn alone"

In a July 5, 2025 post, Defendant openly offers to give away high-performance parts stored in Colorado, including materials he admits "violate Japanese export controls". Among the items listed are components for vacuum balloon test structures, high-frequency induction coils, ceramic nozzles, and exotic high-performance fibers—technologies with potential dual-use and defense applications. This post constitutes a direct admission that Defendant remains in possession of restricted foreign materials and is actively attempting to transfer them to others without any regard for export compliance, end-use restrictions, or licensing requirements. Defendant's offer—made publicly, with no screening or controls—underscores the severity of the legal exposure and further evidences Defendant's willingness to engage in unauthorized distribution of controlled substances:

> "Anyone in Colorado want some high performance parts that can be used to form a vacuum balloon test strut, a high frequency induction coil, ceramic nozzles, and a range of weird high performance fibers (some of which violate Japanese export controls)? Lmk within next few days."

In an August 7, 2025 post, Defendant wrote:

> "I'm talking to a number of defense founders interested in selling internationally before selling to the US because of how slow the DoD is.
> Anyone else noticing that trend?
> It seems like it could become a go-to playbook, and it helps force true system affordability."

This post underscores the risk of Defendant approaching foreign countries to sell Plaintiff's tehnology.

## G. Contents of Private Folder

Plaintiff's "Private" folder—explicitly labeled as such—in the corporate Google Drive contained highly sensitive intellectual property, experimental data, and technical documentation authored solely by Plaintiff, but retained in full—without authorization—by Defendant Chapiro following the company's dissolution. This folder contained essential internal technical data and documentation for both the Vacuustat and Artifact projects, including unre-leased calculations, source code, experimental results, and grant-facing materials. Its contents are summarized as follows:

(a) vacuustat_math (PDF, 16 pages): An original mathematical treatment titled Vacuustat Primer, authored by Plaintiff, deriving structural, buoyancy, and stability constraints for multiple vacuustat architectures. It included novel formulas for mass reduction, buckling-mode transitions, and material selection criteria—extending well beyond the content of the issued patent and constituting valuable trade secret information.

(b) vacuustat_basic (markdown): A simplified version of the above, created specifically for Defendant to facilitate internal knowledge transfer. It provided accessible explanations of the key concepts and was never intended for public dissemination.

(c) Artifact apparatus photo: A high-resolution image documenting the physical layout of the optical components, instruments, and breadboard configuration used in the Artifact prototype.

(d) Three optical equipment inventory spreadsheets: Comprehensive spreadsheets listing the optical parts, instruments, and suppliers used during development and testing of the Artifact. These spreadsheets included part numbers, prices, quantities, and sourcing information—enough to enable exact replication of the experimental system.

(e) Artifact signal processing code (Python): Source code implementing the complete data pipeline for the laser gyroscope. This included fringe tracking from raw video footage, and extraction and analysis of displacement data from fringe shifts. Together, these scripts formed a turnkey signal-processing stack converting raw optical interference data into CSV files and labeled graphs.

(f) 21 experimental trial videos: Raw footage from multiple experimental runs showing live fringe behavior under varying test conditions. These videos serve as both functional evidence and potential blueprints for unauthorized reverse engineering.

(g) Complete data analysis records for four trials: Each analysis folder contains: the source video file of the experiment; raw displacement data in CSV format; time-domain and frequency-domain plots (Fourier transforms). These directories enabled complete reproducibility of the results and independent verification of the system's performance, making them critical from both an intellectual property and national security standpoint.

(h) Custom circular error probable (CEP) calculator: A Python/Tkinter tool with a graphical interface, designed to model spatial targeting accuracy and error propagation. Originally developed for precision drone navigation, the tool also included a screenshot illustrating live-use parameters.

(i) Acquisition, tracking, and pointing (ATP) case study: A detailed technical analysis modeling a spiraling-scan strategy for rapid optical link acquisition between satellites. This study included a custom Desmos calculator and concluded that the method, combined with Plaintiff's Artifact technology, could yield a 100x improvement in average link time compared to the known state of the art.

(j) Encrypted ZIP archive: Although encrypted, the password was shared with Defendant, giving him access to critical government-facing documents. This archive contained: the ARK NSF SBIR Phase I Project Pitch submitted to the U.S. government; accompanying fringe displacement calculations and error analyses; and links to interactive Desmos calculators used for analysis.

