**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Nathan Rapport and<br>Radian Industries Inc.,<br>*Plaintiffs,*<br><br>*v.*<br><br>Michael Chapiro,<br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:25-cv-02071-CEF<br><br>Judge Charles E. Fleming |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**

## CONTENTS


I. Introduction . . . 1
II. Procedural Posture . . . 2
A. Filing of the Complaint . . . 2
B. The Requested Relief Tracks the Complaint Under Rule 54(c) . . . 2
C. Service of Process and Defendant's Actual Notice . . . 3
D. Personal Jurisdiction . . . 5
E. Entry of Default . . . 14
F. Plaintiffs' Motion Under Federal Rule of Civil Procedure 55(b)(2) . . . 14
G. Request for Targeted Supplementation and Hearing . . . 15
H. Purpose of This Supplemental Memorandum . . . 15
III. Legal Framework for Determining Damages and Relief . . . 16
A. Damages May Be Established Through a Just and Reasonable Estimate . . . 16
B. Defendant Misappropriated Substantial Trade Secrets Beyond Plaintiffs' Patent Disclosures . . . 17
C. Trade-Secret Damages Permit Alternative Measures, Including a Reasonable Royalty . . 18
D. Defendant Willfully and Maliciously Misappropriated Plaintiffs' Trade Secrets . . . 21
E. Avoided Costs and Head-Start Benefits Are Cognizable Enrichment . . . 23
F. Plaintiffs' Valuation Methods Are Supported by Established Case Law . . . 25
IV. Factual Context . . . 37
A. Rapport's Technology and the Parties' Original Allocation of Ownership and Control . . 38
B. Defendant's Undisclosed Incorporation of Radian . . . 44
C. The Founders Agreement Created Extensive Leverage Over Rapport's Equity, Technology, and Future Work . . . 46
D. Defendant Diverted His Efforts From Radian, Routed Rapport's Technology Through His Own Ventures, and Repeatedly Sought Control of Radian . . . 53
E. Defendant Unilaterally Asserted the Rights His April Proposals Would Have Achieved . 68
F. Defendant's September 2026 Email Describes Current Vacuustat Sales From Poland . . . 71

G. Evidence Discovered After Dissolution Confirmed Rapport's Security Concerns . . . . . . . 72
H. Defendant's Public Rejection of Intellectual Property Rights Provides Direct Evidence of Willfulness and Intent . . . . . . . 78
I. The Defendant's Misconduct Connects the Individual Damages Categories . . . . . . . 80
V. Independent Compensatory Damages Categories . . . . . . . 82
A. Diverted Corporate Capital . . . . . . . 82
B. Unreimbursed Expenditures and Core-Development Technical Labor . . . . . . . 83
C. 2025 Compensation Shortfall . . . . . . . 85
D. Lost Contract Opportunity . . . . . . . 86
E. Lost Near-Term Investment Opportunity . . . . . . . 88
F. Diverted Khosla Ventures Opportunity . . . . . . . 89
G. Destruction of Radian's Enterprise Value . . . . . . . 92
H. ACPA Statutory Damages for the Radian Domain . . . . . . . 101
I. Artifact Trade-Secret Damages . . . . . . . 105
J. Vacuustat Trade-Secret and License Damages . . . . . . . 138
K. Founders Agreement Breaches and Contractual Damages . . . . . . . 163
L. The Known Record Likely Understates the Full Scope of Harm . . . . . . . 167
VI. Statutory and Enhanced Damages . . . . . . . 172
A. Civil RICO Treble Damages . . . . . . . 172
B. Ohio Corrupt Activities Act Triple Damages . . . . . . . 174
C. Defend Trade Secrets Act Exemplary Damages . . . . . . . 175
D. Ohio Uniform Trade Secrets Act Exemplary Damages . . . . . . . 176
E. Ohio Civil-Theft Liquidated Damages . . . . . . . 178
F. Lanham Act Monetary Relief and ACPA Statutory Damages . . . . . . . 178
G. Punitive Damages on Independently Actionable Ohio Tort Claims . . . . . . . 180
H. Current Enhancement Schedule . . . . . . . 182
I. Current Aggregate Monetary Calculation . . . . . . . 182
J. Plaintiffs Request the Maximum Lawful Aggregate Enhanced Recovery . . . . . . . 185
VII. Attorney's Fees, Litigation Expenses, Costs, and Interest . . . . . . . 186
A. Multiple Independent Bases Support Attorney's Fees . . . . . . . 188
B. Current Fee and Litigation-Expense Amount . . . . . . . 190
C. Taxable and Otherwise Recoverable Costs . . . . . . . 191
D. Prejudgment Interest . . . . . . . 191
E. Post-Judgment Interest . . . . . . . 192
F. Presently Quantified Amount . . . . . . . 193
VIII. Declaratory and Permanent Injunctive Relief . . . . . . . 193
A. Legal Authority and Standards . . . . . . . 194
B. Declaratory Relief . . . . . . . 199
C. Mandatory Restorative Relief . . . . . . . 202
D. Permanent Prohibitory Injunction . . . . . . . 207
E. Additional Findings Requested in the Final Judgment . . . . . . . 210
F. Implementation, Continuing Jurisdiction, and Enforcement . . . . . . . 212
G. Accounting, Disgorgement, and Enforcement . . . . . . . 215
IX. Summary of Damages and Conclusion . . . . . . . 218
A. Summary of Compensatory Damages . . . . . . . 218
B. Summary of Statutory Enhancement and Present Monetary Judgment . . . . . . . 219

C. Summary of Equitable and Continuing Relief . . . . . 221
D. Conclusion . . . . . 221
X. APPENDICES . . . . . 1
A. Chronology of Contemporaneous Valuation Evidence . . . . . 1
B. Net-Present-Value Model of Defendant's Proposed Commercial Economics . . . . . 4
C. Vacuustat Wind-Energy Royalty Model . . . . . 14
D. Vacuustat Telecommunications Infrastructure-Lease Royalty Model . . . . . 25
E. Vacuustat Defense-Procurement Royalty Model . . . . . 38
F. [PROPOSED] Final Judgment and Permanent Injunction . . . . . 49
G. Notice Regarding Client Use of Artificial Intelligence in Preparation of This Damages Memorandum . . . . . 84

## TABLE OF AUTHORITIES

### Cases


*A.O. Smith Corp. v. Petroleum Iron Works Co.*, 73 F.2d 531 (6th Cir. 1934) 109, 137

*Allied Erecting & Dismantling Co. v. Genesis Equipment & Manufacturing, Inc.*, 805 F.3d 701 (6th Cir. 2015) 109, 127

*American Lecithin Co. v. Rebmann*, No. 12-CV-929 (VSB), slip op. (S.D.N.Y. July 24, 2020) 102

*ASK Chemicals LLC v. Novis Works, LLC*, No. 5:19-cv-01585-BYP (N.D. Ohio) 187

*Antoine v. Atlas Turner, Inc.*, 66 F.3d 105 (6th Cir. 1995) 14

*Bailey v. Chattem, Inc.*, 684 F.2d 386 (6th Cir. 1982) 26

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) 16, 170

*Bohnsack v. Varco, L.P.*, 668 F.3d 262 (5th Cir. 2012) 110, 133

*Broan Manufacturing Co. v. Associated Distributors, Inc.*, 923 F.2d 1232 (6th Cir. 1991) 170

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) 9, 13

*C.R.H. Industrial Water, LLC v. Eiermann*, No. 1:23-CV-1805, ECF No. 80 (N.D. Ohio Mar. 3, 2026) 187

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368 (6th Cir. 2022) 106

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82-CRS-CHL, ECF No. 605 (W.D. Ky. Mar. 8, 2021) 186, 189, 190

*CBM Geosolutions, Inc. v. Gas Sensing Technology Corp.*, 215 P.3d 1054 (Wyo. 2009) 165

*Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d 1354 (Fed. Cir. 1998) 27

*Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998) 8, 13

*Cruz v. English Nanny & Governess School*, 169 Ohio St.3d 716 (2022) 190

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) 196

*Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 980 F.3d 1117 (7th Cir. 2020) 23, 127, 136

*Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276 (2006) 216

*Ford Motor Co. v. Catalanotte*, 342 F.3d 543 (6th Cir. 2003) 102

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021) 10

*Galmish v. Cicchini*, 90 Ohio St.3d 22 (2000) 190

*General Environmental Science Corp. v. Horsfall*, 800 F. Supp. 1497 (N.D. Ohio 1992) 181, 185

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified sub nom.*, *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers Inc.*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971) 20

*Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531 (Wyo. 1993) 165, 166

*In re ClassicStar Mare Lease Litigation*, 727 F.3d 473 (6th Cir. 2013) 184, 191, 192

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371 (Fed. Cir. 2001) 27, 28

*KCI USA, Inc. v. Healthcare Essentials, Inc.*, 2018 WL 4327802 (N.D. Ohio Sept. 10, 2018), aff'd, 801 F. App'x 928 (6th Cir. 2020) 173

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) 7, 13

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) 17, 109, 137, 138

*Kiva Kitchen & Bath Inc. v. Capital Distribution, Inc.*, 319 F. App'x 316 (5th Cir. 2009) 102, 104

*La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607 (6th Cir. 2023) 189

*LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182 (S.D.N.Y. 2002) 28

*Maddox v. Lodestar Energy, Inc.*, 750 F. App'x 373 (6th Cir. 2018) 187

*Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454 (6th Cir. 2022) 216

*Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505 (6th Cir. 2005) 19, 28, 36, 128, 133, 140, 158

*Moore v. Schill*, 129 N.E.3d 1013 (Ohio Ct. App. 2019) 181

*Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892 (3d Cir. 2021) 23
*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) 189
*Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, No. 28082, slip op. (Ohio Ct. App. June 20, 2018) 177, 181
*Plainsboro Partners III Ltd. Partnership v. Bellows & Associates, Inc.*, No. 25AP-672, slip op. (Ohio Ct. App. July 21, 2026) 216
*PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co.*, 47 F.4th 156 (3d Cir. 2022) 23, 24, 126, 136, 198
*PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co.*, No. 2:15-cv-965, ECF No. 170 (W.D. Pa. June 8, 2021) 23
*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) 118
*Snellman v. Ricoh Co.*, 862 F.2d 283 (Fed. Cir. 1988) 27, 28
*Spectrum Association Management of Texas, L.L.C. v. Lifetime HOA Management L.L.C.*, 5 F.4th 560 (5th Cir. 2021) 104
*StorageCraft Technology Corp. v. Kirby*, 744 F.3d 1183 (10th Cir. 2014) 130, 131, 132
*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) 16, 170
*SunCoke Energy, Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211 (6th Cir. 2009) 11, 13
*TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895 (Fed. Cir. 1986) 26
*University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974) 18, 19, 28, 128
*Versata Software, LLC v. Ford Motor Co.*, 176 F.4th 1336 (Fed. Cir. 2026) 135
*Vitro Corp. of America v. Hall Chemical Co.*, 292 F.2d 678 (6th Cir. 1961) 28, 36, 109, 133
*Walden v. Fiore*, 571 U.S. 277 (2014) 10
*WSP, Inc. v. Wyoming Steel Fabricators & Erectors, Inc.*, 158 P.3d 651 (Wyo. 2007) 166

**Statutes**

11 U.S.C. § 523(a)(2), (4), (6) 68, 210, 221
15 U.S.C. § 1116(a) 195, 197, 207
15 U.S.C. § 1117(a), (d) 52, 54, 78, 101, 102, 104, 179, 180, 185, 189, 191, 216
15 U.S.C. § 1125(a), (d) 52, 59, 101, 179, 180, 195, 202
18 U.S.C. § 1030(g) 196
18 U.S.C. § 1836(b) 18, 23, 51, 54, 106, 128, 135, 161, 176, 189, 195, 198, 215
18 U.S.C. § 1839(3) 17
18 U.S.C. § 1962(a)–(d) 100, 173
18 U.S.C. § 1964(c) 51, 54, 172, 173, 174, 185, 188, 191
2025 Wyo. Sess. Laws ch. 170, § 2 166
Wyo. Stat. § 6-5-308(a)(ii) 45
28 U.S.C. § 1920 55, 191
28 U.S.C. § 1961 55, 192
28 U.S.C. § 2201(a) 194
28 U.S.C. § 566(c) 213
31 U.S.C. § 1301(a) 99
35 U.S.C. § 154(b) 18, 31
Ohio Rev. Code § 1333.61(D) 17
Ohio Rev. Code § 1333.62 195, 198
Ohio Rev. Code § 1333.63 18, 23, 51, 106, 128, 161, 176, 177, 185, 215
Ohio Rev. Code § 1333.64 23, 54, 161, 177, 189
Ohio Rev. Code § 1343.03 192
Ohio Rev. Code § 2307.382 6, 13, 49
Ohio Rev. Code § 2307.61 52, 178, 185

Ohio Rev. Code § 2315.21 52, 77, 79, 180, 181, 184, 185
Ohio Rev. Code § 2703.14(I) 4, 5
Ohio Rev. Code § 2721.02(A) 194
Ohio Rev. Code §§ 1336.07–.08 217
Ohio Rev. Code §§ 2333.01, 2333.09 217
Ohio Rev. Code §§ 2923.32, 2923.34 51, 54, 174, 175, 185, 188

**Rules and Regulations**

Fed. R. Bankr. P. 4007 210
Fed. R. Civ. P. 4(k)(1)(A) 6
Fed. R. Civ. P. 54(b), (c), (d)(2) 2, 21, 55, 83, 187, 191, 214
Fed. R. Civ. P. 55(b)(2) 14, 15, 49, 215
Fed. R. Civ. P. 65(d) 53, 65, 66, 69, 78, 81, 82, 205, 206, 207, 209, 211, 213
Fed. R. Civ. P. 69(a) 80, 213, 217
Fed. R. Civ. P. 70(a) 202, 212, 214
Fed. R. Civ. P. 71 212
Federal Acquisition Regulation 3.101-1 99
Federal Acquisition Regulation 6.101 99
N.D. Ohio Local Civ. R. 4.2 4
Ohio Civ. R. 4.1(A)(1)(a) 4

**Other Authorities**

Federal Aviation Administration, Procedures for Handling Airspace Matters § 6-1-5 28
Internal Revenue Service, IRM 4.48.5, Intangible Property Valuation Guidelines 5

# I. Introduction

Defendant's default establishes his liability for the misconduct alleged in the Complaint. This supplemental memorandum addresses the amount of damages caused by that misconduct and the relief necessary to remedy it.

Defendant's conduct caused multiple distinct injuries, including the diversion of corporate funds, unreimbursed expenditures and labor, destruction of business and investment opportunities, impairment and misappropriation of two independently developed technologies, loss of enterprise value, impairment of business goodwill and investor relationships, and delay in commercialization. Each category is supported by its own evidence and calculation. Plaintiffs therefore respectfully request separate findings as to each injury.

The record includes financial documents, contemporaneous agreements, communications, technical materials, government submissions, fundraising documents, prototype evidence, and Defendant's own statements concerning the technologies' value and commercial potential.[1] The intellectual-property damages are supported through converging methods, including reasonable-royalty analysis, avoided development costs, head-start value, degree of impairment, Defendant's contemporaneous valuations and commercialization efforts, and market-based analysis. Alternative methods measuring the same injury support a single award for that injury.

Plaintiffs accordingly respectfully request: an award of the compensatory damages set forth below; the maximum lawful statutory and exemplary enhancement; reasonable attorney's fees, litigation expenses, costs, and interest; declaratory and permanent injunctive relief protecting Plaintiffs' ownership and control of their intellectual property and corporate assets; a sworn accounting and disgorgement of proceeds derived from Defendant's misconduct; and the retention of jurisdiction necessary to enforce the judgment.

[1] Unless otherwise specified, references to Exhibits A–E (including C2, C3, C5, C6, and B4) designate exhibits filed with the Complaint; Exhibits F1–F10 are supplemental memorandum exhibits. References to Complaint exhibits identify the relevant exhibit, figure, or page where available. Descriptions or quotations from communications do not alter the sealed status of protected technical materials, which remain identified as [SEALED].

## II. Procedural Posture

### A. Filing of the Complaint

Plaintiffs Nathan Rapport and Radian Industries, Inc. commenced this action on September 30, 2025, by filing a Complaint (ECF No. 1) asserting federal and state-law claims arising from Defendant Michael Chapiro's misappropriation and unauthorized use of Plaintiffs' intellectual property; diversion of corporate assets and business opportunities; interference with Plaintiffs' contractual and commercial rights; unauthorized access to and retention of electronic records; and related misconduct. Plaintiffs filed fifteen supporting evidentiary exhibits concurrently with the Complaint (ECF No. 2), followed by five additional exhibits filed under seal on October 7 and 8, 2025 (ECF Nos. 8–9).

The Complaint sought compensatory and enhanced damages, attorney's fees and costs, declaratory and injunctive relief, an accounting, disgorgement, and all other relief authorized by law. The Complaint and supporting exhibits identified the principal injuries for which Plaintiffs now seek monetary and equitable relief. This Memorandum supplements that evidentiary record and provides the legal and computational framework necessary for the Court to determine the amount and form of relief following Defendant's default.

### B. The Requested Relief Tracks the Complaint Under Rule 54(c)

Federal Rule of Civil Procedure 54(c) provides that a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." The Complaint gave Defendant notice of both the economic injuries and the statutory forms of relief now presented for adjudication. It separately quantified the principal damages categories, including the Vacuustat royalty injury, Artifact impairment, diverted investment and contract opportunities, destruction of Radian's enterprise value, diverted corporate capital, development expenditures and labor, and compensation loss. (Compl. ¶¶ 189–198.)

The Prayer for Relief correspondingly demanded compensatory damages for Defendant's trade-secret, intellectual-property, contractual, fiduciary, conversion, fraud, and interference misconduct; statutory and exemplary damages under the Ohio Uniform Trade Secrets Act, Defend Trade Secrets

Act, Lanham Act, and RICO statutes; treble and punitive damages; disgorgement; and the declaratory and injunctive relief specified in the Complaint. (Compl. ¶ 379.) The present Memorandum quantifies those well-pleaded injuries, develops Count XIII's expressly pleaded compensatory, restitutionary, and disgorgement remedies, applies the pleaded statutory and equitable remedies, and supplies the evidentiary and computational record required for entry of judgment. Each requested monetary and equitable remedy corresponds to an injury and form of relief pleaded before default. (Compl. ¶¶ 299–305, 379.)

Plaintiffs hereby waive Count X (defamation per se) in this action and seek no judgment or recovery on that count. None of the damages quantified in Sections V, VI, or X is attributable to Count X. The state-court action remains the vehicle for adjudicating the defamation-related claims and later publications; Plaintiffs seek no duplicative recovery.[2]

### C. Service of Process and Defendant's Actual Notice

The record establishes both completed court-authorized service and Defendant's actual notice of this action months before service by publication was completed. Plaintiffs began service efforts immediately after filing. On October 7, 2025, Plaintiffs' counsel sent the Summons, Complaint, and unsealed exhibits by certified mail to 300 Lenora Street, Suite 787, Seattle, Washington—the address Defendant used in the Founders Agreement and in records of Defendant's company, Advanced Human Engineering LLC. (Compl. Ex. A1 — Corporate Records at 47, ECF No. 2-1.) By October 14, Defendant was personally corresponding with Plaintiffs' counsel about the lawsuit, asserting his own legal theories concerning the parties' relationship, criticizing the claims, and threatening responsive litigation. See ECF Nos. 20, 23.

On October 20, Plaintiffs' counsel asked Defendant to provide an address for service or waive formal service. Defendant provided no service address and did not execute a waiver. That same day,

[2] Rapport filed a related action in the Cuyahoga County Court of Common Pleas, Case No. CV-26-136153, on April 2, 2026, to preserve claims subject to Ohio's one-year limitations period when difficulties perfecting service in this federal action created a risk of dismissal under Fed. R. Civ. P. 4(m). The state action also addresses defamatory and false-light publications occurring after the federal complaint was filed. Waiver of Count X here avoids overlapping adjudication and duplicative recovery.

Plaintiffs' counsel transmitted to Defendant's actively used email address the Summons, Complaint, unsealed exhibits, Notice of a Lawsuit and Request to Waive Service of a Summons (AO 398), and Waiver of the Service of Summons (AO 399). On October 21, Zack Shapiro of Rains LLP, who identified himself as Defendant's corporate counsel, contacted Plaintiffs' counsel and addressed the Complaint and its factual and legal basis. Plaintiffs' counsel contemporaneously memorialized that Mr. Shapiro had acknowledged receipt of the October 20 materials and that he declined to accept service, waive service, or provide Defendant's physical address. Mr. Shapiro did not correct those points when expressly invited to do so, and later confirmed in writing that he represented Defendant as corporate counsel and maintained that he had no obligation to accept service, waive service, or provide Defendant's address. See ECF No. 23 and accompanying exhibits.

Plaintiffs nevertheless continued to pursue formal service rather than rely upon Defendant's actual notice. On October 28 and 29, Plaintiffs moved for alternative service after a professional process server and skip trace failed to identify a valid residential address. The Court denied that request without prejudice and directed Plaintiffs to first submit a service packet for mailing by the Clerk under Local Rule 4.2. Plaintiffs promptly complied; the Clerk mailed the Summons and Complaint by certified mail on November 3, and USPS recorded delivery at the Lenora Street address on November 8. The Court later determined that the Clerk-directed mailing did not complete service because the postal record did not contain the signed return receipt required by Ohio Civ. R. 4.1(A)(1)(a). The Court denied Plaintiffs' first application for default without prejudice and extended the service period. ECF Nos. 19–21.

On February 18, 2026, Plaintiffs renewed their motion for alternative service, supported by the documented history of Defendant's actual notice, the unsuccessful traditional service efforts, and additional evidence concerning Defendant's unknown residence. ECF No. 23. After further proceedings, Judge Fleming remanded the publication issue for determination of whether Ohio Rev. Code § 2703.14(I) applied, whether Plaintiffs had exercised reasonable diligence in attempting to locate Defendant, and whether publication was authorized. ECF No. 26.

On May 1, 2026, the Court found that Defendant was not an Ohio resident, that his residence could not be ascertained, that Ohio Rev. Code § 2703.14(I) applied, and that Plaintiffs had exercised reasonable diligence in attempting to locate him. The Court expressly relied upon Plaintiffs' use of a professional process server, a skip trace, investigation of multiple potential addresses, and a private investigator, and authorized service by publication. ECF No. 29. On June 5, Judge Fleming affirmed the findings that § 2703.14(I) applies and that Plaintiffs exercised reasonable diligence, and held that publication was authorized for the entire action rather than only selected claims. ECF No. 31.

Plaintiffs commenced publication through the Daily Legal News on May 13, 2026 and completed the six successive weekly publications on June 17, 2026. Plaintiffs filed proof of completed publication on June 18. ECF Nos. 32, 32-1. Service was therefore completed through the method expressly authorized by the Court after an express finding of reasonable diligence. Defendant's response deadline expired on July 15, 2026. Defendant did not answer, move, appear, or otherwise defend.

The service record thus rests on two independent and mutually reinforcing facts: formal service was completed through the publication procedure authorized by the Court for the entire action, and Defendant had actual notice of the lawsuit and its contents many months earlier through direct communications with Plaintiffs' counsel and counsel already representing him in corporate matters. Plaintiffs do not rely on actual notice as a substitute for formal service; however, the actual-notice record independently confirms that Defendant received notice of the action and had a sustained opportunity to appear and defend before default was entered.

## D. Personal Jurisdiction

The Court possesses specific personal jurisdiction over Defendant Michael Chapiro. Defendant deliberately entered and maintained a continuing commercial, contractual, fiduciary, executive, and technological relationship centered in substantial part on Radian's physical research-and-development operation in Cleveland, Ohio. Defendant knew that location before joining the venture, personally formalized Cleveland as Radian's principal hardware location, personally used the Cleveland location in federal business records, financed technical work being performed there, physically shipped

experimental equipment there, and obtained through that relationship the technology, confidential information, corporate access, and commercial opportunities that form the subject of this action.

Those contacts satisfy Ohio Rev. Code § 2307.382 and the constitutional requirements for specific personal jurisdiction. Plaintiffs respectfully request that the Court make an express finding of personal jurisdiction in connection with entry of final judgment. The supporting facts and authorities were previously set out in ECF No. 20 and incorporated as Exhibit B to ECF No. 30; they are further developed below.

### 1. Ohio Law Authorizes Personal Jurisdiction

Federal Rule of Civil Procedure 4(k)(1)(A) establishes personal jurisdiction over a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located. Ohio Rev. Code § 2307.382(A)(1) authorizes personal jurisdiction over a person as to causes of action arising from that person's "[t]ransacting any business in this state." Section 2307.382(C) further authorizes Ohio courts, in addition to the enumerated grounds in subsection (A), to exercise personal jurisdiction "on any basis consistent with the Ohio Constitution and the United States Constitution."

Defendant transacted business in Ohio through a sustained course of commercial conduct. He entered an ongoing cofounder relationship with Rapport in Ohio; became Chief Executive Officer of Radian; entered multiple agreements governing the parties' continuing obligations; committed development capital to technical work performed in Cleveland; directed communications, corporate activity, and property into Cleveland; used the Cleveland operation in corporate and federal records; obtained continuing access to technical work maintained there; and participated in the commercialization, financing, and government-interfacing activities of the enterprise.

These acts constitute a continuing course of business deliberately connected to Ohio and satisfy § 2307.382(A)(1). The same course of conduct establishes the constitutional basis recognized by § 2307.382(C).

### 2. Defendant's Ohio Contacts Control the Due-Process Inquiry

The constitutional inquiry focuses on "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984). *Keeton* assigns the minimum-contacts inquiry to the defendant: "a plaintiff is not required to have 'minimum contacts' with the forum State before that State is permitted to assert personal jurisdiction over a nonresident defendant." *Id.* at 779–80. The relevant contacts are therefore Defendant Chapiro's deliberate contacts with Ohio.

That conduct began with actual knowledge of the Ohio location. In Rapport's initial July 30, 2024 communication, before the parties formed Radian or entered their subsequent agreements, Rapport expressly informed Defendant that he had "moved back to Ohio." (Ex. C1 — Initial Conversations.) The parties then discussed Rapport's technology, technical-development plans, potential government funding, commercialization strategy, engineering requirements, and business structure. On August 1, Defendant affirmatively asked Rapport, "Are you looking for a co-founder?" (*Id.*) Defendant thereafter agreed to join the venture and identified business development, strategy, and government interfacing as his principal responsibilities.

Defendant thus chose to establish the parties' continuing commercial relationship with express knowledge that Rapport and the technical-development program were located in Ohio. *Keeton* further recognizes that a plaintiff's forum residence may enhance defendant-created contacts when the defendant's relationship with the plaintiff makes that state a focus of his activities. 465 U.S. at 780. Here, the jurisdictional connection is not simply Rapport's residence; it is Defendant's deliberate decision to enter and maintain a commercial relationship involving the Cleveland research-and-development operation.

### 3. Defendant Made Cleveland an Express Part of Radian's Operating Structure

Defendant subsequently adopted Cleveland as part of the venture's formal and actual operating structure.

Defendant personally created the September 9, 2024 *Name Change and Incorporation* document designating Rapport's Cleveland location as Radian's "principal place of business for

hardware." (Compl. ¶¶ 63–65; Compl. Ex. A1 at 12.) Defendant also personally submitted Radian's federal System for Award Management registration using the Cleveland address as the Company's business location. (ECF No. 20, PageID ## 995–96; Rapport Decl. ¶ 6.)

Defendant made the same Ohio representation in Radian's DD Form 2345, which identified 1893 W. 54th St., Cleveland, Ohio as Radian's physical address and identified Defendant as Radian's CEO and primary Data Custodian. The U.S./Canada Joint Certification Program approved the certification on December 9, 2024. (Ex. F8 — Government Forms and Certifications.)

The Company's actual operations matched those designations. Cleveland was Radian's sole operating location for research and development, engineering, hardware, experimentation, prototype work, and technical development. Rapport performed Radian's engineering and experimental work there and maintained its physical hardware, prototypes, technical records, and development materials there. Defendant served as the Company's Chief Executive Officer with continuing knowledge of those operations. (ECF No. 20, PageID ## 995–96; Rapport Decl. ¶¶ 2–4.)

These facts establish Ohio as an operating location deliberately recognized, used, and incorporated into the business by Defendant himself.

The Sixth Circuit's decision in *Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998), provides direct support. *Cole* held that a nonresident who transacts business through communications with an Ohio resident and creates a "continuing obligation in Ohio" purposefully avails himself of the forum. *Id.* at 436. Where the cause of action arises from that relationship, the exercise of specific jurisdiction is presumptively proper. *Id.*

Defendant's relationship with Ohio involved an extensive set of continuing obligations. He served as CEO; entered the Founders Agreement and other corporate agreements; entered a formal financing agreement; participated in federal contracting and investment activity; exercised access to corporate and technical systems; participated in decisions regarding the technology and hardware maintained in Cleveland; and undertook continuing fiduciary, contractual, financial, and commercial responsibilities toward the venture.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), likewise recognizes purposeful availment where a commercial actor reaches across state lines and creates “continuing relationships and obligations” with forum residents. *Id.* at 473. The analysis considers the parties’ prior negotiations, contemplated future consequences, contractual terms, and “actual course of dealing.” *Id.* at 479.

The parties’ actual course of dealing establishes a sustained Ohio-centered commercial relationship.

### 4. Defendant Personally Financed Technical Development in Cleveland

Defendant’s financial commitments further tied his own conduct to the Cleveland technical operation.

The written Loan Agreement required Defendant to provide Radian with an initial $30,000 loan upon execution and an additional $30,000 upon achievement of a specific indoor-pointing technical milestone. (Compl. ¶ 68; Compl. Ex. A1 at 48.) The second tranche was therefore expressly tied to progress in the experimental and engineering program Rapport was conducting in Cleveland.

Defendant entered that financing arrangement with knowledge of the location and purpose of the development program. The committed capital funded the work Rapport was performing in Cleveland, including hardware acquisition, experimentation, engineering, and prototype development. (Rapport Decl. ¶ 7.)

The financing relationship therefore created another continuing Ohio contact: Defendant personally committed capital to advance specified technical development occurring in Cleveland and tied additional funding to achievement of a technical milestone within that program.

The same financing relationship forms part of the operative facts underlying Plaintiffs’ contract, fiduciary-duty, fraud, conversion, civil-theft, fraudulent-transfer, and racketeering claims. ECF No. 20 at PageID 996–98.

### 5. Defendant Physically Shipped Experimental Equipment to Cleveland

Defendant’s participation in the Cleveland technical program included direct shipments of physical property into Ohio.

During Radian's experimental-development program, Defendant personally shipped a camera to Rapport at the Cleveland R&D location for use in the technical work being performed there. Rapport physically received the camera in Cleveland. Defendant also sent additional electronics and equipment to the Cleveland operation. (Rapport Decl. ¶ 8.)

The contemporaneous correspondence concerning the camera reflects its use and subsequent return and records Defendant's direct participation in decisions concerning the equipment. (Ex. C3 at 25–29, *Rapport's Email Exchange with telescopes.net*.)

The shipments constitute direct physical contacts created by Defendant in furtherance of the parties' commercial and technical relationship. Defendant knew the location of the R&D operation, participated in its work, and sent physical equipment into Ohio to support that work.

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 365 (2021), reinforces the significance of Defendant's own Ohio-directed conduct. In *Ford Motor*, the Supreme Court distinguished *Walden v. Fiore*, 571 U.S. 277 (2014), because the *Walden* defendant had created no forum contacts of his own: he had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Ford Motor*, 592 U.S. at 365 (quoting *Walden*, 571 U.S. at 289). Here, Defendant himself repeatedly created contacts with Ohio through communications, shipments, R&D activity, financing efforts, and conduct directed toward the Cleveland-based work underlying this litigation. Those are Defendant-created forum contacts of the kind absent in *Walden*.

Defendant Chapiro created each of those forms of commercial connection relevant here. He knowingly established a continuing relationship with an Ohio-based technical operation, repeatedly communicated into Ohio in carrying out that relationship, financed technical development there, formally designated Cleveland as Radian's hardware business location, personally used that address in federal business records, and physically sent experimental equipment into Ohio.

These acts establish purposeful availment through Defendant's own affirmative conduct.

## 6. Defendant Obtained Access to the Property and Information at Issue Through the Ohio-Centered Relationship

Defendant's Ohio-centered relationship also supplied his access to the technology, confidential information, and electronic records central to this action.

Rapport developed and maintained Radian's technical work through the Cleveland operation. The Company's experimental apparatus, technical records, engineering work, source materials, prototypes, confidential files, and associated intellectual-property materials were generated or maintained there. Defendant received access to that body of work through his role as cofounder and Chief Executive Officer and through the agreements governing the parties' relationship.

Defendant's contractual and fiduciary duties concerning the use, protection, confidentiality, retention, ownership, and return of those materials arose from the same continuing relationship. Defendant later admitted retaining "a backup of the company Drive," and the Complaint establishes his subsequent retention, use, disclosure, ownership assertions, and commercialization activities concerning Plaintiffs' technical and corporate materials. (Compl. ¶¶ 160–161, 209–211.)

The Sixth Circuit's decision in *SunCoke Energy, Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211 (6th Cir. 2009), further supports the jurisdictional significance of this relationship. *SunCoke* involved access to forum-originated confidential technical information through an ongoing commercial relationship and continuing duties governing the protection and return of that information. *Id.* at 217–21.

The relationship here follows the same jurisdictionally significant pattern. Defendant entered the Ohio-centered venture, obtained access through that relationship to technical and confidential material generated and maintained through the Cleveland operation, assumed continuing obligations concerning that material, and later engaged in the conduct concerning those materials that forms the basis of Plaintiffs' claims.

### 7. Plaintiffs' Claims Arise Out of and Relate to Defendant's Ohio Contacts

Plaintiffs' causes of action arise from the same continuing course of dealing that created Defendant's Ohio contacts.

The contract, fiduciary-duty, fraud, conversion, civil-theft, fraudulent-transfer, and related claims (Counts XI–XVIII) arise from the agreements, money, property, governance rights, financial transactions, and continuing obligations created through Defendant's relationship with Rapport and Radian.

The DTSA, OUTSA, CFAA, unjust-enrichment, conspiracy, and related proprietary- information claims (Counts I, IX, XX–XXII) arise from Defendant's access to, acquisition of, retention of, disclosure of, use of, and ownership assertions concerning technical information obtained through the Ohio-centered business relationship.

The RICO and Ohio Corrupt Activities claims (Counts IV–VIII) arise from the same commercial course of conduct, including use of Plaintiffs' technology and property, financial transactions, diversion of corporate resources and opportunities, representations concerning ownership and authority, and commercial activity undertaken through rights and access obtained from the Radian relationship.

The Lanham Act, ACPA, tortious-interference, and related business-tort claims (Counts II–III, XIX) concern Defendant's use of Plaintiffs' commercial identity, technology, ownership rights, business relationships, and opportunities developed through that same enterprise.

The jurisdictional contacts and the causes of action therefore share a common factual nucleus: Defendant's decision to join, finance, manage, obtain access to, and commercialize an enterprise whose technical operations were conducted in Cleveland.

*Ford Motor* confirms that the constitutional relatedness inquiry encompasses claims that "arise out of or relate to" the defendant's purposeful forum contacts. 592 U.S. at 359, 361–65. Here, the connection is direct. The Ohio relationships, transactions, property, technology, access rights, and continuing obligations that establish purposeful availment are the same relationships and interests from which the causes of action arise.

### 8. Exercise of Jurisdiction in Ohio Is Reasonable

The exercise of jurisdiction in Ohio follows naturally from Defendant's deliberate course of conduct.

Ohio was the center of the venture's physical technical operations. Its research, engineering, experimentation, hardware, prototypes, and many technical records were located in Cleveland. Defendant knew those facts, formally recognized the Cleveland operation, used the Cleveland address in business records, financed work being performed there, physically sent equipment there, and obtained through the resulting relationship the property, information, and access underlying this action.

Ohio therefore has a substantial interest in adjudicating claims arising from commercial obligations directed into the State, physical and intellectual property maintained here, technical development performed here, and business relationships carried out through an Ohio operating location.

Defendant's own interstate commercial activities further demonstrate the reasonable foreseeability of litigation arising where those activities were purposefully conducted. He managed Radian across state lines, entered interstate contracts and financial arrangements, pursued federal contracting and investment activity, directed property into Ohio, and participated continuously in an Ohio-based development program.

Under *Cole*, *Burger King*, *Keeton*, *Ford Motor*, and *SunCoke*, those deliberate contacts establish purposeful availment, a direct relationship between Defendant's Ohio activities and Plaintiffs' claims, and a reasonable basis for the exercise of specific jurisdiction.

### 9. Requested Finding of Personal Jurisdiction

Based on the Complaint and the contemporaneous record, Plaintiffs respectfully request that the Court expressly find that it possesses specific personal jurisdiction over Defendant Michael Chapiro; that Defendant transacted business in Ohio within the meaning of Ohio Rev. Code § 2307.382(A)(1); that the exercise of jurisdiction is independently authorized by § 2307.382(C); and that Defendant's deliberate Ohio contacts satisfy the constitutional requirements for specific personal jurisdiction.

The record establishes that Defendant entered the parties' commercial relationship with actual knowledge that Rapport and the technical-development program were located in Ohio; personally proposed and entered the cofounder relationship; served as Chief Executive Officer of the resulting enterprise; personally designated Cleveland as Radian's principal hardware location; personally used that location in federal business records; entered continuing contractual, fiduciary, executive, and financial obligations connected to the Cleveland operation; committed capital to technical development performed there; physically sent experimental equipment there; and obtained through that relationship the property, confidential information, corporate access, and commercial rights at issue in this action.

Plaintiffs' claims arise out of and relate to those contacts. Plaintiffs respectfully submit that this Court therefore possesses specific personal jurisdiction over Defendant Michael Chapiro and may enter final judgment on the claims adjudicated in this action.

### E. Entry of Default

After service by publication was completed on June 17, 2026, Defendant's deadline to plead or otherwise defend expired on July 15, 2026. Defendant filed no answer, motion, appearance, or other response. Plaintiffs therefore applied to the Clerk for entry of default under Federal Rule of Civil Procedure 55(a). On July 21, 2026, the Clerk entered Defendant's default. ECF No. 35.

By virtue of Defendant's default, the Complaint's well-pleaded factual allegations concerning liability are admitted, except allegations relating to the amount of damages. *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995). Defendant's default therefore establishes the operative misconduct and Plaintiffs' entitlement to relief on legally sufficient claims, while leaving the determination of damages and the appropriate scope of equitable relief for this Court.

### F. Plaintiffs' Motion Under Federal Rule of Civil Procedure 55(b)(2)

Plaintiffs thereafter moved under Federal Rule of Civil Procedure 55(b)(2) for entry of default judgment. Because the relief requested includes substantial compensatory damages, statutory enhancements, attorney's fees, and permanent equitable relief, Plaintiffs requested leave to supplement the motion with a detailed memorandum, declarations, calculations, and supporting exhibits.

The Rule 55(b)(2) motion preserves Plaintiffs' request for prompt entry of judgment and provides the Court the evidentiary record supporting the relief requested.

### G. Request for Targeted Supplementation and Hearing

The submitted record supports entry of judgment on the requested relief. If the Court identifies a specific issue concerning the legal sufficiency of a pleaded claim, an exhibit's foundation or admissibility, or the evidentiary or computational support for a monetary award, Plaintiffs request an opportunity to address that issue through targeted supplemental briefing, declarations, documentation, revised calculations, or testimony. Plaintiffs further request an evidentiary hearing or referral under Rule 55(b)(2) for any matter the Court determines warrants further examination.

If an identified issue requires amendment of the Complaint, Plaintiffs request an opportunity to move for leave to amend under Rule 15 and to complete the applicable notice and service procedures before adjudication of the amended pleading.

### H. Purpose of This Supplemental Memorandum

This Supplemental Memorandum provides the factual, legal, and computational basis for the monetary and equitable relief requested in Plaintiffs' pending motion for default judgment. It addresses each distinct category of injury separately, explains the evidence and methodology supporting the requested amount, and organizes primary and alternative damages measures so that each distinct economic injury is awarded once.

The Memorandum also addresses statutory and enhanced damages, attorney's fees and litigation expenses, declaratory and permanent injunctive relief, an accounting and disgorgement, prejudgment and post-judgment interest, and continuing enforcement of the Court's judgment.

Plaintiffs incorporate the Complaint, previously filed declarations, docket materials, and accompanying exhibits without repeating the complete factual record. The discussion that follows is limited principally to the evidence necessary to quantify Plaintiffs' losses, measure Defendant's enrichment, define the relief required to remedy the injuries established by default, and support entry of a final enforceable judgment.

## III. Legal Framework for Determining Damages and Relief

### A. Damages May Be Established Through a Just and Reasonable Estimate

Where the nature of the wrong prevents exact computation, damages may be determined through a just and reasonable estimate grounded in relevant evidence. The factfinder may rely on probable and inferential proof, and the resulting award may be approximate when supported by a reasonable evidentiary basis. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–65 (1931); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–66 (1946).

This principle is especially important where the defendant's misconduct has made a more exact calculation difficult. In those circumstances, the risk of uncertainty falls on the party whose concealment, diversion of opportunities, retention of records, or unauthorized exploitation of property produced the evidentiary gaps.

Plaintiffs therefore present calculations derived from contemporaneous agreements, financial records, technical materials, commercial submissions, Defendant's own statements and projections, documented expenditures, and reasonable economic assumptions. Each requested amount is accompanied by its methodology and, where appropriate, alternative measures. Those materials provide the Court with a reasonable basis to estimate the damages caused by Defendant's conduct despite the measurement gaps his conduct created.

The economic models presented in Appendices B–E employ traditional, established methods of economic valuation regularly and reasonably relied upon by economic experts, including discounted present-value analysis and royalty-based modeling. Their assumptions, inputs, formulas, and computational steps are expressly disclosed, making the results transparent, reproducible, and testable. The methodologies therefore possess the reliability characteristics recognized in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–95 (1993).

## B. Defendant Misappropriated Substantial Trade Secrets Beyond Plaintiffs' Patent Disclosures

Defendant's misappropriation encompassed confidential technical materials extending substantially beyond Plaintiffs' patent disclosures. The Complaint identifies Defendant's retention and third-party dissemination of the restricted "Private" folder containing technical materials for both inventions, and Exhibit B4 includes analyses, designs, and software. (Compl. ¶¶ 160–63, 209, 353–55; Ex. B4 — Technical Materials.) Those materials support trade-secret relief in their own right. In *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479–85, 491–92 (1974), the Supreme Court held that patent law permits protection of confidential technical information under Ohio trade-secret law. The DTSA and OUTSA protect independently valuable technical information maintained through reasonable secrecy measures. 18 U.S.C. § 1839(3); Ohio Rev. Code § 1333.61(D). Plaintiffs used restricted access, encryption, contractual confidentiality obligations, and revocation of Defendant's access to protect this body of intellectual property. (Compl. ¶¶ 76–78, 161–62, 354.)

The Vacuustat materials illustrate the confidential technical knowledge Defendant obtained. Rapport filed his initial patent application in 2015 and subsequently developed detailed engineering implementations. Exhibit B4 includes Rapport's original mathematical analyses and engineering primer, followed by his March 2020 structural-engineering report containing CAD designs, finite-element simulation results, material evaluations, component specifications, and manufacturing-oriented drawings. Additional schematics document further component-level detail. The Complaint identifies Defendant's access to the underlying Vacuustat calculations and CAD files. (Compl. ¶¶ 97, 161–62, 187, 353; Ex. B4 — Technical Materials at 2–40.) The 2020 materials document substantial post-patent-filing technical development within the misappropriated confidential package.

The Artifact materials likewise extend beyond the provisional patent filing into the software and hardware know-how needed to implement and validate the invention. Exhibit B4 includes Rapport's video analysis and data analysis software, performance-calculation programs, and acquisition, tracking, and pointing analysis. The Complaint identifies the retained "Private" folder as

containing software and technical data capable of reproducing the Artifact technology and validating experimental results from raw data through final figures. (Compl. ¶¶ 75, 161–63, 209, 353–55; Ex. B4 — Technical Materials at 41–56.) These concrete implementations and validation methods are substantial confidential knowledge implicated by Defendant's retention and disclosure of the archive.

The March 2020 Vacuustat engineering work postdates the initial 2015 filing and demonstrates the accumulation of additional technical knowledge. The separately maintained Artifact code and data likewise identify implementation knowledge beyond Rapport's provisional patent filing. The content of each claimed secret, its relationship to the relevant patent disclosure, and Plaintiffs' confidentiality measures establish the scope of trade-secret protection. Plaintiffs request damages, accounting, and prospective relief encompassing Defendant's misappropriation of these independently valuable confidential materials in addition to the patented inventions.

### C. Trade-Secret Damages Permit Alternative Measures, Including a Reasonable Royalty

The Defend Trade Secrets Act (DTSA) authorizes recovery of actual loss caused by misappropriation together with distinct unjust enrichment attributable to the misappropriation. Alternatively, the Court may measure damages through a reasonable royalty for Defendant's unauthorized disclosure or use of the trade secret. 18 U.S.C. § 1836(b)(3)(B). The Ohio Uniform Trade Secrets Act (OUTSA) provides the same basic framework, permitting recovery of actual loss and unjust enrichment or, in lieu of those measures, a reasonable royalty equitable under the circumstances. Ohio Rev. Code § 1333.63(A).

These statutory measures support a flexible valuation framework tailored to the nature of the information, Defendant's use of it, the resulting economic consequences, and the evidence available. *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538–39 (5th Cir. 1974). Plaintiffs present actual-loss, unjust-enrichment, and reasonable-royalty calculations, supported by the parties' actual license terms, projected commercial use, Defendant's contemporaneous valuations and commercialization plans, the scope of the rights appropriated, development and competitive head start, and avoided costs. Each distinct economic injury supports one recovery, while alternative valuation

methods permit the Court to select the measure best supported by the record. Unjust enrichment supports an additional recovery where it represents a separate economic benefit.

A reasonable royalty measures the value of the rights appropriated in the commercial setting in which Defendant intended to use them. The royalty is determined through a hypothetical negotiation conducted as of the time the misappropriation began. The inquiry asks what a willing owner and a willing user, each reasonably seeking agreement and possessing the information then known or reasonably foreseeable, would have agreed was fair compensation for the particular disclosure and use Defendant intended to make. The resulting award may take the form of a running royalty, a lump-sum license fee, or another payment structure appropriate to the scope and duration of the assumed license.

In *University Computing*, the Fifth Circuit identified several considerations relevant to that negotiation: the resulting and foreseeable change in the parties' competitive positions; prices previously paid by purchasers or licensees; the total value of the secret to its owner, including its importance to the owner's business; the nature and extent of the defendant's intended use; and other circumstances that would have affected the parties' bargain, including the availability of legitimate alternatives. 504 F.2d at 537–39. The Sixth Circuit has applied the same reasonable-royalty framework under Ohio trade-secret law. *Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510–11 (6th Cir. 2005).

*University Computing* further recognizes that development cost is one relevant consideration within a broader valuation of the trade secret's commercial use. The valuation therefore accounts for the commercial setting of the misappropriation, the foreseeable consequences of disclosure and use, the scope of Defendant's intended exploitation, and the economic position Defendant sought to obtain. Defendant's own contemporaneous statements concerning the technology's price, financing potential, enterprise value, contract opportunities, and expected commercial use provide direct evidence relevant to that inquiry. *See University Computing*, 504 F.2d at 539–40.

The familiar *Georgia-Pacific* considerations also provide an additional, originally patent-specific framework for examining the economic terms of the hypothetical license. Relevant considerations include existing licenses for the same technology, the exclusivity and duration of the rights conveyed, the commercial relationship of the parties, the technology's expected utility and profitability, legitimate alternatives, the extent to which the protected technology contributes to the contemplated product or service, and the amount the parties reasonably would have agreed upon through arm's-length negotiation. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom.*, *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers Inc.*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971).

The hypothetical negotiation evaluates the full scope of the rights Defendant actually appropriated. Those rights include acquisition, possession, disclosure, submission to government agencies or investors, use in proposals and fundraising, further development, commercialization, and use through affiliated or competing entities. The assumed compensation therefore corresponds to the breadth, duration, commercial reach, and consequences of the exploitation Defendant undertook and the rights he asserted.

The negotiation also incorporates the economic position Defendant sought through those rights. Relevant evidence includes the scale of the programs Defendant proposed, the financing and enterprise valuations he sought, the applications and markets he identified, the deployment volumes he projected, the competitive position he expected to secure, and the development advantage he attributed to possession of the technology. These contemporaneous values illuminate the value Defendant placed on the rights he appropriated and the economic benefit he expected them to produce.

Plaintiffs' existing Vacuustat license provides a direct benchmark because it is a license between Rapport and Radian governing the Vacuustat, entered before Defendant's later unauthorized commercialization activity. That agreement establishes a five-percent royalty on qualifying revenues through expiration of the patent. (Compl. ¶¶ 67–74; Ex. A1 — Corporate Records at 50–52.) Defendant subsequently assumed a substantially broader, effectively royalty-free commercial position encompassing

use outside Radian's authorized commercialization framework, investor and government disclosure, competing commercialization, and control over further development and exploitation. A lawful license conveying comparable rights would therefore price both the breadth of the commercial authority granted and the continuing royalty participation Rapport would surrender.

Plaintiffs therefore present a reasonable-royalty calculation grounded in the existing license, the scope of Defendant's intended use, the parties' contemporaneous statements concerning value, the parties' commercialization plans, Defendant's financing proposals and valuations, the technology's expected economic utility, the development advantage conferred, and the scarcity of legitimate substitutes. These considerations permit the Court to determine an appropriate running royalty or the lump-sum value of the unauthorized royalty-free license that Defendant effectively assumed without authorization. The reasonable-royalty calculation operates as an alternative measure for the unauthorized disclosure and use of the misappropriated technology valued through actual-loss and unjust-enrichment methods.

Where alternative legally authorized measures produce different valuations of the same injury, Plaintiffs request judgment based on the highest valuation supported by the evidence and authorized by the governing statute, subject to Fed. R. Civ. P. 54(c) and the prohibition against duplicative recovery. Plaintiffs request separate findings identifying each compensable injury, its evidentiary and legal basis, and the amount awarded. Unjust enrichment remains separately recoverable to the extent it reflects an economic benefit not already included in the selected measure of Plaintiffs' actual loss.

### D. Defendant Willfully and Maliciously Misappropriated Plaintiffs' Trade Secrets

Defendant acknowledged that Rapport is the sole inventor and that Defendant had made no inventive contribution to the technologies at issue. He also understood that his access arose solely from his position within Radian, the parties' confidential relationship, and agreements restricting use, disclosure, retention, and commercialization. After dissolution, Defendant retained unauthorized copies of Plaintiffs' technical files and corporate records, acknowledged possessing a backup of the company's Google Drive, withheld access to corporate email and other infrastructure, and made an

extortionate demand for a payment of $15,000. He used the retained materials through entities he separately controlled and presented Plaintiffs' technologies to investors, government agencies, and prospective strategic partners as intellectual property available for his own commercialization efforts.

Defendant's contemporaneous communications confirm that he was aware that the intellectual property he misappropriated contained sensitive trade secrets. In the mass venture-capital email solicitation that generated the April 17 Khosla Ventures meeting, Defendant expressly recognized the secrecy of the underlying technology, telling prospective investors: "We will certainly not be sharing a deck with technology or architecture details given the highly sensitive nature of this area." (Ex. C3 — Corporate Communications at 13–14.) Nevertheless, he used the existence, validation, and commercial potential of Plaintiffs' technologies to solicit institutional capital. His email omitted Rapport's name and Radian's name, identified Defendant as the person handling investor inquiries, and invited prospective investors to arrange an introductory call through him.

That solicitation also demonstrates Defendant's commercial motive: he pursued large-scale financing on the strength of the technologies while withholding their sensitive architecture. The specific valuation projections and diverted investor engagement are established in Section V(F), and the proprietary rights Defendant asserted through his ventures are addressed in the technology-specific damages sections. (Ex. C3 — Corporate Communications at 13–14; Ex. C6 — Signal Export [SEALED].)

Defendant's misconduct continued even after he had unmistakable notice that he no longer held any position at Radian. He retained Rapport's trade secret materials after dissolution, continued to assert or imply rights in technologies he knew he had not invented, pursued opportunities through competing entities, and disclosed confidential information to persons and agencies outside the authorized venture. His seizure of Radian's corporate systems and records also deprived Plaintiffs of the information necessary to determine the full scope of his unauthorized uses, derivative work, financing activity, and resulting benefit.

Defendant has now defaulted and has provided no accounting for his conduct. The foregoing facts establish intentional misappropriation and use for competitive and financial gain, accompanied by concealment, continued use after notice, and deliberate interference with Plaintiffs' ability to recover and protect their trade secrets.

Because of these deliberate and intentional acts, the DTSA authorizes exemplary damages of up to twice the damages awarded for the misappropriation, together with reasonable attorney's fees. 18 U.S.C. § 1836(b)(3)(C)–(D). Ohio law independently permits punitive or exemplary damages of up to three times the award for willful and malicious misappropriation and authorizes attorney's fees on the same basis. Ohio Rev. Code §§ 1333.63(B), 1333.64(C).

**E. Avoided Costs and Head-Start Benefits Are Cognizable Enrichment**

Unjust enrichment under the DTSA and OUTSA includes economic benefits beyond profits realized from completed sales. A misappropriator receives economic benefit by avoiding the time, expense, risk, and unsuccessful experimentation that would have been required to acquire or develop equivalent information through legitimate means. 18 U.S.C. § 1836(b)(3)(B)(i)(II); Ohio Rev. Code § 1333.63(A).

Courts therefore recognize avoided research-and-development costs and development head start as permissible measures of enrichment when the evidence connects the misappropriated information to the advantage obtained. In *Epic Systems Corp. v. Tata Consultancy Services Ltd.*, the Seventh Circuit upheld the use of avoided research-and-development costs where the stolen information gave the defendant a significant head start in developing and positioning a competing product. 980 F.3d 1117, 1129–33 (7th Cir. 2020). The Third Circuit has likewise recognized that avoiding substantial research-and-development costs may constitute real and redressable harm resulting from trade-secret use. *Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892, 913–14 & n.21 (3d Cir. 2021).

In *PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co.*, 47 F.4th 156, 161–66 (3d Cir. 2022), the Third Circuit affirmed an unjust-enrichment award measured by the plaintiff's research-and-development costs. The evidence showed that the defendants acquired the technology to save both money

and approximately ten years of development time, and that the plaintiff's costs reasonably approximated what the defendants would have had to expend to create equivalent information legitimately. PPG's supporting declaration included salaries, benefits, engineering hours, materials, equipment, consultants, overhead, testing, and other expenditures specifically attributable to developing the misappropriated technology. *See PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co.*, No. 2:15-cv-965, ECF No. 170, at 8–12, 20–23 (W.D. Pa. June 8, 2021).

Avoided cost and head-start value are related but distinct concepts. Avoided cost measures the expenditures Defendant escaped by stealing Plaintiffs' work rather than recreating it legitimately. Head-start value measures the economic advantage of beginning from Rapport's accumulated technical knowledge, expertise, and insight, without having independently developed either technology, rather than starting from the position available to an independent developer. That advantage may include earlier access to financing and government opportunities, elimination of failed approaches, accelerated product development, and earlier entry into the market.

A commercial head start confers substantial economic value even when a competitor eventually develops technologically equivalent products. Clayton M. Christensen's study of the disk-drive industry in *The Innovator's Dilemma* provides a striking example. When entrants introduced smaller 8-inch disk drives, two-thirds of the established 14-inch-drive manufacturers never introduced a competing model, while the remaining one-third introduced 8-inch models approximately two years after the entrants. Their products were nevertheless equivalent in performance, including capacity, recording density, access time, and price per megabyte. Despite their technological competitiveness, every established 14-inch-drive manufacturer was ultimately driven from the industry. Christensen attributed their failure to delayed entry into the emerging market rather than any inability to develop competitive products. Clayton M. Christensen, *The Innovator's Dilemma: When New Technologies Cause Great Firms to Fail* 4, 18–19 (1997).

Christensen documented the same importance of early market entry across subsequent technological transitions. By 1995, the initial entrant firms controlled 98 percent of the $130 million

market for 1.8-inch disk drives. His broader analysis found that firms entering emerging disk-drive markets within their first two years were six times more likely to succeed than later entrants. Thirty-seven percent of firms entering emerging markets achieved at least $100 million in annual revenue, compared with only six percent of firms entering established markets. *Id.* at 26, 164, 166–67. These findings illustrate that the economic advantage conferred by a technological head start extends far beyond the costs of independently reproducing the underlying technology. Early access to valuable technical knowledge accelerates product development, financing, customer acquisition, and commercialization, allowing a competitor to establish a position that later entrants cannot readily displace, even when those entrants ultimately achieve equivalent technical performance. Defendant's misappropriation has allowed him to pursue financing and commercialization opportunities using Rapport's work. The economic benefit of that advantage must be considered in addition to the development costs he avoided.

The relevant inquiry encompasses what Plaintiffs historically spent, the information Defendant obtained, the advancement of Defendant's position, and the legitimate work required to reach an equivalent position independently.

Plaintiffs therefore include avoided costs and head-start benefits as measures of Defendant's enrichment. The calculations identify the technical work embodied in the misappropriated materials, the labor and resources reasonably necessary to reproduce that work, the development time bypassed, and the commercial position Defendant was able to assume by using Plaintiffs' technology. Where those benefits are distinct from Plaintiffs' actual loss, they support a separate unjust-enrichment recovery under the DTSA and OUTSA.

### F. Plaintiffs' Valuation Methods Are Supported by Established Case Law

Courts value early-stage intellectual property by reference to the commercial expectations that existed when the rights were appropriated, infringed, licensed, financed, or positioned for market entry. The governing inquiry focuses on the value the parties assigned to the technology in its commercial setting at the relevant time. Contemporaneous forecasts, projected sales, anticipated

profits, planned production volumes, expected pricing, licensing terms, financing positions, and commercialization roadmaps therefore provide affirmative evidence of value for prototype-stage and early-commercialization technology.

This projection-based method applies the trade-secret hypothetical-negotiation framework already established in Section III(C). The additional point developed here is evidentiary: contemporaneous forecasts and commercialization plans can establish the parties' expected value at the relevant date, even when commercial production has not yet occurred.

The Sixth Circuit applies the same principle to damages arising from impaired commercialization. In *Bailey v. Chattem, Inc.*, 684 F.2d 386, 388–89, 396–97 (6th Cir. 1982), the plaintiff transferred rights in an invention in exchange for a one-percent royalty, and the defendant failed to make reasonable efforts to commercialize the product. The defendant's vice president stated that he expected annual sales of approximately $4 million if commercialization succeeded. *Id.* at 397. The Sixth Circuit held that this evidence of a substantial market and the defendant's own sales expectation supported the jury's damages award, explaining that commercialization damages frequently allow for a reduced degree of precision. *Id.* This Circuit therefore recognizes projected commercial performance as probative evidence where misconduct impairs the realization of an invention's expected market.

Federal Circuit authority is still more explicit. In *TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895, 899–900 (Fed. Cir. 1986), the infringer characterized the invention as an "unproven product" and attacked its own pre-infringement profit forecast as speculative. The damages analysis relied principally on a memorandum prepared by the infringer's top management before infringement, which projected the profitability of the accused product. *Id.* at 899. Those anticipated economics supported a thirty-percent reasonable royalty. *Id.* The Federal Circuit affirmed, emphasizing that the internal forecast was especially probative because the infringer itself had used those figures in deciding whether to manufacture and market the product. *Id.* at 900. The resulting judgment exceeded $31 million. *Id.* at 897, 900–03.

*TWM* supplies a central principle of damages valuation methodology for this case: a party's own commercial forecast is admissible valuation evidence because it records the economic expectations on which that party acted. A forecast used to guide manufacturing, financing, licensing, investment, or commercialization decisions captures the expected value of the opportunity at the time those decisions were made.

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384–85 (Fed. Cir. 2001), applies the principle directly to projected future sales. The damages expert used a five-year business plan prepared by the infringer shortly before infringement, including projections that contemplated substantial growth in future sales. *Id.* at 1384. The Federal Circuit affirmed the damages award because the business plan reflected information available at the time of the hypothetical negotiation. *Id.* at 1385. The court recognized approximation and uncertainty as inherent characteristics of forward-looking commercial forecasts and treated the infringer's contemporaneous expectations as the relevant valuation evidence. *Id.*

*Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d 1354, 1357–60 (Fed. Cir. 1998), reinforces the same valuation principle in a dispute involving proprietary technology disclosed under a nondisclosure agreement. After receiving the technology, Rockwell declined to license it, assigned engineers who had learned the technology to a competing development program, and began shipping prototype chipsets incorporating the technology. *Id.* at 1357–58. The jury valued a paid-up license by applying a royalty rate to Rockwell's own projected sales and discounting the resulting stream to present value. *Id.* at 1358–60. The Federal Circuit affirmed the $57.658 million contract damages award and held that the projection-based methodology was supported by substantial evidence. *Id.* at 1359–60. The valuation therefore used the commercial forecasts available when the relevant use began and translated those expected sales into a present-value license valuation, supporting the present-value method employed in Plaintiffs' calculations.

*Snellman v. Ricoh Co.*, 862 F.2d 283, 289–90 (Fed. Cir. 1988), likewise confirms that expected market penetration may supply the royalty base. The jury considered evidence that Ricoh expected

and intended to manufacture and distribute approximately 40,000 to 50,000 infringing machines in the United States. *Id.* at 289. The Federal Circuit held that the projected-sales evidence was "relevant and proper" in determining a reasonable royalty and that the jury could calculate a lump-sum royalty from Ricoh's expected sales. *Id.* The court expressly relied on *TWM* and the economic expectations existing at the time of infringement. *Id.* at 289–90.

Trade-secret decisions expressly adopt these patent analyses. *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 188–91 (S.D.N.Y. 2002), held that an infringer's projected sales may be used in a trade-secret reasonable-royalty analysis when the projections reflect information available at the relevant valuation date. The court explained that such forecasts evidence the parties' perceived value of the trade secret when it was misappropriated and cited *Interactive Pictures*, *Snellman*, and *TWM* for that proposition. *Id.* at 188–89. Contemporaneous forecasts are probative because they document how decision-makers perceived commercial value while making the relevant decisions.

The valuation framework also gives substantial weight to the technology owner's contemporaneous valuation and bargaining position. A reasonable royalty models a negotiation between both sides. *University Computing*, 504 F.2d at 538–39. The Sixth Circuit has likewise treated actual bargaining positions and negotiated economic terms as strong evidence of value. *Vitro Corp. of America v. Hall Chemical Co.*, 292 F.2d 678, 682–83 (6th Cir. 1961), affirmed trade-secret damages based on minimum payments negotiated in an unconsummated agreement very similar to the LOIs in this action, describing the parties' negotiated terms as the best available measure of value. *Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510–13 (6th Cir. 2005), similarly upheld a substantial reasonable royalty grounded in evidence of how the parties themselves valued the information. The owner's reservation value and the user's expected-use value therefore form complementary sides of the valuation inquiry.

### 1. Plaintiffs' Models Translate the Parties' Commercial Assessments into Reproducible Calculations

The valuation models presented in this Memorandum apply these authorities in a disciplined and transparent form. Each model identifies a commercial pathway, states the economic inputs, identifies the evidentiary source for those inputs, calculates the resulting revenue or royalty stream, and discounts future amounts to present value. The principal assumptions governing scale, price, timing, commercialization structure, product performance, and expected use are tied to contemporaneous record evidence. Rapport's accompanying statement explains his technical and computational qualifications, the models' methodology, and the basis for their fifteen-percent discount rate. (Ex. F5 — Statement Regarding Valuation Models and Methodology.) The record contains unusually detailed commercial assessments from both Rapport and Defendant, developed during years of technical discussion, market research, fundraising, product planning, and commercialization activity.

The models also resolve discretionary choices in a deliberately restrained direction. They do not simply adopt the earliest commercialization date, largest deployment scale, highest price, or broadest market appearing in the record. Where the evidence supports a range or a more expansive commercial trajectory, the calculations frequently use conservative numerical interpretations, later revenue recognition, finite model horizons, or narrower application coverage. Those constraints provide an additional check on the projection-based methodology: the record defines a bounded recovery rather than a maximized one.

The parties' independent assessments also converge on the same broad economic proposition: both treated the Vacuustat and Artifact as platform technologies capable of supporting substantial commercial markets. Their statements supply complementary forms of evidence. Rapport's communications document the inventor's technical expectations, proposed applications, intended licensing structure, reservation value, and early market analysis. Defendant's communications document the expected-use value assigned by the party that misappropriated the technology, including production plans, pricing, financing, acquisition value, market scale, and government-facing deployment sched-

ules. The models integrate those contemporaneous assessments as explicit computational input parameters.

### 2. Vacuustat Wind-Energy Model

The wind-energy model carries Rapport's contemporaneous engineering estimate directly into the calculation. In August 2021, Rapport explained to Defendant that a 600-meter Vacuustat-supported vertical-axis wind turbine could combine approximately five times the swept area of a representative conventional turbine with approximately twice the wind-power output due to the increased altitude, producing roughly ten times the output of a representative 1.5 MW conventional turbine. He therefore estimated approximately 15 MW per Vacuustat-supported turbine. (Ex. C3 — Corporate Communications at 30–33; Appendix C.) In the same exchange, Rapport estimated that such a system could be produced at substantially lower cost than a conventional turbine and explained why the economics retained a substantial margin for engineering uncertainty. (Ex. C3 — Corporate Communications at 30–33.)

Appendix C uses the 15 MW figure as the rated capacity of each modeled Vacuustat wind system. The remainder of the model then combines that contemporaneous technical estimate with independent DOE/LBNL capacity-factor data, EIA generation-price data, the parties' actual five-percent Vacuustat royalty, the patent-backed royalty term, and an explicit risk-adjusted discount rate. The five-year commercialization-delay interval comes from Defendant's own contemporaneous assessment that a slower capitalization path would take approximately five additional years to reach the contemplated commercial outcome. (Ex. C3 — Corporate Communications at 13–14; Appendix C.) The resulting model therefore combines Rapport's engineering forecast, Defendant's timing forecast, the parties' contractual royalty economics, and public market data in a single reproducible calculation.

The wind calculation remains confined to this single application and the defined patent-backed royalty period. It does not import Defendant's much larger enterprise-level valuation projections into the wind model or assign additional value beyond the model horizon.

### 3. Vacuustat Telecommunications Model

The telecommunications model is grounded in a multi-year exchange between the parties concerning elevated communications infrastructure. In August 2021, Rapport estimated that roughly twelve high-altitude, solar-powered stationkeeping Vacuustat platforms could provide continental U.S. communications coverage. He compared that architecture with the enormous satellite count required by a LEO constellation. (Ex. C3 — Corporate Communications.) In March 2022, Defendant expressly recalled that twelve-platform concept, identified 5G and U.S. telecommunications infrastructure as major areas of value, and proposed a distributed architecture in which smaller Vacuustat systems could replace “a few dozen cell towers.” Rapport agreed that a larger number of smaller-scale systems represented the stronger commercial architecture. (Ex. C3 — Corporate Communications at 15–17; Appendix D.)

Appendix D translates that exchange into explicit economic inputs. Defendant’s phrase “a few dozen cell towers” is represented as two dozen tower-equivalents per Vacuustat node. The model independently validates that commercial estimate through line-of-sight geometry and obtains approximately the same 24-to-1 coverage-area relationship for a 600-meter Vacuustat platform compared with a representative conventional cellular antenna. It then applies realized Crown Castle tower-lease economics to the resulting infrastructure capacity. The model therefore connects a commercial estimate made by Defendant to an independent geometric calculation and an external market benchmark.

Those choices are restrained relative to the record. Defendant’s “few dozen” statement is modeled as two dozen rather than a larger multi-dozen figure. The model also retains the original twelve-node starting scale even though the parties’ later exchange favored a larger number of smaller Vacuustat systems. Appendix D therefore uses the lower numerical interpretation of Defendant’s tower-replacement estimate and the earlier, smaller starting network rather than converting the later distributed-network discussion into a larger opening deployment.

### 4. Vacuustat Defense-Procurement Model

The Vacuustat defense-procurement model draws still more directly from Defendant's own commercialization roadmap. Defendant supplied a government-facing plan identifying a $15 million prototype epoch, approximately $75 million for manufacturing maturation, pilot-factory capacity of at least one full-size platform per month, a first market-ready product in 2029, larger-number production during the 2033–2034 integration period, and very-large-scale deployment beginning in 2035. He further described a 100-platform mature deployment at approximately $500 million and projected eventual deployment "in the thousands." (Ex. E3 [SEALED], ECF No. 8; Appendix E.)

The model carries those commercial expectations into a reproducible procurement calculation. Its 100-platform mature-deployment anchor is Defendant's stated benchmark. The corresponding approximately $5 million per-platform price follows arithmetically from Defendant's own $500 million estimate. The model's production timeline follows Defendant's government-facing schedule. The initial procurement quantity of fifteen platforms is grounded in Defendant's September 2026 statement that he was selling the first fifteen units from a production facility in Poland and that the customer would then want hundreds. (Ex. F9 — Vacuustat Email.) The 15-platform starting volume therefore uses Defendant's reported production activity as the opening procurement scale while retaining his own later-stage 100-platform and "thousands" benchmarks for mature deployment.

The timing and scale choices are materially more restrained than the full record would permit. The model does not use Defendant's reported 2026 sales activity to accelerate the defense-procurement start; it retains the 2029 market-ready date from his government-facing roadmap. Nor does it import the anticipated "hundreds" immediately following the first fifteen units. Instead, the modeled path reaches 100 platforms only in 2035. That mature anchor is one-tenth of even a 1,000-platform deployment and therefore at least an order of magnitude below Defendant's stated "thousands" trajectory. The model then ends in 2037, without carrying that eventual thousands-scale deployment into later years. The defense calculation thus preserves Defendant's later roadmap dates and sharply limits his

larger deployment projections even after his own reported 2026 commercialization activity supplied evidence of an earlier and faster trajectory.

Appendix E applies the contemporaneous-production-forecast principle established above to Defendant's own projected capacity, price, schedule, and deployment scale, then calculates a present-value royalty using the parties' actual five-percent license.

## 5. Artifact Valuation and Royalty Cross-Check

The Artifact record contains complementary market assessments from both parties beginning before formation of Radian. Rapport's July 2024 communications quantified the commercial opportunity while the technology was still being developed. He identified commercial interferometer pricing around $20,000, estimated a plausible navigation-device price range of approximately $40,000 to $200,000, and constructed an illustrative satellite-only scenario using 1,200 SpaceX units at $50,000 plus 250 additional units at $100,000. That simple scenario produced approximately $85 million in annual revenue, from which Rapport estimated an enterprise value around $700 million. (Ex. C3 — Corporate Communications; Appendix A.)

Rapport then expanded the market analysis beyond satellites. He identified military aircraft, missiles, artillery, commercial aviation, vehicles, and other inertial-navigation applications, including an illustrative $200 million market from 2,000 Air Force aircraft at $100,000 per device. He further observed that a lower-cost navigation system could create additional applications beyond those represented by existing inertial-navigation sales. (Ex. C3 — Corporate Communications.) These statements document the inventor's contemporaneous commercial thesis: a high-performance inertial device could command high-five-figure or greater pricing in aerospace applications while opening broader markets as cost declined.

Defendant independently researched the same market and supplied additional corroboration. In August 2024, he identified the high-end laser-ring-gyro market at approximately $0.8–1.3 billion, the broader PNT market at approximately $16 billion, fiber-optic gyroscopes at approximately $1.1–1.6 billion, and Honeywell's flagship large-aircraft laser-ring-gyro system at approximately $300,000. He

further observed that individual laser-ring gyros appeared to cost $10,000 or more and that three-unit systems could reach $30,000 or more, with contemporary pricing plausibly closer to $50,000 or above. (Ex. C3 — Corporate Communications.) The parties therefore entered their collaboration with independently developed evidence of billion-dollar incumbent markets and high-value unit economics.

Defendant's later commercialization plans were still more concrete. He estimated approximately $15,000 in manufacturing cost and $30,000 in selling price for the commercial gyro, proposed long-duration five-percent revenue participation for particular fields, and publicly contemplated a $100 million strategic acquisition while naming potential counterparties including Anduril, Raytheon, Lockheed, and Boeing. These pricing and transaction terms provide the commercial inputs used below; Defendant's separate Black Lattice pitch is examined in Section V(F). (Ex. C5 — Investor Sabotage at 30, ECF No. 2-8, PageID #302; Ex. C6 — Signal Export [SEALED]; Ex. F6 — Valuation Evidence; Appendix B.)

Appendix B translates those contemporaneous economics into the Artifact royalty cross-check. The model uses Defendant's approximately $15,000 cost estimate as modeled COGS, applies his most restrictive proposed high-volume transfer-price multiple, uses his approximately $30,000 contemplated downstream selling price, and applies the five-percent revenue participation and twenty-five-year term he proposed for the identified gyro and accelerometry fields. The model then uses explicit starting volumes, finite market ceilings, a stated annual growth rate, a fifteen-percent discount rate, and zero terminal value. Each assumption is visible and reproducible.

Several of those choices expressly reduce the modeled value. Defendant's purchasing proposal permitted transfer prices up to three times COGS at lower volumes and reduced the ceiling to 1.5 times COGS only at high volume; Appendix B applies the 1.5-times-COGS multiple to every modeled unit from the outset. It also assigns zero terminal value and does not incorporate other Artifact applications, accelerometry, option consideration, exclusivity consideration, acquisition value, or other sources of

economic value identified elsewhere in the record. The cross-check therefore leaves multiple documented value components outside the calculation.

An approximately $30,000 downstream price is supported by the contemporaneous record. It comes directly from Defendant's own contemplated commercialization economics. It also falls within the lower portion of the high-value pricing environment both parties had identified before the dispute: Rapport had modeled $40,000–$200,000 per navigation unit in 2024, while Defendant independently identified incumbent high-end systems and components ranging from tens of thousands to hundreds of thousands of dollars. The model thus uses Defendant's concrete $30,000 figure while the earlier bilateral market research corroborates the economic setting in which that figure operates.

The $100 million Artifact strategic-acquisition benchmark is supported in the same way. Defendant himself supplied that transaction-specific figure while actively identifying strategic acquirers. His "billion dollar product" assessment, product-cost analysis, investor materials, proposed field-specific participation terms, and broader financing plans all corroborate a commercial opportunity measured far above the $25 million impairment and reasonable-royalty figures requested in the Memorandum. Rapport's earlier satellite-only analysis had independently produced an approximately $700 million enterprise-value illustration before Defendant became his cofounder. The parties' separate estimates therefore converge on a technology with substantial strategic and operating value.

### 6. Rapport's Contemporaneous Reservation Value Supplies the Licensor Side of the Hypothetical Negotiation

The reasonable-royalty inquiry also requires consideration of the value Rapport placed on retaining ownership and control of the technology. His contemporaneous Signal communications provide direct evidence of that reservation value.

On April 12, 2025, Rapport rejected an early financing path in explicit valuation terms: "We can't take an early $2.5M VC round for Radian, that just doesn't make sense given the value of the IP that Radian currently has." (Ex. C6 — Signal Export [SEALED]; Appendix A.) That statement directly ties Rapport's financing position to the value of the intellectual property. It establishes that he regarded

a $2.5 million early round as economically inconsistent with the IP's expected value and preferred to preserve ownership rather than monetize the company on those terms.

In the same conversation, Rapport framed the choice between immediate capital and long-term ownership at a much larger scale: "Do you want to raise $50-100m right now and be completely diluted and effectively shut out of the company after a few seed rounds, or would you rather be a little more patient and grow a company that will rake in billions every year without dilution?" (Ex. C6 — Signal Export [SEALED]; Appendix A.) His separate assessment of the Safe gyro's substantial price-performance gains and expanded commercial market, quoted in Section IV(D)(7), further supports the value he placed on retaining future commercialization rights.

These statements supply the licensor side of the bargaining record: Rapport placed a high value on continued ownership, exclusivity, and downstream upside, while Defendant's LOIs and commercialization proposals reflected the commercial benefits he sought from long-duration field rights and strategic transactions. The distinct evidentiary significance of actual negotiated terms is addressed above through *Vitro* and *Mid-Michigan*. Applied to Artifact, that record permits the hypothetical negotiation to account for both Rapport's demonstrated reservation value and Defendant's expected commercial benefit.

### 7. Defendant's Broader Financing and Commercialization Statements Corroborate the Modeled Scale

Defendant's investor solicitation presented the combined technology program as capable of unusually large defense and telecommunications markets, supported by ambitious financing and enterprise-value projections. The complete statements and their role in the diverted Khosla Ventures opportunity appear in Section V(F). For valuation purposes, those projections corroborate Defendant's contemporaneous commercial expectations; they are neither multipliers nor direct inputs to the application-specific royalty calculations. The models instead use documented prices, expected deployment quantities, licensing terms, and finite projection periods. (Ex. C3 — Corporate Communications at 13–14.)

Because both technologies were still being developed and positioned for commercialization, the parties' contemporaneous technical assessments, negotiated economics, projected production, and intended uses provide the relevant commercial evidence at the valuation date. The authorities discussed above support that approach, and Appendices B–E disclose the resulting assumptions and calculations for independent review.

## IV. Factual Context

The damages categories in Section V arise from a single course of misconduct involving two technologies that Rapport invented and supplied to Radian. Under the parties' original arrangement, Rapport held 51% ownership, a Board majority, and the Chairman and CTO roles; Defendant held 49% and served as CEO, responsible principally for fundraising, business development, government relations, and administration. Rapport retained ownership of the underlying technologies, subject to an express Vacuustat license and contemplated Artifact licensing arrangement. (Compl. ¶¶ 24–43, 67–75, 80–82, 318.)

Defendant secretly incorporated Radian, drafted agreements conferring extensive corporate powers over equity and technical work, pursued financing and commercialization through Phoenix Dynamics and Black Lattice instead of Radian, and repeatedly proposed transferring majority ownership and Board control to himself. Rapport adopted Board restrictions that Defendant acknowledged but did not observe. As Rapport's experiments revealed the Artifact's strategic risks and he developed a safer commercial alternative, Defendant continued pressing both his competing ventures and control proposals. Those circumstances led Rapport to dissolve Radian on April 29, 2025. (Compl. ¶¶ 44–47, 62–66, 104–113, 157–161; Ex. A1 — Corporate Records; Ex. A2 — Dissolution; Ex. C6 — Signal Export [SEALED].)

After dissolution, Defendant asserted control and commercialization rights over Plaintiffs' property, retained technical and corporate records, and continued activity through ventures he controlled. The chronology below documents these events and supplies the factual foundation for the separate

corporate, contractual, financing, trade-secret, and equitable remedies addressed in later sections. (Compl. ¶¶ 209–211, 315–316, 376; Ex. C2 — Screenshots; Ex. E1 — Enterprise Structure.)

### A. Rapport's Technology and the Parties' Original Allocation of Ownership and Control

#### 1. Rapport Conceived the Artifact Before Approaching Defendant and Forming the Venture

Rapport is the sole inventor of the two technologies at issue. The Vacuustat was Rapport's preexisting patented technology, protected by U.S. Patent No. 10,625,842 and associated confidential technical materials. The Artifact likewise originated with Rapport. Before Rapport approached Defendant in July 2024 and before the parties formed their venture, Rapport had developed the Artifact's theoretical foundation, operative concept, design architecture, intended navigation application, and initial experimental program. (Compl. ¶¶ 24, 27–33; Ex. C1 — Initial Conversations.)

The parties' contemporaneous communications establish that chronology directly. On July 30, 2024, Rapport contacted Defendant under the subject line *Advice for starting a company?* and described technical work Rapport had already performed. Rapport explained that interferometric experimental data showed a very clear effect, that he had successfully worked out the theoretical formula for the effect based on Doppler theory, and that he had prepared a draft technical paper describing his method. Rapport then identified the invention's intended application: "I think this displacement effect could be very useful for satellite and deep space navigation." (Ex. C1 — Initial Conversations.)

Rapport approached Defendant at that point for commercial guidance concerning the technology he had developed. His questions concerned "who should I approach, how should I approach, what do I need to prepare, what data do I need, how do I overcome skepticism, how do I raise money, how do I put together a business plan, etc." The July 30 communication thus presented Defendant with an existing invention, an articulated physical theory, an identified navigation application, experimental evidence, and a defined path toward further validation. (Ex. C1 — Initial Conversations.)

Defendant responded on August 1 by asking Rapport, "Are you looking for a co-founder?" The prospect of Defendant joining the venture therefore arose after Rapport had presented him with the

Artifact concept, its theoretical basis, its intended application, and the technical program Rapport intended to pursue. (Ex. C1 — Initial Conversations.)

Defendant's subsequent communications identified his contemplated role as nontechnical. On August 3, Defendant wrote: "My background in materials engineering is likely going to offer limited value here so I would primarily be interested in helping with the business development, strategy, and government interfacing." Defendant described his previous exposure to the relevant field as "a passing familiarity with IMUs" and proceeded to research inertial-navigation technologies, market size, pricing, government funding pathways, potential customers, and commercialization strategy in response to Rapport's proposal. Rapport remained responsible for the invention and technical development. (Ex. C1 — Initial Conversations.)

Defendant's August 5 written summary memorialized that division of responsibilities. Rapport would carry out the experimental program and obtain compelling data; Defendant would investigate market data and business strategies. Following experimental validation, Rapport would prepare and file the provisional patent application. The same summary contemplated a company in which Rapport would hold 51% of the equity and two Board seats, while Defendant would hold 49% and one Board seat. (Ex. C1 — Initial Conversations.)

The parties' contemporaneous understanding also assigned the development expense and validation risk to Rapport personally. The Complaint states that allocation directly: "Contemporaneous statements also make clear that it was understood by the parties that Plaintiff Rapport would construct the Artifact prototype himself and run validation tests at his own expense before any corporate entity was formed or investment accepted. Defendant declined to take on any financial risk until the concept was proven." (Compl. ¶ 33; Ex. C1 — Initial Conversations.) The arrangement therefore placed the pre-formation technical work, expenditure, and validation program with Rapport, while Defendant's contemplated contribution remained strategic.

Rapport thereafter continued the Artifact research and development program he had begun before Defendant entered the project. Rapport personally designed and constructed the experimental

apparatus, purchased the components, performed the experiments, collected the experimental data, developed the signal-processing and analysis software, evaluated the results, and filed the Artifact provisional patent application solely in his own name. Defendant's assigned activities centered on business development, fundraising, strategy, government engagement, and administration. (Compl. ¶¶ 24–39, 75.)

The chronology is therefore clear: Rapport conceived the Artifact and developed its underlying theory, device concept, intended application, and experimental program first; Rapport then approached Defendant for advice concerning commercialization; Defendant thereafter asked to join as a cofounder and assumed business-development responsibilities. ARK and Radian were organizational vehicles for financing, developing, and commercializing technology Rapport had already invented.

Rapport's initial commercialization considerations were broad and expressly encompassed civilian, commercial, scientific, and defense applications. In the July 30, 2024 email that first presented the technology to Defendant, Rapport identified satellite and deep-space navigation as a principal commercial application. Rapport explained that autonomous interferometric navigation could allow satellites to determine their orientation in deep space without continuous dependence on ground-based communication, reducing the expense and operational limitations associated with Earth-based navigation infrastructure. Rapport described a "feasible, straightforward path" toward a deep-space navigation device and approached Defendant for advice concerning customers, financing, intellectual-property protection, and commercialization. (Ex. C1 — Initial Conversations.)

The parties then explored the breadth of the navigation market in concrete commercial terms. On July 31, Rapport analyzed satellite demand, identified SpaceX and other satellite operators as potential customers, and estimated a satellite-navigation business capable of approximately $85 million in annual revenue under one illustrative sales scenario. Rapport separately evaluated autonomous GPS-independent navigation for U.S. Air Force aircraft and estimated that approximately 2,000 aircraft at $100,000 per unit represented a $200 million market "worth pursuing." He also identified Navy submarines as a potential application. By August 1, Rapport had expanded the identified applications

to commercial aircraft, satellites, automobiles and trucks, as well as defense systems; on August 2, he specifically considered lower-cost applications for automobile manufacturers while identifying higher-end navigation markets as the appropriate initial commercialization focus. These contemporaneous discussions establish that the Artifact was conceived from the outset as a broadly applicable navigation platform with substantial commercial markets extending well beyond weapons applications. (Ex. C1 — Initial Conversations.)

Defendant's earliest responses, by contrast, focused on offensive weapons systems as the center of his proposed strategy. On August 3, 2024, Defendant wrote: "If we have the 'gyro,' we can vertically integrate in attack drones and cruise missiles, while selling externally to higher end applications (e.g. hypersonic missiles, large ISR UAVs, satellites, etc.)." Rapport continued the venture while the technology remained under development and its ultimate capabilities were not yet known. The significance of Defendant's weapons-centered orientation became substantially greater after Rapport validated the technology, identified its strategic implications, and observed Defendant's continued efforts to obtain control over its sensitive capability. (Ex. C1 — Initial Conversations; Ex. E3 — National Security Risk.)

Defendant's 2024 government-facing paperwork shows that he anticipated potential export controls over Radian's developing technologies; it does not establish a definitive classification. In the DD Form 2345 he executed as Radian's CEO, Defendant described Radian as a prime contractor and manufacturer of IMUs engaged in IMU R&D under NAICS 541715 and stated: "We are developing technologies that will fall under ITAR." The U.S./Canada Joint Certification Program approved Radian's certification on December 9, 2024. (Ex. F8 — Government Forms and Certifications.)

### 2. The Parties' Original Allocation of Ownership and Control Reflected Rapport's Inventorship

The parties' original written allocation of responsibility, economics, and governance reflected the circumstances under which the venture began. The August 13, 2024 ARK Interim Partnership Agreement designated Rapport as "CTO & Founder" and Defendant as "CEO & Co-Founder." Rapport was

responsible for technical development; Defendant was tasked with business development, fundraising, strategy, and administration. Ownership was allocated 51% to Rapport and 49% to Defendant. Rapport held two of the three Board seats and served as Chairman. (Compl. ¶¶ 40–43.)

The parties also maintained defined boundaries around Rapport's preexisting intellectual property. Rapport had created and patented the Vacuustat years before Radian. He granted Radian exclusive commercialization rights through a separate agreement providing Rapport a five-percent royalty on qualifying commercial revenue. The Vacuustat thus entered the enterprise through an express royalty-bearing license that preserved Rapport's underlying ownership and defined Radian's commercial rights. (Compl. ¶¶ 67–74; Vacuustat Licensing Agreement.)

The January 2025 Founders Agreement expressly reinforced that arrangement. Rapport requested the addition of a Vacuustat-specific provision stating that "the terms of license for the vacuustat and vacuum balloon are defined in a separate agreement" and that, "[i]n any area where there is a conflict between this agreement and the other agreement, the other one will take precedence." The separate Vacuustat license therefore controlled the parties' rights in that technology where its terms conflicted with the broader Founders Agreement. (Compl. Ex. A1 — Corporate Records at 45–46, ECF No. 2-1; Rapport Decl. ¶ 10.)

The Artifact followed the same ownership-and-licensing structure. Rapport conceived the technology before approaching Defendant, personally bore the development expense and validation risk, remained its sole inventor and technical developer throughout the venture, and filed the Artifact provisional patent application solely in his own name. Contemporaneous communications show that Defendant apparently raised no objection to that filing. On April 6, 2025, Rapport advised Defendant that he had filed the provisional patent; Defendant responded that this was "great, and definitely something worth having." After Rapport stated, "I listed myself as the sole inventor," Defendant acknowledged the statement with a thumbs-up reaction. That exchange records no contemporaneous objection by Defendant to Rapport's sole-inventor filing. (Ex. C2 — Screenshots, Fig. 4.)

The parties' contemplated commercialization structure preserved Rapport's ownership. Plaintiffs previously identified that structure to the Court in ECF No. 30: contemporaneous statements showed that Rapport intended to patent the Artifact in his own name and thereafter license the IP to Radian, following the same commercialization model as the Vacuustat license. (ECF No. 30, p. 7; Compl. ¶¶ 28–39; Ex. C1 — Initial Conversations.) The Founders Agreement also included an "Assignment of IP and Assets Agreement" as a contemplated instrument for transferring founder assets, however, that separate instrument was never executed. (Compl. ¶ 75; Compl. Ex. A1 — Corporate Records at 32, ECF No. 2-1.)

The documented sequence was therefore consistent throughout: Rapport conceived the Artifact, personally financed and performed its validation, filed for patent protection in his own name apparently without Defendant's objection, retained the underlying intellectual property, and contemplated granting Radian commercialization rights through a separate license. The structure paralleled the Vacuustat arrangement: Rapport owned the technology, and Radian's contemplated Artifact commercialization rights were to be defined in a separate agreement, which was not executed.

The documentary structure therefore reflected the factual structure that existed from the venture's inception. Rapport supplied the underlying inventions and technical development. Defendant joined after conception of the Artifact and was brought in to provide business-development, fundraising, strategic, and administrative services. The enterprise provided the organizational vehicle through which the parties intended to fund and commercialize Rapport's technology.

The parties' original arrangement accordingly placed Rapport in four mutually reinforcing positions: inventor and owner of the underlying technology, technical founder, 51% economic participant, and controlling director and Chairman. Defendant entered as the 49% cofounder tasked with the business-development and administrative functions necessary to bring Rapport's technology to market.

Defendant's subsequent conduct progressively targeted each component of his originally agreed-upon allocation. Defendant sought expanded economic ownership and Board control of Radian,

asserted increasingly broad rights over Rapport's technology, and pursued unauthorized commercialization and fundraising involving that technology through his own entities.

### B. Defendant's Undisclosed Incorporation of Radian

Defendant's misconduct began within two weeks of the ARK agreement. On August 27, 2024, Defendant unilaterally incorporated "Radian Industries Inc." in Wyoming without Rapport's knowledge. Defendant named himself sole incorporator, used a one-time corporate email alias, supplied a fictitious telephone number, and omitted Rapport entirely from the articles of incorporation. (Compl. ¶ 62.)

The incorporation occurred while Rapport was developing the technology that would become the venture's principal new technical asset. Rapport devoted substantial time and his own resources to the Artifact, including research, apparatus construction, troubleshooting, experimentation, software development, data collection, and analysis. That work produced the prototype and experimental record that Defendant later used as the basis for substantial commercialization and financing efforts.

Defendant subsequently created a documentary chronology purporting to extend Radian's asserted corporate relationship backward across Rapport's personally funded technical-development period. After Rapport had performed substantial intervening work, Defendant placed in the shared Company Drive a document titled "Name Change and Incorporation," dated September 9, 2024. The document portrayed Radian as the continuation of ARK and represented that the Wyoming incorporation had occurred "by unanimous agreement of 100% of the owners." Rapport had been unaware of Defendant's August 27 incorporation and had not approved the representation attributed to him. (Compl. ¶¶ 63–66.)

That retroactive characterization was an attempt to entrap Rapport's intellectual property. It converted three distinct events—the August 13 interim venture agreement, Defendant's unilateral August 27 incorporation, and Rapport's continuing Artifact development—into a purported continuous corporate history. That history later supplied Defendant with a pretense for characterizing work

performed before Radian existed as a corporation, and work performed before Rapport knew of Radian's corporate existence, as work arising within Radian's claimed corporate relationship.

Defendant's undisclosed incorporation was material for several independent reasons. Wyoming law expressly makes knowingly or willfully submitting materially false or fictitious information in a filing with the Secretary of State a felony. Wyo. Stat. § 6-5-308(a)(ii). Defendant knew his own telephone number yet supplied a fictitious number in the incorporation filing.

Defendant subsequently misrepresented that incorporation had occurred by unanimous agreement and used the resulting corporate chronology to assert rights over Rapport's independently financed technical development. Rapport later executed the January 8, 2025 Founders Agreement without knowing of Defendant's earlier unilateral incorporation or its intended use to claim rights over his intellectual property. This sequence demonstrates bad faith from the venture's inception, supports the Complaint's fraudulent-inducement and fraudulent-misrepresentation claims, and establishes the factual basis for Defendant's attempted appropriation and unjust enrichment. The deceptive incorporation and associated misrepresentations also support the alleged wire-fraud scheme underlying Plaintiffs' RICO claims. (Compl. ¶¶ 62–66, 186(1)–(2), 317–336.)

Radian's internal governance records reflected the parties' agreed-upon allocation. The initial Board minutes provided that "Nathan Rapport is appointed two board seats, and Michael Chapiro is appointed one board seat." The minutes appointed Rapport CTO and Chairman and appointed Defendant CEO, Treasurer, Secretary, and President. They contemplated one million founder shares, with 510,000 corresponding to Rapport's 51% interest and 490,000 corresponding to Defendant's 49% interest, together with maintenance of an interim electronic stock ledger. Defendant separately confirmed his 490,000-share allocation in a signed Section 83(b) election dated December 17, 2024, identifying the property as "490,000 shares of common stock in Radian Industries, Inc." and describing the shares as partly subject to a vesting/repurchase agreement. (Ex. F8 — Government Forms and Certifications.) Rapport therefore possessed the two-to-one Board majority and ultimate governance authority as contemplated from the beginning. (Compl. ¶¶ 80–82.)

Defendant also attempted to entrench himself as CEO by inserting a provision into the proposed corporate bylaws that would have deprived Rapport of his authority to remove him. The provision, titled "Section 4.12: Provision for Enhanced Stability," declared that removal of the CEO would require both Board approval and approval by a 60% majority of stockholders, notwithstanding any contrary governance provisions. It further required the same 60% stockholder approval to repeal the provision itself. Under the parties' agreed 51%-to-49% ownership allocation, this proposed supermajority requirement would have given Defendant, the minority shareholder, an effective veto over his own removal as CEO, despite Rapport's controlling equity interest and two-to-one Board majority. Rapport rejected the provision, which was removed and never adopted by Radian. (Compl. ¶¶ 40–47.)

### C. The Founders Agreement Created Extensive Leverage Over Rapport's Equity, Technology, and Future Work

The January 2025 Founders Agreement was supplied and principally drafted by Defendant. Defendant included extensive provisions governing intellectual property, work product, invention assignment, post-service inventions, competition, confidentiality, termination, and repurchase rights. Rapport made two specific substantive changes to that framework: he designed the vesting schedule governing the founders' contemplated shares and requested a Vacuustat-specific provision preserving the priority of the parties' separate Vacuustat licensing agreement. (Rapport Decl. ¶ 10; Compl. Ex. A1 — Corporate Records at 32–47, ECF No. 2-1.)

Those revisions had a consistent protective character. Rapport substantially reduced Defendant's economic exposure as minority cofounder through an accelerated and front-loaded vesting schedule, while preserving the established contractual treatment of technology Rapport had developed and patented years before Radian. Defendant's contributions, by contrast, created extensive corporate powers over founder equity, technical work, inventions, records, and future activity in Radian. Approximately three months later, Defendant began seeking control of the corporation possessing the foregoing powers.

### 1. Rapport Designed an Accelerated Vesting Schedule That Gave Defendant Substantial Immediate Equity Protection

The Founders Agreement contemplated 510,000 shares for Rapport and 490,000 shares for Defendant at a purchase price of $0.001 per share. Defendant's signed Section 83(b) election independently identifies the same 490,000-share quantity and states that the shares were partly subject to a quarterly vesting/repurchase agreement over two years. (Ex. F8 — Government Forms and Certifications.) Rapport specifically designed the vesting schedule applicable to those contemplated founder allocations. He chose an accelerated, front-loaded structure that gave each founder substantial protected equity immediately and released the balance on a substantially shorter timetable than a conventional startup vesting schedule. (Rapport Decl. ¶ 11; Compl. Ex. A1 — Corporate Records at 32–33, ECF No. 2-1.)

Startup founder equity commonly follows a four-year vesting schedule with a one-year cliff, under which the first substantial vesting event occurs after completion of the first year.[3] Rapport's schedule began with an immediate release of 30% of each founder's entire allocation from the Company's repurchase option. An additional 17.5% was scheduled for release on June 1, 2025, followed by 8.75% on the first day of each calendar quarter until the entire allocation had been released. The schedule therefore provided for 47.5% of each founder's allocation to be released by June 1, 2025; 56.25% by July 1, 2025; 65% by October 1, 2025; and 100% by October 1, 2026. (Compl. Ex. A1 — Corporate Records at 33, ECF No. 2-1.)

For Defendant, the immediate protection was substantial. Thirty percent of his contemplated 490,000-share allocation—147,000 shares, corresponding to 14.7% of the contemplated one-million-share capitalization—was released from the repurchase option from the outset. By June 1, 2025, 232,750 shares, or 47.5% of his founder allocation, were scheduled to be released. By July 1, 275,625 shares, or 56.25%, were scheduled to be released.

[3] See Cooley GO, *Founder's Stock, Vesting and Founder Departures* (discussing founder vesting and the common use of a one-year cliff); Orrick, *Founder Equity Splits: Getting It Right From Day One* (discussing the familiar four-year vesting schedule with a one-year cliff).

Rapport designed that schedule while holding the parties' agreed two-to-one Board majority. The schedule guaranteed Defendant a substantial protected founder interest from the beginning of the relationship and placed him on a rapid path toward protection of a majority of his contemplated allocation. Rapport thereby paired majority governance authority with substantial and accelerated economic protection for his minority cofounder. (Rapport Decl. ¶ 12.)

That structure is significant in light of Defendant's later campaign to reverse the agreed governance allocation. By April 2025, Defendant already had 30% of his contemplated founder allocation protected from repurchase and was approaching a June 1 release that would increase the protected portion to 47.5%, followed one month later by a release increasing it to 56.25%. Rapport's vesting plan thus substantially limited Defendant's economic exposure from an early separation even as Rapport retained Board control.

Defendant's subsequent proposals therefore sought a fundamentally different allocation of corporate power. He sought majority economic ownership and ultimately Board control of Radian itself. Those demands arose in the context of an existing structure in which Rapport had already given Defendant significant immediate and accelerating economic protection while preserving the parties' agreed allocation of governance authority.

Rapport's second substantive change preserved the priority of the separate royalty-bearing Vacuustat license over inconsistent provisions of the Founders Agreement. As documented in the original ownership-and-licensing discussion above, this safeguard protected Rapport's preexisting patented technology without disturbing the agreed Radian commercialization arrangement. (Rapport Decl. ¶ 10; Compl. Ex. A1 — Corporate Records at 45–46, ECF No. 2-1.)

Rapport's two substantive revisions therefore ran in the same direction. He gave Defendant substantial immediate protection in his contemplated founder equity and an accelerated path toward complete release, while preserving the contractual boundary protecting Rapport's preexisting Vacuustat technology.

## 2. Defendant Linked Corporate Control to Termination and Nominal-Price Repurchase of Founder Equity

Defendant's contributions to the Founders Agreement gave Radian a direct and powerful mechanism affecting the economic position of either founder. Section 7 expressly preserved "the right or power of the Company" to terminate a founder's employment or consulting relationship "for any reason, with or without cause." Section 3(a) tied that termination authority directly to the Company's repurchase rights. Upon the "voluntary or involuntary termination" of a founder's Continuous Service Status "for any reason (including death or Disability), with or without cause," Radian received an "irrevocable, exclusive option" lasting six months to repurchase "all or any portion" of the founder's shares remaining subject to the Repurchase Option at the original purchase price. (Compl. Ex. A1 — Corporate Records at 32–33, 38, ECF No. 2-1.)

Termination also immediately fixed the quantity of equity exposed to repurchase. Section 3(a)(iii) provided that the scheduled releases from the Repurchase Option "shall immediately cease as of the Termination Date." The Agreement therefore created a direct sequence of contractual consequences: termination immediately stopped future releases, fixed the remaining restricted-share balance, and activated Radian's six-month exclusive option to acquire that balance at the original $0.001-per-share purchase price.

Before the June 1, 2025 release, 70% of each founder's contemplated allocation remained subject to that mechanism. For Rapport, that amounted to 357,000 of his contemplated 510,000 shares. At the contractual purchase price of $0.001 per share, Radian could exercise the Repurchase Option over that entire block for $357. For Defendant, the corresponding restricted block consisted of 343,000 of his contemplated 490,000 shares, carrying an aggregate original purchase price of $343. Rapport's accelerated vesting schedule caused those exposed quantities to decline rapidly over time. (Compl. Ex. A1 — Corporate Records at 32–33, ECF No. 2-1.)

The Agreement also supplied an efficient mechanism for completing the repurchase. Section 3(a)(ii) provided that upon the Company's notice and payment, Radian would "become the legal and

beneficial owner of the Shares being repurchased and all rights and interest therein or related thereto." The same provision authorized Radian to transfer the repurchased shares into its own name "without further action by Purchaser." (Compl. Ex. A1 — Corporate Records at 33, ECF No. 2-1.)

Section 4 reinforced that mechanism through an escrow arrangement. Restricted-share certificates were to be delivered to the Company Secretary together with an executed "Assignment Separate from Certificate" in blank. The Agreement authorized the escrow holder to "take all such actions and to effectuate all such transfers and/or releases" consistent with the Agreement and described the escrow appointment as "irrevocable." The Board possessed the power to appoint a successor escrow holder. (Compl. Ex. A1 — Corporate Records at 36, ECF No. 2-1.)

These provisions made Board control economically consequential. Control of Radian carried authority over a corporation empowered to terminate a founder without cause, immediately halt further vesting, and exercise an exclusive nominal-price repurchase option over the founder's remaining restricted shares. The Agreement also made that repurchase power transferable: § 3(d) authorized Radian to assign its purchase right, in whole or in part, to any holder of Company stock or to another person or organization. The contractual structure therefore permitted the Company's repurchase right over one founder's restricted shares to be assigned to the other founder, enabling that founder to acquire the affected shares at the contractual purchase price. The escrow and transfer provisions supplied the machinery for completing that acquisition. (Compl. Ex. A1 — Corporate Records at 32–33, 35–36, 38, ECF No. 2-1.)

Rapport's accelerated vesting schedule materially reduced both founders' exposure to those powers. The same contractual powers assumed a different significance when Defendant began seeking Board control in April 2025. At that time, 357,000 of Rapport's contemplated shares remained subject to the Company's Repurchase Option at an aggregate original purchase price of $357. Defendant's proposed transfer of Board control would therefore have placed control of the corporation possessing the termination, repurchase, and share transfer machinery in Defendant's hands while a large portion of Rapport's contemplated founder allocation remained subject to that machinery.

### 3. Defendant Supplied Broad Corporate Rights Over Technology and Future Work

Defendant's draft paired the foregoing equity-related powers with sweeping asserted rights concerning technical work. Section 13(d) provided that work product developed during Company service, or through use of Company time, materials, or resources, would become the Company's "exclusive property" and granted the Company and its affiliates the exclusive right to exploit the processes, ideas, and concepts embodied in that work product. (Compl. Ex. A1 — Corporate Records at 45–46, ECF No. 2-1.)

Section 13(e) extended those asserted rights to inventions and intellectual property. It provided for irrevocable assignment to Radian of patent, copyright, and trade-secret rights in inventions, ideas, disclosures, improvements, and works of authorship developed or conceived by a founder that related to products, processes, apparatus, designs, or technology developed or marketed by the Company or arose even partly from the founder's services. It further required disclosure of covered inventions and execution of additional documents at the Company's request. (Compl. Ex. A1 — Corporate Records at 45–46, ECF No. 2-1.)

Defendant's provisions extended Radian's asserted ownership rights into the period following a founder's service. An invention made within one year following termination was presumed to belong to the Company unless the former founder established by clear and convincing evidence that the invention made no use of Confidential Information. Copyrightable work prepared within the scope of Company service was separately designated work made for hire and assigned to Radian if that characterization failed. (Compl. Ex. A1 — Corporate Records at 45–47, ECF No. 2-1.)

The Agreement also imposed extensive restrictions on post-service technical and commercial activity. Section 13(a) imposed a four-year nonsolicitation period governing Company employees and relationships with customers, suppliers, licensees, and other business relations. (Compl. Ex. A1 — Corporate Records at 44–45, ECF No. 2-1.)

Section 13(b) imposed a four-year noncompetition provision covering participation in businesses involving or relating to "interferometry, inertial motion systems, compasses, pointing systems or

apparatuses, [or] navigation systems," in hardware or software. "Participation" expressly included activity as an owner, shareholder, partner, employee, consultant, or licensor of technology. The provision therefore reached central technical fields in which Rapport worked and the principal organizational mechanisms through which he could independently develop or commercialize related technology. (Compl. Ex. A1 — Corporate Records at 44–45, ECF No. 2-1.)

Section 13(c) separately required continued protection of Confidential Information and surrender upon departure of notes, plans, records, reports, software, documents, data, and copies relating to Company Confidential Information or work product. (Compl. ¶¶ 76–79; Compl. Ex. A1 — Corporate Records at 44–46, ECF No. 2-1.)

The equity and post-service provisions reinforced one another. Sections 13(a) and 13(b) remained operative while a founder beneficially owned at least 10% of the Company. Under the contemplated one-million-share capitalization, exercise of the Repurchase Option against all 357,000 of Rapport's initially restricted shares would leave his immediately released 153,000-share block representing 15.3% of the Company. The contractual structure therefore permitted Radian to repurchase a majority of Rapport's contemplated allocation while Rapport remained within the ownership threshold associated with the Agreement's continuing four-year restrictions. (Compl. Ex. A1 — Corporate Records at 33, 44–45, 47, ECF No. 2-1.)

The Founders Agreement supplied powerful contractual machinery through which Radian could exercise rights affecting founder equity and assert rights over Company-related work product, technical records, inventions, subsequent inventions, commercialization activity, and future participation in related technical fields. Control of Radian carried corresponding power over matters central to Rapport's economic interests and continuing technical work.

The Agreement thus combined two materially different sets of provisions. Rapport's personally designed vesting schedule gave Defendant substantial immediate equity protection and an accelerated path toward full release of his contemplated founder allocation, and Rapport's Vacuustat provision preserved the priority of the separate Vacuustat license. Defendant's draft supplied the termination

and nominal-price repurchase machinery and placed broad asserted powers over Company-related technical work, technical records, subsequent inventions, commercialization activity, and post-service competition in Radian.

That combination made control of Radian exceptionally consequential. Under the parties' agreed structure, Rapport held that control while Defendant received the benefit of the founder-protective vesting schedule Rapport had designed. Approximately three months after execution of the Founders Agreement, Defendant began seeking to reverse the governance allocation and place control of the corporation possessing the foregoing powers in his own hands.

### D. Defendant Diverted His Efforts From Radian, Routed Rapport's Technology Through His Own Ventures, and Repeatedly Sought Control of Radian

By April 2025, Defendant was pursuing a course of misconduct directly contrary to the role for which Rapport had brought him into Radian. Radian was the venture the parties had formed to finance, develop, and commercialize Rapport's technologies. Defendant's assigned CEO responsibilities were to perform Radian's external business development, fundraising, grant work, government inter-facing, operations, and public representation. Instead, Defendant was devoting substantial effort to Phoenix Dynamics and Black Lattice, presenting Rapport-derived technology through those entities, seeking capital for them, campaigning for Radian to grant them commercial rights, and developing increasingly elaborate restructurings that would place Radian and its commercialization rights under Defendant's control.

The timing made that campaign especially consequential. Most of Rapport's contemplated founder shares remained subject to Radian's nominal-price repurchase machinery; Defendant's own accelerated vesting protection was rapidly increasing; and Rapport's technologies were generating concrete investor and government interest. Defendant was therefore seeking control of Radian during the period in which control carried its greatest leverage over Rapport's still-restricted equity and while the commercial value of the underlying technology was becoming increasingly concrete.

### 1. While Serving as Radian's CEO, Defendant Began Raising Capital Around Rapport's Technology Through Phoenix

On April 4, 2025, while serving as Radian's CEO, Defendant circulated a Phoenix Dynamics Technology & Investment Memorandum identifying himself as Phoenix's CEO and presenting Rapport's Artifact-derived navigation capability as proprietary to Phoenix. The memorandum claimed superior performance at low-five-figure cost, sought a $2.5 million pre-seed financing, and contemplated a subsequent seed round "10x or larger." The full proprietary-gyro representation is quoted in the Artifact valuation analysis at Section V(I)(3)(c). (Compl. ¶¶ 104–105, 114 *et seq.*; Ex. E1 — Enterprise Structure at 16.)

Defendant's circulation of the April 4 memorandum was part of the fiduciary misconduct at issue. Defendant's job was to raise money, develop external relationships, and pursue commercialization for Radian. He instead presented Rapport's technology as a proprietary advantage of a separate venture he controlled and sought outside capital for that venture. Phoenix had no permission to use Rapport's intellectual property or substitute itself for Radian as a financing or commercialization vehicle.

Rapport was initially willing to hear a proposal under which Defendant would leave Radian before additional contemplated founder shares vested. That willingness had a specific purpose: remove Defendant from Radian and separate him from Rapport's technology while a clean separation was still economically reasonable. Radian remained the sole authorized venture for financing and commercializing Rapport's technology, and Defendant's outside entities had no authorized role in that commercialization process.

Once Defendant described what he actually proposed, the problem became clear. His plans repeatedly preserved a Defendant-controlled outside venture, gave that venture economic or commercial rights in Rapport's technology, and required Radian to transact with it. Defendant himself called Phoenix a "garage operation" and a "funding tactic": "It's garage operation. So it's not hinging operations, it's a funding tactic to go alongside DoD funding approaches." (Ex. C2 — Screenshots, Fig. 11; Ex. C6 — Signal Export [SEALED].)

That description is important because Radian already existed as the venture through which Defendant was supposed to perform fundraising and business development. Phoenix attempted to add a Defendant-controlled layer between Rapport's technology and the capital generated from it. Defendant's own characterization of Phoenix as a 'funding tactic' supports the inference that it served no legitimate Radian business purpose and was intended to enrich Defendant personally rather than discharge his CEO duties.

### 2. Rapport Used His Board Authority to Prohibit the Outside-Venture Arrangements

On April 10, 2025, Rapport used the parties' agreed governance structure to place explicit written restrictions on the conduct Defendant was pursuing. The Radian Industries Conflict of Interest Policy and the Board Resolution on Restrictions on Strategic Authority and Related-Party Transactions supplemented Defendant's existing fiduciary obligations with direct corporate rules governing outside entities, use of Company information, related-party transactions, licensing, exclusivity, revenue sharing, strategic partnerships, and investor or government representation. (Compl. ¶¶ 106–113; Ex. A1 — Corporate Records.)

The Conflict of Interest Policy imposed an "Absolute Prohibition on Conflicts of Interest" and specifically defined prohibited conduct to include "Founding, cofounding, or maintaining a material stake in any outside entity that engages in business, research, development, or fundraising in an area related to or overlapping with the Company's core technologies, customers, or mission." It separately prohibited "Using Company resources, knowledge, or confidential information to benefit another organization" and "Creating external obligations or loyalties that may influence or appear to influence actions taken on behalf of the Company." The resolution reserved the right to "Revoke access to Company information, systems, or operations" to individuals acting in violation of the policy. (Radian Industries Conflict of Interest Policy §§ 1–4.)

The Strategic Authority Resolution imposed equally explicit transactional controls. Related-party arrangements involving an entity in which a Radian officer, director, or shareholder held a material interest had to be "fully disclosed to the Board and submitted for approval," with the interested

party recused. Licensing, joint ventures, partnerships, strategic alliances, exclusivity arrangements, revenue-sharing obligations, equity issuances, and transfers of strategic authority required Board approval. The Resolution further provided: “No individual may represent the Company in discussions with investors, media, government, or other institutions in a manner that binds or commits the Company without prior authorization.” (Board Resolution: Restrictions on Strategic Authority and Related-Party Transactions §§ 1–7.)

Rapport also supplied Defendant a written Roles and Responsibilities document explicitly confirming what Defendant was supposed to be doing for Radian. Defendant’s CEO responsibilities expressly included “External Business Development: Grant submissions, partnerships, and managing key external relationships” and “Fundraising: Coordinating all funding activities, including government grants, strategic partnerships, and potential investments.” The document also assigned Defendant responsibility for operations, legal and compliance requirements, and public representation. Major strategic and financial decisions remained subject to Board approval. (Roles and Responsibilities Document §§ 1–4.)

Defendant acknowledged those limits in writing. After receiving the Roles document, he answered: “Yes, this clarifies things and aligns with how I was thinking about things. At no point did I think I could autonomously enter into partnership agreements.” When Rapport later told him, “Your proposed plan will not be accepted if it conflicts with these resolutions. A plan where you are CEO of both companies will not be accepted,” Defendant responded by continuing the restructuring discussion: “Who will be the CEO of a vacuustat spinoff?” He then confirmed, “I did read the Conflicts doc,” while attempting to characterize the proposed outside companies as “divisions of Radian.” (Ex. C2 — Screenshots, Figs. 6–9; Ex. C6 — Signal Export [SEALED].)

The sequence is direct. Rapport told Defendant that the outside-company structure was prohibited. Defendant acknowledged the governing documents and continued pushing variants of the same structure.

### 3. Defendant Insisted on Preserving Phoenix Even After Rapport Directed Him to Stop

Defendant's April 12 messages demonstrate the intensity of that insistence. Responding to Rapport's direction that he divest from Phoenix as a precondition to any agreement between Radian and Phoenix, Defendant wrote: "Divest from Phoenix is nonsensical gibberish" and then: "what YOU SAID IS REALLY RETARDED AND NON-VIABLE." He continued in all caps: "YOU REPRESENT RADIAN WHEN THERE IS A CONFLICT OF INTEREST. WHY IS THIS SO HARD?!?" and immediately added: "YOU ALREADY HAVE FULL VETO POWER ON ANY AND EVERY PROSPECTIVE DEAL RADIAN IS INVOLVED IN." (Ex. C2 — Screenshots, Fig. 5; Ex. C6 — Signal Export [SEALED].)

Those statements are significant on their own terms. Defendant expressly acknowledged his own conflict of interest arising from Phoenix and expressly recognized Rapport's controlling authority over Radian transactions. He still insisted that Phoenix remain in place.

Rapport's position was simple: Radian was the sole company authorized to commercialize his technology. Defendant had been brought in to perform Radian's fundraising, business-development, and administrative functions. No additional companies were required at any point for Defendant to perform his duties. Rapport had directed him to stop using outside entities around Radian's technology and adopted Board rules expressly prohibiting the arrangements Defendant continued to pursue.

### 4. Defendant Rejected Radian Work While Devoting His Efforts to Outside Ventures and Restructuring Proposals

Defendant's conduct during the same period also departed from the work assigned to him as Radian's CEO. The Roles document placed grant submissions and government funding squarely within his responsibilities. On April 7, Rapport sent Defendant a concrete Radian funding lead for the Vacuustat through ARPA-E. Defendant summarily rejected it: "Waste of time compared to defense." (Ex. C2 — Screenshots, Fig. 10.)

The point is especially consequential because Defendant's preferred defense activity was being routed through Phoenix and Black Lattice. While rejecting an identified funding path for Radian, he

was using Rapport-derived technology in government-facing and investor-facing work for ventures he controlled. The same April 7 screenshot records Rapport asking whether Defendant had filed the Company's taxes; Defendant answered, "Not yet." (Ex. C2 — Screenshots, Fig. 10.) Defendant was therefore neglecting assigned Radian fundraising and administrative work at the same time he was devoting sustained attention to his outside ventures and the structures through which those ventures attempted to obtain rights in Rapport's technology.

### 5. Defendant Continued Advertising Rapport's Technology Through Phoenix and Black Lattice After the Board Prohibited the Structure

After the April 10 Board measures, Defendant continued investor-facing and government-facing use of Rapport's technology through his own ventures. Defendant sent a mass BCC solicitation to venture-capital firms seeking a $50–100 million seed financing around Plaintiffs' combined technology program. He omitted Rapport's name and Radian's name, signed the solicitation himself, and directed investor responses to himself. The solicitation generated an actual Khosla Ventures meeting scheduled for April 17, 2025. (Compl. ¶¶ 93–102; Ex. C3 — Corporate Communications.)

As the April 17 Khosla Ventures meeting approached, Defendant shifted the presentation to Black Lattice, identified himself as that venture's founder, and claimed the Artifact-derived IMU capability as its exclusive competitive advantage. The deck's precise description, the diverted meeting, and the resulting claimed investment loss are presented in Section V(F). (Ex. C2 — Screenshots, Fig. 3; Ex. E1 — Enterprise Structure.)

Defendant's own Signal messages ("Black Lattice (new name for Phoenix Dynamics)") tie Phoenix Dynamics and Black Lattice together, demonstrating that these companies were interchangeable to him, and that both served the same purpose: to reroute Rapport's IP. In the same message, while discussing how his missile concept could create a basis for transfers between the entities, Defendant wrote that he was thinking about it partly "for being able to justify moving funds from Black Lattice (new name for Phoenix Dynamics) to Radian since I obviously can't just embezzle funds." (Ex. C6 — Signal Export [SEALED]; Ex. E1 — Enterprise Structure.)

Read together with Defendant's description of Phoenix as a "funding tactic," those statements reveal the economic structure he was advancing. Capital generated by Rapport's technology would first be raised into a venture Defendant controlled; Defendant would then design intercompany transactions to determine whether and on what terms some of that capital reached Radian. The structure placed Defendant between Rapport's technology and the money generated by that technology.

The same misconduct extended to the Vacuustat. Defendant had already submitted Rapport-derived Vacuustat material through BL Machines LLC, doing business as Black Lattice, in government-facing proposals submitted in response to Requests for Information. Radian held the exclusive Vacuustat commercialization license. Black Lattice held no corresponding license or assignment. Defendant continued using Black Lattice as a separate government-facing and financing vehicle for the Vacuustat and pressed proposals under which Black Lattice or Phoenix would receive exclusivity, preferred pricing, customer status, or other rights in Rapport's technologies. (Compl. ¶¶ 20, 104–124, 211, 217–219; Ex. E4 — RFIs [SEALED].)

### 6. Experimental Validation Changed Rapport's Assessment of the Artifact's Risk

At the beginning of the venture, Rapport was exploring both civilian and defense applications for his technology and had not identified strategic risk as an appreciable concern. However, his assessment evolved as his experimental work clarified the Artifact architecture's performance potential. After building an early benchtop prototype, collecting data, analyzing its performance, and comparing the resulting navigation characteristics with existing inertial systems, Rapport concluded that continued technological development of the same underlying architecture could lead to navigation capabilities with strategic implications. The prototype itself was an experimental system rather than a deployable weapons component, but its measured performance identified a development trajectory that warranted concern about the performance achievable through further refinement. (Ex. C6 — Signal Export [SEALED]; Ex. E3 — National Security Risk.)

On April 23, 2025, Rapport explained that the Artifact could reduce heading error until accelerometer noise became the dominant navigation limit, permit long-duration GPS-independent

precision navigation, and be manufactured cheaply enough for large autonomous deployments. He expressly warned that if the technology were captured or recovered, "not only does your adversary gain that new capability, they also potentially gain a technological advantage on all new [navigational] technology they produce going forward." Defendant responded in the same discussion that "this technology defines who would win a nuclear war." Rapport did not adopt that conclusion; however, he was concerned that the continued technological development of his invention could lead to capabilities serious enough to require careful precautions against proliferation and dissemination. (Ex. C6 — Signal Export [SEALED]; Ex. E3 — National Security Risk.)

Rapport expressed his concerns promptly. On April 21, he told Defendant: "I'm not opposed to continuing to develop this technology. I just want to be sure that it's handled very carefully going forward." On April 28, he stated the issue still more directly: "The critical [Artifact] design gives me serious pause because the risk/reward ratio is not there. The commercial market is not nearly as large, for starters, and it would be extremely dangerous if the critical gyro technology were mishandled." (Ex. C6 — Signal Export [SEALED]; Ex. E3 — National Security Risk.)

### 7. Rapport Developed a Safe Architecture That Preserved Commercialization

Rapport addressed the strategic-risk problem by exploring a safer commercial alternative. On April 27, he told Defendant: "We're going to be able to provide this with our new gyro design (the 'safe' design); I've been doing some analysis on it and it's actually quite good–we should expect to see at least two, maybe three orders of magnitude improvement at a given price tier. And the market for this design will be much larger as well, which is good news from a business perspective." (Ex. C6 — Signal Export [SEALED].)

Defendant independently recognized the Safe gyro's exceptional commercial value. He described high-end IMU performance at a comparatively low price point and proposed approaching major strategic buyers, including Anduril, Lockheed, Boeing, and Raytheon, for a "rapid acquisition/partnership on Safe gyro." The associated unit-price estimate is quoted in the Artifact valuation discussion. (Ex. C6 — Signal Export [SEALED]; Section V(I)(3)(c) Section X(A).)

However, Defendant continued to insist on pursuing the Critical technology even after acknowledging the Safe gyro's extraordinary commercial value. He wrote: "I will also mention that while it is a great business to just have better gyros… what I signed up for was to work on breakthrough physics driven capabilities, not just a fantastic, billion dollar product." He then stated: "If we get a bunch of cash from sale though, then we wouldn't have anything stopping development of the Critical gyro." (Ex. C6 — Signal Export [SEALED]; Section X(A).)

For Rapport, the Safe/Critical discussion was a serious warning sign. He regarded development and dissemination of the Critical version as presenting unacceptable strategic and proliferation risks without stronger safeguards. Defendant nevertheless remained focused on developing that version.

Defendant's contemporaneous explanation reinforced Rapport's concern. On April 28, he wrote: "I really like the idea of being able to impact things meaningfully at the strategic level! It's also a lot harder to get security clearances if we are not pursuing Critical gyro, which makes it harder to know what's really going on in a lot of areas. I don't think Safe gyros gets classified." (Ex. C6 — Signal Export [SEALED]; Ex. E3 — National Security Risk.)

By this point, Rapport's governance authority had become inseparable from technological stewardship. His acknowledged control of Radian gave him the authority to stop development of the Critical gyro, prevent unauthorized disclosure, reject licensing or exclusivity arrangements, block transfer of the technology into Defendant-controlled weapons ventures, and require that commercialization proceed through a safer architecture. Defendant's simultaneous efforts to reverse that governance structure therefore threatened control over whether and how the more sensitive technology would be developed, disseminated, licensed, and used.

### 8. Defendant's Repeated Restructuring Proposals Sought to Put Radian Under His Control

Defendant's outside-venture activity was accompanied by a direct effort to reverse Radian's existing ownership and governance structure and place the company under his control. On April 12, Defendant acknowledged the existing allocation in unmistakable terms: "Currently, you have sole

ultimate deciding power for Radian Industries." He characterized Rapport's ability to remove him as an "existential risk." That acknowledged deciding power was the same authority that allowed Rapport to reject Defendant's outside-venture arrangements and, as the Artifact's risks became clear, to control decisions concerning development and dissemination of the Critical technology. (Ex. C2 — Screenshots, Fig. 5; Ex. C6 — Signal Export [SEALED]; Ex. E3 — National Security Risk.)

The following day, in a proposal conditioned on Phoenix obtaining at least $2.5 million in financing, Defendant proposed that Rapport own 40% of Radian while Chapiro would own 60%. The proposal would have reversed the parties' agreed 51:49 economic allocation and used financing raised for Defendant's outside venture as the premise for transferring majority ownership of Radian to Defendant. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

Defendant continued pressing for restructuring throughout April despite Rapport's repeated statements that arrangements inconsistent with the Board resolutions would not be accepted. By April 27, Defendant's "Non-Binding Radian Restructuring LOI/MOU" proposed that Rapport release his existing Radian shares, that Rapport's proposed research entity, Seldon Initiative, would receive 30% of Radian, and that Defendant hold 70%. The document stated expressly: "Michael to have board control of Radian." A separate provision proposed assigning Defendant the voting rights associated with Seldon's remaining 30% interest. The resulting structure would have concentrated Radian's 70% economic majority, Board control, and essentially all voting power in Defendant. (Ex. A1 — Corporate Records at 55, ECF No. 2-1, PageID #181.)

The same proposal defined Rapport's future role in terms that underscored the proposed transfer of authority. Seldon would perform research, Radian would commercialize the resulting technology, and government contracting would place Radian as prime contractor and Seldon as subcontractor. Rapport could retain the Radian CTO title "to simplify PR at early stages," while Defendant would exercise Board control and the voting rights associated with Seldon's equity. Radian would also receive a right of first refusal over Seldon technology, and Defendant could form additional companies that became Radian customers. Defendant thus proposed a structure in which Rapport would remain

the principal source of Radian's technology and technical work while Defendant controlled the corporation through which that work would be commercialized. (Ex. A1 — Corporate Records at 55, ECF No. 2-1, PageID #181.)

These proposals were particularly notable because Defendant had performed no work that resulted in a tangible economic benefit to Radian. Within approximately two weeks of acknowledging Rapport's ultimate decision-making authority, Defendant proposed first taking a majority equity interest and then acquiring 70% of the equity, Board control, and effectively complete voting control. The proposed changes would have eliminated Rapport's ability to govern the disposition and commercialization of technology he created and continued to develop.

### 9. Defendant's April 27 Proposal Would Have Shifted the Technical Burden to Rapport While Diverting the Economic Benefit to Defendant

Defendant's April 27 proposal would have been economically adverse to Rapport even apart from its proposed transfer of corporate control. It would have allocated the enterprise's principal technical obligations to Rapport while positioning Defendant and Defendant-controlled entities to capture the commercial value generated by that work. Rapport would continue supplying the inventions, research, engineering, product development, and technical expertise necessary to create commercially viable products. Under Defendant's proposals, through Radian and Seldon, Rapport would also have remained responsible for establishing production and manufacturing of the resulting hardware. At the same time, the proposal would have placed Radian under Defendant's control and conferred preferential downstream rights on Defendant's separately controlled Black Lattice venture, had its terms been accepted. (Ex. A1 — Corporate Records at 55, ECF No. 2-1, PageID #181.)

The proposed terms for Black Lattice illustrate the resulting allocation. Defendant intended to raise capital for and operate Black Lattice as a separate loitering-munitions company. The proposal would have granted Black Lattice a ten-year exclusivity option for gyrocomp-enhanced directed-RF communications within a defined loitering-munition field in exchange for $500,000. Under the proposed arrangement, Radian would have been obligated to provide that capability to Black Lattice

at no more than two times cost of goods sold for purchases of at least 100 units. A separate $500,000 option stated that "Seldon shall authorize" Black Lattice to purchase standard-class gyros for ten years for any application at no more than three times COGS in quantities above ten and no more than 1.5 times COGS in quantities above 500. The standard-gyro provision thus contemplated Seldon supplying manufactured gyros to Black Lattice: The contractual right Black Lattice sought was to purchase finished standard-class gyros under pricing tied directly to their production costs. (Ex. A1 — Corporate Records at 55, ECF No. 2-1, PageID #181.)

Other than existing to perform price arbitrage, it was unclear what value or benefit Black Lattice purported to provide to Rapport under Defendant's proposal. The proposal therefore placed the research, engineering, production, and manufacturing burden on Rapport's side of the structure while proposing preferential access for Defendant's downstream company to the resulting products at predetermined prices. Under Defendant's proposal, Rapport, through Seldon and Radian, would have created the technology, turned it into manufacturable products, established production, and supplied the resulting hardware. Black Lattice would then have acquired those products only after the technical work and production risk had already been borne by others. At the 1.5-times-COGS ceiling, a product costing $10,000 in direct unit costs could be sold to Black Lattice for no more than $15,000. That $5,000 gross spread would then have to absorb research expenditures, continuing engineering, specialized personnel, capital equipment, facilities, failed units, administration, warranty obligations, and the other costs required to develop and operate a novel technology business. Those broader expenses could easily consume the entire transfer-price margin.

Black Lattice would obviously have occupied the commercially favored position in that proposed structure. Its proposed acquisition price would have been contractually capped, while its downstream economic opportunity would have remained unrestricted by any comparable pricing limitation. Black Lattice could incorporate Rapport's gyros or communications capability into higher-value systems, sell those systems to customers, or otherwise capture the value created further downstream. Defendant's proposed structure therefore concentrated the labor-, capital-, and technology-intensive

portion of the value chain on the Radian/Seldon side while reserving the downstream commercial leverage for the separate company Defendant intended to operate.

The standard-gyro provision made that allocation particularly stark. The arrangement would have placed Black Lattice between Rapport's manufacturing operation and the ultimate market, allowing Defendant's company to capture downstream value from products Rapport had researched, developed, engineered, and produced.

The proposed revenue share, meanwhile, attached to revenue generated on the Radian side of the structure, where the selling price was to be capped. Limiting the transfer price correspondingly would have limited the Radian revenue base from which Rapport's percentage would be calculated, while additional commercial value would have accumulated in Defendant's separately controlled venture under the proposed arrangement. (Ex. A1 — Corporate Records at 55, ECF No. 2-1, PageID #181.)

Given that Rapport was expected to perform the R&D and manufacturing, he already possessed substantially better commercialization options. For the same effort, he could simply develop and manufacture the technology while retaining control of the commercial vehicle, sell products directly to customers, negotiate arm's-length supply agreements at market prices, or license particular fields of use on terms reflecting the value of the underlying technology. All of these options, of course, were within the original purpose of Radian. Those routes would have allowed Rapport to retain the economic benefit generated by his inventions, technical work, and manufacturing effort.

Defendant's proposal instead would have required Rapport to surrender corporate control, continue supplying the core R&D and manufacturing work, and grant Defendant's separate venture a decade of exclusive or preferential access to the resulting products at contractually capped prices. That proposed allocation placed the principal burdens of technological value creation on Rapport while directing control and downstream economic benefit to Defendant.

## 10. Chapiro's Continued Fiduciary Misconduct and Threat to Rapport's IP Forced Dissolution as a Last Resort

By late April, Defendant's misconduct had made continued operation of Radian unsafe for Rapport's intellectual property, the Company's own commercial interests, and responsible control of the Artifact technology. Defendant remained CEO and retained access to the Company's business-development and administrative systems while using outside ventures to present Rapport's technology, seeking financing and government opportunities through those ventures, rejecting Radian work within his assigned responsibilities, disregarding Board restrictions he had acknowledged, pressing continued development of the Critical gyro after Rapport identified its strategic dangers and proposed a commercially superior safer alternative, and repeatedly demanding structures that would transfer Radian's ownership, Board control, commercialization authority, and rights in Rapport's future technical work to Defendant.

Rapport had used progressively stronger corporate measures to stop that conduct. He first told Defendant that plans inconsistent with Radian's governance requirements would not be accepted. He then adopted written Board restrictions expressly covering outside entities, related-party transactions, licensing, exclusivity, strategic authority, and confidential information. Defendant acknowledged those rules; nevertheless, he continued pursuing arrangements between Radian and Phoenix that preserved Phoenix as a separate Defendant-owned vehicle for commercialization.

Rapport agreed to hear a proposal under which Defendant would leave Radian before additional founder shares vested. The purpose of that discussion was to arrange Defendant's exit from Radian, where Radian would remain the authorized commercialization vehicle for Rapport's technology. Defendant responded with proposed arrangements that preserved Phoenix and Black Lattice as intermediaries, gave those ventures rights in Rapport's technology, and culminated in a demand for 70% of Radian, Board control, and voting control over the remaining 30%.

The agreed governance structure supplied the mechanism for stopping Defendant's conduct. On April 29, 2025, Rapport exercised the Board authority Defendant himself had acknowledged

and adopted a Board Resolution approving dissolution. The Resolution made dissolution effective immediately and authorized Rapport as Chairman to execute the dissolution. (Board Resolution of Radian Industries, Inc. Approving Dissolution; Ex. A2 — Dissolution.)

Dissolution was a last-resort corporate protection necessitated by Defendant's misconduct. Merely removing Defendant from office would have left Radian operating as the exclusive commercialization vehicle for Vacuustat while Defendant was actively misappropriating that technology, and left unresolved the continuing rights Defendant claimed under the Founders Agreement and through the Company while he was already using Rapport's technology through Phoenix and Black Lattice, presenting it to investors and government counterparties outside Radian, and demanding control of Radian itself. Continuing to place Rapport's inventions, technical work, financing opportunities, government engagements, and future development inside that operating structure would have exposed Rapport's assets to further unauthorized use. Dissolution ended that operating structure, protected Rapport's intellectual property, preserved his authority over the development, disclosure, licensing, and stewardship of his inventions, and prevented further use of Radian's corporate machinery to advance Defendant's unauthorized commercialization.

As part of the wind-up, Rapport authorized a return of approximately $18,500 remaining in Radian's Mercury account. The contemporaneous Board Resolution of Radian Industries Approving Repayment of Contributed Funds held that "there is no outstanding debt obligation triggered under the existing Loan Agreement," characterized the contemplated payment as a "voluntary repayment of contributed funds," and provided that, "upon receipt of said funds, Michael Chapiro shall have no further claim against the Company or its officers, directors, or assets." The Resolution authorized Rapport, not Defendant, to complete that transaction. A contemporaneous acknowledgment supplied to Defendant likewise characterized the payment as a voluntary return of contributed funds and provided for release of further claims. Defendant left that acknowledgment unsigned and subsequently withdrew the funds under different asserted terms. (Ex. A2 — Dissolution.)

Rapport retained responsibility for winding up Radian. As the remaining officer and authorized representative responsible for the wind-up, Rapport was entitled to the Company's records, financial information, accounts, and credentials necessary to complete that work. (Compl. ¶ 376.)

The chronology therefore identifies the cause of dissolution in plain terms: Defendant's ongoing fiduciary misconduct, refusal to abide by the Board's directives, diversion of Radian opportunities into Defendant-controlled ventures, neglect of his Radian responsibilities, repeated demands for control, insistence on continued pursuit of the more sensitive Artifact capability, and threat to Rapport's intellectual property and technological stewardship left dissolution as the final corporate mechanism available to stop the misconduct and protect the technology.

**E. Defendant Unilaterally Asserted the Rights His April Proposals Would Have Achieved**

On April 30, one day after dissolution, Defendant asserted that "the company is the owner of the IP," claimed that he was still a "joint owner" of Rapport's technology, and stated that he would be "well within my rights legally to continue working on it in a new entity." He simultaneously proposed removing Rapport from Radian ownership and governance while retaining the technology under an exclusive commercial arrangement. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

On May 1, Defendant expanded those assertions. He declared Rapport's dissolution a "de facto resignation," purported to treat Rapport's unvested shares as repurchased, and announced: "This hereby means you are a minority shareholder, if a shareholder at all." He demanded "[a]ll property of the company/myself," expressly including hardware, pending patents, patentable information, and technical information. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

On May 2, Defendant stated, "Can't have you as a shareholder." Regarding royalties, he warned Rapport "it is also trivial for you to have none if you dig your heels in." (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

The relationship between these post-dissolution assertions and Defendant's preceding proposals is direct. Before dissolution, Defendant repeatedly demanded structures giving him 60%, and then 70% economic ownership, Board control, voting control over the remaining shares, commercialization

authority, downstream rights for Black Lattice, and a structure in which Rapport receive funding only through Defendant's own separate companies. Dissolution prevented those proposals from being realized. Defendant then unilaterally asserted substantially the same powers that he had attempted to obtain through voluntary agreement: authority to remove Rapport from the company, reduce or eliminate Rapport's ownership, retain control of Rapport's technology, continue development through a new entity, and determine Rapport's royalty participation (or lack thereof).

Defendant also retained the technical materials required to exploit those asserted rights. He admitted: "I have a backup of the company Drive." The backup included confidential trade secrets from the expressly labeled "Private" folder, and Defendant retained and accessed the information after Rapport revoked authorization. Defendant further admitted that he had made unauthorized disclosures of Rapport's technology, stating: "[t]here is now a third person who knows what we know." Defendant also made unauthorized technical disclosures to federal personnel. (Compl. ¶¶ 160–161, 209–211.)

Several months later, Defendant expressly described Rapport's IP as retaining future value to him. On July 27, 2025, in a public exchange referring to Rapport and the project, Defendant describes Rapport's IP as "a long tail option I can exercise in a few years". (Ex. C4 — Social Media Posts, ECF No. 2-8, PageID # 293; Ex. F2 — Supplemental Posts, Long-Tail Option Statement.) That statement supports the inference that Defendant views the present legal dispute as a temporary obstacle and is expressly contemplating a return to exploiting Rapport's IP after this litigation runs its course, if he is not prevented from doing so.

Defendant's subsequent May 2 statement quantified his anticipated residual development effort: "I am $250k, 1 physicist, and 1 engineer away from surpassing where we were in a few months." His separate April 30 remarks about obtaining a $1 million contract using the experimental analysis and footage are quoted in the lost-contract damages section, Section V(D). Both statements bear on the head start conferred by his access to Rapport's technical archive. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

Those statements provide a concrete economic benchmark for the value of the retained materials. Defendant estimated that, even with Rapport's research, experimental apparatus documentation, analysis software, footage, data, and technical records already in hand, reproducing the existing development position would still require approximately $250,000, one physicist, one engineer, and several months of work. The $250,000 figure therefore represents a minimum residual reproduction cost after Rapport's accumulated technical work had already been supplied to Defendant. Rapport's archive provided a development and commercialization head start that allowed Defendant to begin from that advanced position rather than independently recreate the underlying research, experimentation, software, data, and technical knowledge—all of which would have been vastly more expensive to reproduce without Rapport's trade secrets, if it could be done at all.

Defendant simultaneously seized control of Radian's electronic infrastructure. He revoked Rapport's access to Radian's corporate Gmail account, cutting off Rapport's access to corporate communications and signed agreements. He separately revoked Rapport's access to the shared Google Drive containing grant drafts, technical files, corporate agreements, and internal records. After Rapport's cease-and-desist email and Defendant's subsequent liquidation of the Company's funds, Defendant also excluded Rapport from the Company's Mercury bank account. (Compl. ¶¶ 157–159.)

On May 16, 2025, after Defendant had withdrawn Radian's remaining corporate funds and revoked Rapport's access to the Company's Mercury bank account, Rapport contacted Mercury to request closure of the account, obtain the Company's transaction records, and prevent further unauthorized activity. On May 20, Mercury notified both parties that it had locked the account pending resolution of the ownership dispute and requested corporate documentation. Rather than cooperate with the winding-up process, Defendant responded by publishing a series of knowingly false and defamatory accusations against Rapport directly to Mercury. Defendant wrote: "Nathan is conducting felony theft of corporate physical assets in excess of $10k after an unlawful dissolution of the corporation." He further asserted: "He is mentally unwell / deranged and has made various threats." In reality, Rapport had exercised his lawful corporate governance authority to dissolve Radian and

was seeking to recover the financial records necessary to account for Defendant's withdrawals and complete the Company's winding up. Defendant's publication of baseless accusations of felony theft, criminal wrongdoing, threatening conduct, and mental instability was a deliberate attempt to discredit Rapport and undermine his authority and credibility in the course of carrying out those responsibilities. (Compl. ¶¶ 157–159, 165–170; Compl. Ex. C3 — Corporate Communications at 7–12, ECF No. 2-7.)

Those lockouts directly impaired the winding-up process. They deprived Rapport, the person responsible for Radian's wind-up of access to corporate records, financial information, agreements, technical files, and communications required to verify transactions, preserve the corporate record, complete financial and tax work, identify the scope of Defendant's disclosures and submissions, and establish a clean chain of ownership and authority for future investors and commercialization partners. They also placed the documentary evidence concerning Radian's ownership and governance inside systems controlled by the same person who was asserting that Rapport had become "a minority shareholder, if a shareholder at all."

Defendant thereafter continued pursuing commercialization outside Radian. Phoenix Dynamics LLC was formally incorporated on May 12, 2025. Defendant's ongoing activities extended the economic injury beyond Radian's dissolution by maintaining competing claims of ownership and attribution, preserving the benefits of Defendant's technical head start, continuing government- and investor-facing use, interfering with establishment of a clean successor commercialization vehicle, and forcing Plaintiffs to pursue litigation to restore uncontested ownership, records, and commercial control.

### F. Defendant's September 2026 Email Describes Current Vacuustat Sales From Poland

On September 8, 2026, after the entry of default, Defendant emailed Rapport under the subject "Vacuum Balloons." He wrote: "We're selling the first 15 units from a production facility in Poland now; then they will want hundreds." He added that the units would "help quite a bit on drone detection." (Ex. F9 — Vacuustat Email, p. 2.) Defendant thus represented that he was engaged in a

current sales effort involving an initial fifteen units from a Polish production facility and anticipated substantially larger subsequent demand.

Defendant had previously identified Poland among the locations he contemplated for foreign engineering and development in his October 2025 essay. (Ex. F1 — October Posts, p. 21.) His September 2026 email subsequently identified a production facility in Poland in connection with his reported vacuum-balloon sales. This new statement identifies concrete subjects for the requested accounting, including the reported production facility, the initial fifteen units, the purchasing counterparty, the terms and proceeds of any resulting transactions, and any technical materials supplied in connection with the reported manufacturing activity. It also supports the request for prospective relief addressing further exploitation and dissemination of Plaintiffs' protected materials.

## G. Evidence Discovered After Dissolution Confirmed Rapport's Security Concerns

The Safe/Critical gyro discussion was a significant contemporaneous warning sign for Rapport. Evidence Rapport discovered after dissolution confirmed the seriousness of that judgment. Defendant's public statements revealed his views concerning nuclear war, catastrophic mass casualties, radical population reduction, and authoritarian political violence. His subsequent conduct simultaneously demonstrated an expanding commitment to hypersonic missile programs, foreign military relationships, foreign engineer recruitment, international weapons manufacturing, and foreign-development strategies designed to produce military capabilities across multiple jurisdictions. (Ex. E3 — National Security Risk; Ex. C4 — Social Media Posts; Ex. F1 — October Posts; Ex. F2 — Supplemental Posts.)

### 1. Defendant's Statements Concerning Nuclear War and Mass Depopulation Loss Confirmed the Security Risk

The significance of Defendant's statements lies in their direct relationship to the technology he sought to control. Rapport had concluded that the Critical Artifact could materially enhance long-range, GPS-independent precision weapons and could affect strategic warfare. Safe stewardship

therefore required judgment directed toward preventing catastrophic escalation, mass civilian casualties, and uncontrolled proliferation.

In public statements, Defendant repeatedly described catastrophic mass-casualty outcomes and drastic population reduction in favorable political, economic, or social terms while pursuing strategic technology, classified access, hypersonic and missile programs, foreign military relationships, and international weapons manufacturing.

For example, Defendant described a nuclear exchange that would kill large numbers of Americans as politically advantageous, repeatedly portrayed drastic reductions in world population as beneficial, minimized the destructive consequences of nuclear war, and expressed favorable views of Hitler and future Hitler-like political figures. The surrounding record also shows Defendant pursuing classified access, hypersonic and missile programs, foreign military relationships, foreign engineer recruitment, and international missile manufacturing. These facts reinforced Rapport's earlier conclusion that Defendant should not retain access to his technology. (Ex. F2 — Supplemental Posts, pp. 3–13; Ex. F1 — October Posts, pp. 3–18, 21–25; Ex. E3 — National Security Risk, pp. 16–28.)

Only twelve days after dissolution, Defendant publicly described a nuclear exchange with Russia in terms of its favorable domestic political consequences. On May 11, 2025, he wrote: "I don't know why so many right wing folks say we can't fuck with Russia because they have nukes–a nuclear exchange would overwhelmingly wipe out liberals that are concentrated in cities and see America go right wing for decades/forever." The statement followed the April discussions in which Defendant had written that the Artifact "defines who would win a nuclear war," had pressed for continued development of the Critical gyro, had expressed interest in strategic-level impact, and had connected the Critical program with obtaining security clearances. (Ex. E3 — National Security Risk; Ex. F2 — Supplemental Posts, Russia Post.)

Defendant subsequently made repeated statements minimizing the danger of nuclear war and presenting catastrophic population loss in favorable terms. On December 24, 2025, he wrote that at the height of the Cold War, "with tens of thousands of nuclear ICBMs, you could only at most kill about

half the population. Nuclear winter is also a myth." On August 8, 2026, he asked readers to "Imagine if the world population were suddenly only 80 million people, 1% of what it is today," and described that scenario as "100x 'infinite abundance' overnight." On August 15, 2026, he wrote: "Thanos was right / 4 billion by 2040 / Single issue 'voter'." (By placing quotation marks around "voter," Defendant presented himself as committed to bringing about the stated reduction in world population through his own actions rather than ordinary political participation.) On April 5, 2026, responding to a post concerning the elimination of poverty, he wrote: "End poverty? I don't want to be too quick to oppose, but is it truly necessary to genocide all 7 billion of them?" (Ex. F2 — Supplemental Posts, World Population / Depopulation Posts.)

The same record contains repeated affirmative statements concerning Hitler and future Hitler-like political figures. On August 2, 2025, Defendant wrote: "As a Jew, this makes me wonder if perhaps Hitler was right on a great many things?" On December 28, 2025, he wrote: "I'm Jewish and even I am starting to wonder whether Hitler was actually right in some regards, and that it was just the Holocaust part + invading Russia that was flawed?" On March 5, 2026, he wrote: "Hitler was objectively good. And people shouldn't be ashamed for remaining excited for the next possible Hitler." Other posts discussed the prospect of a future Hitler-like figure and what Defendant described as becoming what "Hitler and Jobs did not become." (Ex. F2 — Supplemental Posts, Hitler-Related Posts.)

Technology capable of materially affecting strategic weapons presents inherent risks of catastrophic escalation, mass civilian casualties, and uncontrolled proliferation, making careful control over its development and dissemination essential. Defendant's statements demonstrated that he assigned positive value to outcomes ordinarily regarded as catastrophic, including nuclear war, nuclear mass casualties, and drastic population loss. They therefore supplied direct confirmation that Rapport's refusal to place the Critical Artifact under Defendant's control addressed a genuine security risk.

## 2. Defendant's Foreign Travel and Recruitment Activity Confirmed the Dissemination Risk

Defendant's post-dissolution misconduct supplied further confirmation of the security risk Rapport had identified. Defendant continued building weapons ventures, pursued foreign defense relationships, recruited technical personnel abroad, and publicly described plans to manufacture and sell missiles through foreign entities and supply chains. His activities demonstrate a sustained strategy of developing military capabilities across multiple jurisdictions and integrating foreign engineers, foreign manufacturers, foreign military customers, and foreign procurement institutions into that strategy. (Ex. C4 — Social Media Posts; Ex. F1 — October Posts; Ex. E3 — National Security Risk.)

Argentina became an early focus of Defendant. In July 2025, Defendant announced that he was meeting with the Argentine Ministry of Defense and that his team had already been communicating with it. In August, he traveled to Argentina and publicly posted a photograph of himself standing outside the Ministry of Defense, writing, "We're gonna build here like it's 1950′s Socal." He separately asked: "Should I help build a hypersonics startup in Argentina and leverage that to recruit the American deep state to make Argentina based again, enabling greater cooperation in areas that we cannot risk falling into commie hands?" On August 28, he announced an "Agreement with a foreign country for sales of at least 3.5X" and stated that a deposit would be made. On September 8, he wrote that he had "been inside their Pentagon," had "illegally flew a drone on one of their airbases," and was "about to poach their country's top weapons engineer." On October 11, he publicly asked whether anything legally prevented him from advocating for El Salvador to "instigate regime change against communism and take control throughout Central America, with weapons made by my companies in Argentina." These statements document Defendant's travel, foreign defense contacts, hypersonic-development plans, prospective foreign weapons sales, foreign engineer recruitment, and stated intention to supply weapons manufactured in Argentina for military-political activity elsewhere in Latin America. (Ex. C4 — Social Media Posts, pp. 4–5, 7–8; Ex. F1 — October Posts, Figs. 1, 4, 6–8.)

The same strategy expanded during October. On October 12, Defendant publicly displayed communications showing that he was actively recruiting master's- and Ph.D.-level photonics specialists from Berkeley and the University of Minnesota for a founding-engineer role. On October 17, Defendant described himself as "socializing weapons concepts in the Pentagon and foreign procurement offices" and asked what it would cost to create a training factory for "a few hundred technicians in Eastern Europe" who could then be "quickly redeploy[ed] across other countries." On October 18, he referred to "my future missile factories in Eastern Europe" and stated that European missile manufacturing should be concentrated in Eastern Europe, with weapons exported from Poland and the Baltics throughout Europe. On October 19, he wrote that he might be "standing up new types of missile factories with ITAR-free Argentine rocket engines" and announced a five-year objective of "$2 billion in annual missile sales." On October 25, discussing a Latvian materials engineer, he wrote: "we'll get people we need" and referred to "whoever is hiring engineers for us in Latvia." The same day, he wrote that he was "wrangling multiple LaTeX docs for foreign militaries" from coffee shops. (Ex. F1 — October Posts, Figs. 2, 4, 14–20.)

Defendant's October 28 essay made the foreign-development strategy explicit. He wrote: "There is nothing stopping you from leveraging American capital markets with developments in other countries, something I have contemplated for a number of years, but only recently started actively pursuing." He then described a method for reproducing weapons abroad through foreign engineering teams and working around ITAR restrictions, writing: "Now, it is likely covered under ITAR, which means I cannot send the exact CAD or other design files without export approval, but it is completely legal for me to go to the UK, or Poland, or South Korea, find some engineers and tell them, '… take a look at this photo on twitter, and make something similar' and then giving them seed funding to do it." (Ex. F1 — October Posts, p. 21.) He advocated building "defense startups globally, run by Americans," and wrote: "We can seed a new defense industrial base throughout all allied regions, with wholly owned subsidiaries of US startup companies." (Ex. F1 — October Posts, pp. 21–25.)

Defendant's comments on foreign development are especially significant in light of his pre-dissolution representation to the Joint Certification Program that Radian was "developing technologies that will fall under ITAR." (Ex. F8 — Government Forms and Certifications.) Read together, the two exhibits show that Defendant anticipated ITAR restrictions in connection with Radian's developing technologies and later publicly articulated a foreign-development strategy premised on reproducing defense technologies without sending controlled CAD or design files. That statement directly reinforces the dissemination risk associated with Defendant's continued possession of Rapport's technical materials.

These activities directly confirmed the dissemination concern raised by the Safe/Critical exchange. Rapport had identified a technology whose strategic value depended heavily upon controlled development and controlled dissemination. Defendant subsequently broadcast a defense strategy spanning foreign military contacts, foreign procurement offices, hypersonic development, foreign engineer recruitment, missile factories in Eastern Europe, "ITAR-free" foreign components, international weapons sales, and replication of weapons concepts through engineering teams located abroad. Defendant's retained access to Rapport's technical archive therefore carries an ongoing security and dissemination risk.

The chronology establishes a consistent progression. Rapport's concern arose before dissolution from the Artifact's demonstrated capabilities, Defendant's weapons-centered plans, Defendant's unauthorized use and disclosure of Rapport's technology, his demands for corporate control, and his insistence upon continued access to the Critical technology after Rapport proposed an extraordinarily valuable Safe alternative. Defendant's subsequent statements concerning nuclear war, mass population reduction, and authoritarian violence confirmed Rapport's judgment concerning Defendant's suitability to control the Critical technology. Defendant's subsequent foreign weapons activity confirmed the associated dissemination risk. Collectively, the evidence vindicates the security concerns that led Rapport to terminate Defendant's continuing access to his technology.

The record also supplies concrete evidence supporting the prospective relief Plaintiffs requested earlier in this action. In November 2025, the Magistrate Judge recommended denial of Plaintiffs' request for immediate *ex parte* relief while service remained pending, expressly limiting the recommendation "at least to the extent it is filed ex parte". (ECF No. 13, pp. 3–4.) Plaintiffs timely objected, explaining that the recommendation conflated Rule 4 service of the summons and complaint with Rule 65 notice of requested injunctive relief, and documenting that Defendant had received the TRO motion, proposed order, and supporting exhibits by email. (ECF No. 14, pp. 3–6.) The record has since expanded substantially. It now includes Defendant's continued retention and use of Rapport's technical materials, foreign weapons-development activity, foreign technical recruitment, and continuing efforts to commercialize defense technology through Defendant-controlled ventures. These subsequent facts confirm the prospective risks underlying Plaintiffs' original request and independently support the permanent injunctive relief requested with final judgment.

### H. Defendant's Public Rejection of Intellectual Property Rights Provides Direct Evidence of Willfulness and Intent

Defendant's public statements regarding intellectual property supply direct evidence of the state of mind accompanying his misappropriation. Before, during, and after his access to Rapport's technology, Defendant repeatedly declared that intellectual property rights are illegitimate, unlawful, or nonexistent. Defendant concealed these views when he obtained access to Radian, whose business model depended on Rapport's patents, confidential technical information, trade secrets, and controlled commercialization rights. The Complaint specifically pleads Defendant's concealed hostility to intellectual-property rights and the materiality of that concealment. (Compl. ¶¶ 321–329; Ex. C4 — Social Media Posts.)

The pattern preceded Radian. On August 20, 2023, Defendant celebrated what he called "the beginning of the end of the unlawful, criminal notion that 'intellectual property' is a real thing." On December 29, 2023, he urged El Salvador to leave the Patent Cooperation Treaty and wrote in capital letters: "THERE IS NO SUCH THING AS 'Intellectual Property.'" The latter post expressly

connected his rejection of IP rights to foreign jurisdictions and international patent protection. (Ex. C4 — Social Media Posts, pp. 9, 13.)

Defendant continued making similar statements while serving inside the venture with access to Rapport's intellectual property. On August 4, 2024, days after Rapport first approached him about the Artifact, Defendant wrote: "There is no such thing as 'intellectual property.'" On October 8, 2024, he called intellectual property "fundamentally unlawful." On February 13, 2025, he wrote: "'Intellectual property' is not real. It is word salad nonsense to justify the violation of actual property rights with theft, violence, and extortion." On March 3, 2025, after Rapport discovered Defendant's pseudonymous account, Defendant publicly acknowledged: "I wasn't hiding my twitter, but I wasn't pointing it out either." (Ex. C4 — Social Media Posts, pp. 9–13.)

The preserved social-media evidence also records Defendant characterizing the enforcement of patent rights as "state-sanctioned terrorism." That statement is directly probative of intent because it attacks the legal mechanism by which an inventor enforces the rights Defendant later disregarded when he misappropriated Rapport's technology. (Ex. F2 — Supplemental Posts, p. 14.)

The statements became especially probative in April 2025, while Defendant was simultaneously using Rapport's technologies in defense ventures and seeking greater control over Radian. On April 15, Defendant wrote: "Almost none of the people in this IP debate have any of this so-called 'IP' to lose I on the other hand have patents on stuff on its way into strategic missiles for the next many decades, so you'd think I would be on pro-'IP' side …but first and foremost, I have principles!" In the same period he repeatedly declared that IP did not exist and characterized enforcement of IP rights as state violence and extortion. The April 15 statement is particularly revealing because Defendant expressly applied his anti-IP position to patents associated with strategic missiles while he was making attempts to control Rapport's navigational technology. (Ex. C4 — Social Media Posts, pp. 10–11.)

Defendant also maintained his views on IP after misappropriating Rapport's IP. On May 10, 2025, he wrote that a "supposed transgression" of "IP theft" should be discounted "since there is no such thing as 'intellectual property.'" In another post the same day, after stating that he had stepped down

from another company to focus on aerospace and defense, he added: "I'll just mention, as always, 'IP' is not real." On May 24 and June 20, he again characterized intellectual-property rights as violent extortion or theft. (Ex. C4 — Social Media Posts, pp. 11–12.)

These statements establish a consistent state of mind accompanying Defendant's misappropriation. Defendant knew Rapport created the technologies; knew Radian's commercialization rights depended on defined IP ownership and licensing arrangements; obtained access to confidential technical materials through that relationship; publicly rejected the legitimacy of the very rights protecting those materials; concealed the extent of his ideological hostility while obtaining access; and then retained, used, disclosed, and commercialized Rapport's technology through entities he controlled. His public statements directly corroborate the willful and deliberate character of his misappropriation and his intention to continue exploiting the technology without recognizing Rapport's intellectual-property rights. (Compl. ¶¶ 85–88, 321–329; Ex. C4 — Social Media Posts; Ex. E3 — National Security Risk.)

### I. The Defendant's Misconduct Connects the Individual Damages Categories

The damages quantified in Section V arise from Defendant's common course of misconduct directed at Plaintiffs' technology, corporate opportunities, commercialization channels, and governance.

Rapport supplied the underlying technologies, retained ownership of them, controlled Radian's Board under the parties' agreed governance structure, and authorized their commercial use through defined corporate and licensing arrangements. Defendant received access to Rapport's technical work, investor materials, government submissions, corporate records, and commercialization strategy through his role at Radian.

Defendant used that access to redirect economic opportunities and technical assets into ventures he controlled. Phoenix and Black Lattice presented Rapport's technologies in fundraising, government-facing, and commercialization efforts; Defendant diverted the Khosla fundraising opportunity from Radian to Black Lattice; and he pursued defense financing and commercialization through those outside entities while retaining access to Radian's technical and commercial resources.

Defendant simultaneously sought to displace Rapport's acknowledged Board control, proposing majority equity, Board control, and effective voting control for himself. As detailed in the restructuring chronology above, those proposals would have transferred decisions over commercialization, licensing, technical access, and increasingly sensitive Artifact development into Defendant's hands.

Rapport exercised the existing governance structure to protect Radian and the technology. He issued binding resolutions, prohibited continued use of outside entities around Radian's technology, and preserved his authority over the development and dissemination of his inventions. Defendant continued pursuing the same diversion of Plaintiffs' technology and commercial opportunities into Defendant-controlled ventures, together with efforts to obtain control over Radian, despite repeated directives to desist. Rapport dissolved Radian on April 29, terminating the operating structure through which Defendant had received access to Rapport's IP.

Defendant's misconduct continued after dissolution. He asserted ownership and commercialization authority over Plaintiffs' intellectual property, retained the technical archive, excluded Rapport from corporate systems, continued using the technology through Defendant-controlled ventures, and pursued financing, technical recruitment, and weapons-development activity using the resulting commercial position. His subsequent conduct confirmed the significance of the control and stewardship concerns that had already produced the dissolution.

This course of misconduct caused distinct economic injuries: impairment of the Artifact and its commercial position; delay and interference with Vacuustat commercialization; destruction of Radian's going-concern value; diversion of financing and corporate opportunities; transfer of technical materials to competing ventures; diversion of corporate funds; and continuing costs associated with restoring clear ownership, control, and commercial exclusivity.

Section V quantifies those injuries separately. The common factual sequence establishes causation, intent, commercial significance, and the relationship between Defendant's conduct and each resulting economic loss.

## V. Independent Compensatory Damages Categories

This section sets out Plaintiffs' compensatory damages and the evidence supporting each amount. Plaintiffs presently quantify $155,946,437.94 in compensatory damages, before statutory enhancements, attorney's fees and costs, interest, disgorgement, and equitable relief.

The damages are divided into separate categories so the Court can evaluate each injury independently. These categories include diverted funds, unreimbursed expenditures and labor, lost contracting and financing opportunities, destruction of Radian's enterprise value, and damages to the Artifact and Vacuustat. Where more than one legal claim supports the same economic injury, that injury is counted only once. Later sections address statutory enhancements and other forms of relief.

### A. Diverted Corporate Capital

Defendant agreed to provide Radian Industries, Inc. with $60,000 in development capital in two $30,000 tranches. The Agreement further provided that the loan was non-callable and would become repayable only after Radian had won and received cumulative government-contract, grant, or other revenue exceeding $700,000. That condition for repayment never occurred.

The parties came to agreement in April that the second loan tranche was triggered, obligating Defendant to make the full $60,000 available for Radian's use. Approximately $8,335 of the committed funds was instead expended on travel, lodging, conferences, and related activities associated with Defendant's other ventures, including Black Lattice and Phoenix Dynamics. Those expenditures produced no identified deliverable, asset, or investment for Radian and were not authorized as compensation or reimbursement for Defendant's competing ventures. Defendant additionally withheld $2,000 from the triggered second tranche under the asserted justification of unspecified expenses, thereby depriving Radian of another portion of the capital contractually committed to the Company.

The April 29 Board Resolution authorized Rapport to execute a voluntary return of contributed funds, expressly found the loan repayment trigger unfulfilled, and tied receipt to extinguishment of Defendant's further claims. Defendant subsequently exercised control over the funds on materially different terms.

Defendant withdrew approximately $18,500 and characterized the transaction as a "loan repayment." Defendant then continued asserting substantial claims against Radian, Rapport, and Company assets. The Complaint accordingly alleges that the May 9 transaction exceeded the authorization previously given, breached the Loan Agreement, and constituted conversion and civil theft.

The resulting injuries to Radian are: $8,335 in capital diverted to Defendant's other ventures, $2,000 withheld from the triggered second loan tranche, and $18,535.52 wrongfully withdrawn from the corporate account. These amounts arise from the $60,000 funding commitment and are stated once. The $28,870.52 category is the sole compensatory request for these three identified hard-dollar losses.

Accordingly, Plaintiffs request $28,870.52 in compensatory damages for diverted corporate capital. This category is supported independently by, among other claims, breach of fiduciary duty, breach of contract, fraudulent conveyance, civil theft, conversion, and the pleaded racketeering violations. It concerns identifiable corporate funds and is distinct from Plaintiffs' separate claims for unreimbursed development expenditures, uncompensated labor, lost financing and contracting opportunities, destruction of enterprise value, and impairment of Plaintiffs' intellectual property.

**B. Unreimbursed Expenditures and Core-Development Technical Labor**

Plaintiff Rapport personally supplied both the capital and the technical labor required to develop and validate the technologies that became the foundation of the parties' venture. This category measures the readily quantifiable cash and labor value Rapport personally contributed and for which he received no reimbursement or compensation. It is a direct restitutionary and documented labor-value measure. The separate trade-secret sections address the technologies' broader commercial value, the reproduction cost of Rapport's accumulated research and development, and the head-start and avoided-cost benefits resulting from Defendant's later misappropriation.

From late August through December 2024, Rapport personally purchased the hardware, optics, electrical components, and laboratory supplies necessary to construct and test the Artifact prototype. The Complaint documents an intensive period of founder-led development during which Rapport worked full time on prototyping and experimental development, maintained a seven-day work

schedule, and paid the development expenses from his personal funds. The contemporaneous receipts establish unreimbursed research-and-development expenditures totaling $14,247.42.

The financial expenditures capture only part of Rapport's contribution. During the approximately sixteen-week core development period from late August through mid-December 2024, Rapport worked approximately 56 hours per week on technical development, prototyping, testing, procurement, analysis, and related engineering work, totaling approximately 896 hours. The requested value of that labor is calculated at $72 per hour, the approximate hourly equivalent of Rapport's prior $150,000 annual base salary using a 2,080-hour work year. That calculation yields $64,512 in uncompensated core-development technical labor.

Rapport's declaration establishes that his annual base salary at Bread Financial was $150,000, with total compensation above that amount through bonus compensation. His redacted 2024 W-2 and earnings summary independently reports $121,920.95 in gross pay for the partial year in which his employment ended at the end of August. (Rapport Decl. ¶ 14; Ex. F4 — Bread Financial Compensation Record, p. 2.)

The contemporaneous agreements and communications corroborate that this work during the August-December period was undertaken for the venture and that technical labor was understood to constitute a principal contribution to it. The ARK Interim Partnership Agreement, signed by both parties on August 13, 2024, designated Rapport as CTO and Founder and assigned him responsibility for technical development, while Defendant assumed the business and strategic role. Defendant therefore knew that Rapport was contributing substantial uncompensated technical labor and that this labor constituted a central source of value for the contemplated enterprise. (Ex. A1 — Corporate Records; Ex. C1 — Initial Conversations.)

As alleged in the Complaint, Defendant subsequently obtained and retained the benefit of that work. The prototype, experimental results, calculations, technical materials, and related development later used as the technical foundation for Radian's business were subsequently retained, appropriated, disclosed, and used by Defendant in connection with his own competing ventures and commercializa-

tion efforts. Ohio restitution principles permit recovery of the reasonable value of a benefit conferred upon and knowingly retained by another where retention without compensation would be unjust. The $64,512 labor calculation supplies a concrete documented measure of the labor value Rapport personally contributed. The trade-secret sections separately value the substantially greater commercial benefit created and later appropriated.

The two components are therefore $14,247.42 in unreimbursed research-and-development expenditures and $64,512 in uncompensated core-development technical labor, for a combined requested award of $78,759.42.

The $78,759.42 requested here represents the directly documented cash and labor value personally supplied by Rapport during the core prototype-development period and retained for the benefit of the enterprise and Defendant. The separate trade-secret damages analysis captures additional economic value arising from years of earlier research, failed approaches and negative knowledge, reproduction cost, development head start, and the technologies' commercial potential.

## C. 2025 Compensation Shortfall

From January through April 2025, Rapport continued working full time as Radian's CTO, advancing the Company's technologies and business objectives while receiving compensation of only $3,000 per month. A documented floor for valuing those services is Rapport's immediately preceding annual base salary of $150,000, equivalent to $12,500 per month. (Rapport Decl. ¶ 14; Ex. F4 — Bread Financial Compensation Record, p. 2.) Using that prior salary conservatively omits any additional premium for founder, CTO, executive, or specialized technical responsibilities. Four months of full-time services at that rate has a value of $50,000.

Rapport deliberately accepted compensation substantially below the market value of his services during 2025 in order to conserve Radian's limited capital and direct its resources toward development and commercialization. The resulting compensation shortfall therefore reflects a conscious economic contribution to the company to reduce its operating expenses, rather than the market value of Rapport's

labor. By foregoing compensation he otherwise would have earned, Rapport effectively invested additional personal labor value into Radian to extend the company's available runway.

Rapport received only $12,000 during the four-month period from January through April. The difference between the $50,000 reasonable value of his services and the $12,000 actually received is $38,000. Defendant knew that Rapport continued performing full-time technical and executive work for Radian and benefited from that work, which he later misappropriated. As alleged in the Complaint, Defendant simultaneously benefited from Rapport's continued development efforts while diverting Company funds, opportunities, and technical assets for his own purposes. Plaintiffs therefore request $38,000 for Rapport's compensation shortfall.[4]

## D. Lost Contract Opportunity

Defendant's contemporaneous statements establish a concrete lost contract opportunity associated with the Artifact technology. On April 30, 2025, Defendant wrote that "[t]he analysis we have and the footage is enough for me to get a $1m contract," and immediately explained the competitive significance of that opportunity: "with a $1m contract and a few good engineers, we will quickly catch up and get ahead." In context, Defendant was stating that possession of Rapport's technical analysis, prototype footage, experimental results, and related know-how would allow him to secure approximately $1 million in government funding, hire additional engineers, and use the appropriated technology as a springboard to overtake Rapport in further commercial and technical development.

Defendant's statements therefore link the $1 million opportunity directly to his unauthorized possession of Rapport's work and to the competitive head start Defendant expected that work to provide. Defendant later reiterated the magnitude of the resulting injury in his May 9, 2025 communications, asserting that "at a very minimum the damages could be over $1m." These were Defendant's own

[4]This category covers a different period of labor from the core-development damages addressed above. The earlier $64,512 calculation covers invention, prototyping, construction, and experimental work performed from approximately late August through December 2024. The present category begins in January 2025 and compensates the distinct four-month period during which Rapport continued performing full-time services as Radian's CTO through the Company's dissolution at the end of April 2025. The two calculations contain no overlapping hours.

contemporaneous assessments, made while discussing how the technical materials he misappropriated would be used to finance and accelerate a competing development effort.

Defendant was unusually well positioned to assess the likelihood and scale of such a government-contracting opportunity. Before joining Radian, he had substantial firsthand experience pursuing and obtaining federal research-and-development funding. Federal SBIR records identify Defendant as the principal investigator and business contact on a 2020 Air Force SBIR award to Black Lattice, and as the business contact on a subsequent Air Force STTR award involving the University of Washington. Defendant was also a cofounder of Mantis Composites, which subsequently obtained multiple Phase II government awards, including a $1,249,999 Air Force award in 2023 and a $2,964,713 Missile Defense Agency award in 2024.[5] Defendant's statement that the existing Artifact analysis and footage were sufficient for him to obtain a $1 million contract therefore reflected an informed business judgment by the person principally responsible for Radian's government contracting and business development.

Defendant's contemporaneous assessment establishes that he regarded the existing technical package as sufficient to secure an immediate seven-figure government-contracting opportunity and incorporated that opportunity into his own commercialization planning.

Plaintiffs request a compensatory award of $1,000,000 for this lost contract opportunity. This injury protects a separate economic interest from Plaintiffs' other damages categories. The $1 million requested here measures a specific near-term government-contracting opportunity identified by Defendant. The financing categories measure prospective equity capital; the enterprise-value category

[5]See U.S. Small Business Administration, SBIR Award, *Near-Isotropic, High-Strength, High-Stiffness Thermoset Composite 3D Printing for Drop-In Replacement of Machined Metals* (2020) (listing Michael Chapiro as principal investigator and business contact), https://www.sbir.gov/awards/187049 U.S. Small Business Administration, STTR Award, *Near-Isotropic, High-Strength, High-Stiffness Thermoset Composite 3D Printing for Drop-In Replacement of Machined Metals* (2021) (listing Michael Chapiro as business contact and Marco Salviato of the University of Washington as principal investigator), https://www.sbir.gov/awards/187252 Cal Poly Center for Innovation & Entrepreneurship, *Cal Poly's Innovation Quest Competition Awards $30,000 to Student Startups* (May 16, 2016) (identifying Chapiro as a member of the four-person team that founded Mantis Composites), https://cie.calpoly.edu/news/cal-polys-innovation-quest-competition-awards-30000-to-student-startups/ U.S. Small Business Administration, SBIR Award, *3D Printed C/C-SiC for Scramjet Combustors* (2023), $1,249,999 Air Force Phase II award, Contract No. FA2394-23-C-B066, https://www.sbir.gov/awards/205823 U.S. Small Business Administration, SBIR Award, *3D Printed Carbon/Carbon Aeroshell* (2024), $2,964,713 Missile Defense Agency Phase II award, Contract No. HQ0860-24-C-7117, https://www.sbir.gov/awards/209775.

measures Radian's assembled going concern; and the trade-secret sections measure the commercial value, reasonable royalty, lost royalty stream, avoided development cost, and related impairment of the Artifact and Vacuustat.

### E. Lost Near-Term Investment Opportunity

Defendant's contemporaneous statements establish a near-term $500,000 financing opportunity for Radian that was lost. In his May 9, 2025 communication, Defendant stated: "Given we could have very conservatively raised $500k at a $2.5m valuation [...]." That statement identifies both the amount of capital Defendant believed Radian could raise in the near term and the valuation at which he believed such a financing could be completed. Defendant's own qualifier—"very conservatively"—reinforces that he regarded the $500,000 financing as immediately attainable.

That statement was consistent with the Company's contemporaneous position. By that time, Radian possessed a working Artifact prototype, experimental results and supporting technical documentation, valuable Vacuustat intellectual property, government-engagement history, and active investor outreach. Defendant himself had repeatedly discussed substantially larger financing possibilities during April 2025, including raising "a few million" before further Vacuustat validation and seeking much larger rounds if the Company pursued a prime-contractor strategy. His May 9 estimate therefore fits within a broader contemporaneous record in which Defendant attributed substantially greater financing opportunity for the Company's technologies.

The anticipated financing opportunity was destroyed by Defendant's misconduct. He also misappropriated and retained technical materials, impaired the Company's credibility with prospective investors, withdrew corporate funds, and disrupted the Company's operations and institutional continuity. These acts eliminated the practical vehicle through which the near-term financing Defendant himself identified would have been raised.

Defendant's May 9 assessment supplies a contemporaneous measure of the near-term capital available to Radian and the valuation at which he believed it could be raised. The claimed loss concerns that foreclosed financing—not a share of Radian's enterprise value or the separately diverted

Khosla Ventures opportunity. Plaintiffs therefore request $500,000 for this distinct injury. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

### F. Diverted Khosla Ventures Opportunity

Defendant's April 2025 fundraising campaign created a concrete institutional investment opportunity with Khosla Ventures and then diverted that opportunity away from Radian. On or about April 11, 2025, Defendant circulated a mass BCC fundraising email to venture-capital firms under the subject line "We'll Own Golden Dome Strategic Missile Defense & Outpace AT&T+Starlink in Telecom." The solicitation was intended to obtain a $50–100 million seed financing for Radian's combined Vacuustat and Artifact program. (Ex. C3 — Corporate Communications at 13–14.)

Defendant structured the solicitation so that investor interest generated by Rapport's technology flowed exclusively through Defendant. The email omitted Radian's name and omitted Rapport's name entirely. Defendant identified himself alone, signed the message himself, and asked recipients whether they wanted to "get on an intro call." Prospective investors receiving the solicitation therefore had no identification of Rapport as the inventor, controlling founder, or owner of the underlying technology and no direct path to contact him. Defendant made himself the identified intermediary between Rapport's technology and the institutional investors he was soliciting. (Ex. C3 — Corporate Communications at 13–14.)

The substantive representations in the solicitation demonstrate the scale of the opportunity Defendant was presenting. He told investors that he had "been discussing" the Vacuustat since 2020, acknowledged that "last summer I decided to start funding it," and represented, with reference to the Artifact, that "we have proven the key breakthrough on 1 of the 2 main systems." He stated that the combined program would be the "next Raytheon AND AT&T," described a telecommunications capability that would make the venture "easily 10x larger than SpaceX," and projected: "I think we can hit $100b private val in 10 years, $1t public val in 15 years, if venture backed early on." He further represented that the combined technologies had been selected for a Missile Defense Agency Golden

Dome Industry Day one-on-one meeting and expressly sought investors capable of supporting and participating in "a $50-100m seed round." (Ex. C3 — Corporate Communications at 13–14.)

Those statements described two complementary commercialization paths built around Plaintiffs' technology. The Vacuustat platform supplied the basis for the upper-atmosphere telecommunications domain underlying Defendant's "AT&T" and SpaceX comparisons. The Vacuustat and Artifact together supplied enabling capabilities for the missile-defense architecture underlying the "Raytheon" comparison. Defendant was therefore soliciting institutional capital on the basis of both the individual capabilities and the integrated strategic value of Plaintiffs' technologies.

The solicitation succeeded. Defendant obtained a follow-up meeting with a Khosla Ventures partner for April 17, 2025. Defendant himself publicly confirmed the engagement on April 15, writing that he had an "Upcoming call with Khosla partner based on a few paragraphs I emailed Vinod with no deck." Because the solicitation was a broad BCC outreach rather than a personalized Khosla pitch, Khosla's decision to take the meeting supplies direct third-party evidence that Defendant's presentation of the technology, government engagement, and financing strategy was sufficiently credible to obtain institutional attention at the scale he was pursuing. (Ex. C2 — Screenshots, Fig. 3; Ex. C3 — Corporate Communications at 13–14.)

The timing connects that investor traction directly to Defendant's contemporaneous campaign for control of Radian. On April 12, five days before the Khosla meeting, Defendant acknowledged that Rapport possessed "sole ultimate deciding power for Radian Industries" and characterized Rapport's ability to remove him as an "existential risk." The following day, Defendant proposed reversing the parties' 51:49 ownership allocation so that Defendant would hold 60% of Radian. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED]; Ex. A1 — Corporate Records at 55, ECF No. 2-1, PageID 181)

Rapport attempted to preserve the Khosla opportunity for Radian. On April 16, one day before the scheduled meeting, Rapport contacted Khosla Ventures directly, identified himself as the inventor and technical lead behind the technologies Defendant had presented, provided a direct link to his

issued patent, and explained the corporate and licensing structure governing commercialization. That communication supplied the information Defendant had omitted from the solicitation and placed Khosla Ventures on direct notice of Rapport's inventorship and the governing ownership and licensing structure before the meeting occurred. (Ex. C3 — Corporate Communications at 21–23.)

Defendant redirected the engagement to Black Lattice. He confirmed the shift in advance, stating that "the call on Thursday is not about vacuustat, but about the supersonic drones and loitering munitions." His April 15 public post displayed a Black Lattice pitch deck while announcing the upcoming Khosla meeting. The deck identified Black Lattice as a company developing "Supersonic Glide Vehicles and FPV Missiles for a new era of global security." Plaintiffs' technology remained inside the pitch: among Black Lattice's identified sources of "Technical Edge," the deck advertised an "EXCLUSIVE IMU ($150K PERFORMANCE AT <$25K COST), DIRECTIONAL RF" capability and included imagery derived from Rapport's experimental work. Defendant thus used Plaintiffs' technologies to generate the investor engagement, controlled the relationship from its inception by omitting Rapport and Radian from the solicitation, and then redirected the resulting Khosla opportunity toward a competing venture under his own control. (Ex. C2 — Screenshots, Fig. 3; Ex. C3 — Corporate Communications at 13–14; Ex. E1 — Enterprise Structure.)

Defendant's own solicitation explains the economic value of the financing opportunity. He told investors that "Without significant capital to rapidly vertically integrate our capabilities into a more complete offering," reliance principally on DoD funding would tend to leave the venture as a subcontractor to established primes and would make the contemplated $1 trillion market-cap outcome from the commercial applications take approximately "5 years longer" to reach. Successful institutional financing therefore offered development runway, hiring capacity, rapid vertical integration, preservation of a prime-contractor strategy, external validation, access to follow-on capital, and years of commercialization acceleration. (Ex. C3 — Corporate Communications at 13–14.)

The Black Lattice materials identify the transaction scale Defendant sought to capture after diverting the engagement. The deck contemplated an immediate $5 million pre-seed round followed

by a $25 million-plus seed round in early 2026, or alternatively a $25 million-plus seed round immediately followed by a $100 million-plus Series A in late 2026. The materials therefore document a financing progression from $5 million immediately to $25 million-plus and $100 million-plus rounds, alongside the $50–100 million seed scale used in the solicitation that generated the Khosla meeting. (Ex. C2 — Screenshots, Fig. 3; Ex. E1 — Enterprise Structure.)

Plaintiffs request $5,000,000 for the diverted Khosla opportunity. The amount uses the smallest immediate financing round Defendant placed in the Black Lattice materials as the transaction-scale benchmark and values the institutional opportunity that had progressed from mass solicitation to an actual Khosla partner meeting. The requested $5,000,000 equals 5–10% of the $50–100 million seed financing Defendant sought in the solicitation that generated the Khosla engagement—a 90–95% reduction from that financing scale—and matches the smallest immediate financing round in his successor Black Lattice materials. The economic injury includes the acceleration, development capacity, strategic positioning, validation, and follow-on access Defendant himself associated with substantial venture financing. The larger $25 million-plus and $100 million-plus follow-on financing scales reflected in Defendant's contemporaneous fundraising materials provide additional corroboration of the opportunity's economic scale.

This injury concerns the specific Khosla Ventures engagement Defendant actually obtained and diverted. The $500,000 category measures near-term financing that would have been raised, while the present category measures the specific institutional opportunity that progressed to an actual Khosla Ventures partner meeting. The destruction of Radian's preexisting going-concern value and the impairment of the underlying intellectual property are addressed separately below. Plaintiffs therefore request a separate compensatory award of $5,000,000 for the diverted Khosla Ventures opportunity.

### G. Destruction of Radian's Enterprise Value

Defendant's contemporaneous assessment that Radian could raise $500,000 at a $2.5 million valuation supplies a direct benchmark for the Company's pre-dissolution going-concern value. That estimate appears in Section V(E), where the financing opportunity is valued separately. Here, the

valuation provides evidence of the enterprise's worth rather than a second measure of the foreclosed capital.

Rapport independently placed substantial value on retaining the underlying intellectual property and its long-term commercial upside. On April 12, 2025, he rejected the prospect of an early $2.5 million financing round as inconsistent with that value and favored preserving ownership rather than accepting dilution on those terms. His contemporaneous statements and their significance for the licensor's reservation value appear in Section III(F)(6). (Ex. C6 — Signal Export [SEALED].)

The valuation of Radian was supported by an assembled operating enterprise. Radian held exclusive commercialization rights in the Vacuustat technology, which easily justified a substantial valuation in itself; Radian also benefited from Rapport's Artifact work, including a functioning prototype, experimental footage and data, technical analyses, source materials, and accumulated know-how made available within the venture; and Radian was an established corporate entity with defined founder roles, technical documentation, government-submission history, investor contacts, commercialization plans, and an existing intellectual-property licensing structure.

Radian's December 2024 Air Force Phase I proposal received "Good" evaluations for Technical Merit, Defense Need, and Commercialization Potential. By April 2025, Radian had obtained a DARPA meeting, two separate Missile Defense Agency meetings, and additional government opportunities. These assets and relationships formed a going concern capable of combining intellectual-property rights, technical work, institutional relationships, personnel, capital, and commercial momentum into contracts, financing, and continued development. (Ex. C3 — Corporate Communications at 2–3; Ex. C6 — Signal Export [SEALED].)

Exhibit F6 supplies additional contemporaneous evidence of the scale Defendant attributed to Radian's commercialization program. In Radian's February 2025 response to a MDA RFI, Defendant proposed an approximately $70 million, seven-year development and transition program, including approximately $10 million in production capital expenditures, and contemplated MDA funding during the development period before product revenue could sustain continued operations. The submission

thus presented Radian to a federal defense agency as a vehicle for a multiyear technology-development, integration, production, and commercialization program requiring tens of millions of dollars in capital. (Ex. F6 — Valuation Evidence at 5–8.)

Defendant's November 10, 2024 *Laser SkyFi* business plan independently points to the same commercial scale. Defendant wrote that "Radian Industries Inc. has developed an unprecedented capability for precision positioning and pointing that no one else will come close to matching" and proposed that Laser SkyFi would "purchase exclusivity rights from Radian Industries Inc." for commercial telecommunications and optical-communication-terminal applications. He estimated an initial revenue opportunity of approximately $788 million per year and proposed a financing roadmap beginning with a $2.3 million pre-seed investment and $12.7 million seed option, followed by a $200 million-plus financing round within three to four years and more than $1 billion in debt financing within five to six years. (Ex. F6 — Valuation Evidence at 9–14.)

Taken together, Defendant's government-facing and commercial plans treated Radian's technology and commercialization rights as the foundation for programs operating at scales far exceeding the $2.5 million valuation requested here.

Defendant internally assessed the likelihood that Radian's technology would work at 95%, and his investor outreach positioned the combined Vacuustat and Artifact program as a major defense and telecommunications enterprise. Those representations are presented in full in Section V(F) and reinforce the substantially lower $2.5 million going-concern valuation used here. (Ex. C3 — Corporate Communications at 13–14, 21–23; Ex. C6 — Signal Export [SEALED].)

Defendant's misconduct destroyed that going-concern value. As alleged in the Complaint, Defendant diverted corporate opportunities and investor relationships to competing entities, appropriated and retained Plaintiffs' technical materials, impaired Radian's credibility with prospective funders, depleted its remaining capital, and disrupted its operations.

Defendant also subjected Radian's essential banking relationship to direct compliance and reputational risk. When Mercury requested an explanation of transactions among multiple entities and

supporting documentation, Defendant responded by characterizing the inquiry as a "violation of the 4th Amendment," a "spiritual attack on American values," and "treasonous assistance to the CCP," demanded travel information concerning Mercury's leadership to investigate possible Chinese Communist Party contacts, and compared compliance personnel performing their jobs to Nazis. Rapport was unaware that Defendant was communicating with Radian's banking provider in this manner and discovered the exchange only after dissolution. (Ex. C3 — Corporate Communications at 4–5.)

The eventual injury, as a direct result of Defendant's misconduct, was the destruction of Radian as an integrated economic enterprise. Rapport had supplied the technical labor, development expenditures, executive services, and technologies that formed the principal sources of Radian's value, while the Company provided the vehicle through which those contributions could be combined with licensing rights, outside capital, government contracts, personnel, investor relationships, and continued commercialization. Defendant's misconduct eliminated that assembled business and the equity value, institutional momentum, governance continuity, and commercial capacity it embodied.

This category is distinct from Plaintiffs' claims for identifiable foreclosed transactions. The separate $500,000 near-term investment claim measures capital Defendant stated Radian could raise; the $5 million Khosla claim measures a specific institutional financing opportunity Defendant obtained and diverted; and the $1 million contract claim measures a separate government-contracting opportunity. Those transactions would have added capital or revenue to Radian. This claim measures the preexisting going concern itself: its assembled assets, operations, goodwill, institutional position, and capacity to continue as an economic enterprise.

### 1. Investor and Federal-Agency Goodwill Impairment

Defendant's role within Radian included responsibility for business development, fundraising, investor outreach, and external strategic engagement. Defendant used that role, together with his access to Radian's technical materials, commercialization plans, government-engagement materials, and prospective funding channels, to impair Radian's credibility with investors, restrict Rapport's

access to prospective capital sources, concentrate investor communications through himself, and impair both Plaintiffs' future ability to pursue financing.

Within the enterprise-value injury established above, Plaintiffs allocate $250,000 to the combined impairment of Radian's private-investor goodwill, federal-agency goodwill and credibility, and funding relationships. That allocation measures identifiable business interests embedded in Radian's going-concern value: its investor and agency relationships, institutional credibility, access to private and government financing, ability to obtain introductions and institutional consideration, and capacity to commercialize the technologies through present or future ventures. The allocation is included within, and does not increase, the total $2.5 million enterprise-value recovery requested in this section.

The pleaded misconduct supports recovery under, among other theories, breach of fiduciary duty, tortious interference with business relationships, constructive and other pleaded fraud-based theories, the Ohio Corrupt Activities Act, and the federal RICO counts. The Complaint expressly alleges that Defendant's fiduciary breaches included diversion of corporate opportunities, disruption of investor relationships, concealment in capital processes, and misconduct that caused reputational damage, investor confusion, and loss of business opportunity. It separately alleges tortious interference with expected private investment, grant, and commercial relationships and states that Defendant acted to foreclose Plaintiffs' ability to obtain independent investment or grant funding.

The remaining $2.25 million of the $2.5 million enterprise-value injury measures the other components of Radian's destroyed going-concern value. The distinct $500,000 near-term financing opportunity, $1 million government-contract opportunity, and $5 million Khosla Ventures opportunity are valued separately in the preceding subsections. The details of the goodwill impairment are set out below.

### a. Private-Investor Sabotage and Goodwill Impairment

Defendant damaged the quality of the investor relationships he controlled. The record contains repeated hostile and unprofessional communications directed toward prominent venture investors and institutions, including Paul Graham and Y Combinator, Elon Musk, Peter Thiel, Joe Lonsdale, Marc

Andreessen, Bill Gates, Sergey Brin, Nic Carter, Mark Cuban, Chamath Palihapitiya, and Noah Knauf. Defendant publicly stated that he "love[d] calling VCs out for being retarded, which virtually all are," and later concluded that his approach to communicating with VC's was: "don't pretend to be nice, that's how women interact, just call the guy a fucking retard, if he's cool he'll understand." (Ex. C5 — Investor Sabotage at 3, 27.)

Defendant did not disclose these communications or the broader pattern of investor-directed hostility to Rapport while serving as the venture's principal fundraising and business-development representative. Rapport discovered the conduct independently, including material posted through pseudonymous accounts that Defendant had not disclosed to him. Defendant thus exercised control over Radian's investor relationships while withholding from Rapport the reputational damage he was creating in those same channels.

These communications are economically significant because fundraising relationships are cumulative assets of a technology venture. Credibility with investors, access to follow-on introductions, willingness of institutions to engage in diligence, confidence in management, and the ability to obtain repeat meetings all contribute to a venture's capacity to raise capital. Defendant's misconduct degraded those cumulative fundraising assets by damaging credibility, access, introductions, and institutional continuity across the investor network. The Complaint specifically alleges that Defendant disrupted business relationships, undermined potential funding opportunities, created investor confusion, and impaired Radian's ability to operate effectively.

Defendant compounded that injury by excluding Rapport from investor engagement. Defendant withheld identifying information and made himself the identified contact for investor inquiries, thereby excluding Rapport from opportunities to communicate directly with those investors, correcting misleading impressions, presenting the technical basis of the inventions, answering diligence questions, or developing independent institutional relationships on Radian's behalf. Rapport was the inventor and principal technical contributor whose work formed the basis of the fundraising effort.

Defendant's exclusion therefore impaired the Company's broader fundraising goodwill and its ability to establish durable relationships with sophisticated capital sources.

Defendant's misconduct injured Radian's institutional goodwill and Rapport's own ability to pursue financing and commercial relationships as an inventor, founder, and entrepreneur. Defendant served as the principal outward-facing representative of a venture whose value depended on the technologies invented by Rapport. By controlling investor communications, concealing Rapport's identity and role, presenting Rapport's technologies as his own through Defendant-controlled entities, and engaging in hostile or unprofessional conduct toward prospective capital sources, Defendant impaired relationships and channels available to support financing both for Radian and for future commercialization of Rapport's technologies.

This allocation measures identifiable economic business interests embedded in Radian's going-concern value: the Company's investor goodwill and fundraising relationships; its ability to obtain meetings, introductions, diligence, investment, and strategic partnerships through its founders; and its capacity to commercialize the technologies through present or future financing channels. Investors contacted or alienated by Defendant were potential sources of capital, introductions, and institutional credibility beyond a single financing round. The same misconduct also burdened Rapport's prospective business relationships and fundraising capacity, demonstrating the persistence and breadth of the impairment beyond the Company's dissolution.

The defense-technology investment market magnifies that injury. Sophisticated investors, founders, accelerators, government contractors, and strategic partners operate through overlapping professional networks in which introductions, references, prior dealings, and informal diligence materially influence access to capital. Defendant's misconduct entered an existing and developing network of overlapping business relationships and burdened Rapport's future approaches to investors, introducers, strategic partners, and other participants connected to the persons Defendant contacted directly.

The April 17, 2025 Khosla Ventures meeting constitutes an identifiable diverted investment opportunity with its own evidentiary record and requested damages measure and is valued separately in Section V(F). This allocation instead measures the broader impairment of Radian's private-investor goodwill, institutional credibility, and future fundraising capacity. The continuing impairment of Rapport's ability to approach the same investors and interconnected participants in the defense-technology capital market further demonstrates the persistence of that relationship damage.

### b. Government-Funding Sabotage and Federal-Agency Goodwill Impairment

Defendant also impaired Radian's credibility with the federal agencies from which the Company sought funding. In Radian's February 26, 2025 response to a Missile Defense Agency ("MDA") Request for Information ("RFI"), Defendant used the Company's official government submission to advance an illegal financing proposal involving Chroma, a separate business he personally owned. Defendant told MDA that Radian was funded "largely via the revenue of an unrelated company owned by Michael Chapiro," identified that company as Chroma, and proposed that MDA "find a way to get other organizations to buy that hardware" (referring to Chroma's LED-therapy devices) so that "we can funnel funds into Radian Industries." Defendant further noted that his proposed scheme would support "maintaining a high level of secrecy around the technology." (Ex. F6 — Valuation Evidence at 8.)

Thus, while acting as Radian's CEO in a formal government submission, Defendant asked MDA to generate commercial purchases for his personally owned company in order to covertly "funnel" the resulting Chroma revenue into Radian.

Although Defendant's proposal, on its own terms, would have placed Chroma between the source of the prospective economic benefit and Radian, it presented a far more serious problem than ordinary fiduciary misconduct and self-dealing. Federal appropriations may be expended only for their authorized purposes, and federal procurement authority exists to satisfy legitimate governmental requirements rather than to create an indirect funding channel for an unrelated company. See 31 U.S.C. § 1301(a); FAR 3.101-1; FAR 6.101. Had federal agencies implemented the arrangement for the

purpose Defendant proposed, the resulting expenditures would have raised direct violations of federal appropriations and procurement law. Defendant nevertheless placed this proposal in Radian's official MDA submission while Radian was seeking substantial federal research and development funding, thereby exposing the Company to serious legal and institutional risk with one of its most important prospective funding sources. (Ex. F6 — Valuation Evidence at 8.)

The resulting impairment to Radian's government-facing goodwill was substantial. Radian depended upon federal research, development, integration, and transition funding to mature and commercialize its technology, and Defendant's own RFI contemplated approximately $70 million of such funding over seven years. In the same submission seeking that institutional support, Defendant proposed a funding mechanism that would have asked federal officials to use purchases from his unrelated company as a means of indirectly financing Radian. The proposal therefore exposed Radian and Rapport to scrutiny concerning procurement integrity, use of federal funds, conflicts of interest, and the reliability of its management at precisely the agencies whose confidence Radian required to obtain development funding and enter the defense technology industry. (Ex. F6 — Valuation Evidence at 5–8.)

Defendant's RFI admission also materially corroborates the enterprise structure pleaded in Plaintiffs' federal RICO claims. The Complaint identifies Chroma, Black Lattice, Phoenix Dynamics, and other Defendant-controlled entities as components of the pleaded enterprise and alleges that Defendant used those entities to obtain financing, exploit Plaintiffs' technology, and redirect economic value. (Compl. ¶¶ 248–252.) Defendant's own RFI confirms that he used Chroma as a financing channel for Radian, contrary to the terms of the parties' Loan Agreement, and proposed expanding that channel by asking MDA to divert funding from Radian to Chroma. His contemporaneously described financing proposal directly corroborates the factual allegations underlying the pleaded § 1962 claims, particularly the § 1962(c) enterprise theory.[6]

[6] Rapport's subsequent dissolution of Radian therefore not only protected Rapport's intellectual property, but also reduced the continuing risk that Defendant would undertake unauthorized and illegal activities through an entity with which Rapport remained publicly and legally associated.

### 2. Enterprise-Value Allocation and Requested Award

Plaintiffs value the total destruction of Radian's enterprise at $2.5 million. Of that amount, $250,000 is allocated to the combined investor and federal-agency goodwill impairment described in Section V(G)(1), while $2.25 million measures the remaining components of Radian's destroyed going-concern value. Plaintiffs therefore request $2.5 million in compensatory damages for destruction of Radian's enterprise value. The allocation permits the Court to evaluate the goodwill component independently without increasing the total enterprise-value recovery.

## H. ACPA Statutory Damages for the Radian Domain

Counts II and III establish the connected Lanham Act conduct arising from Defendant's post-dissolution use of Radian's identity and domain. Count II pleads false designation of origin and false advertising under 15 U.S.C. § 1125(a)(1)(A)–(B), including Defendant's continued operation of the Radian Industries website after dissolution in a manner wrongly conveying that the Company remained active, that Defendant remained affiliated with it, and that he possessed proprietary rights in its technologies. (Compl. ¶¶ 222–224.) Count III pleads cyberpiracy under 15 U.S.C. § 1125(d), alleging that Defendant maintained and used the Radian domain after dissolution without Plaintiffs' authorization, through a domain identical to Radian's distinctive commercial identity, with bad-faith intent to profit from confusion and appropriated goodwill. (Compl. ¶¶ 225–228.) Plaintiffs elect the statutory measure under § 1117(d) for Count III. The Count II allegations establish the commercial function of the same course of domain use and the source, sponsorship, affiliation, and ownership confusion that Defendant's control created.

Section 1117(d) authorizes an award from $1,000 through $100,000 for each domain name used in violation of § 1125(d)(1), in the amount the Court considers just. Plaintiffs request the maximum $100,000 award for `radianindustries.com`. The statutory measure addresses the full character of the domain injury: appropriation of the Company's exact online identity, continuing apparent authority to speak and act under that identity, interference with Plaintiffs' control of Radian's commercial presence,

confusion over affiliation and proprietary authority, and the deterrence required by deliberate and persistent cyberpiracy.

The statutory award serves both compensation and deterrence. *Kiva Kitchen & Bath Inc. v. Capital Distribution, Inc.*, 319 F. App'x 316, 320–21 (5th Cir. 2009), identified willfulness, deliberateness, reparation of injury, restitution of profit, and deterrence as relevant considerations, and affirmed the maximum $100,000 award for each of three domains used deliberately to divert business. Section 1117(d) therefore supplies a statutory valuation for the wrongful control and use of the domain itself, including the commercial and reputational consequences that resist precise reconstruction through ordinary lost-profit proof.

The Sixth Circuit's ACPA precedent confirms that continuing domain conduct independently supports statutory damages. In *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549–50 (6th Cir. 2003), the court held that post-registration trafficking in a previously registered domain supported statutory damages under § 1117(d), emphasizing that registration, trafficking, and use are distinct acts under the statute. *American Lecithin Co. v. Rebmann*, No. 12-CV-929 (VSB), slip op. at 27–28 (S.D.N.Y. July 24, 2020), applies the same principle in the closely analogous insider context. There, an employee had obtained domain control while serving the business and retained the domains after his employment ended; the court focused the ACPA inquiry on the defendant's ongoing conduct after termination and held that the circumstances permitted a finding of bad-faith retention. Defendant's former CEO role establishes his direct knowledge of Radian's identity, ownership structure, customers, technologies, and commercial significance; his post-dissolution retention and use establish the actionable conduct.

Defendant's contemporaneous communications make the purpose of his conduct explicit. On April 30, 2025, immediately following Radian's dissolution, Defendant described the structure through which he intended to continue the enterprise after dissolution: "I just have to make a new corporation and go through all the DoD setup" and "I could even keep going under the same trade name." (Ex. E2 — Post-Dissolution Misconduct at 2.) He signed the communication "Co-Founder & CEO / Radian Industries Inc." (*Id.* at 3.)

Those statements directly connect the retained Radian identity to a forward-looking commercial plan. Defendant described creation of a successor corporation as the administrative vehicle needed to continue operations, while expressly identifying continued use of the same Radian trade name as available to him. The exact domain `radianindustries.com` supplied the principal online instrument for carrying out that plan. Control of the domain allowed a successor operation to present itself publicly under the established Radian name, preserve continuity of appearance to investors, customers, agencies, and other counterparties, and reinforce Defendant's asserted authority over Radian's technologies. The contemplated successor entity and the retained trade identity therefore formed complementary parts of the same continuation strategy.

Defendant reinforced that asserted authority in the following days. On May 1, 2025, he represented that Rapport's shares had been repurchased and characterized Rapport as "a minority shareholder, if a shareholder at all", equated himself as the company while demanding the return of "[a]ll property of the company/myself", and again signed the communication as Radian's "Co-Founder & CEO." (Ex. E2 — Post-Dissolution Misconduct at 4.) These statements accompanied Defendant's continuing possession of the Company's digital identity and demonstrate his affirmative assertion that he, rather than Rapport, possessed authority of Radian's ownership, assets, and continued commercial use.

The later post-dissolution evidence shows his implementation of that claimed authority across Radian's digital infrastructure. Exhibit E2 establishes that `nathan@radianindustries.com`, a functioning Radian email address previously used by Rapport, could no longer be used to access its associated Google account by July 30, 2025; it documents Rapport's loss of access to the corporate Google Drive; and it confirms that `https://radianindustries.com/` remained online and served valid HTTPS traffic on August 4, 2025. (Ex. E2 — Post-Dissolution Misconduct at 17–23; Compl. ¶¶ 157–161.) The domain thus operated together with email, website, and account-control mechanisms as a functioning layer of corporate identity under Defendant's control.

The duration of the violation independently supports the maximum statutory measure. Radian was dissolved on April 30, 2025. More than a year and five months have now elapsed since dissolution—approximately seventeen months as of this memorandum—and Plaintiffs still require judicial transfer of `radianindustries.com`, registrar control, DNS control, hosting control, and the associated administrative credentials. Defendant's control therefore persisted across the entire period in which Plaintiffs sought to wind up Radian, secure its records and intellectual property, correct ownership and affiliation confusion, and protect the Radian identity from continued commercial use. The length of that retention magnifies both the accumulated injury and the deterrence interest served by § 1117(d).

The maximum-award authorities identify the same aggravating features present here. In *Spectrum Association Management of Texas, L.L.C. v. Lifetime HOA Management L.L.C.*, 5 F.4th 560, 565–66 (5th Cir. 2021), the Fifth Circuit affirmed a $100,000 award for a domain used by a former employee in connection with a competing business, where the defendant knew the plaintiff's marks, acted willfully and in bad faith, used the domain to divert users, and retained control through the dispute. *Kiva Kitchen & Bath Inc. v. Capital Distribution, Inc.*, 319 F. App'x 316, 320–21 (5th Cir. 2009), likewise affirmed $100,000 per domain where competitors deliberately used infringing domains to divert customers and persisted in retaining them. The established facts here contain the same core considerations—insider knowledge, deliberate commercial purpose, continued use, competitive activity, and persistent retention—together with the additional force of Defendant's express written plan to continue under the Radian trade name and his control of the Company's exact corporate domain.

The $100,000 maximum gives full effect to § 1117(d) on Count III. Defendant acquired control of `radianindustries.com` through his corporate position, possessed direct knowledge of Plaintiffs' rights, expressly announced a plan to continue commercial activity through a new corporation while "keep[ing] going under the same trade name," continued to hold himself out as Radian's CEO, retained the exact corporate domain and associated infrastructure, maintained Radian's public-facing website after dissolution, and has sustained that control to the present, for approximately seventeen months. Those facts establish deliberate, commercially directed, persistent cyberpiracy at the aggravated end

of the statutory range. Plaintiffs accordingly request $100,000 in statutory damages under 15 U.S.C. § 1117(d) for the Count III violation concerning `radianindustries.com`, together with the domain-transfer and permanent injunctive relief requested in Section VIII.

## I. Artifact Trade-Secret Damages

Defendant's conduct concerning the Artifact caused a distinct and independently compensable trade-secret injury. Unlike the discrete contract and financing opportunities addressed above, this category concerns damage to the underlying technology itself: a confidential body of technical information, experimental results, source code, implementation knowledge, and commercialization know-how developed by Rapport and later retained, disclosed, and exploited by Defendant without authorization. The record supports approximately $100 million as a contemporaneous pre-impairment strategic benchmark for the Artifact technology. Defendant's misconduct materially impaired that value by appropriating for himself a broad bundle of exclusive-license-like commercial rights, transferring Rapport's development head start to a hostile competing venture, expanding the circle of persons exposed to the confidential information, and depriving Rapport of sole practical control over the manner and terms on which the technology would be commercialized.

Plaintiffs request one $25 million compensatory award for the Artifact injury. Diminution in value and reasonable royalty independently support that single award; neither measure is added to the other. An accounting may establish additional nonduplicative gains, while avoided development costs and competitive head start corroborate the value wrongfully obtained. Under the diminution measure, that amount represents twenty-five percent of the approximately $100 million pre-impairment benchmark and the economic injury Defendant caused through loss of exclusivity, erosion of development head start, impaired attribution, loss of disclosure control, and interference with commercialization. Defendant materially impaired the asset by acting as though he had acquired an unrestricted, royalty-free, and effectively exclusive commercial license: he retained the technical materials, disclosed them to third parties, represented the capability as proprietary and "exclusive" technology of competing ventures, recruited personnel around the relevant field, and continued pursuing the defense applica-

tions for which the technology was developed—all without Rapport's permission, a negotiated license, or payment for the commercial rights he assumed.

As explained in Section III(C), the DTSA and OUTSA permit actual-loss, nonduplicative unjust-enrichment, and alternative reasonable-royalty measures. 18 U.S.C. § 1836(b)(3)(B); Ohio Rev. Code § 1333.63(A). The Sixth Circuit directs courts to take a "flexible and imaginative approach" to trade-secret valuation where precision is difficult. *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 389–93 (6th Cir. 2022). Here, diminution and reasonable royalty are independent methods supporting one $25 million award.

**1. Nature and Scope of the Artifact Trade Secrets**

The Artifact trade secrets comprise an assembled body of confidential information necessary to reproduce, validate, refine, and commercialize the technology. That body of information includes the physical architecture and optical configuration of the prototype; component selection and sourcing information; experimental methods; implementation details; signal-processing methods and source code; raw experimental footage; processed data; time- and frequency-domain analyses; performance calculations; design lessons and accumulated know-how; application-specific analyses; and confidential information concerning how the technology could be integrated into practical navigation systems.

The contents of Rapport's expressly labeled "Private" folder illustrate the breadth and practical utility of the information Defendant obtained. The folder contained, among other materials, documentation of the physical apparatus; component inventories and sourcing records; source code implementing the experimental signal-processing pipeline; raw experimental footage; processed data and complete analysis records; custom analytical tools; application-specific studies; and encrypted government-facing materials and supporting calculations. The Complaint alleges that the assembled materials were sufficient to replicate the Artifact and independently validate its experimental results from the underlying experimental record through the resulting analyses. (Compl. ¶¶ 160–162, 315; Ex. B4 — Technical Materials [SEALED].)

Defendant obtained an assembled technical package sufficient to reproduce, evaluate, and build upon Rapport's Artifact technology. The sourcing records reduce procurement uncertainty; the apparatus documentation reveals implementation choices; the source code supplies the analysis pipeline; and the raw and processed experimental records disclose the observed effect and the methodology used to measure and analyze it. Taken together, the materials eliminate numerous stages of experimentation, troubleshooting, procurement, coding, data analysis, and validation that an independent developer otherwise would have to perform.

The trade secret also included intangible know-how extending far beyond the price of the laboratory hardware. Rapport's foundational theoretical research began around 2020, continued into the conception of the Artifact device around 2024, and then proceeded through the intensive prototype, debugging, testing, and analysis work that followed—a research trajectory spanning roughly six years by the present damages proceeding. Experimental development produces negative knowledge as well as successful results: which configurations fail, which sources of noise matter, which components perform adequately, how the signal should be extracted, how the apparatus should be arranged, and which apparent paths are unproductive. A recipient of the assembled technical package receives the benefit of those lessons while bypassing the same false starts and reconstruction of the same reasoning.

Rapport was also pursuing patent protection while preserving confidential implementation information. He filed a provisional patent application covering the Artifact technology and was entitled during that period to describe the invention as patent pending. He later preserved secrecy by declining to convert the provisional application into a nonprovisional application, thereby avoiding public disclosure of the sensitive technology. That choice reflected the value Rapport placed on secrecy and controlled commercialization.

## 2. Development and Experimental Validation

The commercial value of the Artifact rested on a developed physical prototype supported by experimental footage, data, and analysis. The contemporaneous record traces the technology's progression through construction, testing, data collection, analysis, and validation.

When Rapport first approached Defendant in July 2024, Defendant immediately evaluated prototype cost, target markets, competing inertial-navigation systems, performance requirements, government-funding pathways, and commercialization strategy. By August 3, 2024, he had concluded that the technology was the type of "leap-ahead" capability he wanted to pursue as a cofounder, described it as substantially more "widgetizable" than other advanced technologies he had considered, and stated that it appeared "very well positioned for DoD funding." Defendant proposed focusing his own efforts on business development, strategy, and government interfacing while Rapport performed the technical work. (Ex. C1 — Initial Conversations.)

Those early discussions predate the successful prototype work and this litigation. Defendant's later, substantially stronger valuation statements therefore followed the intervening construction, testing, data collection, and technical development rather than preceding them.

Rapport built the Artifact prototype, recorded experimental results, and developed software and analyses capable of independent technical review. Defendant later described that technical package as sufficient to obtain a million-dollar government contract and accelerate a competing engineering effort. The direct quotations, contracting context, and separate measure of lost opportunity appear in Section V(D). (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

Defendant also represented the Artifact breakthrough as proven while soliciting $50–100 million in institutional financing. His exact investor-facing language and the resulting Khosla meeting are addressed in Section V(F) the representation here corroborates his contemporaneous belief in the technical results. (Ex. C3 — Corporate Communications at 13–14.)

Rapport has separately attested that the experimental data he collected and recorded satisfied the applicable performance criteria for export-restricted inertial-navigation capability. That conclusion followed construction of the prototype, collection and preservation of experimental data, and comparison of the measured results with recognized technical criteria.

By April 2025, the parties were discussing a "safe" commercial gyro design projected to provide two to three orders of magnitude improvement at a given price tier and reach a substantially larger

market. Defendant responded by evaluating specific price points, strategic acquirers, commercialization paths, and potential transaction structures. Their discussions had advanced to monetization of a technology supported by a prototype, data, and a concrete performance advantage.

### 3. Commercial and Strategic Value of the Artifact

The record supports approximately $100 million as a contemporaneous strategic-acquisition benchmark valuation for the Artifact. That benchmark rests on an unusually extensive body of contemporaneous valuation evidence, much of it authored by Defendant himself while serving as Radian's CEO. Defendant researched incumbent markets and pricing; developed concrete product and network architectures around the Artifact; prepared a seven-year government-facing development and production roadmap; identified multiple additional commercial applications; assigned substantial consideration to exclusivity and commercialization rights; identified sophisticated strategic acquirers; recognized the Safe gyro's very substantial commercial opportunity; contemplated an approximately $100 million strategic acquisition; and later used the technology as a claimed proprietary or exclusive asset in ventures seeking millions to more than $100 million in financing.

Sixth Circuit trade-secret law gives direct significance to precisely this form of evidence. In *A.O. Smith Corp. v. Petroleum Iron Works Co.*, 73 F.2d 531, 539 (6th Cir. 1934), the court emphasized that unfair acquisition cannot permit a competitor "who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer." The court then relied specifically on the wrongdoer's own estimate of the value of the secrets and their cost of acquisition and on the defendant's extensive advertising of the novelty of the appropriated process as corroborating evidence of value. *Id.* The Supreme Court later quoted *A.O. Smith*'s development-cost principle approvingly in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481–82 (1974), an Ohio trade-secret case.

The governing principles described in Section III(C) and Section III(F) recognize the misappropriator's expected use, the value actually appropriated, and the parties' negotiated licensing terms as valuation evidence. *Vitro*, 292 F.2d at 682–83; *Allied Erecting*, 805 F.3d at 706, 708.

Defendant's own transaction proposals and commercial forecasts are evidence of those considerations here.

Persuasive authority reaches the same conclusion with respect to negotiated commercial terms. In *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280–81 (5th Cir. 2012), the Fifth Circuit held that the parties' negotiated terms supplied sufficient evidence of what a reasonably prudent investor would pay for the misappropriated technology, even though the contemplated transaction never became a completed contract. Here, the evidence is considerably broader: Defendant repeatedly generated his own market estimates, development budgets, production plans, exclusivity terms, transaction values, financing plans, and market-facing representations concerning the Artifact.

Section X(A) collects the principal numerical statements and transaction terms chronologically. Together, they trace a continuous progression from initial market analysis, through concrete commercialization and industrialization plans, to licensing terms, strategic-acquisition discussions, and actual fundraising. Defendant's approximately $100 million strategic-acquisition statement sits within that larger body of mutually reinforcing evidence and supplies a concrete transaction-specific benchmark for pre-impairment value.

### a. Contemporaneous Market and Unit-Economic Analysis

The parties began quantifying the commercial opportunity immediately after their July 2024 discussions began. In a July 31, 2024 email, Rapport modeled an initial satellite-focused use case. Using then-current satellite replacement assumptions, he estimated a scenario in which approximately 1,200 devices could be sold to SpaceX annually at $50,000 each and another 250 devices could be sold at $100,000 each, producing approximately $85 million in annual revenue. Assuming approximately half of revenue remained after overhead, Rapport estimated that such a business could support an enterprise value on the order of $700 million. He separately identified an installed-base opportunity of approximately $200 million if 2,000 Air Force aircraft adopted $100,000 navigation units. (Ex. C1 — Initial Conversations.)

Defendant then conducted his own independent market research. On August 3, 2024, he reported that the ring-laser-gyro market appeared to be approximately $0.8–1.3 billion and that the overall positioning, navigation, and timing market was approximately $16 billion. He agreed that the higher end of the market presented the appropriate initial target and contacted Honeywell to investigate incumbent pricing. He identified a commercialization strategy in which the gyro could be vertically integrated into attack drones and cruise missiles while also being sold into higher-end applications such as hypersonic missiles, large ISR aircraft, and satellites. (Ex. C1 — Initial Conversations.)

On August 4, Defendant reported a fiber-optic-gyro market of approximately $1.1–1.6 billion, a hemispherical-resonator-gyro market of approximately $150 million, and an approximately $300,000 price for Honeywell's flagship ring-laser-gyro-based system for large commercial aircraft. He further observed that individual ring laser gyros appeared to cost at least $10,000, placing a conventional three-gyro system at $30,000 or more, with current system pricing potentially reaching $50,000 or higher. These figures supplied concrete incumbent benchmarks against which Defendant evaluated a smaller, lower-cost, higher-performance optical navigation technology. (Ex. C1 — Initial Conversations.)

The post-validation discussions supplied still more specific unit economics. On April 28, 2025, Defendant summarized the contemplated commercial proposition as approximately "$50-100k IMU performance at $25k" with a fraction of the size, weight, and power and improved robustness. The following day he evaluated a manufacturing cost near $15,000 and a selling price near $30,000. These are Defendant's own contemporaneous estimates of the Artifact's price/performance position, production economics, and prospective selling price. (Ex. C6 — Signal Export [SEALED]; Section X(A).)

### b. Defendant's Concrete Pre-Dispute Commercialization Plans

Defendant's own pre-dispute business planning demonstrates that he treated the Artifact as a broadly enabling platform technology capable of supporting large commercial and defense programs. By November 2024, he had already designed a detailed telecommunications business plan around

the precision technology later named Artifact. His *Laser SkyFi* plan described the emergence of an "unexpected, proprietary technical capability" as the development that made the proposed architecture uniquely viable. Defendant then identified that capability expressly with Radian, writing that Radian had developed an "unprecedented capability for precision positioning and pointing that no one else will come close to matching." (Ex. F6 — Valuation Evidence at 10–11.)

Defendant's contemplated commercial structure independently establishes that he understood the technology's field-of-use rights to possess substantial economic value. He expressly wrote that "Laser SkyFi will purchase exclusivity rights from Radian Industries Inc." covering "all commercial telecom application[s]" and "all commercial optical communication terminal (OCT) applications." (Ex. F6 — Valuation Evidence at 11.) Thus, months before the parties' dispute, Defendant's own business plan treated commercial exclusivity in identified Artifact application fields as an asset that an outside venture was required to purchase from Radian.

*Laser SkyFi* also quantified the resulting commercial opportunity in concrete operational terms. Defendant proposed an initial network of approximately 20 satellites, each supporting approximately ten optical links to commercial aircraft, for approximately 200 connected aircraft. He estimated approximately $100 million to build and launch the initial satellites and approximately $50 million to retrofit the aircraft. Using the resulting network capacity, he calculated an initial revenue opportunity of approximately $788 million per year. (Ex. F6 — Valuation Evidence at 11–12.) The document therefore tied the Artifact's precision-pointing capability to a specific network architecture, specific deployment quantities, specific capital requirements, and nearly $800 million in estimated annual revenue.

Defendant paired those operating assumptions with a concrete financing roadmap. He proposed a $2.3 million pre-seed transaction followed by a $12.7 million seed option, producing approximately $15 million of initial capitalization; a $200 million-plus financing round within three to four years to deploy the first constellation; more than $1 billion in debt within five to six years to expand capacity; and an IPO within seven to eight years. (Ex. F6 — Valuation Evidence at 13.) Those figures provide

contemporaneous evidence of the scale of the enterprise Defendant believed could be built around commercial access to Rapport's Artifact technology.

Defendant's February 26, 2025 submission to the Missile Defense Agency supplied an equally concrete defense-industrial commercialization plan. In that government-facing document, Defendant proposed an approximately $70 million, seven-year Artifact development, integration, and transition program, including approximately $10 million in production capital expenditures. He expressly characterized that total funding level as "incredibly inexpensive for the capabilities we expect to be able to deliver." The proposed program separated continuing capability-development R&D from integration and production work and translated the requested funding into staffing assumptions: approximately $4 million per year corresponded to ten personnel, while the additional $8 million integration-and-production effort corresponded to approximately twenty more personnel. (Ex. F6 — Valuation Evidence at 5.)

Defendant then laid out a four-epoch industrialization path. Epoch 1 contemplated a fully operational persistent-IMU demonstration by the end of 2026. Epoch 2 contemplated compact IMU development, high-shock and vibration qualification, space survivability, manufacturability, and the first production-ready units. Epoch 3 contemplated an increase to approximately $12 million per year, with continuing R&D accompanied by integration, commercialization, QA/QC, secure facilities, security clearances, supply-chain work, and actual interceptor testing. Epoch 4 contemplated development of configurations "across all interceptors" through work with the relevant primes. Defendant further anticipated product revenue beginning during the program and ultimately sustaining operations and continued development. (Ex. F6 — Valuation Evidence at 5–6.)

The RFI placed production scale on the same concrete footing. Defendant estimated approximately $10 million of production capex to establish capacity for "hundreds of IMUs per year" and expressly contemplated scaling production to "10,000+ units per year" through additional automation and capital investment. He expected production pricing for drop-in IMUs to match or undercut incumbent alternatives at comparable volume because the technology used conventional materials and

components. (Ex. F6 — Valuation Evidence at 5–6.) These statements reflect an industrial production plan measured in tens of thousands of units.

Defendant also expressly identified the interceptor program as only one portion of the technology's commercial field. Under the heading "Other Related Capabilities and Platforms," he wrote that Rapport's novel technology created "a number of other high value applications" because it enabled very precise pointing in addition to positional information. He then identified four additional application classes: free-space optical communications, directed energy, space LADAR, and precision strike. For free-space optical communications, Defendant anticipated "two orders of magnitude faster linking." For directed-energy systems, he identified precise platform and target position and pointing as essential. For space LADAR, he described an application to tracking hypersonic vehicles and expanding intercept opportunities. For precision strike, he identified autonomous navigation under heavy GPS denial as an enabling capability for lower-cost weapons capable of saturating air defenses. (Ex. F6 — Valuation Evidence at 7.)

The same document identified the major defense primes through which Defendant expected to reach the market. Defendant stated that Radian intended to serve as a component supplier and partner with interceptor manufacturers including Lockheed Martin Space, Lockheed Martin Missiles & Fire Control, Boeing Space & Defense, RTX, Northrop Grumman, and BAE. He further stated that Radian intended to remain available to all primes and specifically recognized that a single prime might offer "significant funding for exclusivity." (Ex. F6 — Valuation Evidence at 7.) That statement independently confirms Defendant's understanding that exclusive access to the Artifact could command substantial consideration.

Defendant also identified Rapport to MDA as "the principal inventor of the underlying gyro technology." (Ex. F6 — Valuation Evidence at 8.) Defendant therefore made these detailed valuations, production plans, application assessments, and exclusivity assumptions with direct knowledge that Rapport had originated the core technology. His writings document a commercial program built around Rapport's invention, with development budgets measured in tens of millions of dollars,

production contemplated at more than 10,000 units annually, additional application fields, and a commercialization strategy extending across major defense primes and commercial telecommunications.

The contemplated production scale is especially significant in light of the parties' earliest contemporaneous valuation work: on July 31, 2024, Rapport estimated that annual sales of only 1,450 devices —1,200 to SpaceX at $50,000 each and another 250 at $100,000 each—could generate approximately $85 million in annual revenue and support a business worth approximately $700 million. (Ex. C1 — Initial Conversations.) Defendant's later contemplation of annual production exceeding 10,000 units thus represented a commercial scale nearly seven times the unit volume underlying that initial $700 million benchmark.

### c. Contemporaneous Strategic-Acquisition and Licensing Benchmarks

By April 2025, Defendant's commercialization plans had become specific enough to price licensing, financing, and strategic transactions. The hypothetical-negotiation authorities are addressed in Section III(C) and Section III(F) their application here is that Defendant himself proposed concrete compensation for limited Artifact rights before claiming broader rights without authorization.

On April 12, while the parties were discussing financing strategy, Rapport rejected the prospect of an early $2.5 million financing round as inconsistent with the value of the Company's intellectual property. Defendant responded that if an investor offered "$100m at $1b we would take it," while separately recalling that his own pitch for pursuing the prime-contractor opportunity had been to raise $50–100 million. Those discussions establish the financial scale at which Defendant was evaluating control, dilution, and technology rights. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

Defendant's pre-dissolution restructuring proposals assigned express prices to narrower commercial rights. The proposed arrangements included long-duration revenue participation for gyro and accelerometry technology and separate consideration for defined ten-year exclusivity and purchasing rights. The April 27 proposal, for example, priced a ten-year Black Lattice exclusivity option in the defined loitering-munition communications field at $500,000 and separately priced a ten-year preferential standard-gyro purchasing option at another $500,000. These rights covered limited portions

of the much broader commercial position Defendant ultimately assumed after misappropriation. The proposals therefore establish that Defendant himself treated even narrow field-specific access as an asset requiring substantial consideration. (Ex. A1 — Corporate Records at 55; Section X(A).)

On April 28, Defendant's strategic valuation became more concrete. Building on the product price/performance assessment quoted above, he suggested that direct outreach to Anduril, Lockheed, or another major strategic counterparty could produce a "much much better deal" than the existing DoD approach, and proposed a "rapid acquisition/partnership on Safe gyro" involving Raytheon, Lockheed, Boeing, Anduril, and other prospective buyers. (Ex. C6 — Signal Export [SEALED]; Section X(A).)

On April 28, Defendant publicly stated:

> "Who will pay more for an acquisition of a deeply enabling technology across various platforms?
> Anduril, Raytheon, Lockheed, Boeing, others?
> Might end up going for a quick $100m buy out if we can find the right partner[.]"

Defendant made that $100 million acquisition statement while actively evaluating commercialization paths and strategic counterparties. (Ex. C5 — Investor Sabotage at 30, ECF No. 2-8, PageID #302.)

Defendant's investor-facing materials independently corroborated his commercial estimates. The April 4, 2025 Phoenix Dynamics Technology & Investment Memo identified "Guidance and Navigation" as a core proprietary capability and represented: "We have a proprietary laser gyro technology that is able to achieve 6-figure price performance, at low 5-figure costs, which no competitor will have." (Ex. E1 — Enterprise Structure at 16.) Black Lattice later made the same underlying capability central to its pitch, as documented in the diverted Khosla opportunity at Section V(F). These were market-facing representations of commercial utility and scarcity, not independent licenses or evidence that Defendant owned the technology.

The surrounding record supplies extensive independent support for the figure. Defendant had already developed a nearly $800 million annual-revenue telecommunications concept (*Laser SkyFi*)

around the Artifact, contemplated $200 million-plus equity financing and more than $1 billion of debt for that venture, proposed an approximately $70 million government-funded development and production program, identified additional applications beyond the primary defense use, recognized that exclusivity could command significant funding, and assigned specific consideration to narrower field rights. (Ex. F6 — Valuation Evidence.) The following day, he continued evaluating approximately $15,000 manufacturing cost and approximately $30,000 product pricing. (Ex. C6 — Signal Export [SEALED]; Section X(A).)

Plaintiffs therefore use approximately $100 million as the Artifact's contemporaneous pre-impairment strategic-acquisition benchmark. Defendant himself supplied that transaction-specific valuation while actively considering acquisition counterparties and commercialization strategies. The figure is independently reinforced by the substantially larger commercial opportunities Defendant identified elsewhere in the record, including his express characterization of the commercial gyro as a "billion dollar product." The $100 million benchmark thus reflects Defendant's own concrete acquisition assessment within a record consistently valuing the Artifact's commercial potential at hundreds of millions of dollars or more.

Defendant's later five-year objective of $2 billion in annual missile sales corroborates the downstream market scale he hoped to reach, although it is not a direct input to the pre-impairment acquisition benchmark. That October 2025 statement is quoted in the foreign-recruitment and defense-commercialization chronology at Section IV(G). Read with Defendant's earlier drone and missile integration plans, it provides further evidence of his expected-use value without replacing the contemporaneous strategic-acquisition evidence. (Ex. F1 — October Posts, Fig. 20.)

#### d. Defendant's Fundraising Representations Confirm the Appropriate Valuation

Defendant's fundraising use of the Artifact confirms that the preceding valuation evidence was tied to actual commercial activity rather than an abstract assessment. Phoenix Dynamics sought a $2.5 million pre-seed round to build and fly three proposed vehicles incorporating the technology, with a subsequent financing "10x or larger" following demonstrations and initial sales. Defendant

made the Artifact-derived navigation capability central to that investment proposition; the full Phoenix representation is quoted above. (Ex. E1 — Enterprise Structure at 16.)

Black Lattice then used the same capability to pursue financing under Defendant's own name and for a competing venture. The Black Lattice pitch-deck wording, proposed financing sequences, and redirection of the Khosla Ventures meeting are documented in Section V(F). Their additional significance here is that Defendant repeatedly treated the value of Rapport's technology as available for capitalization outside Radian, without a negotiated license or payment to its owner. (Ex. C2 — Screenshots, Fig. 3; Ex. E1 — Enterprise Structure at 22.)

### e. Exclusive Commercial Rights Were a Principal Part of the Value Defendant Appropriated

The Supreme Court has identified exclusive access as the source of trade-secret economic value. In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011–12 (1984), the Court explained that the value of a trade secret lies in the competitive advantage created by exclusive access, that disclosure or use by competitors destroys that competitive edge, and furthermore, the fact that the data retains its usefulness is irrelevant to the economic impact of unauthorized disclosure. Defendant's commercial plans reflected that same principle: his proposed ventures sought exclusive fields, his investor materials emphasized scarcity and competitive exclusion, and his defense-supply planning treated exclusivity as a right warranting significant funding.

Defendant ultimately assumed a commercial position substantially broader than any of the limited rights he had previously priced. He retained the replication-grade technical archive; pursued derivative development; disclosed information to investors, collaborators, and prospective personnel; attempted to recruit photonics engineers; integrated Rapport's technology into competing ventures; presented it to government and commercial counterparties; pursued contracts and financing; and represented the resulting capability as proprietary or exclusive to ventures he controlled. Defendant thereby exercised the economic bundle associated with a broad commercial license while paying zero consideration and accepting zero contractual restraints.

A lawful transaction granting comparable rights would command substantial consideration because the rights themselves carry substantial economic consequences. Such a transaction would allocate fields of use, territory, duration, sublicensing authority, confidentiality, foreign access, ownership of improvements, investor and government disclosures, attribution, reporting, audits, security obligations, termination, and commercial consideration. The November *Laser SkyFi* plan, February MDA RFI, and April restructuring proposals demonstrate that Defendant understood this directly: each treated controlled commercial access or exclusivity as a separately valuable right requiring compensation.

The same evidence bears directly on diminution in value. Before Defendant's misconduct, Rapport controlled access to the technical package and possessed the ability to negotiate commercial fields separately, preserve competition among licensees, protect secrecy, and determine the timing and scope of disclosure. Defendant's possession and exercise of broad competing rights burdened each of those valuable attributes. A strategic purchaser or licensee evaluating the Artifact after Defendant's appropriation would confront a competing party already in possession of the technical package, having disclosed it to unknown third parties, marketed it as exclusive technology of outside ventures, and asserted commercialization rights across multiple fields.

### 4. Defendant's Unauthorized Retention, Disclosure, and Competitive Exploitation

The record establishes actual retention, disclosure, and commercial exploitation of the Artifact trade secrets.

#### a. Retention of a Replication-Grade Technical Package

Following dissolution, Defendant admitted retaining a backup of Radian's company Drive, including the restricted technical materials previously described. The original admission and the broader post-dissolution sequence appear in Section IV(E). The Complaint alleges that he continued accessing the restricted materials after authorization was revoked.

Defendant's post-dissolution statements further show why the retained archive mattered. He treated the existing analysis and footage as a basis for securing approximately $1 million in funding

and accelerating further development, as quoted in the lost-contract analysis at Section V(D). On May 2, he estimated that he needed only $250,000, a physicist, an engineer, and several months to surpass the prior development position—even with the benefit of the accumulated materials he had retained. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED].)

### b. Unauthorized Disclosures to Third Parties

Defendant also expanded the circle of persons exposed to the confidential technology without Rapport's authorization.

Defendant's own investor solicitation recognized the sensitive nature of the technology and stated that technical or architectural details would not be shared in the fundraising deck. His express statement is quoted in the willfulness discussion at Section III(D). This recognition of the need for controlled disclosure contrasts with his subsequent unauthorized disclosures. (Ex. C3 — Corporate Communications at 13–14.)

Before dissolution, Rapport expressly warned Defendant not to discuss the Artifact except under strict nondisclosure protections. Defendant asserted that government employees were subject to strict NDAs and proceeded with technical outreach. Whatever confidentiality obligations a recipient may have owed independently, those obligations did not authorize Defendant to disclose Rapport's trade secrets or transfer Rapport's right to decide when and on what terms disclosure would occur. On April 26, 2025, Defendant reported a 30–40 minute meeting with three Naval Surface Warfare Center personnel, including personnel working on strategic systems hardware and hypersonics, and stated that he had "explained to them the gravity of the situation based on our conversation." He separately reported speaking with the technical director associated with the SLCM-N program about retaining navigation accuracy in the absence of space assets and discussing tamper resistance and destruction mechanisms intended to prevent reverse engineering.

Defendant later admitted an additional unauthorized disclosure in even clearer terms. On May 2 he wrote that "there is now a third person who knows what we know (under NDA of course), and he agrees the data is compelling." Defendant has not identified that person. The admission confirms

that protected information has moved beyond the two founders and that the new recipient received enough information to evaluate Rapport's experimental data as "compelling."

Rapport held the right to select recipients, negotiate confidentiality terms, stage disclosure, compartmentalize information, and preserve exclusive bargaining power. Defendant unilaterally exercised those rights by choosing recipients and terms of disclosure for Rapport's trade secrets. Each such unauthorized disclosure transferred a portion of Rapport's control over access and secrecy to persons selected by Defendant.

### c. Exploitation Through Phoenix Dynamics and Black Lattice

Defendant exploited the Artifact through entities under his control, using the technology as part of their proprietary commercial position.

The April 2025 Phoenix Dynamics investment memorandum incorporated Rapport's Artifact technology into the proposed weapons systems, capital requirements, and proprietary capabilities of a competing enterprise. This was a proposed commercial application of his work by an entity for which Defendant, not Rapport, was seeking financing. The valuation implications of the original memorandum are analyzed above.

Phoenix Dynamics LLC was then formally organized in Wyoming on May 12, 2025, after Rapport dissolved Radian and after Defendant had been expressly warned against further unauthorized use and disclosure of Rapport's technical data. The formation of the entity provided a separate corporate vehicle through which the appropriated technology could be financed, staffed, developed, and commercialized outside Rapport's control.

Black Lattice provided a second vehicle for the same use and financing of the technical capability. Defendant acknowledged that Black Lattice and Phoenix Dynamics were overlapping or successor ventures; the original Black Lattice deck and its claimed rights are discussed in Section V(F). Here, their significance is the continuation of unauthorized development and marketing through vehicles outside Rapport's control. (Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED]; Ex. E1 — Enterprise Structure.)

The diverted Khosla engagement described in Section V(F) shows how this exploitation extended beyond technical development: investor interest generated by Plaintiffs' inventions was redirected toward Black Lattice. That transaction-specific injury is valued separately; for the Artifact claim, the same conduct evidences unauthorized commercial use of the underlying technology and a resulting loss of control over its attribution and licensing. (Ex. C2 — Screenshots, Fig. 3; Ex. C3 — Corporate Communications at 13–14, 21–23; Ex. E1 — Enterprise Structure.)

Through those ventures, Defendant undertook activities ordinarily requiring authority from the technology owner, including derivative development, outside disclosure, financing, and integration into contemplated products. He did so without a negotiated license, royalties, or agreed use restrictions. These were exercises of claimed commercial control, not a lawful transfer of ownership or rights.

### d. Continuing Activity and Need for Accounting

Defendant's later public activity confirms continuing technical recruitment and commercial activity after the initial post-dissolution disclosures and successor-venture materials. On October 12, 2025, Defendant publicly displayed a recruiting conversation concerning master's and Ph.D. candidates specializing in photonics who were interested in a founding-engineer role. Significantly, Defendant asked the other participant, "Do you have leads for a first engineer," indicating that he was assembling the initial technical team for a venture rather than merely recruiting personnel for an established company in which he held an investment. That evidence directly corroborates his earlier statement that he was one physicist and one engineer away from surpassing Rapport's development position in a matter of months. (Ex. F1 — October Posts at 12, Fig. 14.)

Those later materials support continuing uncertainty, an accounting, and prospective injunctive relief. The known retention, disclosures, competing claims of exclusivity, development head start, and fundraising use support the requested $25 million award; the subsequent activity demonstrates an ongoing dissemination and derivative-use risk requiring equitable relief and a complete accounting.

### 5. Appropriation of Exclusive Commercial Rights and Competitive Head Start

The foregoing conduct impaired the Artifact in ways extending far beyond replacement cost of laboratory hardware.

First, Defendant appropriated the economic position of a broad commercial licensee. His Phoenix and Black Lattice marketing, documented above, treated Rapport's technology as a competitive capability available through Defendant-controlled ventures. Yet no comparable license was negotiated or paid for. A strategic purchaser evaluating a $100 million acquisition would distinguish between a technology whose inventor controls commercialization and one for which a hostile former cofounder possesses the replication package, claims competing rights, and has undertaken development and disclosure.

Defendant's own post-dissolution communications directly confirm the breadth of control he claimed for himself. On April 30, 2025, Defendant asserted that "the company is the owner of the IP," claimed that even if the dissolution were valid he would remain a "joint owner in the IP," and declared that he would be "well within my rights legally to continue working on it in a new entity." Those assertions are relevant here as evidence of the scope of control Defendant claimed for himself; the ownership and assignment history is addressed in Section IV. At the same time, Defendant demanded that Rapport permit his Radian shares to be repurchased and stated that Rapport could no longer remain in "any sort of managerial or board role" in a future venture, although Defendant still wanted Rapport to continue performing technical work as an engineer.

The commercial structure Defendant proposed is particularly revealing. Defendant suggested that Radian could assign the intellectual property back to Rapport "in exchange for your shares" while simultaneously putting in place "an exclusive licensing agreement with royalties." In other words, Defendant's proposed resolution contemplated stripping Rapport of his equity and governance position while preserving for the commercial venture an exclusive right to exploit Rapport's technology, leaving Rapport principally with a royalty interest. That proposal closely parallels the economic position Defendant later attempted to assume without agreement or payment.

Defendant escalated that position on May 1, purporting unilaterally to declare Rapport's dissolution a "de facto resignation," to deem Rapport's unvested shares repurchased, and to reduce him to "a minority shareholder, if a shareholder at all." Defendant then demanded the return of "all property of the company/myself," expressly including hardware, pending patents, patentable information, and technical information. The following day, Defendant made the intended allocation of rights still more explicit: "I also want you to have royalties to this technology, but it is also trivial for you to have none if you dig your heels in," followed shortly thereafter by "Can't have you as a shareholder."

These statements reveal a sweeping assertion of rights. Defendant asserted the right to control the corporate vehicle, remove Rapport from ownership and governance, possess the technical materials, continue development through a new entity, decide the terms on which Rapport might receive royalties, and commercialize the technology notwithstanding Rapport's objection. That position substantially resembles an exclusive commercial license coupled with corporate control and exceeds the rights Defendant actually possessed.

Second, Defendant transferred a substantial development head start to himself and his affiliates. Rapport's preexisting research, prototype, software, and experimental analyses supplied a starting point Defendant would otherwise have had to recreate. Defendant himself estimated the remaining development gap in terms of a few months, one physicist, one engineer, and approximately $250,000; his separate government-contract assessment is quoted in Section V(D). These statements show the value of access to the accumulated record rather than independently recreating the underlying know-how.

Third, Defendant impaired Rapport's first-mover advantage. Before the misappropriation, Rapport controlled when competitors or potential partners would receive implementation details and on what terms. Afterward, Defendant could pursue development in parallel, recruit engineers, present the capability to investors, and approach government and strategic counterparties using Rapport's technical work. Parallel development enabled by Rapport's confidential work directly burdens his first-mover position.

Fourth, Defendant created attribution and commercial-control contamination. Investors, government officials, engineers, and prospective strategic partners exposed to Phoenix or Black Lattice materials were presented with a competing narrative in which Defendant's entities possessed the proprietary or exclusive navigation technology. A prospective acquirer or licensee therefore must account for another actor's possession, assertions of rights, prior disclosures, and capacity to create competing implementations when valuing a commercial grant from the inventor.

Fifth, Defendant impaired Rapport's ability to control security, field of use, and downstream dissemination. Rapport repeatedly distinguished safer commercial applications from more sensitive implementations and preserved the Artifact's secrecy by allowing the provisional application to expire before taking steps that would lead toward public disclosure. Defendant instead made unauthorized disclosures, discussed strategic applications, and pursued commercialization through his own entities. For technology whose value depends substantially on scarcity and controlled access, appropriation of those rights carries independent economic consequences.

Sixth, Defendant's failure to provide a complete accounting has prevented Rapport from determining the full dissemination history, including the complete set of copies, recipients, derivative documents, investor presentations, government communications, engineers, affiliates, and foreign entities that received or relied upon Artifact information. That unresolved dissemination burden reduces the assurance of uncontested commercial control that Rapport could offer a sophisticated purchaser before Defendant's wrongful copying, disclosure, and competing use.

### 6. Continuing Impairment and the Distinct Role of Prospective Relief

The impairment remains ongoing. Defendant has admitted possessing copies of the relevant technical information. The record remains unreconciled by return or destruction of all copies, sworn identification of all recipients, a complete accounting of derivative work, or withdrawal of the investor-facing representations through which Phoenix Dynamics and Black Lattice claimed the technology. The later record also shows continued technical recruitment and defense commercialization activity by Defendant. (Compl. ¶¶ 160–161, 209–211, 315–316.)

That uncertainty affects present value. A purchaser or licensee must account for the disclosures already known and for unresolved questions concerning where the information has gone, what derivative development has occurred, and whether later implementations were seeded by Defendant's access. Those unresolved questions are themselves commercial burdens created by the known misappropriation and reinforce the value impairment already established by the record.

Monetary damages, an accounting, and an injunction therefore perform different functions. The damages request compensates impairment and unauthorized use that have already occurred. The accounting is necessary to identify recipients, derivative uses, and proceeds left unknown by Defendant's withholding of that information. The requested injunction is prospective: it is intended to stop further use and disclosure and prevent the existing impairment from increasing.

*PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co.*, 47 F.4th 156, 163–64 (3d Cir. 2022), illustrates the complementary roles of damages and prospective relief in a default-judgment setting. The Third Circuit upheld substantial trade-secret damages together with a permanent injunction because the damages compensated for past uses of the secrets while the injunction governed potential future use. Here, damages compensate disclosures already made, the head start already transferred, prior representations of proprietary or exclusive control, and the resulting impairment of Rapport's commercial position. Prospective relief addresses future use and disclosure.

### 7. Two Independent Measures Support the Twenty-Five-Million-Dollar Artifact Award

The record independently supports the same $25 million award under two recognized trade-secret measures: diminution in value and a reasonable royalty. Diminution measures the reduction in value of the controlled asset after Defendant's misconduct; reasonable royalty measures the lawful price of the breadth of use Defendant actually assumed. Both measures value the same appropriated bundle of rights from opposite sides of the transaction. Plaintiffs seek one $25 million award under either measure.

### a. Diminution in Value

#### i. Pre-Impairment Benchmark and Governing Law

The record supports approximately $100 million as the Artifact's pre-impairment strategic benchmark. Section V(I)(3)(c) and Section X(A) establish that benchmark through contemporaneous market analysis, product economics, exclusivity and royalty negotiations, strategic-acquisition discussions, and Defendant's investor-facing use of Artifact as a proprietary and exclusive commercial advantage. Plaintiffs request $25 million, representing twenty-five percent of that benchmark.

The flexible valuation standard and the governing trade-secret measures are established in Section III(C) and at the opening of this section. For diminution, the operative question is the value of the confidential Asset before misappropriation and the commercially meaningful burden imposed by retention, disclosure, competing proprietary claims, and the transfer of development head start. *Caudill Seed*, 53 F.4th at 389–93; *Allied Erecting*, 805 F.3d at 706. The concrete benchmark and impairment evidence are addressed immediately below.

Substantial trade-secret awards tied to proven use also have direct appellate support. In *Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 980 F.3d 1117, 1127–33, 1144–45 (7th Cir. 2020), the Seventh Circuit affirmed a $140 million compensatory award grounded in confidential information shown to have been incorporated into and used through the defendant's comparative analysis, with the calculation accounting for benefit conferred and technological decay. Here, the requested amount is tied to known retention, disclosures, competing commercialization, and Defendant's quantified development head start.

#### ii. Record-Based Impairment

The before-and-after record establishes concrete impairment to the Artifact. Before misappropriation, Rapport controlled the technical package, the timing and recipients of disclosure, the fields and terms of commercialization, the development head start created by years of research and experimentation, and the ability to offer a licensee or strategic purchaser uncontested practical exclusivity. Defendant's misconduct transferred the technical archive and development head start to an adverse

actor who disclosed protected information, claimed the capability as proprietary or "exclusive" technology of competing ventures, exercised broad commercial rights over it, and left the dissemination and derivative-use history unaccounted for.

The requested twenty-five-percent impairment measures those demonstrated burdens: loss of sole practical control over commercialization and disclosure; known unauthorized dissemination; transfer of development head start; appropriation of exclusive-license-like rights; competing proprietary and exclusivity claims; and the resulting burden on future licensing, partnership, and strategic-acquisition transactions. Unresolved downstream dissemination and derivative use add continuing commercial risk to those completed injuries.

Accordingly, diminution in value independently supports a $25,000,000 compensatory award.

**b. Reasonable Royalty**

The DTSA expressly permits "a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B)(ii). Ohio law likewise permits a reasonable royalty "equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both." Ohio Rev. Code § 1333.63(A).

The governing hypothetical-negotiation test, discussed in Section III(C), asks the fair price for licensing the specific intended use as of misappropriation. *Mid-Michigan*, 416 F.3d at 510–11; *University Computing*, 504 F.2d at 539. The use intended and actually undertaken here is documented by Defendant's own proposals, disclosures, and commercial activity.

That formulation is especially significant here because Defendant's intended uses are very well-documented by his own contemporaneous writings. At and around the time of misappropriation, his list of contemplated uses included:

(a) a $500,000 ten-year exclusivity option for Black Lattice in gyrocomp-enhanced loitering-munition applications (Ex. A1 — Corporate Records at 55);

(b) a proposed ten-year exclusivity option limited to supersonic cruise missiles, priced by Defendant at $1 million if exercised by the end of 2026 and $2 million if exercised by the end of 2027 (Ex. C6 — Signal Export [SEALED]);

(c) manufacture and sale of commercial gyros at approximately $15,000 cost and $25,000–$30,000 selling prices (Ex. C6 — Signal Export [SEALED]);

(d) strategic acquisition or partnership transactions with Anduril, Raytheon, Lockheed, Boeing, and other major defense contractors (Ex. C6 — Signal Export [SEALED]);

(e) an approximately $70 million, seven-year MDA-funded development and transition program, including approximately $10 million in production capital expenditures, to mature, integrate, produce, and commercialize the technology (Ex. F6 — Valuation Evidence at 5–8);

(f) use of the technology as the foundation for a $50–100 million venture-capital seed round aimed at vertically integrating Radian into a prime contractor, with Defendant projecting a $100 billion private valuation within ten years and a $1 trillion public valuation within fifteen years (Ex. C3 — Corporate Communications at 13–14);

(g) a possible rapid strategic acquisition or "$100m buy out" (Ex. C5 — Investor Sabotage at 30);

(h) pursuit of a $1 million government contract using the existing Artifact analysis and experimental footage (Ex. E2 — Post-Dissolution Misconduct at 2);

(i) replication and continued development using approximately $250,000, one physicist, one engineer, and several months (Ex. E2 — Post-Dissolution Misconduct at 5);

(j) deployment across missiles, loitering munitions, drones, GPS-denied navigation, hypersonic systems, aircraft, satellites, and other high-value aerospace and defense applications (Ex. C6 — Signal Export [SEALED]; Ex. E1 — Enterprise Structure);

(k) use as a proprietary Phoenix Dynamics capability while seeking a $2.5 million pre-seed round and contemplating a "10x or larger" follow-on financing (Ex. E1 — Enterprise Structure at 16);

(l) use as Black Lattice's claimed exclusive, high-performance IMU offering while pursuing $5 million, $25 million-plus, and ultimately $100 million-plus financing rounds (Ex. E1 — Enterprise Structure at 22; Ex. C2 — Screenshots, Fig. 3);

(m) exclusive commercial-telecommunications and optical-communication-terminal applications, for which Defendant's *Laser SkyFi* plan projected approximately $788 million in initial annual revenue (Ex. F6 — Valuation Evidence at 9–12); and

(n) continued technical and commercial exploitation through competing ventures, including additional disclosure, engineering recruitment, fundraising, and continued technical development (Ex. E1 — Enterprise Structure; Ex. E2 — Post-Dissolution Misconduct at 5; Ex. F1 — October Posts at 12, Fig. 14).

Defendant subsequently carried Rapport's technology into Phoenix Dynamics and Black Lattice, represented it to investors as proprietary or exclusive technology of those ventures, disclosed Artifact information to a technically knowledgeable third party who understood the shared information and independently assessed the data as compelling, and sought personnel capable of continuing its technical development. His earlier commercial planning also contemplated exclusive use of the Artifact's precision-pointing capability across commercial telecommunications and optical-communication-terminal markets. The hypothetical royalty must therefore price the extraordinarily broad commercial use Defendant intended to make of the trade secrets.

*StorageCraft Technology Corp. v. Kirby*, 744 F.3d 1183, 1186–90 (10th Cir. 2014), is particularly instructive in determining what, economically, Defendant appropriated. *StorageCraft* holds that when a misappropriator takes a trade secret and discloses it to a competitor, he "effectively assumes for himself an unrestricted license" in the secret. *Id.* at 1184. A reasonable royalty accordingly prices the scope of the license the defendant actually arrogated to himself, and the amount "undoubtedly depends on what he did with the secret" and the uses encompassed by that assumed license. *Id.* at 1188–90. Thus, a narrowly restricted disclosure and a right to possess, disclose, and enable commercial exploitation by competitors do not carry the same economic value. *Id.*

The recipient's capability was central to the royalty analysis in *StorageCraft*. Kirby intentionally disclosed the secret to NetJapan, "an able competitor," knowing that NetJapan "could well use the secret to compete with StorageCraft." *Id.* at 1190. The court treated that technically and commercially capable recipient as significant to the economic scope of the rights Kirby assumed through disclosure. *Id.* at 1188–90.

Defendant's May 2 disclosure to a technically knowledgeable recipient, set out in Section V(I)(4)(b), supplies the corresponding valuation fact: a person capable of evaluating the experimental record had received information about the protected work. Under *StorageCraft*, the recipient's competence matters to the commercial scope of the rights Defendant exercised. (Ex. E2 — Post-Dissolution Misconduct at 5; 744 F.3d at 1188–90.)

Defendant also carried Plaintiffs' trade secrets into Phoenix Dynamics and Black Lattice—competing ventures positioned to exploit the same technology—and then represented, valued, and pursued that technology as part of those ventures' commercial programs. The reasonable royalty must therefore value the rights Defendant actually appropriated: possession of the technical materials; disclosure to technically knowledgeable recipients and competing ventures; erosion of secrecy and exclusivity; and attempted commercialization across the fields Defendant himself identified.

**i. Scope of the Hypothetical License**

Defendant's actual conduct defines the scope of the hypothetical license. A lawful grant would have needed to authorize possession and copying of the technical archive; continued development; disclosure to engineers, collaborators, investors, and government personnel; fundraising and government-contracting use; integration into missiles, drones, communications systems, and other aerospace and defense products; technical recruitment; derivative development and improvements; representation of the capability as proprietary or exclusive technology of Defendant-controlled ventures; strategic-acquisition and partnership efforts; and commercialization through Phoenix Dynamics, Black Lattice, or other successor entities.

That bundle is economically comparable to an unusually broad, royalty-free commercial license coupled with substantial control over commercialization. A lawful agreement would allocate field of use, territory, sublicensing, confidentiality, security, foreign access, ownership of improvements, investor and government disclosure, attribution, reporting, audit and accounting, and termination. The hypothetical negotiation therefore values the compensation Rapport would have required to surrender the continuing royalty participation and commercial control that Defendant exercised without payment. *StorageCraft*'s instruction to value the scope actually assumed applies directly. 744 F.3d at 1188–90.

### ii. Contemporaneous Licensing and Exclusivity Benchmarks

The parties' pre-dissolution negotiations supply concrete prices for narrower rights. The April 27 proposal contemplated $500,000 for a ten-year exclusivity option covering gyrocomp-enhanced directed-RF communications in a narrowly defined class of human-in-the-loop loitering munitions weighing no more than 500 pounds, while preserving Rapport's ownership and separate product-purchase economics. The same proposal priced a ten-year option for preferential standard-gyro purchasing terms at another $500,000. (Ex. A1 — Corporate Records at 55.)

The April LOIs also priced broad commercialization through continuing participation. Defendant proposed a 5% revenue share for gyro and accelerometry technology lasting twenty-five years above a revenue threshold, together with equity, governance, information-sharing, funding, and commercialization provisions. Those terms associated sweeping commercialization rights with long-duration economic participation while separately assigning six- and seven-figure prices to field-specific rights. A royalty-free grant of comparable or greater breadth would capitalize that surrendered participation into upfront consideration. (Ex. A1 — Corporate Records at 55.)

A separate Defendant-authored proposal priced a still narrower ten-year cruise-missile exclusivity right—limited to supersonic cruise missiles weighing no more than 1,000 pounds and operating at no more than Mach 2.5—at $1 million if exercised by the end of 2026 and $2 million if exercised

by the end of 2027. That proposal likewise preserved ownership of Artifact and separately priced purchases of the resulting capability.

The Sixth Circuit recognizes actual negotiated economic terms as significant evidence of a trade secret's value, including unconsummated negotiations and agreements that are not themselves licenses. *Vitro*, 292 F.2d at 682–83; *Mid-Michigan*, 416 F.3d at 509–12; *see also Bohnsack*, 668 F.3d at 279–80. Unlike a generic estimate, Defendant's contemporaneous proposals here placed concrete prices and revenue-participation terms on rights narrower than those he exercised without payment.

### iii. The Parties' Bargaining Positions

Rapport's refusal to pursue financing he considered inconsistent with the value of Radian's intellectual property establishes the licensor's high reservation value. His original April 12, 2025 statement and wider position on dilution appear in Section III(F)(6). That evidence indicates that an arm's-length license granting Defendant's broad rights would have required meaningful consideration for surrendered exclusivity and future upside. (Ex. C6 — Signal Export [SEALED]; Appendix A.)

Artifact-specific evidence points in the same direction. Rapport expected the Safe gyro to improve price-performance dramatically while opening a larger market, as set out in the factual chronology at Section IV(D)(7). His research, personal labor and capital, prototype construction and testing, confidential experimental records, provisional patent filing, and controlled disclosures reinforce the value he placed on retaining those rights. (Ex. C6 — Signal Export [SEALED]; Appendix A.)

Defendant's contemporaneous expected-use value was likewise high. As established in Section V(I)(3)(c) and the surrounding valuation record, Defendant independently researched billion-dollar inertial-navigation markets and incumbent pricing, quantified Artifact's product economics, identified major strategic counterparties, recognized the commercial gyro's very substantial market potential, contemplated a "rapid acquisition/partnership," identified a possible $100 million acquisition, and the following day contemplated a $15,000 manufacturing cost in concert with a $30,000 selling price. These commercial assessments assist in evaluating the licensee side of the hypothetical negotiation.

### iv. Royalty Cross-Check and Amount

Section X(B) capitalizes Defendant's proposed 5% long-duration revenue participation into present value for two specific commercialization fields identified in his April 2025 LOI. Using Defendant's contemporaneous approximately $30,000 contemplated selling price, an illustrative initial penetration of 100 units per field growing at 30% annually, finite long-run market ceilings, and a 15% discount rate, the model produces an illustrative combined present value of approximately $26.59 million. That amount represents one component of the compensation required to convert continuing royalty participation into a royalty-free grant.

The royalty cross-check draws on the parties' actual bargaining evidence: field-specific exclusivity prices, continuing royalty terms, Rapport's reservation value, Defendant's expected-use value, and product-level economics. As explained in Section III(C), such concrete negotiated inputs are relevant to the hypothetical license valuation.

Together, those benchmarks support a lawful lump-sum license price—and therefore a reasonable-royalty award—of at least $25 million for a royalty-free license broad enough to legitimize Defendant's actual conduct. The approximately $100 million strategic-acquisition benchmark, six- and seven-figure prices for defined fields, long-duration participation for broader commercialization, and Section X(B) independently converge on a royalty at least equal to the pleaded $25 million amount.

## 8. Corroborating Measures and Distinct Enrichment

### a. Unjust Enrichment

Defendant's access conferred substantial additional benefits. He obtained a technical head start; bypassed the work required to independently reproduce Rapport's results before approaching funders and engineers; represented the technology as a proprietary advantage of his own ventures; used that claimed advantage to enhance the differentiation of Phoenix Dynamics and Black Lattice; and positioned himself to seek contracts, investment, strategic partnerships, and enterprise value based on a capability he did not invent and had not licensed.

The DTSA allows nonduplicative unjust enrichment where the value Defendant obtained exceeds or differs from the actual-loss measure. 18 U.S.C. § 1836(b)(3)(B)(i)(II). The Federal Circuit likewise recognizes enrichment beyond historical licensing terms when the record supports value obtained through unauthorized use. *Versata Software, LLC v. Ford Motor Co.*, 176 F.4th 1336 (Fed. Cir. 2026). The April LOIs thus supply one valuation input among Defendant's commercial gains, saved research costs, and head-start benefits; no benefit already included in the selected compensatory measure is sought twice.

Defendant's default leaves the full amount of his realized gains unresolved. His fundraising materials, government-contracting statements, and successor ventures establish the channels through which enrichment was sought and demonstrate why an accounting is necessary. Additional relief requested relating to Defendant's exploitation of Artifact is addressed separately in the accounting and disgorgement section.

### b. Avoided Development Costs and Head Start

Avoided development cost and competitive head start provide an additional cross-check because Defendant himself quantified the resources required to reproduce Rapport's work while already having the misappropriated technical materials to guide him. He obtained implementation documentation, sourcing information, source code, experimental records, processed data, analyses, and the accumulated technical knowledge embodied in the archive. He stated that the materials already in hand were sufficient to obtain a $1 million contract and that, with "a few good engineers," he could "quickly catch up and get ahead." Two days later, after admitting that he retained a Drive backup, he estimated that he was $250,000, one physicist, and one engineer away from surpassing the existing development position "in a few months." Read together, these contemporaneous statements describe the engineering effort Defendant expected to undertake with Rapport's IP already serving as the roadmap: approximately $250,000, two specialized technical personnel, and several months to reproduce the existing technical position and carry it forward.

The value of the avoided development in this action is analogous to traveling to a known destination with an accurate map in hand, compared to mapping the terrain and discovering the route from scratch. The cost of the trip with the map already in hand is vastly less than the far greater cost of finding a route without it, which necessarily requires surveying the terrain, testing routes, encountering dead ends, backtracking, and perhaps eventually identifying the viable path, if it is discovered at all.

Defendant's estimate that approximately $250,000, one physicist, one engineer, and several months would allow him to replicate and surpass Rapport's development position assumed that Defendant already possessed Rapport's technical materials. The avoided development cost was substantially greater: Defendant acquired the benefit of the preceding research, experimentation, unsuccessful approaches, analysis, validation, and technical judgment required to discover that path in the first instance. The same appropriation also conferred a substantial head start by compressing years of accumulated technical research and development into the several-month replication period Defendant himself identified. The $250,000 figure accordingly only establishes the cost of exploiting the completed development path after disclosure; the full economic benefit of the misappropriation includes both that replication cost and the much larger development cost and time Defendant avoided by receiving the map itself.

The appellate cases confirm that a development head start can carry substantial economic value when the award is tied to the information actually received and used. *Caudill Seed* is particularly instructive. The Sixth Circuit upheld a damages framework permitting recovery for value gained or money saved by avoiding research and development and emphasized evidence that the misappropriated research allowed the defendant to become a producer of the competing product within four months—a compensable commercial "jump start." 53 F.4th at 389–94. *Epic Systems* likewise affirmed $140 million in compensatory damages based on avoided development costs associated with confidential information shown to have been used. 980 F.3d at 1127–33, 1144–45. And in *PPG Industries*, a default-judgment case, the Third Circuit affirmed approximately $8.8 million in supported actual

damages based principally on research-and-development costs the misappropriator avoided, together with enhanced damages and prospective injunctive relief. 47 F.4th at 159–64.

An independent competitor with no head start would face a much longer, expensive, and uncertain development period before having any possibility of reaching the position from which Defendant proposed to spend that $250,000. That stage encompasses discovering the underlying architecture, solving the foundational technical problems, selecting and rejecting approaches through experimentation, constructing and testing prototypes, developing the supporting software and analysis pipeline, generating and interpreting experimental data, and accumulating the negative knowledge and practical insights embodied in Rapport's archive. The head start transferred the benefit of that antecedent development burden—the labor, expense, time, uncertainty, experimentation, and accumulated technical knowledge required to create the roadmap Defendant intended to use.

The head start and avoided costs principle has deep roots in Sixth Circuit trade-secret law. *A.O. Smith* held that a competitor who obtains desired technical knowledge through unfair means must account for the development price paid in labor, money, and equipment. 73 F.2d at 539. The Supreme Court quoted that principle approvingly in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 482 (1974), an Ohio trade-secret case. Here, Defendant's own contemporaneous estimate separates the development stages in concrete terms: Rapport's archive supplied the accumulated intellectual and experimental work, while Defendant's $250,000 estimate quantified the substantial additional engineering effort he expected to spend using that work to reproduce the existing technical position and carry it forward.

### 9. Separate Economic Interests Protected by the Artifact and Transaction-Specific Awards

The $25 million Artifact impairment claim protects a different economic interest from the separately requested $1 million lost-contract award, $500,000 near-term financing award, $5 million Khosla Ventures opportunity award, and Radian enterprise-value award.

The $1 million contract category concerns a particular near-term government-contracting opportunity that Defendant himself stated the existing Artifact analysis and footage could secure. The $500,000 financing category concerns the amount Defendant expressly said Radian could raise in the near term. The Khosla category concerns the value of a specific institutional investment opportunity that progressed to an actual meeting and was then diverted. Radian's enterprise-value category concerns destruction of the assembled corporate going concern.

The present category concerns the underlying Artifact trade-secret asset itself. Appropriation of exclusive-license-like commercial rights, transfer of a competitive head start, and loss of uncontested commercialization control diminish the asset's value. The transaction-specific categories measure separate lost contracts or investments, and the Radian category measures the destroyed going concern. Those opportunities also provide probative evidence of Artifact's commercial value while remaining separate economic injuries.

Plaintiffs request one recovery for each distinct economic injury, with any unjust-enrichment award in this section confined to benefits distinct from separately valued transaction opportunities. Accordingly, the $25 million Artifact award compensates impairment and unauthorized exploitation of the underlying trade-secret asset, independently of the separately quantified transaction-specific and corporate injuries.

## J. Vacuustat Trade-Secret and License Damages

The Vacuustat presents an unusually concrete trade-secret damages record because the parties themselves established the economic terms for lawful commercialization before this litigation. Rapport owns U.S. Patent No. 10,625,842 and the associated nonpublic technical package, including trade secrets protectable independently of the patent. Patent and trade-secret protection may coexist for confidential technical information. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479–85, 491–92 (1974). He granted Radian Industries an exclusive worldwide commercialization license covering both the patent and associated Vacuustat technology, including his notes, calculations, computer code, and CAD files. In return, the parties established a five-percent revenue royalty running through

expiration of the patent on qualifying sales, systems incorporating Vacuustats, and services enabled primarily by Vacuustats. The license also imposed a commercialization requirement requiring Radian, by December 31, 2027, either to obtain a government contract focused on the Vacuustat or construct a Vacuustat capable of maintaining structural integrity and positive sea-level buoyancy for at least sixty seconds.

Defendant then used the same technology through Black Lattice without authorization from Rapport or Radian. He submitted detailed government-facing Vacuustat fund-raising materials under Black Lattice's name,[7] marked the submissions as proprietary to Black Lattice, sought investment into Black Lattice to develop the technology, and laid out a multiyear program for prototype development, scalable manufacturing, military integration, telecommunications, and large-scale deployment. He did so while in possession of Rapport's confidential Vacuustat technical materials, while CEO of Radian, and while Radian held the exclusive commercial channel established by the parties' written bargain.

The resulting injury is therefore anchored in actual transactions and Defendant's own contemporaneous conduct. The parties had already priced lawful commercial access at five percent of qualifying revenue. Years of pre-Radian communications had identified concrete commercial applications—including Vacuustat-enabled wind energy, telecommunications, ISR, and other persistent high-altitude uses—and Defendant's later submissions established a development path, identified expected capital requirements, modeled deployment at significant scale, and treated secrecy as capable of yielding a major head start. His investor solicitation later tied early private financing directly to faster vertical integration and years of commercialization time. Defendant's conduct diverted the commercialization program, consumed a finite portion of the patent-backed royalty window, transferred technical and institutional momentum to a competing vehicle, and left Rapport to rebuild a clean commercialization path while Defendant continued to possess and use the underlying technical archive.

The governing DTSA and Ohio trade-secret measures are described in Section III(C). The Vacuustat record warrants application of those measures to an actual royalty-bearing license, a finite

[7] These were submitted through his shell company BL Machines LLC.

remaining patent term, diverted commercialization, and separately provable enrichment. *Caudill Seed*, 53 F.4th at 389–93; *Mid-Michigan*, 416 F.3d at 510–13.

Plaintiffs accordingly present the lost royalty and commercialization-delay measure as the principal Vacuustat compensatory theory. The parties' negotiated five-percent royalty independently supplies the primary benchmark for a reasonable royalty. Defendant's avoided development effort, competitive head start, government and investor access, and proceeds traceable to Vacuustat exploitation provide additional evidence of value and support recovery of distinct unjust enrichment established through the requested accounting. These measures place the Vacuustat injury on multiple contemporaneous economic foundations. Plaintiffs therefore request **$121,800,808.00** in compensatory damages, as developed below and in Appendices C–E.

### 1. Ownership, Trade Secrets, and the Negotiated Commercial Bargain

#### a. Rapport Owned the Vacuustat and Developed the Technical Foundation Years Before Radian

The Vacuustat originated with Rapport years before the formation of Radian. U.S. Patent No. 10,625,842, entitled *Lighter-than-Air Fractal Tensegrity Structures*, identifies Nathan Rapport as both inventor and assignee. The application was filed July 23, 2015, claimed priority to a July 31, 2014 provisional application, and issued April 21, 2020. The patent describes a vacuum-lift structure using a flexible airtight membrane supported by a fractal tensegrity internal structure designed to resist atmospheric pressure while maintaining a mass below the air displaced by the structure. Its stated advantages include buoyancy control, long endurance, and lower operating cost relative to conventional aerostats.

Defendant knew the provenance of the technology long before the parties formed Radian. On October 25, 2020, Chapiro contacted Rapport about the technology and wrote: "I saw you wrote a patent on a 'star' shaped design." He then asked Rapport technical questions concerning compressive requirements and structural efficiency. That contemporaneous communication independently estab-

lishes Defendant's knowledge that the underlying Vacuustat architecture originated with Rapport. (Ex. C1 — Initial Conversations at 2, ECF No. 2-5, PageID #220.)

Chapiro's 2020 inquiry also establishes that he knew Rapport's Vacuustat work extended beyond the issued patent. Chapiro explained that, after he had asked MIT researcher Ben Jennett about a star configuration, Jennett pointed him to Rapport's patent. Rapport then told Chapiro that he had written software to evaluate permutations of Vacuustat materials and dimensions, created CAD designs for planned manufacturing and testing, developed additional concepts for scaling the structure, and completed "a fair amount of improved analysis that is not included in the patent." Chapiro thereafter continued discussing materials, compression members, and manufacturing approaches with Rapport. Years before Radian existed, Defendant therefore knew both that Rapport was the source of the patented star architecture and that Rapport possessed a separate body of unpublished analytical, computational, CAD, and implementation work.

The technical exchange continued. In August 2021, Rapport provided Chapiro with output from a Vacuustat design-analysis program and explained that he had developed additional scaling designs beyond the limitations reflected in earlier work. The discussion addressed alumina, boron carbide, structural efficiency, membranes, precision-manufactured joints, payload efficiency, and manufacturing economics. Those communications establish a direct technical lineage from Rapport's pre-Radian research to the subject matter Defendant later pursued through Black Lattice.

The same pre-Radian record also establishes Defendant's sustained commercial interest. In August 2021, Chapiro evaluated Vacuustat applications in high-margin markets including ISR, telecommunications, imaging, cell-tower replacement, and other persistent high-altitude uses, and expressly discussed beginning with the highest-margin markets while manufacturing scaled. During a March 2022 discussion concerning government commercialization, Chapiro wrote that he was "still very interested in pursuing vacuum balloons," identified DTRA, MDA, NRO, and DARPA as potential government channels, and described white papers, proposals, program-manager outreach, and conferences as routes to funding and adoption. The later Black Lattice government program thus

followed years of discussions in which Rapport supplied the invention and technical work while Chapiro explored routes for financing and commercialization.

Rapport's work also produced a substantial nonpublic implementation package: unpublished mathematical analyses, engineering calculations, implementation-oriented technical notes, confidential CAD and structural work, and other information directed toward making the Vacuustat buildable and commercially useful. Together, those materials preserved accumulated analytical and engineering work required to translate the patented architecture into practical design choices, manufacturable structures, testing paths, and commercialization decisions. Possession of that package materially compresses the path from the patented concept to continued refinement, manufacture, testing, and commercial deployment.

The parties' own later license expressly recognized that broader technical package. It granted Radian exclusive worldwide rights not only to Patent No. 10,625,842 but also to "any and all associated technologies or IP associated with vacuum balloons," expressly including Rapport's "notes, calculations, computer code, and computer-aided design (CAD) files." The written agreement therefore supplies contemporaneous evidence that the nonpublic implementation material was itself part of the valuable commercial rights being transferred to Radian.

### b. The Sealed Private-Folder Materials Contain the Nonpublic Vacuustat Trade-Secret Package

The sealed technical-materials exhibit identifies the Vacuustat trade secrets as an assembled engineering package. The Vacuustat portion of Exhibit B4 [SEALED] contains, among other things, Rapport's original mathematical treatment of Vacuustat structural mechanics; a simplified analysis prepared to facilitate knowledge transfer; a confidential engineering report containing structural and CAD work; and additional nonpublic engineering materials.

Those materials were stored in Rapport's expressly labeled Private folder. Defendant also acknowledged keeping a backup of the Radian Drive. That backup included the Private folder, and

Rapport confirms that all of the Vacuustat materials identified in the sealed exhibit were contained there.

The practical value of this package lies in the technical path it preserves. The Private-folder materials contain accumulated work on structural selection, translation of theoretical relationships into implementation choices, materials and buckling behavior, manufacturable components and nodes, membrane and load behavior, CAD, and the identification of productive technical approaches. Possession of that accumulated work materially compressed the experimentation, analysis, engineering selection, and design effort required to continue Vacuustat development.

Exhibit B4 to the Complaint has been filed under seal, allowing the Court to evaluate the full technical record while the public memorandum identifies the protected information by category. The sealed materials establish that Defendant received a body of nonpublic implementation information that the parties themselves expressly included within the scope of the exclusive Vacuustat license.

### c. The Vacuustat License and Loan Formed a Concrete Pre-Litigation Commercial Bargain

The Vacuustat licensing agreement granted Radian an exclusive worldwide license to Patent No. 10,625,842 and associated Vacuustat technology while Rapport retained ownership and a continuing royalty interest. The agreement provided: “Radian Industries Inc. shall pay a royalty of 5% of revenues from the sale of vacuum balloons, systems incorporating vacuum balloons, or services enabled primarily by the use of vacuum balloons.” That royalty definition extended across the technology’s commercial applications, including direct product sales, downstream systems, and services whose value depended primarily on Vacuustat. (Compl. ¶¶ 67–74; Ex. A1 — Corporate Records at 50–52.)

That license formed part of the bargain through which Rapport contributed valuable Vacuustat commercial rights to Radian and Defendant committed development financing to the Company. The license and loan created reciprocal economic obligations: Radian received exclusive access to Rapport’s patented and associated Vacuustat technology, Rapport retained a continuing royalty inter-

est, and Defendant committed capital to advance the venture. (Compl. ¶¶ 67–74; Ex. A1 — Corporate Records at 50–52.)

The royalty term continued through expiration of the patent. Payments were due quarterly. Rapport received audit rights to inspect Radian's books and records relating to royalty calculations. Rapport retained ownership of the Vacuustat, granted Radian the exclusive commercial channel, and retained continuing economic participation tied directly to commercialization success. Defendant, in turn, committed capital to the venture and accepted a structure in which lawful commercialization of the technology generated a defined royalty for Rapport.

A preserved backup copy of the license reflects a file modification date of November 26, 2024, establishing that the written agreement existed no later than that date. The five-percent royalty rate was a real, contemporaneous allocation of commercial value established before Defendant's later unauthorized commercialization.

### d. The License Required a Concrete Commercialization Milestone

The license was designed to place the Vacuustat on an active commercialization path. It required Radian to achieve one of two specified milestones before December 31, 2027: either obtain a government contract focused on the Vacuustat technology, or construct a Vacuustat capable of maintaining structural integrity while maintaining positive buoyancy at sea level for at least sixty seconds. If neither event occurred, the agreement would become null and void and Radian would lose its licensee rights.

That requirement fixed a contemporaneous timetable for commercial progress. By December 31, 2027, Radian was required either to secure a government contract focused on the Vacuustat or produce a working buoyant prototype meeting the contractual sixty-second sea-level standard. The parties thus tied the exclusive license to a concrete near-term commercialization milestone.

Defendant's own later government submissions independently corroborate that development horizon. His Black Lattice roadmap placed a first vacuum-balloon prototype within a 2024–2027 development epoch. The license and Defendant's own roadmap therefore converged on essentially the same near-term milestone period.

Radian's dissolution permanently eliminated the operating commercialization vehicle through which the contractual milestone was to be achieved. A dissolved Radian could no longer carry out the multiyear development and commercialization program required to satisfy the agreement. The resulting contractual consequence is that Radian can no longer satisfy the commercialization condition and the Vacuustat commercialization rights vest in Rapport. Economically, dissolution terminated the Radian pathway through which Rapport's five-percent royalty trajectory had been established.

**2. Unauthorized Diversion, Retention, and Continuing Exploitation**

**a. Defendant Routed the Vacuustat Through Black Lattice Without Authorization**

Defendant's competing Vacuustat activity was concrete and documented. Black Lattice submissions identify "Michael Chapiro" as the technical point of contact, and identified BL Machines LLC doing business as Black Lattice as the submitting entity.

An early Black Lattice Vacuustat RFI is dated November 8, 2024, establishing that Defendant was already routing Rapport's Vacuustat technology through a separate entity during Radian's operation. A preserved Radian Drive backup establishes the parties' written Vacuustat license agreement existed no later than November 26, 2024.

By February 27, 2025, Defendant's unauthorized diversion of the Vacuustat fundraising was unmistakable. Radian held an exclusive worldwide Vacuustat license. Black Lattice held no corresponding license or assignment. Neither Rapport nor Radian authorized Black Lattice to commercialize the technology. Yet Defendant submitted a detailed Vacuustat program to the Missile Defense Agency under Black Lattice's name.

The February submission presented a complete Black Lattice Vacuustat development program. It proposed development of what it called the world's first vacuum balloons; described structural-design classes and materials/manufacturing approaches; proposed staged prototype and manufacturing development; identified military and commercial applications; quantified development costs and schedules; and identified Black Lattice as the entity requiring investment to execute the program. It expressly stated that "investment into Black Lattice is needed" to advance continuous-fiber metal 3D printing,

reestablish feedstock manufacturing capability, explore subsystem architectures, and develop systems-integration techniques. (Ex. E4 — RFIs [SEALED], Feb. 27, 2025 MDA 2045 Threat RFI.)

The submission also contains direct provenance evidence. Its "Star / Suspension-Bridge Architecture" describes multiple compressive struts emanating from a central point, tensile connections joining their outer ends, and a tensile skin transferring atmospheric loads into compression; moreover, it contemplates six beams aligned with the principal X, Y, and Z axes. Rapport's patent likewise describes six struts intersecting through the center, external tensile members, an airtight membrane, and radially arranged internal structure. Defendant's October 2020 acknowledgment of Rapport's patented star design is quoted in the ownership discussion above. The structural correspondence ties Black Lattice's later architecture to the Vacuustat design Defendant knew originated with Rapport; the sealed Private-folder materials establish the additional confidential implementation package he possessed.

Defendant thus treated Black Lattice as the commercial vehicle for developing the Vacuustat while Radian held the exclusive license and Rapport remained the owner of the underlying patent and technical package. His October 2020 message expressly acknowledged Rapport's authorship of the Vacuustat patent, and his later Black Lattice submission reproduced a closely corresponding star/suspension-bridge architecture. Defendant therefore advanced the competing program with direct knowledge of Rapport's inventorship and preexisting rights.

### b. Defendant Presented Rapport's Technology as Black Lattice Proprietary Material

Defendant placed Black Lattice proprietary notices on the government submissions and asserted control over disclosure and use of the technical material presented there. The February 2025 submission stated that the proposal included data that should not be disclosed outside the Government except for review by persons under NDA and should not be duplicated, used, or disclosed for purposes beyond proposal evaluation.

Those restrictions demonstrate Defendant's own recognition that controlled access to the technical and architectural information carried economic value. He was simultaneously asserting Black

Lattice proprietary control over a development program founded upon Rapport's Vacuustat technology and undertaken without authorization from Rapport or Radian.

The April 2025 investor solicitation reinforced that awareness: Defendant withheld detailed technical architecture from the pitch deck because of its sensitivity, as discussed and quoted in Section III(D). Despite recognizing the need for controlled disclosure, he retained Rapport's Private-folder materials, disclosed protected information to third parties and federal personnel, and pursued commercialization through entities with no Vacuustat license or assignment. (Ex. C3 — Corporate Communications at 13–14.)

### c. Defendant Obtained and Exploited the Confidential Implementation Package

Defendant obtained the nonpublic Vacuustat implementation package through the parties' confidential corporate relationship and retained it while building an unauthorized competing commercialization program.

First, Defendant possessed the confidential Private-folder package containing nonpublic Vacuustat analyses and engineering materials.

Second, he obtained that access through the parties' corporate relationship and the exclusive commercialization arrangement designating Radian as the authorized commercial vehicle.

Third, he used a separate entity to present a detailed development program around the technology, seek investment to execute it, claim proprietary control over the resulting submissions, and pursue government opportunities without authorization from Rapport or Radian.

Fourth, the admitted allegations establish disclosure of protected content and continued commercialization efforts through Black Lattice and Phoenix Dynamics, entities that possessed no Vacuustat license or assignment. (Compl. ¶¶ 209–213, 217–219.)

The economic injury arises from Defendant's acquisition, retention, disclosure, and commercial exploitation of the confidential technical package together with his diversion of the Vacuustat commercialization program into competing entities he controlled.

### d. Defendant Publicly Confirmed Continuing Vacuustat Exploitation and Claimed Sole Inventorship

Defendant's own public statements establish that his Vacuustat activity continued after Radian's dissolution. On October 7, 2025, Defendant publicly announced: "I am going to make a vacuum balloon." The statement is direct evidence of continuing intent to build and commercialize the technology after the Radian venture had ended.

Less than three weeks later, on October 26, 2025, Defendant publicly claimed that his venture included vacuum-balloon technology "of which I am the sole inventor." That assertion contradicted U.S. Patent No. 10,625,842, which names Rapport as inventor and assignee, and Defendant's direct 2020 acknowledgment of Rapport's patented design, quoted in the ownership discussion above. (Ex. C1 — Initial Conversations at 2, ECF No. 2-5, PageID #220; Ex. F1 — October Posts.)

The progression is probative of continuing exploitation, attribution, and intent. Defendant first acknowledged Rapport's patented star design and learned that Rapport possessed unpublished analysis, software, CAD, and scaling work; later obtained Rapport's Private-folder technical archive; routed a closely corresponding strut-and-tension architecture through Black Lattice; continued publicly declaring his intent to build vacuum balloons after Radian's dissolution; and ultimately represented himself as the technology's "sole inventor." These post-dissolution statements confirm Defendant's continuing commercial exploitation and competing ownership claims and support both monetary and equitable relief.

### e. Defendant's September 2026 Email Describes Sales From a Polish Production Facility

Defendant's September 8, 2026 email reported sales of the first fifteen units from a production facility in Poland, anticipated a subsequent order for hundreds, and identified drone detection as an application. Its full language and context are reproduced in Section IV(F). The claimed commercial activity is relevant here to current exploitation, model scale, and the accounting requested below. (Ex. F9 — Vacuustat Email at 2.)

This communication adds a specific reported production and sales activity to the preceding record of government proposals, investment solicitations, and post-dissolution statements of intent to build the Vacuustat. The requested accounting will determine the actual manufacturing and delivery status of the units, sales and payment terms, resulting proceeds, identities of the production and purchasing counterparties, and the source and content of any technical information supplied in connection with the reported activity.

### 3. Contemporaneous Evidence of Commercial Scale and Value

#### a. Defendant's Own Government Roadmap Establishes a Concrete Development and Commercialization Path

The Black Lattice submissions map, price, and schedule the development path Defendant himself presented to the Missile Defense Agency as an actionable program.

The February 2025 RFI proposed an initial $2 million Phase I effort over approximately eighteen to twenty-four months directed toward enabling materials and manufacturing. It then contemplated a Phase II in which one or more prototype Vacuustats would be designed, constructed, and flight tested, with an estimated additional cost of approximately $3–6 million.

A related Black Lattice ConOps broke development into four major epochs. The first, identified as 2024–2027, contemplated a four-year rapid-prototyping effort culminating in the first vacuum-balloon prototype at a total cost of approximately $15 million. The next stage, identified as 2028–2030, contemplated approximately $75 million in maturation work leading from a prototype to scalable manufacturing and a deployable tethered system described as the first market-ready product. Later phases addressed navigation, propulsion, systems capability, and missile-defense integration. (Ex. E3 [SEALED], ECF No. 8.)

These figures came from Defendant's own government-facing commercialization plan. They show a staged, funded development program with specific near-term engineering milestones progressing from enabling manufacturing work to a prototype and then to a market-ready platform.

The roadmap also aligns with the license's December 31, 2027 commercialization requirement. The parties' contract required either a government contract focused on the technology or a working buoyant prototype by that date. Defendant's own proposal independently placed the first prototype within the same 2024–2027 interval. The contemplated royalty stream therefore rested on a documented commercial timetable shared across two separate contemporaneous records.

**b. Defendant's Own Deployment Models Establish the Scale of the Opportunity**

Defendant's government submissions also identify the scale at which he modeled Vacuustat deployment.

For one large-scale government deployment concept, Defendant modeled approximately 100 balloons to provide redundant coverage along thousands of miles of contested coastline. For a long-distance mesh-network communications concept, he modeled approximately 2,000 balloons. He further contemplated eventual deployment in the thousands and substantially larger quantities of smaller systems.

The same submissions identified broad application classes extending beyond missile defense. They described persistent ISR, telecommunications, remote cargo delivery, energy applications, and flexible integration of payloads and communications systems. In the telecommunications discussion, Defendant specifically identified commercial fixed-wireless infrastructure as a major application and described elevated Vacuustat nodes as capable of materially improving terrestrial communications networks.

The parties' five-percent license expressly covered the three categories set out above—direct sales of Vacuustats, systems incorporating them, and services enabled primarily by them. Its wording therefore supplied a negotiated royalty mechanism for the broader applications Defendant subsequently identified, including telecommunications and other downstream services. (Compl. ¶¶ 67–74; Ex. A1 — Corporate Records at 50–52.)

These Defendant-authored deployment and application materials establish a documented universe of contemplated commercialization pathways and supply contemporaneous inputs for the

damages model. The application-specific appendices evaluate defined deployment cases using the parties' royalty terms, Defendant's schedules and application scenarios, market evidence, and the finite patent-backed royalty period.

### c. Vacuustat-Enabled Wind Energy Was a Documented Pre-Radian Commercial Application

Wind energy was one of the principal Vacuustat applications being evaluated years before Radian's formation. In August 2021, Rapport explained to Chapiro that a Vacuustat-supported wind turbine could exploit both greater swept area and the strong increase in available wind power with altitude. For a 600-meter vertical-axis wind-turbine concept, Rapport estimated approximately ten times the output of a representative conventional 100-meter turbine—approximately 15 MW versus approximately 1.5 MW—based on the combined effect of greater swept area and higher-altitude wind speeds. (Ex. C3 — Corporate Communications at 30–33.)

Rapport also identified the economic mechanism that made the application specifically dependent on Vacuustat technology. Conventional aerostats require hydrogen or helium and incur lifting-gas leakage and replenishment costs. A Vacuustat instead maintains buoyancy by evacuating ordinary air and can restore vacuum using a pump, materially changing the endurance and operating-cost structure of a permanently elevated platform. Rapport explained that this difference made the Vacuustat suitable for permanent or long-duration elevated infrastructure.

The parties then discussed the application in economic terms. Rapport estimated approximately $250,000 for the Vacuustat-supported turbine platform compared with approximately $2 million for a conventional turbine, while emphasizing the advantages of higher-altitude wind access and reduced structural support. Chapiro responded by asking for turbine mass, power output, operating elevation, balloon cost per kilogram, expected lifetime, and levelized cost of energy over twenty years. He analyzed sensitivity to weight-to-buoyancy ratio and material cost and wrote that, if the economics already "pencils out," still greater altitude could multiply available power further.

The discussion continued beyond that exchange. In February 2023, Chapiro independently returned to the airborne-energy application, sending Rapport information concerning atmospheric power collection and asking whether it could be combined with an airborne wind turbine. The record therefore establishes sustained pre-Radian commercial evaluation of Vacuustat-enabled airborne energy over multiple years.

This commercial history is directly relevant to the royalty valuation. The Vacuustat license reaches revenue from sales of Vacuustats, systems incorporating Vacuustats, and services enabled primarily by Vacuustats. A Vacuustat-supported wind-energy platform falls squarely within the class of systems for which the parties negotiated the five-percent revenue participation. The wind-energy damages-model appendix therefore evaluates wind energy as a principal commercial scenario using contemporary wind-resource, turbine-cost, output, deployment, and revenue evidence together with the historical engineering and economic framework reflected in the parties' own communications.

**d. Defendant Expressly Valued Secrecy as a Long-Term Competitive Head Start**

The Black Lattice ConOps expressly valued secrecy as a competitive advantage measured in years. Defendant wrote that "we can secure around a 15 year head start on developing these capabilities before anyone realizes they are possible." He further stated that even after discovery, duplication would be challenging because the manufacturing process differed substantially from conventional processes. (Ex. E3 [SEALED], ECF No. 8.)

That statement is important for the trade-secret analysis. Defendant himself assigned strategic value to maintaining an informational and manufacturing lead measured in years. He understood that knowledge of how to implement the Vacuustat—and the manufacturing route necessary to achieve a viable weight-to-buoyancy ratio—could create an enduring competitive advantage.

Defendant possessed the sealed Private-folder materials containing Rapport's accumulated mathematical, structural, CAD, and implementation work. That archive supplied a starting foundation for continued development that an independent competitor would have had to construct without access to

Rapport's work. The competitive significance of keeping those implementation methods confidential is evidenced by the ConOps statement quoted above.

#### e. Defendant Treated the Vacuustat as the Foundation of a Very Large Integrated Commercial Program

Defendant's April 2025 investor solicitation corroborates the commercial scale he attributed to the Vacuustat. Without identifying Rapport by name, he told prospective investors that they had discussed the Vacuustat program since 2020 and that he had begun funding it the previous summer; he also described the paired Artifact breakthrough as proven. The solicitation presented the technologies as an integrated defense and upper-atmosphere telecommunications venture, sought institutional seed financing, and projected substantial enterprise value. Its full language and investor context appear in Section V(F). Those projections are evidence of Defendant's contemplated commercial reach, not direct inputs to the Vacuustat royalty models, which instead rely on application-specific deployment, timing, and negotiated-royalty evidence. (Ex. C3 — Corporate Communications at 13–14.)

#### f. Defendant Tied Early Capital Directly to Years of Commercialization Time

The same solicitation links access to early financing with the commercialization timetable. Defendant explained that developing a vertically integrated offering through institutional capital could avoid the slower subcontractor route dependent chiefly on government funding; he estimated the latter would delay the larger commercial outcome by approximately five years. The full contemporaneous investor statement appears in Section V(F).

That statement supplies Defendant's contemporaneous assessment of the economic function of early financing. Capital would accelerate vertical integration, preserve a prime-contractor strategy, build the complete offering more quickly, and advance the commercial timetable by years.

The statement also links Defendant's diversion of investor and government opportunities to the Vacuustat royalty injury. Early financing purchased development time, personnel, manufacturing capability, vertical integration, institutional position, prime-contractor positioning, and accelerated commercialization. When Defendant diverted the technology and its opportunities into Black Lattice

while impairing Radian's ability to continue, he disrupted the financing-to-commercialization pathway that he had described to investors.

Defendant's fundraising responsibilities encompassed both private investment and government funding, while the accelerated path he described depended upon substantial early private capital. His misconduct specifically impaired that private-capital channel: he damaged relationships with prospective investors, routed investor access through himself, omitted Rapport and Radian from material investor communications, and redirected the Khosla engagement to Black Lattice. Section V(G)(1)(a) documents that broader investor sabotage and resulting goodwill impairment. The remaining commercialization path therefore proceeds through government funding—the same financing route Defendant contemporaneously assessed as adding approximately five years to the larger commercial outcome. His own financing analysis supplies a direct causal benchmark for the five-year delay used in the Vacuustat model.

The separate Vacuustat damages-model appendices quantify the resulting delay using the strongest contemporaneous evidence available, including the license milestone, Defendant's government roadmap, the patent's remaining term, the timing of market-ready deployment, and defined commercialization scenarios.

**g. The Vacuustat Had Reached an Advanced Engineering-Development Stage**

The Vacuustat rested on a substantial body of structural analysis and engineering work developed years before Radian existed. Rapport had developed the underlying structural architecture by 2014, reduced it to detailed mathematical treatment, obtained U.S. Patent No. 10,625,842, and continued developing the engineering implementation beyond the material disclosed in the patent. The resulting technical package included analytical calculations addressing structural loading, buckling behavior, material properties, scaling, buoyancy, and structural efficiency; computer-generated design data; implementation-oriented technical notes; and detailed CAD work directed toward physical construction.

By 2020, the engineering work had progressed into component-level CAD models and finite-element analysis. The confidential March 26, 2020 *Vacuustat Structure Final Report*, prepared for

Rapport in collaboration with an independent MIT-trained engineer, contains detailed CAD models of the Vacuustat structure and its constituent components, including struts, hub connectors, cap connectors, fastener interfaces, string interfaces, and related assemblies. The report specifies materials and component geometry, develops a bill of materials, and depicts successive design revisions of components intended for manufacture. It also documents SolidWorks beam buckling analysis and finite-element analysis simulating the deformation of structural components under defined loads. These analyses supported the viability of the structural design. Rapport personally paid $7,000—40 engineering hours at $175/hour—for the engineering engagement that produced the Vacuustat Structure report. (Rapport Decl. ¶ 13.) (Ex. B4 — Technical Materials [SEALED], *Vacuustat Structure Final Report*.)

Finite-element simulations extended to the joints and connectors through which the Vacuustat's structural loads would be transmitted. The engineering report modeled detailed three-dimensional connector geometries under calculated design loads and generated quantitative outputs including stress distributions, displacement fields, and factors of safety. For example, the report applied a calculated load to a modeled central hub connector and used finite-element analysis to determine the resulting displacement across the component. Other simulations similarly evaluated components using forces derived from strut bending, string tension, and the expected mechanics of the assembled structure. The work therefore addressed the actual structural interfaces required to translate the Vacuustat's architecture into a physical assembly. (Ex. B4 — Technical Materials [SEALED], *Vacuustat Structure Final Report*.)

The finite-element analysis complemented an extensive analytical foundation. Rapport's Vacuustat materials derive structural relationships governing atmospheric loading, compression members, Euler and Johnson buckling, material stiffness and strength, weight-to-buoyancy relationships, safety factors, iterative tensegrity construction, and achievable lift efficiency for candidate materials. The analysis was applied numerically to specific design cases and candidate materials, producing dimensional and performance parameters that could be carried forward into detailed engineering. The

technical package accordingly connected the governing mechanics to particular structural dimensions, materials, components, and construction choices. (Ex. B4 — Technical Materials [SEALED].)

The CAD and simulation work further demonstrates that the development program had advanced into physical implementation. The engineering record contains modeled components with defined holes, grooves, fastener locations, material specifications, interfaces for tension members and struts, and other manufacturing features. Rapport and the contractor were therefore developing parts capable of being fabricated and assembled, while using finite-element analysis to evaluate those parts under the loads expected from the larger structure. This body of work supplied a concrete engineering pathway from structural theory to manufactured components, assembly, and physical validation. (Ex. B4 — Technical Materials [SEALED], *Vacuustat Structure Final Report*.)

An independent aerospace-structures assessment later corroborated the maturity of that pathway. In March 2026, Rapport contacted Professor Matthew Santer, Professor of Aerospace Structures at Imperial College London, concerning potential graduate research based on the Vacuustat. Rapport proposed designing, analyzing, manufacturing, and compression-testing a representative Vacuustat strut, with active stabilization as an additional area of study. Professor Santer responded, "Structures such as this are well understood and simple design, analysis and test would not usually fit the brief for advanced research. Even active stabilisation for this class of structure is quite well covered in the literature."[8] (Ex. F3 — Rapport–Santer Correspondence, pp. 5–6.)

Santer's assessment is consistent with the development record that preceded it. The governing mechanics had been analyzed; candidate materials and structural configurations had been evaluated; detailed CAD components had been designed; critical joints and connectors had been subjected to finite-element analysis; and a physical testing program could proceed through identifiable engineering

[8] Professor Santer's assessment concerned the proposed graduate research project: design, analysis, manufacture, and compression testing of a representative strut, with active stabilization as a possible extension. The trade secrets at issue consist of the accumulated nonpublic implementation materials described in the technical record, including calculations, material and dimensional selections, weight-to-buoyancy optimization, CAD, component and interface designs, finite-element results, manufacturing-oriented implementation work, and related know-how. His assessment that the proposed strut work could proceed through established structural-engineering methods further corroborates the program's readiness for fabrication, validation, refinement, and system integration.

steps. The technical record therefore supports treating the Vacuustat's structural development as a substantially de-risked engineering program centered on fabrication, validation, refinement, and system integration.

That maturity is economically significant. Commercial valuation depends in part on the state of technical development and the nature of the work required to reach deployment. Here, the documented development path consisted of identifiable engineering activities supported by existing calculations, CAD, finite-element analysis, material selections, component designs, and proposed physical tests. The Vacuustat damages model can therefore evaluate commercialization from a documented engineering foundation and a defined sequence of development milestones. That record, together with Defendant's own later prototype budgets and commercialization roadmap, supports the commercial trajectory addressed in Section V(J)(4).

### 4. Measures of Vacuustat Damages

#### a. Actual Loss: Defendant's Conduct Consumed a Finite Royalty Window

Rapport's principal economic injury arises from the loss of commercialization time within a finite royalty term.

The license tied Rapport's compensation to actual customer payments through expiration of Patent No. 10,625,842, creating a finite patent-backed royalty window. Qualifying revenues received during that term generated the five-percent royalty; commercialization displaced beyond expiration fell outside that contractual revenue window.

Delay therefore has a direct economic consequence. Each year consumed rebuilding the development program, restoring uncontested commercial control, recreating investor and government relationships, recovering records, addressing competing ownership and attribution claims, and protecting against Defendant's continuing use shifts the expected revenue ramp later in the finite patent-backed window and removes revenue-producing time from it.

Defendant's own documents establish that timing mattered. The license required a government contract or working positive-buoyancy prototype by the end of 2027. His MDA roadmap placed the

first prototype in the 2024–2027 period and a first market-ready tethered product in the succeeding 2028–2030 maturation stage. His VC solicitation stated that insufficient private capital could add approximately five years to the larger commercialization path. The record therefore supplies several independent contemporaneous anchors for measuring the economic cost of lost time.

The separate damages-model appendices calculate the present value of royalties lost because of that displacement. They identify evidence-based commercialization schedules, defined deployment cases, pricing and revenue inputs, the five-percent contractual royalty base, the patent-life period, and discounting. The body of this memorandum establishes the documented commercial trajectory and causal injury; the appendices supply the arithmetic.

### b. The Five-Percent License Is the Primary Benchmark for a Reasonable Royalty

The same agreement supplies a direct benchmark for the statutory reasonable-royalty measure.

Rapport and Radian set the royalty rate in their written license at five percent for exclusive worldwide commercialization of the Vacuustat patent and associated technical package. The agreement defined the royalty-bearing transactions, duration, exclusions, audit rights, commercialization obligations, and transfer restrictions.

The Sixth Circuit's agreement-based reasonable-royalty analysis in *Mid-Michigan*, discussed in Section III(C), makes the parties' actual five-percent Vacuustat license a particularly probative pricing benchmark. 416 F.3d at 510–13. The license is an actual negotiated royalty rather than a speculative market estimate.

Authorizing Black Lattice's competing commercial use would have required rights beyond the existing Radian arrangement because Radian already held the exclusive worldwide commercialization license. Any transaction permitting Black Lattice to exploit the technology would therefore have required modification, termination, buyout, or other resolution of Radian's exclusivity, together with negotiated terms addressing field of use, sublicensing, government and investor disclosure, foreign access, confidentiality, attribution, improvements, reporting, audit rights, security, termination, and

return or destruction of technical materials. Defendant instead assumed broad practical commercialization rights for Black Lattice without paying consideration or resolving Radian's exclusive rights.

The five-percent rate is therefore the principal empirical benchmark established by the parties' actual license transaction. The damages-model appendices apply it to the supported royalty bases and evaluate the additional economic significance of the broader scope and competitive posture of Defendant's unauthorized Black Lattice use.

### c. Alternative Unjust-Enrichment and Head-Start Measures

Defendant's conduct produced four identifiable forms of enrichment and competitive benefit subject to the requested accounting.

The first is avoided technical effort. Possession of Rapport's analyses, engineering work, knowledge-transfer materials, confidential structural work, and accumulated implementation knowledge materially compressed the technical work required to advance the development path. Defendant's own Black Lattice materials emphasized that the challenge lay in materials, manufacturing, buckling control, nodes, and system integration—the same broad categories in which Rapport's accumulated technical analysis and engineering knowledge had value.

The second is competitive acceleration. Rapport's technical archive supplied Defendant with an immediate engineering foundation while he prepared detailed government submissions, development roadmaps, and investor materials around the Vacuustat and began building institutional relationships for a competing commercialization program.

The third is enterprise and financing benefit. Defendant expressly sought investment into Black Lattice to advance the Vacuustat program, later used the combined technologies to seek a $50–100 million seed financing, and obtained institutional engagement including the Khosla meeting discussed elsewhere in this memorandum. Any financing, contracts, equity value, consulting compensation, license income, government awards, or other proceeds traceable to Vacuustat exploitation are proper subjects of the requested accounting.

The fourth is a secrecy-based advantage. The ConOps discussion above shows that Defendant attributed commercial value to delaying competitors' recognition of the technology and limiting their ability to reproduce the manufacturing process. This provides independent support for the economic significance of confidential implementation know-how beyond its historical research cost.

These measures independently corroborate the economic significance of what Defendant obtained. The requested accounting will identify and quantify saved development effort, financing or contract proceeds, competitive acceleration, and other enrichment attributable to the Vacuustat program.

### d. The Vacuustat Injury Is Distinct From the Other Damages Categories

The Vacuustat damages measure a separate intellectual-property and commercialization injury.

Section V(A) concerns specific corporate funds. Section V(B) compensates Rapport for identified cash and services. Section V(G) measures destruction of Radian as an assembled going concern. Section V(F) addresses the value of a particular diverted financing opportunity. Section V(I) addresses a different technology, different technical package, and different impairment.

The Vacuustat section instead measures injury to a separate patented and trade-secret technology with its own exclusive license, its own five-percent royalty, its own patent-backed term, its own commercialization requirement, its own government-development roadmap, and its own unauthorized Black Lattice commercialization path.

The damages-model appendices allocate each economic input according to its actual economic function. Qualifying downstream customer revenue forms the contractual royalty base, while development capital and separately valued financing opportunities are treated in the damages categories to which they belong. This structure allows the Vacuustat models to measure the royalty stream generated by downstream commercialization without distorting the role of capital used to reach that commercialization.

### 5. Willfulness and Requested Relief

#### a. The Record Supports Willful and Malicious Misappropriation

The circumstances surrounding Defendant's Vacuustat use support a finding of willful and malicious misappropriation and the enhanced relief addressed separately in Section VI.

Defendant's knowledge of Rapport's inventorship predates Radian: the October 2020 correspondence discussed above identified Rapport's patented star architecture and his additional unpublished technical work. Defendant later used the closely corresponding structural configuration described above in Black Lattice submissions, publicly announced his intention to make vacuum balloons, and subsequently claimed to be their "sole inventor." Those later representations were made against his documented knowledge of Rapport's authorship and technical contributions.

Defendant knew the commercial rights were controlled. He participated in the Radian transaction under which the Vacuustat was licensed exclusively to the Company and Rapport retained a five-percent royalty.

Defendant knew the technical information was sensitive. His own government submissions asserted proprietary restrictions, and his VC solicitation expressly refused to circulate technology or architecture details because of their sensitivity.

Defendant knew Black Lattice lacked the negotiated commercial rights held by Radian. He nevertheless presented the Vacuustat program under Black Lattice's name, sought investment into Black Lattice for its development, and continued the competing program without authorization from Rapport or Radian.

Defendant also retained Rapport's Private-folder technical materials after dissolution, disclosed protected content to third parties and federal personnel, and pursued commercialization through entities lacking a Vacuustat license or assignment.

Those facts show informed and deliberate commercial use of rights Defendant knew originated with Rapport and were governed by a defined licensing structure. They support a finding that the misappropriation was willful and malicious. Plaintiffs address the resulting exemplary damages and

attorney's fees under 18 U.S.C. § 1836(b)(3)(C)–(D) and Ohio Rev. Code §§ 1333.63(B), 1333.64(C) in Section VI.

### b. Requested Vacuustat Compensatory Relief

Plaintiffs request a compensatory Vacuustat award in the amount established by the separate Vacuustat damages-model appendices.

The principal measure is the present value of the five-percent contractual royalty stream lost through the commercialization delay and displacement caused by Defendant's misconduct. The models use the parties' actual royalty agreement, the patent's finite remaining term, the contractual commercialization milestone, Defendant's own government-development roadmap, Defendant-authored deployment scenarios and commercial applications, and market and pricing evidence. See Section X(C), Section X(D), and Section X(E).

As an alternative measure of the same injury arising from Defendant's unauthorized disclosure and use, Plaintiffs request an equitable reasonable royalty using the parties' actual five-percent Vacuustat license as the principal benchmark. The hypothetical royalty should account for the broader scope of rights Defendant assumed and the field, duration, exclusivity, disclosure, sublicensing, and commercialization restrictions that a lawful competing license would have required.

Plaintiffs further request an accounting of all Vacuustat-related contracts, grants, investor proceeds, equity value, licenses, consulting income, government payments, and other commercial benefits received or pursued by Defendant, Black Lattice, Phoenix Dynamics, or affiliated entities, including the fifteen-unit sales effort and Polish production facility Defendant described in his September 8, 2026 email. (Ex. F9 — Vacuustat Email, p. 2.) The accounting will identify distinct enrichment attributable to the Vacuustat program, and Plaintiffs request recovery or disgorgement of those distinct gains as permitted by law.

The requested award therefore rests on converging contemporaneous evidence: Rapport's issued patent and longstanding technical work; Defendant's pre-Radian acknowledgment of Rapport's inventorship and knowledge of Rapport's unpublished analysis, software, CAD, and scaling work; the

parties' documented pre-Radian evaluation of Vacuustat-enabled wind energy and other commercial markets; the sealed nonpublic implementation package; the parties' actual exclusive license; the negotiated five-percent royalty; the linked development financing; the December 2027 commercialization requirement; Defendant's unauthorized Black Lattice submissions; Defendant's own prototype and manufacturing roadmap; his deployment models; his express valuation of secrecy as a long-term competitive head start; his investor representations linking major private capital to years of commercialization acceleration; and his post-dissolution public statements confirming continued intent to build vacuum balloons while claiming sole inventorship despite his documented prior acknowledgment of Rapport's patent and inventorship.

Together, that record supplies a concrete basis for compensating the Vacuustat injury in the amount of **$121,800,808.00**. The application-specific models in Section X(C), Section X(D), and Section X(E) independently derive that amount from the negotiated license, documented development trajectory, patent-backed royalty term, Defendant-authored commercialization evidence, and market inputs. Defendant's own very large valuation projections provide additional corroboration of the commercial scale he attributed to the technology. This section establishes that the underlying economic right, commercial trajectory, delay injury, and royalty benchmark are documented and measurable.

### K. Founders Agreement Breaches and Contractual Damages

Count XIII supplies an independent contractual basis for monetary relief arising from Defendant's competing participation, interference with Company business relationships, use and disclosure of Company-related confidential information, and retention of Company materials. The Complaint identifies the Founders Agreement as a binding contract, incorporates the factual allegations pleaded throughout the Complaint, alleges Defendant's breach of the Agreement's obligations, and expressly requests compensatory damages, restitution, disgorgement of improperly retained funds and benefits, interest, and related relief. (Compl. ¶¶ 299–305.) The Agreement selects Wyoming law. (Compl. Ex. A1 — Corporate Records at 47, ECF No. 2-1.)

Defendant's promised compliance with the Founders Agreement had independent economic value to Radian. Section 13(a) protected Radian's relationships with customers, suppliers, licensees, and other business relations against solicitation and interference. Section 13(b) restricted direct or indirect participation in businesses involving or relating to "interferometry, inertial motion systems, compasses, pointing systems or apparatuses, [or] navigation systems," in hardware or software, and expressly defined participation to include service as an owner, shareholder, partner, employee, consultant, or licensor of technology. Section 13(c) protected Confidential Information and required surrender of Company records, reports, software, documents, data, and copies. Sections 13(d)–(e) addressed Company-related work product and inventions. (Compl. Ex. A1 — Corporate Records at 44–47, ECF No. 2-1; see Section IV(C).)

The record establishes Defendant's operation of Phoenix Dynamics and Black Lattice as competing ventures built around Rapport-derived inertial-navigation capability. Their contemporaneous investor materials characterized that capability as proprietary or exclusive, as described in Section V(F) and Section IV(D)(5). The outside ventures and their commercialization activities fall within the forms of participation prohibited by § 13(b). (Compl. ¶¶ 104–105, 114 et seq.; Ex. E1 — Enterprise Structure at 16, 22; Compl. Ex. A1 — Corporate Records at 44–45.)

The post-execution MDA activity independently establishes contractual breaches. The Complaint alleges at least three unauthorized federal RFI responses through Black Lattice and specifically identifies Defendant's February 27, 2025 response to MDA's 2045 Threat RFI. That submission followed Radian's own February 26 MDA RFI response by one day. Radian's submission presented Radian as the vehicle for an approximately $70 million, seven-year development and transition program; Defendant's February 27 submission presented a detailed Vacuustat program through BL Machines LLC d/b/a Black Lattice, identified Black Lattice as the entity requiring investment, and placed Black Lattice proprietary restrictions on the technical program. (Compl. ¶¶ 90, 93–98; Ex. E4 — RFIs [SEALED], Feb. 27, 2025 MDA 2045 Threat RFI; Ex. F6 — Valuation Evidence at 5–8.) By placing a competing Vacuustat program before the same agency under Black Lattice and directing investment

toward Black Lattice, Defendant interfered with Radian's MDA business relation protected by § 13(a). His use and disclosure of Company-held confidential technical material to advance Black Lattice independently violated § 13(c). (Compl. Ex. A1 — Corporate Records at 44–46, ECF No. 2-1.) The resulting agency contacts, funding opportunities, development benefits, and economic gains form part of the contractual damages and accounting inquiry.

The post-dissolution record supplies a defined § 13(b) accounting target. By October 2025, Defendant's own website identified Bohr Systems among his angel-investment affiliations, while Bohr described its business as "Robust Navigation for Military Drones in GPS-Denied Environments." (Ex. F1 — October Posts, Figs. 22–23.) Section 13(b) expressly reaches ownership and shareholder participation in navigation businesses. (Compl. Ex. A1 — Corporate Records at 44–45, ECF No. 2-1.) Defendant's Bohr investment therefore places the acquisition date, investment amount, security or ownership interest, present value, appreciation, distributions, advisory or consulting compensation, governance rights, and every associated economic benefit within the contractual accounting.

Section 13(c) supplies a parallel contractual basis for restorative and monetary relief. Defendant admitted retaining a backup of the Radian Company Drive after Rapport revoked authorization, while § 13(c) required surrender of Company records, software, data, documents, and copies. (Compl. ¶¶ 76–79, 157–161, 209–211; Compl. Ex. A1 — Corporate Records at 44–46, ECF No. 2-1.) The retained archive is directly relevant to the disclosures, investor activity, government submissions, and competing commercialization established elsewhere in this Memorandum. Sections 13(d)–(e) further make the identity, timing, ownership, and economic disposition of covered work product and inventions material to the contractual accounting.

Wyoming law supports injunctive relief against irreparable competitive harm. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 546–47 (Wyo. 1993), recognized that unfair competition causing lost customers warranted injunctive relief under an enforceable noncompetition covenant. *CBM Geosolutions, Inc. v. Gas Sensing Technology Corp.*, 215 P.3d 1054, 1055, 1058 (Wyo. 2009), affirmed a preliminary injunction where former employees formed a competing technology venture

and disclosure of an innovative technical process threatened permanent loss of customers and competitive advantage. Defendant's retention, disclosure, and competing commercialization of Plaintiffs' confidential technical materials likewise threaten lasting loss of secrecy, exclusivity, and commercial control that monetary damages cannot restore. Injunctive relief requiring return of Company materials and prohibiting further unauthorized use or disclosure is warranted, as detailed in Section VIII.

Wyoming law also recognizes monetary damages for breach of a covenant not to compete. *Hopper*, 861 P.2d at 547–48, recognizes lost net profits as compensation where reasonably caused by the breach. *WSP, Inc. v. Wyoming Steel Fabricators & Erectors, Inc.*, 158 P.3d 651, 655–56 (Wyo. 2007), confirms that lost profits are one measure and that the injured party's expectation in the promised noncompetition performance itself supplies an independent measure where the value of that promised performance is reasonably ascertainable. The January 2025 Founders Agreement falls within the pre-July 1, 2025 contracts expressly preserved by Wyoming's 2025 noncompetition legislation. 2025 Wyo. Sess. Laws ch. 170, § 2(a)–(b).

The parties' own April 27 negotiations supply contemporaneous evidence of the economic value assigned to exclusivity and restricted competitive access. The proposal priced a ten-year Black Lattice exclusivity option in a defined loitering-munition field at $500,000 and separately priced a ten-year preferential standard-gyro purchasing option at another $500,000. (Ex. A1 — Corporate Records at 55; Ex. F7 — Restructuring Proposals.) Those transactions assign concrete consideration to substantially narrower commercial rights than the broad inertial-motion and navigation participation covered by § 13(b).

Defendant's October 2025 five-year objective of $2 billion in annual missile sales corroborates the scale of the protected competitive field, without serving as an independent contractual damages figure. His statement is quoted in the post-dissolution factual chronology. Combined with the navigation-specific Bohr investment and the Phoenix Dynamics and Black Lattice materials, it evidences Defendant's continuing pursuit of downstream missile markets in which he treated advanced inertial navigation as an enabling capability. (Ex. F1 — October Posts, Fig. 20.)

Plaintiffs request a contractual damages finding under Count XIII encompassing the losses caused by these breaches and the restitutionary benefits established through the accounting. The February 27 MDA breach supplies an additional contractual basis for the government-funding goodwill and Vacuustat-diversion injuries quantified elsewhere in Section V; Phoenix Dynamics and Black Lattice supply pre-dissolution § 13(b) breaches; and Bohr supplies a post-dissolution ownership-related accounting target. The present compensatory schedule carries each quantified economic injury once. The accounting requested in Section VIII(G) and specified in Appendix F will permit determination of each distinct expectation loss, investment gain, equity appreciation, distribution, advisory or consulting payment, licensing value, government-funding benefit, and other economic benefit attributable to the contractual breaches. The judgment can award each distinct economic injury once while identifying every legal basis supporting that recovery.

## L. The Known Record Likely Understates the Full Scope of Harm

The damages quantified above arise from a record that Defendant himself has rendered incomplete. The misconduct already established spans multiple independent channels: retention and use of Plaintiffs' technical materials; disclosures to third parties; investor solicitations; diversion of the Khosla Ventures opportunity; federal government submissions; commercialization through Defendant-controlled entities; competing claims of ownership and exclusivity; withdrawal of corporate funds; exclusion of Rapport from Radian's electronic infrastructure; and reputational attacks affecting the same professional and commercial community in which Plaintiffs were attempting to raise capital and commercialize their technology.

The known instances were uncovered through communications, records, public statements, government-facing materials, and other evidence that remained available to Plaintiffs. Defendant has never provided a comprehensive account of his activity. He acknowledged retaining a backup of Radian's Drive after authorization was revoked, admitted that the circle of persons possessing the technology had expanded, and failed to identify the full set of persons to whom Plaintiffs' information had been disclosed. He separately excluded Rapport from corporate Gmail, the shared Google Drive,

and the Company's Mercury account, placing corporate communications, technical records, financial information, and evidence concerning outside dealings under Defendant's control. (Compl. ¶¶ 157–161, 209–211.) As set forth above, Defendant then continued investor-facing, government-facing, and commercialization activity through Black Lattice, Phoenix Dynamics, and related efforts while retaining Plaintiffs' technical archive.

These facts support a strong inference that additional conduct and resulting harm remain undiscovered. The established misconduct occurred repeatedly, through several entities, across several types of transaction, and in communications with persons outside Plaintiffs' view. Defendant's known activity included private investor outreach, government submissions, technical disclosure, fundraising, recruiting, and communications concerning ownership and commercialization of Plaintiffs' intellectual property. Each of those activities is capable of occurring without creating a record accessible to Plaintiffs. The breadth and recurrence of the conduct already uncovered therefore make additional undiscovered activity highly likely.

The greatest uncertainty concerns the scope and downstream consequences of Defendant's dissemination and commercial use of Plaintiffs' intellectual property. Defendant controlled the technical archive and selected the recipients, content, and terms of his disclosures. The present record identifies only the disclosures and uses that Plaintiffs were able to reconstruct. Defendant has supplied no recipient list, disclosure log, inventory of copies, identification of derivative materials, account of further forwarding or redistribution, or explanation of what materials remain in the possession of Black Lattice, Phoenix Dynamics, affiliated persons, prospective investors, government personnel, contractors, or other third parties. Each additional disclosure can impair Plaintiffs' control over confidentiality, exclusivity, attribution, licensing, strategic-acquisition value, and future commercialization.

The same information asymmetry applies to Defendant's fundraising and commercial activity. The record already establishes that Defendant conducted broad investor outreach using Plaintiffs' technologies, obtained an institutional meeting with Khosla Ventures, pursued substantial government programs, and presented Rapport-derived technology as proprietary or exclusive technology of

ventures Defendant controlled. Additional solicitations, investor discussions, government contacts, partnership discussions, financing arrangements, grants, contracts, equity interests, consulting arrangements, or other economic benefits would principally appear in Defendant's own accounts and communications or in the records of the third parties he contacted. Plaintiffs presently possess only the subset of those activities that became independently visible.

Defendant's September 8, 2026 email identifies a specific additional channel for examination. Defendant represented that he was selling an initial fifteen vacuum-balloon units from a production facility in Poland and anticipated demand for hundreds more. (Ex. F9 — Vacuustat Email, p. 2.) That representation identifies concrete subjects for the requested accounting: the production facility and its operators, the status and disposition of the initial units, customers and prospective customers, contracts and payments, and any technical materials furnished to manufacturing counterparties. The resulting records will establish the actual scope and economic consequences of the reported activity.

Reputational injury creates a parallel evidentiary problem. Defendant communicated about Rapport, Radian, his claims to ownership and control of the technology, and the future of the venture to persons within the same investor, technical, governmental, and commercial networks upon which Rapport depended for future financing and commercialization. Additional private statements to investors, government personnel, prospective partners, engineers, advisors, or other members of that community could affect Plaintiffs' credibility and future relationships while remaining invisible to Plaintiffs themselves. A prospective investor or commercial partner who withdraws because of a private communication ordinarily supplies no record explaining that decision to the person whose reputation has been harmed. The resulting injury can therefore extend beyond the communications Plaintiffs have succeeded in identifying.

Defendant possessed the information capable of resolving these uncertainties. His corporate accounts, personal and business email, messaging records, cloud storage, investor correspondence, government submissions, financial records, communications through Black Lattice and Phoenix Dynamics, and communications with third parties could identify the recipients, uses, transactions,

proceeds, and statements presently outside Plaintiffs' knowledge. Defendant instead retained the relevant materials, withheld corporate access and accounting, and then defaulted in this litigation. He has supplied no discovery responses, deposition testimony, sworn disclosure history, financial accounting, recipient identification, or explanation of the disposition of Plaintiffs' information. His conduct therefore created both the underlying injuries and substantial portions of the present uncertainty concerning their full extent.

The governing damages rule assigns that uncertainty to the wrongdoer. In *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–65 (1931), the Supreme Court distinguished uncertainty concerning the existence of injury from uncertainty concerning its amount. Once injury is established, the amount may be determined through a just and reasonable inference from the available evidence even where the result is approximate. *Id.* at 563–65. The Court expressly recognized that "the risk of the uncertainty should be thrown upon the wrongdoer" where the defendant's conduct has made precision unavailable. *Id.* at 563.

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–66 (1946), reaffirmed the same principle. The Supreme Court held that a factfinder may make a "just and reasonable estimate of the damage based on relevant data" and may rely upon probable and inferential proof where wrongful conduct has prevented more precise measurement. *Id.* at 264. The Court placed the risk of uncertainty in computing damages upon the wrongdoer whose conduct created it. *Id.* at 265–66. These principles permit the Court to use the evidence that exists to make the most reasonable assessment of the injury even where Defendant's conduct has deprived Plaintiffs of information that would have permitted greater precision.

The Sixth Circuit applies the same distinction. In *Broan Manufacturing Co. v. Associated Distributors, Inc.*, 923 F.2d 1232, 1235–36 (6th Cir. 1991), a Lanham Act damages case, the court explained that once the existence of damages has been established, substantial evidence permitting reasonable inferences and a fair assessment provides an adequate basis for determining the amount.

The court further upheld recovery for future injuries where the damages evidence had been established "with as much certainty as the nature of the tort and the circumstances permit." *Id.* at 1240.

Those principles have particular force here because the record already establishes substantial injury through numerous independently documented acts, while Defendant controls much of the evidence required to identify their complete scope. Plaintiffs have anchored the damages calculations above to contemporaneous agreements, Defendant's own valuations and commercialization projections, specific financing and contracting opportunities, documented expenditures, technical-development evidence, market-facing statements, and defined economic models. The evidentiary gaps concern the full extent of an injury whose mechanisms and substantial economic consequences are already established.

The Court should therefore assess the foregoing damages measures with the information asymmetry Defendant created firmly in view. The breadth of known misconduct supports a strong inference that the presently quantified categories capture only the portion of the injury that Plaintiffs have been able to reconstruct from available evidence. The governing rule permits a fair and reasonable estimate from that evidence and places the resulting uncertainty on Defendant. The same evidentiary circumstances reinforce Plaintiffs' requests for a complete accounting, disgorgement of presently undisclosed benefits, identification of all third-party disclosures, return and destruction of retained materials, permanent injunctive relief, and continuing jurisdiction over later-discovered proceeds and violations.

The damages established in the present record are evidence-supported measures of the injuries that can presently be quantified. The record further supports a strong inference of additional intellectual-property dissemination, fundraising and commercialization activity, reputational injury, and economic benefit in light of the conduct already established and the records Defendant continues to control. The uncertainty surrounding those additional harms strengthens the basis for the Court to award the full damages supported by the existing evidence and to grant the accounting and equitable relief necessary to identify and remedy the remaining injury.

# VI. Statutory and Enhanced Damages

The compensatory awards in Section V establish the economic bases to which the governing statutory enhancements attach. Defendant's default establishes liability on the pleaded federal RICO, Defend Trade Secrets Act, Lanham Act, Anti-Cybersquatting Consumer Protection Act, Ohio Corrupt Activities Act, civil-theft, and state-law tort claims. The documentary record independently establishes the facts governing the degree of enhancement, including Defendant's knowing acquisition and retention of Plaintiffs' property, deliberate use of Rapport's technologies through competing entities, concealment of ownership and attribution, diversion of corporate funds and opportunities, continued exploitation after dissolution, and use of Plaintiffs' property for commercial and governmental pursuits.

Each distinct economic injury supports one compensatory award. The statutes below then supply treble, exemplary, liquidated, disgorgement, or punitive relief keyed to that award or to a separate statutory violation. Plaintiffs request separate findings under each statute and entry of the greatest aggregate judgment authorized for the distinct injuries established in the record.

The calculations in this section use the current compensatory schedule, including the current \$121,800,808 Vacuustat figure derived from the three application-specific present-value loss models: \$25.83 million for wind energy, \$57.15 million for telecommunications infrastructure, and \$38.82 million for defense procurement. The enhancement calculations below use that current modeled amount.

## A. Civil RICO Treble Damages

### 1. Section 1964(c) Requires Threefold Recovery for Racketeering-Caused Business and Property Injuries

18 U.S.C. § 1964(c) entitles a person injured in business or property by reason of a violation of 18 U.S.C. § 1962 to recover threefold the damages sustained, together with the cost of suit and a reasonable attorney's fee. Once the Court determines the compensatory damages caused by the established § 1962 violations, the threefold measure follows by statute.

This District has applied § 1964(c) to substantial, multiyear lost-profit injuries established after default. In *KCI USA, Inc. v. Healthcare Essentials, Inc.*, No. 1:14-cv-549, 2018 WL 4327802 (N.D. Ohio Sept. 10, 2018) (Pearson, J.), the Court held that lost profits constitute injury to business under § 1964(c), found the required direct relation between the defendants' racketeering activity and $196,763,000 in lost profits calculated over nine years, and trebled that lost-profit component to $590,289,000. The Court trebled the full $215,005,546 compensatory award to $645,016,638. *Id.* The Sixth Circuit affirmed both the default judgment and the damages order. *KCI USA, Inc. v. Healthcare Essentials, Inc.*, 801 F. App'x 928, 934–35 (6th Cir. 2020).

The Complaint pleads violations of § 1962(a), (b), (c), and (d) and identifies the resulting business and property injuries throughout the racketeering counts. Those injuries include loss of corporate funds, diversion of commercialization and financing opportunities, destruction of enterprise value, misappropriation and impairment of proprietary technology, interference with commercial relationships, and the transfer of economic value into Defendant-controlled entities. The Complaint further alleges that Defendant used his position as Radian's CEO to obtain access to Plaintiffs' trade secrets and confidential business materials, then used that access to solicit federal funding and private investment through entities he controlled while excluding Rapport from ownership and attribution.

Section V quantifies the economic consequences of that course of conduct. The current damages schedule places the full $155,946,437.94 compensatory subtotal within the business and property injuries caused by Defendant's racketeering scheme. Threefold recovery on that base equals:

**$155,946,437.94 × 3 = $467,839,313.82**

Plaintiffs therefore request a civil RICO award of $467,839,313.82 on the damages schedule established in this memorandum.

### 2. Category-Specific Findings Preserve Trebling Across the Established Injuries

The Court can enter separate findings identifying the RICO relationship of each compensatory category. That approach preserves a clear judgment record for diverted corporate capital, development

expenditures and labor, compensation loss, lost contracting and financing opportunities, the Khosla opportunity, enterprise-value destruction, Artifact impairment, and Vacuustat injury.

A category-specific judgment also permits the Court to designate the statutory basis governing each enhanced award. Every compensatory category attributed to the § 1962 violations carries the threefold measure required by § 1964(c).

### 3. Attorney's Fees and Costs Are Added to the Trebled Damages

Section 1964(c) separately awards the cost of suit, including a reasonable attorney's fee. Plaintiffs therefore request trebling of the RICO compensatory damages first, followed by the addition of recoverable attorney's fees and costs. Section VII provides the requested amount and supporting documentation.

## B. Ohio Corrupt Activities Act Triple Damages

Ohio Rev. Code § 2923.34(E) provides a civil cause of action for a person directly or indirectly injured by a violation of Ohio Rev. Code § 2923.32 and authorizes triple actual damages upon clear and convincing proof of the violation, conspiracy, and resulting damages. Section 2923.34(F) separately provides reasonable attorney's fees to a prevailing plaintiff.

The Complaint pleads that Defendant conducted and participated in an enterprise through theft, fraud, wire fraud, obstruction, access-device fraud, trade-secret misappropriation, and related corrupt activity; used the purported debt arrangement to acquire and maintain control; and reinvested corporate funds, usurped opportunities, and proprietary technology into Defendant-controlled entities. The pleaded damages include corporate funds, commercial opportunities, enterprise value, and intellectual-property injuries.

The evidentiary record independently supplies clear and convincing proof of those facts. It includes executed agreements, bank records, contemporaneous emails and Signal communications, Defendant's admissions concerning retained corporate files and technical materials, federal submissions made through competing entities, investor solicitations, and Defendant's own descriptions of the value and intended commercial use of Plaintiffs' technologies. Those materials provide direct docu-

mentary proof of the conduct, the property and opportunities transferred, and the resulting economic injuries.

Plaintiffs therefore request triple actual damages under Ohio Rev. Code § 2923.34(E) for the damages caused by Defendant's corrupt activity. The current compensatory schedule produces the same threefold calculation as the federal RICO measure:

**$155,946,437.94 × 3 = $467,839,313.82**

For injuries falling within both federal RICO and the Ohio Corrupt Activities Act, the judgment can designate a single threefold recovery supported independently by both statutes. Plaintiffs further request the reasonable attorney's fees authorized by § 2923.34(F).

## C. Defend Trade Secrets Act Exemplary Damages

### 1. The Record Establishes Willful and Malicious Misappropriation

Section III(D) establishes Defendant's willful and malicious misappropriation and is incorporated here. Defendant knew Rapport originated the technologies and underlying technical work; knew the materials were confidential and commercially sensitive; acknowledged the sensitivity and extraordinary value of the technology in his own investor communications; retained Plaintiffs' technical archive after dissolution; admitted possessing a backup of Radian's Google Drive; demanded $15,000 from Plaintiff to "entertain allowing the dissolution" even though he had already outlined his plans to continue using the Radian trade name under a new entity regardless of the dissolution (Ex. E2 — Post-Dissolution Misconduct at 14); used Plaintiffs' technology through entities under his control; presented Rapport's technologies without authorization to investors and government agencies; and continued exercising control after receiving direct notice of Rapport's ownership and demands concerning the property.

The Complaint expressly pleads willful and malicious misappropriation. The admitted allegations and documentary evidence establish deliberate misappropriation, retention, disclosure, and commercial exploitation undertaken with knowledge of Plaintiffs' rights.

Defendant's September 8, 2026 email provides additional contemporaneous evidence concerning the duration of his commercial activity after notice of Plaintiffs' rights and during this litigation. Defendant represented that he was selling the first fifteen vacuum-balloon units from a production facility in Poland and anticipated subsequent demand for hundreds. (Ex. F9 — Vacuustat Email, p. 2.) Read together with his earlier acknowledgments of Rapport's inventorship, the negotiated Vacuustat license, the unauthorized Black Lattice commercialization record, and his post-dissolution retention of Plaintiffs' technical materials, this subsequent statement further supports Plaintiffs' request for findings concerning the persistence and deliberate character of the misappropriation.

### 2. Plaintiffs Request the Full Two-Times Exemplary Award Authorized by the DTSA

Under 18 U.S.C. § 1836(b)(3)(C), willful and malicious misappropriation authorizes exemplary damages up to two times the damages awarded under § 1836(b)(3)(B). The current trade-secret compensatory awards consist of $25,000,000 for the Artifact injury and $121,800,808 for the Vacuustat injury, producing a current trade-secret base of $146,800,808.

The maximum DTSA exemplary award on that base is:

**$146,800,808 × 2 = $293,601,616 in exemplary damages**

Adding the underlying $146,800,808 trade-secret award produces a current DTSA trade-secret recovery of:

**$146,800,808 + $293,601,616 = $440,402,424**

Plaintiffs request the full $293,601,616 exemplary award on the trade-secret damages schedule established in this memorandum.

Section 1836(b)(3)(D) also authorizes reasonable attorney's fees for willful and malicious misappropriation. Plaintiffs request that relief in Section VII.

## D. Ohio Uniform Trade Secrets Act Exemplary Damages

Ohio law supplies a larger trade-secret enhancement. Ohio Rev. Code § 1333.63(B) authorizes punitive or exemplary damages up to three times the compensatory award under § 1333.63(A) when willful and malicious misappropriation exists. The three-times figure is the exemplary component

itself, and the underlying compensatory award remains part of the judgment. *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, No. 28082, slip op. at 33–36 (Ohio Ct. App. June 20, 2018), confirms both the court's authority to award exemplary damages up to three times the compensatory trade-secret award and the application of § 1333.63(B)'s trade-secret-specific punitive framework to damages arising from malicious misappropriation.

The current $146,800,808 trade-secret base therefore supports exemplary damages of:

**$146,800,808 × 3 = $440,402,424 in exemplary damages**

Together with the underlying $146,800,808 compensatory award, the maximum current recovery under Ohio Rev. Code § 1333.63 is:

**$146,800,808 + $440,402,424 = $587,203,232**

The full statutory enhancement is warranted by the deliberate character and duration of Defendant's conduct. Defendant acquired the information through a position of trust, knew Rapport's inventorship and ownership, recognized the information's secrecy and commercial value, routed the technologies through competing entities, retained the technical archive after dissolution, disclosed and used protected material for outside commercial and governmental pursuits, asserted control over the technologies after his authority ended, and continued the conduct after direct notice of Plaintiffs' rights.

Plaintiffs therefore request exemplary damages equal to three times the final trade-secret compensatory award under Ohio Rev. Code § 1333.63(B). Ohio Rev. Code § 1333.64(C) separately authorizes reasonable attorney's fees for willful and malicious misappropriation, which Plaintiffs request in Section VII.

For the Artifact and Vacuustat injuries governed by both federal and Ohio trade-secret law, Plaintiffs request one compensatory award for each injury and the Ohio exemplary measure producing the greatest trade-secret-specific enhancement authorized by statute. The DTSA independently establishes a federal basis for the same compensatory award, a two-times exemplary remedy, and attorney's fees.

## E. Ohio Civil-Theft Liquidated Damages

Count XIV establishes civil theft under Ohio Rev. Code §§ 2307.61 and 2913.02. The Complaint pleads knowing and unlawful control over Radian property with purpose to deprive the Company of its use and benefit, including Defendant's $18,535.52 withdrawal from Radian's corporate account and his retention and dissemination of the confidential Private-folder materials. The Complaint further pleads that the conduct was willful, malicious, and undertaken in bad faith.

Ohio Rev. Code § 2307.61(A)(1)(b) permits the property owner to elect liquidated damages equal to the greater of $200 or three times the value of the property. For the $18,535.52 cash withdrawal, the statutory liquidated amount is:

$$\mathbf{\$18{,}535.52 \times 3 = \$55{,}606.56}$$

Plaintiffs elect the $55,606.56 liquidated measure for the cash component of Count XIV. The same withdrawal forms part of the racketeering and corrupt-activity damages base, for which the threefold mathematical result is identical. The Private-folder taking supports the trade-secret compensatory and exemplary awards described above and the return, deletion, accounting, and injunctive relief requested below.

## F. Lanham Act Monetary Relief and ACPA Statutory Damages

### 1. Section 1117(a) Supplies an Alternative Enhancement for Established Lanham-Act Damages

The established Lanham Act violations arose from Defendant's use of Plaintiffs' commercial identity and technology in interstate commerce, including representations that presented Rapport's technology through Defendant-controlled entities, omitted Rapport's inventorship and ownership, and conveyed false impressions concerning source, sponsorship, affiliation, and proprietary rights. The Complaint also pleads Defendant's continued operation of Radian's website after dissolution in a manner wrongly suggesting an ongoing affiliation with the Company and its technologies.

Under 15 U.S.C. § 1117(a), Plaintiffs may recover Defendant's profits, Plaintiffs' actual damages, and costs, subject to the governing principles of equity. In assessing actual damages, the Court may enter judgment for any amount above the damages found, up to three times the actual damages.

Several compensatory categories established in Section V measure injuries caused in part by Defendant's false designations, false representations of affiliation and ownership, and diversion of commercial opportunities. Those categories include lost contracting and financing opportunities, the diverted Khosla opportunity, destruction of enterprise value and goodwill, and impairment caused by ownership and attribution confusion. To the extent the Court attributes those established damages to Defendant's § 1125(a) violations, Plaintiffs request the full enhancement authorized by § 1117(a).

Those same economic injuries also support other causes of action carrying equal or greater statutory enhancements. Plaintiffs therefore request § 1117(a) as an independent alternative basis for enhancing the Lanham-linked compensatory awards and request the greatest measure authorized for each distinct injury.

Defendant's profits, revenues, financing proceeds, and other commercial benefits attributable to the false-designation and false-advertising violations remain subject to the accounting requested in Section VIII(G). Any traceable benefit established through that accounting may support disgorgement under § 1117(a) to the extent it represents a distinct economic benefit.

### 2. The ACPA Election Supplies a Separate $100,000 Statutory Measure for the Radian Domain

The Radian-domain injury is measured through the statutory election in 15 U.S.C. § 1117(d). Section 1117(d) authorizes a plaintiff asserting a violation of § 1125(d)(1) to elect statutory damages from $1,000 through $100,000 per domain name in place of actual damages and profits for that cybersquatting claim. The § 1117(d) election supplies the monetary measure for the domain claim, while § 1117(a)'s enhancement applies to actual damages established under § 1125(a).

### 3. Plaintiffs Elect $100,000 in ACPA Statutory Damages for the Radian Domain

15 U.S.C. § 1117(d) permits a plaintiff asserting a violation of 15 U.S.C. § 1125(d) to elect statutory damages from $1,000 through $100,000 for each domain name, as the Court considers just.

The Complaint establishes bad-faith cyberpiracy involving the Radian domain. Defendant knew Plaintiffs' rights in the Radian identity, maintained control of the domain and website after dissolution, used the site to wrongfully convey an ongoing affiliation with Radian and proprietary rights in its technologies, and used the resulting confusion for commercial advantage. His conduct continued during the period in which Plaintiffs sought restoration of corporate control and protection of the associated intellectual property.

Plaintiffs elect statutory damages of $100,000 for the pleaded Radian domain. The maximum award reflects deliberate post-dissolution use of a corporate identity Defendant had previously controlled as CEO, direct knowledge of Plaintiffs' rights, continued commercial confusion concerning ownership and affiliation, and the duration of the violation. Plaintiffs separately request transfer or cancellation of the domain and permanent injunctive relief in Section VIII.

## G. Punitive Damages on Independently Actionable Ohio Tort Claims

Ohio Rev. Code § 2315.21(C)(1)–(2), (D)(1), and (D)(4) authorize punitive damages in a tort action when the defendant's conduct demonstrates malice or aggravated or egregious fraud, compensatory damages are awarded, and the plaintiff establishes entitlement to punitive damages by clear and convincing evidence. The Complaint expressly requests punitive relief on independently actionable Ohio tort claims, including conversion, fraudulent inducement, fraudulent misrepresentation, and tortious interference with business relationships. (Compl. ¶¶ 312–336, 344–351.) Those counts address deliberate seizure and retention of corporate property, knowing misrepresentations used to obtain control and access, diversion of funding and commercialization opportunities, and continued interference after dissolution.

The evidentiary record establishes the required conscious wrongdoing. Defendant exercised control over corporate funds and infrastructure, concealed material activity, diverted identified busi-

ness and financing opportunities, retained property after dissolution, asserted ownership and authority over Rapport's technologies, and used Plaintiffs' property and commercial identity through competing entities for his own advantage. The conduct continued after express notice of Plaintiffs' rights and after dissolution terminated Defendant's corporate authority. These facts establish a sustained course of knowing conduct directed at Plaintiffs' property and commercial interests and support the maximum punitive measure.

Plaintiffs therefore request $350,000 in punitive damages. For an individual defendant, Ohio Rev. Code § 2315.21(D)(2)(b) limits the judgment to the lesser of twice the compensatory damages awarded from that defendant or ten percent of the individual's net worth when the tort was committed, up to a maximum of $350,000. The twice-compensatory branch permits the full statutory maximum once compensatory damages on the applicable tort claims reach $175,000. The tort-linked business injuries quantified in Section V exceed that threshold many times over; the $1,000,000 lost-contract opportunity alone exceeds it.

The net-worth limitation does not require Plaintiffs to prove Defendant's net worth as a prerequisite to an otherwise proper punitive award. Ohio courts place the burden on the party seeking a reduction based on financial condition to place evidence supporting that reduction in the record. *Moore v. Schill*, 129 N.E.3d 1013, 1018 (Ohio Ct. App. 2019). Defendant defaulted and has submitted no financial evidence supporting a reduction under § 2315.21(D)(2)(b). The record therefore supplies no basis for reducing the requested $350,000 award on net-worth grounds.

The punitive award is separately additive to the federal RICO measure used for the residual injuries in the present aggregate calculation; the Ohio Corrupt Activities Act remains a parallel alternative threefold route. In *General Environmental Science Corp. v. Horsfall*, 800 F. Supp. 1497, 1505–06 (N.D. Ohio 1992), a court in this District trebled compensatory damages under civil RICO and then added a separate Ohio punitive-damages award in a default action involving trade-secret theft, competition, and related state torts. *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, No. 28082, slip op. at 4–5, 35–36 (Ohio Ct. App. June 20, 2018), likewise distinguishes

ordinary punitive relief on independently actionable tort claims from the separate exemplary remedy governing trade-secret misappropriation under OUTSA. The $350,000 requested here attaches to Counts XV–XVII and XIX's independently actionable tort conduct and is included as a separate punitive component of the present aggregate judgment.

### H. Current Enhancement Schedule

The current statutory calculations are summarized below. The trade-secret figures use the present $25,000,000 Artifact award and $121,800,808 Vacuustat award.

| Statute | Current Base | Enhancement | Current Requested Measure |
|---|---|---|---|
| Federal RICO, 18 U.S.C. § 1964(c) | $155,946,437.94 | Threefold total recovery | $467,839,313.82, plus fees and costs |
| Ohio Corrupt Activities Act, Ohio Rev. Code § 2923.34(E) | $155,946,437.94 | Triple actual damages | $467,839,313.82, plus fees |
| DTSA, 18 U.S.C. § 1836(b)(3)(C) | $146,800,808 | Up to 2× base as exemplary damages | $293,601,616 exemplary; $440,402,424 combined |
| OUTSA, Ohio Rev. Code § 1333.63(B) | $146,800,808 | Up to 3× base as exemplary damages | $440,402,424 exemplary; $587,203,232 combined |
| Ohio civil theft, Ohio Rev. Code § 2307.61(A)(1)(b) | $18,535.52 cash component | Three times property value | $55,606.56 |
| Lanham Act, 15 U.S.C. § 1117(a) | Established actual damages attributable to § 1125(a) | Up to threefold actual damages | Alternative enhancement for overlapping compensatory categories |
| ACPA, 15 U.S.C. § 1117(d) | One pleaded domain | $1,000–$100,000 statutory range | $100,000 elected |
| Ohio tort punitive damages, Ohio Rev. Code § 2315.21 | Tort-linked compensatory damages exceed $175,000 threshold | Lesser of 2× compensatory damages or 10% of net worth; $350,000 maximum | $350,000 requested |

### I. Current Aggregate Monetary Calculation

The current compensatory schedule totals $155,946,437.94. The trade-secret component is $146,800,808: $25,000,000 for Artifact impairment plus $121,800,808 for Vacuustat delay and lost

royalties. The remaining $9,145,629.94 consists of the seven independently quantified business and property injuries shown below.

| **Remaining Compensatory Category** | **Amount** |
|---|---:|
| Diverted corporate capital | $28,870.52 |
| R&D expenses and core-development labor | $78,759.42 |
| 2025 compensation shortfall | $38,000.00 |
| Lost contract opportunity | $1,000,000.00 |
| Lost near-term investment opportunity | $500,000.00 |
| Diverted Khosla Ventures opportunity | $5,000,000.00 |
| Destroyed Radian enterprise value | $2,500,000.00 |
| **Remaining compensatory subtotal** | **$9,145,629.94** |
| Threefold RICO/OCAA recovery on this subtotal | $27,436,889.82 |

The enhancement statutes use different mathematical structures. Federal RICO provides threefold recovery, so a $1 compensatory injury becomes $3 in the judgment: the original $1 plus $2 of statutory enhancement. The Ohio Corrupt Activities Act likewise provides triple actual damages upon the required evidentiary showing. OUTSA uses an additive exemplary-damages structure: the Court may award exemplary damages up to three times the underlying trade-secret award, so a $1 trade-secret award can support $3 in exemplary damages in addition to the original $1, producing $4 total. The current aggregate therefore applies the larger OUTSA measure to the $146,800,808 trade-secret component and the threefold federal RICO measure to the remaining $9,145,629.94, while preserving the Ohio Corrupt Activities Act as a parallel alternative threefold basis.

The resulting trade-secret recovery is $587,203,232: the $146,800,808 compensatory trade-secret award plus $440,402,424 in OUTSA exemplary damages. The remaining compensatory injuries produce $27,436,889.82 under the threefold RICO/OCAA measure. The separately pleaded domain violation adds the $100,000 ACPA statutory election, and the independently actionable Ohio tort claims add the $350,000 punitive award.

| **Component of Aggregate Judgment** | **Amount** | **Derivation** |
|---|---:|---|
| OUTSA trade-secret recovery | $587,203,232.00 | Trade-secret base + OUTSA exemplary |

| | | |
|---|---|---|
| RICO/OCAA recovery on remaining compensatory injuries | $27,436,889.82 | 3 × $9,145,629.94 |
| ACPA statutory damages for `radianindustries.com` | $100,000.00 | § 1117(d) election |
| Ohio tort punitive damages | $350,000.00 | § 2315.21 maximum |
| **Current monetary damages after statutory enhancement** | **$615,090,121.82** | Sum of four components |
| Attorney's fees — requested interim lodestar | $163,125.00 | Subject to verification |
| Counsel's separately billed expenses | $655.78 | Not fees |
| Other documented litigation expenditures | $2,035.00 | Investigator, publication, filing |
| **Presently quantified monetary judgment** | **$615,255,937.60** | **Before interest and supplemental relief** |

The full-base RICO calculation stated earlier in this section remains an independent alternative recovery path: threefold recovery on the entire $155,946,437.94 compensatory subtotal equals $467,839,313.82. The aggregate calculation above produces a larger amount because OUTSA supplies a larger enhancement for the $146,800,808 trade-secret component and § 2315.21 supplies the separate $350,000 punitive award on the independently actionable tort claims. The judgment can therefore identify the alternative statutory routes while using the larger OUTSA measure for the trade-secret injuries, the RICO/OCAA measure for the remaining compensatory injuries, and the separate punitive award authorized for the tort conduct.

This category-specific structure also makes the single-recovery principle transparent. Each underlying compensatory injury appears once in the aggregate judgment. An enhancement then attaches to that injury under the statute producing the governing recovery. The Sixth Circuit applies the same injury-based approach to overlapping compensatory theories: additional recovery becomes duplicative when an alternative theory compensates the same loss. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013). Here, the aggregate calculation assigns the trade-secret injuries to the OUTSA measure and the seven separate residual injuries to the RICO/OCAA measure. The

$350,000 punitive component is separately noncompensatory relief imposed on the independently actionable tort conduct and therefore does not duplicate an underlying compensatory award. *General Environmental Science*, 800 F. Supp. at 1505–06.

The DTSA exemplary award is an alternative trade-secret enhancement and is smaller than the OUTSA measure on the same $146,800,808 base. Federal RICO and the Ohio Corrupt Activities Act provide parallel threefold measures for the $9,145,629.94 residual compensatory base. The $18,535.52 cash-theft component is contained within the $28,870.52 diverted-corporate-capital category; the civil-theft statute independently produces the same threefold measure for that component. Section 1117(a) supplies an alternative enhancement route for actual damages attributable to the Lanham Act violations. The $100,000 ACPA award supplies the separately elected statutory measure for the domain violation. Ohio Rev. Code § 2315.21 supplies the additional $350,000 punitive award on the independently actionable tort claims.

The presently quantified judgment sought on the interim lodestar basis is $615,255,937.60, including the $350,000 punitive award, $163,125.00 in requested reasonable attorney's fees (subject to verification), $655.78 in counsel's expenses, and $2,035.00 in other documented litigation expenditures, plus additional fees and costs incurred after the present accounting cutoff, prejudgment and post-judgment interest, and any additional disgorgement or monetary relief established through the accounting.

### J. Plaintiffs Request the Maximum Lawful Aggregate Enhanced Recovery

The statutory remedies operate most clearly through injury-specific findings. Plaintiffs request that the judgment identify each compensatory injury, identify every statutory enhancement applicable to that injury, and apply the measure producing the greatest recovery authorized by law.

For the Artifact and Vacuustat trade-secret injuries, Ohio Rev. Code § 1333.63(B) supplies the largest trade-secret-specific enhancement and supports exemplary damages equal to three times the final trade-secret compensatory award. For the remaining business and property injuries caused by the racketeering and corrupt-activity scheme, 18 U.S.C. § 1964(c) and Ohio Rev. Code § 2923.34(E)

supply threefold recovery. Section 1117(a) independently supports enhanced recovery for established actual damages attributable to the Lanham Act violations. For the Radian-domain violation, Plaintiffs elect the $100,000 statutory award under 15 U.S.C. § 1117(d). Ohio Rev. Code § 2307.61(A)(1)(b) independently supports the same threefold recovery for the $18,535.52 cash-theft component. The independently actionable Ohio tort injuries support the $350,000 maximum punitive award authorized by Ohio Rev. Code § 2315.21.

Plaintiffs further request the attorney's-fee and cost awards independently authorized by federal RICO, the DTSA, the Ohio Corrupt Activities Act, OUTSA, the Lanham Act where applicable, and other governing provisions. Those amounts are addressed in Section VII and are added after application of the damages multipliers.

This structure gives effect to every established statutory violation, preserves one compensatory recovery for each distinct economic injury, and produces the maximum aggregate judgment authorized by the governing remedial statutes.

## VII. Attorney's Fees, Litigation Expenses, Costs, and Interest

Plaintiffs seek recovery of the reasonable attorney's fees, litigation expenses, taxable costs, and interest authorized by the claims established through Defendant's default. Multiple independent statutory and common-law bases support fee recovery. The current ledger documents $70,012.50 in billed attorney fees, $655.78 in separately billed counsel expenses, and $2,035.00 in other documented expenditures. Plaintiffs request attorney's fees at the $163,125.00 interim lodestar, rather than billed rates, producing $165,815.78 in requested fees and documented expenditures before later costs, subject to verification. Additional fees and expenditures incurred after the present accounting cutoff remain recoverable as authorized by law.

Plaintiffs request that attorney's fees be calculated under the lodestar method: reasonable hours multiplied by a reasonable hourly rate. *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82-CRS-CHL, ECF No. 605, at 29–42 (W.D. Ky. Mar. 8, 2021) (applying the lodestar method to a trade-secret fee award). The reasonable hourly rate is the prevailing market rate commanded by

lawyers of comparable skill and experience. *Maddox v. Lodestar Energy, Inc.*, 750 F. App'x 373, 377–78 (6th Cir. 2018). Plaintiffs propose $750 per hour for the services of Michael W. Vary. Counsel reports that his hourly rate while serving as the court-appointed special master for patent claim construction in *ASK Chemicals LLC v. Novis Works, LLC*, No. 5:19-cv-01585-BYP (N.D. Ohio), was $750. The Court appointed him on December 17, 2019. (*Id.*, ECF No. 23.) Draft Exhibit F10 sets out the proposed rate, counsel's qualifications, and the ledger-derived hours through September 2026; the exhibit requires counsel's independent verification and execution before filing. His December 2019 affidavit in that case documents his admission to the Illinois bar in 1982 and the Ohio bar in 1985. (*Id.*, ECF No. 22.) Counsel's professional history reflects more than four decades of intellectual-property practice beginning in 1982, including approximately three years as an associate at Kirkland & Ellis LLP, more than twenty years as a Jones Day associate and partner, and subsequent of-counsel and independent-consulting work focused on intellectual-property litigation, licensing, and dispute resolution. He also holds a Ph.D. in physical organic chemistry. A recent Northern District of Ohio trade-secret case provides a further local comparison: *C.R.H. Industrial Water, LLC v. Eiermann*, No. 1:23-CV-1805, ECF No. 80, at 7–9 (N.D. Ohio Mar. 3, 2026), approved $690 per hour for a litigation partner with twenty-nine years of experience. These records support the requested rate, subject to the Court's determination of the reasonable prevailing-market rate for counsel's work in this action.

The through-September-2026 fee ledger identifies $70,012.50 in billed fees at historical rates and 217.5 hours associated with those entries. At the proposed $750 rate, those hours yield a requested interim lodestar of $163,125.00. The monetary judgment uses that proposed lodestar as one fee component, in place of, not in addition to, the billed-fee subtotal. Counsel must verify the compensable hours and historical billing entries in his final Exhibit F10 declaration and supply supporting records; the draft declaration is not itself final proof. Plaintiffs request leave to supplement for later compensable work through the procedure directed by the Court, including Federal Rule of Civil Procedure 54(d)(2) where applicable. Any attorney's fees already awarded will be credited against the ultimate single fee award.

### A. Multiple Independent Bases Support Attorney's Fees

#### 1. Civil RICO Requires Recovery of Reasonable Attorney's Fees and the Cost of Suit

The civil RICO remedy expressly provides that a person injured in business or property by reason of a violation of 18 U.S.C. § 1962 "shall recover" threefold damages "and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). The fee-and-cost award therefore accompanies the RICO recovery established above and is added after application of the threefold damages measure.

Plaintiffs' legal work arose directly from the racketeering injuries adjudicated in this action: investigation of Defendant's diversion of corporate property and opportunities; recovery and analysis of corporate, technical, financial, and electronic records; preparation of the federal Complaint and evidentiary exhibits; repeated service proceedings; default proceedings; damages development; protection of trade-secret material; and preparation of the accounting and equitable remedies required to restore Plaintiffs' property and commercial rights.

#### 2. The Ohio Corrupt Activities Act Independently Requires Reasonable Attorney's Fees

Ohio Rev. Code § 2923.34(F) provides that a plaintiff who prevails under § 2923.34(B) or (E) "shall recover reasonable attorney fees in the trial and appellate courts." The same conduct supporting the federal RICO award establishes Plaintiffs' Ohio corrupt-activity claims and supplies an independent mandatory basis for the reasonable fees incurred in obtaining judgment and enforcing the resulting relief.

The federal and Ohio racketeering statutes support recovery of a single reasonable fee award for work attributable to the overlapping course of conduct.

#### 3. Willful and Malicious Trade-Secret Misappropriation Independently Supports Fees Under the DTSA and OUTSA

The trade-secret record establishes willful and malicious misappropriation. As set forth in the preceding sections, Defendant knowingly acquired and retained Rapport's confidential technical materials, exercised control over them after dissolution, used Plaintiffs' technologies in competing

commercial and governmental pursuits, disclosed protected information to third parties, and continued asserting rights over technologies he knew Rapport had created.

The DTSA authorizes reasonable attorney's fees to the prevailing party when "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D). Ohio Rev. Code § 1333.64(C) independently authorizes reasonable attorney's fees when willful and malicious misappropriation exists. The lodestar method begins with the hours reasonably expended multiplied by a reasonable hourly rate. *Caudill Seed*, No. 3:13-CV-82-CRS-CHL, ECF No. 605, at 29–42.

The technical and evidentiary work required by these claims forms a substantial component of the litigation. It includes review of the retained trade-secret repositories, reconstruction of the development history of the Artifact and Vacuustat, analysis of Defendant's uses and disclosures, preparation and handling of sealed technical material, evaluation of the resulting economic injury, and preparation of the permanent-injunction and accounting provisions necessary to secure the technologies.

### 4. The Lanham Act Supplies an Additional Fee Basis

15 U.S.C. § 1117(a) authorizes reasonable attorney's fees to the prevailing party in an "exceptional" case. The Sixth Circuit applies the totality-of-the-circumstances standard stated in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), including the substantive strength of the prevailing party's position and the manner in which the opposing party litigated the case. *La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607, 615–16 (6th Cir. 2023).

The established Lanham Act conduct involved deliberate assertions of ownership, source, affiliation, and corporate authority; continued operation of Radian's website and domain after dissolution; presentation of Rapport's technology through Defendant-controlled ventures; and commercial solicitations omitting Rapport's ownership and inventorship. Defendant then defaulted while continuing to control the corporate infrastructure and records bearing on the scope of those uses. Those circumstances support an exceptional-case finding and provide an additional statutory basis for the same reasonable fee award.

### 5. Ohio Tort Law Supplies an Additional Fee Basis Upon an Award of Punitive Damages

Ohio law permits recovery of reasonable attorney's fees where punitive damages are awarded for tortious conduct involving the requisite malice. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 35 (2000); *Cruz v. English Nanny & Governess School*, 169 Ohio St.3d 716, 724 (2022). That fee recovery is compensatory and accompanies the punitive-damages findings requested for Defendant's independently actionable Ohio torts.

This basis also supports reasonable litigation expenses associated with prosecution of the tort claims. Plaintiffs therefore request recovery of the documented legal fees and litigation expenses falling within the Ohio punitive-damages rule, together with the independently authorized federal and state statutory fee awards described above.

## B. Current Fee and Litigation-Expense Amount

The through-September-2026 ledger documents $70,012.50 in attorney's fees billed at historical rates and 217.5 hours. Applying the proposed $750 hourly rate yields $163,125.00 in requested interim lodestar fees, an increase of $93,112.50 over the billed-fee cross-check. Plaintiffs request a single award at the reasonable lodestar, subject to supporting time records, counsel's verified declaration, and the Court's assessment of compensable hours and reasonable hourly rate; billed fees are not added a second time. *Caudill Seed*, No. 3:13-CV-82-CRS-CHL, ECF No. 605, at 29–42.

Plaintiffs have documented $2,690.78 in separately identifiable expenditures incurred to date, including $655.78 in counsel's billed expenses and $2,035.00 in other costs:

| | |
|---|---:|
| Counsel's separately billed expenses | $655.78 |
| Private investigator | $1,000.00 |
| Publication | $630.00 |
| Court filing fee | $405.00 |
| **Documented non-fee expenditures** | **$2,690.78** |

The billed-fee plus expenditures cross-check totals $72,703.28 replacing billed attorney fees with the requested interim lodestar produces $165,815.78 in fees and expenditures. Plaintiffs request that each expenditure be awarded once under the applicable fee- or cost-shifting authority and classified

as a taxable cost or recoverable litigation expense as the Court determines appropriate. This treatment preserves recovery while preventing double counting of counsel's fees, counsel's expenses, or the filing and publication costs.

Federal Rule of Civil Procedure 54(d)(2) permits a claim for attorney's fees and related nontaxable expenses by motion and ordinarily sets a fourteen-day period following entry of judgment, subject to a statute or Court order providing a different procedure. Plaintiffs request that the Court determine entitlement to fees as part of the default judgment and permit supplementation for fees and expenditures incurred after the present accounting cutoff through the procedure the Court directs.

## C. Taxable and Otherwise Recoverable Costs

Federal Rule of Civil Procedure 54(d)(1) provides for an award of costs to the prevailing party. 28 U.S.C. § 1920 authorizes taxation of specified categories including clerk and marshal fees; qualifying transcript expenses; printing and witness fees; exemplification and necessary copying costs; docket fees; and compensation of court-appointed experts and interpreters where applicable.

Additional substantive statutes independently authorize costs. Civil RICO awards "the cost of the suit" together with attorney's fees. 18 U.S.C. § 1964(c). The Lanham Act includes "the costs of the action" among the remedies available to a successful plaintiff. 15 U.S.C. § 1117(a).

Plaintiffs will submit a final cost schedule identifying each recoverable expenditure and its statutory basis. The requested costs will include the filing, service, publication, record-production, copying, transcript, and comparable case expenses that qualify under § 1920 or another applicable fee-and-cost provision.

## D. Prejudgment Interest

Prejudgment interest compensates for the time between economic injury and judgment. The Sixth Circuit has specifically recognized the district court's broad discretion to award prejudgment interest on civil RICO damages. *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 496–98 (6th Cir. 2013). *ClassicStar* explains that prejudgment interest is an element of complete compensation and that RICO's treble-damages remedy permits a prejudgment-interest award when the equities support one.

The equities strongly support prejudgment interest here. Plaintiffs' economic injuries arose months before judgment; Defendant retained control of corporate property, technical records, and information needed to establish the full scope of the damages; service required extended proceedings; and Defendant ultimately defaulted. The resulting passage of time deprived Plaintiffs of the use of money and commercial value attributable to injuries that had already occurred.

Plaintiffs therefore request prejudgment interest on the compensatory amounts legally eligible for interest, calculated from the appropriate injury or accrual date for each category through entry of judgment. The final interest schedule will identify the eligible principal amount, accrual date, rate, period, and resulting interest for each component. For the federal RICO recovery, the Court may select the compensatory rate and methodology that fully accounts for the time value of the loss under *ClassicStar*.

Ohio Rev. Code § 1343.03 supplies additional interest remedies for eligible state-law judgments. Plaintiffs request application of the state-law interest provisions to the portions of the judgment satisfying their statutory requirements.

### E. Post-Judgment Interest

Post-judgment interest follows the federal money judgment by statute. Under 28 U.S.C. § 1961(a), interest is allowed on any money judgment recovered in a federal district court from the date judgment is entered. The rate is the weekly average one-year constant-maturity Treasury yield published by the Board of Governors of the Federal Reserve System for the calendar week preceding entry of judgment. Section 1961(b) provides daily computation through payment and annual compounding.

Plaintiffs therefore request post-judgment interest under 28 U.S.C. § 1961 on the monetary judgment from the date of entry until satisfaction, with supplemental fee and cost awards bearing interest from the date applicable to each such award.

## F. Presently Quantified Amount

The compensatory amount of $155,946,437.94 increases to $615,090,121.82 after the statutory enhancements separately itemized in Section VI. Adding the requested interim lodestar fee award and documented expenditures produces:

**$615,090,121.82 + $163,125.00 + $655.78 + $2,035.00 = $615,255,937.60**

The presently quantified monetary judgment requested on the interim lodestar basis is therefore $615,255,937.60, subject to counsel's verification of reasonable hours and the Court's determination of the fee award, plus additional fees and costs incurred after the present accounting cutoff, prejudgment interest, post-judgment interest, and supplemental monetary relief established through the accounting.

## VIII. Declaratory and Permanent Injunctive Relief

Declaratory and permanent injunctive relief will restore clear ownership, corporate authority, control of retained technical materials, and accurate commercial attribution. The monetary awards addressed in Section VI and Section VII compensate injuries already sustained. Prospective relief secures Plaintiffs' continuing rights, restores the corporate and technical assets remaining under Defendant's control, terminates ongoing avenues of exploitation, and establishes an enforceable framework governing future conduct.

The relief requested here tracks Count XXIII and the equitable and declaratory components of the Prayer for Relief. The Complaint expressly seeks declarations concerning Rapport's sole inventorship and ownership, the validity of Radian's dissolution, Rapport's winding-up authority, the legal effect of Defendant's outside submissions, Rapport's right to corporate records and credentials, and Rapport's freedom to practice and commercialize his inventions. (Compl. ¶¶ 373–378.) Prayer for Relief ¶¶ 5–12 separately request permanent restrictions on use of Plaintiffs' technologies and Radian's identity; return of confidential and proprietary materials; identification of recipients; deletion of copies, backups, and derivative uses; sworn certification; ownership and corporate-authority declarations; bankruptcy-related findings; alter-ego findings concerning Defendant's affiliated entities; and findings

concerning the commercial value of Rapport's proprietary work and the economic injury caused by Defendant's misconduct. Prayer ¶¶ 16–17 request continuing enforcement jurisdiction and final-judgment treatment, and ¶ 20 requests further equitable relief. The Lanham Act count also requests corrective advertising. (Compl. ¶ 224; Compl., Prayer for Relief ¶¶ 5–12, 16–17, 20.)

Prayer ¶¶ 13–15 request a constructive trust, disgorgement, and sworn financial and ownership disclosures. Those complementary remedies are developed separately in Section VIII(G), together with the post-judgment tracing and enforcement rights expressly preserved in Complaint ¶ 380.

The proposed operative terms are collected in Appendix F. The discussion below addresses the statutory authority, factual basis, scope, and enforcement mechanisms supporting that relief.

## A. Legal Authority and Standards

### 1. Declaratory Judgment Authority

The Declaratory Judgment Act authorizes a federal court, in a case of actual controversy within its jurisdiction, to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Ohio law likewise authorizes declarations determining rights, status, and legal relations affected by a contract, statute, or other legal instrument. Ohio Rev. Code §§ 2721.02(A), 2721.03.

An active controversy exists concerning ownership, inventorship, commercialization rights, corporate authority, and retained assets. Defendant claimed rights over Rapport's technologies, presented those technologies through Phoenix Dynamics and Black Lattice, asserted continuing authority concerning Radian after dissolution, retained corporate and technical records, and continued controlling Radian's website and domain. Count XXIII places each of those legal relationships directly before the Court. (Compl. ¶¶ 373–378.)

A final declaration will establish a single authoritative statement of rights for investors, government agencies, commercial counterparties, service providers, domain registrars, financial institutions, and persons who received materials from Defendant. That declaration will remove the ownership and

authority uncertainty created by Defendant's competing claims and provide the foundation for the restorative provisions of the injunction.

### 2. Trade-Secret Injunctive Authority

The Defend Trade Secrets Act authorizes an injunction preventing actual or threatened misappropriation "on such terms as the court deems reasonable" and expressly authorizes affirmative actions necessary to protect a trade secret. 18 U.S.C. § 1836(b)(3)(A)(i)–(ii). Ohio's Uniform Trade Secrets Act independently authorizes injunctions addressing actual or threatened misappropriation and permits courts to compel affirmative acts protecting trade secrets in appropriate circumstances. Ohio Rev. Code § 1333.62(A), (C).

Those statutory remedies fit the established conduct directly. Defendant retained a backup of Radian's Drive containing Rapport's technical materials, used Rapport-derived technology through outside ventures, disclosed protected material to third parties, presented the technologies as proprietary or exclusive capabilities of Defendant-controlled entities, and continued building technical and commercial channels relevant to those technologies. The requested return, deletion, disclosure-identification, and future-use provisions implement the affirmative protections expressly authorized by the DTSA and OUTSA.

### 3. Lanham Act and ACPA Authority

The Lanham Act authorizes injunctions according to principles of equity to prevent violations of 15 U.S.C. § 1125(a) and (d). 15 U.S.C. § 1116(a). Following a finding of a Lanham Act violation, a plaintiff seeking a permanent injunction receives a rebuttable presumption of irreparable harm. *Id.* Section 1116(a) also authorizes a written compliance report under oath detailing the manner and form of compliance.

The ACPA supplies a direct remedy for the domain itself. In an action involving cyberpiracy under § 1125(d), the Court may order forfeiture or cancellation of the domain name or transfer of the domain name to the owner of the mark. 15 U.S.C. § 1125(d)(1)(C).

The Complaint establishes continued operation of the Radian Industries website and domain after dissolution in a manner wrongly conveying continuing corporate affiliation and proprietary authority. (Compl. ¶¶ 222, 225–228.) Transfer of `radianindustries.com`, its registrar account, DNS control, hosting control, and associated administrative credentials to Radian through Rapport as its authorized winding-up representative directly restores the commercial identity placed at issue by the established Lanham Act and ACPA violations.

### 4. CFAA Equitable Authority

Count IX pleads violations of the Computer Fraud and Abuse Act arising from Defendant's unauthorized access to and control over electronic systems and data. Section 1030(g) authorizes a person suffering damage or loss from a violation to obtain compensatory damages and injunctive or other equitable relief, subject to the statutory conditions governing a civil action. 18 U.S.C. § 1030(g).

For the established CFAA claim, restoration of Radian's email, Google Workspace, Drive, administrative credentials, account-recovery mechanisms, and associated electronic records directly addresses the electronic access and control placed at issue in the Complaint. The CFAA therefore supplies an additional statutory basis for the mandatory transfer, access-restoration, preservation, and verification provisions requested in Section VIII(C).

### 5. Permanent-Injunction Factors

Permanent injunctive relief is appropriate where the plaintiff establishes irreparable injury, inadequacy of legal remedies for that injury, an equitable balance of hardships, and consistency with the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Each factor supports the requested relief.

#### a. Continuing Loss of Exclusive Control Constitutes Irreparable Injury

Rapport's technologies derive commercial value from controlled possession, controlled disclosure, accurate attribution, and the owner's ability to offer commercial counterparties a clear chain of rights. Defendant acquired a replication-grade technical archive, exercised commercial rights over the technologies through outside entities, disclosed information to third parties, claimed the technologies

as proprietary or exclusive capabilities of competing ventures, and retained the archive after dissolution. His later activity includes relevant technical recruitment and continued pursuit of defense, navigation, and aerospace ventures. The complete recipient list and full derivative-use history remain within records Defendant controls.

Defendant's July 27, 2025 public description of Rapport's intellectual property as a future option, quoted in the post-dissolution factual chronology at Section IV(E), is relevant to prospective injury. Coupled with his admission that he retained a backup of Radian's company Drive, that statement identifies a concrete risk of renewed exploitation of the technical archive after an interval of inactivity. (Ex. C4 — Social Media Posts, ECF No. 2-8, PageID #293; Ex. F2 — Supplemental Posts, Long-Tail Option Statement.)

Defendant's September 8, 2026 email adds a contemporaneous account of current commercialization. He represented that he was selling the first fifteen vacuum-balloon units from a production facility in Poland and anticipated demand for hundreds more. (Ex. F9 — Vacuustat Email, p. 2.) The reported activity identifies an overseas production source and potential manufacturing and purchasing counterparties, reinforcing the need for prospective protection against continued use, reproduction, commercialization, and downstream disclosure of Plaintiffs' protected materials.

That condition creates continuing impairment independent of the historical damages already quantified. Each retained copy can support additional disclosure, development, fundraising, contracting, recruitment, or derivative work. Each unresolved third-party disclosure burdens Rapport's ability to establish practical exclusivity to a purchaser, licensee, investor, or government counterparty. Each continuing misrepresentation of ownership or affiliation perpetuates uncertainty over source and authority.

Radian's commercial identity presents the same form of continuing injury. Defendant retained and operated the corporate website and domain after dissolution, thereby placing a continuing public-facing representation of corporate affiliation under his control. The Lanham Act independently supplies a presumption of irreparable harm following the established violation. 15 U.S.C. § 1116(a).

### b. Monetary Relief Addresses Past Injury While Prospective Relief Secures Future Control

The monetary awards compensate the diminution, delay, lost opportunities, diverted capital, and other economic injuries already caused. Prospective control requires operational remedies: return of the technical archive, deletion of retained copies, identification of downstream recipients, restoration of corporate credentials, transfer of the Radian domain, accurate attribution, and enforceable restrictions governing future use and disclosure.

Trade-secret law expressly provides those operational remedies. 18 U.S.C. § 1836(b)(3)(A); Ohio Rev. Code § 1333.62. The distinction between retrospective compensation and prospective protection is especially important where a misappropriator retains the technical package and controls information concerning downstream dissemination. *See, e.g., PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co.*, 47 F.4th 156, 163–64 (3d Cir. 2022) (affirming monetary trade-secret relief together with permanent injunctive relief addressing prospective harm).

### c. Balance of Hardships Favors Restoration of Plaintiffs' Rights

The requested injunction restores Plaintiffs' possession, control, attribution, and corporate authority over property and rights adjudicated in their favor. It confines Defendant's future technical and commercial activity to assets, technology, information, and rights lawfully his own.

Compliance consists principally of returning property, transferring corporate infrastructure, identifying recipients, deleting retained copies, correcting ownership and affiliation representations, and conducting future activity from independently obtained information. Continued retention of the archive and infrastructure perpetuates loss of exclusivity, commercial uncertainty, attribution confusion, and dissemination risk. Any asserted hardship to Defendant from relinquishing improperly retained property or ceasing unauthorized conduct is self-inflicted and non-actionable. The equitable balance therefore favors the requested restorative relief.

#### d. Public Interest Favors Clear Ownership, Trade-Secret Protection, and Accurate Attribution

The requested injunction advances established public interests in protecting confidential commercial information, enforcing trade-secret rights, preserving accurate representations of source and affiliation, securing orderly corporate winding up, and giving effect to final judgments. The record also establishes that portions of the technology have potential defense and strategic applications, making controlled dissemination especially important. A specific injunction defining ownership, possession, permitted use, and compliance obligations serves those interests.

## B. Declaratory Relief

The requested declarations establish the ownership, commercialization, dissolution, and winding-up rights that govern the restorative and prohibitory relief that follows.

### 1. Ownership, Inventorship, and Commercialization Rights

#### a. Rapport Is the Sole Inventor and Owner of the Artifact and Vacuustat

The Complaint pleads that Rapport is the sole inventor and owner of the Artifact and Vacuustat and retains the associated intellectual-property rights. Defendant's default establishes the well-pleaded ownership and inventorship allegations. The supporting record independently identifies Rapport as the inventor, documents the Vacuustat patent, documents Rapport's Artifact research and prototype development, and contains Defendant's own acknowledgments of Rapport's inventorship. (Compl. ¶¶ 24–39, 67–75, 318.)

Plaintiffs request a declaration that, as between Rapport and Defendant and their respective controlled entities, Rapport is the sole inventor and owner of the Artifact and Vacuustat technologies and the associated patents and patent rights, trade secrets, confidential technical information, technical analyses, experimental data, code, CAD, drawings, research records, know-how, and Rapport-created derivative technical work.

Plaintiffs request that the declaration further establish Rapport's exclusive authority, as owner, to determine the future licensing, disclosure, development, commercialization, and disposition of those rights.

### b. Rapport's Ownership Remained Vested Through Defendant's Outside Submissions and Ventures

Defendant used the technologies in RFI submissions, grant-related materials, investor presentations, investment memoranda, pitch decks, and commercialization efforts through Black Lattice, Phoenix Dynamics, and related ventures. Those submissions created commercial claims and opportunities for the entities Defendant controlled; they transferred zero ownership rights from Rapport. (Compl. ¶¶ 104–105, 114 et seq., 211, 217–219; Ex. E1 — Enterprise Structure.)

Plaintiffs therefore request a declaration that Defendant's government submissions, investor solicitations, pitch materials, corporate formations, proprietary notices, exclusivity statements, and related commercialization activity left Rapport's ownership and inventorship rights fully vested in Rapport and created zero license, assignment, waiver, estoppel, shop right, or equitable ownership interest in Defendant, Phoenix Dynamics, BL Machines LLC d/b/a Black Lattice, or any successor or affiliated entity.

### c. Rapport May Continue Practicing and Commercializing His Technologies

Count XXIII expressly requests a declaration concerning Rapport's continued practice and commercialization of his own inventions. (Compl. ¶ 376(7).) Plaintiffs request a declaration that Rapport may research, develop, practice, license, disclose, manufacture, market, sell, and commercialize the Artifact and Vacuustat in the exercise of his ownership rights; that his continued practice and commercialization do not infringe any intellectual-property rights claimed by Defendant or Defendant-controlled entities; and that such claims create zero restriction on those activities.

This declaration has immediate commercial value. It gives prospective investors, licensees, purchasers, government agencies, research partners, and successor ventures a judicially established

chain of authority from the inventor and owner, as well as an express judicial acknowledgment of Rapport's title to both inventions.

### 2. Radian's Dissolution and Winding-Up Authority

#### a. Radian's April 2025 Dissolution Is Valid and Effective

The Complaint states that Rapport lawfully dissolved Radian Industries Inc. in April 2025 and seeks a declaration confirming the dissolution's continuing validity and effect. (Compl. ¶ 376(3).) The dissolution record documents the Board action and the filing with the Wyoming Secretary of State. Rapport's April 29, 2025 notice contemporaneously informed Defendant that the Board had approved dissolution and that the necessary state filing had been submitted.

Plaintiffs request a declaration that Radian's April 2025 dissolution is valid and effective and that Radian continues solely to the extent authorized by governing law for winding up, prosecuting and defending claims, disposing of assets, and completing related post-dissolution affairs.

#### b. Rapport Holds the Authority to Wind Up Radian

The Complaint identifies Rapport as Radian's authorized representative, former Chairman, majority owner, and controller of two of the Company's three Board seats, and Count XXIII requests recognition of his authority to obtain corporate records and credentials necessary for winding up. (Compl. ¶¶ 2–4, 376(6).)

Plaintiffs request a declaration that Rapport possesses the authority to act for Radian in its winding up and in this litigation, including authority to collect and control corporate records, recover corporate accounts and credentials, administer remaining assets, communicate with service providers and counterparties, maintain or dispose of corporate intellectual and digital property, and take the steps reasonably necessary to complete the winding-up process.

#### c. Rapport's Winding-Up Authority Governs Radian's Post-Dissolution Affairs

Count XXIII requests a declaration defining post-dissolution corporate authority. (Compl. ¶ 376(3).) Plaintiffs request a declaration that Rapport is Radian's authorized winding-up representative and holds the corporate authority to administer Radian's remaining property, accounts, records,

credentials, technology rights, and winding-up affairs. Acts purporting to exercise Radian authority after dissolution derive legal effect from that authorized winding-up authority.

This declaration gives banks, registrars, cloud providers, government agencies, investors, and other third parties a clear judicial basis for recognizing Rapport's instructions concerning Radian's remaining property and accounts.

### C. Mandatory Restorative Relief

The declarations in Section VIII(B) establish who is entitled to control the property and rights at issue. The mandatory relief in Section VIII(C) implements those declarations by restoring Radian's infrastructure, returning Plaintiffs' materials, identifying the locations and recipients of retained copies, completing remediation, and creating a verifiable compliance record.

#### 1. Restoration of Radian's Corporate Infrastructure

Defendant's post-dissolution control extended beyond technical files. The Complaint and supporting exhibits establish lockouts and continuing control over corporate communications, digital systems, records, and the Radian website. Restoration of those systems is a concrete affirmative remedy that places the dissolved corporation's remaining property under the authority responsible for winding it up. (Compl. ¶¶ 157–161, 209–211, 315–316.)

Plaintiffs request restoration to Radian through Rapport of the Company's email and cloud systems, domain and web infrastructure, banking, payment, tax, accounting, and corporate-record systems, authentication and recovery mechanisms, and any other accounts, repositories, devices, services, or credentials through which Defendant retains control over Radian property. Appendix F specifies the operative transfer, verification, and provider-side implementation requirements, including execution of instruments necessary to complete each transfer.

#### 2. Transfer of `radianindustries.com`

The ACPA expressly authorizes transfer, cancellation, or forfeiture of a domain used in violation of § 1125(d). 15 U.S.C. § 1125(d)(1)(C). Plaintiffs request an order transferring `radianindustries.com` to Radian through Rapport as its authorized representative and directing

implementation through the current registrar and registry, together with transfer of DNS control, hosting control, and associated administrative credentials. Plaintiffs request that the judgment authorize Rapport to present the transfer order directly to the registrar and registry and request implementation from those providers. If Namecheap, Inc. remains the registrar or relevant account provider at the time of judgment, Plaintiffs request that the same authorization extend expressly to Namecheap. Rule 70 supplies substitute authority for any provider instrument or specific act otherwise requiring Defendant's execution. Transfer preserves the corporate domain for orderly winding up, corrective public information, and protection of the goodwill associated with Radian's name.

### 3. Covered Materials

For purposes of the return, inventory, disclosure, deletion, remediation, and certification requirements in Section VIII(C), Plaintiffs request that "Covered Materials" include every technical and nontechnical work product, file, record, communication, dataset, calculation, technical note, research record, source-code file, CAD or design file, image, video, experimental record, business plan, commercialization plan, financial model, proposal, white paper, RFI, pitch deck, investor material, government submission, credential record, and other material created by Rapport or Radian and obtained by Defendant through the parties' relationship, together with every copy, excerpt, summary, screenshot, export, archive, translation, derivative document, or other material containing, describing, reproducing, or materially incorporating that work product.

### 4. Delivery of the Complete Technical and Corporate Archive

The record establishes Defendant's possession of a backup of the Radian Drive and his retention of Rapport's Private-folder materials. Those materials include information central to the Artifact and Vacuustat and to Radian's corporate affairs. The Complaint specifically requests return of technical documentation, CAD files, footage, encryption keys, grant proposals, and communications relating to Rapport's inventions. (Prayer for Relief ¶ 6.)

Plaintiffs request an order requiring Defendant to deliver to Rapport a complete, readable copy of all Covered Materials within Defendant's possession, custody, or control, preserving original file

names, directory structure, metadata, version information, and available audit information where reasonably accessible.

### 5. Inventory of Devices, Accounts, and Repositories

A deletion order can be verified only against a complete inventory of the places in which Defendant stored, synchronized, exported, backed up, transmitted, or accessed the Covered Materials. Plaintiffs therefore request a sworn inventory identifying every physical device, virtual device, account, repository, storage service, collaboration system, email account, source-control system, backup system, and Defendant-controlled entity through which Covered Materials were possessed, stored, synchronized, backed up, attached, transmitted, or made accessible at any time from Defendant's first access through the date of certification.

For each device or account, Plaintiffs request that the inventory provide information sufficient to identify the system, custodian, and controlling entity; establish when and where Covered Materials were present or accessible; identify relevant storage, synchronization, backup, export, migration, and sharing pathways; identify persons granted access; state current status and disposition; and identify known destinations to which the materials were copied, transmitted, synchronized, archived, or backed up. Plaintiffs request that the inventory cover personal accounts and accounts maintained through Phoenix Dynamics, Black Lattice, Mach Capital, Advanced Human Engineering/Chroma, or any other Defendant-controlled entity, including hosted-compute and AI services used with Covered Materials, and that relevant audit and account records be preserved to verify the inventory and remediation. Appendix F sets out the complete operative inventory fields and preservation requirements.

### 6. Recipient and Downstream-Disclosure Schedule

The Complaint expressly requests identification of all persons to whom confidential or proprietary materials were disclosed, transferred, or made accessible. (Prayer for Relief ¶ 7.) The established record includes known disclosures and commercialization activity through outside entities, while Defendant controls the records capable of identifying the complete downstream chain.

Plaintiffs request that the schedule expressly address the Polish production facility identified in Defendant's September 8, 2026 email and its owners, operators, engineers, manufacturers, contractors, and other participants. Plaintiffs request that Defendant identify each such person or entity and specify any Covered Materials or their substance furnished or made accessible in connection with the reported production and sales activity, together with any resulting copies, derivative technical materials, and downstream disclosures. (Ex. F9 — Vacuustat Email, p. 2.)

Plaintiffs request a sworn disclosure schedule identifying every natural person, company, investor, fund, contractor, employee, recruit, engineer, consultant, advisor, government office, agency, military organization, research organization, university, foreign entity, commercial counterparty, or other person or entity that at any time received, viewed, downloaded, was granted access to, was shown, or was orally informed of the substance of any Covered Material, whether directly from Defendant or through an entity, employee, contractor, collaborator, or intermediary acting with him. For each recipient or access event, Plaintiffs request that the schedule identify information sufficient to establish the recipient, timing, source and method of disclosure, material or subject matter disclosed, purpose and associated transaction, scope and duration of access, applicable restrictions, known copies or derivative work, downstream recipients, current disposition, and searches undertaken to ensure completeness. Appendix F states the complete operative disclosure fields.

Plaintiffs request that the injunction further require Defendant to provide each identified recipient with a Court-approved written notice of the judgment, request return and deletion of the Covered Materials, request identification of downstream recipients and derivative copies, preserve every response, and provide the notices, delivery records, and responses to Plaintiffs. Persons acting in active concert or participation with Defendant and receiving actual notice remain subject to Rule 65(d)(2).

### 7. Return, Deletion, and Destruction of Remaining Copies

After delivery and inventory, Plaintiffs request that the injunction require permanent deletion or destruction of every additional copy within Defendant's possession, custody, or control, including local files, external drives, cloud repositories, email attachments, message attachments, exports,

backups, snapshots, screenshots, caches, synced folders, version-history copies, archival files, virtual machines, source-control repositories, collaboration platforms, and copies stored through Defendant-controlled entities.

Plaintiffs request that the same requirement extend to derivative documents containing, reproducing, summarizing, encoding, or materially incorporating Plaintiffs' confidential technical information. A derivative presentation or design can preserve the commercial substance of a trade secret after the source file changes form. Plaintiffs therefore request that the injunction address the information and its reproductions across formats.

### 8. Remediation by Persons Acting in Concert With Defendant

Prayer for Relief ¶ 8 expressly requests deletion and destruction obligations extending to Defendant and third parties acting in concert with him, including Phoenix Dynamics LLC, BL Machines LLC, affiliated agents, and recipients participating in the use of Rapport's proprietary materials. Rule 65(d)(2) binds persons who receive actual notice and act in active concert or participation with Defendant or his agents.

Plaintiffs therefore request that every person or entity within Rule 65(d)(2) that possesses Covered Materials be ordered, upon actual notice of the judgment, to return or deliver the covered material as directed by the Court, permanently delete or destroy every remaining copy, backup, and derivative use within that person's possession, custody, or control, preserve records sufficient to verify the remediation, and provide a certification under penalty of perjury identifying the repositories searched and the actions completed.

Plaintiffs request that the recipient-remediation process in Section VIII(C)(6) apply to every additional recipient identified through Defendant's sworn disclosure schedule. Plaintiffs further request that the Court retain jurisdiction to issue recipient-specific implementing orders upon notice, compel production or preservation where authorized, and use post-judgment discovery to determine possession, dissemination, and compliance.

### 9. Sworn Certification and Continuing Supplementation

Verification is essential because the relevant materials are digital, readily duplicable, and capable of persistence across devices, providers, backups, exports, and derivative repositories. Plaintiffs request a sworn certification identifying the searches performed, locations searched, materials returned or deleted, recipients found and notices sent, infrastructure transferred, and every unresolved repository, recipient, provider, or transfer requiring additional Court action. Plaintiffs request that the certification confirm a reasonable and comprehensive search and complete disclosure of responsive locations and recipients, subject to continuing supplementation for later discoveries. Appendix F specifies the operative certification and missing-record requirements.

The Lanham Act independently authorizes an injunction directing a defendant to file and serve a written report under oath describing in detail the manner and form of compliance. 15 U.S.C. § 1116(a). Plaintiffs request such a report covering the Lanham and ACPA components and a parallel sworn certification covering the trade-secret, CFAA, corporate-restoration, inventory, recipient-identification, and deletion provisions.

## D. Permanent Prohibitory Injunction

Plaintiffs request a final injunction stating its terms with the specificity required by Federal Rule of Civil Procedure 65(d) and containing provisions governing the following defined conduct.

### 1. Protection Against Future Use and Exploitation

Plaintiffs request an injunction enjoining Defendant from possessing, using, reproducing, licensing, selling, marketing, commercializing, submitting, transmitting, disclosing, developing from, or assisting another person to exploit the Artifact, the Vacuustat, or Plaintiffs' confidential technical materials except pursuant to Rapport's express written authorization or further order of the Court.

Plaintiffs request that this provision cover the underlying trade secrets and confidential information across renamed projects, reformatted documents, derivative presentations, implementations, and successor entities. Its focus is the protected information and technology rights adjudicated in this action.

### 2. Protection Against Diversion of Commercial Opportunities

Plaintiffs request that the injunction prohibit Defendant from using the Artifact, Vacuustat, Covered Materials, or derivative information to solicit, route, divert, accept, or pursue investment, financing, grants, government contracts, procurement opportunities, licenses, acquisitions, strategic partnerships, commercial agreements, recruiting relationships, engineering work, or other economic opportunities for Defendant or another entity. Plaintiffs request that the same restriction cover the use of Plaintiffs' technology or work product as a recruiting credential, technical differentiator, proprietary capability, investment thesis, government-procurement capability, or basis for forming or capitalizing a competing program.

### 3. Accurate Inventorship, Ownership, and Affiliation Representations

Plaintiffs request an injunction enjoining Defendant from representing that he or an entity he controls invented, owns, exclusively controls, licenses, or possesses commercialization authority over the Artifact or Vacuustat. Plaintiffs further request that investor materials, government submissions, recruiting materials, websites, pitch decks, technical memoranda, social-media statements used for commercial promotion, and direct communications with prospective counterparties accurately reflect the Court's ownership declaration.

Plaintiffs request that the injunction likewise bar representations that Rapport's exercise of his own ownership and commercialization rights infringes rights belonging to Defendant or Defendant-controlled entities.

### 4. Corrective Notice

The Lanham Act count expressly requests corrective advertising. (Compl. ¶ 224.) Plaintiffs request that the corrective remedy be directed to the audiences that actually received Defendant's false or misleading commercial representations concerning inventorship, ownership, source, sponsorship, affiliation, exclusivity, or authority.

Plaintiffs request a Court-approved corrective notice stating the operative findings of the final judgment, including Rapport's inventorship and ownership, Radian's dissolved status, Rapport's

winding-up authority, and Rapport's exclusive winding-up authority to claim ownership, licensing power, or continuing Radian affiliation. Plaintiffs request that Defendant deliver that notice to every investor, government office, agency, contractor, commercial counterparty, engineer, recruit, partner, prospective acquirer, licensee, or other person identified through the disclosure schedule as having received a materially false commercial representation concerning those subjects, and preserve and produce proof of delivery and every response.

### 5. Radian's Name, Domain, Infrastructure, and Corporate Authority

Following transfer of Radian's infrastructure, Plaintiffs request an injunction enjoining Defendant from using Radian's name, domain, email addresses, branding, accounts, credentials, corporate authority, or reputation to conduct business, solicit financing, communicate with government agencies, enter transactions, or imply a continuing corporate role.

Plaintiffs request that public and private representations concerning Radian accurately state its dissolved status and Rapport's authority over the winding up. This provision directly addresses the source, sponsorship, affiliation, and corporate-authority confusion established by the Lanham Act claims.

### 6. Application to Persons Acting in Concert With Defendant

The Complaint specifically identifies Phoenix Dynamics LLC and BL Machines LLC d/b/a Black Lattice as vehicles through which Defendant used Plaintiffs' technology. Defendant also acknowledged functional overlap between Phoenix Dynamics and Black Lattice. (Compl. ¶¶ 104–105, 114 et seq., 211, 217–219; Ex. C2 — Screenshots; Ex. C6 — Signal Export [SEALED]; Ex. E1 — Enterprise Structure.) Plaintiffs request that the injunction apply to Defendant personally and, consistent with Rule 65(d)(2), to his officers, agents, servants, employees, attorneys, and persons acting in active concert or participation with him who receive actual notice.

Plaintiffs request an injunction enjoining Defendant from accomplishing through Phoenix Dynamics, Black Lattice, Mach Capital, a successor entity, an affiliate, a contractor, a recruit, or another

intermediary any use, disclosure, representation, or commercialization that the injunction restricts when undertaken by Defendant directly.

### E. Additional Findings Requested in the Final Judgment

In addition to the declarations and injunction, Plaintiffs request the findings pleaded in the Prayer for Relief concerning the character of Defendant's conduct, his use of affiliated entities, and the commercial value and resulting economic injury established by the record.

#### 1. Findings Under 11 U.S.C. § 523

Prayer for Relief ¶ 10 requests express findings concerning the character and state of mind of Defendant's misconduct. Those findings follow from the causes of action established by default and from the documentary record supporting the damages determination.

Plaintiffs request a judicial finding that Defendant's misappropriation of trade secrets, conversion of corporate property, breaches of fiduciary duty, fraudulent self-dealing, and intentional interference with Rapport's business relationships were willful and malicious within the meaning of 11 U.S.C. § 523(a)(6).

Plaintiffs further request a judicial finding that the fiduciary misconduct, appropriation of corporate property, diversion of funds and opportunities, retention of Plaintiffs' property, and related acts established in this action involved fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of 11 U.S.C. § 523(a)(4). The record establishes deliberate self-dealing and conscious appropriation of property and opportunities Defendant was obligated to administer for Radian and Plaintiffs.

Plaintiffs also request a judicial finding that Defendant's fraudulent inducement, fraudulent representations, concealed self-dealing, ownership and authority representations, and related acquisition or use of Plaintiffs' property and services involved false pretenses, false representations, or actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

These findings identify the character of the adjudicated conduct and resulting obligations for any later proceeding involving 11 U.S.C. § 523. Section 523(c) and Federal Rule of Bankruptcy

Procedure 4007 govern the formal dischargeability determination for debts within § 523(a)(2), (4), and (6). Plaintiffs request that the final judgment preserve each finding expressly and identify, where practicable, the monetary and equitable obligations arising from the corresponding conduct.

### 2. Findings Concerning Defendant's Use of Affiliated Entities

Prayer for Relief ¶ 11 requests a finding that Defendant acted through Phoenix Dynamics LLC, BL Machines LLC, Advanced Human Engineering LLC, and other affiliated entities as alter-ego instrumentalities used to perpetuate fraud, misappropriate corporate assets, evade contractual obligations, and avoid personal liability.

The record supports findings concerning Defendant's own use and control of those entities. Plaintiffs request a judicial finding that Defendant used Phoenix Dynamics LLC, BL Machines LLC d/b/a Black Lattice, Advanced Human Engineering LLC, Mach Capital, and other entities under his control as instrumentalities for the conduct adjudicated in this action, including solicitation of investment and government opportunities, presentation and commercialization of Plaintiffs' technologies, routing of assets and opportunities, and continuation of the challenged conduct through nominally separate entities.

Plaintiffs request that the judgment apply all relief against Defendant to conduct he undertakes through entities under his ownership or control and bind his officers, agents, servants, employees, attorneys, and any other persons acting in active concert or participation with him to the extent provided by Rule 65(d)(2). Plaintiffs further request preservation of the alter-ego, successor-liability, fraudulent-transfer, and related enforcement remedies pleaded in Prayer ¶ 11 and Complaint ¶ 380 for supplemental proceedings involving affiliated entities and traceable assets.

### 3. Findings Concerning Commercial Value and Economic Injury

Prayer for Relief ¶ 12 requests an express finding that Rapport's proprietary technologies, business plans, technical documents, and confidential materials held substantial commercial value and that Defendant's misconduct caused direct loss of economic opportunity, market position, and valuation potential.

The compensatory record establishes those facts quantitatively and qualitatively. The Artifact and Vacuustat supported government submissions, investment solicitations, commercialization plans, licensing economics, development programs, and enterprise-value projections. Defendant's own investor and government materials treated the technologies as commercially and strategically valuable assets. His appropriation, dissemination, diversion, and ownership representations transferred opportunities and impaired Rapport's ability to present exclusive and uncontested rights to investors, licensees, purchasers, and government counterparties.

Plaintiffs therefore request the finding pleaded in Prayer ¶ 12: Rapport's proprietary technologies, business plans, technical documents, and confidential materials possessed substantial commercial value, and Defendant's misappropriation, sabotage, self-dealing, and related misconduct caused direct loss of economic opportunity, market position, and valuation potential.

## F. Implementation, Continuing Jurisdiction, and Enforcement

Plaintiffs request that the final judgment pair each substantive command with the implementation and verification mechanisms necessary to complete restoration, confirm compliance, and address later-identified repositories, recipients, providers, transfers, or assets.

### 1. Provider-Side Implementation and Rule 70

Plaintiffs request that the judgment create a provider-side implementation path in addition to Defendant's transfer duties and expressly identify Rapport as Radian's authorized winding-up representative and the person entitled to receive administrative control of the covered Radian accounts and property. Plaintiffs request authorization to present a certified copy of the judgment directly to Google LLC and every identified email, cloud-storage, file-hosting, website-hosting, domain-registration, DNS, financial, payment, account-recovery, or other service provider holding or controlling Radian infrastructure and to request restoration or transfer consistent with the judgment.

Federal Rule of Civil Procedure 70(a) supplies a mechanism for completing any specific act or instrument required from Defendant. Once the judgment's transfer deadline expires with a transfer incomplete, Plaintiffs may request appointment of a person authorized to execute the provider-spe-

cific transfer, account-recovery, administrator-change, consent, authorization, identity-verification, or credential-reset instrument in Defendant's place. The completed act carries the same legal effect as Defendant's own performance. Fed. R. Civ. P. 70(a). Plaintiffs request that the Court retain jurisdiction to issue provider-specific implementing orders upon notice, authorize delivery of certified judgments and Rule 70 instruments to the relevant provider, and use the procedures available under Rules 70 and 71 and other applicable authority to effectuate the ordered restoration.

Where enforcement requires execution of a writ, process, or implementing order rather than substitute execution of an instrument, the United States Marshals Service may execute the Court's lawful writs, process, and orders as provided by 28 U.S.C. § 566(c). Plaintiffs request that any such process necessary to enforce a specific turnover, possession, or restoration command remain available by further order of the Court.

### 2. Post-Judgment Discovery Under Rule 69

Federal Rule of Civil Procedure 69(a)(2) separately authorizes post-judgment discovery from any person in aid of judgment or execution. Plaintiffs request authority to obtain directly from relevant providers the account identifiers, administrator histories, access logs, sharing logs, repository information, recovery information, transfer records, billing records identifying account ownership, and other provider-held records necessary to identify, restore, and verify Radian property and Covered Materials.

### 3. Specificity and Verifiability Under Rule 65(d)

Federal Rule of Civil Procedure 65(d) requires an injunction to state its terms specifically and describe in reasonable detail the acts restrained or required. Plaintiffs therefore request that the proposed judgment accompanying this memorandum identify the covered technologies, material categories, corporate systems, domain, required transfers, required disclosure information, deletion obligations, certification requirements, and restricted representations directly in the order.

A specific order creates an operational enforcement record in which each required act has a defined object, deadline, and verification method. Plaintiffs request that the order require preservation

of records necessary to demonstrate compliance, identify later-discovered repositories and recipients, support provider-side restoration, and complete the complementary accounting and enforcement process.

### 4. Continuing Jurisdiction Over Compliance and Remediation

Prayer for Relief ¶ 16 requests continuing jurisdiction to enforce the judgment, monitor compliance with injunctive relief, supervise required transfers, certifications, and deletions, and resolve compliance disputes. Plaintiffs request retention of jurisdiction for each of those purposes, including provider-side implementation, recipient remediation, supplemental certifications, accounting, disgorgement, constructive-trust administration, post-judgment discovery, and later-identified repositories or assets.

Plaintiffs further request retention of jurisdiction to enforce the injunction, resolve compliance disputes, appoint a person under Rule 70 to complete specific acts remaining unperformed after the judgment deadline, compel supplemental certifications, authorize post-judgment discovery in aid of enforcement, address later-identified repositories or recipients, and enter provider-specific or other implementing orders consistent with the declarations and permanent injunction.

### 5. Finality and Supplemental Enforcement Remedies

Prayer for Relief ¶ 17 requests final-judgment treatment under Federal Rule of Civil Procedure 54(b). Plaintiffs request entry of final judgment against Defendant on all claims adjudicated against him. If any claim or issue remains pending when judgment is entered, Plaintiffs request an express determination under Rule 54(b) that there is no just reason for delay and entry of final judgment as to the claims and relief fully adjudicated against Defendant.

Complaint ¶ 380 expressly preserves fraudulent-transfer, unjust-enrichment, successor-liability, and other post-judgment remedies necessary to enforce the judgment, trace diverted assets, and unwind transfers, conveyances, or encumbrances undertaken to evade execution. Plaintiffs request that the final judgment preserve those enforcement rights and the Court's authority to adjudicate supplemental proceedings brought within the existing action or through other authorized process.

The proposed operative declarations, restorative commands, injunction, findings, provider-side implementation, and enforcement provisions are collected in Appendix F. Constructive trust, disgorgement, sworn financial and ownership disclosures, asset tracing, and continuing accounting are addressed separately in Section VIII(G).

### G. Accounting, Disgorgement, and Enforcement

The Complaint expressly seeks a constructive trust over traceable proceeds and assets (Prayer ¶ 13); disgorgement of investment proceeds, equity appreciation, capital infusions, and other benefits derived from Plaintiffs' property and opportunities (Prayer ¶ 14); four categories of sworn financial disclosure (Prayer ¶ 15); and continuing enforcement jurisdiction (Prayer ¶ 16). Complaint ¶ 380 also preserves fraudulent-transfer, successor-liability, tracing, and other post-judgment remedies. Defendant controlled the entities, transactions, solicitations, accounts, and records through which the pleaded misconduct occurred. An accounting is therefore necessary to quantify gains not presently ascertainable from Plaintiffs' records and to identify property available for equitable relief and enforcement. Federal Rule of Civil Procedure 55(b)(2)(A) expressly authorizes an accounting when needed to enter or effectuate default judgment. The specific disclosures, production obligations, deadlines, and implementing relief requested are set out in Appendix F.

#### 1. Trade-Secret Unjust Enrichment

The DTSA authorizes recovery of unjust enrichment caused by misappropriation to the extent not included in the plaintiff's actual loss. 18 U.S.C. § 1836(b)(3)(B)(i)(II). Ohio Rev. Code § 1333.63(A) provides the same complementary remedy. The accounting will determine any causally attributable financing benefits, equity value, contractual consideration, development value, avoided engineering expense, commercialization advantage, and other economic benefits not already compensated by the requested actual-loss award. Such gains are distinct from the injury-side valuations presented in the preceding sections; recovery must exclude duplication for the same economic injury or benefit.

### 2. Lanham Act Profits

Under 15 U.S.C. § 1117(a), Plaintiffs must establish Defendant's sales attributable to the established Lanham Act violations, while Defendant bears the burden of establishing costs, deductions, and apportionment. *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 471–72 (6th Cir. 2022). An accounting of connected commercial receipts and supporting records permits application of that allocation. Investment funding, grants, and equity transactions must also be disclosed for the independent trade-secret, contractual, unjust-enrichment, and tracing remedies, without presupposing that every such receipt constitutes Lanham Act profits.

### 3. Fiduciary and Contractual Accounting

Defendant's default establishes the well-pleaded fiduciary breaches and contractual misconduct, and an equitable accounting is appropriate where a fiduciary relationship and the disposition of property or benefits require it. *See Plainsboro Partners III Ltd. Partnership v. Bellows & Associates, Inc.*, No. 25AP-672, slip op. at 9–10 (Ohio Ct. App. July 21, 2026). Count XIII also requests compensatory damages, restitution, and disgorgement for breaches of the Founders Agreement. (Compl. ¶¶ 299–305.) The accounting must reach interference with Company relationships under § 13(a), covered competitive positions and investments under § 13(b), and records, Confidential Information, work product, and inventions governed by §§ 13(c)–(e). (Compl. Ex. A1 — Corporate Records at 44–47, ECF No. 2-1.) The § 13(b) inquiry is independently contractual; it is not limited to transactions in which Defendant also used Plaintiffs' technology. Particularly relevant are the Black Lattice Missile Defense Agency activity and the Bohr Systems investment addressed in Section V(K). Appendix F requires schedules sufficient to determine contractual expectation damages, restitution, disgorgement, and other relief under Count XIII.

### 4. Constructive Trusts and Tracing

Ohio recognizes a constructive trust over wrongfully obtained, specifically identifiable property and its traceable substitutes, subject to the clear-and-convincing-evidence requirement. *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 280–82 (2006). The accounting is needed to follow

proceeds through accounts, affiliated entities, transfers, securities, equity interests, cryptocurrency, and replacement assets to their present form. The requested order reserves imposition of a constructive trust on particular assets for the required evidentiary showing; it also preserves the appreciation embodied in any asset properly traced. *Id.* at 282.

### 5. Execution and Supplemental Enforcement

Rule 69(a)(1) incorporates applicable Ohio execution procedures, and Rule 69(a)(2) permits discovery from any person in aid of the judgment or execution. Ohio Rev. Code §§ 2333.01 and 2333.09 provide supplementary means of reaching and examining equitable interests, financial assets, contractual rights, and other property of the judgment debtor. Ohio Rev. Code §§ 1336.07–.08 provide remedies for qualifying fraudulent transfers. Plaintiffs seek authority to verify the accounting through third-party records, trace transfers and later-maturing rights, and pursue turnover, garnishment, attachment, creditor's-bill, avoidance, or other authorized procedures, with the notice and safeguards applicable to affected nonparties.

The accounting required by Appendix F includes the entity and transaction maps, Founders Agreement schedules, financing and government submissions, commercial transactions (including the reported Polish Vacuustat production and sales), benefits and their disposition, and the minimum ownership, financing, account, and transfer disclosures pleaded in Prayer ¶ 15. Appendix F also specifies records-based verification, a continuing fourteen-day duty to report later-maturing benefits, and retained jurisdiction over accounting compliance, appropriate supplemental monetary determinations, constructive trusts on identified assets, and judgment enforcement. Each additional recovery remains subject to its governing legal requirements and must be reconciled against compensation already awarded for the same injury or benefit. This subsection establishes the legal grounds for those remedies; the proposed judgment in Appendix F supplies their operative terms without narrowing the relief requested in the Complaint.

## IX. Summary of Damages and Conclusion

The record supports a presently quantified monetary judgment of **$615,255,937.60**, together with additional fees and costs incurred after the present accounting cutoff, prejudgment and post-judgment interest, supplemental monetary relief established through the accounting, and the declaratory, injunctive, constructive-trust, tracing, and enforcement remedies described above.

The monetary calculation proceeds in three steps. First, the compensatory record establishes $155,946,437.94 in economic injury; this is the compensatory base, not the requested final judgment. Second, the statutory enhancements explained in Section VI yield $615,090,121.82 in monetary damages. Third, Plaintiffs request one interim lodestar fee award of $163,125.00, plus $655.78 in counsel's separately billed expenses and $2,035.00 in other documented expenditures, for $165,815.78 in fees and expenditures. The interim lodestar is subject to verification of reasonable hours and rate; it replaces, rather than supplements, the $70,012.50 billed-fee amount.

### A. Summary of Compensatory Damages

The presently quantified compensatory damages are:

| **Compensatory Category** | **Amount** |
|---|---:|
| Diverted corporate capital | $28,870.52 |
| R&D expenses and core-development labor | $78,759.42 |
| 2025 compensation shortfall | $38,000.00 |
| Lost contract opportunity | $1,000,000.00 |
| Lost near-term investment opportunity | $500,000.00 |
| Diverted Khosla Ventures opportunity | $5,000,000.00 |
| Destroyed Radian enterprise value | $2,500,000.00 |
| Artifact impairment | $25,000,000.00 |
| Vacuustat delay and lost royalties | $121,800,808.00 |
| **Total Compensatory Damages** | **$155,946,437.94** |

The Artifact and Vacuustat awards together comprise a $146,800,808 trade-secret damages base. The seven remaining compensatory categories total $9,145,629.94.

Count XIII supplies an additional contractual basis for applicable injuries within this compensatory schedule and preserves supplemental contractual relief for distinct expectation losses and

restitutionary benefits established through the accounting requested in Section VIII(G). The quantified subtotal carries the presently proven economic injuries once while the accounting determines additional contract-specific value from Defendant's covered participation, interference with Company business relations, retained benefits, and related transactions.

### B. Summary of Statutory Enhancement and Present Monetary Judgment

The aggregate calculation applies the largest presently identified trade-secret enhancement to the $146,800,808 Artifact-and-Vacuustat component and applies the threefold federal RICO measure to the $9,145,629.94 residual compensatory component, with the Ohio Corrupt Activities Act preserved as a parallel alternative threefold basis. The separately pleaded domain violation adds the elected $100,000 ACPA statutory award, and the independently actionable Ohio tort claims add the $350,000 punitive award.

| **Judgment Component** | **Amount** | **Calculation** |
|---|---:|---|
| Trade-secret compensatory damages | $146,800,808.00 | Artifact + Vacuustat |
| OUTSA exemplary damages | $440,402,424.00 | 3 × trade-secret base |
| **Trade-secret recovery** | **$587,203,232.00** | Base + exemplary |
| Residual compensatory damages | $9,145,629.94 | Seven other categories |
| RICO/OCAA enhancement on residual damages | $18,291,259.88 | Additional 2 × residual base |
| **RICO/OCAA recovery on residual injuries** | **$27,436,889.82** | 3 × $9,145,629.94 |
| ACPA statutory damages | $100,000.00 | `radianindustries.com` |
| Ohio tort punitive damages | $350,000.00 | § 2315.21 maximum |
| **Monetary damages after statutory enhancement** | **$615,090,121.82** | Current aggregate |
| Attorney's fees — requested interim lodestar | $163,125.00 | 217.5 hours × $750/hour; subject to verification |
| Counsel's separately billed expenses | $655.78 | Not attorney fees |
| Other documented litigation expenditures | $2,035.00 | Investigator, publication, filing |
| **Presently Quantified Monetary Judgment** | **$615,255,937.60** | Before interest and supplemental relief |

The bridge from the compensatory subtotal to the enhanced-damages subtotal is explicit: $155,946,437.94 in original economic injury plus $440,402,424.00 in additional OUTSA exemplary damages, plus $18,291,259.88 in the additional RICO/OCAA enhancement on residual injuries, plus $100,000.00 in ACPA statutory damages and $350,000.00 in separate Ohio punitive damages equals $615,090,121.82. Thus the larger total reflects statutory enhancements, not an unaccounted-for increase in the underlying compensatory valuation. Each underlying injury appears only once. The requested interim lodestar and documented expenses are added only after those enhanced damages.

This calculation assigns each underlying economic injury once and then applies the statutory measure producing the governing recovery for that injury. The aggregate includes the separately elected ACPA award and the $350,000 punitive award on independently actionable Ohio tort claims. The DTSA exemplary remedy, full-base RICO trebling, Ohio Corrupt Activities Act trebling, Ohio civil-theft liquidated damages, and Lanham Act enhancement supply additional or alternative remedial bases as described in Section VI.

The $615,255,937.60 figure uses the requested interim lodestar of $163,125.00, calculated from 217.5 hours at $750 per hour; the fee request remains subject to counsel's time-record verification, completion of Exhibit F10, and the Court's assessment of reasonable hours and rate. This is a single fee award, not billed fees plus lodestar. The ledger separately identifies $70,012.50 in billed attorney fees and $655.78 in counsel expenses; it supports a billed-fee cross-check of $615,162,825.10 if the Court instead awards fees at billed rates. The separately documented $2,035.00 in non-counsel expenditures consists of $1,000 for an investigator, $630 for publication, and the $405 filing fee. All expense recovery is requested under applicable fee- and cost-shifting authority, with no duplicate allowance. Several forms of relief remain to be determined from records, rates, or assets identified after submission of this memorandum:

(a) additional attorney's fees and litigation expenditures incurred after the present accounting cutoff;

(b) any additional taxable costs not already included in the presently documented $2,035.00 of litigation expenditures;

(c) prejudgment interest on eligible components of the award;

(d) post-judgment interest under 28 U.S.C. § 1961;

(e) trade-secret unjust enrichment established through the accounting;

(f) Lanham Act profits established through the accounting;

(g) contractual expectation damages, restitution, and disgorgement attributable to Founders Agreement breaches established through the accounting;

(h) disgorgement of traceable investment proceeds, equity appreciation, capital infusions, and other economic benefits;

(i) constructive-trust relief over specifically traced assets and proceeds;

(j) supplemental monetary relief arising from later-discovered or later-maturing Covered Transactions.

### C. Summary of Equitable and Continuing Relief

The monetary judgment addresses the economic injury established in the present record. Plaintiffs additionally seek declarations confirming ownership and corporate authority; restoration and remediation of Radian property and Covered Materials; permanent restrictions against further unauthorized use, diversion, and false attribution; the findings requested under 11 U.S.C. § 523 and concerning affiliated entities and commercial value; a sworn accounting, disgorgement, constructive-trust and tracing relief; Rules 69 and 70 implementation; and continuing enforcement jurisdiction. The legal and factual basis for that relief is developed in Section VIII and Section VIII(G), the procedural and jurisdictional basis for final judgment is developed in Section II, and the proposed operative terms and findings are collected in Appendix F.

### D. Conclusion

Defendant's default establishes liability on the pleaded claims, and the evidentiary record provides an extensive independent basis for determining damages and equitable relief. The record includes Defendant's own admissions, corporate and banking records, agreements, government submissions, investor materials, contemporaneous communications, retained-file admissions, public

statements, technical records, and the evidence supporting the application-specific Artifact and Vacuustat valuations.

The resulting damages arise from identifiable economic events: diversion of corporate funds and opportunities, uncompensated development work, loss of contracting and financing opportunities, destruction of enterprise value, impairment and delayed commercialization of valuable proprietary technology, breaches of the contractual protections governing competition, Company relationships, confidential information, and Company materials, and continuing appropriation of Plaintiffs' commercial identity and technical work. The statutory remedies then assign enhanced consequences to the willful, malicious, fraudulent, and racketeering misconduct established by the admitted allegations and supporting evidence.

Plaintiffs therefore respectfully request entry of judgment in the presently quantified amount of **$615,255,937.60**, consisting of the monetary damages and statutory enhancements summarized above together with $163,125.00 in requested reasonable attorney's fees under the interim lodestar, $655.78 in counsel's separately billed expenses, and $2,035.00 in other documented expenditures, subject to verification and the Court's reasonableness determination, plus additional fees and costs incurred after the present accounting cutoff, prejudgment interest, post-judgment interest, and supplemental monetary relief established through the accounting. Plaintiffs further request the declaratory, injunctive, accounting, disgorgement, constructive-trust, tracing, implementation, and continuing-enforcement relief developed in Section VIII and Section VIII(G) and set forth in Appendix F, together with such additional relief as the Court deems just and proper.

Dated: November 2, 2026

Respectfully submitted,

*/s/Michael W. Vary*

Michael W. Vary
Ohio Reg. 33,789
Counsel for Plaintiffs
17710 Westview Drive
Bainbridge, Ohio 44023
vary.michael@gmail.com
216-496-3429

# X. APPENDICES

## A. Chronology of Contemporaneous Valuation Evidence

| Date | Document | Quotation |
|---|---|---|
| July 31, 2024 | *Advice for starting a company?* email — Rapport to Chapiro | "In terms of cost… you can buy an educational 'Michelson-Morley interferometer' kit for about $3k, and a commercial interferometer runs about $20k. I think for a satellite navigation system you might multiply the commercial price by a factor of 2-10x, so roughly $40-200k per device." |
| July 31, 2024 | *Advice for starting a company?* email — Rapport to Chapiro | "Let's say SpaceX is willing to pay $50k per device, and they need 1200, whereas another 250 devices might be sold for $100k each… that's $85 million in annual revenue. Say roughly half of that is overhead, the other half is free cash flow… that gives you a business worth maybe $700 million (and maybe a third of that without SpaceX as a customer)." |
| July 31, 2024 | *Advice for starting a company?* email — Rapport to Chapiro | "With patent protection you could charge essentially whatever the market will bear; the real value of the device is the R&D that goes into the design rather than the materials." |
| July 31, 2024 | *Advice for starting a company?* email — Rapport to Chapiro | "The US Navy has 71 submarines so that's not a huge market (maybe $10 million, but not an annually recurring revenue stream). The USAF has about 2,000 aircraft, on the other hand, so if autonomous navigation capability without a GPS is something they might want, there's a potential market…. 2,000 aircraft at $100k each is a $200 million market, so that would be worth pursuing." |
| Aug. 2, 2024 | *Advice for starting a company?* email — Rapport to Chapiro | "If the price could be brought down low enough (e.g. under $5k maybe), that may open up the market to sell them to car manufacturers." |
| Aug. 3, 2024 | *Advice for starting a company?* email — Chapiro to Rapport | "I had a passing familiarity with IMUs, but did not know about the laser ring gyro. I'm seeing reports that this is a $0.8-1.3b market, which makes sense as the higher end of the $16b overall PNT market." |
| Aug. 3, 2024 | *Advice for starting a company?* email — Chapiro to Rapport | "If we have the 'gyro,' we can vertically integrate in attack drones and cruise missiles, while selling externally to higher end applications (e.g. hypersonic missiles, large ISR UAVs, satellites, etc)." |
| Aug. 4, 2024 | *Advice for starting a company?* email — Chapiro to Rapport | "In addition to the laser ring gyro, I see that fiber optic gyros are a $1.1-1.6 billion market and hemispherical resonator gyroscopes are a $150m market." |
| Aug. 4, 2024 | *Advice for starting a company?* email — Chapiro to Rapport | "I was also able to find that Honeywell's flagship laser ring gyro based system for large commercial aircraft is priced at $300k. It looks like laser ring gyros are $10k+, so using 3 is $30k+ and some of those numbers are from a few years ago so I wouldn't be surprised if actual prices are closer to $50k+." |
| Apr. 4, 2025 | *Phoenix Dynamics Technology & Investment Memo* | "Capital Needed: With a $2.5m pre-seed round, we will be able to build and fly all three vehicles in about a year, and the headlines from all our record-breaking will enable a rather large seed round, in addition to the opportunity to garner domestic & foreign sales to be in a strong position for a 10x or larger seed round." |
| Apr. 4, 2025 | *Phoenix Dynamics Technology & Investment Memo* | "We have a proprietary laser gyro technology that is able to achieve 6-figure price performance, at low 5-figure costs, which no competitor will have." |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | Defendant referred to Rapport only as "my physicist co-founder," omitted Rapport's name and Radian's name, identified himself alone, and invited recipients to "get on an intro call." The solicitation was sent by mass BCC and was intended to seek a $50–100 million seed financing for Radian's combined technology program. |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | "My physicist co-founder and I have something we have been discussing since 2020 (last summer I decided to start funding it, and we have proven the key breakthrough on 1 of the 2 main systems)…." |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | "We will be the 'next Raytheon* AND AT&T.'" Defendant's solicitation described the combined technologies as enabling the missile-defense architecture and the Vacuustat platform as enabling a new upper-atmosphere telecommunications domain. |

| Date | Document | Quotation |
|---|---|---|
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | Defendant represented that the contemplated telecommunications capability "will make us easily 10x larger than SpaceX." |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | "I think we can hit $100b private val in 10 years, $1t public val in 15 years, if venture backed early on." |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | "We were recently one of the few companies selected by the Missile Defense Agency for Golden Dome Industry Day one-on-one meetings." |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | "we are interested in connecting with investors who can support and participate in a $50-100m seed round (even if we start with only part of that, pending milestones)." |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | "Without significant capital to rapidly vertically integrate our capabilities into a more complete offering, DoD funding alone is more likely to position us toward becoming a subcontractor to the big primes," which Defendant stated would make the larger commercial outcome take approximately "5 years longer" to reach. |
| Pre-Apr. 17, 2025 | *Mass VC solicitation that generated the Khosla Ventures meeting* | "We will certainly not be sharing a deck with technology or architecture details given the highly sensitive nature of this area…." |
| Apr. 12, 2025 | Signal communications — Rapport to Chapiro | "Do you want to raise $50-100m right now and be completely diluted and effectively shut out of the company after a few seed rounds, or would you rather be a little more patient and grow a company that will rake in billions every year without dilution?" |
| Apr. 12, 2025 | Signal communications — Chapiro to Rapport | "If they said $100m at $1b we would take it…" |
| Apr. 12, 2025 | Signal communications — Rapport to Chapiro | "We can't take an early $2.5M VC round for Radian, that just doesn't make sense given the value of the IP that Radian currently has." |
| Apr. 12, 2025 | Signal communications — Chapiro to Rapport | "Remember, my pitch was we need $50-100m to really go after being the prime. If we can do that, we should go after that, and gyros could be separate." |
| Apr. 13, 2025 | *Non-Binding Letter of Intent* — PGP-signed | "Michael shall form a new company, Celestial Precision. Michael shall furnish all his shares in Radian Industries and X% of shares in Celestial Precision to Radian Industries in exchange for the licensing of all applicable Radian IP to Celestial, as well as any derivative IP in the areas of gyros, accelerometers, or vacuustats." |
| Apr. 13, 2025 | *Non-Binding Letter of Intent* — PGP-signed | "Radian Industries shall operate as an R&D lab and receive a flat 5% revenue share from Celestial Precision for 25 years for gyro & accelerometry tech and 15 years for vacuustat tech, payable to the inventor…. This revenue share shall only apply to revenues in excess of $1m per year." |
| Apr. 13, 2025 | *Non-Binding Letter of Intent* — PGP-signed | "Whereas Michael intends to raise money for a loitering munitions startup under the name Black Lattice, Radian Industries shall authorize a 10 year exclusivity deal for gyrocomp-enhanced directed RF coms links … in exchange for $X. This shall be further limited to systems with a maximum takeoff weight of 500 lbs. This deal shall include Celestial Precision providing this capability at no more than 3x COGS when purchased in quantities of at least 100." |
| Apr. 13, 2025 | *Non-Binding Letter of Intent* — PGP-signed | "Radian shall authorize an option for a 10-year exclusivity deal that is limited to supersonic cruise missiles with a maximum weight of no more than 1000 lbs, and a top speed of no more than Mach 2.5 … which may be purchased for $X million if exercised by December 31st 2026, or $2X million if exercised by December 31st 2027. This deal shall include Celestial Precision providing this capability at no more than 3x COGS when purchased in quantities of at least 10." |
| Pre-Apr. 29, 2025 | *Draft Non-Binding Letter of Intent* — Chapiro proposal | "Radian shall authorize an option for a 10-year exclusivity deal that is limited to supersonic cruise missiles with a maximum weight of no more than 1000 lbs, and a top speed of no more than Mach 2.5 … which may be purchased for $1m if exercised by December 31st 2026, or $2m if exercised by December 31st 2027." |
| Apr. 21, 2025 | Signal communications — Rapport to Chapiro | "Well you've seen already what I can do with $60k… $1M could go a long way :)" |

| Date | Document | Quotation |
|---|---|---|
| Apr. 27, 2025 | *Final Radian Restructuring LOI* | "A revenue share of 5% will be paid to Nathan for 25 years for gyro & accelerometry tech and 15 years for vacuustat tech. This revenue share shall only apply to revenues in excess of $1m per year." |
| Apr. 27, 2025 | *Final Radian Restructuring LOI* | "Whereas Michael intends to raise money for a loitering munitions startup under the name Black Lattice, Seldon shall authorize a 10 year exclusivity option for gyrocomp-enhanced directed RF coms links … in exchange for $500k, expiring December 31st 2025. This shall be further limited to systems with a maximum takeoff weight of 500 lbs. This deal shall include Radian Industries providing this capability at no more than 2x COGS when purchased in quantities of at least 100." |
| Apr. 27, 2025 | *Final Radian Restructuring LOI* | "Seldon shall authorize an option for discount pricing on standard-class gyros to Black Lattice for a purchase price of $500k. This shall entitle Black Lattice to 10 years of purchasing standard-class gyros for any application at no more than 3x COGS in quantities above 10, and no more than 1.5x COGS in quantities above 500." |
| Apr. 27, 2025 | Signal communications — Rapport to Chapiro | "We're going to be able to provide this with our new gyro design (the 'safe' design); I've been doing some analysis on it and it's actually quite good–we should expect to see at least two, maybe three orders of magnitude improvement at a given price tier. And the market for this design will be much larger as well, which is good news from a business perspective." |
| Apr. 28, 2025 | Signal communications — Chapiro to Rapport | "Instead of going through Black Lattice, maybe we can get a much much better deal by going to Anduril, Lockheed, or whoever else with the safe technology, and that could be more capital, faster than the DoD approach." |
| Apr. 28, 2025 | Signal communications — Chapiro to Rapport | "So premise is something along the lines of: $50-100k IMU performance at $25k? price point with a fraction of size, weight, power, and better robustness." |
| Apr. 28, 2025 | Signal communications — Chapiro to Rapport | "I will also mention that while it is a great business to just have better gyros… what I signed up for was to work on breakthrough physics driven capabilities, not just a fantastic, billion dollar product." |
| Apr. 28, 2025 | Signal communications — Chapiro to Rapport | "We can potentially go for a rapid acquisition/partnership on Safe gyro. Raytheon, Lockheed, Boeing, Anduril, lots of potential buyers." |
| Apr. 28, 2025 | Signal communications — Chapiro to Rapport | "If we get a bunch of cash from sale though, then we wouldn't have anything stopping development of the Critical gyro." |
| Apr. 28, 2025 | Public post by Chapiro | "Who will pay more for an acquisition of a deeply enabling technology across various platforms? Anduril, Raytheon, Lockheed, Boeing, others? Might end up going for a quick $100m buy out if we can find the right partner, I don't know if I'll even care if we make Anduril make it." |
| Apr. 29, 2025 | Signal communications — Chapiro to Rapport | "I want to make sure we are on the same page long term given the seriousness around the Artifact." |
| Apr. 29, 2025 | Signal communications — Chapiro to Rapport | "My guess is if we can push performance to that level, it might not actually push cost up very much. If IMU cost there can be $15k to enable selling at $30k, it's fairly interesting." |
| Apr. 29, 2025 | Signal communications — Chapiro to Rapport | "I'm thinking more about how to get the first $1m, first $10m, rather than first billions. We don't really need billions that urgently." |
| Apr. 30, 2025 | Email — Chapiro to Rapport | "The analysis we have and the footage is enough for me to get a $1m contract." |
| Apr. 30, 2025 | Email — Chapiro to Rapport | "With a $1m contract and a few good engineers, we will quickly catch up and get ahead." |
| May 2, 2025 | Email — Chapiro to Rapport | "I am $250k, 1 physicist, and 1 engineer away from surpassing where we were in a few months." |
| May 2, 2025 | Email — Chapiro to Rapport | "There is now a third person who knows what we know (under NDA of course), and he agrees the data is compelling." |
| May 2, 2025 | Email — Chapiro to Rapport | "I have a backup of the company Drive." |
| Apr. 2025 | *Black Lattice* investor pitch deck | "EXCLUSIVE IMU ($150K PERFORMANCE AT <$25K COST)" |
| Apr. 2025 | *Black Lattice* investor pitch deck | Financing alternatives presented in the deck included an immediate $5 million raise or an immediate $25 million-plus raise, with a contemplated $100 million-plus later financing round. |

### B. Net-Present-Value Model of Defendant's Proposed Commercial Economics

This Appendix presents a net-present-value model of the commercial agreement Defendant proposed during the parties' April 2025 negotiations for two specific applications he identified for commercialization. The model includes both components of the contemplated compensation that would have accrued to Rapport: (1) the twenty-five-year 5% revenue share and (2) the margin on units supplied under Defendant's proposed cost-linked purchasing structure. The model applies the expressly stated assumptions below and discounts all modeled cash flows to present value.

Defendant's April restructuring proposals contemplated a 5% revenue share for gyro and accelerometry technology lasting twenty-five years, applicable to revenues exceeding $1 million annually. The proposals also identified loitering munitions and qualifying cruise missiles as contemplated commercialization fields.[9] Defendant's April 27 proposal separately offered Black Lattice a ten-year discounted-purchasing option for standard-class gyros at no more than three times COGS in quantities above 10 and no more than 1.5 times COGS in quantities above 500.[10]

Defendant separately estimated on April 29, 2025 that an IMU at the contemplated performance level could cost approximately $15,000 and sell for approximately $30,000. The model therefore uses $15,000 as the modeled COGS, applies the most restrictive 1.5-times-COGS purchasing rate to every modeled unit, and uses Defendant's $30,000 estimate as the downstream selling price. This yields a modeled transfer price of $22,500 and a supply margin of $7,500 per unit to Rapport before the separate 5% revenue share.

The April 27 discounted-purchasing option itself had a ten-year term. For Years 11–25, the model continues the same 1.5-times-COGS transfer price, preserving Defendant's lowest proposed transfer-price multiple throughout the modeled period rather than assuming a higher standard price after the ten-year discounted-purchasing option expired. The model also applies the 1.5-times-COGS rate from the first unit, including years when modeled volume is below 500 units.

[9] *Non-Binding Letter of Intent* (Apr. 13, 2025), ¶¶ 2, 9–10.

[10] *Final Radian Restructuring LOI* (Apr. 27, 2025), Revenue Sharing and Sales Agreements ¶¶ 2, 5. The nonbinding LOI records Defendant's contemporaneous proposed economic structure and bargaining position.

## 1. Methodology

The model uses conventional discounted-cash-flow arithmetic. The Internal Revenue Service's published intangible-property valuation guidelines likewise identify discounted cash flow and net present value as recognized income-based methods for valuing intangible economic benefits and emphasize that projected income, useful life, and risk should be made explicit.[11]

For application $j$ in year $t$, modeled unit volume is:

$$Q_{j,t} = \min\bigl(C_j, Q_{0,j}(1+g)^{t-1}\bigr)$$

where:

(a) $Q_{0,j}$ is the application-specific first-year unit volume;

(b) $Q_{0,\text{loitering}} = 200$ units;

(c) $Q_{0,\text{cruise}} = 4$ units;

(d) $g = 30\%$ annual growth; and

(e) $C_j$ is the annual unit ceiling assigned to the relevant application.

The application-specific starting volumes and 30% annual growth rate are expressly identified modeling assumptions.

Annual downstream revenue for application $j$ in year $t$ is:

$$R_{j,t} = p \cdot Q_{j,t}$$

where $p = \$30,000$ per unit.

The modeled supply margin attributable to application $j$ in year $t$ is:

$$M_{j,t} = (s - c)Q_{j,t}$$

where $c = \$15,000$ is modeled COGS and $s = 1.5c = \$22,500$ is the modeled transfer price. Thus:

$$M_{j,t} = \$7,500 \cdot Q_{j,t}$$

[11] Internal Revenue Service, *IRM 4.48.5, Intangible Property Valuation Guidelines*, § 4.48.5.2.4, available at `https://www.irs.gov/irm/part4/irm_04-048-005`. The IRS guidance supplies general valuation-methodology guidance for the discounted-cash-flow calculation used here.

The model treats only incremental revenue above \$1 million as royalty bearing and applies that threshold separately to each application. Thus the royalty $Y_{j,t}$ for application $j$ in year $t$ is:

$$Y_{j,t} = \alpha \max\big(R_{j,t} - H, 0\big)$$

where:

(a) $\alpha = 5\%$; and

(b) $H = \$1,000,000$ is the royalty activation threshold.

The model applies the \$1 million threshold separately to each application. This treatment permits up to \$2 million of combined annual revenue to escape the 5% share in years when both applications exceed the threshold. In the early cruise-missile years, modeled cruise revenue remains below \$1 million, so no cruise-missile royalty is recognized at all until that field independently crosses the threshold.

Total modeled annual cash flow $F_{j,t}$ to Rapport from application $j$ in year $t$ is the sum of the supply margin and the revenue share:

$$F_{j,t} = M_{j,t} + Y_{j,t}$$

Each year's cash flow is discounted at 15%:

$$\mathrm{PV}_{j,t} = \frac{F_{j,t}}{(1+r)^t}$$

where $\mathrm{PV}_{j,t}$ is the present value in Year 0 of the modeled cash flow attributable to application $j$ in year $t$, using a discount rate $r = 15\%$.

The twenty-five-year net present value for each application $j$ is therefore:

$$\mathrm{NPV}_j = \sum_{t=1}^{25} \frac{F_{j,t}}{(1+r)^t}$$

and the combined NPV is:

$$\mathrm{NPV}_{\text{total}} = \mathrm{NPV}_{\text{loitering}} + \mathrm{NPV}_{\text{cruise}}$$

## 2. Assumptions

| Parameter | Value | Basis |
|---|---|---|
| Revenue-share duration | 25 years | Duration proposed by Defendant for gyro and accelerometry technology. |
| Revenue-share rate ($\alpha$) | 5% | Rate proposed by Defendant. |
| Annual threshold ($H$) | \$1m | Applied separately to each application and only to revenue above the threshold. |
| Modeled COGS ($c$) | \$15,000 | Defendant's contemporaneous estimated IMU cost, treated here as modeled COGS. |
| Modeled transfer price ($s$) | \$22,500 | 1.5 times modeled COGS, applying Defendant's most restrictive high-volume purchasing multiple to every unit. |
| Supply margin | \$7,500 / unit | Difference between the \$22,500 modeled transfer price and \$15,000 modeled COGS. |
| Supply-margin horizon | 25 years | Carries the 1.5-times-COGS discounted price through the revenue-share period rather than assuming a higher standard price after the ten-year discount option expires. |
| Downstream unit price ($p$) | \$30,000 | Defendant's contemporaneous contemplated selling price. |
| Loitering starting volume ($Q_{0,\text{loitering}}$) | 200 units | Assumed first-year volume for the loitering-munition field. |
| Cruise-missile starting volume ($Q_{0,\text{cruise}}$) | 4 units | Assumed first-year volume for the cruise-missile field. |
| Annual unit growth ($g$) | 30% | Modeled annual unit-growth rate applied until the relevant finite unit ceiling is reached. |
| Loitering-munition ceiling ($C_{\text{loitering}}$) | 20,000 / year | Finite long-run ceiling reached in Year 19. |
| Cruise-missile ceiling ($C_{\text{cruise}}$) | 2,500 / year | Finite long-run ceiling that is not reached within the twenty-five-year model; modeled Year-25 volume is approximately 2,171 units. |
| Discount rate ($r$) | 15% | Explicit risk-adjustment assumption. |
| Terminal value | \$0 | No value assigned beyond the twenty-five-year modeled period. |

## 3. Finite Long-Run Unit Ceilings

The model uses explicit finite annual unit ceilings of 20,000 units for the loitering-munition field and 2,500 units for the cruise-missile field.

The 20,000-unit loitering-munition ceiling represents less than one-half of one percent of the industrial scale already visible in unmanned warfare when the parties were negotiating. In March 2025, before the April LOI, Ukraine's Ministry of Defence reported that Ukrainian defense-industrial capacity for 2025 was approximately 4.5 million FPV drones and that the Ministry planned to procure that output.[12]

The 20,000-unit ceiling is grounded against the approximately 4.5 million-unit Ukrainian FPV-drone industrial capacity reported in March 2025. The modeled ceiling represents less than one-half of one percent of that reported capacity and is reached in Year 19.

Contemporaneous U.S. procurement policy likewise reflected movement toward large quantities of attritable autonomous weapons. By January 2024, the Department of Defense described the Replicator initiative as intended to field "thousands" of autonomous systems across multiple domains within approximately 18 to 24 months, and subsequent Replicator announcements specifically included Switchblade 600 and expansion of other loitering-munition systems.[13]

The cruise-missile field begins with 4 modeled units in Year 1 and uses a 2,500-unit *long-run ceiling*. At 30% annual growth, modeled production reaches approximately 2,171 units in Year 25, remaining below the ceiling throughout the modeled period. The ceiling therefore prevents the model from assuming annual cruise-missile production beyond the approximately 2,500-missile annual production-line capacity Lockheed Martin publicly described contemporaneously in March 2025.[14]

Subsequent procurement evidence further corroborates the modeled long-run production scale; the hypothetical-negotiation information set itself uses the information available as of April 2025.

[12] Ministry of Defence of Ukraine, *Glib Kanievskyi: In 2025, the Ministry of Defence plans to procure 4.5 million FPV drones* (Mar. 10, 2025), https://mod.gov.ua/en/news/glib-kanievskyi-in-2025-the-ministry-of-defence-plans-to-procure-4-5-million-fpv-drones .

[13] U.S. Department of Defense, *Defense Innovation Official Says Replicator Initiative Remains on Track* (Jan. 26, 2024), https://www.defense.gov/News/News-Stories/Article/Article/3657609/defense-innovation-official-says-replicator-initiative-remains-on-track/ . U.S. Department of Defense, *Deputy Secretary of Defense Kathleen Hicks Announces Additional Replicator All-Domain Attritable Autonomous Capabilities* (Nov. 13, 2024), https://www.defense.gov/News/Releases/Release/Article/3963289/deputy-secretary-of-defense-kathleen-hicks-announces-additional-replicator-all/ .

[14] Mike Stone, *Eyeing the Pacific, Lockheed unveils low-cost $150,000 cruise missile*, Reuters (Mar. 3, 2025), https://www.reuters.com/business/aerospace-defense/eyeing-pacific-lockheed-unveils-low-cost-150000-cruise-missile-2025-03-03/ . The cited program supplies contemporaneous production-scale context; the modeled field remains governed by the weight, speed, and other limits defined in Defendant's LOI.

In May 2026, the Department of Defense announced framework agreements positioning the United States to procure more than 10,000 low-cost cruise missiles across several portfolios over only three years beginning in 2027.[15]

## 4. Model Calculation

Under these assumptions, the model produces the following present values for the supply-margin component and the 5% revenue-share component:

| Application | Supply-margin NPV | Royalty NPV | Combined NPV |
|---|---:|---:|---:|
| Loitering munitions | $131.30m | $25.94m | $157.23m |
| Qualifying cruise missiles | $4.09m | $0.65m | $4.74m |
| **Combined** | **$135.38m** | **$26.59m** | **$161.97m** |

The model produces approximately $26.59 million in present value from the 5% revenue share and approximately $135.38 million from the separately modeled supply margin, for a combined present value of approximately $161.97 million. The royalty was one component of a substantially larger compensation structure proposed by Defendant. Critically, the royalty component alone has a present value greater than the requested $25 million reasonable royalty. The substantially larger supply-margin component therefore supplies additional modeled economic value beyond the royalty stream that independently supports the requested award.

The following table shows $\text{PV}_{j,t}$ for each application in each modeled year. Each value includes both that year's discounted supply margin and that year's discounted 5% revenue share:

| Year | Loitering units | Loitering $\text{PV}_{j,t}$ | Cruise units | Cruise $\text{PV}_{j,t}$ | Combined annual PV |
|---|---:|---:|---:|---:|---:|
| 1 | 200 | $1,521,739 | 4 | $26,087 | $1,547,826 |
| 2 | 260 | $1,731,569 | 5 | $29,490 | $1,761,059 |
| 3 | 338 | $1,967,289 | 7 | $33,336 | $2,000,625 |
| 4 | 439 | $2,232,468 | 9 | $37,684 | $2,270,152 |
| 5 | 571 | $2,531,117 | 11 | $42,600 | $2,573,716 |
| 6 | 743 | $2,867,747 | 15 | $48,156 | $2,915,903 |

[15] U.S. Department of Defense, *Department Enhances Lethal Strike Capacity Through Partnership with New and Traditional Defense Companies* (May 13, 2026), `https://www.defense.gov/news/Releases/Release/Article/4485332/department-of-defense-enhances-lethal-strike-capacity-through-partnership-with-new/` . This later development further corroborates the finite long-run ceiling. The April 2025 hypothetical-negotiation information set uses contemporaneously available evidence, while the later procurement data corroborates the modeled long-run production scale.

| Year | Loitering units | Loitering PV$_{j,t}$ | Cruise units | Cruise PV$_{j,t}$ | Combined annual PV |
|---|---|---|---|---|---|
| 7 | 965 | $3,247,440 | 19 | $54,437 | $3,301,878 |
| 8 | 1,255 | $3,675,923 | 25 | $61,538 | $3,737,461 |
| 9 | 1,631 | $4,159,655 | 33 | $69,564 | $4,229,220 |
| 10 | 2,121 | $4,705,927 | 42 | $82,006 | $4,787,933 |
| 11 | 2,757 | $5,322,968 | 55 | $95,927 | $5,418,895 |
| 12 | 3,584 | $6,020,071 | 72 | $111,243 | $6,131,314 |
| 13 | 4,660 | $6,807,736 | 93 | $128,191 | $6,935,927 |
| 14 | 6,058 | $7,697,821 | 121 | $147,031 | $7,844,853 |
| 15 | 7,875 | $8,703,728 | 157 | $168,053 | $8,871,781 |
| 16 | 10,237 | $9,840,600 | 205 | $191,576 | $10,032,176 |
| 17 | 13,308 | $11,125,551 | 266 | $217,958 | $11,343,508 |
| 18 | 17,301 | $12,577,922 | 346 | $247,599 | $12,825,521 |
| 19 | 20,000 | $12,644,244 | 450 | $280,948 | $12,925,193 |
| 20 | 20,000 | $10,994,995 | 585 | $318,510 | $11,313,506 |
| 21 | 20,000 | $9,560,865 | 760 | $360,852 | $9,921,718 |
| 22 | 20,000 | $8,313,796 | 988 | $408,613 | $8,722,409 |
| 23 | 20,000 | $7,229,388 | 1,285 | $462,513 | $7,691,901 |
| 24 | 20,000 | $6,286,424 | 1,670 | $523,365 | $6,809,789 |
| 25 | 20,000 | $5,466,456 | 2,171 | $592,085 | $6,058,541 |
| **Total** | | **$157.233m** | | **$4.739m** | **$161.973m** |

Modeled unit volumes are shown to the nearest whole unit for readability. Present values and totals are calculated from the unrounded unit-growth series. The cruise-missile trajectory begins at four units and reaches approximately 2,171 units in Year 25, remaining below the 2,500-unit ceiling throughout the modeled period. The loitering-munition ceiling binds in Year 19, causing its discounted annual value to peak in Year 19 before declining as the capped nominal cash flow is discounted farther into the future.

The model quantifies two commercialization fields expressly identified by Defendant. Additional sources of value remain outside the calculation, including:

(a) gyro or IMU sales in other aerospace, defense, satellite, aircraft, maritime, or commercial applications;

(b) any accelerometry revenue;

(c) any commercialization after the twenty-five-year modeled period;

(d) any terminal value;

(e) any equity interest or governance rights;

(f) any strategic-acquisition premium;

(g) the $500,000 consideration proposed for the discounted-purchasing option itself;

(h) any separate payment for field exclusivity; or

(i) any other use of the technical archive or derivatives.

The calculation also excludes the higher transfer-price multiples Defendant proposed for lower-volume purchases. Defendant's April 27 proposal permitted a purchase price of up to three times COGS in quantities above 10 and reduced that ceiling to 1.5 times COGS only in quantities above 500. The model instead applies the 1.5-times-COGS multiple to every unit from Year 1 onward and continues that discounted multiple throughout all twenty-five years.

### 5. Relationship to the Requested Artifact Award

Plaintiffs request $25 million for the Artifact injury. This model quantifies the commercial economics of Defendant's own proposed structure and compares those economics with the requested amount. Defendant proposed a twenty-five-year 5% economic participation structure for gyro and accelerometry technology, proposed preferential purchasing economics for standard-class gyros, and contemporaneously estimated approximately $15,000 cost and approximately $30,000 downstream selling price for the contemplated IMU. Applying the most restrictive 1.5-times-COGS transfer-price multiple to every unit yields a modeled $7,500 supply margin per unit in addition to the 5% revenue share.

Under the stated application-specific starting volumes, unit-growth, finite-ceiling, and 15% discount assumptions, the entire modeled economic stream has a present value of approximately $161.97 million: approximately $135.38 million from the supply margin and approximately $26.59 million from the 5% revenue share. The royalty was one component of a substantially larger compensation structure proposed by Defendant. The royalty component alone exceeds the requested $25 million reasonable royalty.

The model also excludes other Artifact applications, accelerometry, terminal value, option consideration, exclusivity consideration, acquisition value, and other sources of economic value. The requested lump-sum reasonable royalty rests principally on the breadth of rights Defendant actually appropriated, the parties' contemporaneous licensing and exclusivity negotiations, the approximately $100 million strategic-acquisition benchmark, and Defendant's own commercial exploitation of the

technology. This appendix independently corroborates the requested reasonable royalty through a quantitative model derived from Defendant's own proposed commercial terms.

## 6. Valuation Model Code

```
"""Appendix B valuation model.

Models two application fields using application-specific starting volumes:
- loitering munitions: 200 units in Year 1, capped at 20,000 units/year
- qualifying cruise missiles: 4 units in Year 1, capped at 2,500 units/year
- 30% annual unit growth until the applicable finite ceiling
- $15,000 modeled COGS
- 1.5x COGS transfer price ($22,500)
- $30,000 downstream selling price
- 5% revenue share on annual downstream revenue above $1,000,000,
  applying the threshold separately to each application
- 15% annual discount rate
- 25 modeled years
- no terminal value

The 1.5x COGS transfer price is applied throughout the 25-year model as a
conservative continuation of the discounted price, even though the April 27,
2025 discounted-purchasing option itself had a 10-year term.
"""
from dataclasses import dataclass

YEARS = 25
UNIT_GROWTH = 0.30
COGS = 15_000.0
TRANSFER_MULTIPLE = 1.5
TRANSFER_PRICE = COGS * TRANSFER_MULTIPLE
SUPPLY_MARGIN_PER_UNIT = TRANSFER_PRICE - COGS
DOWNSTREAM_PRICE = 30_000.0
ROYALTY_RATE = 0.05
ROYALTY_THRESHOLD = 1_000_000.0
DISCOUNT_RATE = 0.15

@dataclass(frozen=True)
class Application:
    name: str
    starting_units: float
    annual_ceiling: float

APPLICATIONS = (
    Application("Loitering munitions", 200.0, 20_000.0),
    Application("Qualifying cruise missiles", 4.0, 2_500.0),
)

def annual_units(app: Application, year: int) -> float:
    return min(
        app.annual_ceiling,
        app.starting_units * (1.0 + UNIT_GROWTH) ** (year - 1),
    )

def annual_cash_flow(app: Application, year: int) -> dict[str, float]:
    units = annual_units(app, year)
    downstream_revenue = DOWNSTREAM_PRICE * units
    supply_margin = SUPPLY_MARGIN_PER_UNIT * units
    royalty = ROYALTY_RATE * max(downstream_revenue - ROYALTY_THRESHOLD, 0.0)
    total_cash_flow = supply_margin + royalty
    present_value = total_cash_flow / (1.0 + DISCOUNT_RATE) ** year
    return {
        "year": float(year),
        "units": units,
        "downstream_revenue": downstream_revenue,
        "supply_margin": supply_margin,
        "royalty": royalty,
        "total_cash_flow": total_cash_flow,
        "present_value": present_value,
    }

def application_npv(app: Application) -> dict[str, float]:
    rows = [annual_cash_flow(app, year) for year in range(1, YEARS + 1)]
    supply_npv = sum(
        row["supply_margin"] / (1.0 + DISCOUNT_RATE) ** int(row["year"])
        for row in rows
    )
```

```
    royalty_npv = sum(
        row["royalty"] / (1.0 + DISCOUNT_RATE) ** int(row["year"])
        for row in rows
    )
    total_npv = sum(row["present_value"] for row in rows)
    return {
        "supply_npv": supply_npv,
        "royalty_npv": royalty_npv,
        "total_npv": total_npv,
    }

def money(value: float) -> str:
    return f"${value:,.2f}"

def main() -> None:
    results = {app.name: application_npv(app) for app in APPLICATIONS}

    print("BASE CASE")
    for app in APPLICATIONS:
        result = results[app.name]
        print(f"{app.name}:")
        print(
            f"\tsupply NPV={money(result['supply_npv'])}; "
            f"\n\troyalty NPV={money(result['royalty_npv'])}; "
            f"\n\tcombined NPV={money(result['total_npv'])}"
        )

    supply_total = sum(result["supply_npv"] for result in results.values())
    royalty_total = sum(result["royalty_npv"] for result in results.values())
    total = sum(result["total_npv"] for result in results.values())
    print()
    print(f"Combined supply-margin NPV: {money(supply_total)}")
    print(f"Combined royalty NPV: {money(royalty_total)}")
    print(f"Combined total NPV: {money(total)}")

    print("\nYEAR-BY-YEAR PRESENT VALUES")
    print(
        f"{'Year':<6}"
        f"{'Loitering Units':>16}"
        f"{'Loitering PV':>20}"
        f"{'Cruise Units':>16}"
        f"{'Cruise PV':>18}"
        f"{'Combined PV':>20}"
    )
    print("-" * 98)

    loitering, cruise = APPLICATIONS

    for year in range(1, YEARS + 1):
        loit = annual_cash_flow(loitering, year)
        cruise_row = annual_cash_flow(cruise, year)

        loit_pv = f"${loit['present_value']:,.2f}"
        cruise_pv = f"${cruise_row['present_value']:,.2f}"
        combined_pv = f"${loit['present_value'] + cruise_row['present_value']:,.2f}"

        print(
            f"{year:<6}"
            f"{loit['units']:>16,.0f}"
            f"{loit_pv:>20}"
            f"{cruise_row['units']:>16,.0f}"
            f"{cruise_pv:>18}"
            f"{combined_pv:>20}"
        )

if __name__ == "__main__":
    main()
```

## C. Vacuustat Wind-Energy Royalty Model

This appendix quantifies the U.S. wind-energy component of the Vacuustat royalty interest. It applies the parties' actual five-percent revenue royalty to a defined commercialization model, compares the but-for commercialization path with the same deployment path beginning five years later, and discounts the resulting lost royalties to a 2026 valuation date.

The model follows the economic structure established by the parties' written Vacuustat license. The Vacuustat license requires a five-percent royalty on revenues from sales of vacuum balloons, systems incorporating vacuum balloons, and services enabled primarily by vacuum balloons, with royalties continuing through expiration of Patent No. 10,625,842. (Compl. ¶¶ 67–74; Compl. Ex. A1 at 50–52.) The contemplated wind business model was an owner-operator model in which Vacuustat-supported turbines would generate electricity for sale. Electricity receipts are therefore treated as royalty-bearing revenue from the Vacuustat-enabled generating service.

### 1. Summary Result

Under the parameter assumptions set out below, the modeled five-year commercialization delay produces present-value lost wind royalties of $25.83 million for 2026.

The fixed royalty term makes commercialization timing economically consequential. The but-for path begins accumulating operating capacity in 2028, while the delayed path begins in 2033 and reaches the same final model year in 2037. The delayed path therefore enters the royalty period later, accumulates less operating capacity within that period, and generates a smaller royalty stream.

### 2. Evidentiary and Economic Inputs

#### a. Fifteen-Megawatt Vacuustat Wind System

Let $S$ denote the rated generating capacity of one modeled Vacuustat-supported wind system. The model uses $S = 15$ MW because that figure appears in Rapport's contemporaneous August 16, 2021 communication with Chapiro. Rapport estimated that a 600-meter Vacuustat vertical-axis wind turbine would produce approximately ten times the output of the 1.5 MW conventional-turbine

comparison used in the same exchange, yielding an estimated output of approximately 15 MW. (Ex. C3 — Corporate Communications at 30–33.)

The model carries that contemporaneous system-capacity estimate directly into the valuation.

### b. Commercialization Timeline and Five-Year Delay

Let $t$ denote the calendar year. Let $t_0^B$ denote the first commercial year in the but-for path, $d$ the modeled commercialization delay in years, and $t_0^D$ the first commercial year in the delayed path, such that

$$t_0^D = t_0^B + d.$$

The model uses $t_0^B = 2028$ and $d = 5$, producing $t_0^D = 2033$. The 2028 but-for start follows the development path reflected in the Vacuustat license: the agreement required either a qualifying government contract or a working positive-buoyancy prototype before December 31, 2027. (Compl. ¶¶ 67–74; Compl. Ex. A1 at 50–52.) A 2028 commercial-revenue start follows a 2026–2027 period of prototype construction, testing, contracting, and deployment.

Defendant contemporaneously estimated a five-year commercial timing difference for a slower capital path. In his VC solicitation, Defendant stated that reliance on DoD funding and a subcontractor role, instead of substantial private capital supporting rapid vertical integration, would make the contemplated market-cap outcome take "5 years longer" to reach. (Ex. C3 — Corporate Communications at 13–14.) This model uses that contemporaneous five-year timing estimate as the commercialization-delay interval. The but-for and delayed paths otherwise use the same initial deployment, annual growth rate, capacity factor, electricity-price series, and royalty rate.

### c. Initial Commercial Deployment and Growth

Let $n_0$ denote the number of systems in the initial commercial deployment, $Q_0$ the initial deployed generating capacity, and $g$ the annual growth rate in new deployed capacity. The model uses four initial systems, so

$$Q_0 = n_0 S.$$

With $n_0 = 4$ and $S = 15$ MW, the initial commercial deployment is 60 MW.

Let $Q_t^B$ denote new Vacuustat-supported wind capacity deployed in year $t$ under the but-for path. For $t \geq t_0^B$:

$$Q_t^B = Q_0(1+g)^{t-t_0^B}.$$

Let $Q_t^D$ denote new capacity deployed in year $t$ under the delayed path. Deployment is zero before $t_0^D$. For $t \geq t_0^D$:

$$Q_t^D = Q_0(1+g)^{t-t_0^D}.$$

The model uses $g = 30\%$. The delayed path therefore reproduces the same deployment trajectory five years later.

### d. Operating Capacity and Service Life

Let $s$ denote the summation-year index. Let $C_t^B$ and $C_t^D$ denote cumulative operating Vacuustat wind capacity in year $t$ under the but-for and delayed paths, respectively. Installed capacity remains in operation through the modeled royalty period, so

$$C_t^B = \sum_{s=t_0^B}^{t} Q_s^B$$

and

$$C_t^D = \sum_{s=t_0^D}^{t} Q_s^D.$$

All modeled installations remain within ordinary wind-turbine service life through the royalty term. The U.S. Department of Energy states that the expected service life of wind turbines is approximately 30 years.[16]

### e. Capacity Factor

Let $f$ denote the modeled wind capacity factor and $h$ the number of hours in a calendar year. The model uses $f = 35\%$ and $h = 8,760$. The U.S. Department of Energy identifies approximately 35%

[16] U.S. Department of Energy, WINDExchange, *Wind Energy End-of-Service Guide*, "The Life of a Wind Turbine." https://www.energy.gov/cmei/systems/windexchange/wind-energy-end-service-guide

as the average capacity factor for a U.S. wind turbine.[17]

Let $E_t^B$ and $E_t^D$ denote annual electricity generation in MWh under the but-for and delayed paths. Annual generation is

$$E_t^B = C_t^B \cdot h \cdot f$$

and

$$E_t^D = C_t^D \cdot h \cdot f.$$

### f. Electricity Revenue

Let $P_t$ denote the EIA projected generation-service price in year $t$, expressed in constant 2025 dollars per MWh. The model uses the *Annual Energy Outlook 2026* ("AEO2026"), Counterfactual Baseline Case, Table 8, "Prices by Service Category — Generation."[18]

Let $R_t^B$ and $R_t^D$ denote annual royalty-bearing electricity revenue under the but-for and delayed paths. Revenue is

$$R_t^B = E_t^B P_t$$

and

$$R_t^D = E_t^D P_t.$$

The parties chose gross revenue as the contractual royalty measure, so the royalty applies directly to electricity receipts. Commercial feasibility is separately supported by the contemporaneous engineering and cost record, including Rapport's approximately $250,000 estimate for the Vacuustat-supported turbine platform.

### g. Five-Percent Contractual Royalty

Let $\rho$ denote the contractual royalty rate. The Vacuustat license sets $\rho = 5\%$ of royalty-bearing revenue. Let $Y_t^B$ and $Y_t^D$ denote annual royalty income under the but-for and delayed paths. Thus,

[17] U.S. Department of Energy, WINDExchange, *Land-Based Economic Development Guide*, citing Lawrence Berkeley National Laboratory for a 35% average U.S. wind-turbine capacity factor. https://www.energy.gov/cmei/systems/windexchange/land-based-economic-development-guide

[18] U.S. Energy Information Administration, *Annual Energy Outlook 2026*, Table 8, "Electricity Supply, Disposition, Prices, and Emissions," Counterfactual Baseline Case, "Prices by Service Category — Generation," Apr. 2026. https://www.eia.gov/outlooks/aeo/tables_ref.php

$$Y_t^B = \rho R_t^B$$

and

$$Y_t^D = \rho R_t^D.$$

Let $L_t$ denote the annual royalty loss attributable to the commercialization delay:

$$L_t = Y_t^B - Y_t^D.$$

### h. Patent-Term Endpoint

Let $T$ denote the final model year. Patent No. 10,625,842 was filed July 23, 2015, and the face of the issued patent states that its term was adjusted under 35 U.S.C. § 154(b) by 614 days. (Ex. B1 — Vacuustat Patent.) A twenty-year term from July 23, 2015, plus the stated 614-day patent-term adjustment reaches 2037. The model therefore uses $T = 2037$ as the final model year.

### i. Present-Value Convention

Let $r$ denote the real risk-adjusted discount rate and $t_v$ the valuation year. The model uses $r = 15\%$ and $t_v = 2026$. All market-price inputs are stated in constant 2025 dollars.

Let $\text{PV}_t$ denote the present value, as of the valuation year, of the annual royalty loss $L_t$. Under the end-of-year discounting convention:

$$\text{PV}_t = \frac{L_t}{(1+r)^{t-t_v}}.$$

Let $\text{PV}_{\text{loss}}$ denote the total present value of the modeled wind royalty loss. Then

$$\text{PV}_{\text{loss}} = \sum_{t=(t_0^B)}^{T} \text{PV}_t.$$

The same discount convention is used to calculate the present value of the full but-for and delayed royalty streams.

## 3. Parameter Assumptions

| Parameter | Value | Basis |
|---|---|---|
| But-for commercial year ($t_0^B$) | 2028 | First commercial year following the license's December 31, 2027 commercialization milestone. |
| Commercialization delay ($d$) | 5 years | Defendant's contemporaneous five-year commercial-timing estimate. |
| Delayed commercial year ($t_0^D$) | 2033 | But-for commercial year plus the modeled five-year delay. |
| System rated capacity ($S$) | 15 MW | Rapport's contemporaneous August 2021 Vacuustat wind-system estimate. |
| Initial system count ($n_0$) | 4 systems | Initial commercial deployment assumption. |
| Initial deployed capacity ($Q_0$) | 60 MW | Product of initial system count and modeled system rated capacity. |
| Annual deployment growth ($g$) | 30% | Annual growth applied to new Vacuustat-supported generating capacity. |
| Capacity factor ($f$) | 35% | DOE/LBNL U.S. wind-turbine average. |
| Hours per year ($h$) | 8,760 | Calendar-year conversion from MW of operating capacity to annual MWh at the modeled capacity factor. |
| Electricity price ($P_t$) | EIA annual generation price | AEO2026 Table 8, generation service category, constant 2025 dollars. |
| Royalty rate ($\rho$) | 5% of revenue | Actual Vacuustat license. |
| Discount rate ($r$) | 15% real | Risk-adjusted present-value assumption. |
| Valuation year ($t_v$) | 2026 | Present-value reference year. |
| Final model year ($T$) | 2037 | Patent-backed royalty term reaches 2037. |

## 4. Modeled Deployment Path

The four-system starting project and 30% annual growth assumption produce the following deployment paths. The delayed path reproduces the but-for trajectory beginning five years later.

| Year | But-for added MW | But-for operating MW | Delayed added MW | Delayed operating MW |
|---|---|---|---|---|
| 2028 | 60.0 | 60.0 | 0.0 | 0.0 |
| 2029 | 78.0 | 138.0 | 0.0 | 0.0 |
| 2030 | 101.4 | 239.4 | 0.0 | 0.0 |
| 2031 | 131.8 | 371.2 | 0.0 | 0.0 |
| 2032 | 171.4 | 542.6 | 0.0 | 0.0 |
| 2033 | 222.8 | 765.4 | 60.0 | 60.0 |

| Year | But-for added MW | But-for operating MW | Delayed added MW | Delayed operating MW |
|---|---|---|---|---|
| 2034 | 289.6 | 1,055.0 | 78.0 | 138.0 |
| 2035 | 376.5 | 1,431.5 | 101.4 | 239.4 |
| 2036 | 489.4 | 1,920.9 | 131.8 | 371.2 |
| 2037 | 636.3 | 2,557.2 | 171.4 | 542.6 |

By the end of 2037, the but-for path has approximately 2,557.2 MW of Vacuustat-supported wind capacity in operation, while the delayed path has approximately 542.6 MW in operation. The difference arises from the five-year shift in the same deployment trajectory within the fixed model horizon.

## 5. Annual Royalty Calculation

| Year | EIA price / MWh | But-for royalty | Delayed royalty | Lost royalty | PV lost royalty |
|---|---|---|---|---|---|
| 2028 | $66.48 | $611,483 | $0 | $611,483 | $462,369 |
| 2029 | $66.53 | $1,407,469 | $0 | $1,407,469 | $925,434 |
| 2030 | $67.86 | $2,490,463 | $0 | $2,490,463 | $1,423,931 |
| 2031 | $71.81 | $4,086,565 | $0 | $4,086,565 | $2,031,745 |
| 2032 | $71.90 | $5,980,529 | $0 | $5,980,529 | $2,585,548 |
| 2033 | $71.99 | $8,446,584 | $662,164 | $7,784,420 | $2,926,452 |
| 2034 | $70.67 | $11,429,244 | $1,495,052 | $9,934,192 | $3,247,505 |
| 2035 | $69.30 | $15,207,403 | $2,543,311 | $12,664,091 | $3,599,925 |
| 2036 | $68.85 | $20,274,532 | $3,918,118 | $16,356,414 | $4,043,055 |
| 2037 | $69.11 | $27,092,097 | $5,748,462 | $21,343,635 | $4,587,670 |
| **Total** | | $97.03m | $14.37m | $82.66m | **$25.83m** |

| | |
|---|---|
| Undiscounted but-for royalties | $97.03m |
| Undiscounted delayed royalties | $14.37m |
| Undiscounted lost royalties | $82.66m |
| PV of five-year delay loss | **$25.83m** |

## 6. Symbol and Notation Reference

| Symbol | Definition |
|---|---|
| $t$ | Calendar year. |
| $B$ | Superscript identifying the but-for commercialization path. |
| $D$ | Superscript identifying the delayed commercialization path. |
| $t_0^B$ | First but-for commercial year. |
| $d$ | Modeled commercialization delay in years. |

| Symbol | Definition |
|---|---|
| $t_0^D$ | First delayed commercial year. |
| $S$ | Rated generating capacity of one modeled Vacuustat-supported wind system. |
| $n_0$ | Number of systems in the initial commercial deployment. |
| $Q_0$ | Initial deployed generating capacity. |
| $g$ | Annual growth rate in new deployed generating capacity. |
| $Q_t^B$ | New Vacuustat-supported wind capacity deployed in year $t$ under the but-for path. |
| $Q_t^D$ | New Vacuustat-supported wind capacity deployed in year $t$ under the delayed path. |
| $s$ | Summation-year index. |
| $C_t^B$ | Cumulative operating capacity in year $t$ under the but-for path. |
| $C_t^D$ | Cumulative operating capacity in year $t$ under the delayed path. |
| $f$ | Modeled wind capacity factor. |
| $h$ | Hours in a calendar year. |
| $E_t^B$ | Annual electricity generation under the but-for path. |
| $E_t^D$ | Annual electricity generation under the delayed path. |
| $P_t$ | EIA generation-service electricity price in year $t$. |
| $R_t^B$ | Annual royalty-bearing electricity revenue under the but-for path. |
| $R_t^D$ | Annual royalty-bearing electricity revenue under the delayed path. |
| $\rho$ | Contractual royalty rate. |
| $Y_t^B$ | Annual royalty income under the but-for path. |
| $Y_t^D$ | Annual royalty income under the delayed path. |
| $L_t$ | Annual royalty loss attributable to the commercialization delay. |
| $r$ | Real risk-adjusted discount rate. |
| $t_v$ | Present-value reference year. |
| $\mathrm{PV}_t$ | Present value of the annual royalty loss in year $t$. |
| $\mathrm{PV}_{\mathrm{loss}}$ | Total present value of the modeled wind royalty loss. |
| $T$ | Final model year. |

## 7. Conclusion

The U.S. wind model produces a 2026 present-value royalty loss of $25.83 million from the modeled five-year commercialization delay. The but-for path begins with four 15 MW systems in 2028 and grows annual deployed capacity at 30%; the delayed path follows the same deployment trajectory beginning in 2033. Both paths end in the same 2037 model year.

The model quantifies the economic consequence of losing five years within a finite royalty period: the delayed path accumulates substantially less operating capacity before the royalty horizon ends, reducing the electricity revenue on which the contractual five-percent royalty is calculated.

The remaining Vacuustat damages are calculated modularly. Telecommunications and defense are evaluated using their own deployment and revenue evidence, after which the distinct application-specific royalty streams are combined into the total Vacuustat royalty-loss measure.

## 8. Valuation Model Code

```
"""Vacuustat wind-energy royalty-loss model.

Models the U.S. wind-energy component of the Vacuustat royalty interest using:
- 2028 but-for commercialization start
- 5-year commercialization delay (2033 delayed start)
- four 15 MW systems in the initial commercial deployment (60 MW)
- 30% annual growth in newly deployed generating capacity
- 35% wind capacity factor
- EIA AEO2026 annual generation-service prices in constant 2025 dollars
- 5% contractual royalty on royalty-bearing electricity revenue
- 15% real annual discount rate
- 2026 valuation year
- 2037 final model year

The but-for and delayed paths use the same deployment trajectory. The delayed
path begins five years later and therefore accumulates less operating capacity
within the same finite model horizon.
"""

from dataclasses import dataclass

BUT_FOR_START_YEAR = 2028
COMMERCIALIZATION_DELAY = 5
DELAYED_START_YEAR = BUT_FOR_START_YEAR + COMMERCIALIZATION_DELAY
FINAL_MODEL_YEAR = 2037
VALUATION_YEAR = 2026

SYSTEM_CAPACITY_MW = 15.0
INITIAL_SYSTEM_COUNT = 4
INITIAL_DEPLOYMENT_MW = SYSTEM_CAPACITY_MW * INITIAL_SYSTEM_COUNT
DEPLOYMENT_GROWTH = 0.30

CAPACITY_FACTOR = 0.35
HOURS_PER_YEAR = 8_760.0
ROYALTY_RATE = 0.05
DISCOUNT_RATE = 0.15

# EIA Annual Energy Outlook 2026, Counterfactual Baseline Case, Table 8,
# "Prices by Service Category — Generation," constant 2025 dollars per MWh.
EIA_GENERATION_PRICE_PER_MWH = {
    2028: 66.48,
    2029: 66.53,
    2030: 67.86,
    2031: 71.81,
    2032: 71.90,
    2033: 71.99,
    2034: 70.67,
    2035: 69.30,
    2036: 68.85,
    2037: 69.11,
}

@dataclass(frozen=True)
class CommercializationPath:
    name: str
    start_year: int

BUT_FOR = CommercializationPath("But-for", BUT_FOR_START_YEAR)
DELAYED = CommercializationPath("Delayed", DELAYED_START_YEAR)

def annual_deployment_mw(path: CommercializationPath, year: int) -> float:
    """New Vacuustat-supported wind capacity deployed in a given year."""
    if year < path.start_year:
        return 0.0
    return INITIAL_DEPLOYMENT_MW * (1.0 + DEPLOYMENT_GROWTH) ** (year - path.start_year)

def operating_capacity_mw(path: CommercializationPath, year: int) -> float:
    """Cumulative operating capacity through the given year."""
    if year < path.start_year:
```

```
        return 0.0
    return sum(
        annual_deployment_mw(path, deployment_year)
        for deployment_year in range(path.start_year, year + 1)
    )

def annual_generation_mwh(path: CommercializationPath, year: int) -> float:
    """Annual electricity generation from cumulative operating capacity."""
    return operating_capacity_mw(path, year) * HOURS_PER_YEAR * CAPACITY_FACTOR

def annual_revenue(path: CommercializationPath, year: int) -> float:
    """Annual royalty-bearing electricity revenue."""
    return annual_generation_mwh(path, year) * EIA_GENERATION_PRICE_PER_MWH[year]

def annual_royalty(path: CommercializationPath, year: int) -> float:
    """Annual contractual royalty income."""
    return ROYALTY_RATE * annual_revenue(path, year)

def present_value(value: float, year: int) -> float:
    """Discount an end-of-year cash flow to the 2026 valuation year."""
    return value / (1.0 + DISCOUNT_RATE) ** (year - VALUATION_YEAR)

def annual_model_row(year: int) -> dict[str, float]:
    """Calculate deployment, royalties, loss, and present value for one year."""
    but_for_royalty = annual_royalty(BUT_FOR, year)
    delayed_royalty = annual_royalty(DELAYED, year)
    lost_royalty = but_for_royalty - delayed_royalty

    return {
        "year": float(year),
        "price_per_mwh": EIA_GENERATION_PRICE_PER_MWH[year],
        "but_for_added_mw": annual_deployment_mw(BUT_FOR, year),
        "but_for_operating_mw": operating_capacity_mw(BUT_FOR, year),
        "delayed_added_mw": annual_deployment_mw(DELAYED, year),
        "delayed_operating_mw": operating_capacity_mw(DELAYED, year),
        "but_for_royalty": but_for_royalty,
        "delayed_royalty": delayed_royalty,
        "lost_royalty": lost_royalty,
        "pv_lost_royalty": present_value(lost_royalty, year),
        "pv_but_for_royalty": present_value(but_for_royalty, year),
        "pv_delayed_royalty": present_value(delayed_royalty, year),
    }

def model_rows() -> list[dict[str, float]]:
    return [annual_model_row(year) for year in range(BUT_FOR_START_YEAR, FINAL_MODEL_YEAR + 1)]

def model_totals() -> dict[str, float]:
    rows = model_rows()
    return {
        "but_for_royalties": sum(row["but_for_royalty"] for row in rows),
        "delayed_royalties": sum(row["delayed_royalty"] for row in rows),
        "lost_royalties": sum(row["lost_royalty"] for row in rows),
        "pv_but_for_royalties": sum(row["pv_but_for_royalty"] for row in rows),
        "pv_delayed_royalties": sum(row["pv_delayed_royalty"] for row in rows),
        "pv_lost_royalties": sum(row["pv_lost_royalty"] for row in rows),
    }

def money(value: float) -> str:
    return f"${value:,.2f}"

def main() -> None:
    rows = model_rows()
    totals = model_totals()

    print("VACUUSTAT WIND-ENERGY ROYALTY MODEL")
    print(f"But-for start year:        {BUT_FOR_START_YEAR}")
    print(f"Delayed start year:        {DELAYED_START_YEAR}")
    print(f"Initial deployment:        {INITIAL_DEPLOYMENT_MW:,.1f} MW")
    print(f"Annual deployment growth:  {DEPLOYMENT_GROWTH:.0%}")
    print(f"Capacity factor:           {CAPACITY_FACTOR:.0%}")
    print(f"Royalty rate:              {ROYALTY_RATE:.0%}")
    print(f"Discount rate:             {DISCOUNT_RATE:.0%}")
    print(f"Final model year:          {FINAL_MODEL_YEAR}")

    print("\nMODELED DEPLOYMENT PATH")
    print(
        f"{'Year':<6}"
        f"{'But-for Added MW':>18}"
        f"{'But-for Operating MW':>22}"
        f"{'Delayed Added MW':>18}"
        f"{'Delayed Operating MW':>22}"
    )
```

```
    print("-" * 86)

    for row in rows:
        print(
            f"{int(row['year']):<6}"
            f"{row['but_for_added_mw']:>18,.1f}"
            f"{row['but_for_operating_mw']:>22,.1f}"
            f"{row['delayed_added_mw']:>18,.1f}"
            f"{row['delayed_operating_mw']:>22,.1f}"
        )

    print("\nANNUAL ROYALTY CALCULATION")
    print(
        f"{'Year':<6}"
        f"{'EIA Price/MWh':>16}"
        f"{'But-for Royalty':>20}"
        f"{'Delayed Royalty':>20}"
        f"{'Lost Royalty':>20}"
        f"{'PV Lost Royalty':>20}"
    )
    print("-" * 102)

    for row in rows:
        price = money(row["price_per_mwh"])
        but_for = money(row["but_for_royalty"])
        delayed = money(row["delayed_royalty"])
        lost = money(row["lost_royalty"])
        pv_lost = money(row["pv_lost_royalty"])

        print(
            f"{int(row['year']):<6}"
            f"{price:>16}"
            f"{but_for:>20}"
            f"{delayed:>20}"
            f"{lost:>20}"
            f"{pv_lost:>20}"
        )

    print("-" * 102)
    print(
        f"{'TOTAL':<22}"
        f"{money(totals['but_for_royalties']):>20}"
        f"{money(totals['delayed_royalties']):>20}"
        f"{money(totals['lost_royalties']):>20}"
        f"{money(totals['pv_lost_royalties']):>20}"
    )

    print("\nPRESENT-VALUE SUMMARY")
    print(f"PV of but-for royalties:   {money(totals['pv_but_for_royalties'])}")
    print(f"PV of delayed royalties:   {money(totals['pv_delayed_royalties'])}")
    print(f"PV of lost royalties:      {money(totals['pv_lost_royalties'])}")

if __name__ == "__main__":
    main()
```

## D. Vacuustat Telecommunications Infrastructure-Lease Royalty Model

This appendix quantifies the U.S. telecommunications-infrastructure component of the Vacuustat royalty interest. It applies the parties' actual five-percent revenue royalty to a defined commercialization model in which Radian owns and operates Vacuustat telecommunications platforms and leases infrastructure capacity to wireless carriers. The carriers supply and control their own radio equipment and customer-facing wireless services. Radian earns recurring infrastructure-lease revenue from the Vacuustat platforms, and the contractual five-percent Vacuustat royalty applies to that revenue.

This model compares the but-for commercialization path with the same deployment path beginning five years later and discounts the resulting lost royalties to a 2026 valuation date.

### 1. Summary Result

Under the parameter assumptions set out below, the modeled five-year commercialization delay produces present-value lost telecommunications-infrastructure royalties of **$57.15 million** for 2026.

The fixed royalty term makes commercialization timing economically consequential. The but-for path begins accumulating operating nodes in 2028, while the delayed path begins in 2033 and reaches the same final model year in 2037. The delayed path therefore enters the royalty period later, accumulates fewer operating nodes within that period, and generates a smaller royalty stream.

### 2. Evidentiary and Economic Inputs

#### a. Multi-Tenant Vacuustat Platforms

Let $k$ denote the number of conventional wireless-site equivalents represented by one modeled Vacuustat telecommunications node. The contemporaneous Vacuustat telecommunications record supports a distributed elevated-infrastructure architecture. In March 2022, Chapiro proposed that smaller Vacuustat systems could replace "a few dozen cell towers," specifically identifying 5G and improvement of U.S. telecommunications infrastructure as major areas of value. (Ex. C3 — Corporate Communications at 15–17.)

This model uses $k = 24$, corresponding to two dozen conventional wireless-site equivalents per 600-meter Vacuustat node. Each Vacuustat platform is modeled as multi-tenant infrastructure capable of hosting carrier equipment and earning recurring lease payments from wireless operators.

### 3. Geometric Basis for the 24-Tower-Equivalent Assumption

Defendant contemporaneously estimated that a Vacuustat-supported telecommunications platform could replace "a few dozen cell towers."[19] This model translates "a few dozen" to 24 conventional tower-equivalents per Vacuustat node. Basic line-of-sight geometry independently corroborates the physical plausibility of that estimate.

The Federal Communications Commission states that cellular and PCS cell-site towers are typically 50 to 200 feet high.[20] The model uses a representative conventional antenna height of 25 meters, approximately 82 feet, which lies within the FCC's stated typical range.

Let $R$ denote the radius of the Earth, $h_c$ the representative height of a conventional cellular antenna, and $h_v$ the modeled height of a Vacuustat-supported telecommunications platform. NASA gives the Earth's mean radius as approximately 6,371 kilometers.[21] For purposes of this geometric comparison, $h_c$ is 25 meters and $h_v$ is 600 meters.

For an antenna at height $h$ above a spherical Earth, let $d(h)$ denote the straight-line distance from the antenna to the geometric horizon. By the Pythagorean theorem,

$$d(h) = \sqrt{(R + h)^2 - R^2} = \sqrt{2Rh + h^2}.$$

Applying this relationship, the geometric horizon for the representative 25-meter conventional antenna is approximately 17.85 kilometers. The corresponding geometric horizon for a 600-meter

[19] Ex. C3 — Corporate Communications, ECF No. 2-7, at 15–16, PageID ## 254–255. On March 4, 2022, Defendant recalled Plaintiff's prior proposal for "12 stationkeeping vacuustats for telecom coverage of the entire US" and asked whether smaller Vacuustat systems could "replace a few dozen cell towers." Plaintiff responded on March 5, 2022 that "a larger number of smaller-scale vacuustat systems would make more sense than trying to cram everything into a small number of extremely large-scale systems."

[20] Federal Communications Commission, *Human Exposure to Radio Frequency Fields: Guidelines for Cellular and PCS Sites*, https://www.fcc.gov/consumers/guides/human-exposure-radio-frequency-fields-guidelines-cellular-and-pcs-sites.

[21] NASA, *Solar System Sizes*, https://science.nasa.gov/resource/solar-system-sizes/.

Vacuustat-supported antenna is approximately 87.44 kilometers. The 600-meter platform therefore has approximately 4.9 times the geometric line-of-sight radius of the representative conventional antenna.

Because coverage area scales with the square of coverage radius, the approximately 4.9-fold difference in line-of-sight radius corresponds to approximately 24 times the geometric coverage area.

The same result follows directly from spherical geometry. Let $A(h)$ denote the surface area of the spherical cap visible from antenna height $h$, and let $\theta$ denote the corresponding central angle between the antenna's subpoint and the geometric horizon. The geometry gives

$$\cos(\theta) = \frac{R}{R+h},$$

and therefore

$$A(h) = 2\pi R^2(1 - \cos(\theta)).$$

Substituting the expression for $\cos(\theta)$ gives

$$A(h) = 2\pi R^2 \frac{h}{R+h}.$$

Accordingly, the ratio between the geometric coverage areas of the Vacuustat-supported antenna and the representative conventional antenna is

$$\frac{A(h_v)}{A(h_c)} = \frac{h_v(R+h_c)}{h_c(R+h_v)}.$$

Using the modeled antenna heights, this ratio is approximately 23.998, or approximately 24 to 1. A 600-meter Vacuustat-supported telecommunications platform therefore has approximately 24 times the geometric line-of-sight coverage area of a representative 25-meter conventional cellular antenna.

This geometric result independently corroborates Defendant's contemporaneous estimate that a Vacuustat-supported platform could replace "a few dozen cell towers." The model accordingly uses 24 conventional tower-equivalents per Vacuustat node.

The modeled 600-meter operating height also corresponds closely to the Federal Aviation Administration's treatment of exceptionally tall structures. FAA guidance provides that proposed structures exceeding 2,000 feet above ground level, approximately 609.6 meters, are presumed to

have a substantial adverse effect on navigable airspace and must be determined to be hazards to air navigation unless that presumption is overcome.[22] The modeled height of 600 meters, approximately 1,969 feet, lies immediately below that threshold and provides a natural upper operating-height assumption for the geometric comparison.

### a. Crown Castle U.S. Tower-Lease Benchmark

Let $p$ denote annual cash site-rental revenue per conventional tower. Crown Castle's fourth-quarter 2025 supplemental financial materials provide a direct market benchmark for U.S. multi-tenant tower economics. As of December 31, 2025, Crown Castle reported approximately 40,000 towers and an average of 2.4 tenants per tower. It reported approximately $3.930 billion of last-quarter-annualized cash site-rental revenue across 39,804 towers.[23]

Dividing the reported annualized cash site-rental revenue by the reported tower count yields $p \approx \$98,734$ per conventional tower per year. The model carries that realized 2025 tower-portfolio benchmark forward in constant real dollars through the modeled royalty period.

### b. Annual Lease Revenue per Vacuustat Node

Let $u$ denote annual infrastructure-lease revenue per operating Vacuustat node. The model calculates node-level infrastructure revenue as

$$u = kp.$$

With $k = 24$ and the Crown Castle tower benchmark described above, $u$ is approximately $2.37 million per operating Vacuustat node per year.

[22] Federal Aviation Administration, *Procedures for Handling Airspace Matters*, § 6-1-5, https://www.faa.gov/air_traffic/publications/atpubs/pham_html/chap6_section_1.html.

[23] Crown Castle Inc., *Fourth Quarter 2025 Supplemental Information*, pp. 10, 13. Crown Castle reports approximately 40,000 towers, 2.4 average tenants per tower, and $3.930 billion of last-quarter-annualized cash site-rental revenue across 39,804 towers. https://www.sec.gov/Archives/edgar/data/1051470/000105147026000008/q42025supplement.htm

### 4. Commercialization Timeline and Deployment

#### a. 2028 But-For Start and 2033 Delayed Start

Let $t$ denote the calendar year. Let $t_0^B$ denote the first commercial year in the but-for path, $d$ the modeled commercialization delay in years, and $t_0^D$ the first commercial year in the delayed path, such that

$$t_0^D = t_0^B + d.$$

The model uses $t_0^B = 2028$ and $d = 5$, producing $t_0^D = 2033$. The 2028 but-for start follows the development path reflected in the Vacuustat license: the agreement required either a qualifying government contract or a working positive-buoyancy prototype before December 31, 2027. (Compl. ¶¶ 67–74; Compl. Ex. A1 at 50–52.) A 2028 commercial-revenue start follows a 2026–2027 period of prototype construction, testing, contracting, network integration, and deployment.

Defendant contemporaneously estimated a five-year commercial timing difference for a slower capital path. In his VC solicitation, Defendant stated that reliance on DoD funding and a subcontractor role, instead of substantial private capital supporting rapid vertical integration, would make the contemplated $1 trillion market-cap outcome take "5 years longer" to reach. (Ex. C3 — Corporate Communications at 13–14.) This model uses that contemporaneous five-year timing estimate as the commercialization-delay interval. The but-for and delayed paths otherwise use the same initial deployment, annual growth rate, tower-equivalence assumption, infrastructure-revenue benchmark, and royalty rate.

#### b. Initial Twelve-Node Network and Growth

Let $N_0$ denote the initial number of new Vacuustat telecommunications nodes and $g$ the annual growth rate in new-node deployment. The model uses $N_0 = 12$ nodes and $g = 30\%$.

The initial twelve-node scale is anchored directly to the contemporaneous telecommunications architecture. Plaintiff's issued Vacuustat patent states that roughly a dozen station-keeping "vacuus-tatellites" hovering at approximately 18 km might be sufficient to provide service coverage for the continental United States. (Ex. B1 — Vacuustat Patent.) Chapiro expressly recalled that twelve-

platform concept in March 2022 and proposed moving toward smaller systems that could replace "a few dozen cell towers" each. Rapport agreed that "a larger number of smaller-scale vacuustat systems would make more sense" than concentrating the network in a small number of extremely large platforms. (Ex. C3 — Corporate Communications at 15–17.) The model therefore uses twelve nodes as the initial commercial-network scale while allowing subsequent deployment to expand at the modeled annual growth rate.

Let $N_t^B$ denote new Vacuustat telecommunications nodes deployed in year $t$ under the but-for path. For $t \geq t_0^B$:

$$N_t^B = N_0(1+g)^{t-t_0^B}.$$

Let $N_t^D$ denote new nodes deployed in year $t$ under the delayed path. Deployment is zero before $t_0^D$. For $t \geq t_0^D$:

$$N_t^D = N_0(1+g)^{t-t_0^D}.$$

The delayed path therefore reproduces the same deployment trajectory five years later.

### c. Operating Nodes

Let $s$ denote the summation-year index. Let $C_t^B$ and $C_t^D$ denote cumulative operating Vacuustat telecommunications nodes in year $t$ under the but-for and delayed paths, respectively. Nodes remain in operation through the modeled royalty period, so

$$C_t^B = \sum_{s=t_0^B}^{t} N_s^B$$

and

$$C_t^D = \sum_{s=t_0^D}^{t} N_s^D.$$

## 5. Infrastructure Revenue and Contractual Royalty

Let $R_t^B$ and $R_t^D$ denote annual royalty-bearing infrastructure-lease revenue under the but-for and delayed paths. Revenue is

$$R_t^B = C_t^B u$$

and

$$R_t^D = C_t^D u.$$

Let $\rho$ denote the contractual royalty rate. The Vacuustat license sets $\rho = 5\%$ of royalty-bearing revenue. Let $Y_t^B$ and $Y_t^D$ denote annual royalty income under the but-for and delayed paths. Thus,

$$Y_t^B = \rho R_t^B$$

and

$$Y_t^D = \rho R_t^D.$$

Let $L_t$ denote the annual royalty loss attributable to the commercialization delay:

$$L_t = Y_t^B - Y_t^D.$$

## 6. Model Horizon and Present-Value Convention

Let $T$ denote the final model year. Patent No. 10,625,842 was filed July 23, 2015, and the face of the issued patent states that its term was adjusted under 35 U.S.C. § 154(b) by 614 days. (Ex. B1 — Vacuustat Patent.) The patent-backed royalty term reaches 2037, so the model uses $T = 2037$ as the final model year.

Let $r$ denote the real risk-adjusted discount rate and $t_v$ the valuation year. The model uses $r = 15\%$ and $t_v = 2026$. The Crown Castle revenue benchmark is carried forward in constant real dollars.

Let $\mathrm{PV}_t$ denote the present value, as of the valuation year, of the annual royalty loss $L_t$. Under the end-of-year discounting convention:

$$\mathrm{PV}_t = \frac{L_t}{(1+r)^{t-t_v}}.$$

Let $\mathrm{PV}_{\text{loss}}$ denote the total present value of the modeled telecommunications royalty loss. Then

$$\mathrm{PV}_{\text{loss}} = \sum_{t=(t_0^B)}^{T} \mathrm{PV}_t.$$

## 7. Parameter Assumptions

| Parameter | Value | Basis |
|---|---|---|
| But-for commercial year ($t_0^B$) | 2028 | First commercial year following the license's December 31, 2027 commercialization milestone. |
| Commercialization delay ($d$) | 5 years | Defendant's contemporaneous five-year commercial-timing estimate. |
| Delayed commercial year ($t_0^D$) | 2033 | But-for commercial year plus the modeled five-year delay. |
| Tower equivalents per node ($k$) | 24 | Chapiro's contemporaneous "few dozen cell towers" estimate, modeled as two dozen. |
| Initial new-node deployment ($N_0$) | 12 nodes | Contemporaneous nationwide Vacuustat communications-network scale identified in Plaintiff's patent and later expressly recalled by Chapiro. |
| Annual deployment growth ($g$) | 30% | Annual growth applied to new Vacuustat telecommunications nodes. |
| Annual cash site-rental revenue per tower ($p$) | \$98,734 | Crown Castle 2025 tower-portfolio economics. |
| Annual lease revenue per Vacuustat node ($u$) | \$2.37m | Product of modeled tower equivalents per node and annual rental revenue per conventional tower. |
| Royalty rate ($\rho$) | 5% of revenue | Actual Vacuustat license. |
| Discount rate ($r$) | 15% real | Risk-adjusted present-value assumption. |
| Valuation year ($t_v$) | 2026 | Present-value reference year. |
| Final model year ($T$) | 2037 | Patent-backed royalty term reaches 2037. |

## 8. Modeled Deployment Path

The 12-node starting network and 30% annual growth assumption produce the following deployment paths. The delayed path reproduces the but-for trajectory beginning five years later.

| Year | But-for new nodes | But-for operating | Delayed new nodes | Delayed operating |
|---|---|---|---|---|
| 2028 | 12.0 | 12.0 | 0.0 | 0.0 |
| 2029 | 15.6 | 27.6 | 0.0 | 0.0 |
| 2030 | 20.3 | 47.9 | 0.0 | 0.0 |
| 2031 | 26.4 | 74.2 | 0.0 | 0.0 |
| 2032 | 34.3 | 108.5 | 0.0 | 0.0 |
| 2033 | 44.6 | 153.1 | 12.0 | 12.0 |

| Year | But-for new nodes | But-for operating | Delayed new nodes | Delayed operating |
|---|---|---|---|---|
| 2034 | 57.9 | 211.0 | 15.6 | 27.6 |
| 2035 | 75.3 | 286.3 | 20.3 | 47.9 |
| 2036 | 97.9 | 384.2 | 26.4 | 74.2 |
| 2037 | 127.3 | 511.4 | 34.3 | 108.5 |

By the end of 2037, the but-for path has approximately 511.4 Vacuustat telecommunications nodes in operation, while the delayed path has approximately 108.5 operating nodes. The difference arises from the five-year shift in the same deployment trajectory within the fixed model horizon.

## 9. Annual Royalty Calculation

| Year | But-for lease revenue | But-for royalty | Delayed royalty | Lost royalty | PV lost royalty |
|---|---|---|---|---|---|
| 2028 | $28.44m | $1.42m | $0.00m | $1.42m | $1.08m |
| 2029 | $65.40m | $3.27m | $0.00m | $3.27m | $2.15m |
| 2030 | $113.46m | $5.67m | $0.00m | $5.67m | $3.24m |
| 2031 | $175.93m | $8.80m | $0.00m | $8.80m | $4.37m |
| 2032 | $257.14m | $12.86m | $0.00m | $12.86m | $5.56m |
| 2033 | $362.72m | $18.14m | $1.42m | $16.71m | $6.28m |
| 2034 | $499.97m | $25.00m | $3.27m | $21.73m | $7.10m |
| 2035 | $678.40m | $33.92m | $5.67m | $28.25m | $8.03m |
| 2036 | $910.36m | $45.52m | $8.80m | $36.72m | $9.08m |
| 2037 | $1,211.90m | $60.59m | $12.86m | $47.74m | $10.26m |
| **Total** | | $215.19m | $32.02m | $183.17m | **$57.15m** |

Annual figures are rounded for presentation; totals are calculated from the model's unrounded values.

## 10. Symbol and Notation Reference

| Symbol | Definition |
|---|---|
| $t$ | Calendar year. |
| $B$ | Superscript identifying the but-for commercialization path. |
| $D$ | Superscript identifying the delayed commercialization path. |
| $t_0^B$ | First but-for commercial year. |
| $d$ | Modeled commercialization delay in years. |
| $t_0^D$ | First delayed commercial year. |
| $k$ | Conventional wireless-site equivalents represented by one Vacuustat telecommunications node. |
| $p$ | Annual cash site-rental revenue per conventional tower. |

| Symbol | Definition |
|---|---|
| $u$ | Annual infrastructure-lease revenue per operating Vacuustat node. |
| $N_0$ | Initial number of new Vacuustat telecommunications nodes. |
| $g$ | Annual growth rate in new-node deployment. |
| $N_t^B$ | New Vacuustat telecommunications nodes deployed in year $t$ under the but-for path. |
| $N_t^D$ | New Vacuustat telecommunications nodes deployed in year $t$ under the delayed path. |
| $s$ | Summation-year index. |
| $C_t^B$ | Cumulative operating nodes in year $t$ under the but-for path. |
| $C_t^D$ | Cumulative operating nodes in year $t$ under the delayed path. |
| $R_t^B$ | Annual royalty-bearing infrastructure-lease revenue under the but-for path. |
| $R_t^D$ | Annual royalty-bearing infrastructure-lease revenue under the delayed path. |
| $\rho$ | Contractual royalty rate. |
| $Y_t^B$ | Annual royalty income under the but-for path. |
| $Y_t^D$ | Annual royalty income under the delayed path. |
| $L_t$ | Annual royalty loss attributable to the commercialization delay. |
| $r$ | Real risk-adjusted discount rate. |
| $t_v$ | Present-value reference year. |
| $\mathrm{PV}_t$ | Present value of the annual royalty loss in year $t$. |
| $\mathrm{PV}_{\mathrm{loss}}$ | Total present value of the modeled telecommunications royalty loss. |
| $T$ | Final model year. |

## 11. Conclusion

The U.S. telecommunications infrastructure-leasing model produces a 2026 present-value royalty loss of **$57.15 million** from the modeled five-year commercialization delay. The but-for path begins with 12 Vacuustat nodes in 2028 and grows annual new-node deployment at 30%; the delayed path follows the same deployment trajectory beginning in 2033. Both paths end in the same 2037 model year.

The model uses realized U.S. multi-tenant tower economics as its revenue benchmark and Chapiro's contemporaneous "few dozen cell towers" estimate as the basis for 24 conventional tower-equivalents per Vacuustat node. It quantifies the economic consequence of losing five years within a finite royalty period: the delayed path accumulates substantially fewer operating nodes before the royalty horizon ends, reducing the infrastructure-lease revenue on which the contractual five-percent royalty is calculated.

The remaining Vacuustat damages are calculated modularly. Wind energy and defense are evaluated using their own deployment and revenue evidence, after which the distinct application-specific royalty streams are combined into the total Vacuustat royalty-loss measure.

## 12. Valuation Model Code

```
"""Vacuustat telecommunications infrastructure-lease royalty-loss model.

Models the U.S. telecommunications component of the Vacuustat royalty interest
using:
- 2028 but-for commercialization start
- 5-year commercialization delay (2033 delayed start)
- 12 Vacuustat nodes in the initial commercial deployment
- 30% annual growth in newly deployed nodes
- 24 conventional tower-equivalents per Vacuustat node
- Crown Castle 2025 cash site-rental economics as the revenue benchmark
- 5% contractual royalty on royalty-bearing infrastructure-lease revenue
- 15% real annual discount rate
- 2026 valuation year
- 2037 final model year

The but-for and delayed paths use the same deployment trajectory. The delayed
path begins five years later and therefore accumulates fewer operating nodes
within the same finite model horizon.
"""

from dataclasses import dataclass


BUT_FOR_START_YEAR = 2028
COMMERCIALIZATION_DELAY = 5
DELAYED_START_YEAR = BUT_FOR_START_YEAR + COMMERCIALIZATION_DELAY
FINAL_MODEL_YEAR = 2037
VALUATION_YEAR = 2026

INITIAL_NODE_COUNT = 12
DEPLOYMENT_GROWTH = 0.30
TOWER_EQUIVALENTS_PER_NODE = 24.0

# Crown Castle Inc., Fourth Quarter 2025 Supplemental Information.
# Last-quarter-annualized cash site-rental revenue across 39,804 towers.
CROWN_CASTLE_ANNUALIZED_CASH_SITE_RENTAL_REVENUE = 3_930_000_000.0
CROWN_CASTLE_TOWER_COUNT = 39_804.0
ANNUAL_REVENUE_PER_TOWER = (
    CROWN_CASTLE_ANNUALIZED_CASH_SITE_RENTAL_REVENUE / CROWN_CASTLE_TOWER_COUNT
)
ANNUAL_REVENUE_PER_NODE = TOWER_EQUIVALENTS_PER_NODE * ANNUAL_REVENUE_PER_TOWER

ROYALTY_RATE = 0.05
DISCOUNT_RATE = 0.15


@dataclass(frozen=True)
class CommercializationPath:
    name: str
    start_year: int


BUT_FOR = CommercializationPath("But-for", BUT_FOR_START_YEAR)
DELAYED = CommercializationPath("Delayed", DELAYED_START_YEAR)


def annual_new_nodes(path: CommercializationPath, year: int) -> float:
    """New Vacuustat telecommunications nodes deployed in a given year."""
    if year < path.start_year:
        return 0.0
    return INITIAL_NODE_COUNT * (1.0 + DEPLOYMENT_GROWTH) ** (year - path.start_year)


def operating_nodes(path: CommercializationPath, year: int) -> float:
    """Cumulative operating Vacuustat telecommunications nodes through a year."""
    if year < path.start_year:
        return 0.0
    return sum(
        annual_new_nodes(path, deployment_year)
```

```
        for deployment_year in range(path.start_year, year + 1)
    )


def annual_lease_revenue(path: CommercializationPath, year: int) -> float:
    """Annual royalty-bearing infrastructure-lease revenue."""
    return operating_nodes(path, year) * ANNUAL_REVENUE_PER_NODE


def annual_royalty(path: CommercializationPath, year: int) -> float:
    """Annual contractual Vacuustat royalty income."""
    return ROYALTY_RATE * annual_lease_revenue(path, year)


def present_value(value: float, year: int) -> float:
    """Discount an end-of-year cash flow to the 2026 valuation year."""
    return value / (1.0 + DISCOUNT_RATE) ** (year - VALUATION_YEAR)


def annual_model_row(year: int) -> dict[str, float]:
    """Calculate deployment, royalties, loss, and present value for one year."""
    but_for_royalty = annual_royalty(BUT_FOR, year)
    delayed_royalty = annual_royalty(DELAYED, year)
    lost_royalty = but_for_royalty - delayed_royalty

    return {
        "year": float(year),
        "but_for_new_nodes": annual_new_nodes(BUT_FOR, year),
        "but_for_operating_nodes": operating_nodes(BUT_FOR, year),
        "delayed_new_nodes": annual_new_nodes(DELAYED, year),
        "delayed_operating_nodes": operating_nodes(DELAYED, year),
        "but_for_lease_revenue": annual_lease_revenue(BUT_FOR, year),
        "delayed_lease_revenue": annual_lease_revenue(DELAYED, year),
        "but_for_royalty": but_for_royalty,
        "delayed_royalty": delayed_royalty,
        "lost_royalty": lost_royalty,
        "pv_lost_royalty": present_value(lost_royalty, year),
        "pv_but_for_royalty": present_value(but_for_royalty, year),
        "pv_delayed_royalty": present_value(delayed_royalty, year),
    }


def model_rows() -> list[dict[str, float]]:
    return [
        annual_model_row(year)
        for year in range(BUT_FOR_START_YEAR, FINAL_MODEL_YEAR + 1)
    ]


def model_totals() -> dict[str, float]:
    rows = model_rows()
    return {
        "but_for_royalties": sum(row["but_for_royalty"] for row in rows),
        "delayed_royalties": sum(row["delayed_royalty"] for row in rows),
        "lost_royalties": sum(row["lost_royalty"] for row in rows),
        "pv_but_for_royalties": sum(row["pv_but_for_royalty"] for row in rows),
        "pv_delayed_royalties": sum(row["pv_delayed_royalty"] for row in rows),
        "pv_lost_royalties": sum(row["pv_lost_royalty"] for row in rows),
    }


def money(value: float) -> str:
    return f"${value:,.2f}"


def main() -> None:
    rows = model_rows()
    totals = model_totals()

    print("VACUUSTAT TELECOMMUNICATIONS ROYALTY MODEL")
    print(f"But-for start year:          {BUT_FOR_START_YEAR}")
    print(f"Delayed start year:          {DELAYED_START_YEAR}")
    print(f"Initial node deployment:     {INITIAL_NODE_COUNT:,.0f}")
    print(f"Annual deployment growth:    {DEPLOYMENT_GROWTH:.0%}")
    print(f"Tower-equivalents per node:  {TOWER_EQUIVALENTS_PER_NODE:,.0f}")
    print(f"Annual revenue per tower:    {money(ANNUAL_REVENUE_PER_TOWER)}")
    print(f"Annual revenue per node:     {money(ANNUAL_REVENUE_PER_NODE)}")
    print(f"Royalty rate:                {ROYALTY_RATE:.0%}")
    print(f"Discount rate:               {DISCOUNT_RATE:.0%}")
    print(f"Final model year:            {FINAL_MODEL_YEAR}")

    print("\nMODELED DEPLOYMENT PATH")
```

```
    print(
        f"{'Year':<6}"
        f"{'But-for New':>16}"
        f"{'But-for Operating':>20}"
        f"{'Delayed New':>16}"
        f"{'Delayed Operating':>20}"
    )
    print("-" * 78)

    for row in rows:
        print(
            f"{int(row['year']):<6}"
            f"{row['but_for_new_nodes']:>16,.1f}"
            f"{row['but_for_operating_nodes']:>20,.1f}"
            f"{row['delayed_new_nodes']:>16,.1f}"
            f"{row['delayed_operating_nodes']:>20,.1f}"
        )

    print("\nANNUAL ROYALTY CALCULATION")
    print(
        f"{'Year':<6}"
        f"{'But-for Lease Revenue':>24}"
        f"{'But-for Royalty':>20}"
        f"{'Delayed Royalty':>20}"
        f"{'Lost Royalty':>20}"
        f"{'PV Lost Royalty':>20}"
    )
    print("-" * 110)

    for row in rows:
        but_for_revenue = money(row["but_for_lease_revenue"])
        but_for_royalty = money(row["but_for_royalty"])
        delayed_royalty = money(row["delayed_royalty"])
        lost_royalty = money(row["lost_royalty"])
        pv_lost_royalty = money(row["pv_lost_royalty"])

        print(
            f"{int(row['year']):<6}"
            f"{but_for_revenue:>24}"
            f"{but_for_royalty:>20}"
            f"{delayed_royalty:>20}"
            f"{lost_royalty:>20}"
            f"{pv_lost_royalty:>20}"
        )

    print("-" * 110)
    print(
        f"{'TOTAL':<30}"
        f"{money(totals['but_for_royalties']):>20}"
        f"{money(totals['delayed_royalties']):>20}"
        f"{money(totals['lost_royalties']):>20}"
        f"{money(totals['pv_lost_royalties']):>20}"
    )

    print("\nPRESENT-VALUE SUMMARY")
    print(f"PV of but-for royalties:     {money(totals['pv_but_for_royalties'])}")
    print(f"PV of delayed royalties:     {money(totals['pv_delayed_royalties'])}")
    print(f"PV of lost royalties:        {money(totals['pv_lost_royalties'])}")

if __name__ == "__main__":
    main()
```

## E. Vacuustat Defense-Procurement Royalty Model

This appendix quantifies the U.S. defense-procurement component of the Vacuustat royalty loss. The model follows Defendant Michael Chapiro's February 27, 2025 Missile Defense Agency ConOps roadmap, including its development epochs, pilot-factory production capacity, first market-ready product, transition to larger-number production, mature deployment economics, and approximately $500 million cost for a 100-balloon platform deployment. (Ex. E3 [SEALED], ECF No. 8.)

The modeled commercial structure follows the ConOps: Radian manufactures and sells Vacuustat platforms to the United States Government or defense prime contractors, while mission payloads and other defense systems are supplied separately. Defendant's mature-deployment estimate prices the 100-balloon Vacuustat platform line at approximately half a billion dollars and identifies payload costs separately. (Ex. E3 [SEALED], ECF No. 8.)

The model applies the parties' actual five-percent Vacuustat revenue royalty to platform-procurement revenue and compares the documented but-for commercialization path with the same path shifted five years later. (Compl. ¶¶ 67–74; Compl. Ex. A1 at 50–52; Ex. C3 — Corporate Communications at 13–14.)

Defendant's September 8, 2026 email supplies a later, concrete production anchor. Defendant reported that the first 15 units were being sold from a production facility in Poland and that the customer would then want hundreds. (Ex. F9 — Vacuustat Email.) The model uses that reported 15-unit production quantity as the initial annual procurement quantity while retaining the ConOps' 2029 first U.S. defense-procurement year.

### 1. Summary Result

Under the assumptions stated below, the defense-procurement model produces a 2026 present-value royalty loss of approximately **$38.82 million**.

The loss results from shifting the same procurement progression five years later while retaining 2037 as the final model year. The but-for path reaches Defendant's mature-deployment stage during

the modeled period; the delayed path remains in the earlier production ramp. The resulting difference in annual contractual royalties is discounted to the 2026 valuation year.

### 2. Defendant's Roadmap Supplies the Commercialization Timeline

The February 27, 2025 ConOps lays out the following progression. (Ex. E3 [SEALED], ECF No. 8.)

| Period | Roadmap stage | Defendant's budget | Commercial significance |
|---|---|---|---|
| 2024–2027 | Epoch 1 — Materials & Manufacturing | $15m | Rapid prototyping culminating in the first balloon prototype. |
| 2028–2030 | Epoch 2 — Systems Manufacturing Capabilities | $75m | Pilot-factory production in 2028 and first market-ready tethered product in 2029. |
| 2030–2032 | Epoch 3 — Controls & Navigation | $40m / $60m / $100m | Expansion from the established tethered product into navigation, propulsion, and proven system capability. |
| 2033–2034 | Epoch 4 — Missile Defense Integration | $200m | Integration into the broader architecture with a wide range of balloon types produced in larger numbers. |
| 2035–2045 | (Very) Large Scale Deployment | Mature production | Technology described as mature by 2035, followed by large-scale architecture buildout. |

The $75 million second epoch expressly transitions from a single prototype to a product "that can be manufactured at scale and ready to use by an end-customer in the field." Defendant states that the 2028 pilot factory would support construction of at least one full-size vacuum balloon per month and that the 2029 deployable tethered system would be the "first market-ready product," capable of being provided to the military services for missile defense or other purposes. (Ex. E3 [SEALED], ECF No. 8.)

The 2030–2032 epoch expands the established tethered product into navigation, propulsion, and multi-platform capability. The 2033–2034 integration epoch calls for "a wide range of balloon types

being produced in larger numbers." By 2035, Defendant states that the technology could be mature and enter "(Very) Large Scale Deployment." (Ex. E3 [SEALED], ECF No. 8.)

### 3. Platform Price Derived From Defendant's Mature-Deployment Estimate

Let $V_M$ denote Defendant's mature-deployment Vacuustat platform-value benchmark, $Q_M$ the number of platforms in that benchmark, and $P$ the resulting modeled price per Vacuustat platform. Defendant's ConOps states that a line of 100 balloons carrying 2,000-pound defense payloads could cost "around half a billion," with the Vacuustat-platform cost stated separately from the payloads. (Ex. E3 [SEALED], ECF No. 8.) The model therefore defines:

$$P = \frac{V_M}{Q_M}.$$

With $V_M$ equal to approximately \$500 million and $Q_M$ equal to 100 platforms, the resulting modeled platform price $P$ is approximately \$5 million per Vacuustat platform.

Defendant's same cost discussion projects "huge numbers of balloons" deployed "in the thousands" as manufacturing matured. (Ex. E3 [SEALED], ECF No. 8.) The model does not carry that thousands-scale deployment into the modeled procurement period. Instead, it uses 100 platforms as the 2035 mature-procurement anchor. That anchor is one-tenth of even a 1,000-platform deployment and is therefore an order of magnitude below the scale Defendant himself described.

### 4. Procurement Ramp

Let $t$ denote calendar year; $B$ and $D$ denote the but-for and delayed paths, respectively; $t_0^B$ and $t_0^D$ denote their first procurement years; $Q_0$ denote initial annual procurement; $g$ denote annual procurement growth; $t_M^B$ and $t_M^D$ denote the mature-deployment anchor years; and $Q_M$ denote annual procurement at the mature-deployment anchor.

#### a. Initial Procurement: 2029 Market-Ready Product and 15-Unit Production Anchor

Defendant states that the 2028 pilot factory would support production of at least one full-size vacuum balloon per month. (Ex. E3 [SEALED], ECF No. 8.) That establishes annual production capacity of at least 12 full-size platforms before the first market-ready product identified for 2029.

Defendant later supplied a more concrete quantity. In his September 8, 2026 email, he reported that the first 15 units were being sold from a production facility in Poland and that the customer would then want hundreds. (Ex. F9 — Vacuustat Email.) The model therefore sets initial annual procurement $Q_0$ to 15 platforms. It retains 2029 as the first U.S. defense-procurement year $t_0^B$ from the government-facing ConOps rather than moving that date earlier; the Poland email updates the starting quantity from the ConOps' 12-platform minimum annual capacity to Defendant's reported 15-unit production run. For the initial production ramp, annual but-for procurement $Q_t^B$ is:

$$Q_t^B = Q_0(1 + g)^{t - t_0^B}.$$

This initial-growth expression applies through 2034 and produces a progressive transition from pilot-factory production to the larger-number production Defendant described for the 2033–2034 integration epoch.

### b. 2035 Mature Deployment Anchor

The model sets the mature but-for anchor year $t_M^B$ to 2035, the beginning of Defendant's "(Very) Large Scale Deployment" period, and sets mature annual procurement $Q_M$ to 100 platforms. That quantity corresponds directly to Defendant's mature 100-balloon deployment example while remaining far below his stated thousands-scale deployment trajectory.

For years beginning with the mature anchor, annual but-for procurement is:

$$Q_t^B = Q_M(1 + g)^{t - t_M^B}.$$

The model therefore begins the mature stage at 100 platforms in 2035 and applies the same annual growth rate in 2036 and 2037.

### c. Five-Year Delayed Path

Let $\Delta$ denote the five-year commercialization delay. The delayed path shifts each but-for commercialization anchor by the same interval:

$$t_0^D = t_0^B + \Delta,$$

$$t_M^D = t_M^B + \Delta.$$

Accordingly, the first market-ready procurement moves from 2029 to 2034, and the mature 100-platform anchor moves from 2035 to 2040. Because 2040 lies beyond the final model year, the delayed path remains within its initial production ramp through 2037. Annual delayed procurement $Q_t^D$ during that ramp is:

$$Q_t^D = Q_0(1+g)^{t-t_0^D}.$$

## 5. Royalty and Present-Value Calculation

Let $R_t^B$ and $R_t^D$ denote annual Vacuustat platform-procurement revenue under the but-for and delayed paths. Because $P$ is the modeled price per platform:

$$R_t^B = PQ_t^B,$$

$$R_t^D = PQ_t^D.$$

Let $\rho$ denote the contractual royalty rate. Annual but-for royalty income $Y_t^B$ and delayed royalty income $Y_t^D$ are:

$$Y_t^B = \rho R_t^B,$$

$$Y_t^D = \rho R_t^D.$$

Let $L_t$ denote the annual royalty loss attributable to the commercialization delay:

$$L_t = Y_t^B - Y_t^D.$$

Let $r$ denote the annual real discount rate and $t_v$ the valuation year. The present value $V_t$ of the annual royalty loss is:

$$V_t = \frac{L_t}{(1+r)^{t-t_v}}.$$

The total present-value royalty loss $V_L$ is the sum of $V_t$ across the modeled years through the final model year $T$.

## 6. Model Assumptions

| Parameter | Value | Basis |
|---|---|---|
| But-for first procurement year ($t_0^B$) | 2029 | Defendant's first market-ready product. |
| Commercialization delay ($\Delta$) | 5 years | Defendant's contemporaneous commercial-timing estimate. |
| Delayed first procurement year ($t_0^D$) | 2034 | But-for first procurement year shifted by $\Delta$. |
| 2028 pilot-factory capacity | ≥12 platforms/year | Defendant's stated capacity of at least one full-size balloon per month. |
| Initial annual procurement ($Q_0$) | 15 platforms | Defendant's September 8, 2026 report that the first 15 units were being sold from a Poland production facility. |
| Platform price ($P$) | \$5m | Defendant's approximately \$500m / 100-balloon mature platform estimate. |
| Annual procurement growth ($g$) | 30% | Applied to each production regime. |
| But-for mature anchor year ($t_M^B$) | 2035 | Beginning of Defendant's "(Very) Large Scale Deployment" period. |
| Mature annual procurement ($Q_M$) | 100 platforms | Defendant's 100-balloon mature deployment example; far below his stated deployment scale "in the thousands." |
| Delayed mature anchor year ($t_M^D$) | 2040 | But-for mature anchor shifted by $\Delta$. |
| Royalty rate ($\rho$) | 5% of revenue | Actual Vacuustat license. |
| Discount rate ($r$) | 15% real | Present-value assumption. |
| Valuation year ($t_v$) | 2026 | Present-value reference year. |
| Final model year ($T$) | 2037 | Final year of the modeled royalty period. |

## 7. Annual Procurement and Royalty Calculation

| Year | But-for platforms | Delayed platforms | But-for royalty | Delayed royalty | Lost royalty | PV lost royalty |
|---|---|---|---|---|---|---|
| 2029 | 15.0 | 0.0 | \$3.75m | \$0.00m | \$3.75m | \$2.47m |
| 2030 | 19.5 | 0.0 | \$4.88m | \$0.00m | \$4.88m | \$2.79m |
| 2031 | 25.4 | 0.0 | \$6.34m | \$0.00m | \$6.34m | \$3.15m |
| 2032 | 33.0 | 0.0 | \$8.24m | \$0.00m | \$8.24m | \$3.56m |
| 2033 | 42.8 | 0.0 | \$10.71m | \$0.00m | \$10.71m | \$4.03m |
| 2034 | 55.7 | 15.0 | \$13.92m | \$3.75m | \$10.17m | \$3.33m |
| 2035 | 100.0 | 19.5 | \$25.00m | \$4.88m | \$20.13m | \$5.72m |
| 2036 | 130.0 | 25.4 | \$32.50m | \$6.34m | \$26.16m | \$6.47m |
| 2037 | 169.0 | 33.0 | \$42.25m | \$8.24m | \$34.01m | \$7.31m |
| **Total** | | | \$147.585m | \$23.201m | \$124.384m | **\$38.82m** |

Annual figures are rounded for presentation; the three undiscounted royalty totals are displayed to three decimal places (millions) so their subtraction is apparent, and all totals are calculated from the unrounded model values. The but-for royalty stream has a 2026 present value of approximately $44.77 million, while the delayed royalty stream has a present value of approximately $5.95 million. Their difference is the $38.82 million present-value defense royalty loss.

## 8. Symbol and Notation Reference

| Symbol | Definition |
|---|---|
| $t$ | Calendar year. |
| $B$ | Superscript identifying the but-for commercialization path. |
| $D$ | Superscript identifying the delayed commercialization path. |
| $t_0^B$ | First but-for procurement year, 2029. |
| $t_0^D$ | First delayed procurement year, 2034. |
| $\Delta$ | Commercialization delay, five years. |
| $Q_0$ | Initial annual procurement, 15 platforms, based on Defendant's reported Poland production run. |
| $Q_t^B$ | But-for Vacuustat platforms procured in year $t$. |
| $Q_t^D$ | Delayed-path Vacuustat platforms procured in year $t$. |
| $g$ | Annual procurement growth rate, 30%. |
| $t_M^B$ | But-for mature-deployment anchor year, 2035. |
| $t_M^D$ | Delayed mature-deployment anchor year, 2040. |
| $Q_M$ | Annual procurement at the mature-deployment anchor, 100 platforms. |
| $V_M$ | Defendant's mature-deployment Vacuustat platform-value benchmark, approximately $500m. |
| $P$ | Modeled price per Vacuustat platform, approximately $5m. |
| $R_t^B$ | Annual but-for platform-procurement revenue. |
| $R_t^D$ | Annual delayed-path platform-procurement revenue. |
| $\rho$ | Contractual royalty rate, 5%. |
| $Y_t^B$ | Annual but-for Vacuustat royalty. |
| $Y_t^D$ | Annual delayed-path Vacuustat royalty. |
| $L_t$ | Annual royalty loss caused by the commercialization delay. |
| $r$ | Real annual discount rate, 15%. |
| $t_v$ | Valuation year, 2026. |
| $V_t$ | Present value in 2026 of the annual royalty loss in year $t$. |
| $V_L$ | Total present-value defense royalty loss. |
| $T$ | Final model year, 2037. |

## 9. Conclusion

The U.S. defense-procurement model produces a present-value royalty loss of approximately **$38.82 million** from the five-year commercialization delay.

The model is anchored principally to Defendant's own government-facing roadmap: a $15 million prototype epoch; a $75 million manufacturing-maturation epoch; pilot-factory capacity of at least one full-size balloon per month; a first market-ready product in 2029; larger-number production during 2033–2034 integration; a 100-balloon mature-deployment benchmark priced by Defendant at approximately $500 million; and very large-scale deployment beginning in 2035. Defendant additionally projected eventual deployment "in the thousands." (Ex. E3 [SEALED], ECF No. 8.) His September 8, 2026 email later reported the first 15 units being sold from a Poland production facility and anticipated demand for hundreds, providing a concrete production-scale anchor for the model's 15-platform initial quantity. (Ex. F9 — Vacuustat Email.) The model's 100-platform mature anchor therefore remains substantially below Defendant's own stated long-run deployment scale.

The remaining Vacuustat damages are calculated modularly. Wind energy and telecommunications are evaluated using their own deployment and revenue evidence, after which the distinct application-specific royalty streams are combined into the total Vacuustat royalty-loss measure.

## 10. Valuation Model Code

```
"""Vacuustat defense-procurement royalty-loss model.

Models the U.S. defense-procurement component of the Vacuustat royalty interest
using:
- 2029 but-for first procurement year
- 5-year commercialization delay (2034 delayed first procurement year)
- 15 platforms in the initial annual procurement, based on Defendant's reported
  first 15-unit Poland production/sales run
- 30% annual procurement growth during the initial production ramp
- 100-platform mature-deployment anchor in 2035
- 30% annual procurement growth after the mature-deployment anchor
- $500 million mature deployment value across 100 platforms
- 5% contractual royalty on platform-procurement revenue
- 15% real annual discount rate
- 2026 valuation year
- 2037 final model year

The but-for and delayed paths use the same two-stage procurement trajectory.
The delayed path begins five years later, shifting the mature 100-platform
anchor from 2035 to 2040. Because 2040 lies beyond the final model year, the
delayed path remains within its initial production ramp through 2037.
"""

from dataclasses import dataclass

BUT_FOR_START_YEAR = 2029
COMMERCIALIZATION_DELAY = 5
DELAYED_START_YEAR = BUT_FOR_START_YEAR + COMMERCIALIZATION_DELAY
```

```python
BUT_FOR_MATURE_YEAR = 2035
DELAYED_MATURE_YEAR = BUT_FOR_MATURE_YEAR + COMMERCIALIZATION_DELAY

FINAL_MODEL_YEAR = 2037
VALUATION_YEAR = 2026

# Defendant reported on September 8, 2026 that the first 15 units were being
# sold from a production facility in Poland. Ex. F9 – Vacuustat Email.
INITIAL_PLATFORM_COUNT = 15.0
PROCUREMENT_GROWTH = 0.30
MATURE_PLATFORM_COUNT = 100.0

MATURE_DEPLOYMENT_VALUE = 500_000_000.0
MATURE_DEPLOYMENT_PLATFORM_COUNT = 100.0
PLATFORM_PRICE = MATURE_DEPLOYMENT_VALUE / MATURE_DEPLOYMENT_PLATFORM_COUNT

ROYALTY_RATE = 0.05
DISCOUNT_RATE = 0.15


@dataclass(frozen=True)
class ProcurementPath:
    name: str
    start_year: int
    mature_year: int


BUT_FOR = ProcurementPath(
    "But-for",
    BUT_FOR_START_YEAR,
    BUT_FOR_MATURE_YEAR,
)
DELAYED = ProcurementPath(
    "Delayed",
    DELAYED_START_YEAR,
    DELAYED_MATURE_YEAR,
)


def annual_platform_procurement(path: ProcurementPath, year: int) -> float:
    """Vacuustat platforms procured in a given year."""
    if year < path.start_year:
        return 0.0

    if year < path.mature_year:
        return INITIAL_PLATFORM_COUNT * (1.0 + PROCUREMENT_GROWTH) ** (
            year - path.start_year
        )

    return MATURE_PLATFORM_COUNT * (1.0 + PROCUREMENT_GROWTH) ** (
        year - path.mature_year
    )


def annual_platform_revenue(path: ProcurementPath, year: int) -> float:
    """Annual royalty-bearing Vacuustat platform-procurement revenue."""
    return annual_platform_procurement(path, year) * PLATFORM_PRICE


def annual_royalty(path: ProcurementPath, year: int) -> float:
    """Annual contractual Vacuustat royalty income."""
    return ROYALTY_RATE * annual_platform_revenue(path, year)


def present_value(value: float, year: int) -> float:
    """Discount an end-of-year cash flow to the 2026 valuation year."""
    return value / (1.0 + DISCOUNT_RATE) ** (year - VALUATION_YEAR)


def annual_model_row(year: int) -> dict[str, float]:
    """Calculate procurement, royalties, loss, and present value for one year."""
    but_for_royalty = annual_royalty(BUT_FOR, year)
    delayed_royalty = annual_royalty(DELAYED, year)
    lost_royalty = but_for_royalty - delayed_royalty

    return {
        "year": float(year),
        "but_for_platforms": annual_platform_procurement(BUT_FOR, year),
        "delayed_platforms": annual_platform_procurement(DELAYED, year),
        "but_for_platform_revenue": annual_platform_revenue(BUT_FOR, year),
        "delayed_platform_revenue": annual_platform_revenue(DELAYED, year),
```

```
        "but_for_royalty": but_for_royalty,
        "delayed_royalty": delayed_royalty,
        "lost_royalty": lost_royalty,
        "pv_lost_royalty": present_value(lost_royalty, year),
        "pv_but_for_royalty": present_value(but_for_royalty, year),
        "pv_delayed_royalty": present_value(delayed_royalty, year),
    }


def model_rows() -> list[dict[str, float]]:
    return [
        annual_model_row(year)
        for year in range(BUT_FOR_START_YEAR, FINAL_MODEL_YEAR + 1)
    ]


def model_totals() -> dict[str, float]:
    rows = model_rows()
    return {
        "but_for_royalties": sum(row["but_for_royalty"] for row in rows),
        "delayed_royalties": sum(row["delayed_royalty"] for row in rows),
        "lost_royalties": sum(row["lost_royalty"] for row in rows),
        "pv_but_for_royalties": sum(row["pv_but_for_royalty"] for row in rows),
        "pv_delayed_royalties": sum(row["pv_delayed_royalty"] for row in rows),
        "pv_lost_royalties": sum(row["pv_lost_royalty"] for row in rows),
    }


def money(value: float) -> str:
    return f"${value:,.2f}"


def main() -> None:
    rows = model_rows()
    totals = model_totals()

    print("VACUUSTAT DEFENSE-PROCUREMENT ROYALTY MODEL")
    print(f"But-for start year:          {BUT_FOR_START_YEAR}")
    print(f"Delayed start year:          {DELAYED_START_YEAR}")
    print(f"Initial annual procurement:  {INITIAL_PLATFORM_COUNT:,.0f} platforms")
    print(f"Annual procurement growth:   {PROCUREMENT_GROWTH:.0%}")
    print(f"But-for mature anchor:       {BUT_FOR_MATURE_YEAR}")
    print(f"Delayed mature anchor:       {DELAYED_MATURE_YEAR}")
    print(f"Mature annual procurement:   {MATURE_PLATFORM_COUNT:,.0f} platforms")
    print(f"Mature deployment value:     {money(MATURE_DEPLOYMENT_VALUE)}")
    print(f"Modeled platform price:      {money(PLATFORM_PRICE)}")
    print(f"Royalty rate:                {ROYALTY_RATE:.0%}")
    print(f"Discount rate:               {DISCOUNT_RATE:.0%}")
    print(f"Final model year:            {FINAL_MODEL_YEAR}")

    print("\nMODELED PROCUREMENT PATH")
    print(
        f"{'Year':<6}"
        f"{'But-for Platforms':>20}"
        f"{'Delayed Platforms':>20}"
    )
    print("-" * 46)

    for row in rows:
        print(
            f"{int(row['year']):<6}"
            f"{row['but_for_platforms']:>20,.1f}"
            f"{row['delayed_platforms']:>20,.1f}"
        )

    print("\nANNUAL ROYALTY CALCULATION")
    print(
        f"{'Year':<6}"
        f"{'But-for Revenue':>22}"
        f"{'But-for Royalty':>20}"
        f"{'Delayed Royalty':>20}"
        f"{'Lost Royalty':>20}"
        f"{'PV Lost Royalty':>20}"
    )
    print("-" * 108)

    for row in rows:
        but_for_revenue = money(row["but_for_platform_revenue"])
        but_for_royalty = money(row["but_for_royalty"])
        delayed_royalty = money(row["delayed_royalty"])
        lost_royalty = money(row["lost_royalty"])
        pv_lost_royalty = money(row["pv_lost_royalty"])
```

```
        print(
            f"{int(row['year']):<6}"
            f"{but_for_revenue:>22}"
            f"{but_for_royalty:>20}"
            f"{delayed_royalty:>20}"
            f"{lost_royalty:>20}"
            f"{pv_lost_royalty:>20}"
        )

    print("-" * 108)
    print(
        f"{'TOTAL':<28}"
        f"{money(totals['but_for_royalties']):>20}"
        f"{money(totals['delayed_royalties']):>20}"
        f"{money(totals['lost_royalties']):>20}"
        f"{money(totals['pv_lost_royalties']):>20}"
    )

    print("\nPRESENT-VALUE SUMMARY")
    print(f"PV of but-for royalties:     {money(totals['pv_but_for_royalties'])}")
    print(f"PV of delayed royalties:     {money(totals['pv_delayed_royalties'])}")
    print(f"PV of lost royalties:        {money(totals['pv_lost_royalties'])}")

if __name__ == "__main__":
    main()
```

## F. [PROPOSED] Final Judgment and Permanent Injunction

This matter came before the Court upon Plaintiffs Nathan Rapport and Radian Industries Inc.'s Application for Default Judgment under Federal Rule of Civil Procedure 55(b)(2), the Supplemental Memorandum in Support of Default Judgment, the Complaint, the declarations and affidavits, the exhibits, the docket materials, and the complete record.

Defendant Michael Chapiro, having been validly served and having failed to plead, answer, appear, or otherwise defend, is in default. Upon consideration of the record, the Court ORDERS, ADJUDGES, and DECREES as follows.

## I. Procedural and Jurisdictional Findings

The Court finds that:

(a) Plaintiffs completed service by publication on June 17, 2026 in accordance with the Court's orders and filed proof of completed publication at ECF Nos. 32 and 32-1.

(b) Defendant had actual notice of this action and its contents before publication was completed, including through communications with Plaintiffs' counsel and communications involving counsel representing Defendant in related corporate matters.

(c) Defendant received constitutionally adequate notice and a sustained opportunity to appear and defend, yet failed to answer, move, appear, or otherwise defend after service was completed.

(d) The Clerk properly entered Defendant's default under Federal Rule of Civil Procedure 55(a) on July 21, 2026, ECF No. 35.

(e) Based on the Complaint and contemporaneous record, the Court finds that Defendant purposefully established continuing contacts with Ohio related to the transactions, property, corporate activity, intellectual property, contractual obligations, and misconduct adjudicated in this action, and Plaintiffs' claims arise from or relate to those contacts. The Court therefore possesses specific personal jurisdiction over Defendant under Ohio Rev. Code § 2307.382 and the Due Process Clause.

(f) Entry of final judgment on the present record is consistent with due process and rests on valid service, personal jurisdiction, Defendant's default, the well-pleaded allegations thereby admitted, and the evidentiary record supporting the relief awarded below.

## II. Liability, Statutory, and Permanent-Injunction Findings

Judgment is entered in favor of Plaintiffs Nathan Rapport and Radian Industries Inc. and against Defendant Michael Chapiro on Counts I–IX and XI–XXIII of the Complaint as adjudicated by Defendant's default and the record before the Court. Plaintiffs have waived Count X (defamation per se) in this action and request no judgment or recovery on that count; no relief awarded by this Judgment is attributable to Count X.

### A. Distinct Economic Injuries

The Court finds that Defendant's course of conduct caused multiple distinct economic injuries. Each injury identified below is independently supported by the record and receives one compensatory award. Alternative causes of action and valuation measures addressing the same injury do not create duplicate recovery.

| **Compensatory Category** | **Amount** |
|---|---:|
| Diverted corporate capital | $28,870.52 |
| R&D expenses and core-development labor | $78,759.42 |
| 2025 compensation shortfall | $38,000.00 |
| Lost contract opportunity | $1,000,000.00 |
| Lost near-term investment opportunity | $500,000.00 |
| Diverted Khosla Ventures opportunity | $5,000,000.00 |
| Destroyed Radian enterprise value | $2,500,000.00 |
| Artifact impairment | $25,000,000.00 |
| Vacuustat delay and lost royalties | $121,800,808.00 |
| **Total compensatory damages** | **$155,946,437.94** |

The Artifact and Vacuustat awards together comprise a $146,800,808.00 trade-secret compensatory base. The seven remaining compensatory categories total $9,145,629.94.

## B. Racketeering and Corrupt-Activity Findings

The Court finds that the compensatory injuries identified above constitute business or property injuries caused by Defendant's adjudicated racketeering scheme within the scope established by the Complaint and record. Threefold recovery on the full $155,946,437.94 compensatory base under 18 U.S.C. § 1964(c) equals $467,839,313.82.

The Court further finds by clear and convincing evidence that the conduct and resulting damages established in the record satisfy the Ohio Corrupt Activities Act remedial standard under Ohio Rev. Code § 2923.34(E). Triple actual damages on the same $155,946,437.94 base likewise equal $467,839,313.82.

These full-base RICO and OCAA calculations constitute independent alternative recovery paths. In the aggregate judgment entered below, the Court applies the larger OUTSA trade-secret enhancement to the Artifact and Vacuustat injuries and applies the RICO/OCAA threefold measure to the seven residual compensatory injuries, thereby avoiding duplicate recovery while preserving the independent statutory grounds.

## C. Willful and Malicious Trade-Secret Misappropriation

The Court finds that Defendant's misappropriation of Plaintiffs' trade secrets was willful and malicious. Defendant knew Rapport originated and owned the technologies and underlying technical work; knew the materials were confidential and commercially sensitive; retained Plaintiffs' technical archive after dissolution; disclosed and used protected material for competing commercial and governmental pursuits; represented the technologies through Defendant-controlled ventures; and continued exercising control after direct notice of Plaintiffs' rights.

The $146,800,808.00 trade-secret compensatory base therefore supports:

(a) exemplary damages of $293,601,616.00 under 18 U.S.C. § 1836(b)(3)(C), producing a combined DTSA trade-secret recovery of $440,402,424.00 and

(b) exemplary damages of $440,402,424.00 under Ohio Rev. Code § 1333.63(B), producing a combined OUTSA trade-secret recovery of $587,203,232.00.

The Court applies the larger OUTSA measure in the aggregate judgment while preserving the DTSA measure as an independent alternative statutory basis.

### D. Lanham Act and ACPA Findings

The Court finds that Defendant's adjudicated Lanham Act conduct involved deliberate assertions and representations concerning ownership, source, sponsorship, affiliation, inventorship, exclusivity, licensing authority, and corporate authority, including presentation of Rapport's technology through Defendant-controlled ventures and continued control and operation of Radian's website and domain after dissolution.

To the extent established compensatory injuries are attributable to 15 U.S.C. § 1125(a), 15 U.S.C. § 1117(a) supplies an independent alternative basis for enhancement of those actual damages, subject to the prohibition against duplicate recovery. Defendant's profits and other economic benefits attributable to the adjudicated Lanham Act violations remain subject to the accounting ordered below.

The Court further finds that the pleaded use and retention of `radianindustries.com` satisfies the adjudicated cyberpiracy claim and warrants the elected statutory award of $100,000.00 under 15 U.S.C. § 1117(d), together with transfer of the domain under 15 U.S.C. § 1125(d)(1)(C).

The Court finds that the circumstances established in the record also support treatment of the Lanham Act claims as an exceptional case for purposes of reasonable attorney's fees under 15 U.S.C. § 1117(a).

### E. Civil-Theft and Ohio Tort Findings

The $18,535.52 cash-withdrawal component contained within the diverted-corporate-capital category independently supports the elected $55,606.56 liquidated measure under Ohio Rev. Code § 2307.61(A)(1)(b). Because the same injury is already included within the RICO/OCAA recovery, the civil-theft measure is preserved as an independent alternative statutory basis and is not added a second time.

The Court further finds that Defendant's independently actionable Ohio tort conduct demonstrated actual malice and aggravated or egregious fraud sufficient to support punitive damages under

Ohio Rev. Code § 2315.21(C). The Court awards $350,000.00 in punitive damages, representing the maximum amount requested under Ohio Rev. Code § 2315.21(D)(2)(b). The financial disclosure ordered below shall establish Defendant's net worth at the relevant time and permit any adjustment required by § 2315.21(D)(2)(b). The punitive award is included once in the presently quantified monetary judgment and remains subject to the prohibition against duplicate recovery.

## F. Permanent-Injunction Findings

The Court finds that permanent injunctive relief is warranted because:

(a) Plaintiffs have suffered and continue to face irreparable injury from loss of exclusive control over proprietary technology and confidential materials, continued possession and dissemination of digital copies, uncertainty concerning ownership and attribution, and Defendant's continuing control of Radian's corporate infrastructure and identity;

(b) monetary relief compensates past economic injury but does not restore exclusive control of Plaintiffs' technology, corporate records, accounts, credentials, domain, repositories, or downstream disclosures and therefore is inadequate to remedy the continuing injury;

(c) the balance of hardships favors restoration of property, authority, and exclusive control adjudicated in Plaintiffs' favor and requires Defendant only to return and cease using property, rights, information, and corporate authority that he is not entitled to possess or exercise; and

(d) the public interest favors protection of trade secrets and confidential commercial information, accurate representations of source and affiliation, orderly corporate winding up, controlled dissemination of technology with strategic and defense applications, and effective enforcement of final judgments.

The Court further finds that the affirmative and prohibitory provisions below are tailored to the actual and threatened misconduct established by default and the evidentiary record and are stated with the specificity required by Federal Rule of Civil Procedure 65(d).

## III. Monetary Judgment

The presently quantified monetary judgment is calculated from the following additive components. The table uses one cumulative subtotal for monetary damages before attorney's fees and litigation expenditures:

| Judgment Component | Amount |
|---|---|
| Trade-secret compensatory damages (Artifact and Vacuustat) | $146,800,808.00 |
| OUTSA exemplary damages | $440,402,424.00 |
| Residual compensatory damages | $9,145,629.94 |
| RICO/OCAA enhancement on residual damages | $18,291,259.88 |
| ACPA statutory damages | $100,000.00 |
| Ohio tort punitive damages | $350,000.00 |
| **Cumulative subtotal — monetary damages after statutory enhancement** | **$615,090,121.82** |
| Attorney's fees — requested interim lodestar, subject to verification | $163,125.00 |
| Counsel's separately billed expenses | $655.78 |
| Other documented litigation expenditures | $2,035.00 |
| **Presently quantified monetary judgment** | **$615,255,937.60** |

Each component above is added once. The $155,946,437.94 compensatory base becomes $615,090,121.82 after adding $440,402,424.00 in OUTSA exemplary damages, $18,291,259.88 in residual RICO/OCAA enhancement, $100,000.00 in ACPA statutory damages, and $350,000.00 in Ohio punitive damages. The requested interim lodestar of $163,125.00 and $2,690.78 in separately recorded expenditures then yield $615,255,937.60. The interim lodestar must be supported by counsel's verified hours and the Court's reasonable-rate determination; it substitutes for, rather than supplements, $70,012.50 in billed fees. No underlying injury or fee is counted twice.

Plaintiffs are further awarded or entitled to seek, as applicable:

(a) additional reasonable attorney's fees incurred after the present cutoff under 18 U.S.C. §§ 1836(b)(3)(D) and 1964(c), Ohio Rev. Code §§ 1333.64(C) and 2923.34(F), 15 U.S.C. § 1117(a), and other applicable authority, including fees incurred in completing the default-judgment, accounting, compliance, and enforcement proceedings;

(b) taxable costs under Federal Rule of Civil Procedure 54(d)(1), 28 U.S.C. § 1920, and other applicable authority, together with recoverable litigation expenditures authorized by the governing substantive claims, each awarded once;

(c) prejudgment interest on each component for which prejudgment interest is authorized, calculated from the appropriate injury or accrual date through entry of judgment under the governing federal or state law;

(d) post-judgment interest under 28 U.S.C. § 1961 from the date of entry of this Judgment until satisfaction, with later supplemental monetary, fee, and cost awards bearing interest from the date applicable to each award;

(e) trade-secret unjust enrichment, Lanham Act profits, disgorgement, restitutionary relief, constructive-trust relief, and other supplemental monetary relief established through the accounting and post-judgment record, to the extent not already included in the present judgment for the same injury or economic benefit; and

(f) additional fees, costs, and recoverable expenditures established through a supplemental submission or the procedure directed by the Court, including a post-judgment fee application under Federal Rule of Civil Procedure 54(d)(2) where applicable.

The presently quantified monetary judgment is enforceable in accordance with Federal Rule of Civil Procedure 62 and other applicable law. Any supplemental monetary award shall identify and exclude amounts already included in the present judgment for the same injury or economic benefit.

## IV. Declaratory Judgment

### A. Ownership, Inventorship, and Commercialization Rights

The Court declares that:

(a) As between Rapport and Defendant and their respective controlled entities, Nathan Rapport is the sole inventor and owner of, and holds legal title to, the Artifact and Vacuustat technologies and the associated patents and patent rights, trade secrets, confidential technical information, technical

analyses, experimental data, code, CAD, drawings, research records, know-how, and Rapport-created derivative technical work.

(b) Rapport holds the exclusive authority, as owner, to determine the future licensing, disclosure, development, commercialization, and disposition of those rights.

(c) No joint inventorship exists between Rapport and Defendant as to the Artifact or Vacuustat.

(d) Defendant's government submissions, investor solicitations, pitch materials, corporate formations, proprietary notices, exclusivity statements, and related commercialization activity transferred no ownership right from Rapport and created no license, assignment, novation, continuation right, work-for-hire interest, implied license, waiver, estoppel, shop right, equitable ownership interest, or other intellectual-property or commercialization right in Defendant, Phoenix Dynamics LLC, BL Machines LLC d/b/a Black Lattice, or any successor or affiliated entity.

(e) Defendant's RFI, grant, government, investor, financing, and commercialization submissions referencing the Artifact, Vacuustat, or Plaintiffs' work product were unauthorized to the extent pleaded and adjudicated and conferred no ownership, license, waiver, estoppel, shop right, or other proprietary interest upon Defendant or a Defendant-controlled entity.

(f) Rapport may research, develop, practice, license, disclose, manufacture, market, sell, and commercialize the Artifact and Vacuustat in the exercise of his ownership rights. As between Rapport and Defendant, Rapport's continued practice and commercialization of those inventions do not infringe any intellectual-property rights claimed by Defendant or Defendant-controlled entities, and claims asserted by Defendant or Defendant-controlled entities create no restriction on Rapport's exercise of those rights.

### B. Radian Industries Inc.; Dissolution and Winding-Up Authority

The Court declares that:

(a) Radian Industries Inc.'s April 2025 dissolution is valid and effective. Radian continues to the extent authorized by governing law for winding up, prosecuting and defending claims, disposing of assets, collecting and preserving property, and completing related post-dissolution affairs.

(b) Nathan Rapport is Radian's authorized winding-up representative and possesses authority to act for Radian in its winding up and in this litigation, including authority to collect and control corporate records, recover corporate accounts and credentials, administer remaining assets, communicate with service providers and counterparties, maintain or dispose of corporate intellectual and digital property, receive property transferred under this Judgment, and take steps reasonably necessary to complete the winding-up process.

(c) Defendant possesses no continuing authority to bind Radian, act for Radian, contract on Radian's behalf, hold himself out as a current Radian officer or representative, or exercise control over Radian's post-dissolution property or affairs.

(d) Any post-dissolution act by Defendant purporting to exercise corporate authority on Radian's behalf has no effect as against Plaintiffs except to the extent later ratified by Rapport in his authorized winding-up capacity or otherwise established by further order of the Court.

(e) Rapport is entitled to full access to Radian's corporate records, bank and tax records, accounts, credentials, repositories, administrative systems, and other property necessary to conduct the winding up, and Defendant shall not obstruct that access.

(f) The ARK Interim Partnership Agreement, Loan Agreement, Vacuum Balloon Licensing Agreement, and Founders Agreement were valid and binding agreements governing their respective subject matter before Radian's dissolution. None of those agreements assigned Rapport's Artifact or Vacuustat intellectual property to Defendant or otherwise conferred ownership of either technology upon him.

## V. Immediate Restoration of Radian Corporate Infrastructure and Property

Within seven (7) days after entry of this Judgment, Defendant shall transfer to Radian through Rapport, as Radian's authorized winding-up representative, possession and absolute, exclusive administrative control of the following Radian property and infrastructure, with historical data and records preserved intact:

(a) all Radian email accounts, mailboxes, administrative consoles, aliases, forwarding rules, mail archives, address books, distribution lists, account histories, audit information, and recovery settings;

(b) all Radian Google Drive, Google Workspace, cloud-storage, file-sharing, collaboration, source-control, data-room, backup, and related administrative accounts and repositories;

(c) `radianindustries.com`, including registrant control, registrar credentials, registry and transfer authorization, DNS control, nameserver settings, hosting accounts, website files, source files, databases, analytics, certificates, logs, backups, and associated administrative credentials;

(d) all banking, payment, merchant, tax, accounting, bookkeeping, incorporation, registered-agent, government-registration, vendor, corporate-record, and similar accounts and records belonging to or maintained for Radian;

(e) all multifactor-authentication methods, authenticator registrations, security keys, recovery codes, recovery email addresses, recovery telephone numbers, API credentials, encryption keys, passwords, password-manager entries, backup codes, and other access or recovery mechanisms associated with Radian property; and

(f) all other accounts, repositories, devices, services, communication channels, or credentials through which Defendant retains administrative, recovery, ownership, or practical control over Radian property.

Defendant shall surrender the foregoing infrastructure with all historical email, files, records, logs, archives, access records, administrative records, communications, audit data, sharing data, billing data, and repositories intact. Defendant shall not delete, alter, redirect, conceal, disable, encrypt, transfer away, or impair any such data or account before transfer.

Defendant shall execute every registrar, hosting, service-provider, banking, payment, account-recovery, administrator-transfer, identity-verification, consent, authorization, domain-transfer, credential-reset, security-key removal, ownership-transfer, or similar instrument necessary to complete each

transfer and shall provide all information reasonably necessary to verify Rapport's exclusive administrative control after transfer.

Upon completion of transfer, Defendant shall remove and relinquish every remaining administrator role, recovery method, forwarding rule, API token, login credential, device session, security key, or other mechanism through which Defendant could regain or exercise access. Defendant shall not later access, reclaim, reset, redirect, suspend, interfere with, or seek control over the transferred infrastructure except pursuant to written authorization from Rapport or further order of the Court.

## A. Transfer of radianindustries.com

`radianindustries.com` is transferred to Radian Industries Inc. through Nathan Rapport as its authorized winding-up representative under 15 U.S.C. § 1125(d)(1)(C). Defendant shall take every action necessary to transfer registrant control, registrar control, registry authorization, DNS control, hosting control, website control, and associated administrative and recovery credentials.

Rapport is authorized to present a certified copy of this Judgment directly to the current registrar, registry, hosting provider, DNS provider, account provider, and other relevant service providers and to request implementation of the transfer. If Namecheap, Inc. remains a relevant registrar or account provider at the time of implementation, this authorization extends expressly to Namecheap, Inc.

## B. Provider-Side Restoration and Substitute Performance

Rapport is authorized, on behalf of Radian in its winding up, to present a certified copy of this Judgment to Google LLC and every identified email, cloud-storage, file-hosting, website-hosting, domain-registration, DNS, financial, payment, account-recovery, or other service provider holding or controlling Radian infrastructure or property and to request restoration, transfer, administrator replacement, recovery-method replacement, credential reset, or other implementation consistent with this Judgment.

If Defendant fails to complete any specific transfer, consent, authorization, execution, credential reset, administrator change, identity verification, domain transfer, or other required act within seven (7) days, Plaintiffs may apply immediately for relief under Federal Rules of Civil Procedure 70 and

71 and other applicable authority, including appointment of another person to perform the required act with the same legal effect as Defendant's performance and issuance of provider-specific implementing orders.

Nothing in this Judgment imposes independent liability upon a nonparty service provider merely because the provider receives notice of this Judgment. Plaintiffs may seek any further provider-specific order necessary to effectuate the adjudicated transfer or restoration rights.

### C. Certification of Infrastructure Restoration

Within fourteen (14) days after entry of this Judgment, Defendant shall serve and file a certification under penalty of perjury identifying each Radian account, domain, repository, credential, and service transferred; the date and method of transfer; each administrator or recovery method removed; each provider action requested or completed; and every unresolved transfer or provider issue requiring additional Court action.

## VI. Covered Materials; Return, Inventory, Disclosure, Deletion, and Remediation

For purposes of this Judgment, Covered Materials means every technical and nontechnical work product, file, record, communication, dataset, calculation, technical note, research record, source-code file, CAD or design file, image, video, experimental record, business plan, commercialization plan, financial model, proposal, white paper, RFI, pitch deck, investor material, government submission, credential record, and other material created by Rapport or Radian and obtained by Defendant through the parties' relationship, together with every copy, excerpt, summary, screenshot, export, archive, translation, derivative document, derivative design, implementation, or other material containing, describing, reproducing, encoding, or materially incorporating that work product.

### A. Delivery of Complete Technical and Corporate Archive

Within fourteen (14) days after entry of this Judgment, Defendant shall deliver to Rapport a complete, readable copy of all Covered Materials within Defendant's possession, custody, or control, preserving original file names, directory structure, metadata, version information, available audit information, and available provenance information where reasonably accessible.

Defendant shall not destroy or alter any Covered Material before completing the required delivery and preserving the non-substantive evidentiary information required by Section XIII below.

### B. Sworn Device, Account, and Repository Inventory

Within fourteen (14) days after entry of this Judgment, Defendant shall serve under penalty of perjury a complete inventory identifying every physical device, virtual device, account, repository, storage service, collaboration system, email account, messaging account, source-control system, hosted development environment, backup system, AI or hosted-compute service, and Defendant-controlled entity through which Covered Materials were possessed, stored, synchronized, backed up, attached, transmitted, uploaded, pasted, indexed, supplied as input, or made accessible from Defendant's first access through the date of certification.

For each physical or virtual device, the inventory shall identify, to the extent available:

(a) device type, manufacturer and model, serial number, hostname, asset tag, MAC address, or other available unique identifier;

(b) owner, custodian, principal user, and every Defendant-controlled entity through which the device was used;

(c) operating system, user profile, browser profile, virtual-machine image, mounted volume, or other relevant environment;

(d) dates or date ranges during which Covered Materials were present, synchronized, cached, downloaded, uploaded, viewed, or otherwise accessible;

(e) relevant folders, paths, mounted drives, external drives, network-attached storage, removable media, local backup volumes, synchronized directories, disk images, and backup destinations;

(f) every cloud, email, messaging, file-transfer, repository, hosted-compute, AI, or backup account synchronized with or accessed from the device in connection with Covered Materials;

(g) the device's current physical location, custodian, and status; and

(h) for every device sold, transferred, lost, stolen, wiped, destroyed, reformatted, reimaged, decommissioned, or otherwise disposed of, the date and manner of disposition, recipient or last known

custodian, disposition of its storage media, and every destination to which relevant data was migrated, copied, synchronized, archived, or backed up.

For each electronic or cloud account, the inventory shall identify, to the extent available:

(a) provider, account name, username, email address, customer or account identifier, and person or entity in whose name the account was maintained;

(b) every relevant workspace, tenant, repository, bucket, project, folder, shared drive, source-control repository, archive, backup set, model workspace, hosted-compute environment, or other storage location, including available URLs or internal identifiers;

(c) dates or date ranges during which Covered Materials were present or accessible;

(d) synchronization, version-history, backup, snapshot, export, migration, forwarding, mirroring, indexing, training, retrieval, or archival features that created or preserved additional copies or derivative representations;

(e) every person or entity granted access and the level and duration of that access;

(f) the account's current status; and

(g) every known destination to which Covered Materials were exported, migrated, forwarded, copied, synchronized, indexed, or backed up.

The inventory shall include personal accounts and accounts maintained through Phoenix Dynamics LLC, BL Machines LLC d/b/a Black Lattice, Mach Capital, Advanced Human Engineering LLC/ Chroma, or any other entity Defendant owned or controlled. Relevant audit logs, access logs, sharing histories, permission histories, version histories, authentication histories, synchronization histories, billing records, and account records shall be preserved until further order confirming completion of remediation.

### C. Sworn Recipient and Downstream-Disclosure Schedule

Within fourteen (14) days after entry of this Judgment, Defendant shall serve under penalty of perjury a disclosure schedule identifying every natural person, company, investor, fund, contractor, employee, recruit, engineer, consultant, advisor, government office, agency, military organization,

research organization, university, foreign entity, commercial counterparty, or other person or entity that at any time received, viewed, downloaded, was granted access to, was shown, or was orally informed of the substance of any Covered Material, whether directly from Defendant or through any entity, employee, contractor, collaborator, or intermediary acting with him.

For each recipient or access event, Defendant shall identify, to the extent known or reasonably ascertainable:

(a) the recipient's full name, organization, title or role, known physical or electronic contact information, and relationship to Defendant or a Defendant-controlled entity;

(b) the date, time if available, and date range of each disclosure or access event;

(c) the originating device, account, repository, workspace, folder, or entity;

(d) the method and communication channel used;

(e) the exact file, folder, document, dataset, image, video, code repository, presentation, or version disclosed, including available file names, paths, document identifiers, URLs, version identifiers, or hashes;

(f) for oral, screen-shared, summarized, demonstrative, or model-mediated disclosures, the technical or commercial subject matter conveyed and the documents or data used to support the communication;

(g) the form of access provided;

(h) the purpose of the disclosure or access and every associated proposal, solicitation, investment process, government submission, RFI, contract pursuit, recruiting effort, technical evaluation, development effort, license discussion, acquisition discussion, or commercial transaction;

(i) the permissions granted, duration of access, and whether downloading, exporting, copying, forwarding, synchronization, local storage, indexing, or other retention was permitted or known to have occurred;

(j) every NDA, confidentiality agreement, proprietary restriction, export-control restriction, government marking, license term, or other condition associated with the disclosure;

(k) every known copy, derivative document, technical implementation, repository, presentation, analysis, proposal, or other work product created from the material;

(l) every known downstream recipient or onward disclosure;

(m) the current known disposition of the material and any return, deletion, revocation, or access-termination steps already taken; and

(n) the searches, accounts, records, communications, calendars, devices, and repositories reviewed to ensure completeness.

### D. Recipient Remediation and Corrective Notice

Within seven (7) days after serving the recipient schedule, Defendant shall provide each identified recipient with a written notice stating the operative ownership, inventorship, Radian-authority, and use restrictions established by this Judgment; request return and permanent deletion of Covered Materials; request identification of downstream recipients and derivative copies; request confirmation of completed remediation; preserve every response; and provide Plaintiffs with the notices, proof of delivery, and responses.

Where a recipient received materially false commercial representations concerning inventorship, ownership, source, sponsorship, affiliation, exclusivity, licensing authority, or Radian authority, the notice shall expressly correct those representations consistently with this Judgment.

### E. Deletion, Destruction, and Remediation

After completing the required delivery, inventory, and preservation steps, and no later than thirty (30) days after entry of this Judgment, Defendant shall permanently delete or destroy every additional copy of Covered Materials within his possession, custody, or control, including local files, external drives, cloud repositories, email or message attachments, exports, backups, snapshots, screenshots, caches, synchronized folders, version-history copies, archival files, virtual machines, source-control repositories, collaboration platforms, hosted-compute environments, AI-service repositories, and copies stored through Defendant-controlled entities.

This obligation includes derivative documents, designs, implementations, presentations, summaries, analyses, or other materials containing, reproducing, summarizing, encoding, or materially incorporating Plaintiffs' confidential technical information.

### F. Remediation by Persons Acting in Active Concert or Participation

Any person or entity within Federal Rule of Civil Procedure 65(d)(2) that possesses Covered Materials and receives actual notice of this Judgment shall return or deliver the materials as directed, permanently delete or destroy every remaining copy, backup, and derivative use within that person's possession, custody, or control, preserve records sufficient to verify remediation, and provide a certification under penalty of perjury identifying the repositories searched and actions completed.

The Court retains jurisdiction to issue recipient-specific implementation, preservation, production, or remediation orders where authorized and necessary to carry the Judgment into effect.

### G. Sworn Compliance Certification and Continuing Supplementation

Within thirty (30) days after entry of this Judgment, Defendant shall serve and file a written report and certification under penalty of perjury that:

(a) attaches the complete device/account/repository inventory and recipient schedule;

(b) identifies the searches performed and the methods used;

(c) identifies every device, account, repository, entity, and storage location searched;

(d) identifies the Covered Materials returned;

(e) identifies each copy deleted or destroyed and the location from which it was removed;

(f) identifies all recipients and downstream recipients found;

(g) attaches the notices sent, delivery records, and recipient responses available by the certification date;

(h) identifies all corporate infrastructure transferred;

(i) identifies every access credential, recovery method, administrator role, token, security key, or other access mechanism relinquished; and

(j) describes every unresolved repository, recipient, provider, transfer, disclosure, or remediation issue requiring additional Court action.

The certification shall state that Defendant completed a reasonable and comprehensive search of every device, account, entity, communication system, and repository identified in the inventory; that the report, inventory, recipient schedule, disclosures, and certifications are complete and accurate after those searches; and that no responsive location, recipient, copy, access method, or unresolved compliance issue known after those searches has been omitted. The certification shall identify any responsive material or record known to have existed but not located, returned, preserved, produced, or deleted and shall provide the explanation required by this Judgment concerning its unavailability.

Defendant has a continuing duty to supplement the certification within fourteen days after discovering any additional copy, repository, recipient, derivative material, provider account, disclosure, access method, or other responsive location not previously reported.

## VII. Permanent Prohibitory Injunction

Defendant and all persons bound under Federal Rule of Civil Procedure 65(d)(2) are permanently enjoined as follows.

### A. Use, Possession, Disclosure, and Exploitation

Defendant shall not possess, use, reproduce, license, sell, market, commercialize, submit, transmit, disclose, develop from, distribute, provide access to, or assist another person to exploit the Artifact, the Vacuustat, or Covered Materials except pursuant to Rapport's express written authorization or further order of the Court.

This prohibition applies across renamed projects, reformatted documents, derivative presentations, implementations, successor ventures, and affiliated entities and protects the underlying information and technology rights adjudicated in this action.

### B. Diversion of Commercial and Institutional Opportunities

Defendant shall not use the Artifact, Vacuustat, Covered Materials, or derivative information to solicit, route, divert, accept, or pursue investment, financing, grants, government contracts, procure-

ment opportunities, licenses, acquisitions, strategic partnerships, commercial agreements, recruiting relationships, engineering work, research engagements, or other economic opportunities for Defendant or another entity.

Defendant shall not use Plaintiffs' technology or work product as a recruiting credential, technical differentiator, proprietary capability, investment thesis, government-procurement capability, commercial qualification, or basis for forming, financing, or capitalizing a competing program.

### C. Inventorship, Ownership, Licensing, Source, and Affiliation Representations

Defendant shall not represent that he or any entity he owns or controls invented, owns, exclusively controls, licenses, or possesses commercialization authority over the Artifact or Vacuustat.

Any investor material, government submission, recruiting material, website, pitch deck, technical memorandum, commercial social-media statement, or direct communication with a prospective counterparty concerning those technologies shall conform to the ownership and inventorship declarations entered in this Judgment.

Defendant shall not represent that Rapport's exercise of his own ownership and commercialization rights infringes rights belonging to Defendant or Defendant-controlled entities.

### D. Radian Name, Domain, Infrastructure, and Corporate Authority

Defendant shall not use Radian's name, `radianindustries.com`, Radian email addresses, branding, accounts, credentials, corporate authority, goodwill, or reputation to conduct business, solicit financing, communicate with government agencies, enter transactions, direct counterparties, or imply a continuing corporate role.

Any public or private representation by Defendant concerning Radian shall accurately state its dissolved status and Rapport's authority over its winding up.

### E. Use of Affiliated, Successor, or Intermediary Entities

Defendant shall not accomplish through Phoenix Dynamics LLC, BL Machines LLC d/b/a Black Lattice, Advanced Human Engineering LLC, Mach Capital, a successor entity, an affiliate, a

contractor, a recruit, an employee, a consultant, an agent, or another intermediary any act that this Judgment prohibits Defendant from undertaking directly.

## VIII. Additional Findings Requested in the Final Judgment

### A. Findings Under 11 U.S.C. § 523

For purposes of identifying the character of the adjudicated conduct and resulting obligations in any later proceeding governed by 11 U.S.C. § 523, the Court finds that:

(a) Defendant's misappropriation of trade secrets, conversion of corporate property, breaches of fiduciary duty, fraudulent self-dealing, and intentional interference with Rapport's business relationships were willful and malicious within the meaning of 11 U.S.C. § 523(a)(6);

(b) Defendant's fiduciary misconduct, appropriation of corporate property, diversion of funds and opportunities, retention of Plaintiffs' property, and related acts involved fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of 11 U.S.C. § 523(a)(4); and

(c) Defendant's fraudulent inducement, fraudulent representations, concealed self-dealing, ownership and authority representations, and related acquisition or use of Plaintiffs' property and services involved false pretenses, false representations, or actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

Any formal determination of dischargeability remains governed by 11 U.S.C. § 523(c) and applicable bankruptcy procedure.

### B. Use of Affiliated Entities

The Court finds that Defendant used Phoenix Dynamics LLC, BL Machines LLC d/b/a Black Lattice, Advanced Human Engineering LLC, Mach Capital, and other entities under his ownership or control as instrumentalities for conduct adjudicated in this action, including solicitation of investment and government opportunities, presentation and commercialization of Plaintiffs' technologies, routing of assets and opportunities, and continuation of challenged conduct through nominally separate entities.

This Judgment applies to Defendant's conduct undertaken through entities under his ownership or control and binds persons acting in active concert or participation with him to the extent provided by Rule 65(d)(2). Plaintiffs' alter-ego, successor-liability, fraudulent-transfer, tracing, avoidance, and related enforcement remedies are preserved for supplemental proceedings involving affiliated entities and traceable assets.

### C. Commercial Value and Economic Injury

The Court finds that Rapport's proprietary technologies, business plans, technical documents, and confidential materials possessed substantial commercial value and that Defendant's misappropriation, sabotage, self-dealing, diversion, dissemination, ownership and authority representations, and related misconduct caused direct loss of economic opportunity, market position, and valuation potential.

## IX. Sworn Accounting and Financial Disclosure

For purposes of this Judgment, a Covered Transaction means any solicitation, submission, disclosure, financing, investment, grant, contract, sale, license, acquisition discussion, partnership, joint venture, procurement pursuit, research or development engagement, recruiting arrangement, employment arrangement, consulting or advisory arrangement, ownership or investment position, transfer, payment, equity issuance, option or warrant grant, capital contribution, or other transaction in connection with which Defendant, directly or through another person or entity, used, disclosed, referenced, presented, submitted, demonstrated, invoked, relied upon, or otherwise employed the Artifact, Vacuustat, Rapport's confidential or proprietary work product, Radian's assets or opportunities, a Company business relation, or a representation concerning ownership of or authority over those assets as technical, commercial, investment, recruiting, contracting, procurement, financing, or other support. A Covered Transaction also independently includes interference with a Company employee, customer, supplier, licensee, or other business relation within Founders Agreement § 13(a) (including opportunities routed through another entity); any acquisition, holding, disposition, investment, employment, consulting, advisory, partnership, licensing, or other participation falling within § 13(b), whether or not it separately involved Plaintiffs' technology; and any retention, use,

disclosure, transfer, or exploitation of records, Confidential Information, work product, inventions, or related materials governed by §§ 13(c)–(e).

Within thirty (30) days after entry of this Judgment, Defendant shall serve upon Plaintiffs a complete accounting under oath, signed under penalty of perjury, and produce supporting records in native or ordinarily maintained form sufficient to verify and reconcile every material entry.

Defendant shall respond separately to each disclosure category and subcategory required by this Section, using headings corresponding to the categories below. No required category may be omitted. If Defendant contends that no responsive transaction, asset, entity, recipient, account, payment, benefit, record, or other information exists for a required category, Defendant shall expressly state that fact under oath after conducting the searches required by this Judgment.

Contemporaneously with service of the accounting and supporting production, Defendant shall file a notice stating the date and manner of service. The accounting and supporting financial records need not be filed on the public docket unless otherwise ordered.

## A. Complete Entity Map

The accounting shall identify every corporation, limited-liability company, partnership, fund, project, trade name, assumed name, sole proprietorship, joint venture, or other legal or commercial vehicle Defendant owned, controlled, managed, formed, financed, represented, or used in connection with a Covered Transaction from January 1, 2024 through the accounting date, expressly including Phoenix Dynamics LLC, BL Machines LLC d/b/a Black Lattice, Advanced Human Engineering LLC/ Chroma, Mach Capital, Bohr Systems (including Defendant's angel-investment affiliation), and every relevant predecessor, successor, affiliate, subsidiary, parent, fund, project vehicle, spinout, renamed venture, or asset transferee.

For each entity, Defendant shall identify:

(a) full legal name, trade names, jurisdiction and date of formation, principal address, registered agent, and current status;

(b) every ownership or beneficial interest held by Defendant directly or indirectly, including interests held through nominees, trusts, or other entities;

(c) the percentage and class of each interest, voting rights, liquidation rights, conversion rights, preferences, vesting terms, repurchase rights, and transfer restrictions;

(d) every office, board position, management role, agency relationship, signing authority, or other form of control exercised by Defendant;

(e) each predecessor, successor, affiliate, subsidiary, parent, spinout, renamed project, or asset transferee relevant to a Covered Transaction; and

(f) capitalization tables, membership or stock ledgers, operating or shareholder agreements, subscription agreements, SAFEs, convertible notes, warrants, option agreements, side letters, and amendments reflecting the ownership and financing structure.

**B. Investor Presentations, Financing Solicitations, and Capital Transactions**

Defendant shall identify every person, fund, venture-capital firm, family office, lender, strategic investor, angel investor, accelerator, investment bank, intermediary, or other financing source solicited in connection with a Covered Transaction, including direct outreach, mass outreach, introductions, pitch events, meetings, calls, data-room access, investment memoranda, decks, follow-up communications, diligence, term-sheet discussions, and completed financings.

For each financing source or transaction, Defendant shall identify:

(a) the financing source and participating representatives;

(b) the date, location, and participants for each material meeting, call, or presentation;

(c) the entity on whose behalf Defendant acted;

(d) the technology, work product, opportunity, Company relationship, or ownership or authority representation used;

(e) every deck, memorandum, model, data room, technical document, demonstration, image, video, proposal, or other material supplied or displayed;

(f) every amount sought, valuation proposed, ownership percentage discussed, and financing structure offered;

(g) every term sheet, letter of intent, commitment, subscription, SAFE, note, warrant, option, side letter, or other financing instrument offered or executed;

(h) the gross amount committed, funded, contributed, invested, loaned, or otherwise supplied, together with each funding date and receiving account;

(i) the securities, equity, options, warrants, governance rights, or other consideration issued in exchange;

(j) Defendant's direct or indirect ownership before and after the transaction, the value assigned to his interest, and any appreciation; and

(k) the present status and disposition of the funds, securities, and consideration received.

### C. Government Submissions, Grants, Procurement Activity, and Public Funding

Defendant shall identify every RFI response, white paper, proposal, concept paper, grant application, SBIR/STTR submission, solicitation response, procurement proposal, subcontracting proposal, teaming arrangement, research agreement, cooperative agreement, other transaction authority pursuit, foreign-government pursuit, or comparable submission involving a Covered Transaction.

The schedule shall identify:

(a) the agency, office, military branch, governmental unit, foreign ministry or procurement office, prime contractor, intermediary, or other recipient;

(b) the solicitation number, program name, submission title, and submission date;

(c) the submitting entity and every participant or team member;

(d) every technology, design, technical concept, business plan, image, calculation, specification, or work product used;

(e) each representation of ownership, exclusivity, proprietary authority, inventorship, corporate affiliation, or commercialization rights;

(f) the amount requested, proposed contract value, contemplated follow-on value, and period of performance;

(g) the stage reached, including meetings, evaluations, down-selects, negotiations, site visits, demonstrations, diligence, awards, agreements, or follow-on invitations;

(h) every grant, contract, subcontract, award, reimbursement, milestone payment, advance, deposit, or other consideration received or committed, together with the receiving account and later disposition; and

(i) every resulting equity, option, partnership, licensing, teaming, employment, recruiting, consulting, advisory, or other economic benefit obtained by Defendant or a Defendant-controlled entity.

The accounting shall separately schedule Defendant's Black Lattice Missile Defense Agency RFI activity, including the February 27, 2025 MDA 2045 Threat RFI submitted one day after Radian's February 26 response, and identify the entity through which each submission was made; technical and business materials used; agency personnel, contacts, meetings, and communications; the funding and development pathway presented; all resulting opportunities, awards, contracts, or development benefits; all funding or other consideration sought or obtained; and the resulting economic value.

### D. Commercial Transactions and Business Opportunities

Defendant shall identify every customer, licensee, purchaser, acquirer, strategic partner, manufacturer, contractor, subcontractor, research partner, consultant, broker, recruiter, supplier, and other commercial counterparty involved in a Covered Transaction.

For each counterparty, Defendant shall state the opportunity pursued, technology or work product used, value proposed, transaction structure, amount invoiced or received, equity or other consideration exchanged, contract status, future or contingent payments, renewal or milestone rights, and all related benefits to Defendant or an affiliated entity.

The schedule shall include acquisition discussions, technology sales, licenses, royalties, consulting or advisory arrangements, engineering-development agreements, manufacturing arrangements, paid demonstrations, research agreements, exclusivity arrangements, intellectual-property transac-

tions, and transactions in which Plaintiffs' technology or work product served as consideration, collateral, inducement, technical qualification, recruiting credential, or commercial leverage.

Defendant shall separately account for the Vacuustat production and sales activity described in his September 8, 2026 email (Ex. F9 — Vacuustat Email, p. 2), including his representation that the first fifteen units were being sold from a production facility in Poland and his projection of subsequent demand for hundreds. The accounting shall identify the Polish facility and operating entity; all manufacturing, engineering, supply, distribution, and sales counterparties and agreements; units ordered, fabricated, completed, shipped, delivered, invoiced, and paid for; actual and prospective purchasers; prices, deposits, invoices, payments, costs, and other consideration; and the designs, specifications, calculations, and other technical materials supplied or made accessible to manufacturing counterparties. The accounting shall distinguish completed sales and receipts, outstanding commitments, offers, and projected demand, with supporting records for each.

For every sale, contract, license, consulting payment, commercialization receipt, or other operating revenue connected to false source, affiliation, ownership, sponsorship, inventorship, exclusivity, licensing-authority, or corporate-authority representations, Defendant shall identify the gross amount received and separately identify every claimed cost, deduction, or apportionment item with supporting records.

### E. Founders-Agreement and Company-Relationship Schedules

For every interference within the scope of Founders Agreement § 13(a), Defendant shall identify the Company employee, customer, supplier, licensee, or other business relation at issue; Defendant's competing solicitation, submission, contact, or transaction; the entity through which Defendant acted; resulting contacts and opportunities; funding, contracts, equity, or other consideration sought or obtained; and the resulting economic value.

For every ownership, investment, employment, consulting, advisory, partnership, or licensing position within the scope of Founders Agreement § 13(b), Defendant shall state the acquisition or commencement date; consideration paid or received; ownership class and quantity; percentage

interest; present value; appreciation; distributions; dividends; compensation; consulting or advisory fees; carried interests; options; warrants; sale proceeds; transfer proceeds; successor interests; and every other economic benefit received, accrued, vested, or contingent.

The § 13(b) schedule shall expressly address Defendant's Bohr Systems angel-investment affiliation, including the acquisition date; amount invested and consideration paid; security or ownership class, quantity, and percentage; present value and appreciation; distributions, dividends, and proceeds; governance and advisory rights; consulting or other compensation; options, warrants, and successor interests; and all other benefits associated with that position. This requirement applies independently of any showing that the investment used Plaintiffs' technology.

For conduct within the scope of Founders Agreement §§ 13(c)–(e), Defendant shall identify each retained record, item of Confidential Information, work product, invention, improvement, derivative material, disclosure, or claimed right and shall state every economic, technical, competitive, fundraising, contracting, recruiting, licensing, valuation, or other benefit associated with its possession, use, retention, disclosure, or exploitation.

## F. Tracing of Every Financial Benefit

For every payment, investment, grant, capital infusion, financing installment, equity interest, option, warrant, contractual right, carried interest, revenue share, distribution, dividend, proceeds payment, compensation payment, consulting or advisory fee, debt forgiveness, property transfer, cryptocurrency transfer, or other economic benefit derived from, obtained through, or facilitated by a Covered Transaction, Defendant shall identify and trace the benefit from receipt or accrual to its present form. The accounting shall also quantify noncash benefits where measurable, including avoided research or engineering expense, accelerated development or technical qualification, head-start value, preferential fundraising access, and other benefits attributable to the adjudicated conduct.

For each benefit, the accounting shall disclose:

(a) the date received or accrued and the payer, transferor, grantor, investor, or source;

(b) the recipient and beneficial owner;

(c) the form of consideration and the contemporaneous value assigned to it;

(d) the account, wallet, entity, repository, or security position into which the benefit was first received;

(e) every subsequent transfer, conversion, exchange, distribution, dividend, redemption, sale, exercise, rollover, contribution, reinvestment, or disposition;

(f) each asset purchased or acquired with the proceeds;

(g) the present holder, account, wallet, entity, security, or asset embodying the proceeds;

(h) the current quantity and, where available, current value of retained equity, securities, options, warrants, cryptocurrency, contractual rights, or other consideration; and

(i) the supporting documents establishing the complete chain of receipt and disposition.

### G. Minimum Financial Disclosures Under Prayer for Relief ¶ 15

At a minimum, Defendant shall disclose under oath:

(a) every current stock interest, membership interest, partnership interest, carried interest, profits interest, option, warrant, SAFE right, convertible security, phantom-equity right, revenue share, beneficial interest, nominee-held interest, trust-held interest, and other economic or governance interest he holds in any entity commercializing, developing, financing, presenting, or otherwise using Plaintiffs' inventions, Covered Materials, assets, or opportunities, including the entity, security class, quantity, percentage ownership on both an issued-and-outstanding and fully diluted basis, acquisition date, consideration paid, vesting status, exercise price, conversion terms, liquidation preferences, transfer restrictions, encumbrances, and transactions affecting the interest;

(b) all investment funding, loans, capital contributions, grants, advances, convertible instruments, SAFEs, notes, credit facilities, deposits, and other financing received since January 1, 2024 by each relevant entity, including source, date, amount, recipient, receiving account, transaction documents, consideration issued, valuation, use of proceeds, related Covered Transaction, and present disposition;

(c) every bank account, brokerage account, securities account, cryptocurrency wallet, digital-asset exchange account, payment-processor account, money-market account, certificate of deposit,

custodial account, trust account, foreign financial account, stored-value account, or other financial instrument within Defendant's ownership, beneficial ownership, signatory authority, custody, management, or practical control, together with the provider, account title and beneficial owner, unique account or wallet identifier, dates, Defendant's form of access or control, associated entity, current balances or holdings, monthly statements from January 1, 2024 through the accounting date, transaction histories, and linked accounts, wallets, beneficiaries, users, or destinations relevant to transfers exceeding $1,000 or a Covered Transaction, sufficient for tracing and enforcement; and

(d) every transfer of assets, funds, securities, equity, cryptocurrency, or other property exceeding $1,000 made by Defendant or his affiliates since Radian's formation, including date, value, form of property, originating person/entity/account, recipient person/entity/account, relationship between Defendant and recipient, stated purpose, consideration, ownership before and after transfer, connection to any Covered Transaction, and present form and location of property received in exchange.

## H. Net-Worth Disclosure for Ohio Punitive Damages

Within thirty (30) days after entry of this Judgment, Defendant shall disclose under oath and produce records sufficient to establish his net worth at the time of the independently actionable Ohio tort conduct for which punitive damages are sought, including assets, liabilities, ownership interests, securities, accounts, real and personal property, and other information reasonably necessary to apply Ohio Rev. Code § 2315.21(D)(2)(b).

## I. Source Records and Verification

Defendant shall produce documents sufficient to verify and reconcile each material accounting entry, including bank and brokerage statements; cryptocurrency exchange and wallet records; general ledgers, journals, trial balances, financial statements, tax returns, and bookkeeping exports; capitalization tables and securities records; financing documents; contracts; licenses; purchase orders; statements of work; teaming agreements; grant and award documents; invoices; payment confirma-

tions; government submissions; RFI responses; investor decks and memoranda; data-room indexes and access logs; calendars; CRM records; contact lists; communications; and records showing transfers, distributions, dividends, redemptions, asset purchases, securities purchases, gifts, loans, intercompany payments, and other dispositions of proceeds.

Each accounting schedule and supplement shall identify the records searched and produced in support of the disclosure and shall be signed under penalty of perjury.

Defendant shall include with the accounting a certification under penalty of perjury that the accounting, schedules, disclosures, and productions are complete and accurate after the searches described; that no required disclosure category has been omitted; and that each category for which no responsive information was identified contains an express statement to that effect.

If any information or record required by this Judgment is unavailable, no longer exists, or cannot be obtained, Defendant shall identify the information or record; state when and where it was last known to exist; identify its last known custodian; describe when, how, and under what circumstances it became unavailable; identify any known backup, duplicate, recipient, provider, or alternative source; and describe the steps taken to locate, recover, or reconstruct it. Defendant shall identify every responsive record or category of information known to have existed but not produced. Claimed inability to comply with one requirement does not excuse compliance with any other requirement or production of responsive information and records that remain available.

## X. Supplemental Monetary and Equitable Relief Following Accounting

Upon the accounting record and any authorized post-judgment discovery, the Court retains jurisdiction to:

(a) determine and award DTSA and OUTSA unjust enrichment not already included in Plaintiffs' actual-loss recovery;

(b) determine and award Defendant's profits recoverable under 15 U.S.C. § 1117(a), applying the statutory burden allocation governing sales, costs, deductions, and apportionment;

(c) determine and award contractual expectation damages, restitution, and disgorgement available under Count XIII for the established breaches of Founders Agreement §§ 13(a)–(e), including the contractually covered competitive investments and business-relationship interference independently of trade-secret misuse, without duplicating compensation already awarded for the same injury or benefit;

(d) order disgorgement or equivalent restitutionary recovery for investment proceeds, equity appreciation, capital infusions, financing benefits, grants, compensation, consulting or advisory fees, carried interests, options, warrants, sale proceeds, transfer proceeds, successor interests, and other economic gains attributable to the adjudicated misconduct and not already included in the present judgment for the same injury or benefit;

(e) identify specifically traceable proceeds and assets and impose a constructive trust over property directly or indirectly traceable to Plaintiffs' misappropriated inventions, confidential materials, business plans, corporate property, or diverted opportunities to the extent authorized by governing law and supported by the accounting record;

(f) direct turnover, execution, garnishment, attachment, creditor's-bill proceedings, liens, and other proceedings in aid of execution against Defendant's identified property and economic interests under Federal Rule of Civil Procedure 69 and applicable Ohio law;

(g) determine whether the punitive-damages component requires adjustment under Ohio Rev. Code § 2315.21(D)(2)(b) after the required net-worth disclosure;

(h) adjudicate supplemental fraudulent-transfer, unjust-enrichment, alter-ego, successor-liability, tracing, avoidance, and related enforcement proceedings consistent with the Complaint and governing law; and

(i) enter additional implementing or monetary orders necessary to carry this Judgment into effect while preventing duplicate recovery for the same injury or economic benefit.

## XI. Continuing Duty to Report Later-Maturing Benefits

Defendant shall supplement the accounting within fourteen days after any later receipt, vesting, conversion, exercise, sale, distribution, contract award, grant award, financing event, funding installment, equity issuance, redemption, milestone payment, royalty, acquisition payment, compensation payment, consulting or advisory payment, or other economic realization arising from a Covered Transaction identified in the initial accounting.

Each supplement shall identify the transaction, amount or property received, date, receiving account or holder, subsequent disposition, records searched, and supporting records produced, and shall be signed under penalty of perjury.

This reporting obligation shall continue through satisfaction of the monetary judgment and completion of the equitable remediation concerning all Covered Transactions disclosed through the accounting.

## XII. Post-Judgment Discovery, Execution, and Third-Party Implementation

Plaintiffs may obtain discovery from Defendant and from any person in aid of judgment or execution under Federal Rule of Civil Procedure 69(a)(2) and applicable Ohio procedure, including discovery directed to banks, brokerages, cryptocurrency exchanges, payment processors, investors, grantors, customers, government counterparties, registered agents, capitalization-table providers, affiliated entities, service providers, domain registrars, cloud providers, and other relevant record custodians.

Plaintiffs may use subpoenas and other authorized discovery to verify the accounting, identify assets, trace Covered Transactions and proceeds, determine possession or dissemination of Covered Materials, confirm ownership or control of accounts and infrastructure, and establish compliance with this Judgment. Plaintiffs need not await expiration of any accounting, certification, transfer, remediation, or other compliance deadline before commencing discovery authorized by this Section.

If Defendant fails to perform any specific act required by this Judgment, Plaintiffs may seek substitute performance, conveyance, execution of instruments, divestiture of title, contempt, coercive

relief, or other implementation under Federal Rules of Civil Procedure 70 and 71 and other applicable authority.

## XIII. Preservation of Evidence and Records

Nothing in this Judgment shall be construed to require destruction of evidence before the evidentiary information necessary to document compliance has been preserved.

Defendant shall preserve all documents, communications, devices, account records, audit logs, access logs, sharing histories, permission histories, version histories, authentication histories, synchronization histories, billing records, banking records, brokerage records, cryptocurrency records, capitalization records, tax records, contracts, government submissions, investor records, and other information reasonably relevant to compliance, accounting, tracing, execution, or supplemental proceedings until further order of the Court.

Where this Judgment requires deletion or destruction of Covered Materials, Defendant shall first preserve non-substantive records sufficient to identify the existence, location, provenance, access history, disclosure history, transfer history, deletion, and disposition of the material. Defendant shall not retain the protected substantive content after the deletion deadline except to the extent expressly authorized by Plaintiffs, required by law, required by another court or governmental preservation obligation, or permitted by further order of this Court.

Defendant shall not delete, alter, conceal, transfer, encrypt, destroy, fabricate, or otherwise impair the availability or integrity of evidence relevant to this action, the accounting, remediation, execution, or enforcement.

## XIV. Persons Bound

Consistent with Federal Rule of Civil Procedure 65(d)(2), the permanent injunction binds Defendant Michael Chapiro; Defendant's officers, agents, servants, employees, and attorneys; and other persons who receive actual notice of this Judgment and act in active concert or participation with Defendant or those persons.

Nothing in this section makes a nonparty liable merely because it receives notice of this Judgment. The Court retains authority to determine, upon an appropriate record, whether a person is bound by Rule 65(d)(2) or is otherwise subject to an implementing, discovery, preservation, turnover, or enforcement order authorized by law.

## XV. Continuing Jurisdiction and Enforcement

The Court retains continuing jurisdiction to:

(a) enforce the monetary judgment and permanent injunction through contempt, sanctions, coercive relief, execution, and other authorized process;

(b) compel the initial accounting and supporting production;

(c) resolve disputes concerning completeness, scope, reconciliation, remediation, transfers, certifications, provider implementation, and compliance;

(d) compel supplemental declarations, schedules, records, certifications, and examinations under oath;

(e) supervise Rule 69 discovery and Rules 70 and 71 implementation;

(f) address later-identified repositories, recipients, providers, transfers, entities, accounts, and assets;

(g) determine supplemental unjust enrichment, profits, disgorgement, restitutionary relief, constructive trusts, tracing relief, any required adjustment to the punitive-damages component, fees, costs, interest, and other recoverable amounts;

(h) supervise continuing reports concerning later receipts and maturing rights arising from Covered Transactions;

(i) preserve and enforce the permanent injunction where later activity reveals additional use, disclosure, possession, commercialization, diversion, misattribution, or unauthorized corporate activity involving Covered Materials, Plaintiffs' technology, or Radian property;

(j) issue recipient-specific or provider-specific orders necessary to complete restoration and remediation; and

(k) enter such further legal, equitable, and implementing orders as are necessary to carry this Judgment into full effect and satisfy the monetary and equitable relief awarded herein.

Plaintiffs' rights to pursue authorized fraudulent-transfer, unjust-enrichment, alter-ego, successor-liability, tracing, avoidance, execution, turnover, garnishment, attachment, creditor's-bill, lien, and other post-judgment remedies are preserved.

## XVI. Finality and Further Relief

This Judgment resolves the claims adjudicated against Defendant Michael Chapiro. To the extent Federal Rule of Civil Procedure 54(b) is applicable, the Court determines that there is no just reason for delay and directs entry of final judgment as to the claims and relief adjudicated herein.

The supplemental accounting, fee, cost, interest, any required punitive-damages adjustment, disgorgement, constructive-trust, tracing, remediation, execution, and enforcement proceedings expressly retained by this Judgment constitute post-judgment implementation and supplemental-relief proceedings and do not impair the enforceability of the monetary and permanent equitable relief entered herein.

The Court grants such further legal or equitable relief as may be necessary to effectuate this Judgment consistently with the Complaint, the Supplemental Memorandum, the adjudicated claims, and applicable law.

The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.

Date: ____________________

________________________________________

CHARLES E. FLEMING

United States District Judge

## G. Notice Regarding Client Use of Artificial Intelligence in Preparation of This Damages Memorandum

Plaintiffs and their counsel are mindful of Judge Fleming's standing order concerning the use of AI in the preparation of pleadings submitted to the Court.

Plaintiffs respectfully disclose the use of artificial intelligence by Plaintiff Nathan Rapport in connection with the preparation of initial drafts and inserts for the Memorandum in Support of Default Judgment. Plaintiff Rapport employed AI tools, principally ChatGPT, to assist with legal research and drafting, identifying and analyzing authorities, identifying legal arguments, reviewing evidence, generating and debugging computer code, and identifying potential errors in mathematical calculations, financial models, and legal reasoning. These tools served to augment and improve our extensive independent research, independent analyses, drafting, and document preparation, rather than as a substitute for human judgment or professional review.

The Court's standing order expressly prohibits the use of artificial intelligence by an attorney representing a party or by a party proceeding *pro se* "in the preparation of any filing submitted to the Court." Plaintiffs respectfully submit that Plaintiff Rapport's independent use of AI as a represented litigant does not fall within the scope or the intent of the prohibition, which is intended to prevent blind reliance on AI as the ultimate source of a pleading.

Counsel of record, Michael W. Vary, did not personally employ AI in preparing or reviewing the filing, but independently reviewed all of the materials, provided substantive revisions, and exercised professional judgment over the memorandum submitted to the Court. Counsel's independent review, legal judgment, and responsibility under Federal Rule of Civil Procedure 11 remain distinct from Plaintiff's initial preparatory methods.

Plaintiffs and their counsel represent, pursuant to Rule 11, Fed. R. Civ. P., that all of the legal positions presented in their memorandum are well grounded in existing law, and that all of the factual contentions have evidentiary support.

This statement is provided in the interest of transparency and in recognition of the standing order's notification requirement.