**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Nathan Rapport and<br>Radian Industries Inc.,<br>*Plaintiffs,*<br><br>*v.*<br><br>Michael Chapiro,<br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:25-cv-02071-CEF<br><br>Judge Charles E. Fleming |

# EXHIBIT F5 TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

Michael W. Vary, Ohio Reg. 33,789
Counsel for Plaintiffs
17710 Westview Drive
Bainbridge, Ohio 44023
vary.michael@gmail.com
216-496-3429

# STATEMENT REGARDING VALUATION MODELS AND METHODOLOGY

I, Nathan Rapport, provide this statement to explain the valuation models accompanying the damages memorandum, the qualifications and specialized knowledge I bring to their preparation and interpretation, the principal methods and assumptions used, and the basis for the fifteen-percent discount rate applied throughout the models.

The models quantify economic consequences using transparent mathematical relationships applied to identified evidence. Their material assumptions, variables, equations, annual calculations, source data, and resulting values are disclosed in the accompanying appendices. Executable Python implementations of the models are also provided so that the calculations can be independently reproduced and modified.

## A. Qualifications, Specialized Knowledge, and Rule 702 Reliability

Rule 702 recognizes expertise arising from "knowledge, skill, experience, training, or education" and permits expert testimony when the proponent establishes that the testimony will assist the trier of fact, is based on sufficient facts or data, results from reliable principles and methods, and reflects a reliable application of those principles and methods to the facts. I offer the valuation opinions and analyses in the appendices accompanying the damages memorandum as expert evidence under Federal Rule of Evidence 702.[1]

I hold a Bachelor of Science degree with a double major in Physics and Applied Mathematics. My undergraduate education included substantial training in mathematics, physics, numerical analysis, mathematical modeling, and quantitative problem solving.

I have also worked professionally as a software engineer. My professional work has included development of quantitative software for the financial industry, and I have significant professional experience using Python. Python is the language used to implement the valuation models accompa-

[1] Fed. R. Evid. 702, *Federal Rules of Evidence*, https://www.uscourts.gov/sites/default/files/2025-02/federal-rules-of-evidence-dec-1-2024_0.pdf.

nying the damages memorandum. I am able to read, modify, validate, and explain the source code and the numerical calculations it performs.

I developed the underlying Vacuustat and Artifact technologies addressed by the models. My work has included theoretical analysis, mathematical modeling, engineering design, prototype development, experimental work, patent preparation, and investigation of potential commercial applications. I therefore have direct technical knowledge of the technologies whose commercialization is modeled.

I also participated directly in the commercial discussions reflected in the record, including discussions concerning licensing, royalty structures, manufacturing and product economics, potential applications, development timelines, financing, and commercialization. My education, professional software-engineering and Python experience, direct technical work on Artifact and Vacuustat, and participation in the relevant commercialization discussions provide specialized knowledge directly applicable to these models.

The models are grounded in identified record evidence and disclosed external data, supplemented where necessary by expressly identified modeling assumptions. Their principal methodology—discounted-cash-flow and net-present-value analysis—is a recognized income-based valuation method. Additional calculations use standard arithmetic, compounding, geometry, and engineering relationships appropriate to the particular model.

The methodology is applied transparently. Variables are defined, equations are disclosed, annual calculations are tabulated, assumptions are identified, sources are cited, and executable source code is supplied. The same mathematical rules are applied consistently to the but-for and delayed paths in the Vacuustat models.

The model inputs are explicitly parameterized, permitting alternative values to be substituted without changing the underlying methodology. The corresponding results can then be recalculated directly. This structure makes the assumptions, methods, arithmetic, and conclusions independently reproducible and evaluable.