## H. Summary

This section has presented abundant evidence that Defendant's conduct poses a serious and ongoing threat to national security, export compliance, and the U.S.'s strategic technological advantage.

It establishes the strategic relevance of the intellectual property at issue, as described by Plaintiff in contemporaneous technical communications —including its potential applications in missiles, missile defense, and telecommunications. Plaintiff's repeated warnings to Defendant regarding the sensitive nature of the technology were met not with caution, but with escalating efforts by Defendant to militarize and commercialize it, including instances outside lawful or secure channels.

Defendant has not only articulated a clear ideological hostility to intellectual property and export controls, but has taken repeated steps in accordance with his ideology. These include unauthorized disclosures of Plaintiff's confidential materials, circulation of classified or ITAR-adjacent concepts in domestic and foreign fundraising pitches, and attempts to recruit political support for offshore deployment and shielding of strategic technologies. Defendant has also expressed improper motives for seeking classification or clearance, and has—by his own admission—violated Japanese export controls with the intent of fabricating a proposal ring from restricted materials for a hypothetical future fiancé.

Further compounding the risk is the Defendant's strategic outreach to jurisdictions known for weak IP enforcement and adversarial regulatory

postures. These include direct attempts to contact the President of El Salvador (and most recently, the president of Argentina), offers to assist in missile defense and nuclear development abroad, and coordination with foreign entities like Tether and the Argentine Ministry of Defense. Defendant's own posts document his smuggling, fabrication, and attempted distribution of export-controlled materials—high-modulus carbon fiber from Japan in particular—without appropriate licenses, oversight, or regard for legal consequences.

Taken together, Defendant's pattern of behavior provides clear, multi-sourced evidence of a deliberate scheme to exfiltrate sensitive technologies, evade lawful controls, and profit from unauthorized commercialization of protected inventions. It underscores the need for immediate injunctive relief, potential criminal referral, and robust enforcement of both intellectual property and national security law.

Given Defendant's extensive travel history in Europe and Latin America and his stated intent to continue commercializing Plaintiff's intellectual property in defiance of cease-and-desist correspondence, there is legitimate concern that Defendant may seek to evade accountability by fleeing the United States.

The Court should be aware that Defendant poses a potential flight risk—particularly if adverse rulings are issued or enforcement proceedings commence.

## II. Defendant's Opposition to Intellectual Property Rights

### A. Representative Statements

The following examples, posted by Defendant on X, are representative of his refusal to recognize the validity of intellectual property rights. These statements are included here to demonstrate that Defendant's statements constituted a prolonged and sustained pattern of opposition to intellectual property rights.

In an August 20, 2023 post, Defendant denounced the concept of intellectual property as a legal construct, characterizing it as both "unlawful" and "criminal":

> "Here we can see the beginning of the end of the unlawful, criminal notion that "intellectual property" is a real thing."

In an April 17, 2024 post, Defendant equated intellectual property with violent theft, framed IP enforcement as antithetical to American values, and ridiculed those who rely on legal protections for their inventions,

using hostile and degrading language to characterize both the law and its
supporters:

> "Stop being a little bitch-ass statist cuck, intellectual
> property is not real and undermines American values of freedom,
> life, liberty, and property.
> IPooors are in the same category that say taxes are giving
> 'back' to justify VIOLENT THEFT/EXTORTION!
> Try being more valuable!"

In an August 4, 2024 post, Defendant denied the legitimacy of intellectual
property rights, coupling his rejection with profane political rhetoric and
portraying IP as a form of authoritarian control incompatible with "freedom
of association":

> "There is no such thing as 'intellectual property,' commie,
> statist scum
> Freedom of association, motherfucker"

In an October 8, 2024 post, Defendant described intellectual property as
"fundamentally unlawful," and framed its abolition as a moral and strategic
imperative for the United States:

> "The greatest strategic move America could pull is leaping
> ahead of the entire world on property rights & moral superi-
> ority yet again by being first to recognize the fundamental
> unlawfulness of 'intellectual property.' […]"

In a November 14, 2024 post, Defendant again denied the existence of
intellectual property, calling it a "nonsense commie term" and equating
it with the phrase "paying your fair share in taxes," which he also
described as a form of violent extortion. This comparison underscores the
extremity of Defendant's ideological beliefs, revealing a worldview that
treats foundational civic obligations as oppressive. Later, he neglected to
file taxes for the company and failed to fulfill basic corporate compliance
responsibilities, consistent with his broader rejection of both intellectual
property and governmental authority. As he wrote:

> "There is no such thing
> As intellectual property
> 'Intellectual property' is actually a nonsense commie term,
> not unlike 'paying your fair share in taxes,' used to j[ust]
> violent[ly] extort and deprive people of their private property
> […]"

In a November 21, 2024 post, Defendant again denied the legitimacy of intellectual property, claiming that its very existence constitutes an "infringement to real property rights." This framing reveals a belief that being required to pay money—or otherwise recognize value—for an invention constitutes theft, because he does not believe intellectual property is real or entitled to protection. As he wrote:

> "[…] There is no such thing as "intellectual property" and the notion of such is an infringement to real property rights."

On December 22, 2024, Defendant publicly compared intellectual property enforcement to armed robbery, equated intellectual property with taxation as violent extortion, and mocked the legitimacy of IP rights by calling a supporter a "deranged commie"—a statement that reflects not only Defendant's extreme hostility toward the concept of intellectual property, but also his open contempt for the legal and constitutional frameworks that protect patent holders:

> "You are a deranged commie, thinking you can utter incantations that allow you to 'lawfully' rob people of tangible property at gunpoint. No need to equivocate – 'IP' is the same as people who think 'paying fair share of taxes' is a legitimate statement.👆 You don't even do R&D."

On December 22, 2024, Defendant publicly denounced intellectual property as a "criminal concept". He continued by invoking what he calls "the real law," stating: "Ignorance is not an excuse of (the real) law." This statement reveals that Defendant knowingly rejects the legitimacy of established U.S. intellectual property law in favor of an undefined, extralegal framework that he purports to recognize instead—thereby admitting that his opposition is not due to confusion or mistake, but arises from a deliberate decision to disregard binding legal obligations:

> "There are few people who match me on percent of work that can be magnified through the criminal concept of IP, and yet, I am able to understand why it is wrong, so you have no excuse, not that you had one anyway. Ignorance is not an excuse of (the real) law."

On February 13, 2025, Defendant explicitly advocated for the abolition of all intellectual property laws, as well as the FDA and healthcare regulations as part of a "cartelized industry". This statement underscores Defendant's broader ideological opposition to government institutions designed to protect both public health and intellectual labor:

38

> "Abolishing the FDA and eliminating all healthcare, health
> insurance, and 'intellectual property' laws is the only way
> this cartelized industry that destroys human health can ever
> end. […]"

On February 13, 2025, Defendant asserted that intellectual property is
"not real," describing it as "word salad nonsense" used to justify "theft,
violence, and extortion":

> "'Intellectual property' is not real.
> It is word salad nonsense to justify the violation of actual
> property rights with theft, violence, and extortion."

On March 1, 2025, Defendant mocked the legitimacy of intellectual property
by calling it "gay nonsense that isn't real" and appended a clown emoji to
further ridicule the concept, not only reinforcing Defendant's categorical
rejection of IP rights, but also demonstrating his habitual use of derisive
language and symbols to delegitimize the legal framework protecting invention
and intellectual labor:

> "[…] I will be among the first to defend Valar against **this**
> line of attack because "intellectual property" is actually gay
> nonsense that isn't real. 🤡"

On April 5, 2025, Defendant once again declared that "intellectual prop-
erty is not real," in a post that included hostile, profane, and homophobic
language, equating intellectual property claims with devaluing America, and
concluded by disparaging his post's recipient as a "shitcoiner parasite":

> "What sort of soy fâggotry is this?
> 'Intellectual property' is not real
> Your claim is tantamount to saying America is worthless, which
> is obviously wrong
> No serious person expects a shitcoiner parasite such as your-
> self to understand the nature of value & wealth creation though"

On April 11, 2025, Defendant reiterated his rejection of intellectual
property by declaring "'Intellectual Property' is not real" and, in a post
that included homophobic, sexual, and ableist slurs, equated belief in IP
rights with leftism and "state violence," further underscoring his view that
legal protections for intellectual property are tantamount to communism and
authoritarian theft:

> "Don't be a gay and retarded statist cuck, Chris.
> Leave that to the leftists.