## B. Nature and Structure of the Models

The principal models use an income-based discounted-cash-flow methodology. The Internal Revenue Service's intangible-property valuation guidance identifies the income approach as a recognized method for valuing intangible property and explains that it ordinarily computes net present value using discounted cash flow.[2]

The models follow a common structure. First, the relevant evidence establishes a contractual, transactional, or commercial economic relationship. Second, the model converts that relationship into annual cash flows using explicitly identified parameters. Third, those annual cash flows are discounted to a common valuation date. Where the damages theory concerns delay, the model calculates both the economic path that would have existed without the delay and the same commercialization path shifted by the modeled delay, and measures the difference.

The source hierarchy used in constructing the models is:

(a) contractual terms and contemporaneous written statements of the parties;

(b) contemporaneous technical and commercial documents;

(c) government, regulatory, public-company, and other external data used to establish market or economic inputs; and

(d) expressly identified modeling assumptions where the record does not supply an exact numerical value.

Substantial portions of the modeled economics derive directly from contemporaneous evidence. The Vacuustat models use the actual five-percent royalty established by the parties' written license. The Artifact model uses Defendant's own proposed five-percent revenue participation structure, his proposed supply terms, and his contemporaneous product-cost and selling-price estimates. Other model inputs similarly draw from contemporaneous engineering plans, written deployment concepts, government data, public-company financial information, and other sources identified in the individual appendices.

[2] Internal Revenue Service, Internal Revenue Manual § 4.48.5.2.4, *Intangible Property Valuation Guidelines*, https://www.irs.gov/irm/part4/irm_04-048-005.

Each assumption requiring judgment is stated expressly in the relevant model.

## C. Discounted-Cash-Flow and Present-Value Methodology

Future cash flows have lower present value because receipt is delayed and future receipt entails risk. The models account for both effects by discounting future cash flows to present value.

Let $r$ denote the annual discount rate, $t$ the number of years between the valuation date and receipt of a future cash flow, and $\mathrm{CF}_t$ the cash flow received in year $t$. Its present value is:

$$\mathrm{PV}_t = \frac{\mathrm{CF}_t}{(1+r)^t}.$$

The models use $r = 15\%$.

The use of discounted cash flow for intangible-property valuation is consistent with established valuation practice. IRS intangible-property guidance states that the income approach considers the income-generating capacity of the intangible, the expected duration of the economic benefit, and the risk associated with receiving the anticipated benefits. The guidance specifically identifies the discount rate as a means of reflecting opportunity cost of capital, inflation, liquidity, real interest, and risk premium.[3]

The same IRS guidance identifies risks relevant to intangible-property valuation including research-and-development risk, manufacturability risk, marketing and demand risk, competitive risk, government-regulation risk, legal risk, the need for additional development, the feasibility of commercial exploitation, and the present state of development.[4]

Those considerations are directly relevant to the technologies modeled here. The modeled cash flows concern technologies requiring further engineering, manufacturing scale-up, customer adoption, financing, and commercialization. The valuation models presented incorporate those risks and uncertainties by discounting future cash flows.

[3] Internal Revenue Service, Internal Revenue Manual § 4.48.5.2.4, *Intangible Property Valuation Guidelines*, https://www.irs.gov/irm/part4/irm_04-048-005.

[4] *Id.*

## D. Basis for the Fifteen-Percent Discount Rate

I selected a fifteen-percent annual discount rate to incorporate substantial risk into the present-value calculations. Published aerospace and defense valuations provide direct industry benchmarks for the magnitude of that rate.

| Aerospace / defense valuation | Method / asset | Discount rate |
|---|---|---|
| HEICO Corporation — Electronic Technologies Group[5] | Relief-from-royalty valuation of an intangible trade name | 15.0% |
| HEICO Corporation — intellectual property[6] | Relief-from-royalty valuation of intellectual property | 19.0% |
| Kratos Defense & Security Solutions / Digital Fusion[7] | Discounted-cash-flow valuation of a defense and security business | 15.0%–18.0% |
| LMI Aerospace — Engineering Services[8] | DCF valuation of aerospace engineering operations | 15.4% |

These sector-specific examples place the fifteen-percent rate at the low end of discount rates used in the cited aerospace and defense valuations. HEICO used exactly 15.0% in a relief-from-royalty valuation; Kratos's financial adviser used 15.0%–18.0% in a defense-business DCF; LMI Aerospace used 15.4% for aerospace engineering operations; and HEICO used 19.0% for intellectual property valued through a relief-from-royalty method.