39

> 'Intellectual Property' is not real, and you are actually
> claiming you believe in using state violence to deprive people
> of their real property because of your magic incantations.
> Stop being a commie"

On April 12, 2025, Defendant likened belief in intellectual property rights to support for healthcare and food, mocking both as illegitimate "intellectual perspective" and reinforcing his ideological stance that IP is a collectivist fiction unworthy of legal recognition:

> "When will more bitcoiners finally realize that saying 'in-
> tellectual property is a real thing' is the same sort of
> 'intellectual perspective' that goes into saying 'healthcare
> and food is a human right?'"

On April 12, 2025, Defendant ridiculed the belief in intellectual property rights by mimicking it in alternating upper and lowercase letters (a common internet convention used to mock opposing views in a sarcastic, childish tone), concluding with a homophobic slur, reinforcing both his contempt for intellectual property rights and his use of inflammatory, derogatory language:

> "I tHiNk 'inTeLlEcTuAL pRoperTy' is PropeRTy
> Fuck off, commie f*g!"

On April 13, 2025, Defendant mocked intellectual property law as incoherent and illegitimate, using the invented acronym "MYP" ("My Your Property") to ridicule the legal framework protecting inventions and to imply that such laws are nothing more than government-sanctioned theft:

> "And what Jack is saying is you are retarded because IP doesn't
> actually exist
> 'You are stealing my MYP (My Your Property), it's your property,
> but gov says I get to have it because of MYP Law.'"

On April 15, 2025, Defendant equated the enforcement of intellectual property rights with violent state extortion, denouncing it as "communism" and describing IP holders as "RINO commie scum"—a statement that further illustrates his belief that IP laws are illegitimate, coercive, and undeserving of legal protection:

> "Communism uses double speak:
> 1) 'my property rights' for counterfeiting wealth by money
> printing
> 2) 'my IP' using State to shoot anyone in head who doesn't

> pay extortion fees to wrangle/sell **their real property** due to
> agreement **between you & State**
> Both RINO commie scum 🤡 "

In an April 15, 2025 post, Defendant explicitly admits that his rejection of intellectual property rights is a willful and ideologically motivated position, stating that despite holding patents himself—including on technology "on its way into strategic missiles" (a reference that appears to falsely attribute Plaintiff's technology as his own)—he opposes IP protections "on principle":

> "Almost none of the people in this IP debate have any of this
> so-called 'IP' to lose
> I on the other hand have patents on stuff on its way into
> strategic missiles for the next many decades, so you'd think
> I would be on pro-'IP' side
> …but first and foremost, I have principles!"

On May 4, 2025, Defendant again mocked the legitimacy of intellectual property, using clown and skull emojis to ridicule belief in intellectual property protections:

> "You think IP is real. 🤡 💀 "

On May 10, 2025, Defendant claimed that "intellectual property" is not real and invoked The Bitcoin Standard to justify excusing IP theft—particularly by young women, who he implies lack moral agency—despite the fact that the book, written by economist Saifedean Ammous, does not endorse Defendant's anti-IP ideology and is grounded in a tradition that upholds individual property rights:

> "That's wild.
> Probably worth remembering that young women should not be held
> to the same standards as men for their transgressions, especially if the supposed transgression is IP theft since there
> is no such thing as 'intellectual property.' #BitcoinStandard"

On May 10, 2025, Defendant again reiterated his belief that intellectual property is "not real," in a response to a post that appears to be unrelated to any intellectual property dispute:

> "Yeah, I have no idea what's going on here, nor am I involved
> in any decisions that may involve people in relation to these
> events. I stepped down as CEO of my LED biz a few weeks ago

> to focus more on aerospace & defense.
> I'll just mention, as always, 'IP' is not real."

On May 24, 2025, Defendant claimed that intellectual property is "double speak" for violent extortion and the deprivation of private property—asserting, paradoxically, that the defense of intellectual property is anti-property, and reiterating his broader ideological position that IP laws are incompatible with American values:

> "America must leverage its cultural superiority of property rights to realize that 'intellectual property' is double speak for the violent extortion and deprivation of private property. […]"

On June 20, 2025, Defendant reiterated his ideological opposition to intellectual property by equating it with "violent theft," again comparing intellectual property rights to healthcare—reaffirming his view that IP rights and healthcare entitlements are illegitimate claims to the property of others:

> "Having principles bears a price that can fall upon oneself. Ideas are not a thing that a person can be deprived of. Notion of 'IP' is no more a reality than the notion of any other 'right to the property of others' e.g. 'free healthcare.' Ironically, you are pro violent theft."