A fifteen-percent rate therefore provides a substantial risk adjustment while remaining consistent with rates actually applied in aerospace, defense, and technology-intangible valuations.

[5] HEICO Corporation, Form 10-Q for the quarter ended July 31, 2024. HEICO valued a trade name within its Electronic Technologies Group using the relief-from-royalty method, an income approach applying an asset-specific discount rate to forecast asset-specific cash flows. The filing reports an exact discount rate of 15.0%. HEICO serves commercial aviation, defense, and space markets. https://www.sec.gov/Archives/edgar/data/46619/000004661924000059/hei-20240731.htm.

[6] HEICO Corporation, Form 10-K for the fiscal year ended October 31, 2015. HEICO valued intellectual property within its Electronic Technologies Group using the relief-from-royalty method and reported an exact discount rate of 19.0%. The same disclosure reports discount-rate ranges of 14.0%–18.0% for non-amortizing trade names and 15.0%–19.0% for customer relationships. https://www.sec.gov/Archives/edgar/data/46619/000004661915000078/hei1031201510k.htm.

[7] Kratos Defense & Security Solutions, Inc., Registration Statement on Form S-4 concerning its acquisition of Digital Fusion, Inc. Imperial Capital's discounted-cash-flow analysis of Digital Fusion used an exact disclosed range of discount rates from 15.0% to 18.0%; the range shown in the table reproduces the range reported in the filing. https://www.sec.gov/Archives/edgar/data/1069258/000104746908012513/a2189291zs-4.htm.

[8] LMI Aerospace, Inc., Form 10-K for the year ended December 31, 2016. LMI's discounted-cash-flow analysis of its Engineering Services reporting unit used an exact discount rate of 15.4%. LMI stated that the rate incorporated risk inherent in projected revenue growth and operating margins and that the increase from 12.2% reflected the unit's historical earnings volatility. The filing identifies the relevant market as the aerospace and defense industry. https://www.sec.gov/Archives/edgar/data/1059562/000105956217000007/form10k.htm.

## E. Practical Effect of the Fifteen-Percent Rate

The practical effect of a fifteen-percent discount rate is substantial. Let $D_t$ denote the discount factor applied to a dollar received $t$ years after the valuation date:

$$D_t = \frac{1}{(1+r)^t}.$$

At $r = 15\%$, the present value of one future dollar is:

| Years into future | Present Value of $1 | Reduction from $1 |
|---|---|---|
| 1 | $0.870 | 13.0% |
| 5 | $0.497 | 50.3% |
| 10 | $0.247 | 75.3% |
| 15 | $0.123 | 87.7% |
| 20 | $0.061 | 93.9% |
| 25 | $0.030 | 97.0% |

Thus, one dollar modeled five years in the future contributes less than fifty cents to present value. One dollar fifteen years in the future contributes approximately twelve cents. One dollar twenty-five years in the future contributes approximately three cents.

This effect is particularly significant in the Artifact model because the proposed revenue participation extends for twenty-five years. Large nominal cash flows occurring late in that period make comparatively small contributions to present value. The same principle materially reduces the value assigned to later Vacuustat royalty cash flows.

The fifteen-percent rate therefore materially reduces the value assigned to long-term modeled cash flows and incorporates substantial risk into the resulting present-value figures.

## F. Growth and Commercialization Assumptions

The growth rates used in the models are explicit parameters defining the modeled commercialization ramps.