## B. Defendant's Rejection of Intellectual Property Rights In Practice

Although Defendant frequently conflates intellectual property rights with communism—which he purportedly opposes—his repeated public statements rejecting intellectual property rights reflect an ideology that is fundamentally at odds with both capitalism and the American legal system. His view—that inventors should not be entitled to receive compensation for their work—is not rooted in free-market principles, but instead resembles the collectivist position advanced by figures like Richard Stallman and other proponents of what can aptly be described as information communism, who argue that intellectual property should be freely shared regardless of origin or effort.

With that said, even the most hardened critics of intellectual property—whether from the far left or libertarian traditions—typically argue that IP law should be dismantled to protect individual rights or public access. They may invoke public benefit to advocate liberating knowledge from corporations or institutions, but they do not argue that it is morally acceptable to appropriate an individual's work to benefit a corporation. Defendant's

actions invert this moral logic: he did not "liberate" knowledge from a faceless institution—he took patent-protected intellectual property and trade secrets from his business partner, an individual inventor with limited personal resources, and used them in a scheme to enrich his own private companies.

Capitalism is a system in which individuals have the right to own property, including the means of production and capital, and to engage in voluntary exchange. This includes not only physical assets but also intellectual creations, which are protected through legal mechanisms such as patents, copyrights, and trade secrets. Far from defending property rights, Defendant's ideology seeks to erase them in the domain of invention, making it explicitly anti-property and therefore anti-capitalist.

Defendant's ideological position is particularly disingenuous given that he has personally filed and obtained multiple patents, which he has listed prominently on his LinkedIn profile. Beyond seeking ordinary patent protection, in a December 16, 2024 post on X, for example, he publicly asked, "On a related note, has anyone successfully had something intentionally get classified under the Invention Secret Act? Can that be a good tactic?" This remark illustrates not only Defendant's familiarity with the patent system, but his intent to exploit its most restrictive and secretive provisions as a tactical advantage—directly contradicting his professed disdain for intellectual property.

Defendant's willingness to invoke patent protection for his own benefit while simultaneously denying that others have any right to those same benefits reveals the opportunistic and self-contradictory nature of his stance. In fact, Defendant's stance is transparently unprincipled—he opposes intellectual property rights only when they benefit someone else.

Furthermore, Defendant's repeated assertions that intellectual property is "not real" rely on a false and misleading conflation between abstract ideas and the concrete outputs of intellectual labor. Intellectual property law does not protect vague notions or general concepts—it protects the results of sustained technical effort, such as CAD files, software source code, schematics, mathematical derivations, and designs of engineered systems. These outputs are practical, structured results of labor and directly tied to the creation of tangible products. Producing them requires time, expertise, and labor no less real than the physical construction of a building or machine. The distinction between an "idea" and a fully realized design is analogous to the difference between imagining a house and drawing up blueprints with structural analysis, dimensions, and material specifications. Defendant's attempt to dismiss these contributions as immaterial is not only dishonest and intellectually barren, but a hollow pretext used to justify the misappropriation of Plaintiff's labor while denying any corresponding obligation to compensate, acknowledge, or collaborate.

Moreover, Defendant's rejection of intellectual property rights places him squarely within the ideological camps of extreme leftists and communists who seek to abolish individual ownership over the products of labor. While cloaking his rhetoric in libertarian or anti-statist language, the substance of Defendant's position—that inventors have no right to control or benefit from their own creations—reflects the collectivist belief that knowledge and innovation should be forcibly shared, regardless of authorship or effort. Defendant's worldview is fundamentally incompatible with capitalism, which depends on property rights, voluntary exchange, and the recognition of labor, whether physical or intellectual.

Defendant's conduct also reflects a more troubling dynamic: while cloaking his collectivist ideology in the language of capitalism, he sought access to Plaintiff's proprietary intellectual property and trade secrets under the false pretense of financially contributing to a legitimate enterprise. Once in possession of Plaintiff's work, Defendant—acting in accordance with his collectivist ideology—proceeded to freely share Plaintiff's intellectual property and trade secrets without consent, attribution, or compensation.

This pattern of behavior—extracting value under false pretenses, denying property rights, and unilaterally redistributing Plaintiff's intellectual capital—was not only deceptive, but resembles subversive communist behavior masquerading as entrepreneurial collaboration. Far from a principled capi-talist, as Defendant claims to be, Defendant's conduct in fact aligns with the bad-faith behavior of a subversive, implacable communist.