A thirty-percent annual growth rate is used in several models to describe expansion from relatively small initial deployment quantities. Historical aerospace, defense, and space-company results provide useful context for the magnitude of that parameter:

| Company | Historical growth measure | Growth |
|---|---|---|
| Redwire Corporation[9] | Full-year 2024 revenue growth | 24.7% |
| AeroVironment, Inc.[10] | Fiscal 2024 revenue growth | 33.0% |
| Rocket Lab USA, Inc.[11] | Full-year 2024 revenue growth | 78.0% |
| Intuitive Machines, Inc.[12] | Full-year 2024 revenue growth | 186.6% |

These historical annual growth rates range from 24.7% to 186.6%. The thirty-percent model parameter lies near the low end of this set of observed aerospace, defense, and space growth rates and closely tracks AeroVironment's reported 33% full-year growth.

The equations and annual tables show the modeled deployment path directly. Additional record evidence supplies independent scale anchors within the individual models. The Vacuustat defense model incorporates Defendant's written pilot-factory and mature-deployment concepts; the telecommunications model begins from the approximately twelve-platform network scale described contemporaneously in Plaintiff's patent materials and later discussed by Defendant; and the Artifact model imposes finite annual unit ceilings on the relevant applications.

Because growth is represented as an explicit parameter, the annual quantities shown in the tables are the direct mathematical consequence of the stated growth rate, identified starting quantities, and application-specific scale anchors. The disclosed equations and source code make that calculation fully reproducible.

[9] Redwire Corporation, full-year 2024 results. Redwire reported that 2024 revenue increased exactly 24.7% year over year, to $304.1 million from $243.8 million. Redwire describes itself as a space-infrastructure company serving civil, commercial, and national-security programs. https://www.sec.gov/Archives/edgar/data/1819810/000181981025000050/exhibit991redwire12312024e.htm.

[10] AeroVironment, Inc., fiscal 2024 results. AeroVironment reported fiscal-year revenue of $716.7 million, up exactly 33% year over year. The same release reported 74% year-over-year revenue growth in its Loitering Munitions Systems segment for the fourth quarter. https://www.sec.gov/Archives/edgar/data/1368622/000155837024009505/avav-20240626xex99d1.htm.

[11] Rocket Lab USA, Inc., Form 10-K for the year ended December 31, 2024. Rocket Lab reported that annual revenue increased exactly 78% from 2023 to 2024, from $244.592 million to $436.214 million. Space Systems revenue increased 80% and Launch Services revenue increased 74% during the same year. https://www.sec.gov/Archives/edgar/data/1819994/000162828025008724/rklb-20241231.htm.

[12] Intuitive Machines, Inc., full-year 2024 results. The company reported $228.000 million of 2024 revenue and $79.551 million of 2023 revenue, and described 2024 revenue as "nearly three times" 2023 revenue. The 186.6% figure shown in the table is calculated directly from those reported amounts as ($228.000 million / $79.551 million) - 1, rounded to one decimal place. https://www.sec.gov/Archives/edgar/data/1844452/000184445225000016/lunr-20241231xexx991earnin.htm.

## G. Conclusion

The valuation models accompanying the SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT apply transparent mathematical and computational methods to evaluate evidence concerning the economic value and commercialization of Artifact and Vacuustat.

The models use discounted-cash-flow and net-present-value techniques to account expressly for the timing and risk of future economic benefits. The fifteen-percent discount rate materially reduces the value assigned to future cash flows, falls within the cited aerospace and defense valuation benchmarks, and causes distant modeled cash flows to contribute only a small fraction of their nominal value to present value.

The models disclose their material assumptions, source data, mathematical relationships, annual calculations, and executable Python implementations. Their results are reproducible, testable, and directly recalculable under alternative parameter values.

I provide this statement to explain the technical, mathematical, and computational basis of those models and the specialized knowledge I used in developing and evaluating them.

Nathan Rapport

Date: October 29, 2026